**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| United States of America,   ) | |
|        ) | |
|     Plaintiff   ) | |
|        ) | |
|    VS.      ) | CASE NO. 3:18-CR-097 |
|        ) | |
|        ) | |
| Ross Roggio,    ) | |
|        ) | |
|    Defendant  ) | |
|        ) | |
| _____ ) | |

**TRANSCRIPT OF PROCEEDINGS -**
**MOTION TO MODIFY CONDITIONS OF PRETRIAL RELEASE**
**BEFORE THE HONORABLE ROBERT D. MARIANI**
**TUESDAY, AUGUST 7, 2018**
**SCRANTON, PENNSYLVANIA**

**FOR THE PLAINTIFF:**

    Melinda C. Ghilardi, AFPD
    Federal Public Defender's Office
    201 Lackawanna Avenue
    Suite 317
    Scranton, PA  18503-1953

**FOR THE DEFENDANT:**

    Todd K. Hinkley, AUSA
    Jenny Roberts, AUSA
    William J. Nealon Federal Building
    Suite 311
    234 North Washington Avenue
    Scranton, PA 18501-2830

---

**DIANA GILBRIDE, RMR, FCRR**
**FEDERAL OFFICIAL COURT REPORTER**
**P.O. BOX G**
**SCRANTON, PA 18501-0090**

1      (11:09 a.m., convene.)

2      THE COURT:  Good morning everyone.

3      MS. GHILARDI:  Good morning, your Honor.

4      THE COURT:  This is the matter of the United States

5  of America versus Ross Roggio.  Before me is a motion for

6  hearing, which that aspect of the motion I've granted, that's

7  why we're all here today.  And the subject of the hearing is to

8  modify the conditions of pretrial release, as I understand it,

9  to allow Mr. Roggio to engage in international travel, is that

10  right Ms. Ghilardi?

11      MS. GHILARDI:  Yes, your Honor, it is.

12      THE COURT:  All right.  I'll hear the basis for your

13  motion, if you wish.

14      MS. GHILARDI:  Yes, your Honor.  Thank you very much

15  for the opportunity, I appreciate it.  As I indicated in my

16  motion, your Honor, my client has been released on pretrial

17  services since April 3rd of this year.  And on May 25 we filed

18  an unopposed motion to modify the conditions of release to

19  permit the electronic monitoring portion of his conditions to

20  be relaxed, and that was by agreement of the parties.  So,

21  since May 25 of this year Mr. Roggio has no longer been on

22  electronic monitoring.

23      He does still have a travel restriction, which

24  restricts his travel to the Middle District of Pennsylvania, so

25  he is not permitted to travel within the United States without

3

1  permission and international travel.  I believe that the

2  probation office is not in a position to authorize

3  international travel.  International travel would have to be

4  approved by your Honor.

5           Since my client was charged he has not worked.  And

6  he now has the opportunity, he has an employment opportunity,

7  your Honor, with Kingdom Special Operations Group.  And I have

8  a letter of engagement from the CEO of that company, Roger

9  Flores.  I've provided a copy of that letter to Mr. Hinkley and

10  Ms. Roberts this morning, and I am going to provide a copy to

11  your Honor as well, if I may.

12           THE COURT:  Certainly.

13           MS. GHILARDI:  This employment opportunity, your

14  Honor, would require my client to travel within the United

15  States, as well as internationally.  And in the interest of

16  full disclosure and proceeding perhaps as orderly as we

17  possibly can in this matter, I have chosen to come to the court

18  at the outset before my client accepts this employment

19  opportunity.

20           THE COURT:  A wise move.

21           MS. GHILARDI:  Excuse me?

22           THE COURT:  A wise move.

23           MS. GHILARDI:  Thank you, your Honor.  And so the

24  vast majority of Mr. Roggio's work would be done here in the

25  Middle District of Pennsylvania from his home.  But Kingdom

4

1  Special Operations Group is based in Las Vegas, Nevada, so he

2  would have to travel there on occasion.  And he would also have

3  to travel internationally.

4        Basically what my client will be doing for this

5  company, your Honor, is new business development.  The owner of

6  this -- the CEO of this company, Mr. Flores, is someone whom my

7  client has known for eight to ten years.  And although they

8  have never worked together before, they have worked -- done

9  parallel work.  So, they are very familiar with each other.

10        Mr. Flores comes highly decorated.  He is a retired

11  three-star general.  He is a former supervisor with the

12  Department of Homeland Security.  And he is a former employee

13  of the CIA.   The Kingdom Special Operations group, what Mr.

14  Roggio would be doing with them is new business development for

15  logistics, humanitarian relief and medical supplies.

16        Mr. Roggio has developed over the years a great skill

17  at negotiating and closing business deals.  And it is that

18  particular skill that Mr. Flores is seeking to add to his

19  company at this particular point in time.

20        Mr. Flores is well aware of Mr. Roggio's criminal

21  indictment.  In fact, in the subject matter of the letter that

22  I have just provided your Honor and the government, Mr. Flores

23  specifically cites the criminal case number.  And Mr. Flores

24  indicates in this letter that his company, Kingdom Special

25  Operations Group, provides services and sales to foreign

5

1  governments and private businesses worldwide.

2          Mr. Flores has indicated that he would put into place

3  several safeguards -- and they are listed at -- four items here

4  in this letter, your Honor -- safeguards to ensure that Mr.

5  Roggio returns and appears at all court appearances as

6  required.

7          The first provision that Mr. Flores has put into

8  place is that his company will provide transportation resources

9  reasonably necessary to ensure that Mr. Roggio reports for all

10 court dates scheduled and notified in a reasonable manner.  The

11 second is that Mr. Flores will withhold any compensation due

12 impending upon condition of Mr. Roggio's full compliance with

13 the assurances.  Due and pending in as much as Mr. Roggio will

14 be paid on a transactional basis at the conclusion of each

15 engaged -- each engagement assigned.

16         No. 3.  The company would arrange and require Mr.

17 Roggio as a condition of engagement with Kingdom Special

18 Operations to identify and report his location no less than

19 every 12 hours while performing work for Kingdom to any point

20 of contact so designated.  That would I think be the probation

21 office.

22         And Kingdom Special Operations has indicated that

23 they would limit Mr. Roggio's travel in and over only those

24 countries which maintain active extradition treatise with the

25 United States.  So, they are the conditions that Kingdom is --

1  is offering the Court in order to assure Mr. Roggio's

2  appearance in court as required.

3          Although Mr. Flores was not able to be here today,

4  your Honor, he is available by telephone should the Court have

5  any questions for Mr. Flores; I am able to contact him by

6  telephone.

7          As I indicated, Mr. Roggio's work would begin

8  immediately, and his primary work would be at home and in Las

9  Vegas.  He would attend meetings, financial negotiations and

10 contract.  He would be involved in contract negotiations.  Mr.

11 Roggio is willing to provide a travel itinerary in advance of

12 travel, and he is willing to come to the probation office to

13 pick up his passport from the United States probation officer

14 and then return his passport to the United States probation

15 officer when the job is done until the next time he is required

16 to travel internationally.

17         As far as risk of flight is concerned, your Honor,

18 because risk of flight and danger to the community, I

19 understand that they are the two areas that the Court is

20 required to consider under the Bail Reform Act.  Mr. Roggio has

21 elderly parents who are here in court with him this morning.

22 His mother is 76 years old and his father is 93 years old.  He

23 currently lives with both of his parents.

24         In fact, he relocated years ago from North Carolina

25 where he had been living for a number of years to the Middle

1  District of Pennsylvania to the Stroudsburg area so that he can

2  be with his parents in their later years.  If he were to flee,

3  he would never see them again.  And that would be a real

4  problem for him.

5         Mr. Roggio also has two daughters, your Honor.  They

6  live in Hickory, North Carolina.  They are ages 12 and ten.

7  And if he were to flee, he would never -- he would never see

8  them again either.  I do not believe that Mr. Roggio's parents,

9  nor his daughters, have passports.

10        So, as far as risk of flight is concerned, Mr. Roggio

11  has a great deal to lose, your Honor, if he would -- if he

12  would flee.

13        His primary objective at this point is to get back to

14  work.  It has been a number of months since he was arrested,

15  and he has not been able to work.  And that is a -- that is a

16  hardship, your Honor.  I think it's a hardship for anybody who

17  is not able to work.  And the skills and the experience that he

18  has are in this field of contract negotiations and closing

19  business deals.  So, it's very difficult to secure that type of

20  work in the Middle District of Pennsylvania.  Certainly he can

21  work from his home office the vast majority of the time.  But

22  there is some travel within the Continental United States, as

23  well as outside the Continental United States.

24        Before I close my argument, your Honor, I would just

25  like to ask my client if he has anything else that I should

8

1  add, if I may?

2          THE COURT:  Please.

3          (Whereupon, Ms. Ghilardi conferred with her client.)

4          MS. GHILARDI:  Thank you, your Honor.  Does your

5  Honor have any questions for me at this juncture?

6          THE COURT:  I do, I do.  Do you know to what

7  countries Mr. Roggio would travel?

8          MS. GHILARDI:  I believe at this point, your Honor,

9  at this point your Honor we're talking about Turkey and the

10 European Union.  Possibly India.

11         THE COURT:  All right.  And do you know why this

12 particular organization, Kingdom Special Operations, has seen

13 fit to indicate at the bottom of each page of this two-page

14 purported agreement or proposed agreement, why they've seen fit

15 to include this statement:  All military equipment in part or

16 in whole are strictly regulated by the United States Department

17 of State in accordance with the guidelines in the International

18 Traffic in Arms, parentheses, ITAR, close paren, per Title 22,

19 Code of Federal Regulations, parts 120-130.  Therefore, if you

20 are outside of the United States, including Canada, an expert

21 license must be obtained.  All sales and shipping are subject

22 to license approval by U.S. Department of State, end quote.

23         Do you know why that statement is included at the

24 bottom of each of these pages?

25         MS. GHILARDI:  So, this is their standard letterhead,

9

1  your Honor.  And I believe that it is included because that may

2  be a -- military equipment may be a subset of their business.

3  That is not the subset of the business that Mr. Roggio will be

4  involved in, but this is their general letterhead that they use

5  for all operations.  So, therefore, they feel the need to have

6  that information at the bottom of their letterhead.

7           THE COURT:  I can, and I do draw the inference from

8  that paragraph that this particular company, Kingdom Special

9  Operations, is in -- at least in part in the sale of arms

10  business.  Now, if you think I'm incorrect I'd like to have you

11  tell me so.

12           MS. GHILARDI:  No, I believe that is correct.  I

13  believe that is a subset of their business, your Honor.  But as

14  I indicated --

15           THE COURT:  I don't see -- I don't see in this

16  particular offer of employment or recapitulation of what the

17  offer of employment is to Mr. Roggio, I don't see an actual

18  statement of what his duties would be.  Do I?

19           MS. GHILARDI:  No, your Honor.  But he will be doing

20  new business development.

21           THE COURT:  I guess the question is what kind of

22  business is that?  I don't have any assurances -- I don't have

23  any assurances that he won't be using his considerable although

24  at least allegedly unlawful experience to return to the arms

25  industry or the arms sale industry which is the subject of the

10

1   indictment obviously.

2        MS. GHILARDI:  I understand the Court's concern, your

3   Honor.  My understanding is that he will be involved in

4   logistics, humanitarian relief and medical supplies.  However,

5   I'm sure if the Court would like, I could get clarification on

6   all of that from Mr. Flores.  And ask Mr. Flores to provide a

7   supplemental conditions of engagement letter.

8        THE COURT:  Let's hear from the United States.

9        MR. HINKLEY:  Thank you, your Honor.  I believe the

10  government shares the concern of the Court.  And as a primary

11  matter, we wonder about a business that is in seemingly the

12  arms export business, who would be willing to hire someone

13  under indictment for violation of those statutes.  It seems to

14  me not a very smart thing to do.  And so that makes me wonder

15  about this company and what's going on with this.

16       We would suggest to the Court that maybe a defendant

17  needs to have a more modest expectation of employment.  There

18  are plenty of good jobs within the Middle District of

19  Pennsylvania.

20       In regards to our issue here, our issue is the

21  question of whether he is a danger of risk of flight, and we

22  would suggest that he is.  Among the various crimes for which

23  he is charged, there are a number of wire fraud charges.  And

24  it is shown in the indictment that several million dollars were

25  wired to accounts controlled by Mr. Roggio.

1          I will state that the investigation has looked into
2    the finances, and we are not able to identify where all of that
3    money went.  So, we are concerned that there are assets out
4    there that we don't know about.  We are concerned that he will
5    basically be unsupervised traveling internationally to
6    apparently Turkey, among other places.

7          And though his itinerary may not include areas or
8    countries which we would be able to extradite, certainly if he
9    has assets he can get there once he is out of the United
10   States.

11         Now, beyond that, Mr. Roggio has a concerning
12   history, including an incident where he claims to have been
13   kidnapped in Iraq and sought the assistance of the United
14   States Government to extract him from that country.  He claimed
15   that he had his passport stolen and the United States issued --
16   the Department of State I believe issued an emergency passport
17   to get him out of the country.

18         When Mr. Roggio arrived in the United States on
19   February 26 of 2017 he was questioned by the United States
20   Customs and Border Protection.

21         And I want to read excerpts from that interview that
22   they performed with him on that day.

23         It is noted that the interview occurred at the John
24   F. Kennedy International Airport, where Mr. Roggio had debarked
25   from a Turkish Airlines flight from Arbil, Iraq via Istanbul,

1  Turkey.  Mr. Roggio was referred to secondary, where he was
2  interviewed by an agent.  He was issued a temporary United
3  States passport and also possessed a Pennsylvania driver's
4  license.  He stated -- Mr. Roggio stated he was traveling with
5  his girlfriend and stated that he had been together for nine
6  months, that she worked for the subject as a personal
7  assistant.  He stated that he was traveling from Iraq, where he
8  had worked for the past three months, and stated he resided in
9  Sulaymaniyah, Iraq.  And traveled back and forth with -- his
10 last outbound trip to Iraq was the end of November of 2016.

11         Mr. Roggio indicated that he owned Roggio Consulting
12 Company, which was a construction company.  And that his
13 company was overseeing the construction of three high-rise
14 residential buildings in Sulaymaniyah, Iraq, in collaboration
15 with Zarya Construction Company.

16         He stated he was working as a consultant for the
17 project and advised on building construction from the
18 foundation to the metal structure development and everything in
19 between.  He stated that he had around 40 employees from all
20 over the world working for him.  And stated Zarya paid him nine
21 million dollars for the project.

22         Mr. Roggio stated that after Thanksgiving of 2016 he
23 returned to Iraq to continue his project.  And he was planning
24 on traveling back to the United States right before Christmas
25 of 2016.

1    He said he purchased his ticket and proceeded to

2  Sulaymaniyah Airport in December, and that while at the airport

3  he was approached by a security guard who ordered him to go

4  with him.  Mr. Roggio stated while walking with the security

5  guard he was approached by another man who threw a scarf over

6  his head and told him he was going to be kidnapped.

7    The subject stated he was taken to an unknown

8  location and was held there until February 24 of 2017, stating

9  that the kidnappers took his passport.  He stated he was scared

10  and he thought he was going to die.  He requested the reason

11  why he was treated like that.  And he stated that he was

12  informed that Kadir Hayman representing Zarya Company was

13  holding him against his will because Kadir considered -- excuse

14  me -- Zarya overpaid for the construction project and they

15  wanted their money back.

16    Mr. Roggio stated that Zarya claimed they had paid

17  him 12 million dollars instead of nine, so they requested back

18  the money.  Mr. Roggio stated he was forced to transfer money

19  from his account into the kidnappers' account little by little.

20  He transferred back up to $200,000 into the kidnappers account.

21    Mr. Roggio stated he was able to escape by jumping

22  through a window at two o'clock in the morning.  And he was

23  helped by his friend Hiwy.  No contact information was provided

24  by Mr. Roggio, who Mr. Roggio paid $250 to drive him to the

25  American Embassy.

1      Mr. Roggio stated no one knew of his kidnapping, and

2   that he had a protocol of his ex-wife Kristy Roggio who resides

3   in the United States, that he was supposed to call her every

4   day.  Mr. Roggio indicated he instructed Kristy if she doesn't

5   hear from him in more than three days she was to alert

6   authorities about him possibly being kidnapped or missing.

7      He stated his ex-girlfriend alerted the authorities

8   about his absence.  It goes on a few more sentences.  However,

9   that was the meat of what the interview was.  Mr. Roggio

10  indicating that he was apparently kidnapped in Iraq and escaped

11  through a window before issued an emergency passport by the

12  government.

13     I would suggest to the Court that it would be a

14  really bad idea to give Mr. Roggio the ability to travel

15  internationally when he has assets that the government is

16  unaware of, where he went, when he has several million dollars

17  transferred by an Iraqi company to him, who for all we know

18  could have additional assets they could transport, transfer to

19  him after court today, a gentleman who indicates he had been

20  kidnapped in Iraq and escaped to government authorities under

21  very peculiar circumstances.  A gentleman who is facing a very

22  long time if convicted of crimes for which he's been indicted.

23  For all these reasons we just do not feel that the Court should

24  modify the conditions.

25     And again, he may have special talents.  He can do

1  that here.  He does not have to travel internationally to do

2  that, nor for this company which apparently deals in this very

3  type of statutes for which he is indicted.

4           THE COURT:  Mr. Roggio is the subject of a 37-count

5  indictment.  And I'm undoubtedly catching you cold in asking

6  you this question, but do you have any estimate of the amount

7  of prison time Mr. Roggio is facing?

8           MR. HINKLEY:  (No response.)

9           THE COURT:  And we all understand it's significant,

10 but --

11          MR. HINKLEY:  I had in fact added that up at one

12 point I think for the defense initial appearance.  As I recall,

13 it was a couple of life times at least if convicted of all the

14 crimes for which he is charged.

15          THE COURT:  Thank you.

16          I've looked at the indictment Mr. Roggio to

17 understand what you're charged with.  I've read it carefully.

18 As I indicated, there are 37 counts.  You are charged with

19 violating the Arms Export Control Act and other statutes, which

20 I will not labor the record with, and you're charged with

21 conspiracy to commit an offense against the United States,

22 essentially being someone who, together with others, trafficked

23 in arms and engaged in arms sales without ever possessing a

24 license or any approval from the DDT, which for the record is

25 the Directorate of Defense Trade Controls, without ever getting

16

1  their approval to export defense articles or defense services,

2  as you are accused of doing, as you are accused of doing

3  specifically to Iraq and Iraq foreign nationals.

4          The indictment is lengthy.  Repeatedly you are

5  charged with exporting what can accurately be called weapons of

6  war.  There's no question that -- and for both gas rings and

7  firing pin retainers are integral aspects of weaponry.  And the

8  indictment, again, is replete with accusations that you have

9  engaged in the sale of these and other articles in violation of

10  the United States Federal Law that I've just made reference to.

11  And there are specifics, many specifics.

12          Under paragraph 23, in support of the overt acts you

13  are alleged to have taken in furtherance of this conspiracy,

14  there are several -- for example, on or about November 14, 2015

15  Ross Roggio e-mailed a weapons and ammunition feasibility

16  report with respect to a firearms manufacturing project in the

17  Kurdistan region of Iraq.

18          On or about March 9, 2016, Ross Roggio, d/b/a Roggio

19  Consulting Company, prepared a budget increase spreadsheet

20  affixing cost to various aspects of a firearms manufacturing

21  project in the Kurdistan region of Iraq.

22          On or about March 28, 2016, Ross Roggio purchased

23  15,000 M4 Bolt Gas Rings and 3200 Firing Pin Retainers from OML

24  Global, which was located in Fayetteville, North Carolina.

25          On or about April 6, 2016, Ross Roggio e-mailed an

1  individual at a company that provided metal injection molding,

2  metal powder production and metal powder metallurgy, and wrote,

3  quote, Let's move on this, exclamation point end quote, in

4  response to inquiries from the individual regarding that

5  company fabricating molds to produce gun parts by metal

6  injection molding.

7  On or about September 26, 2016, Ross Roggio e-mailed

8  test videos of firearms manufactured by Ross Roggio in the

9  Kurdistan region of Iraq to an Iraqi National for whom Ross

10 Roggio was providing defense services and manufacturing

11 firearms incorporating U.S. origin defense articles.

12 On or about February 8, 2015, $1,329,608.65 was

13 deposited into PNC Bank, account number with the last four

14 digits being 6274 held by Roggio Consulting Company, LLC, via

15 international wire from the Kurdistan International Bank

16 located in Arbil, Iraq.

17 Again, Count 2 is an Arms Control Act violation.

18 These are lengthy.  I will not read them all.

19 Count 3 is a violation of the International Emergency

20 Powers Act.  Count 4 is an Arms Control Act Violation.  Count 5

21 is a smuggling goods from the United States count.  Count 6 is

22 also a smuggling goods from the United States offense.

23 Counts 7 through 9 are wire fraud.  And the details

24 of the wire fraud are listed in rather significant detail.

25 Count 10 through 28 are money laundering counts.  The amounts

1  that are alleged to have been so laundered are -- they range

2  from a low of 24,000 to a high of $1,329,000 and various

3  amounts in between.  And there are 28 various amounts alleged

4  to have been money-laundered by you or your company.  Counts 29

5  through 37 likewise are money-laundering counts with

6  significant amounts involved again in the various specific

7  dollar amounts that are set forth in the indictment in this

8  section.

9          So, the question before me, Mr. Roggio, is why would

10  I let someone who is charged with 37 counts of arms export

11  violations and money laundering violations that specifically

12  relate to weaponry going, according to the terms of the

13  indictment, to an extremely volatile area of the globe, why

14  would I let someone who is charged with 37 counts of this kind

15  of misconduct leave the United States to engage in at this

16  point some vague description of activity for a company which

17  itself is in the military equipment sales business?  Why would

18  I do that?  I'm going to answer my own question.  I wouldn't; I

19  wouldn't.  Yes, there's a risk of flight here.  Mr. Hinkley's

20  estimate rings true.

21          If you were convicted of each of these counts the

22  term of imprisonment would be exceedingly lengthy.  I have no

23  doubt that you love your parents and love your children, but I

24  don't know the kind of man you are.  I know nothing about you,

25  other than you are charged with a variety of very significant

1  offenses carrying serious penalties in each case.

2          And in your mind, whether you'd be willing to give up

3  your contact with your parents and contact with your children

4  to avoid spending the rest of your life in prison, assuming,

5  assuming of course, it's only an assumption, that you were

6  convicted, is something that I can't discern, but it's

7  certainly a possibility.

8          But in addition to that, there's the issue of whether

9  I have an obligation to make sure that you don't engage in arms

10 trafficking again through this company which ostensibly has

11 some benevolent activities it undertakes, but which clearly by

12 its own letterhead is engaged in the sale of military

13 equipment.

14         So, I will be perfectly straight out with you.  I

15 cannot see a set of circumstances where I would allow you to

16 leave the country to engage in employment of this company.  In

17 fact, I'm not sure there are a set of circumstances that I

18 could envision that would allow me to let you leave the country

19 for any reason.

20         But right now, what I'm faced with and what I'm

21 ruling on, only what I'm ruling on, is your request to be

22 allowed to go to work for a company that's in the military

23 equipment business outside of the United States, and I can't do

24 that and I won't do that.  Is there anything else?

25         MR. HINKLEY:  No, your Honor.  Thank you.

20

1        THE COURT:  Anything else?

2        MS. GHILARDI:  No, your Honor.

3             (11:45 a.m., court adjourned.)

21

1          REPORTER'S CERTIFICATE

2

3          I, DIANA L. GILBRIDE, Official Court Reporter for the

4   United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of Title 28,

6   United States Code, Section 753, do hereby certify that the

7   foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has been

11  prepared by me or under my supervision.

12

13

14                         /s/ Diana L. Gilbride
                           Diana L. Gilbride, RMR, FCRR
15                         Official Court Reporter

16  REPORTED BY:

17       DIANA L. GILBRIDE, RPR
         Official Court Reporter
18       United States District Court
         Middle District of Pennsylvania
19       P.O. Box G
         Scranton, PA  18501-0090
20

21          (The foregoing certificate of this transcript does not
    apply to any reproduction of the same by any means unless under
22  the direct control and/or supervision of the certifying
    reporter.)

23

24

25