AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Middle District of Pennsylvania

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
 ) Case No. 3:17mc197
devices and forensic images of devices detained from )
Ross William Roggio and Christina Sidiropoulou during a )
border search at JFK on 2/27/17 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ Pennsylvania _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Crimes as listed in paragraph 126 of the Affidavit | |

The application is based on these facts:

See Affidavit of Probable Cause attached

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Christopher M. Hertzog, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 03/21/2017 _____

*Judge's signature*

City and state: Scranton, PA

KAROLINE MEHALCHICK, US Magistrate Judge
*Printed name and title*

G003197

## AFFIDAVIT IN SUPPORT OF

## A SEARCH AND SEIZURE WARRANT

I, **Special Agent Christopher M. Hertzog**, being first duly sworn, hereby depose and state as follows:

## I. INTRODUCTION

1.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been since January 2007.   Prior to that, I was a contractor employed by Forfeiture Support Associates, assigned to the Drug Enforcement Administration to assist in Asset Forfeiture matters. I am a graduate of the Criminal Investigator Training Program taught at the Federal Law Enforcement Training Center in Glynco, Georgia.  As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States.  In the course of my experience as an HSI agent, I have been involved in the investigation of money laundering, export control violations, and other crimes.  In addition, I have received significant training in the investigation of export control violations, including but not limited to the Arms Export Control Act, the International Traffic in Arms Regulations, the Export Administration Regulations, and the International Emergency Economic Powers Act.

2.      I am familiar with the facts and circumstances of the investigation described below from my own personal participation in this investigation, my review of documents relating to this investigation, my training and experience, and discussions I have had with other law enforcement personnel.  Because this affidavit is being submitted for the limited purpose of establishing

G003198

probable cause, it does not include all of the facts that I have learned during the course of this investigation. Where the contents of documents and the actions, statements and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.      The Department of Commerce ("DOC"), the Federal Bureau of Investigation ("FBI") and Homeland Security Investigations ("HSI") are investigating the unlawful export of Rifling Combo Buttons and other controlled items from the United States to Iraq without securing the necessary export license.

## II. ITEMS TO BE SEIZED

4.      On February 26, 2017, HSI agents at John F. Kennedy International Airport ("JFK") detained various electronic devices from Ross ROGGIO and Christina SIDIROPOULOU upon their return to the United States as part of a border search[1]. Although the government has authority, under the border search doctrine, to seize and conduct a full and comprehensive search of the various electronic devices seized from ROGGIO and SIDIROPOULOU in order to clear the devices for entry into the United States, the instant search warrant is being sought to permit HSI agents to continue to seize and search images of the devices.   Specifically, this affidavit seeks a court order authorizing the continuing search and seizure of the following items, all of which are further described in Attachment A:  Item #001 – 1 Apple MacBook Pro laptop computer; Item #002 – 1 Apple iPad Tablet Computer bearing serial # F9FQX38SGHK9; Item #003 – 1 Apple

---

[1] Searches of persons and their effects at the border constitute a long-recognized exception to the Fourth Amendment's warrant requirement. *United States v. Ramsey*, 431 U.S. 606, 616– 19 (1977).  The border search authority granted to customs officers is broad and is codified in numerous statutes and regulations.  Congress has defined customs officers to include "any officer of the United States Customs Service of the Treasury Department . . . or . . . of the Coast Guard, or any agent or other person, including foreign law enforcement officers, authorized by law or designated by the Secretary of the Treasury to perform any duties of an officer of the Customs Service." 19 U.S.C. § 1401(i).  Accordingly, customs officers working for CBP and HSI have border search authority.

iPhone 6 bearing serial # F19QJ1K1GRY8; Item #004 – 1 Apple iPhone 6 bearing serial # F73PMQ49G5MG; Item #005 – 1 Scandisk Removable Flash Drive; Item #006 – 1 Apple iPhone 6S bearing serial # DNQQH0A5GRY5; Item #007 - 1 Apple iPhone 7 bearing serial # FK1PF8RQG5QJ; and forensic images of Items #001 through #007.

### III. APPLICABLE EXPORT LAW AND REGULATIONS

5.      To further the national security and foreign policy interests of our nation, Congress and the President, throughout our history, have controlled and regulated the export of arms and the trade of goods and services with designated foreign nations or foreign nationals. *See generally United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 322–24 (1936) (summarizing the extensive use throughout the nation's history of embargoes and export controls). Several federal statutes impose limitations and licensing requirements upon the export or transfer of goods, technology, and services from the United States and within the United States to a foreign national.

6.      Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a).   Pursuant to that authority, the President may declare a national emergency through Executive Orders that have the full force and effect of law.  Among other things, IEEPA empowers the President to issue regulations governing exports from the United States.

7.      Also pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001.  66 Fed. Reg. 44,025 (Aug. 22, 2001).  While in effect, the EAA regulated the export of

goods, technology, and software from the United States.  Pursuant to the provisions of the EAA, the Department of Commerce's Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA.  *See* 15 C.F.R. § 730.02.  In Executive Order 13,222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA.  Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13,222 from the time period covered by that Executive Order through the present.  *See, e.g.*, 81 Fed. Reg. 52,587 (Aug. 8, 2016).

8.      Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute.  50 U.S.C. § 1705(a).  Willful violations of the EAR constitute criminal offenses under IEEPA, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine.  50 U.S.C. § 1705(c).

9.      Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain U.S. items.  15 C.F.R. §§ 734.2-.3.  In particular, BIS has placed restrictions on the export and reexport of items that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.  A BIS license may be required not only to export items from the United States, but also to lawfully reexport such items from one country to a new country.  *See* 15 C.F.R. § 734.2(b)(4).

10.     The most sensitive items subject to EAR controls are identified on the Commerce Control List, or "CCL," set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1.   Items listed on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export control requirements depending on destination, end use, and end user. Items categorized under ECCNs require a license for export based on a specific "reason for control," such as Anti-Terrorism ("AT").

11.

12.     Another statute, the Arms Export Control Act (the "AECA"), authorizes the President to control the export of defense articles and defense services from the United States.  In "furtherance of world peace and the security and foreign policy of the United States" the AECA authorizes the President to undertake, among other things, the following key functions in controlling the import and the export of defense articles and defense services: (1) to designate the items constituting defense articles and defense services, (2) to require licenses for the export of such articles and services, and (3) to promulgate regulations for the import and export of such articles and services. 22 U.S.C. § 2778(a).  The President's statutory authority has been delegated to the Secretary of State.  Exec. Order No. 13,637.

13.     The regulations promulgated pursuant to the Act are the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Sections 120 through 130. The United States Department of State, Directorate of Defense Trade Controls (the "DDTC") administers the ITAR and regulates the export of defense articles.  Unless an exemption applies, the AECA and the ITAR provide that no defense articles or defense services may be exported without a license from the DDTC.  22 U.S.C. § 2778(b)(2); 22 C.F.R. § 123.1.  Furthermore, pursuant to the AECA, it is unlawful for individuals to engage in the business of brokering foreign

or domestic defense articles with respect to their export or transfer from the United States without a license or other written approval from the DDTC. Brokering includes financing, transporting, freight forwarding, or taking any other action that facilitates the manufacture, export, or import of a defense article or defense service.

14.   The ITAR defines a defense article to be any item on the United States Munitions List ("USML"), which is contained in the regulations. 22 C.F.R. §§ 120.2, 121.1. The USML sets forth twenty-one categories of defense articles that are subject to export licensing controls by the DDTC, ranging from firearms parts to military equipment to missiles. 22 C.F.R. § 121.1.

15.   Decisions on issuing export licenses must take into account, among other considerations, "whether the export of an article would contribute to an arms race, aid in the development of weapons of mass destruction, support international terrorism, increase the possibility of outbreak or escalation of conflict, or prejudice the development of bilateral or multilateral arms control or nonproliferation agreements or other arrangements." 22 U.S.C. § 2778(a)(2). Pursuant to the ITAR, exporting, or attempting to export, a defense article from the United States without a license or written approval from the DDTC is unlawful. 22 C.F.R. § 127.1(a)(1).

16.   Specifically, Section 127.1(a)(1) of the ITAR states, in pertinent part, that it is unlawful to "export or attempt to export from the United States, or re-export or retransfer or attempt to re-export or retransfer from one foreign destination by a United States person of any defense article or by anyone of any United States origin defense article for which a license or written approval is required by this subchapter without first obtaining the required license." Section 127.1(a)(3) sets forth that it is illegal for anyone to "conspire to export, import, or cause to be exported, imported or re-exported, any defense article for which a license or written approval

is required without first obtaining the required license." In addition, Section 127.1(d) of the ITAR specifies that no person may willfully cause, or aid, or abet, counsel, demand, induce, procure, or permit the commission of any act prohibited by Title 22, United States Code, Section 2778, or any regulation, license, approval, or order issued thereunder. The AECA establishes criminal penalties for any willful violation of the AECA or the ITAR. 22 U.S.C. § 2778(c).

## IV. THE INVESTIGATION AND PROBABLE CAUSE

### A. BACKGROUND

17.     On March 30, 2016, an individual from Drill Masters Eldorado Tool Inc., located in Connecticut, contacted the FBI Public Access Line to report a suspicious shipment of gun parts to Iraq. The individual stated that a person from the Package Place, located in Pennsylvania, contacted Drill Masters Eldorado Tool Inc. regarding a shipment of gun parts ordered and shipped to ROSS ROGGIO, 116 Turkey Hill Road, Stroudsburg, PA, email address Roggio@yahoo.com, by Drill Masters Eldorado Tool Inc. These gun parts were going to be reshipped to Iraq. According to the individual from Drill Masters Eldorado Tool Inc., the Package Place employee said that ROGGIO'S wife had visited Package Place, bringing with her Drill Masters Eldorado Tool Inc. gun parts and requesting that they be shipped to Iraq by Package Place.

18.     In April 2016, the DOC was contacted by the FBI and was notified that an investigation was ongoing into the activities of ROGGIO and others for the potential export of controlled items, including rifling combo buttons, from the United States to Iraq without the requisite BIS export license.

19.     On April 29, 2016, in Stroudsburg, Pennsylvania, ROGGIO was telephonically interviewed by an FBI Special Agent ("SA") regarding the export of gun products from the United States to Iraq. ROGGIO was asked by the SA if he had shipped any gun parts or gun tools to Iraq.

G003204

ROGGIO responded: "No." ROGGIO went on to say that he may have shipped cleaning kits for an AR-15 approximately six weeks prior.

20. ROGGIO was asked if he had ordered gun reamers or drills from a company named Drill Masters Eldorado Tool Inc. located in Connecticut. ROGGIO responded that he may have, and, if he did, the items would have been shipped to his house or his parents' house in Stroudsburg, Pennsylvania. ROGGIO stated that he was unsure where the reamers and/or rifling buttons were because he had a safe or lock box at both his and his parents' house in Stroudsburg, Pennsylvania.

21. On May 2, 2016, Debbie CORNWAL, Finance Manager at Drill Masters Eldorado Tools Inc., was telephonically contacted by an FBI SA regarding ROGGIO's December 3, 2015 order consisting of, among other items, fifteen rifling combo buttons. CORNWAL stated that rifling combo buttons require an export license and that she has never shipped any items from Drill Masters Eldorado Tools Inc. to Iraq.

22. CORNWAL also stated that, on February 25, 2016, ROGGIO's order was sent by Drill Masters Eldorado Tool Inc. to ROGGIO at 116 Turkey Hill Road, Stroudsburg, Pennsylvania. According to the information provided by CORNWAL, ROGGIO was charged $3,486.00 for the fifteen rifling combo buttons. CORNWAL also recalled being contacted by a Frank Last Name Unknown (Frank LNU) from the Package Place in Pennsylvania concerning the items that were sent to ROGGIO. Frank LNU asked CORNWAL for a description of the items in the boxes that ROGGIO had purchased from Drill Masters Eldorado Tool Inc. in order to complete a Shipper's Export Declaration ("SED"). Based upon my training and experience, an SED is filed with the United States government before items are exported to a destination located outside of the United States. Information included in SEDs is used by law enforcement officials to detect and disrupt illegal smuggling activities.

23.     On May 3, 2016, Frank MONTEFORTE was interviewed by FBI SAs at his place of employment, Package Place, 730 Milford Road, Suite 14, East Stroudsburg, Pennsylvania, regarding items shipped to ROGGIO in Iraq. MONTEFORTE recalled that an individual named Kristy ROGGIO came to Package Place to have packages sent to her husband in Iraq. MONTEFORTE recalled that the shipment consisted of tools possibly used for gun making. MONTEFORTE stated that he telephoned Drill Masters Eldorado Tool Inc. in Connecticut and asked for a description of the items being exported so that the export documentation could be prepared.

24.     MONTEFORTE stated that ROGGIO's packages were shipped to Iraq via DHL (DHL AirWaybill #5622077020), and that the items were described as reamers and drill bits. MONTEFORTE stated that, shortly thereafter, he was visited again by Kristy ROGGIO, who came to Package Place to pick up some Zippo lighters which were supposed to have been exported on March 30, 2016 with the other tools (due to regulations, DHL would not ship the Zippo lighters). During this visit, Kristy ROGGIO told MONTEFORTE that her husband (Ross ROGGIO) received the remaining items included in the March 30, 2016, DHL shipment.

25.     MONTEFORTE provided the SAs with documentation pertaining to the items shipped under DHL AirWaybill #5622077020 to ROGGIO in Iraq. One such document is a "The Packaging Place" form dated March 29, 2016, completed by Kristy ROGGIO indicating that she shipped personal items, tools, and boxes valued at $2,628.21 to ROGGIO in Iraq. On this form, Kristy ROGGIO provided an email address: rwroggio@yahoo.com.

26.     During this interview, the FBI SA showed MONTEFORTE a photograph of two cylindrical items, which, based upon interviews with Drill Masters Eldorado Tool Inc., is how rifling combo buttons are packaged and shipped from Drill Masters Eldorado Tool Inc.

MONTEFORTE looked at the photograph and said, "Yes, that looks like them, they were in plastic tubes and they were about 36 inches long."

27.     Based upon my training and experience, I know that individuals wanting to export commodities out of the United States without the required export license from BIS commonly will not provide a true commodity description, and will also undervalue a commodity on the export documentation in order to avoid detection by law enforcement officials.

28.     On or about May 16, 2016, an FBI SA received an email from Thomas HALL, President of Drill Masters Eldorado Tool Inc., pertaining to the ROGGIO order for rifling combo buttons.   In this email, HALL provided copies of the paperwork associated with this order, including a sales order dated December 3, 2015, an invoice dated February 25, 2016, and a packing list dated February 25, 2016, addressed to ROGGIO, 116 Turkey Hill Road, Stroudsburg, PA 18360 for, among other items, fifteen rifling combo buttons for which ROGGIO was charged $3,486.00.  On May 25, 2016 a BIS SA submitted a license determination request to BIS for the Drill Masters Eldorado Tool Inc. rifling combo buttons that ROGGIO had purchased and was believed to have exported to Iraq without the required export license.

29.     On May 26, 2016, BIS issued a License Determination stating that the rifling combo buttons purchased by ROGGIO from Drill Masters Eldorado Tools Inc., and believed to have been exported to Iraq on or about March 30, 2016, required an export license from BIS in order to be lawfully exported from the United States to Iraq from January 1, 2016 to May 19, 2016. Specifically, these rifling combo buttons fall under ECCN 2B018.e and are controlled for export to Iraq for the following reasons: National Security, Regional Stability, and United Nations Embargo concerns.

G003207

30.     On September 6, 2016, a BIS export license history check was performed and revealed no records of applications submitted by or on behalf of, and no BIS export licenses issued to or ever possessed by: Ross ROGGIO; Kristy ROGGIO; Ross BROGAN; ROGGIO ARSENAL; and ROGGIO CONSULTING; 116 Turkey Hill, PA or 143 Indian Spring, PA.

## B.   EXECUTION OF E-MAIL SEARCH WARRANTS

31.     On November 17, 2016, BIS SA Dunberg executed a court-authorized search warrant on e-mail service provider Yahoo! Inc. for the contents of two email accounts utilized by Ross ROGGIO, specifically, ROGGIO@YAHOO.COM and RWROGGIO@YAHOO.COM.

32.     On January 9, 2017, SA Dunberg received an electronic response from Yahoo! Inc. containing search warrant results for the time frame of March 7, 2013 through November 17, 2016.

33.     SA Dunberg reviewed the content of these e-mails, which provided the following information:

34.     On or about November 4, 2015, an email signed by "Ross" was sent from rwroggio@yahoo.com to elina.kadaja@gmail.com and elina@roggiocc.com and had as an attachment a document entitled "Weapons and Ammunition Feasibility Report." This report contains a detailed description of the requirements to build a weapons and ammunition plant in the Kurdish region of Iraq. One section of this report is entitled "LEGAL FEASIBILITY" and states, in part: "The largest pool of skilled gun manufacturers will come from the USA. In order for these selected personnel to work on the project, they must be compliant to The International Traffic in Arms Regulations (ITAR). They will require the approval of the United States State Department. Failure to get proper approvals places the selected personnel in grave danger of incarceration and heavy fines."

G003208

35.     On April 11, 2016, at 12:26:25 PM (PDT), the RWROGGIO@YAHOO.COM account sent an e-mail to rauno@roggioCC.com which contained the attachment "untitled, Sales Invoice Ross.pdf." The body of this e-mail contained a forwarded e-mail conversation between RWROGGIO@YAHOO.COM and William.Mathes@OML-Global.com in which MATHES provides ROGGIO with banking information detailed as: FSNB Bank / William Mathes III / Account Number 44523373 / Routing Number 103112675 / Address for the account 6316 Yadkin Road, Fayetteville, NC 28303. A review of the attachment revealed an OML Global invoice dated 3/28/2016 (invoice # 10523) detailing a sale of 15,000 "Gas Ring – M4 Bolt Gas Ring MIL" for the price of $2,250.00 and 3,200 "Cotter Pin – Firing Pin Retainer" for the price of $1,920.00 to Ross ROGGIO (customer ID # RR1206). Additional invoice information shows that ROGGIO paid $317.00 for expedited shipping and that the shipping method was listed as "Best Courier" with shipping terms listed as "FOB" and payment terms listed as "Pre-Pay." No address information was provided under the "Ship To" portion of the invoice. Also included within the body of this e-mail was the file name "Screen Shot 2016-04-11 at 22.33.09.png," which detailed that ROGGIO had executed a payment to MATHES' bank account in the amount of $4,487.80 (USD) via an account controlled by ROGGIO which was assigned "CEO Tracking Number 000000222." Originator information was listed as: "ROGGIO CONSULTING COMPANY LLC at 116 Turkey Hill Ct. Stroudsburg, PA 18360."

36.     HSI SA Burke reviewed U.S. Department of Homeland Security ("DHS") records for ROGGIO's international travel and verified that ROGGIO was outside of the U.S. when the order was invoiced and paid for. DHS records show that ROGGIO departed JFK on 3/25/2016 on

G003209

a flight to Sulaimaniyah, Iraq[2].  Records show that ROGGIO had been in the United States for five

days prior to his 3/25/2016 departure, having arrived from Sulaimaniyah, Iraq on 3/20/2016.

37.    On February 23, 2017, HSI SA Burke submitted a licensing determination request

to the DDTC with respect to the "Gas Ring – M4 Bolt Gas Ring MIL" and "Cotter Pin – Firing

Pin Retainer."

38.    On February 24, 2017, the DDTC provided SA Burke with a blanket memorandum

issued by the DDTC on July 7, 2016 confirming that these items are listed on the USML in

Category I(h) and therefore require a license or other written approval from the DDTC in order to

be lawfully exported from the United States.  Specifically, Category I(h) lists "Bolt Gas Rings"

and "Firing Pin Retaining Pin."  While there may be limitations on the status of these items on the

USML, none of the limitations apply here.

39.    On February 27, 2017, SA Burke requested licensing histories from the DDTC with

respect to Ross William ROGGIO a/k/a Ross Gotham BROGAN; ROGGIO CONSULTING

COMPANY/CORPORATION; ROGGIO ARSENAL, LLC; Kristy Lynn ROGGIO ; and Amanda

M. MECOMBER.

40.    On March 16, 2017, the DDTC issued a  License and Registration History Report

stating that no records were found for any registration application by, any application for an export

license by, any export license granted to, or any other written approval granted to an individual or

entity so identified with respect to the exportation of defense articles or defense services, brokering

or any other regulated activities regarding the temporary import, export, or transfer of any defense

articles or defensive services for the these persons and entities.

C.  **February 26, 2017 Border Search of ROGGIO and SIDIROPOULOU**

---

[2] Please note that "Sulaimaniyah" may also be spelled as "Sulaymaniyah," and that both spellings refer to the same location within the Kurdistan region of Iraq.

41.     On January 27, 2017, pursuant to joint investigation with the DOC and the FBI into the illegal activities of Ross William ROGGIO and ROGGIO CONSULTING COMPANY, SA Burke created a subject record within the HSI investigative case management system for Ross ROGGIO and ROGGIO CONSULTING COMPANY, which included a 24-hour advance notification of any travel by ROGGIO.

42.     On February 25, 2017, SA Burke received an automatic notification via DHS reporting systems that ROGGIO was scheduled to arrive at JFK on February 26, 2017 at approximately 6:25 p.m. aboard Turkish Airlines flight #1. Upon receipt of this notification, SA Burke conducted various DHS records checks to confirm the travel alert and identified that ROGGIO was traveling with an individual named Christina SIDIROPOULOU. SA Burke coordinated with the HSI New York JFK Office and U.S. Customs and Border Protection ("CBP") to arrange for ROGGIO and SIDIROPOULOU to undergo a secondary examination and border search upon their arrival at JFK customs.

43.     On February 26, 2017, ROGGIO and SIDIROPOULOU arrived in the United States aboard Turkish Airlines flight #1 from Erbil, Iraq via Istanbul, Turkey and were referred for secondary inspection at JFK customs at approximately 7:28 p.m. Both ROGGIO's and SIDIROPOULOU's bags were inspected with negative results and both were interviewed. Your affiant has reviewed the written reports from the ROGGIO and SIDIROPOULOU interviews, which are summarized below.

44.     On February 26, 2017, CBP Officer Aurelia Morales interviewed ROGGIO and reported (in summary) as follows: ROGGIO stated that he was traveling with his girlfriend of nine months, SIDIROPOULOU, who also served as his personal assistant. ROGGIO stated that he was traveling from Iraq, where he had worked for the previous three years, during which time, he

G003211

traveled back and forth to the United States with his last outbound trip to Iraq occurring at the end of November 2016.  ROGGIO stated that he owns ROGGIO Consulting Company and was overseeing the construction of three high-rise residential buildings in Sulaymaniyah, Iraq, in collaboration with "Zarya Construction Company."   ROGGIO stated that he was working as consultant for the project and advised on building construction to include the foundation to the metal structure development and everything in-between.    ROGGIO stated that he had approximately 40 employees, from all over the world, working for him and that Zarya paid him nine million dollars to complete the project.

45.    ROGGIO stated that, after Thanksgiving 2016, he returned to Iraq to continue his project there.  ROGGIO stated that he was planning on traveling back to the United States right before Christmas 2016.   ROGGIO stated that he purchased his ticket and proceeded to Sulaymaniyah Airport in December 2016.  At the airport, he was approached by a security guard who ordered him to go with him, and, while walking with the security guard, he was approached by another man who threw a scarf over his head and told him he was going to be kidnapped. ROGGIO stated that he was taken to an unknown location and was held until February 24, 2017. ROGGIO stated that the kidnappers took his passport and that he was scared and he thought he was going to die.   ROGGIO stated that he asked why he was being held and was informed that Kadir Haman, representing Zarya Construction Company, was holding him against his will because Kadir considered that Zarya overpaid for the construction project and they wanted their money back.  ROGGIO stated that Zarya claimed they paid him twelve million dollars instead of nine and wanted the rest of the money returned.  ROGGIO stated that he was forced to transfer money from his account into the kidnapper's account little by little, and that he transferred approximately two hundred thousand dollars into the kidnapper's account.

G003212

46.   ROGGIO stated that he was able to escape by jumping through a window at two o'clock in the morning. He said he was helped by his friend, Hiwy, to whom he paid $250 to drive him to the American embassy. ROGGIO stated no one knew of his kidnapping. ROGGIO stated that he had a protocol with his ex-wife, Christi Roggio, who resides in the United States, that he was supposed to call her every day. ROGGIO stated that he instructed Christi that if she did not hear from him in more than three days, she was to alert the authorities about him possibly being kidnapped or missing. ROGGIO stated that his ex-wife alerted the authorities about his absence. ROGGIO stated that he will never travel to Iraq again.

47.   ROGGIO stated he resides at: 143 Indian Spring Dr., Stroudsburg, PA 18360 and provided his business address in the United States as 116 Turkey Hill Court, Stroudsburg, PA. ROGGIO provided his business address in Iraq as Roggio Consulting Company, Baharan Residential Complex, Building 13, Floor 2, Office 10, Sulaimaniyah, Kurdistan region of Iraq. ROGGIO provided his phone numbers as: 5709778102 (in the U.S.); and, number 9647726159495 (in Iraq) along with email address: ross@roggiocc.com and Skype: rossroggio.

48.   On February 26, 2017, CBP Officer Sara PEREA interviewed SIDIROPOULOU and reported (in summary) as follows: SIDIROPOULOU is a 25-year-old female born in Greece. In early 2016, she met Ross William ROGGIO in Greece where he often visited and, on February 23, 2017, she moved to Sulaimaniyah Iraqui Kurdistan to work as ROGGIO's personal assistant. She was asked what qualifications were requested of her to become his personal assistant, and SIDIROPOULOU stated that he only requested she would be willing to travel and speak English. Subject stated that, shortly after her arrival to Sulaimaniyah, they became a couple and have been dating for eight months and have been inseparable. SIDIROPOULOU stated that they have not been apart for more than five days since getting together, with the exception of two weeks during

Thanksgiving in November 2016. According to her, ROGGIO flew to the United States to spend Thanksgiving with his two children from his prior marriage.

49.    They lived together in Sulaimaniyah, Kurdistan Iraq. She described North Iraq as a very safe place because they even sell alcohol. She stated that at no time did she fear for her safety, and that at no time did ROGGIO express to her that he feared for his life or safety. She also stated that nothing eventful happened while they lived in Kurdistan for 11 months. SIDIROPOULOU stated that her duties as a personal assistant to ROGGIO were to do his laundry and cleaning at his office in Sulaimaniyah Kurdistan. She would also file his paperwork and delegate work to his staff on his behalf. She said their office hours were Monday through Friday from 8:00 am until 5:00 pm. Regarding ROGGIO's business she stated he has a consulting/construction business named ROGGIO CONSULTING COMPANY that is located in Sulaimaniyah.

50.    According to SIDIROPOULOU, ROGGIO told her he was a civil engineer by profession who graduated from MIT. She did not seem very involved in his business dealings because her vocabulary was limited when she spoke of the services that his business offered. She did say, however, that gets to do roads, hotels and makes projects happen. SIDIROPOULOU was unable to provide the name of one single project conducted by ROGGIO. According to her, in order for his business to be able to operate in Kurdistan, he would have to be sub-contracted by a local business. The local business that contracted ROGGIO CONSULTING COMPANY was ZARYA CONSTRUCTION, whose offices are also in Sulaimaniyah, Iraq (Kurdistan). SIDIROPOULOU's Iraq/Kurdistan Residence Foreigner's Residence Card lists her employer as ZARYA CONSTRUCTION.

51.   SIDIROPOULOU stated she stopped working for ROGGIO about one month ago. Because she is currently unemployed, ROGGIO will cover all her expenses while in the United States.  Their purpose of travel to the United States was to see ROGGIO's 93-year-old father who is hospitalized.  SIDIROPOULOU stated that ROGGIO told her they would be staying in his old home located at 116 Turkey Hill Court Stroudsburg, PA.   She also said they might stay with his parents who live close by in Stroudsburg (this address she did not know).  She said she is unsure of when they will leave the United States maybe a month or two depending on how his father is doing.  When they do go back, she thinks they will either go back to Greece or Sulaimaniyah.

52.   SIDIROPOULOU said that she departed Sulaimaniyah bound for Greece to see her parents on t February 23, 2017. She said that ROGGIO stayed in Sulaimaniyah to make sure all his projects were completed. They then met up in Istanbul to catch their flight to JFK..

53.   Following the interviews, ROGGIO and SIDIROPOULOU were advised that their electronic devices were being detained for a border search.  HSI SA James Mundy detained the following devices from ROGGIO:  1 MacBook Pro Laptop Computer w/ storage bag (Line Item #001); 1 Apple IPad Tablet (Line Item #002); 2 Apple IPhone 6's (Line Items #003 & #004); and 1 Scandisk Flash Drive (Line Item #005).  HSI SA James Mundy then detained the following items from SIDIROPOULOU:  1 Apple IPhone S (Line Item #006); 1 Apple IPhone 7 (Line Item #007); and 1 Apple IPod (Line Item #008).  ROGGIO provided his passwords for all password-protected devices, and the border search process was explained to both ROGGIO and SIDIROPOULOU.  SA Mundy provided them with HSI SA Burke's contact information and explained that the items would be sent to Pennsylvania for examination and returned to ROGGIO and SIDIROPOULOU upon the completion of the forensic review of the devices.   All devices (if possible) were placed

into 'Airplane Mode' to prevent transmitting and receiving new data and commands, and were turned off as part of evidence preparation.

54.     On February 28, 2017, SA Burke received the above items from SA Mundy, confirmed the contents, and secured them pending submission to the HSI Philadelphia Forensics Lab. It should be noted that during SA Burke's initial physical exam of the detained property, a Wells Fargo RSA banking token was found inside the laptop bag containing line item #001.

55.     On March 1, 2017, SA Burke submitted all items to Computer Forensics Agent ("CFA") Doug Green who began a forensic examination of the detained items.

56.     On March 7, 2017 at approximately 5:15 p.m., the computer forensic report for line item #001, an Apple MacBook Pro laptop computer, was posted for investigative review. A summary for this forensic report, which at this time only contained e-mails recovered from the laptop, shows the report creation time as March 7, 2017, at 4:12:56 p.m. and labeled as PH03BI17PH0001\Intella E-Mail by CFA Douglas Green.

57.     The following analysis constitutes a preliminary summary of e-mail recovered from this device and does not include the full scope of data recovered from the forensic examination:

58.     A cursory review of the recovered e-mails indicates 8,462 e-mail files were recovered and include e-mails from April 20, 2001, through February 26, 2017.

59.     On October 10, 2010, at 9:36:23 p.m. EDT, ROGGIO, using e-mail account rwroggio@yahoo.com, sent the following e-mail titled 'Dubai' to Poladjangi@yahoo.com, believed by your affiant to be utilized by Polad TALBANI:

   'Dear Polad. It was a pleasure meeting you. I truly look forward to working with you on

   thus project. Thanks for coming to see me. I shall be in contact with you this week.

   Have a safe trip home. Ross (Sent from my iPhone)'.

G003216

60.      On October 16, 2010, at 4:55:17 PM EDT, ROGGIO, using the e-mail account rwroggio@yahoo.com, sent the following E-mail to 'Polad Talabani <poladjangi@yahoo.com'

Hey Polad,  Hope you had a good flight home. Attached to this email is a quick PowerPoint on our project. It has some cost estimates as well as equipment requirements. There is much not covered in this. I wanted to get something to you. I do believe it is enough to make a general decision.  I have many things moving forward on this. This is going to be a great project.  If you have any questions please feel free to contact me. I will be in touch.  IMPORTANT NOTE: This equitment and cost gets you 75% to AR-10 (7.62)production. Also 40% to Glock production.  Thank You Ross'.  The attachment is titled 'M4 Plant Pro.pptm'.  A review of this attachment has not been completed to date as export of all recovered documents from the laptop hard drive is still ongoing.

61.      On October 16, 2010, at 11:05:07 PM EDT, ROGGIO, using e-mail account rwroggio@yahoo.com, sent the following E-mail to 'Polad Talabani <poladjangi@yahoo.com':

'Hey Polad,  There might be some confusion. The cost estimate on last page of PowerPoint is what it will cost you to make 52,000 guns. Not what the equipment will cost. That was just to give you an idea of yearly cost.  That 16 million is material and labor for one year. To produce 52,000 guns.  Sorry for the confusion.  Ross'.

62.      On January 5, 2011, 1:34 PM, Polad Talabani <poladjangi@yahoo.com> sent the following e-mail to ROGGIO at rwroggio@yahoo.com:

'hi mate.sorry for the late reply.been away with the family and also been a bit busy with work since i have come back. just wanted to say hi and tell you that we are still on for the project so just give me a bit more time so that i can get everything ready for when you come over. best regards to your family.'

G003217

63.     On February 9, 2011, 6:59:43 AM EST, ROGGIO, using the E-mail account rwroggio@yahoo.com, sent the following E-mail to 'Polad Talabani <poladjangi@yahoo.com':

Hey Polad,  Have not forgotten about the ammo presentation. I am currently waiting on the equipment list cost estimate to come back from the manufacturer. I should have a price in a couple of days. As soon as it comes in I will send you the presentation.  Hope all is well with you guys.  Take care Ross'.

64.     On April 3, 2011, 5:47:25 AM EDT, ROGGIO, using the e-mail account rwroggio@yahoo.com, sent the following E-mail to 'Polad Talabani <poladjangi@yahoo.com': ·

'Hey Polad,  How are you? Have been trying to call you. I am still in Kuwait but am planning a trip up your way.  If you didnt know, The largest ammo plant in middle east exploded and killed 110 people. This leaves a gap of over 40% of the ammo in region. Now is the time.  Please give me a call or email me.  Thanks Ross'.

65.     On July 1, 2013, at 5:47:25 AM EDT, ROGGIO, using the E-mail account rwroggio@yahoo.com, sent the following E-mail to 'Polad Talabani <poladjangi@yahoo.com':

Hey Polad,  Hope all is well with you. It has been awhile since we spoke. I would guess due to the length of waiting the Gun Factory is not going to happen. If so I understand. However I am currently able to ship M4s, .45s to Iraq if you need them. Also have large stores of ammo.  If you need these items let me know. Or if I am incorrect and the Gun Factory is still moving forward. Either way let me know.  Thanks Ross'.

66.     On July 2, 2013, at 5:05:06 AM EDT, Polad Talabani <poladjangi@yahoo.com> sent the following e-mail to ROGGIO at rwroggio@yahoo.com:

'hi ross. hope you and your family are well.sorry i have not been in contact with you for a while . been real busy away from kurdistan with other projects. if you can ship m4s to iraq

we are interested .i just need to know what you need from me and prices of the weapons.
please let me know ASAP.WITH REGARDS.'

67.　　On July 3, 2013, at 8:57:40 AM EDT, Polad Talabani <poladjangi@yahoo.com>
sent the following e-mail to ROGGIO at rwroggio@yahoo.com:

'Get a price for about 5000 units . And also send me the name on the gun and a few pics.
Sent from my iPhone'.

68.　　On July 4, 2013, at 6:46 PM (EDT), ROGGIO, using rwroggio@yahoo.com sent
the following e-mail to Gene Carino at gene.carino@udmc-weapons.com:

'Hey gene, I need 5000 units. I have sold many units to this customer. However they want
the new piston systems and I don't like anything other than the PVAR.  This can be broken
down into smaller shipments over time.  They want 10inch m4. 16in m4. There are other
minor requirements. Nothing we can't handle.  I need to keep the price as low as possible.
I was selling them m4s without the piston system for 845.00. I know the price is going up.
But let's keep the price low and keep selling to them.  These will be sold to Iraq
Government. I can get US approval to export. So I don't think shipping to them will be a
problem. Please let me know. Have a safe trip. Call or email me Thanks Ross Roggio.
Sent from my iPad'

69.　　On Thursday, July 4, 2013, at 7:07 AM (EDT) Gene Carino using the e-mail
gene.carino@udmc-weapons.com  sent  the  following  E-mail  to  ROGGIO  at
rwroggio@yahoo.com:

'Hi Ross! Good to hear from you again. Anyway, am just in a meeting now but the ballpark
figure for a PVAR for a quantity of 5,000 units will be somewhere US$2,000 to US$2,500.

I believe your keenest competitor will be LWRC but they have problems on pushrods, either breaking up or bending. They also have not figured out how to make a psiton driven M4 to fire on full auto with no cyling hiccups.-:) We can still bring down those prices if you can get for me the barrels (but not from that lousy ex-supplier of yours the fatso guy). Also, if the customer will pay upfront, we can shave of some percentage points from the final price. These prices are Incoterms Ex-Works.  Ross, on another note, we have not had any continuity with any project. I hope this time around it is for real. Best regards, Gene'

70.    On July 10, 2013, at 3:35:20 PM EDT, Polad Talabani <poladjangi@yahoo.com> sent the following E-mail to ROGGIO at rwroggio@yahoo.com:

'Hi Ross . This is my number . Call me when u get a chance so we can talk about the products u can get .009647704933530'.

71.    On Jul 11, 2013, at 3:20 PM (EDT), ROGGIO, using rwroggio@yahoo.com sent the following E-mail to Gene Carino at gene.carino@udmc-weapons.com:

'Gene, I just left a meeting with my clients. They want to break up there order. They cannot buy all high end piston m4s. Can you make regular gas m4s?  Also before I present your system to them we need an agreement between us. Please don't take it personal. I have know you for some time and trust you. However I must cover myself. For to do this deal all monies will have to come to you first. Then my profits then will be sent to me by you. I do not want to handle such a large amount of money. So lets talk about an agreement that we are both comfortable with.  My clients would like to start the paperwork in the next 2 weeks and sign a deal no later than 6 weeks from now. Sorry my friend but I may have to drag you to Iraq with me.  So lets move as quick as we can. Better to have us wait on my clients, than having them wait for us.  Thanks Ross'

72.     On July 11, 2013, at 6:18 PM (EDT) Gene Carino using the e-mail gene.carino@udmc-weapons.com sent the following E-mail to ROGGIO at rwroggio@yahoo.com:

> Ross, It's better that you prepare the draft yourself since this is your project. Just a word of advice and forewarning, any of our export shipments must conform with the small arms Export regulations of the Phil govt. This means that before I can secure an Export Authority, I will need an EUC and Import Permit from the Iraqi govt. Unfortunately, I believe that Iraq remains to be in the list of UN Arms Embargo. So, may I know who is the buyer, is it the Iraqi govt or the US govt? I do not want to waste your time and so I am telling you about this as early as now. I will also email to you the Firearms Law of the Philippines so that you will understand where I am coming from. I just want to make sure that we will not be violating the UN, US, Iraq or Phil laws.  Best regards, Gene'

73.     On July 12, 2013, at 6:45 AM (EDT), ROGGIO, using rwroggio@yahoo.com sent the following e-mail to Gene Carino at gene.carino@udmc-weapons.com:

> 'Gene, I understand you concern. We will follow all laws of BOTH Governments. I will be starting the paperwork with the Iraq Government this week. I just received there contract and we are finalizing it.  On another note, this contract needs crew serve weapons (SAWs) and ammo. Do you have a reliable ammo supplier in the Philippines? Will need about 15 million rounds. Ross'.

74.     On July 12, 2013, at 7:00 AM (EDT), ROGGIO, using rwroggio@yahoo.com sent the following e-mail to Gene Carino at gene.carino@udmc-weapons.com:

> Gene, I have to finalize the contract before I know exact numbers. This is moving a lot quicker than I like.  I will get the EUC and Import Permit first. Once I get that I will send

to you to get export permit Once Contract is finalized I will send over to you to see what you can fill. I have to go to FN for part of this order. I am hoping you will build the M4s and the PVARs. I am still receiving quotes on the parts you need. Ross'. [Affiant Note: Review of the records to date has identified no further E-mail communications between ROGGIO and Carino following this last E-mail.]

75.     Your affiant believes that ROGGIO attempted to utilize UDMC-Weapons to fulfill an order of 5000 rifles to Polad TALABANI; however, when confronted about the legality of the transaction, ROGGIO terminated communications with Carino at UDMC-Weapons.

76.     On February 10, 2014, at 5:21:46 PM EST, ROGGIO, using the e-mail account rwroggio@yahoo.com, sent the following E-mail to 'Polad Talabani <poladjangi@yahoo.com':

Hey Polad, Lost you on FB. Is everything OK? I have lined up the items you requested. On the first order deposit was made. Kinda need to get an update. Also a lot of contracting companies are taking contracts for security in Iraq. I have a security company. We have provided Security for ABC, CBS, NBC and the AP. Do you know anyone I can talk to about this? Thanks Ross'.

77.     Based on the drop in e-mail communications between ROGGIO and Polad TALABANI recovered within the forensic report between July 10, 2013, and February 10. 2016, your affiant believes that ROGGIO utilized other means to communicate with TALABANI and believes that the above message portion, 'Lost you on FB', is a reference to Facebook and indicates to your affiant that ROGGIO communicated with Polad TALABANI via the Facebook Messenger application.

78.     On March 30, 2016, ROGGIO, using the rwroggio@yahoo.com e-mail, sent the following   E-mail   message   to   Akam   A.   at   akam141516@gmail.com   and   cc'd

G003222

zarya.faruk@farukholding.com,   Polad   Talabani   <poladjangi@yahoo.com>,   bayanamin
bayanamin@yahoo.com:

    'Akam, This is not the forum for this. However I will answer certain points since you

brought them up. It has taken 2 years because of the building. I have been here in the

building just under a MONTH!!! I had no part of the building and its construction. THE

BUILDING IS STILL NOT FINISHED. I was suppose to have 6 months once I moved

into the building. I have now less than 30 days. Your people took 2 years to build a building

that should have taken 6 months. How is this my fault? Yet I must now deliver??? The

budget of 2.5 was for equipment only. Not furniture, payroll, housing, recruiting, and the

thousand of things you guys put on me. I gave you a budget to completion with the clear

understanding that it was best guess. I resent the statement of me "expecting more". I don't

make a more money if we spend more! This was not a contract to build a factory with all

cost included. I have been away from my family and home this whole time. I have seen my

children 4 times in the last 2 years. I RISK MY VERY FREEDOM! I am losing money

every month. And all I am doing what is asked of me. And to be honest, too much is being

asked. If your comments are the feelings of all parties I will be happy to resign. Please

advise me on how you would like me to proceed. Thanks Ross'.

    79.    Your affiant believes the above e-mail outlines the timeline for the creation of the

weapons manufacturing facility in Sulaymaniyah, Iraq and references some delays and setbacks

encountered.   Your affiant also believes that ROGGIO's statement 'I RISK MY VERY

FREEDOM' is a possible reference to ROGGIO's knowledge that he could face legal ramifications

for his actions which would result in incarceration.

G003223

80.    On April 4, 2016, ROGGIO, using the rwroggio@yahoo.com e-mail, sent the following e-mail to Akam A. at akam141516@gmail.com and cc'd Polad Talabani <poladjangi@yahoo.com>, bayanamin bayanamin@yahoo.com:

'Dear Akam,  The budget to completing for 3000 to 3200 units which has been submitted for the amount of 1,494,439.00.  In order to be prepared for any unforeseen problems, a budget of and additional 1,500,000.00 must be allocated.

Any changes or additional monies needed from this 1.5 million will be explained in detail as the need arises.  Currently my best estimate is we will start to deliver units end of first week in May.  Thanks Ross'.

81.    Your affiant believes this email is referencing ROGGIO's intent to complete the production of 3000 to 3200 assault rifles from the facility at Sulaimaniyah, Iraq.  Your affiant further believes that this production includes the parts purchased by ROGGIO from OML Global on March 28, 2016, referenced above, which included 15,000 M4 Bolt Gas Rings and 3.200 Firing Pin Retainer.  Your affiant is aware through training, experience and discussions with other law enforcement officers that one bolt assembly would utilize three gas rings and 1 firing pin retainer thus providing ROGGIO with enough materials to produce 3,200 bolt assemblies which would then be used in the manufacturing of 3,200 rifles.

82.    On March 2, 2017, at approximately 4:05 PM, the computer forensic report for line item #002, the Apple IPad was posted for investigative review.  A summary for this forensic report shows the report creation time as March 2, 2017, at 2:24:57 PM, assigned the evidence # T1 (Tablet 1) PH03BI17PH0001 by examiner CFA Douglas Green.  The device is further identified as an Apple iPad model # MK6J2 with operating system version 10.1.1 and tagged with Apple ID 'rwroggio@yahoo.com'.

83.     The following analysis constitutes a preliminary summary of data observed on this device and does not include the full scope of data recovered from the forensic examination:

84.     A cursory review of the 'timeline' portion of the forensic report indicates ROGGIO's use of the device to compose or review email correspondence, text, chat and instant messaging, call logs, web history, image location information, and contact information from June 28, 2013, through February 26, 2017.

85.     A review of the 'Searched Items' portion of the forensic report revealed that on 1/6/2017, the terms 'how to stop lying and how to stop lieing (sic)' were entered.

86.     A review of the forensic report for Tablet 1 revealed a text messaging exchange, via the 'WhatsApp' messaging application between 'Ross' (ROGGIO), utilizing 9647726159495@s.whatsapp.net (Ross) and 9647701525500@s.whatsapp.net (Kadir), utilized by an unknown person named Kadir, but believed by your affiant to be Kadir HAMAN, referenced by ROGGIO during his 2/26/2017 CBP interview above.

87.     This chat is identified within the report as 'chat-3' under the WhatsApp portion of the report.  Based on your affiant's knowledge of this investigation, forensic reviews of other devices, conversations with other law enforcement officers and content within the body of the text messages, your affiant is aware that ROGGIO had entered into a contractual agreement to manufacture firearms and ammunition for Polad TALABANI, and others located in the Kurdistan region of Iraq.  Your affiant is also aware that ROGGIO's business partners began auditing him and his company when it was suspected that large amounts of money were missing.

88.     The following portion of a WhatsApp text message conversation between ROGGIO and Kadir which begins on 2/13/2017 at 5:09:05 AM (UTC-5) and continues through 2/25/2017:

ROGGIO – 'Sir. Can you call me please'.

Kadir – 'Rose you have not much time left , they need a money all the list you mention regarding all your cars and asset You have to find a way to sell it, and bring the money back Do mot tell me you can not, you have to find a way while you are here'.

ROGGIO – 'I will be talking to my attorney later today to see what can me done. I am working on it.'

Kadir – 'Rose any news.  About the money and also Chase epay account.'

ROGGIO – 'Whole family working on it. Looking better every day.  I will check in that account again when they open.'

Kadir – 'Could you also send me the rigistration document of your cars'

ROGGIO – 'I have to send my mom to go get it. I will call her when she gets up'

Kadir – 'Ok. .Rose do not try be smart.  The path you take , you will end up in prison for very long time.  Now many days passed i have not hear amy news from you.  I am still waiting for the PNC account and also the registration document of your car and the land registry of your house.  Rose any news.  You think you are smarter than everyone else , but you are not'.

89.    Based on a review of the forensic reports for this device and others, your affiant believes that Kadir (HAMAN) is one of the auditors tasked with finding the missing money which had been wired to ROGGIO in support of the weapons and ammunition manufacturing facility.

90.    On March 2, 2017, at approximately 4:49 PM, the computer forensic report for line item #003, an Apple IPhone 6s was posted for investigative review.  A summary for this forensic report shows the report creation time as March 2, 2017, at 4:39:48 PM, assigned the evidence # P1 (Phone 1) PH03BI17PH0001 by CFA Douglas Green.  The device is further identified as an Apple iPhone 6s model # MKQM2 with operating system version 10.1.1.  The device has been labeled

by the user as 'Ross's IPhone' and is further identified with MSISDN +964 772 615 9495, Serial # F19QJ1K1GRY8, IMEI 353309076707833 and tagged with Apple IDs 'rwroggio@yahoo.com' and 'rosswr@icloud.com.

91.     The following analysis constitutes a preliminary summary of data observed on this device and does not include the full scope of data recovered from the forensic examination:

92.     A cursory review of the 'timeline' portion of the forensic report indicates ROGGIO's use of the device to compose or review email correspondence, text, chat and instant messaging, call logs, web history, image location information, contact information from June 28, 2013, through February 26, 2017.

93.     A review of the forensic report for Phone 1 revealed a text messaging exchange, via the 'WhatsApp' messaging application between 'Ross' (ROGGIO), utilizing 9647726159495@s.whatsapp.net (Ross) and 'Polad' utilizing 9647704933530@s.whatsapp.net (Polad). This chat is identified within the report as 'chat-13' under the WhatsApp portion of the report.

94.     Based on your affiant's knowledge of this investigation, conversations with other law enforcement officers, and the content within the body of the text messages, your affiant believes Polad is Polad TALIBANI. Open source information obtained via Google searches reveal that Polad TALABANI is the leader of the Kurdistan Peshmerga Special Forces in Iraq. Public newspaper articles retrieved from United Kingdom reporting services, *Daily Mail* and *Telegraph* in June 2014, detail that Polad TALABANI is in charge of special forces and counter terrorism in the Kurdistan Region of Iraq, his brother Lahur TALABANI is the head of the Kurdistan Regional Government's intelligence service and they are the nephews of Jalal TALIBANI, the former president of Iraq.

G003227

95.     A summary of 'chat-13' between ROGGIO and Polad TALABANI is as follows: On September 27, 2016, beginning at 12:06 PM (UTC-4), ROGGIO begins sending various videos to Polad, showing ROGGIO test firing a machine gun in semi-automatic and automatic modes. The attached videos are identified with the following file names:  3a8ab3c0-862a-42a3-aea8-8669c09712f6.mp4;  1bf8a3be-6ada-4d12-8df8-b85b2e1a73b2.mp4;  74795ab1-3f99-4bde-858a-bbc3e20c37ac.mp4;  71bde23d-f55a-4e80-a647-08fc79c2f824.mp4.   These videos, along with additional test firing videos are located within the 'Video' portion of the forensic report beginning on page 597 as items # 22 through 31 and show they were recorded on September 26, 2017, beginning at 6:06 a.m. (UTC-4).  These video files are also assigned latitude/longitude (+35.7025, +045.5349) and elevation (883.590) when taken.  The latitude/longitude for each video vary slightly, but using Google Maps to reverse geo-code these coordinates reveals that all of the videos were shot at a remote location based approximately 20 miles northeast of Sulaymaniyah, Iraq.  The following text chat takes place:

On 9/27/2016 at 12:09:36 PM (UTC-4) , ROGGIO writes, 'More coming.  One with all are(sic) parts is last one'.

On 10/2/2016 at 10:08:36 AM (UTC-4), ROGGIO writes, 'Hey brother. Update. Bulk of everything ready. We are finishing parts needed and will assemble. Will keep you informed. Thanks.'

On 10/4/2016 at 10:23:02 AM (UTC-4), ROGGIO writes, 'Hey bro. Update. We had a minor setback today in one set of parts. Worker did not do as instructed and made a mistake. They are working over tonight to correct. We should be finished measuring and marking parts by end of tomorrow. Also made shipping boxes to ship. Will keep you

informed. On a side note. Things are going very good with Mohammed. Nice to go to

work now.'

On 10/4/2016 at 10:30:13 AM (UTC-4), Polad replies, ' That's great news.'

96.     On 10/4/2016, beginning at 11:45:41 AM (UTC-4) the following exchange takes

place:

ROGGIO – 'Hate to bother. Is there anyway I can get some new mags?'

Polad – 'No problem brother, if u can remind me tomorrow so I can send u some.' 'How

many do u need'

ROGGIO – 'As many as you can send up to 10. Thanks bro. Will message you tomorrow.'

97.     On 10/6/2016, at 12:48:38 PM (UTC-4), the WhatsApp messaging conversation

continues:

Polad – 'My nephew Ranj will deliver the mags to you'

ROGGIO – 'Got the mags. Thanks bro.'

Polad – 'Ranja will the stuff up from you on Sunday . There is a plane booked to take them

on Monday morning, so please make sure he gets them on Sunday'.

ROGGIO – 'No worries bro. We will be ready tomorrow morning. Going to office just to

make sure and use Friday and sat to double check. I will not fail you.'

98.     On 10/7/2016, beginning at 7:42:06 AM (UTC-4), ROGGIO begins to send a series

of texts and images to Polad via WhatsApp which are identified with the file names: 34c92afb-

3ec8-481e-bb8b-4c4c3676c16d.jpg;   b394c0fa-460f-4826-8d68-a65148873fa2.jpg;   8191c7a6-

4329-4248-bf3b-fcdd773889e7.jpg; ae0cb9c7-b58b-4751-9324-f213291977bd.jpg;  which show

racks of assault rifles. These photos are also identified within the 'Images' section of the forensic

report on page # 582 as items # 227 through 230 and are shown to be taken on 10/7/2016 beginning

at 7:41:56 AM (UTC-4). No geocoding information is listed for these photos.

ROGGIO – 'Packed to go.'

Polad – 'Great news. Ranja will pick them up from you on Sunday'.

ROGGIO – 'They will be waiting'.

Polad – 'I have passed your number on to ranja. He will contact you'.

99.     On October 9, 2016, beginning at 2:07:38 AM (UTC-4) the conversation continues:

ROGGIO – 'Good morning bro. Do you know what time they are coming to pick the

samples up? Thanks.'

ROGGIO – 'Samples have been picked up!'

Polad – 'Good stuff'

ROGGIO – 'Hey bro. Is it ok with you if I leave for a couple of days? We are waiting for

the reports on the samples. Won't do anything just in case of changes. Since everything is

basically done thought I would take a couple of days. If it is ok with you.'

Polad – 'Hey Ross . I think u should wait till me and lahur get back.' [Affiant Note: Polad's

reference to 'lahur' is believed by your affiant to be a reference to Lahur TALABANI,

Polad's brother referenced above.]

100.    On October 19, 2016, at 9:08:43 AM (UTC-4), Roggio sends the following image,

a0bfcc59-717f-41a5-9b14-90e65ecbf153.jpg and text message via WhatsApp to Polad, 'All 4

models. Top 20 inch. 14.5 inch 10.5 last is 8 inch.' The above image shows 4 different types of

assault rifles with varying lengths. This image also appears in the 'Images' section of the forensic

report as item #236 on page 584, indicating it was taken on 10/19/2016 at 9:05:39 AM (UTC-4).

Geocoding for the photo indicates it was taken at latitude/longitude 35.698353/45.536750. Using Google Maps to reverse geocode these coordinates, again places the location in a remote area approximately 20 miles northeast of Sulaymaniyah, Iraq.

101.   On October 23, 2016, beginning at 4:40:33 AM (UTC-4), the following conversation between ROGGIO and Polad takes place:

Polad – 'Hey Ross. I was informed there was no bolts with the parts u sent'.

ROGGIO – 'In each box there was a small plastic bag with a bolt and firing pin and the extra pins. I have just asked 2 people that helped me pack them. We all are sure we placed them in the boxes with the bag marked.'

ROGGIO – 'Our paperwork confirms the bolts and small parts where in the boxes. Can you have them look for the little bags that are marked? Also. All boxes where open and I showed your nephew the paperwork, parts and samples before we closed them and packed them in his car.'

Polad – 'Ok great'

102.   On October 24, 2016, at 9:17:42 AM (UTC-4) ROGGIO wrote to Polad – 'Hey bro. Update. Seems like the 15 bolts and pins have been misplaced. I told your nephew we stopped production and did not have any extras on hand. Today we started production and will complete them here shortly. They will be ready for pickup tomorrow.

103.   On October 29, 2016, beginning at 7:06:07 AM the following conversation takes place between ROGGIO and Polad:

Polad – 'Can u build suppressors for the m4?'

ROGGIO – 'That is a suppressor I built. It will fit any m4. I can make 3 inch up to 18 inch suppressor for the m4. The picture is a 10 inch suppressor.'

Polad – 'I need just suppresors for our m4s at work'.

ROGGIO – 'How many?'

Polad – 'A couple to test'.

ROGGIO – 'Ok. Give me a couple of days to finish test and produce you a few.'

A review of the messages between ROGGIO and Polad TALABANI over the next few weeks reveal that ROGGIO is undergoing an audit. On 11/15/2016, beginning at 3:50:16 AM (UTC-4), ROGGIO texts the following to Polad:

ROGGIO – 'Also I have the invoices the auditors request but have not seen them in days. There seems to be a minor problem. They say I have received over 10 million. But my account shows I have only been wired 6,111,000. Trying to see where the mistake is. Please call me so I can turn this stuff in to finish the audit. Thanks. Auditors just showed up. Lol.

104.    On October 18, 2016, beginning at 4:14:36 AM (UTC-4) the following text message conversation takes place between ROGGIO and Polad:

Polad – 'I can't believe what I just heard. I can't believe u would do such a thing. Thank u for shaming me in front of my friends and family Ross. I trusted u and this is how you repay me.'

105.    On February 14, 2017, beginning at 10:02:01 AM (UTC-5), the following text message conversation takes place between ROGGIO and Polad:

ROGGIO: Sir. I am willing to sell everything. I have done all that has. Even asked of me. I can not sell cars or my house without a power of attorney. Which requires a notary to witness the signature. I can do it in Erbil or back in the states. I cannot sell them without this. There is no way. What more can I do?'

G003232

Polad – 'I don't want anything more to do with you. the embarrassment I suffered because of you I can never forgive . All I know is that they have a really strong case against you , and they want the money back . Wether you spent it on a life of luxury or just stole it it's your problem how you pay it back . Please do t contact me again as I don't want anymore to do with this. I can not believe you have done this .the way you lied to everyone and the way you let me down is beyond my belief. you have embarrassed me so much that I will now have to resign and leave this country. I really thought you were a good person , but I guess you weren't the person that Ron bly told us you were . You had no intention of doing this project from the beginning, just came here to steal money and use people.'

106.   Your affiant has reviewed the above text messages and believes that they show ROGGIO had entered into a contract with Polad TALABANI, and others, to manufacture firearms and other weapon parts to be used by TALABANI's forces.  ROGGIO appears to be under suspicion of having misappropriated millions of dollars which were wired to him by means not yet determined by investigators.  Your affiant believes that entities of the Kurdistan, Iraq government are investigating ROGGIO for the misappropriation of funds and are attempting to recover losses totaling upwards of 10 million dollars.

107.   On March 3, 2017, at approximately 2:01 PM, the computer forensic report for line item #004, an Apple IPhone 6 was posted for investigative review.  A summary for this forensic report shows the report creation time as March 3, 2017 at 11:22:45 AM, assigned the evidence # P2 (Phone 2) PH03BI17PH0001 by CFA Douglas Green.  The device is further identified as an Apple iPhone 6 model # MG4W2 with operating system version 8.3.  The device has been labeled by the user as 'John's iPhone' and is further identified with MSISDN +1 (570) 977-8102, Serial #

F73PMQ49G5MG, IMEI 359238067368491 and tagged with Apple IDs 'rwroggio@yahoo.com' and 'rwroggio@gmail.com'.

108.   The following analysis constitutes a preliminary summary of data observed on this device and does not include the full scope of data recovered from the forensic examination.

109.   A cursory review of the 'timeline' portion of the forensic report indicates use of the device to compose or review email correspondence, text, chat and instant messaging, call logs, web history, image location information, contact information, beginning on March 11, 2009, through February 26, 2017.

110.   A review of the 'Image' portion of the forensic reports shows numerous photographs of, various vacations/work trips, firearms, construction of what appears to be a warehouse and various photos of high end vehicles, which could possibly be assets of ROGGIO's. A summary of some of these photos is as follows:

111.   On July 15, 2015, beginning at 12:29:19 PM (UTC-4), there are various photos taken of numerous scoped rifles. These photos, identified as items 1149 through 1160, are geo-tagged with the latitude and longitude of 40.933511 / -75.269614. IT should be noted that the geo-tagging numbers for each photo vary slightly, however when reverse geo-located using Google maps, these coordinates are identified in and around a single family home located on Indian Spring Drive in Stroudsburg, PA.  Your affiant knows this residence to be 143 Indian Spring Drive, Stroudsburg, PA 18360, the U.S. residence of Ross ROGGIO. Based on the above information, your affiant believes the photos of the various weapons was taken inside the residence of Ross ROGGIO at 143 Indian Spring Drive, Stroudsburg, PA 18360.

112.   On October 15, 2015, beginning at 8:48:45 AM (UTC-4), there are various photos taken of what appears to be a construction site and the building of a warehouse.  These photos

begin on page 1154 of the forensic report and are identified with the item #s: 1370, 1371, 1373, 1374, 1376, 1378, 1380-1383, 1385, 1387, 1389, 1391-1444. These photos are geo-tagged with the latitude and longitude of 35.697242 / 45.536433. It should be noted that the geo-tagging numbers for each photo vary slightly, however when reverse geo-located using Google maps, these coordinates are identified in and around a remote area approximately 20 miles northeast of Sulaymaniyah, Iraq in the same general area as the reverse geolocation of the weapon testing videos and photos discovered on Phone #1. Your affiant believes these are photos of the weapons manufacturing facility being built. In some of the photos, ROGGIO is observed in the photo with someone else is taking the picture using the phone.

113.    A review of the 'MMS Messages' portion of the forensic report identified item # 14 as a MMS Message dated 8/13/2015 at 3:41:50 AM (UTC-4) sent to +9647704933530 which appears in the forensic report under the phone's address book assigned to 'Polad Talabani'. The message reads, 'Hey bro. There just finishing up your guns. I switched out the barrels. They are steel wrapped in carbon fiber. Weigh about 40% lighter. Suppressor are in. So as soon as the weapons are done I'll let you know. Talk to you soon. The MMS Message include 3 photos of firearm components identified as IMG_8592.jpeg; IMG_1399.jpeg; and IMG_9514.jpeg. These photos also appear in the 'Images' section of the forensic report which shows they were taken on 8/13/2015 however no geo-tagging information is included for these photos.

114.    To date, a review of Item #005, the Scandisk Removable Flash Drive, has not been conducted as the forensic examination of this device has not yet been completed and no forensic image has therefore been obtained.

115.    On March 6, 2017, at approximately 3:07 p.m., the computer forensic report for line item #006, an Apple IPhone 6s, was posted for investigative review. A summary for this

forensic report shows the report creation time as March 6, 2017 at 3:03:35 p.m., assigned the evidence # P3 (Phone 3) PH03BI17PH0001 by examiner SA Douglas Green (Computer Forensics Agent – CFA).  The device is further identified as an Apple iPhone 6s model # MKQJ2 with operating system version 10.2.1.  The device has been labeled by the user as 'Christina's iPhone' and is further identified with Serial # DNQQH0A5GRY5, IMEI 353312072176904 and tagged with Apple ID 'ch.sidiropoulou@gmail.com'.

116.    The following analysis constitutes a preliminary summary of data observed on this device and does not include the full scope of data recovered from the forensic examination:

117.    A cursory review of the 'timeline' portion of the forensic report indicates use of the device to compose or review email correspondence, text, chat and instant messaging, call logs, web history, image location information, contact information, beginning on June 11, 2016, through February 26, 2017.

118.    A review of the forensic report for this device reveals that this device appears to have been utilized by Christina SIDIROPOULOU.  A cursory review of SMS/Text Messaging and photos within the forensic report shows that SIDIROPOULOU was communicating with various members of the ROGGIO CONSULTING COMPANY as ROGGIO's personal assistant.  These appear to include day to day tasking's from ROGGIO as well as coordination between SIDIROPOULOU and other employees.  There are numerous photos within the report which appear to detail travels with ROGGIO as well as photos and videos of day to day operations within the manufacturing facility to include ROGGIO and others operating machinery.  A review of the metadata associated with the photos in the forensic report detail the dates and times of the photographs; however, it appears that the geo-tagging feature which collects the latitude and

longitude of where a photo was taken was turned off due to the lack of geo-tagging on any photograph within the report.

119.    On March 7, 2017, at approximately 5:15 PM, the computer forensic report for line item #007, an Apple IPhone 7, was posted for investigative review.  A summary for this forensic report shows the report creation time as March 7, 2017, at 5:14:09 PM, assigned the evidence # P4 (Phone 4) PH03BI17PH0001 by examiner SA Douglas Green (Computer Forensics Agent – CFA). The device is further identified, within the forensic report, as an Apple iPhone 6 Plus, model # MGAU2 with operating system version 9.3.3.  The device has been labeled by the user as 'Ross's iPhone' and is further identified with MSISDN +1 (570) 688-7465, Serial # FK1PF8RQG5QJ, IMEI 354385067205184 and tagged with Apple ID 'rwroggio@yahoo.com'.

120.    The following analysis constitutes a preliminary summary of data observed on this device and does not include the full scope of data recovered from the forensic examination:

121.    A cursory review of the 'timeline' portion of the forensic report indicates use of the device to compose or review email correspondence, text, chat and instant messaging, call logs, web history, image location information, contact information,    beginning on June 28, 2013, through February 26, 2017.

122.    A review of the forensic report for this device shows that this device was used jointly by Christina SIDIROPOULOU and Ross ROGGIO.  A review of the 'Video' portion of the forensic report identifies item # 12 as a video of Ross ROGGIO further identified as IMG_1744.MOV taken on 2/13/2017 at 10:53:11 AM (UTC-5).  During this video, ROGGIO identifies himself and states "if anything should happen to me I leave all my possessions to my daughters Sara and Anna Roggio".

G003237

123.     A review of the 'Images' portion of the forensic report show various photos of two Rolex watches which appear have been purchased by ROGGIO and/or SIDIROPOULOU. Items #115 through 124, 185 through 200, 224 through 238. Although some of these photos are duplicates, some appear with purchase cards. Rolex watch number 1, described as a gold-banded men's watch is positioned next to a Rolex purchase card identifying the watch as model number 218235 with serial number H42V3954 and purchased on 2/20/2016 from the retailer Ora Kessaris S.A. 8A Voukourestiou Str, 10664 Athens, Greece. A Google search of this model number shows that the Rolex model is the Day Date II Presidential 18K Rose Gold Automatic Men's Watch and retails for $37,550.00. Rolex number 2, described leather banded men's watch with gold trim is positioned next to a Rolex purchase card identifying the watch as model number 116515LN with serial number 4H2E2303 and purchased on 06/11/2016 (depending on date format), from the retailer Hilscer Munchen. A Google search of this model number shows that the Rolex model is the Cosmograph Daytona Black Dial 18K Rose Gold Automatic Men's Watch and retails for $28,800.00.

124.     To date, a review of Item #008, the iPod 8 GB, has not been conducted as the forensic examination of this device has not yet been completed and a forensic image has therefore not yet been obtained.

125.     Based on the foregoing, there is probable cause to believe that: (1) ROGGIO and others engaged in the shipment of export controlled items, including rifling combo buttons, from the United States to Iraq without the requisite BIS export license, in violation of IEEPA, 50 U.S.C. § 1701 et. seq.; (2) ROGGIO and others engaged in the shipment of export controlled defense articles, including M4 Bolt Gas Rings and Firing Pin Retainers, from the United States to Iraq without the requisite DDTC export licenses, in violation of the AECA, 22 U.S.C. §§ 2778(b)(2)

G003238

and (c) and 22 C.F.R. §§ 121.1, 123.1, and 127.1; (3) ROGGIO provided defense services and brokering without registering with, or obtaining approvals from, the DDTC, in violation of the AECA; and (4) ROGGIO and others violated 18 U.S.C. § 554 (smuggling goods); 18 U.S.C. § 1349 (wire fraud); and 18 U.S.C. § 1956 (money laundering).

## VI. PROBABLE CAUSE TO BELIEVE THAT EVIDENCE OF THESE CRIMES WILL BE FOUND IN THE SUBJECT DEVICES

126.   Based on my training and experience, and facts revealed during the course of this investigation, I know that exporters, traffickers, and brokers of controlled commodities use computers, mobile telephones, smartphones, external storage devices and other electronic devices to access photos and electronically stored data, email accounts, messaging platforms, place traditional and non-traditional phone and video calls, such as the SUBJECT DEVICES, to communicate with co-conspirators, customers, manufacturers, suppliers, purchasers, distributors, shipping companies, freight forwarders, financial institutions, and accomplices in furtherance of the unlawful export of controlled commodities and other proliferation activities. Accordingly, there is probable cause, as set forth above to believe that the SUBJECT DEVICES and forensic images of the SUBJECT DEVICES will contain additional evidence of violations of IEEPA, 50 U.S.C. § 1701 *et. seq.*, the AECA, 22 U.S.C. §§ 2778(b)(2) and (c) and 22 C.F.R. §§ 121.1, 123.1, and 127.1; 18 U.S.C. § 554 (smuggling goods); 18 U.S.C. § 1349 (wire fraud); and 18 U.S.C. § 1956 (money laundering).

## VII. INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

G003239

127.   It is your affiant's intention to utilize this warrant to seize the SUBJECT DEVICES and forensic images of the SUBJECT DEVICES, described above and in Attachment A in an effort to forensically examine the SUBJECT DEVICES as outlined in Attachment B.

## VIII. CONCLUSION

128.   Based on my training and experience, the facts as set forth in this affidavit, and my knowledge of the nature of electronic communications, namely, that such communications are not transient or easily degraded by the passage of time and are forensically recoverable even in the case of: file corruption, deletion, or steganography, there is probable cause to believe that evidence, fruits, or instrumentalities of crimes exists on the SUBJECT DEVICES.  Accordingly, a search and seizure warrant is requested.

129.   This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a "district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(ii).

130.   Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

131.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. Based on my training and experience, I have learned that criminals actively search for criminal affidavits and search warrants via the Internet and disseminate them to other criminals as they deem appropriate, such as by posting them publicly through online forums.  Disclosure of the papers submitted in support of this application would severely jeopardize the investigation in that it might alert the targets of the investigation-including any users of the SUBJECT DEVICES

to the existence of the investigation and lead such targets to destroy, tamper with, or conceal

evidence in the SUBJECT DEVICES. Disclosure would also give the targets of the investigation

an opportunity to flee or continue flight from prosecution, change patterns of behavior, and notify

confederates.

AFFIANT:

_Christopher M. Hertzog_
Christopher M. Hertzog
Special Agent

Sworn to before me and subscribed

in my presence this 21st day of

March, 2017

_Karoline Mehalchick_
Karoline Mehalchick
United States Magistrate Judge

## ATTACHMENT A

### Property to Be Searched

This warrant applies to devices (the SUBJECT DEVICES), and forensic images of the SUBJECT DEVICES, detained from Ross William ROGGIO and Christina SIDIROPOULOU during a border search at John F. Kennedy International Airport on February 26, 2017 as ROGGIO and SIDIROUPOULOU attempted to enter the United States.

Detained From ROGGIO:

1.   Item #001, an Apple MacBook Pro laptop computer.

2.   Item #002 – 1 Apple iPad Tablet Computer bearing serial # F9FQX38SGHK9

3.   Item #003 – 1 Apple iPhone 6 bearing serial # F19QJ1K1GRY8

4.   Item #004 – 1 Apple iPhone 6 bearing serial # F73PMQ49G5MG

5.   Item #005 – 1 Scandisk Removable Flash Drive

Detained From SIDIROPOULOU:

6.   Item #006 – 1 Apple iPhone 6S bearing serial # DNQQH0A5GRY5

7.   Item #007 -  1 Apple iPhone 7 bearing serial # FK1PF8RQG5QJ

8.   Item # 008 -  1 Apple iPod 8 GB.

G003242

## ATTACHMENT B

### Particular Things to be Seized

I.   Information to be seized by the government

A.      All records on the Devices described in Attachment A, and the forensic images of the Devices described in Attachment A, and information that constitutes fruits, contraband, evidence, and instrumentalities of violations of the International Emergency Economic Powers Act, 50 U.S.C. § 1701, *et. seq.*; the Arms Export Control Act, 22 U.S.C. §§ 2778(b)(2) and (c) and 22 C.F.R. §§ 121.1, 123.1, and 127.1;  18 U.S.C. § 554 (smuggling goods); 18 U.S.C. § 1349 (wire fraud); and 18 U.S.C. § 1956 (money laundering) occurring from the time period of April 20, 2010 through February 26, 2017 and pertaining to the following matters:

1.      The attempted export of commodities to Iraq, the United Arab Emirates, and elsewhere;

2.   Records relating to who created, used, or communicated with the Devices or with any email or social media account, including records about their identities and whereabouts;

G003243

3.      Information relating to the identity and location of targets and co-conspirators;

4.      Information relating to methods of payment and confirmation thereof, shipping and receiving information, wire transfer data, and financial institution information;

5.      Information relating to the identities and location of purchasers, suppliers, manufacturers, and distributors of firearms and firearms manufacturer parts;

6.      Information relating to the identities and location of exporters, shippers, freight forwarders, customers, and end users of firearms and firearms manufacturer parts;

7.      Types, amounts, and prices of firearms and firearms manufacturing equipment and parts, as well as dates, places, and amounts of specific transactions;

8.      Any information recording Roggio's schedule or travel from April 2010, to present;

9.      All bank records, checks, credit card bills, account information, and other financial records;

10.     Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, emails, social media postings, saved usernames, passwords, documents, and browsing history;

11.     Records of Internet Protocol addresses used;

G003244

12.     Records of Internet activity, including firewall logs, cashes, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

13.     Records and documents and other evidence related to the manufacture of firearms in Iraq, and the importation of firearms or firearms parts to Iraq;

14.     Records and documents and other evidence related to the export of firearms, firearms parts, and manufacturing equipment used in the production of firearms.

B.     Electronic/Computer and Smartphone Data

1.     Based on my training and experience and conversations with my colleagues, I am aware that the records, documents and/or materials described above as Items to Be Seized, may be stored electronically within the SUBJECT DEVICES as SMS/Text Messaging, Emails, Photos, Call Logs, Voicemails and other electronically stored data.

2.     Based on my knowledge, training, experience and conversations with other law enforcement agents, I am aware that mobile telephones, computer hardware, software and electronic files may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be contraband, evidence, instrumentalities or fruits of a crime and/or (2) the objects may be used as storage devices that contain contraband, evidence, instrumentalities, or fruits of crime in the form of electronic data. I believe that, in this case, the SUBJECT DEVICES, its software and other electronic media are containers for evidence.

G003245

3.      Searching mobile telephones/smartphones and their computer systems is a highly technical process which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with HSI Computer Forensic Analysts who have specific expertise in the type of computer, smartphone/mobile telephone software application or operating system that is being searched.

4.      Searching these smartphone/mobile telephone's computer systems requires the use of precise, scientific procedures which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since this data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, may be necessary to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

5.      During the execution of the search and seizure warrant supported by this affidavit, your affiant will transport the SUBJECT DEVICES to the HSI Computer Forensic Laboratory in Philadelphia, Pennsylvania where HSI Computer Forensic Analysts will conduct a more enhanced examination. In fact, the Devices have already been transported to the HSI Computer Forensic Laboratory pursuant to the government's Border search authority.

6.      Based my knowledge, training, experience and conversations with law enforcement officers, I know that retrieving information from smartphones/mobile phones, flash drives and

computers often requires agents to seize the electronic storage devices (along with all related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This requirement is due to the following:

      a.     The volume and nature of electronic evidence: smartphones/mobile telephones, computer storage devices (such as hard disks, diskettes, tapes, laser disks, zip drives, etc...) can store the equivalent of thousands of pages of information. The process of forensically examining these devices can take days, depending on the volume of data stored.

      b.     Technical requirements: Forensically examining these devices is a highly technical process requiring a properly controlled environment. Images of computer data need to be verified to ensure that the files restore or copy properly. In addition, computer files may be encrypted, password protected or may be in a format that could result in evidence being overwritten and/or destroyed electronically should an attempt be made to retrieve the electronic evidence on site.

      7.     In light of these concerns, and noting that the Devices have been seized pursuant to the government's Border search authority and that a number of the Devices have not yet been fully analyzed, I hereby request the Court's permission to seize the devices, so that an HSI Computer Forensic Analyst ("CFA") can accurately retrieve the systems's data in a laboratory or other controlled environment. If, after inspecting the computers and other Devices, this CFA determines that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it or them within a reasonable time.

G003247

8.      In searching for data capable of being read, stored or interpreted by a computer, law enforcement personnel executing this search warrant will employ the following procedure:

a.      Your affiant will transport the SUBJECT DEVICES to the HSI Computer Forensic Laboratory, located in Philadelphia, Pennsylvania for review.  The SUBJECT DEVICES will be reviewed by HSI CFAs in order to extract and seize any data that falls within the list of Items to Be Seized set forth herein.

b.      Any data encountered/retrieved from the SUBJECT DEVICES that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not: (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offense specified above.

c.      In searching the data, the HSI CFAs may examine all of the data contained in the SUBJECT DEVICES to view their precise contents and determine whether the data falls within the Items to Be Seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of Items to Be Seized as set forth herein.

d.      If the computer personnel determine that the SUBJECT DEVICES is/are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time.

G003248

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:  Devices and forensic    :
images of devices detained    :
from Ross William Roggio and   : No.
Christina Sidiropoulou during   :
a border search at JFK on 2/27/17 :

## MOTION TO SEAL

AND NOW, the United States of America, by its undersigned counsel, moves pursuant to Rule 6 of the Federal Rules of Criminal Procedure to file the documents accompanying this Affidavit, Application for a Search Warrant and Search Warrant under seal for the reasons set forth in the accompanying sealed Declaration in support of the Government's Motion to Seal.

WHEREFORE, for the foregoing reasons, the United States moves to seal this Affidavit, Application for a Search Warrant and Search

Warrant.  For the convenience of the Court, a proposed form of Order is attached.

Respectfully submitted

BRUCE D. BRANDLER
United States Attorney

/s/ Todd K. Hinkley
TODD K. HINKLEY
Assistant U. S. Attorney
PA 68881
Federal Building
235 North Washington Avenue
Scranton, PA 18503
todd.hinkley@usdoj.gov
(570) 348-2800 (telephone)
(570)348-2830 (facsimile)

2

G003250

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

IN RE:  Devices and forensic     :
images of devices detained     :
from Ross William Roggio and  :  No. 3:17mc197
Christina Sidiropoulou during  :
a border search at JFK on 2/27/17 :

## DECLARATION IN SUPPORT OF MOTION TO SEAL

AND NOW, the United States of America, by its undersigned counsel, submits the following Declaration in Support of the Government's Motion to Seal, pursuant to Rule 6 of the Federal Rules of Criminal Procedure.

1. Your Declarant states that, in the view of your Declarant, this Declaration and following documents should be filed under seal:

   [ X ]   **Affidavit, Application for a Search Warrant and Search Warrant**

2. The United States requests that the above-referenced documents, and this Motion, remain under seal pending:

   [ ] Further Order of Court; or

   [X ] Written notification by the United States that these pleadings no longer need to remain filed under seal; or

G003251

[ ] _____

3.  In support of this Motion, the United States alleges that filing

these pleadings under seal is necessary in order to:

[ X ]  Preserve the integrity of this ongoing case;

[ ] Ensure the safety of investigative personnel;

[ X ]  Protect the identity of potential witnesses;

[ X ] Allow for the seizure of evidence;

[X ] Permit the arrest of those charged with violations of criminal laws; or

[ ] Allow this Defendant to complete the cooperation aspects of the Plea Agreement.

[  ]  Avoid unfair prejudice to the defendant.

WHEREFORE, for the foregoing reasons, the United States moves

to seal this Declaration and the above-referenced pleadings.

/s/ Todd K. Hinkley
TODD K. HINKLEY
Assistant U. S. Attorney
PA 68881
Federal Building
235 North Washington Avenue
Scranton, PA 18503
todd.hinkley@usdoj.gov
(570) 348-2800 (telephone)
(570)348-1908 (facsimile)

2

G003252

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

IN RE:  Devices and forensic
images of devices detained
from Ross William Roggio and
Christina Sidiropoulou during
a border search at JFK on 2/27/17

:
:
: No. 3:17mc197
:
:
:

## O R D E R

IT IS ORDERED that the Clerk of Court provide the United
States Attorney's Office with two certified copies of the accompanying
documents and thereafter keep these documents from public view until
the Clerk has made appropriate docket entries.

IT IS FURTHER ORDERED that these documents can only be
opened by appropriate Court personnel of the Middle District of
Pennsylvania in due course of performing the business of the Clerk's
Office, after which the Clerk is ordered to seal this Order and all
accompanying documents until:

[  ] Notified in writing by the United States Attorney's Office that there
is no longer any reason for the documents to remain sealed; OR

[ X ]  Further Order of the Court

Date: 3-21-17

KAROLINE MEHALCHICK
United States Magistrate Judge

G003253

*AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)*

| | Return | |
|---|---|---|
| **Case No.:**<br>3:17 mc 197 | **Date and time warrant executed:**<br>3/21/2017     4:00 PM | **Copy of warrant and inventory left with:**<br>UNDER SEAL |

**Inventory made in the presence of:**
SA Jeff Burke (HSI)

**Inventory of the property taken and name of any person(s) seized:**
Forensic Electronic Images from the following devices:

1. Item #001, an Apple MacBook Pro laptop computer.
2. Item #002 – 1 Apple iPad Tablet Computer bearing serial # F9FQX38SGHK9
3. Item #003 – 1 Apple iPhone 6 bearing serial # F19QJ1K1GRY8
4. Item #004 – 1 Apple iPhone 6 bearing serial # F73PMQ49G5MG
5. Item #005 – 1 Scandisk Removable Flash Drive
6. Item #006 – 1 Apple iPhone 6S bearing serial # DNQQH0A5GRY5
7. Item #007 - 1 Apple iPhone 7 bearing serial # FK1PF8RQG5QJ
8. Item # 008 - 1 Apple iPod 8 GB.

Physical Devices #1 through #8 were returned to Ross William ROGGIO on March 29, 2017.

**FILED**
**SCRANTON**

MAY – 1 2017

PER _____
**DEPUTY CLERK**

| Certification |
|---|

*I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.*

Date: 3/21/2017

_____
Executing officer's signature

Jeff Burke / Special Agent (HSI)
Printed name and title

G003254