UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:CR-18-0097 |
| | ) | |
| v. | ) | (Judge Mariani) |
| | ) | |
| ROSS ROGGIO | ) | (Filed Electronically) |

## GOVERNMENT'S RESPONSE TO
## DEFENSE MOTION TO SUPPRESS EVIDENCE

I.   Procedural History

On March 20, 2018, a federal grand jury sitting in Scranton,

Pennsylvania returned a multicount indictment charging Ross Roggio

with: conspiracy to commit an offense against the United States, in

violation of 18 U.S.C. § 371; violations of the Arms Export Control Act,

22 U.S.C. § 2278(b) and (c); violations of the International Emergency

Powers Act, 50 U.S.C. §§ 1702 and 1705(c); smuggling goods from the

United States, in violation of 18 U.S.C. §§ 554 and 2; wire fraud, in

violation of 18 U.S.C. § 1343; and money laundering, in violation of 18

U.S.C. §§ 1956(a)(2)(A) and 2.

On March 29, 2019, Roggio filed two pre-trial motions in the above

docket, to include: (1) Motion to Suppress Evidence Seized in Violation

of the United States Constitution (Doc. 46); and (2) Motion for Early Disclosure of *Jencks* Act Material. (Doc. 48).

This brief is filed in opposition to Roggio's Motion to Suppress Evidence.

## II.   Factual Background

The instant prosecution is the result of a joint investigation being conducted by the Federal Bureau of Investigation (FBI), Immigration and Customs Enforcement (ICE), Homeland Security Investigators (HSI), and the U.S. Department of Commerce, Office of Export Enforcement (DOC).  Ross Roggio, a United States citizen, is alleged to have exported firearms parts, firearms manufacturing tools, and defense services in support of the development of a firearms factory in the Kurdistan region of Iraq.

Roggio formerly resided at 143 Indian Spring Drive, Stroudsburg, Pennsylvania.  He operated Roggio Consulting Company, LLC, with a business address of 116 Turkey Hill Court, Stroudsburg, Pennsylvania[1]. Roggio has a background in firearms sales and manufacturing, having been involved with two failed manufacturing enterprises in the United

---

[1] This is also the residence of Roggio's parents.

States. Roggio Arsenal, the first manufacturing venture, was located in Fayetteville, North Carolina and produced AR-15 style weapons, which are the semi-automatic civilian version of the M16 military rifle. Roggio Arsenal went out of business in 2010. In 2014, Roggio also attempted to manufacture weapons under the name Rebel Arms, a business that failed in the planning stages and was located in Stroudsburg, Pennsylvania.

On March 30, 2016, this investigation was initiated when an individual from Drill Masters Eldorado Tools, Inc., located in Connecticut, contacted the FBI Public Access Line to report a suspicious shipment of gun manufacturing tools to Iraq. The report indicated that a customer by the name of Ross Roggio had purchased items from the company and had them delivered to Roggio's residential address in Pennsylvania before being transshipped to Iraq.

Roggio was subsequently telephonically interviewed on April 20, 2016, by a Special Agent of the FBI concerning the alleged shipment of controlled firearms manufacturing items to Iraq. Roggio was speaking on the telephone from Kurdistan, Iraq. Roggio acknowledged purchasing the items, but advised the agent that the items were

shipped to and stored at either his own house, or his parent's house, both of which are located in Stroudsburg, Pennsylvania. Roggio explained that he may have shipped cleaning kits for an AR-15 to Iraq approximately six weeks earlier.

Subsequent interviews with: (1) employees of Drill Master Eldorado Tools, Inc.; (2) Ross Roggio's wife Kristy Merring-Roggio, and (3) the owner of Package Place, a commercial packing and shipping company located in Stroudsburg, Pennsylvania, showed that Roggio had directed the items purchased from Drill Mater Eldorado Tools, Inc. to be transshipped from Stroudsburg, to Kurdistan, Iraq. Records checks with the proper licensing authorities determined that the items purchased by Roggio were both controlled for export to Iraq, and that Roggio had failed to obtain the necessary licenses to make such an export.

On November 17, 2016, based upon information obtained from the investigation, agents obtained a court-authorized search warrant to the email service provider Yahoo! Inc. for the contents of two email accounts utilized by Roggio. Review of the fruits of that search showed, among other things, that on November 4, 2015, Roggio had emailed a document

entitled "Weapons and Ammunition Feasibility Report," to his employee. That report contained a detailed description of the requirements to build a weapons and ammunition plant in the Kurdish region of Iraq. One section of this report entitled "LEGAL FEASIBILITY" states, in part:

> The largest pool of skilled gun manufacturers will come from the USA. In order for these selected personnel to work on the project, they must be compliant to The International Traffic in Arms Regulations (ITAR). They will require the approval of the United States State Department. Failure to get proper approvals places the selected personnel in grave danger in incarceration and heavy fines.

The email search revealed additional evidence of criminal wrongdoing by Roggio, including the purchase of firearms parts for M4 type weapons which, the investigation has determined, were illegally exported to Iraq in support of Roggio's arms and ammunition plant.

As a result of the ongoing investigation, members of the investigative team requested HSI to provide 24-hour advance notification of any travel by Roggio. On February 25, 2017, HSI notified agents that Roggio was scheduled to arrive at John F. Kennedy International Airport (JFK) airport on the next day, aboard a Turkish Airlines flight. Upon receipt of this notification, agents conducted

various records checks, and confirmed that Roggio was returning to the United States, and that he was doing so with a travel companion by the name Christina Sidiropolulou.  Case agents coordinated with HSI New York JFK Office and U.S. Customs and Boarder Protection ("CBP") to arrange that Roggio and his travel companion undergo a secondary examination and border search upon their arrival at JFK customs.

Upon arrival on Turkish Airlines, from Erbil, Iraq, via Istanbul, Turkey, Roggio and Sidiropoulou were referred for secondary inspection at JFK customs.  Roggio was interviewed and stated that he was traveling with his girlfriend, who was also serving as his personal assistant.  Roggio indicated that he was traveling from Iraq, where he had worked for the past three years, during which time he traveled back and forth to the United States with his latest outbound trip to Iraq occurring at the end of November, 2016.  Roggio stated that he owns Roggio Consulting Company, and was overseeing the construction of three high-rise residential buildings in Sulaymaniyah, Iraq, in collaboration with "Zarya Construction Company." Roggio stated that he was working as consultant for the project and advised on building construction to include the foundation to the metal structure

development and everything in-between. Roggio explained that he had approximately 40 employees from all over the world working for him, and that Zarya paid him $9 million to complete the project.

Roggio went on to state that, after Thanksgiving 2016, he returned to Iraq to continue his project there and was planning on traveling back to the United States right before Christmas 2016. Roggio stated that he purchased his ticket and proceeded to Sulaymaniyah Airport in December 2016. At the airport, he was approached by a security guard who ordered him to go with him. While walking with the security guard, he was approached by another man who threw a scarf over his head and told him he was going to be kidnapped. Roggio stated that he was taken to an unknown location and was held until February 24, 2017. Roggio stated that the kidnappers took his passport and that he was scared and he thought that he was going to die. Roggio stated that he asked why he was being held and was informed that Kadir Haman, representing Zarya Construction Company, was holding him against his will because Haman believed that Zarya overpaid for the construction project and they wanted their money back. Roggio stated that Zarya claimed they

paid him $12 million instead of $9 million and wanted the rest of the money returned. Roggio stated that he was forced to transfer money from his account into the kidnapper's account little by little, and that he transferred approximately $200,000 into the kidnapper's account.

Roggio stated that he was able to escape by jumping through a window at two o'clock in the morning. He said he was helped by his friend, Hiwy, to whom he paid $250 to drive him to the American embassy. Roggio stated no one knew of his kidnapping. Roggio stated that he had a protocol with his ex-wife, Kristy Merring-Roggio, who resides in the United States, that he was supposed to call her every day. Roggio stated that he instructed Kristy that if she did not hear from him in more than 3 days, she was to alert the authorities about him possibly being kidnapped or missing. Roggio stated that his ex-wife Ms. Merring-Roggio alerted the authorities about his absence. Roggio stated that will never travel to Iraq again.

Roggio provided agents with a resident address of 143 Spring Drive, Stroudsburg, Pennsylvania, and a business address in the United States as 116 Turkey Hill Court, Stroudsburg, Pennsylvania. According to Roggio, his business address in Iraq was Roggio Consulting

Company, Baharan Residential Complex, Building 13, Floor 2, Office 10, Sulaimaniyah, Kurdistan region of Iraq. Roggio provided his local and Iraqi telephone number, along with email and Skype addresses.

At the conclusion of the interviews of Roggio and Sidiropoulou, both were advised that their electronic devices were being detained for a border search. As a result, HSI agents detained from Roggio: (1) a MacBook Pro Laptop Computer; (2) an Apple iPad Tablet; (3) an Apple iphone 6s; and, (4) a Scandisk Flash Drive. Various electronic items, not subject to this suppression motion, were seized from Sidiropoulou.

The government obtained a search warrant for the electronic devices seized from Roggio on March 21, 2017, from United States Magistrate Judge Karoline Mehalchick. *See* Dkt. No. 3:17-MC-197 (M.D. Pa. Mar. 21, 2017).

The court ordered searches of electronic devices seized from Roggio revealed additional evidence of his crimes, including among other things: (1) communications with his Kurdistan customers; (2) detailed information concerning the arms and ammunition manufacturing plant project; (3) communications concerning possible fraud committed by Roggio in completing the arms factory; (4) financial

records related to payment to Roggio for his work in Kurdistan; and (5) evidence of his knowledge of export control laws.

## III. Argument

### Motion to Suppress Evidence Seized at Border

Rather than attack the propriety of the search warrant obtained by the government to search his electronic devices, Roggio argues that there was an illegal seizure at JFK when the government took his devices pursuant to a border search. (Doc. 47, pp. 7 – 8).

Border searches, a well-recognized exception to the Fourth Amendment's warrant requirement, have long been authorized by federal courts, including the Supreme Court. *See, e.g., United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). International airports act as a "border or functional equivalent" for travelers entering the United States on airplanes. *Bradley v. United States*, 299 F.3d 197, 202 (3d Cir. 2002). Under this "border search" exception to the warrant requirement, routine border stops and searches of persons, luggage, personal effects, and vehicles may be conducted without probable cause or reasonable suspicion. *Montoya de Hernandez*, 473 U.S. at 538; *see also United States v. Flores-Montano,* 541 U.S. 149, 154-55 (2004) (no

probable cause or reasonable suspicion needed for border search of car, including nondestructive disassembly and reassembly of fuel tank). Indeed, neither the Supreme Court nor any lower courts have *ever* required a warrant for a border search, and the Supreme Court has *only once* required a degree of individualized suspicion for a border search or seizure, in *Montoya de Hernandez.  See United States v. Kolsuz*, 890 F.3d 133, 147 (4th Cir. 2018) (stating that lower "courts consistently have required only reasonable suspicion even when reviewing the most intrusive of nonroutine border searches and seizures.").

### A. This Was a Routine Border Search.

"Since the founding of our Republic, Congress has granted the Executive plenary authority to conduct routine searches and seizures at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country."  *Montoya de Hernandez*, 473 U.S. at 537.  "Time and again," the Supreme Court has held that "'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at

11

the border.'" *Flores-Montano*, 541 U.S. at 152-53 (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)).  It is thus well-settled that "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538.

As the Third Circuit has recognized, "it is beyond peradventure" that "'the events of September 11, 2001, only emphasize the heightened need to conduct searches' at our borders." *Bradley*, 299 F.3d at 202 (quoting *United States v. Yang*, 286 F.3d 940, 944 n.1 (7th Cir. 2002)). Thus, this "realization that important national security interests are at stake has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials." *United States v. Ickes*, 393 F.3d 501, 505 (4th Cir. 2005) (internal quotation marks omitted).  The review of Roggio's electronics at the border was conducted to uncover additional information about the ongoing, illegal export of weapons—a purpose within the very core of the national security rationale underlying the border search doctrine. *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458-59 (5th Cir. 2016) (internal quotation

marks omitted) (stating that the illegal export of weapons parts in violation of the Arms Export Control Act directly implicates both "the public's keen interest in restricting the export of defense articles" and "the government's exceptionally strong interest in national defense and national security"); *accord United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003) ("The United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself.").

Roggio argues that the search of his electronics was "not a border search but rather an end run around the warrant requirement . . . ." (Doc. 47 at 9; *see also id.* at 6 (calling the border search "mere pretext").) But by merely landing at an international airport, Roggio subjected himself and his property to a border search. *See Montoya de Hernandez*, 473 U.S. at 539 (when defendant "presented herself at the border," she "subjected herself to the criminal enforcement powers of the Federal Government," including border search authority). Standing alone, the fact that someone is already under investigation for suspected criminal activity does not change a search at the border into something other than a routine border search. *See Kolsuz*, 890 F.3d at

138 (holding that the manual search of defendant's phone at the airport was a routine border search even though he was "well known to government authorities" and CBP officers were "ready for him").

Having established that the search of Roggio's electronics was in fact a border search, the crux of Roggio's claim is that this search was "nonroutine." (Doc. 47 at 10-11.) The Supreme Court has found that there is a requirement of "some level of suspicion in the case of highly intrusive searches" due to the "dignity and privacy interests of the person being searched." *Flores-Montano,* 541 U.S. at 152. Thus, removal and disassembly of a car's gas tank is routine, *see id.* at 155, while a lengthy detention of a traveler to monitor bowel movements pending a rectal examination is not, *see Montoya de Hernandez*, 473 U.S. at 541-42. "The Supreme Court has *never* required reasonable suspicion for a search of *property* at the border, however non-routine and intrusive[.]" *United States v. Touset*, 890 F.3d 1227, 1233 (11th Cir. 2018) (emphasis added).

The Third Circuit has interpreted the Supreme Court's precedent as providing guidance to the lower courts to "focus[] on the privacy interest and the intrusiveness and indignity of the search to distinguish

between routine and nonroutine searches." *United States v. Whitted*, 541 F.3d 480, 485 (3d Cir. 2008). "Accordingly, patdowns, frisks, luggage searches, and automobile searches, involving neither a high expectation of privacy nor a seriously invasive search, are routine, whereas body cavity searches, strip searches, and x-ray examinations are considered nonroutine . . . ." *Id.* at 485-86. In *Whitted*, the Third Circuit held that "the search of private living quarters aboard a ship . . . is a nonroutine border search and must be supported by reasonable suspicion" due to the "special protection [afforded] to an individuals dwelling place." *Id.* at 488. The court based its holding on the "centuries-old principle of respect for the privacy of the home," emphasizing that "a search of a [sic] individual's living quarters" invades "a place where the individual expects not to be disturbed." *Id.* at 489 (internal quotation and citation omitted).

The Third Circuit has not had occasion to decide whether the search of a cell phone or laptop is more akin to a routine search of luggage or an automobile, or a nonroutine body cavity search. However, the court has held that "[d]ata storage media and electronic equipment, such as . . . computer devices, . . . may be inspected and viewed during a

reasonable border search." *United States v. Linarez-Delgado*, 259 Fed. App'x 506, 508 (3d Cir. 2007) (affirming the denial of a motion to suppress a videotape that was viewed by a Customs Officer). Other circuit court decisions make clear that the search of electronic devices and storage media is not necessarily nonroutine. *See Ickes*, 393 F.3d at 504 (upholding search of defendant's computer and disks under the border search exception without requiring individualized suspicion); *United States v. Pickett*, 598 F.3d 231, 235 (5th Cir. 2010) (treating search of defendant's thumb drives, portable hard drives, and laptop memory card at international port as "routine" border search); *United States v. Arnold*, 533 F.3d 1003, 1009 (9th Cir. 2008) (reasonable suspicion not required for manual search of laptop computer at the border); *Touset*, 890 F.3d at 1233-34 (declining to require suspicion for a forensic search of an electronic device).

As the cases show, a forensic search of electronics should be subject to less scrutiny than the individual living quarters found to be nonroutine in *Whitted*. As the Third Circuit stated, Whitted "had a reasonable expectation of privacy in his cabin: he excluded others from it, used it as his home, and slept and conducted his daily life therein."

541 F.3d at 489. Cruise ship passengers "expect that they will not be opened or intruded upon without consent." *Id.* To the contrary, because "'a port of entry is not a traveler's home,' . . . [w]hen someone approaches a border, he should not be surprised" that his belongings will be searched. *Ickes*, 393 F.3d at 506 (quoting *United States v. Thirty-Seven Photographs*, 402 U.S. 363, 376 (1971) (plurality opinion)). *See Touset*, 890 F.3d at 1235 ("Travelers crossing a border . . . [are] on notice that a search may be made, and they are free to leave any property they do not want searched—unlike their bodies—at home.") (internal quotation and citation omitted; alteration in *Touset*). Thus, despite the Third Circuit's holding that reasonable suspicion may be required for a nonroutine search of property when it invades the "sanctity of private dwellings," which require "the most stringent Fourth Amendment protection," *Whitted*, 541 F.3d at 488 (internal quotation and citation omitted), that rationale should not be applied to electronic devices that one should expect would be subject to a search.

Roggio argues—relying on a single dissenting opinion from another circuit—that not only should this Court find that the border search of his devices was nonroutine, but also that the search should

have required "a warrant based on probable cause." (Doc. 47 at 15-16).

He makes this argument against the backdrop described above: no

federal court has *ever* required a warrant for "*any* border search, no

matter how nonroutine or invasive." *Kolsuz*, 890 F.3d at 147.

At the border, the "highest level of Fourth Amendment protection

available is the reasonable suspicion standard." *Id.* at 147. *See also*

*Ramsey*, 431 U.S. at 619 ("There has never been any additional

requirement that the reasonableness of a border search depended on

the existence of probable cause."). Indeed, even the courts that have

held that a forensic evaluation of an electronic device is not a routine

border search have only required at most reasonable suspicion. *See*

*Kolsuz*, 890 F.3d at 146-48 (finding that some level of particularized

suspicion is necessary for a forensic examination of a cell phone at a

border but declining to state a standard); *United States v. Cotterman*,

709 F.3d 952, 968 (9th Cir. 2013) (holding that a forensic examination of

a computer required a "modest" showing of reasonable suspicion);

*United States v. Vergara*, 884 F.3d 1309, 1312-13 (11th Cir. 2018)

(finding that a forensic search of defendant's phones did not require a

warrant but not addressing whether reasonable suspicion was required while stating that it is the highest standard available at the border).[2]

**B. <u>Even if Reasonable Suspicion Was Required, It Was Clearly Present in this Case</u>.**

As discussed above, a search of an electronic device at the border requires no individualized suspicion.  However, this Court need not determine whether or not reasonable suspicion was required, because the agents clearly had reasonable suspicion—if not more—in this case, and thus the search was lawful under any existing border search standard.

As the Third Circuit explained:

> Under the reasonable suspicion standard, customs officers are required to have a "particularized and objective basis" to suspect illegal activity in order to conduct a search.  The officers must be able to articulate reasons that led to the search . . . that are indicative of behavior in which most innocent people do not engage.  We consider the totality of the circumstances in determining whether reasonable suspicion existed at the time of the search.  Accordingly, although each individual factor alone may be consistent with

---

[2] Even where the search occurs away from the border days after entry, courts still do not require anything more than reasonable suspicion. *See Cotterman*, 709 F.3d at 961-62 (forensic search two days later at a field office 170 miles from the border).  *See also United States v. Stewart*, 729 F.3d 517, 525 (6th Cir. 2013) (no Fourth Amendment violation for search of a laptop a day later at a field office 20 miles from airport).

innocent behavior, it is sufficient if together they "serve to eliminate a substantial portion of innocent travelers."

*Whitted,* 541 F.3d at 489-90 (internal citations omitted). The question then, falls on whether customs officers had a "particularized and objective basis" to conduct the instant border search. *Id.* at 489. Fortunately, the Court need go no further than the text of the affidavit submitted in support of the search warrant for Roggio's electronic devices seized at the border to make such a determination.

Although Roggio argues without elaboration that "the information in the Government's possession at the time that Mr. Roggio arrived at JFK did not rise to the level of reasonable suspicion," (Doc. 47 at 15), the government in fact had significant evidence of Roggio's crimes. Paragraphs 17 through 52 of the affidavit provide a helpful roadmap of the facts known to the investigation prior to seizure and search of the Roggio's items at JFK on February 26, 2017. (Doc. 47, Exhibit A). Any fair reading of the information and evidence gathered prior to the seizure suggests that the government had not only "reasonable suspicion of illegal activity," but probable cause to justify the search. *Whitted,* 541 F.3d at 489.

Agents were aware that Roggio had purchased controlled items, and had exported them to Iraq in violation of law. Roggio had utilized commercial email to send a document entitled "Weapons and Ammunition Feasibility Report," that contained a detailed description of the requirements (both physical and legal) to build a weapons and ammunition plant in Kurdistan, Iraq. (Doc. 47, Exhibit A, ¶ 34. Other emails generated or received by Roggio detailed the purchase of firearms parts – 15,000 "Gas Ring MIL" gas rings and 3,200 "Cotter Pin – Firing Pin Retainer" – firearm parts, controlled for export, which were ordered and paid for while Roggio was outside the United States. *Id.* at ¶¶ 35 – 40. On February 26, 2017, Roggio had arrived to the United States from Erbil, Iraq, via Istanbul, Turkey and had with him the various electronic devices and storage media seized by customs officials. *Id.* at ¶¶ 41 – 43.When interviewed, Roggio offered that he was doing business as a construction "consultant" in Kurdistan Iraq building residential housing, had been paid nine million dollars for his work, and was suspected of defrauding his Iraqi partners. *Id.* at ¶¶ 44 – 46.Roggio also confirmed his business addresses in Pennsylvania and Kurdistan

Iraq, together with his telephone numbers and email addresses. *Id.* at
¶ 47.

Put succinctly, the government had reasonable suspicion to
believe that Roggio had violated export law, together with committing
wire fraud and money laundering. The government had, prior to the
boarder search, discovered that these activities occurred both in the
United States and in Iraq. The government had documentation that
showed that Roggio used international electronic communications to
order and purchase items he illegally exported. The government had
reasonable suspicion to believe that Roggio was providing defense
services in Iraq in violation of law. Finally, the government knew that
Roggio was traveling back to the United States from Iraq, with
electronic devices capable of storing and transmitting information about
his illegal activities. *Id.*

The border search, if nonroutine, was well justified by reasonable
suspicion. More than sufficient facts known to the government
established reasonable suspicion that Roggio had violated, and was
continuing to violate the law, and that the devices and electronic

storage media he possessed would contain evidence of the same.

C. Suppression Would Be Unwarranted Because Law Enforcement Agents Acted in Good Faith.

Even where, unlike here, there has been an unlawful search, suppression is not an automatic remedy. *See Herring v. United States*, 555 U.S. 135, 141 (2009). It is well established that "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis v. United States*, 564 U.S. 229, 238 (2011) (internal citations and quotation marks omitted). Thus, as the Supreme Court has held, "[e]vidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule." *Id.* at 241.

It is undeniable that the agents in this case acted in objectively reasonable good faith on the long-established border search precedents applicable to them at the time. As detailed above, the Supreme Court has *never* required reasonable suspicion for a search of *property* at the border, and the lower courts have required it only in the most intrusive of nonroutine border searches. Roggio dedicates four pages of his

memorandum (including a full page of block-quoted text) to an out-of-circuit opinion (*Kolsuz*) that had not been decided at the time of the border search of Roggio's devices.[3]  (Doc. 47 at 11-14.)  Given the state of the law at the time of the search here, it was entirely reasonable for the agents to think that they would not need reasonable suspicion, let alone probable cause, to search Roggio's electronics.  *See, e.g., United States v. Wanjiku*, 919 F.3d 472, 485-86 (7th Cir. 2019) (finding that agents acted in good faith in searching a cell phone, hard drive, and laptop because they had reasonable suspicion); *United States v. Molina-Isidoro*, 884 F.3d 287, 293 (5th Cir. 2018) (finding it reasonable for government agents to conduct warrantless border searches of cell phones, even after *Riley*).

Roggio's motion to suppress should be denied.

---

[3] *Riley v. California*, 573 U.S. 373 (2014), on which *Kolsuz* heavily relies, had been decided at the time of Roggio's arrival at JFK; but that case did not address the border search exception to the Fourth Amendment, and no lower court case had yet applied its reasoning to a border search of electronic devices.

## IV.   <u>Conclusion</u>

The defendant's motion to suppress should be denied on the basis of the aforestated reasons.

Respectfully submitted:

DAVID J. FREED
UNITED STATES ATTORNEY

<u>s/ Todd K. Hinkley</u>
Todd K. Hinkley
Assistant U.S. Attorney
235 North Washington Ave.
Scranton, PA 18503
570-348-2800
Attorney ID PA-68881

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on May 20, 2019, she served a copy of the attached:

## GOVERNMENT'S RESPONSE TO
## DEFENSE MOTION TO SUPPRESS EVIDENCE

by ECF:

Gino A. Bartolai, Esq.

/s/Luann Manning
_____
LUANN MANNING
Supervisory Legal Assistant