IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:CR-18-0097 |
| | : | |
| v. | : | (Judge Mariani) |
| | : | |
| ROSS ROGGIO | : | (Electronically filed) |

## MOTION TO SUPPRESS ROGGIO'S STATEMENT AND RELATED EVIDENCE

AND NOW comes the Defendant, Ross Roggio, by his attorney, Gino Bartolai, Esquire, and files the following Motion to Suppress Roggio's Statement and related evidence, and in support thereof avers the following:

1. On March 20, 2018, Roggio was charged in an Indictment with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371; violations of the Arms Export Control Act, Title 22, United States Code, Sections 2778(b) and ( c); and the International Emergency Powers Act, Title 50, United States Code, Sections 1702 and 1705( c); smuggling goods from the United States, in violation of Title 18 United States Code Sections 554 and 2; wire fraud, in violation of Title 18, United States Code Section 1342; and money laundering, in violation of Title 18 United States Code, Sections 1956(a)(2)(A) and 2.

2. On March 23, 2018, Roggio appeared before Magistrate Judge Karoline Mehalchick for an initial appearance and arraignment and entered a plea of not guilty to the charges.

3. On March 29, 2019, Roggio's former counsel filed a Motion to Suppress Evidence Seized in Violation of the United States Constitution, (Document 46), with supporting brief. (Document 47).  Attached to Roggio's brief as Exhibit A is a 58 page document relative to Homeland Security Special Agent Christopher Hertzog's Application for a Search Warrant.  (Document 47-1).

4. The substance of Roggio's pending motion to suppress evidence and the briefs filed in support thereto involve Roggio's claim that the confiscation of his electronic devices at the JFK Airport and their subsequent searches constituted a violation of the Fourth Amendment and that all fruits of those searches and seizures should be suppressed.

5. On May 20, 2019, the Government filed a Brief in Opposition to Roggio's Motion to Suppress Evidence.  (Document 56).  Roggio filed a Reply Brief on July 10, 2020.  (Document 61).

6. On October 11, 2019, Roggio filed a Motion for Leave to File a Motion to Suppress Roggio's Statement and Related Evidence, (Document 62), which was granted by the Court by Order on June 8, 2020. (Document 63).

**Roggio's Detention at JFK Airport**

7. On or about April 2016, the Department of Commerce, (DOC), the Federal Bureau of Investigation, (FBI), and Homeland Security Investigation, (HSI), were actively investigating Roggio for the potential export of controlled items, including rifling combo buttons, from the United States to Iraq without the requisite DOC's Bureau of Industry and Security export license.  **Doc 47-1, Paragraphs 3 and 18.**

8. As early as November 2016, the DOC had availed itself to the use of the Court's in its investigation of Roggio, having obtained and executed a court-authorized search warrant on e-mail service provider Yahoo! Inc. for the contents of two email accounts used by Roggio.  **Doc 47-1, Paragraph 31.**

9. By January 27, 2017, the joint investigation had reached a point where HSI Special Agent Jeff Burke created a subject record within the HSI Investigative case management system for Roggio which included a 24-hour advance notification of any travel by Roggio.  **Doc 47-1, Paragraph 41.**

10. On February 25, 2017, Special Agent Burke received an automatic notification via the DHS reporting system that Roggio was scheduled to arrive at JFK Airport on February 26, 2017, at approximately 6:25 p.m. aboard Turkish

Airlines Flight #1. Special Agent Burke then coordinated with the HSI New York JFK Office and U.S. Customs and Border Protection to arrange for Roggio, and his traveling companion Christina Sidiropoulou, to undergo a secondary examination and border search upon their arrival at JFK customs. **Doc 47-1, Paragraph 42.**

  11. On February 26, 2017, Roggio and Sidiropoulou arrived in the United States aboard Turkish Airlines flight #1 from Erbil, Iraq via Instanbul, Turkey, and pursuant to Special Agent Burke's directives, were referred for secondary inspection at JFK customs at approximately 7:28 p.m. Both Roggio's and Sidiropoulou's bags were inspected with negative results and both were interviewed. **Document 47-1, Paragraph 43.**

  12. Roggio submits that on February 26, 2017, when he was referred for secondary inspection he was in custody/seized, for Fourth and Fifth Amendment purposes. Roggio submits that his seizure was unlawful in that it occurred without a warrant or reasonable suspicion. Roggio submits that his seizure was a staged event orchestrated by law enforcement agents, who had been investigating him for months. Roggio's initial detention, and continued detention, was done so that law enforcement could seize and search Roggio's person and property without probable cause and/or a warrant, and to subject Roggio to custodial interrogation all under the disguise of a Border Search.

## The Custodial Interrogation of Roggio at JFK Airport

13. On February 26, 2017, at approximately 7:28 p.m., Roggio approached a United States Customs Officer who was standing behind a counter. The Customs officer made inquiry of Roggio's admissibility, examined Roggio's travel papers, looked into the computer system and advised him to wait there while he stepped away from his station. At that time a uniformed Custom's Officer stepped behind Roggio and stood there until another Custom's Officer appeared and escorted Roggio by the arm to a small lobby in secondary screening and told him to sit in a specific chair until further notice.

14. While Roggio was sitting in the secondary screening lobby there was a uniformed Customs Officer seated at a desk in the front of the room. At some point Roggio got up, explaining to the seated Customs Officer that he needed to use the bathroom, at which time he was told to stay where he was while the Officer had an inaudible conversation on his radio, after which Roggio was escorted by the Customs Officer to a holding cell which had a stainless steel toilet. Roggio was locked in the holding cell for approximately 10-15 minutes.

15. While Roggio was locked in the holding cell he knocked on the door and shouted that he had finished and was ready to come out but no one came to

open the door until 2 uniformed Customs Agents, one male and one female, came and escorted him to an interrogation room which was approximately 15' x 12' with a table in the middle and some chairs on both sides.

16. When Roggio entered the interrogation room he noticed that his electronic devices were sitting on the table. He also saw that at the far end of the room stood two males with their suit jackets off and service pistols plainly displayed on their hips. It was subsequently learned that FBI Special Agent Douglas Vetrano and HSI Mundy were both notified of Roggio's expected arrival and had been waiting on site to participate in the questioning of Roggio and the seizure of his electronic devices. Attached to this motion as **Exhibits B and C** are redacted copies of HSI Special Agent Jeffrey Burke's reports relative to the interviews of Roggio and Sidiropoulou.

17. At that point Roggio was in the interrogation room with 4 individuals and he was told to "have a seat" which he did. Roggio was then questioned by the female Customs Agent who at times was being coached by the other armed male agents. During the questioning everyone except Roggio was standing and he became uncomfortable by the situation and also stood up at which time he was told to sit down.

18. Roggio had traveled before and had previously answered questions pertaining to his admissibility but here, while being questioned in this small

interrogation room, with four officers present, he felt that the questions had become investigatory in nature and he told the agents as much saying "shouldn't I have an attorney for this" to which he was told "No, this is a border search matter".

19. At no time before or during the questioning was Roggio advised of his Miranda warnings, nor was he told that he was not required to answer questions or that he was free to leave. Roggio submits that the questions being asked by the customs officer were being provided by FBI Special Agent Vetrano and HSI Special Agents Mundy, and did not have a bearing on the grounds for his admissibility as a U.S. Citizen but instead were meant to only further the ongoing criminal investigation. As such, Roggio submits, he should have been advised of his rights under Miranda. See, United States v. Kiam, 432 F.3d 524, 530 (3rd Cir. 2006).

20. The questioning of Roggio occurred late in the evening after he had been traveling all day. The questioning lasted for almost two hours during which Roggio was not offered any refreshments or food, or asked if he needed to use the bathroom. In fact, at one point Roggio inquired about the well being of Christina, his travel companion and personal assistant, and was told "don't worry about her, you need to worry about yourself."

21. During the questioning Roggio was asked for the passwords to his electronic devices to which he replied, "do I have to give them to you", the answer given to Roggio was "yes if you want to go home".

22. Indeed Roggio *needed to get home* because his father, who was 92 years old, had been admitted to hospital with an infection and was expecting to undergo imminent surgery.  Both Roggio and Sidiropoulou were in route to the hospital when they were detained at customs and both Roggio and Sidiropoulou informed the agents of this circumstance during their interviews.  **Roggio Exhibit B and C.**

23. It was under these coercive circumstances that Roggio relented and involuntarily gave answers to the questions being asked by the law enforcement agents.  It was under these coercive circumstances that Roggio relented and involuntarily provided the passwords to his electronic devises.  Roggio submits that his coerced and involuntary statements, including his disclosure of passwords, were obtained in violation of the Fifth Amendment. Oregon v. Elstad, 470 U.S. 298 (1985), 105 S.Ct. 1285 (1985), United States v. Patane, 542 U.S. 630, 124 S.Ct. 2620 (2004).

## The Searches of the Electronic Devices Seized at JFK Airport

24. On February 26, 2017, at approximately 7:28 p.m., Customs Agents seized the following electronic devices from Roggio; 1 MacBook Pro Laptop Computer, 1 Apple Ipad Tablet, 2 Apple Iphone 6's, and 1 Scandisk Flash Drive. **Doc 47-1, Paragraph 53.**

25. On February 26, 2017, at approximately 7:28 p.m. Customs Agents seized the following electronic devices from Sidiropoulou; 1 Apple Iphone S, 1 Apple Iphone 7, and 1 Apple Ipod. **Doc 47-1, Paragraph 53.**

26. Roggio submits that the aforementioned electronic devices seized from Sidiropoulou belonged to his company, Roggio Consulting, and were being used by Sidiropoulou in her capacity as his personal assistant.

27. On February 26, 2017, at the conclusion of the custodial interrogation of Roggio, HSI Special Agent James Mundy took custody of the aforementioned electronic devices and on February 28, 2017, transferred custody of said devices to HSI Special Agent Burke who conducted a physical exam of the detained property. **Doc 47-1, Paragraphs 53-54.**

28. On March 1, 2017, Special Agent Burke submitted the electronic devices to Computer Forensics Agent Doug Green who began conducting a

forensic examination of the items.  **Doc 47-1, Paragraph 55.**

29. On March 7, 2017, the computer forensic report for Roggio's Apple MacBook Pro Laptop Computer was posted for investigative review.  **Doc 47-1, Paragraphs 56.**

30.  Thereafter, the data retrieved from the forensic search of Roggio's Apple MacBook Pro Laptop Computer was used in HSI Special Agent Christopher Hertzog's Application for Search Warrant filed on March 21, 2017.[1]  **Doc 47-1, Paragraph 57-81.**

31.  On March 2, 2017, the computer forensic report for Roggio's Apple Ipad was posted for investigative review.  **Doc 47-1, Paragraph 82.**

32.  Thereafter, the data retrieved from the forensic search of Roggio's Apple Ipad was used in HSI Special Agent Christopher Hertzog's Application for Search Warrant filed on March 21, 2017.  **Doc 47-1, Paragraphs 83-89.**

33.  On March 2, 2017, the computer forensic report for Roggio's first Apple Iphone 6 was posted for investigative review.  **Doc 47-1, Paragraph 90.**

34.  Thereafter, the date retrieved from the forensic search of Roggio's first Apple Iphone 6 was used in HSI Special Agent Christopher Herzog's Application for Search Warrant filed on March 21, 2017.  **Doc 47-1, Paragraphs 91-106**.

---

[1] HSI Special Agent Hertzog' Application for Search Warrant sought the continued seizure and search of Roggio's Electronic Devices, as well as the forensic images made therefrom.  **Doc 47-1, Paragraph 4.**

35. On March 3, 2017, the computer forensic report for Roggio's second Apple Iphone 6 was posted for investigative review.  **Doc 47-1, Paragraph 107.**

36. Thereafter, the data retrieved from the forensic search of Roggio's second Apple Iphone 6 was used in HSI Special Agent Christopher Hertzog's Application for Search Warrant filed on March 21, 2017.  **Doc 47-1, Paragraphs 108-113.**

37. On March 6, 2017, the computer forensic report for Sidiropoulou's Iphone s was posted for investigative review.  **Doc 47-1, Paragraph 115.**

38. A review of the forensic report for Sidiropoulou's Iphone s revealed that Sidiropoulou was using the device to communicate with various members of Roggio Consulting Company as Roggio's personal assistant.  **Doc 47-1, Paragraph 118.**

39. Thereafter the data retrieved from Sidiropoulou's Iphone s was used in HSI Special Agent Christopher Hertzog's Application for Search Warrant filed on March 21, 2017.  **Doc 47-1, Paragraph 116-118.**

40. On March 7, 2017, the computer forensic report for Sidiropoulou's Iphone 7 was posted for investigative review.  **Doc 47-1, Paragraph 119.**

41. A review of the forensic report for Sidiropoulou's Iphone 7 revealed that the device was used jointly by Roggio and Sidiropoulou.  **Doc 47-1, Paragraph 122.**

42. Thereafter the date retrieved from Sidiropoulou's Iphone 7 was used in HSI Special Agent Christopher Hertzog's Application for Search Warrant filed on March 21, 2017.  **Doc 47-1, Paragraphs 120-123.**

43. HSI Special Agent Christopher Hertzog's Application for Search Warrant filed on March 21, 2017, also made use of Roggio's involuntary and coerced statements provided during his custodial interrogation of February 26, 2017, **Doc 47-1, Paragraph 43-47.**

44. On March 21, 2017, Magistrate Judge Karoline Mehalchick granted the requested Search Warrant which was executed by HSI that same day.  **Doc 47-1, page 58.**

### Evidence Fruits of Constitutional Violations

45. The unlawful detention of Roggio, and the seizure of his electronic devices as JFK Airport on February 26, 2017, without a warrant or probable cause/reasonable suspicion violated his right to be free from unreasonable searches and seizure as guaranteed by the Fourth Amendment.

46. The custodial interrogation of Roggio at JFK Airport on February 26, 2017, resulted in a coerced and involuntary statement by Roggio in violation of his rights against self-incrimination as guaranteed by the Fifth Amendment.

47. The warrantless forensic examinations of the electronic devices seized from Roggio and Sidiropoulou at JFK Airport on February 26, 2017, violated Roggio's right to be free from unreasonable searches and seizures as guaranteed by the Fourth Amendment.

48. The use of Roggio's involuntary statements, and the data unlawfully retrieved from Roggio and Sidiropoulou's electronic devices, in HSI Special Agent Hertzog's Application for Search Warrant poisons the Search Warrant Application and makes the subsequent issuance of the Search Warrant a fruit of the unconstitutional violations. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963).

49. Accordingly, Roggio submits that his statement given to law enforcement on February 26, 2017, and all the physical evidence that resulted from the searches of the electronic devices seized from Roggio and Sidiropoulou on February 26, 2017, should be suppressed.

WHEREFORE, the Defendant, Ross Roggio, respectfully requests that this Honorable Court issue an order suppressing Roggio's statement and all related evidence.

Respectfully submitted,

Date: June 15, 2020

s/Gino Bartolai
**Gino Bartolai, Esquire**
**Attorney ID# PA 56642**

238 William Street
Pittston, Pennsylvania 18640
(570) 654-3572
E-mail: Bartolai@ptd.net
Attorney for Ross Roggio

## CERTIFICATE OF NON-CONCURRENCE

I, Gino Bartolai, Esquire, certify that on this date I contacted Todd K. Hinkley, Assistant United States Attorney, who advised that he does not concur in the within **Motion to Suppress Roggio's Statement and Related Evidence.**

Date: June 15, 2020                         s/Gino Bartolai
                                                          **Gino Bartolai, Esquire**

# CERTIFICATE OF SERVICE

I, Gino Bartolai, Esquire, do hereby certify that I electronically served, via e-mail, a copy of the foregoing **Motion to Suppress Roggio's Statement and Related Evidence,** to the following

>Todd. K. Hinkley, Esquire
>Assistant United States Attorney

and by placing the same in the United States mail, first class, postage prepaid, at Scranton, Pennsylvania, addressed to the following:

>Ross Roggio

Date: June 15, 2020               s/Gino Bartolai
                                **Gino Bartolai, Esquire**