## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | **3:CR-18-0097** |
| | **:** | |
| **v.** | **:** | **(Judge Mariani)** |
| | **:** | |
| **ROSS ROGGIO** | **:** | **(Electronically filed)** |

### BRIEF IN SUPPORT OF MOTION TO SUPPRESS ROGGIO'S STATEMENT AND RELATED EVIDENCE

### Procedural History

On March 20, 2018, Roggio was charged in an Indictment with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371; violations of the Arms Export Control Act, Title 22, United States Code, Sections 2778(b) and ( c); and the International Emergency Powers Act, Title 50, United States Code, Sections 1702 and 1705( c); smuggling goods from the United States, in violation of Title 18 United States Code Sections 554 and 2; wire fraud, in violation of Title 18, United States Code Section 1342; and money laundering, in violation of Title 18 United States Code, Sections 1956(a)(2)(A) and 2.

On March 23, 2018, Roggio appeared before Magistrate Judge Karoline Mehalchick for an initial appearance and arraignment and entered a plea of not guilty to the charges.

On March 29, 2019, Roggio's former counsel filed a Motion to Suppress Evidence Seized in Violation of the United States Constitution, (Document 46), with supporting brief. (Document 47). Attached to Roggio's brief as **Exhibit A** is a 58 page document relative to Homeland Security Special Agent Christopher Hertzog's Application for a Search Warrant. (Document 47-1).

On May 20, 2019, the Government filed a Brief in Opposition to Roggio's Motion to Suppress Evidence. (Document 56). Roggio filed a Reply Brief on July 10, 2020. (Document 61).

On October 11, 2019, Roggio filed a Motion for Leave to File a Motion to Suppress Roggio's Statement and Related Evidence, (Document 62), which was granted by the Court by Order on June 8, 2020. (Document 63).

On June 15, 2020, Roggio filed a Motion to Suppress Roggio's Statement and Related Evidence. This brief is submitted in support of that motion.

## Statement of Facts

On or about April 2016, the Department of Commerce, (DOC), the Federal Bureau of Investigation, (FBI), and Homeland Security Investigation, (HSI), were actively investigating Roggio for the potential export of controlled items, including rifling combo buttons, from the United States to Iraq without the requisite DOC's Bureau of Industry and Security export license.  **Doc 47-1, Paragraphs 3 and 18.**

As early as November 2016, the DOC had availed itself to the use of the Court's in its investigation of Roggio, having obtained and executed a court-authorized search warrant on e-mail service provider Yahoo! Inc. for the contents of two email accounts used by Roggio.  **Doc 47-1, Paragraph 31.**  By January 27, 2017, the joint investigation had reached a point where HSI Special Agent Jeff Burke created a subject record within the HSI Investigative case management system for Roggio which included a 24-hour advance notification of any travel by Roggio.  **Doc 47-1, Paragraph 41.**

On February 25, 2017, Special Agent Burke received an automatic notification via the DHS reporting system that Roggio was scheduled to arrive at JFK Airport on February 26, 2017, at approximately 6:25 p.m. aboard Turkish

Airlines Flight #1. Special Agent Burke then coordinated with the HSI New York JFK Office and U.S. Customs and Border Protection to arrange for Roggio, and his traveling companion Christina Sidiropoulou, to undergo a secondary examination and border search upon their arrival at JFK customs. **Doc 47-1, Paragraph 42.**

On February 26, 2017, Roggio and Sidiropoulou arrived in the United States aboard Turkish Airlines flight #1 from Erbil, Iraq via Instanbul, Turkey, and pursuant to Special Agent Burke's directives, were referred for secondary inspection at JFK customs at approximately 7:28 p.m. Both Roggio's and Sidiropoulou's bags were inspected with negative results and both were interviewed. **Document 47-1, Paragraph 43.**

On February 26, 2017, at approximately 7:28 p.m., Roggio approached a United States Customs Officer who was standing behind a counter. The Customs officer made inquiry of Roggio's admissibility, examined Roggio's travel papers, looked into the computer system and advised him to wait there while he stepped away from his station. At that time a uniformed Customs Officer stepped behind Roggio and stood there until another Customs Officer appeared and escorted Roggio by the arm to a small lobby in secondary screening and told him to sit in a specific chair until further notice.

While Roggio was sitting in the secondary screening lobby there was a

uniformed Customs Officer seated at a desk in the front of the room. At some point Roggio got up, explaining to the seated Customs Officer that he needed to use the bathroom, at which time he was told to stay where he was while the Officer had an inaudible conversation on his radio, after which Roggio was escorted by the Customs Officer to a holding cell which had a stainless steel toilet. Roggio was locked in the holding cell for approximately 10-15 minutes.

While Roggio was locked in the holding cell he knocked on the door and shouted that he had finished and was ready to come out but no one came to open the door until 2 uniformed Customs Agents, one male and one female, came and escorted him to an interrogation room which was approximately 15' x 12' with a table in the middle and some chairs on both sides.

When Roggio entered the interrogation room he noticed that his electronic devices were sitting on the table. He also saw that at the far end of the room stood two males with their suit jackets off and service pistols plainly displayed on their hips. It was subsequently learned that FBI Special Agent Douglas Vetrano and HSI Mundy were both notified of Roggio's expected arrival and had been waiting on site to participate in the questioning of Roggio and the seizure of his electronic devices. Attached to the Motion to Suppress Roggio's Statement and Related Evidence as **Exhibits B and C** are redacted copies of HSI Special Agent Jeffrey Burke's reports relative to the interviews of Roggio and Sidiropoulou.

At that point Roggio was in the interrogation room with 4 individuals and he was told to "have a seat" which he did.  Roggio was then questioned by the female Customs Agent who at times was being coached by the other armed male agents.  During the questioning everyone except Roggio was standing and he became uncomfortable by the situation and also stood up at which time he was told to sit down.

Roggio had traveled before and had previously answered questions pertaining to his admissibility but here, while being questioned in this small interrogation room, with four officers present, he felt that the questions had become investigatory in nature and he told the agents as much saying "shouldn't I have an attorney for this"  to which he was told  "No, this is a border search matter".

At no time before or during the questioning was Roggio advised of his Miranda warnings, nor was he told that he was not required to answer questions or that he was free to leave.

The questioning of Roggio occurred late in the evening after he had been traveling all day.  The questioning lasted for almost two hours during which Roggio was not offered any refreshments or food, or asked if he needed to use the bathroom.  In fact, at one point Roggio inquired about the well being of Christina, his travel companion and personal assistant,  and was told "don't worry about her,

you need to worry about yourself." During the questioning Roggio was asked for the passwords to his electronic devices to which he replied, "do I have to give them to you", the answer given to Roggio was "yes if you want to go home".

Indeed Roggio **needed to get home** because his father, who was 92 years old, had been admitted to hospital with an infection and was expecting to undergo imminent surgery. Both Roggio and Sidiropoulou were in route to the hospital when they were detained at customs and both Roggio and Sidiropoulou informed the agents of this circumstance during their interviews. **Exhibit B and C.**

It was under these coercive circumstances that Roggio relented and involuntarily gave answers to the questions being asked by the law enforcement agents. It was under these coercive circumstances that Roggio relented and involuntarily provided the passwords to his electronic devises.

On February 26, 2017, at approximately 7:28 p.m., Customs Agents seized the following electronic devices from Roggio; 1 MacBook Pro Laptop Computer, 1 Apple Ipad Tablet, 2 Apple Iphone 6's, and 1 Scandisk Flash Drive. **Doc 47-1, Paragraph 53.** At the same time, Customs Agents seized the following electronic devices from Sidiropoulou; 1 Apple Iphone S, 1 Apple Iphone 7, and 1 Apple Ipod. **Doc 47-1, Paragraph 53.** The electronic devices seized from Sidiropoulou belonged to Roggio's company, Roggio Consulting, and were being used by Sidiropoulou in her capacity as Roggio's personal assistant.

On February 26, 2017, at the conclusion of the custodial interrogation of Roggio, HSI Special Agent James Mundy took custody of the aforementioned electronic devices and on February 28, 2017, transferred custody of said devices to HSI Special Agent Burke who conducted a physical exam of the detained property. **Doc 47-1, Paragraphs 53-54.**

On March 1, 2017, Special Agent Burke submitted the electronic devices to Computer Forensics Agent Doug Green who began conducting a forensic examination of the items. **Doc 47-1, Paragraph 55.**

During the course of the next week all of the electronic devices seized from Roggio and Sidiropoulou, with the exception of Roggio's Scandisk Flash Drive and Sidiropoulou's Apple IPod, were forensically examined without a search warrant.

On March 21, 2017, HSI Special Agent Christopher Hertzog used the data retrieved from the forensic searches of the electronic devices, along with the involuntary statements of Roggio, in an Application for a Search Warrant which sought the continued seizure and search of the seized devices as well as the forensic images made therefrom. **Doc 47-1, Paragraph 4.**

On March 21, 2017, Magistrate Judge Karoline Mehalchick granted the requested Search Warrant which was executed by HSI that same day. **Doc 47-1, page 58.**

**Issues Presented**

1.  **Whether Roggio was unlawfully detained at JFK Airport?**

2.  **Whether Roggio's Statement made during Custodial Interrogation was involuntary?**

3.  **Whether Evidence should be Suppresses as Fruits of Constitutional Violations.**

**Argument**

1.  <u>**Roggio was unlawfully detained at JFK Airport**</u>

The Fourth Amendment requires that searches and seizures be reasonable. What is reasonable depends upon all the circumstances surrounding the search or seizure and the nature of the search or seizure itself.  <u>United States v. Montoya De Hernandez</u>, 473 U.S. 531, 537, 105 S.Ct. 3304, 3308 (1985).  The permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.  <u>Id</u>.

The law has always recognized that the Fourth Amendment's balance of

reasonableness is qualitatively different at the international border than in the interior.  United States v. Montoya De Hernandez, 473 U.S. 531, 538, 105 S.Ct. 3304, 3309 (1985).  Indeed, Supreme Court precedent has consistently found that *routine searches and seizures* of the persons and effects of those seeking admissibility are not subject to any requirement of reasonable suspicion, probable cause, or warrant. These cases reflect the longstanding concern for the protection of the integrity of the border.  Id.  Balanced against the Government's interests at the border are the Fourth Amendment rights of the person seeking admission who is still entitled to be free from unreasonable search and seizure and that certain searches and seizures, classified as *non-routine*, require reasonable suspicion to pass constitutional muster.  United States v. Montoya De Hernandez, 473 U.S. 531, 541, 105 S.Ct. 3304, 3310 (1985).  To ascertain whether a border search, or seizure, can be classified as routine the court is required to examine the degree to which it intrudes on a traveler's privacy.  United States v. Whitted, 541 F.3d 480, 485 (3rd Cir. 2008)(Border searches fall into two categories; routine searches that require no suspicion and nonroutine searches that require reasonable suspicion).

In United States v. Montoya De Hernandez the Supreme Court was called upon to determine the lawfulness of the 16 hour detention of a female traveler who was detained at the border on suspicion of smuggling narcotics in her alimentary canal.  According to the Court, "the detention of a traveler at the border, beyond

the scope of a routine customs search and inspection, is justified at its inception if customs agent, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal," United States v. Montoya DeHernandez, 473 U.S. 531, 541, 105 S.Ct. 3304, 3310 (1985). The final issue, according to the Court, is "whether the detention of the respondent was reasonably related in scope to the circumstances which justified it initially". Id. at 473 U.S. 542, 105 S.Ct. at 3311.

Roggio submits that on February 26, 2017, when he was escorted to the secondary inspection area he was in custody/seized, for Fourth and Fifth Amendment purposes. Individuals subjected to secondary inspection by customs officials are in "custody" until they are admitted into the country. United States v. Kiam, 432 F.3d 524, 529 (3ʳᵈ Cir. 2006), United States v. St. Vallier, 404 Fed.Appx. 651, 656, FN 4, (3ʳᵈ Cir. 2010) (found no material distinction between questioning an alien to determine whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country).

Clearly the facts recited by Roggio relative to his encounter with Customs and the FBI on February 26, 2017, support the determination that he was in custody. Courts consider a variety of factors when determining if a person is in custody including:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tone of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.
>
> United States v. Willaman, 437 F.3d 354, 359 (3rd Cir. 2006).

Generally speaking, an individual is in custody if, given the circumstances surrounding the interrogation, a reasonable person would have felt that he or she was at liberty to terminate the interrogation and leave. Thompson v, Keohane, 516 U.S. 99, 112, 116 S.Ct. 457 (1995).

Here, Roggio was escorted by the arm to secondary inspection and told to sit in a specific chair under the surveillance of a uniformed customs officer. When Roggio rose to use the bathroom he was told to stay where he was and was then taken to a holding cell and locked inside. Roggio remained in the holding cell until two uniformed customs officers escorted him into a small interrogation room where he was again told to sit down. When Roggio entered the interrogation room he noticed his personal property on the table and two males in plain clothes with firearms displayed on their hips standing at the far side of the room.

Initially Roggio was seated during the questioning but got uncomfortable by the fact that everyone else was standing. When Roggio also stood up he was told

to sit back down.  Roggio was never told that he was not under arrest or that he was free to leave.  The interrogation lasted for almost 2 hours during which time Roggio was not offered any refreshments, food, or opportunity to use the restroom. When Roggio asked whether he should have an attorney present due to the investigatory nature of the questioning he was told "No, this is a border search matter".  When Roggio inquired about the well-being of his traveling companion and personal assistant, Christina Sidiropoulou, he was told "Don't worry about her, you need to worry about yourself."  When pressed to disclose the passwords to his electronic devices Roggio asked whether he was required to do so and was told "Yes, if you want to go home".

Roggio submits that because of the "high degree of intrusiveness" to his liberty interests, his detention at JFK Airport can not be considered routine.  See, United States v. Whitted, 541 F.3d. 480, 485 (3rd Cir. 2008)(To ascertain whether a border search can be classified as routine court must examine the degree to which it intrudes on a traveler's privacy).  Granted anyone seeking admission into the country through an international airport can be subjected to routine searches and seizures such as being required to pass through a security screening checkpoint and being required to submit to questioning by customs/immigration official relative to their admissibility, and in the case of a Unites States Citizen, the admissibility of their effects.  United States v. Hartwell, 436 F.3d 174 (3rd Cir.

2006), <u>United States v. St. Vallier</u>, 404 Fed.Appx. 651, 656 FN 4 (3rd Cir. 2010).

But what happened in this case is much more than a routine border search and seizure. Here, Roggio's seizure was a staged event orchestrated by law enforcement agents who had been investigating him for months. Roggio's initial detention, and continued detention, was done so that law enforcement could seize and search Roggio's person and property without probable cause and/or a warrant, and to subject Roggio to custodial interrogation all under the disguise of a routine border search. Indeed, the same agencies that were investigating Roggio's suspected export offenses triggered the decision to subject Roggio to secondary inspection and even made it a point to be present and participate in his interrogation.

Nevertheless, even when examined using a border search and seizure analysis Roggio's detention must be considered unlawful. As noted above, the purpose being served by a border inspection/search is to determine whether the individual, and his effects, are admissible. <u>United States v. Kiam</u>, 432 F.3d 524, 529 (3rd Cir. 2006), <u>United States v. St. Vallier</u>, 404 Fed.Appx. 651, 656 FN 4 (3rd Cir. 2010). The detention of a traveler at the border, beyond the scope of a non-routine customs search, as in Roggio's case, is justified at its inception if customs agents, considering all the facts surrounding the traveler and their trip reasonably suspect illegal activity. <u>United States v. Montoya De Hernandez</u>, 473 U.S. 531,

541, 105 S.Ct. 3304, 3310 (1985). Even then, a determination must be made as to whether the detention of the traveler was reasonable related in scope to the circumstances which justified it initially. Id. at 473 U.S. 542, 105 S.Ct. 3311.

In Roggio's case there was no reasonable suspicion on the part of custom's officials to suspect that a secondary inspection would bear upon Roggio's admissibility or the admissibility of his effects. Roggio is a United States citizen who possessed a valid United States Passport who approached a customs official and answered the relevant questions regarding his admissibility and the nature of his effects. It was then that he was detained and only because the officials investigating his suspected export offenses had prearranged for his detention. Roggio submits that the questions being asked by the customs officer were being provided by FBI Special Agent Vetrano and HSI Special Agents Mundy, and did not have a bearing on the grounds for his admissibility as a U.S. Citizen but instead were meant to only further the ongoing criminal investigation. Indeed, at some point early on in Roggio's detention his bags were searched and his effects inspected as evidenced by the fact that he saw his electronic devices displayed on the table of the interrogation room when he walked in. The inspection of Roggio's baggage produced negative results. Clearly, Roggio's continued detention at this point would have exceeded the scope of any initial justification. See, Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319 (1983)(an investigative detention must be

temporary and last no longer than is necessary to effectuate the purpose of the

stop), United States v. Montoya De Hernandez, 473 U.S. 531, 105 S.Ct. 3304

(1985).

Accordingly, Roggio submits that his seizure was unlawful.


2. **Roggio's Statement made during Custodial Interrogation was Involuntary**.

Roggio submits that the statement that he made to law enforcement while in

custody at JFK Airport, including the disclosure of the passwords for his

electronic devices, was involuntary.

Statements made to police are inadmissible as evidence if the statements are

involuntary.  Involuntary statements violate the Due Process Clause of the Fifth

Amendment.  A statement is given voluntarily if, when viewed in the totality of

the circumstances, it is the product of an essentially free and unconstrained choice

by its maker.  United States v. Jacobs, 431 F.3d 99, 109 (3rd Cir. 2005).  If an

individual's will is overborne or that person's capacity for self-determination is

critically impaired, his statements are involuntary.  Id.  Relevant to the

voluntariness inquiry is a suspect's background and experience, including prior

dealing with the criminal justice system.  A necessary predicate to a finding of

involuntariness is coercive police activity and a causal connection between the

police conduct and the statement. The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged statement is voluntary. Id.

In this case, Roggio was taken into custody prior to being interrogated. As earlier noted he was escorted by the arm to a secondary inspection lobby where he was told to sit in a specific chair while being surveilled by a uniformed customs officer. When he need to use the rest room he was locked into a holding cell. He was then escorted from this holding cell to a small interrogation room by two uniformed customs agents. When he entered the interrogation room he was confronted with his personal belongings and two armed law enforcement agents.

What followed was a period of almost two hours of questioning with four law enforcement agents participating. Roggio was uncomfortable because he was seated while these individuals were standing so he rose up only to be told to sit down again. When he felt that the questions had become accusatory he advised that he felt that maybe he should have an attorney present at which time he was told "No, this is a border search matter". When he inquired about the well being of his travel companion and personal assistant, Christina Sidiropoulou, he was told "don't worry about her, you need to worry about yourself." And when he was pressed to provide the passwords to his electronic devices he asked if he was required to do so to which he was told, "Yes, if you want to go home." Indeed, going home was exactly what Roggio needed to do. Roggio's father, who was 92

years old, had been hospitalized with an infection and was about to undergo imminent surgery.  Roggio was on his way to the hospital to see his father when he was detained for secondary questioning and he told his questioners this and they used it to overcome his will and force him to answer their questions.

At no time before or during the questioning was Roggio advised of his Miranda warnings, nor was he told that he was not required to answer questions or that he was free to leave.  Failure to administer Miranda warnings creates a presumption of compulsion.  Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285 (1985).  Roggio submits that the questions being asked by the customs officer were being provided by FBI Special Agent Vetrano and HSI Special Agents Mundy, and did not have a bearing on the grounds for his admissibility as a U.S. Citizen but instead were meant to only further the ongoing criminal investigation. As such, Roggio submits, he should have been advised of his rights under Miranda.  See, United States v. Kiam, 432 F.3d 524, 530 (3rd Cir. 2006). It was under these coercive circumstances that Roggio relented and involuntarily gave answers to the questions being asked by the law enforcement agents.  It was under these coercive circumstances that Roggio relented and involuntarily provided the passwords to his electronic devises.  Roggio submits that his coerced and involuntary statements, including his disclosure of passwords, were obtained in violation of the Fifth Amendment.  Oregon v. Elstad, 470 U.S. 298 (1985), 105

S.Ct. 1285 (1985), <u>United States v. Patane</u>, 542 U.S. 630, 124 S.Ct. 2620 (2004**)**.

Accordingly, Roggio's statement should be suppressed as violative of

<u>Miranda</u> and the Fifth Amendment.

### 3. <u>Evidence should be Suppresses as Fruits of Constitutional Violations</u>.

In <u>Wong Sun v. United States</u>, 371 U.S. 471, 83 S.Ct. 407 (1963), the

Supreme Court held that evidence and witnesses discovered as a result of a search

in violation of the Fourth Amendment must be excluded from evidence.  The

*Wong Sun* doctrine applies as well when the fruit of the Fourth Amendment

violation is a confession.  <u>Oregon v. Elstad</u>, 470 U.S. 298, 306. 105 S.Ct. 1285,

1291 (1985).  And while a failure to give <u>Miranda</u> warnings may not necessarily

trigger the *Wong Sun* doctrine, a violation of the Fifth Amendment in the form of

an involuntary confession will.  <u>United States v. Patane</u>, 542 U.S. 630, 631-632,

124 S.Ct. 2620, 2623 (2004).

The unlawful detention of Roggio, and the seizure of his electronic devices

as JFK Airport on February 26, 2017, without a warrant or probable

cause/reasonable suspicion violated his right to be free from unreasonable

searches and seizure as did the subsequent warrantless forensic examinations of the electronic devices. To the extent that his custodial statement is a fruit of that unlawful detention it should be suppressed.

The custodial interrogation of Roggio at JFK Airport on February 26, 2017, resulted in a coerced and involuntary statement by Roggio in violation of his rights against self-incrimination as guaranteed by the Fifth Amendment.

The use of Roggio's involuntary statements, and the data unlawfully retrieved from Roggio and Sidiropoulou's electronic devices, in HSI Special Agent Hertzog's Application for Search Warrant poisons the Search Warrant Application and makes the subsequent issuance of the Search Warrant a fruit of the unconstitutional violations. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407 (1963).

Accordingly, Roggio submits that his statement given to law enforcement on February 26, 2017, and all the physical evidence that resulted from the searches of the electronic devices seized from Roggio and Sidiropoulou on February 26, 2017, should be suppressed.

**Conclusion**

Based upon the foregoing Argument, Roggio requests that this Honorable Court issue an Order directing that his statement given to law enforcement on February 26, 2017, and all the physical evidence that resulted from the searches of the electronic devices seized from Roggio and Sidiropoulou on February 26, 2017, be suppressed.


Respectfully submitted,


Date: June 15, 2020               s/Gino Bartolai
                                  **Gino Bartolai, Esquire**
                                  **Attorney ID# PA 56642**

                                  238 William Street
                                  Pittston, Pennsylvania 18640
                                  (570) 654-3572
                                  E-mail: Bartolai@ptd.net
                                  Attorney for Ross Roggio

## CERTIFICATE OF SERVICE

I, Gino Bartolai, Esquire, do hereby certify that I electronically served, via

e-mail, a copy of the foregoing **Brief in Support of Motion to Suppress Roggio's**

**Statement and Related Evidence,** to the following

Todd. K. Hinkley, Esquire
Assistant United States Attorney

Ross Roggio

Date: June 15, 2020             s/Gino Bartolai_____
                                **Gino Bartolai, Esquire**