UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:CR-18-0097 |
| | ) | |
| v. | ) | (Judge Mariani) |
| | ) | |
| ROSS ROGGIO | ) | (Filed Electronically) |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE**

I.   **Procedural History**

On March 20, 2018, a federal grand jury sitting in Scranton,
Pennsylvania returned a multicount indictment charging Ross Roggio
with: conspiracy to commit an offense against the United States, in
violation of 18 U.S.C. § 371; violations of the Arms Export Control Act,
22 U.S.C. § 2278(b) and (c); violations of the International Emergency
Powers Act, 50 U.S.C. §§ 1702 and 1705(c); smuggling goods from the
United States, in violation of 18 U.S.C. §§ 554 and 2; wire fraud, in
violation of 18 U.S.C. § 1343; and money laundering, in violation of 18
U.S.C. §§ 1956(a)(2)(A) and 2.

On March 29, 2019, Roggio filed two pre-trial motions: (1) Motion
to Suppress Evidence Seized in Violation of the United States

Constitution (Doc. 46); and (2) Motion for Early Disclosure of *Jencks* Act Material (Doc. 48). The Government filed a Brief in Opposition to Roggio's motion to suppress on July 10, 2019. (Doc. 48). The Court has not yet ruled on that motion. More recently, Roggio filed a Supplemental Motion to Suppress Statements and Related Evidence on June 15, 2020. (Doc. 64).

This brief is filed in opposition to Roggio's Supplemental Motion, which should be denied in its entirety.

## II. <u>Factual Background</u>

This prosecution is the result of a joint investigation being conducted by the Federal Bureau of Investigation (FBI), Homeland Security Investigations (HSI) (an arm of the Department of Homeland Security, Immigration and Customs Enforcement), and the Department of Commerce, Office of Export Enforcement. Ross Roggio, a United States citizen, is alleged to have unlawfully exported firearms parts, firearms manufacturing tools, and defense services in support of the development of a firearms factory in the Kurdistan region of Iraq.

Roggio formerly resided at 143 Indian Spring Drive, Stroudsburg, Pennsylvania. He operated Roggio Consulting Company, LLC, with a

business address of 116 Turkey Hill Court, Stroudsburg, Pennsylvania.[1]

Roggio has a background in firearms sales and manufacturing, having been involved with two failed manufacturing enterprises in the United States. Roggio Arsenal, the first manufacturing venture, was located in Fayetteville, North Carolina and produced AR-15 style weapons, which are the semi-automatic civilian version of the M16 military rifle. Roggio Arsenal went out of business in 2010. In 2014, Roggio also attempted to manufacture weapons under the name Rebel Arms, a business that failed in the planning stages and was located in Stroudsburg, Pennsylvania.

On March 30, 2016, this investigation was initiated when an individual from Drill Masters Eldorado Tools, Inc., located in Connecticut, contacted the FBI Public Access Line to report a suspicious shipment of gun manufacturing tools to Iraq. The report indicated that a customer by the name of Ross Roggio had purchased items from the company and had them delivered to Roggio's residential address in Pennsylvania before being transshipped to Iraq.

---

[1] This address is also the residence of Roggio's parents.

Roggio was subsequently telephonically interviewed on April 20, 2016, by a Special Agent of the FBI concerning the alleged shipment of controlled firearms manufacturing items to Iraq. Roggio was speaking on the telephone from Kurdistan, Iraq. Roggio acknowledged purchasing the items, but advised the agent that the items were shipped to and stored at either his own house, or his parent's house, both of which are located in Stroudsburg, Pennsylvania. Roggio explained that he may have shipped cleaning kits for an AR-15 to Iraq approximately six weeks earlier.

Subsequent interviews with: (1) employees of Drill Master Eldorado Tools, Inc.; (2) Ross Roggio's wife Kristy Merring-Roggio, and (3) the owner of Package Place, a commercial packing and shipping company located in Stroudsburg, Pennsylvania, showed that Roggio had directed the items purchased from Drill Mater Eldorado Tools, Inc. to be transshipped from Stroudsburg, to Kurdistan, Iraq. Records checks with the proper licensing authorities determined that the items purchased by Roggio were both controlled for export to Iraq, and that Roggio had failed to obtain the necessary licenses to make such an export.

On November 17, 2016, based upon information obtained from the investigation, agents obtained a court-authorized search warrant to the email service provider Yahoo! Inc. for the contents of two email accounts utilized by Roggio. Review of the fruits of that search showed, among other things, that on November 4, 2015, Roggio had emailed a document entitled "Weapons and Ammunition Feasibility Report," to his employee. That report contained a detailed description of the requirements to build a weapons and ammunition plant in the Kurdish region of Iraq. One section of this report entitled "LEGAL FEASIBILITY" states, in part:

> The largest pool of skilled gun manufacturers will come from the USA. In order for these selected personnel to work on the project, they must be compliant to The International Traffic in Arms Regulations (ITAR). They will require the approval of the United States State Department. Failure to get proper approvals places the selected personnel in grave danger in incarceration and heavy fines.

The email search revealed additional evidence of criminal wrongdoing by Roggio, including the purchase of firearms parts for M4 type weapons which, the investigation has determined, were illegally exported to Iraq in support of Roggio's arms and ammunition plant.

As a result of the ongoing investigation, members of the investigative team requested HSI to provide 24-hour advance notification of any travel by Roggio. On February 25, 2017, HSI notified agents that Roggio was scheduled to arrive at John F. Kennedy International Airport (JFK) airport on the next day, aboard a Turkish Airlines flight. Upon receipt of this notification, agents conducted various records checks, and confirmed that Roggio was returning to the United States, and that he was doing so with a travel companion by the name Christina Sidiropolulou. Case agents coordinated with HSI New York JFK Office and U.S. Customs and Border Protection (CBP) to arrange that Roggio and his travel companion undergo a secondary examination and border search upon their arrival at JFK customs.

Upon arrival on Turkish Airlines, from Erbil, Iraq, via Istanbul, Turkey, Roggio and Sidiropoulou were referred for secondary inspection at JFK customs. The interviews were conducted by CBP Officers Aurelia Morales (Roggio) and Sara Perea (Sidiropoulou).[2]

---

[2] In his brief in support, Roggio indicates that two additional agents were present "on site to participate in the questioning of Roggio and the seizure of his electronic devices." (Doc. 65 at 5.) Though two other agents were present, the CPB Officer solely conducted the interview of Roggio.

Roggio was interviewed and stated that he was traveling with his girlfriend, who was also serving as his personal assistant. Roggio indicated that he was traveling from Iraq, where he had worked for the past three years, during which time he traveled back and forth to the United States with his latest outbound trip to Iraq occurring at the end of November, 2016. Roggio stated that he owned Roggio Consulting Company, and was overseeing the construction of three high-rise residential buildings in Sulaymaniyah, Iraq, in collaboration with "Zarya Construction Company." Roggio stated that he was working as a consultant for the project and advised on building construction to include the foundation to the metal structure development and everything in-between. Roggio explained that he had approximately 40 employees from all over the world working for him, and that Zarya paid him $9 million to complete the project.

Roggio went on to state that, after Thanksgiving 2016, he returned to Iraq to continue his project there and was planning on traveling back to the United States right before Christmas 2016. Roggio stated that he purchased his ticket and proceeded to Sulaymaniyah Airport in December 2016. At the airport, he was

approached by a security guard who ordered Roggio to go with him. While walking with the security guard, Roggio was approached by another man who threw a scarf over his head and told him he was going to be kidnapped. Roggio stated that he was taken to an unknown location and was held until February 24, 2017. Roggio stated that the kidnappers took his passport and that he was scared and he thought that he was going to die. Roggio stated that he asked why he was being held and was informed that Kadir Haman, representing Zarya Construction Company, was holding him against his will because Haman believed that Zarya overpaid for the construction project and they wanted their money back. Roggio stated that Zarya claimed they paid him $12 million instead of $9 million and wanted the rest of the money returned. Roggio stated that he was forced to transfer money from his account into the kidnapper's account little by little, and that he ultimately transferred approximately $200,000 total into the kidnapper's account.

Roggio stated that he was able to escape by jumping through a window at two o'clock in the morning. He said he was helped by his friend, Hiwy, to whom he paid $250 to drive him to the American

embassy. Roggio stated no one knew of his kidnapping. Roggio stated that he had a protocol with his ex-wife, Kristy Merring-Roggio, who resides in the United States, that he was supposed to call her every day. Roggio stated that he instructed Kristy that if she did not hear from him for more than three days, she was to alert the authorities about him possibly being kidnapped or missing. Roggio stated that his ex-wife Ms. Merring-Roggio alerted the authorities about his absence. Roggio stated that will never travel to Iraq again.

Roggio provided agents with a residence address of 143 Spring Drive, Stroudsburg, Pennsylvania, and a business address in the United States as 116 Turkey Hill Court, Stroudsburg, Pennsylvania. According to Roggio, his business address in Iraq was Roggio Consulting Company, Baharan Residential Complex, Building 13, Floor 2, Office 10, Sulaimaniyah, Kurdistan region of Iraq. Roggio provided his local and Iraqi telephone number, along with email and Skype addresses.

In his Motion and Brief in Support, Roggio alleges that: (1) he was questioned by a female Customs Agent who was being coached by other armed male agents; (2) he asked whether he should have an attorney for the questioning; (3) he was told to sit down during

questioning on more than one occasion; and (4) he was told he would not be allowed to go home unless he provided passwords to his electronic devices. (Doc. 64). In fact, Roggio's interview was conducted by CPB Officer Morales without "coaching" or input from others. CPB Officer Morales's interview consisted of routine questions normally asked during such encounters, including Roggio's name, business, means and reason for travel, and claim of entitlement to enter the United States. What is more, Roggio never inquired about having an attorney present, nor was Roggio advised by anyone that he would not be allowed to "go home" if he failed to provide electronic passwords.

At the conclusion of the interviews[3] of Roggio and Sidiropoulou, both were advised that their electronic devices were being detained for a border search. Agents detained from Roggio: (1) an Apple MacBook Pro laptop computer; (2) an Apple iPad tablet; (3) an Apple iPhone 6S; and (4) a Scandisk flash drive (removable storage device). Various

---

[3] The two travelers were interviewed separately. Secondary Inspection Reports of Roggio (Defendant's Exhibit B) and Roggio's traveling companion, Sidiropoulou (Defendant's Exhibit C) were filed with Roggio's Brief in Support (Doc. 64) as Exhibits B and C, respectively.

electronic items, not subject to this suppression motion, were seized from Sidiropoulou.

The government obtained a search warrant for the electronic devices seized from Roggio on March 21, 2017, from United States Magistrate Judge Karoline Mehalchick. *See* Dkt. No. 3:17-MC-197 (M.D. Pa. Mar. 21, 2017).

The court ordered searches of electronic devices seized from Roggio revealed additional evidence of his crimes, including among other things: (1) communications with his Kurdistan customers; (2) detailed information concerning the arms and ammunition manufacturing plant project; (3) communications concerning possible fraud committed by Roggio in completing the arms factory; (4) financial records related to payment to Roggio for his work in Kurdistan; and (5) evidence of his knowledge of export control laws.

## III.   Argument

The Government fully briefed Roggio's first motion to suppress, some of which argument and case law are applicable to the instant supplemental motion. As such, the Government incorporates by reference its previous brief in opposition as if fully set forth herein.

(Doc. 61).  As in his original suppression motion, Roggio's Supplemental Motion seeks to suppress evidence gathered from his electronic devices. (Doc. 64 at 9 – 13.)  New to the instant motion is an assertion that such evidence should be suppressed as "fruit of the poisonous tree" of the statements Roggio argues were illegally obtained.  (Doc. 64 at 3 – 8.)  As the Government's previous Brief in Opposition addresses the suppression of electronic evidence, this brief will address Roggio's claim that the Government violated his Fifth Amendment rights during the secondary border inspection.

As an initial matter, federal law dictates that all travelers, including U.S. Citizens, who enter or exit the United States are subject to examination – including both questioning and physical inspection of their belongings – upon arrival to and departure from the United States.  19 U.S.C. §§ 1433(b), 1459(a); 19 C.F.R. § 162.6; 8 U.S.C. § 1225(a)(3); 8 C.F.R. § 235.1(b) and (f).

The narrow question in the instant case is whether officers were required to give Roggio *Miranda* warnings before questioning him during a secondary border inspection.  The Fifth Amendment to the United States Constitution states, "No person ... shall be compelled in

any criminal case to be a witness against himself." U.S. Const., amend.

V. In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court held

the prosecution could not use statement stemming from "custodial

interrogation" of a defendant unless they used procedural safeguards

effective to secure the privilege against self-incrimination. The court

defined custodial interrogation as, "… questioning initiated by law

enforcement officers after a person has been taken into custody or

otherwise deprived of his freedom of action in any significant way." *Id.*

at 444.

Generally, courts have adopted a different standard when

applying *Miranda* in the context of the border.[4] "'A person seeking

entry into the United States does *not* have a right to remain silent.'"

*United States v. Kiam*, 432 F.3d 524, 529 (3d Cir. 2006) (quoting *United*

*States v. Gupta,* 183 F.3d 615, 617 (7th Cir. 1999)) (emphasis in *Kiam*).

Federal courts have long held that, "… persons seeking entry at the

border may be questioned without Miranda warnings, even though they

---

[4] JFK airport, where Roggio was questioned, is clearly the "border." *See*
*United States v. FNU LNU*, 653 F.3d 144, 148 n.3 (2d Cir. 2011) ("The
international arrivals section and Customs area of a U.S. airport
undisputedly constitute the 'border' for constitutional purposes.").

are also subject to custody." *Gupta*, 183 F.3d at 618 (citing cases); *see United States v. Molina–Gomez*, 781 F.3d 13, 22 (1st Cir. 2015) ("[E]vents which might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into [t]he country.") (quoting *United States v. Moya*, 74 F.3d 1117, 1120 (11th Cir.1996)).

Specifically, the Fifth Amendment privilege against self-incrimination does not apply to routine questions asked of travelers at the border, such as identity, nationality, business, and claim of entitlement to enter. *See Gupta*, 183 F.3d at 617. As is clear from the report of interview completed by CBP Officer Morales following her questioning of the defendant, the secondary inspection interview was routine in nature. The report documents that Roggio provided information about (1) his travel and identity documents; (2) the identity of the person he was traveling with; (3) the place from where he was traveling; (4) his frequency of travel; (5) his reason for travel (business in Iraq and return to United States to visit his ill father); (6) the nature of his travel (foreign business interests); and (7) the reason for possession of a temporary United States passport (kidnapping in Iraq).

(Defendant's Exhibit B.)  Such information is squarely within "routine" questioning by U.S. Customs and Border Protection at a United States border.  *See Gupta*, 183 F.3d at 617.

The fact that CPB Officers removed Roggio and his companion from the primary entry line for secondary inspection does not offer the defendant any additional protections.  In *Kiam*, the Third Circuit examined the application of *Miranda* rules in the context of immigration inspections at the international border and held that "normal *Miranda* rules simply cannot apply to this unique situation at the border."  432 F.3d at 529; *see also United States v. St. Vallier,* 404 F. App'x 651, 656 (3rd Cir. 2010) ("Normal *Miranda* rules are, however, inapplicable to circumstances where border inspectors question persons seeking entry into the United States.")  Therefore, individuals seeking to enter the United States may be questioned without *Miranda* warnings even if they are "taken out of a primary inspection line for secondary questioning."  *Kiam,* 432 F.3d at 529-30; *see also St. Vallier,* 404 F. App'x. at 656 ("…whether an individual is questioned in a primary inspection line or removed from the line for secondary inspection has no bearing on the inapplicability of normal Miranda

15

rules under such circumstances."). In *St. Vallier*, the Third Circuit explained that, for the purposes of *Miranda*, there is "no material distinction between questioning an alien to determine whether he is entitled to enter the country and questioning a U.S. Citizen to determine whether his effects are entitled to enter the country." 404 F. App'x. at 656 n.4.

Nonetheless, the Third Circuit has recognized that even in the context of an international border, "eventually, a 'line must be drawn,' beyond which *Miranda* warnings are required." *Kiam*, 432 F.3d at 530 (quoting *Gupta*, 183 F.3d at 618). The court explained that this line is crossed when "inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution." *Kiam*, 432 F.3d at 530. However, the line is not crossed by "mere overlap" between questions to assess admissibility of an individual or their effects and questions regarding potential criminal liability. *Id.* at 530 n.6.

Importantly, the Third Circuit has recognized that, "…determinations regarding the admissibility of persons or importation of effects often involve an initial assessment of whether a person is

engaged in criminal activity." *St. Vallier*, 404 F. App'x. at 657 (citing

*Kiam*, 432 F.3d at 527 (border inspector properly questioned appellant

about his prior travels and association with other passengers on his

arrival flight as part of admissibility determination relating to concerns

of ongoing human smuggling operation)). The fundamental inquiry is

whether the official's questions, "bear upon both admissibility and

criminal conduct, while not relating solely to the prosecution of the

latter...." *St. Vallier*, 404 F. App'x at 657 (citing *Kiam*, 432 F.3d at 531).

In other words, if the questioning is not exclusively related to a criminal

investigation, then the non-Mirandized interview is permissible and the

defendant's answers admissible, because they do not cross the boundary

articulated by the Third Circuit. Moreover, CBP's authority extends to

investigating and enforcing laws relating to immigration and export

and import control—natural subjects of inquiry at border inspections.

The secondary inspection of Roggio – though it was conducted at

the request of agents investigating the offenses for which he is now

charged – did not involve questioning beyond what is considered routine

border inquiry. In *United States v. Harder*, 180 F. Supp. 3d 355 (E.D.

Pa. 2016), the court was confronted with a similar argument and held

that the questioning of the Defendant did not require *Miranda*

warnings.  In *Harder*, the defendant arrived at JFK after returning

from a business trip to London, Baku, and Moscow.  *Id.* at 358.  The

FBI, who suspected the defendant of participating in a bribery scheme,

had assigned an agent to interview the defendant when he arrived at

JFK.  *Id.*  After the defendant arrived at the primary inspection area, he

was escorted by CBP to a secondary inspection area for questioning.

Once there, the agents informed the defendant that he was not

obligated to speak with them but that they had some questions for him

if he would agree to talk.  The defendant agreed to answer the agent's

questions.  *Id.* at 359.  After being indicted, the defendant argued that

his *Miranda* rights were violated when he was questioned in the

secondary inspection area.  *Id.* at 357.  The court disagreed and held

that, "warnings were not required because under *Kiam*, the Agents'

questions did not trigger *Miranda*."  *Id.* at 366.  The court directly

addressed and rejected the argument that suppression was required

because the questions were designed to aid in prosecution of the

defendant.  The court explained that the defense's reading of *Kiam*,

"would impose more rigorous Miranda standards on the questioning of

those seeking admission to this country than on the questioning of everyone already within our borders—exactly the opposite of the *Kiam* Court's intentions." *Id.*

CONCLUSION

The Third Circuit has held that questions asked during a secondary border search do not require the reading of *Miranda* rights so long as they relate to the officer's determination of whether the defendant, or their effects, may enter the country. Additionally, the court has held that *Miranda* warnings are not required even when questions relate to the defendant's criminal activity, so long as those questions also relate to the officer's determination of whether the defendant should be admitted into the United States. In Roggio's case, the questions asked, based on the answers outlined in the reports of the interview, addressed topics that the court has consistently held relate to admissibility of an individual or their effects into the United States. Additionally, the court has also held that questions relating to a potential criminal prosecution do not require *Miranda* unless they no longer address the issue of admissibility. For this reason, the questions

asked in the instant case do not require *Miranda* warnings under the

*Kiam* standard.

The defendant's supplemental motion to suppress should be

denied for all of the foregoing reasons.

Respectfully submitted:

DAVID J. FREED
UNITED STATES ATTORNEY

s/ Todd K. Hinkley
Todd K. Hinkley
Assistant U.S. Attorney
235 North Washington Ave.
Scranton, PA 18503
570-348-2800
Attorney ID PA-68881

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA | No. 3:18-CR-0097 |
|---|---|
| v. | (Judge Mariani) |
| ROSS ROGGIO<br>Defendant. | (electronically filed) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers. That on this Wednesday, October 7, 2020, he served a true and correct copy of the foregoing

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S SUPPLEMENTAL MOTION TO SUPPRESS EVIDENCE

by filing the same via ECF, in which the recipient is enrolled.

Recipient:
Gino A. Bartolai, Jr.
238 William Street
Pittston, PA 18640
Email: barolai@ptd.net

October 7, 2020

s/ Todd K. Hinkley
Todd K. Hinkley
Assistant United States Attorney