**1**

09:11AM

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA,  )
                           )
            Plaintiff      )
                           )
         vs                )    18-CR-97
                           )
ROSS ROGGIO,               )
                           )
            Defendant      )
_____)


TRANSCRIPT OF PROCEEDINGS
*Suppression Hearing*
BEFORE THE HONORABLE ROBERT D. MARIANI
THURSDAY, MAY 27, 2021; 9:30 A.M.
SCRANTON, PENNSYLVANIA


FOR THE GOVERNMENT:
    TODD K. HINKLEY, ESQ.
    Assistant United States Attorney
    William J. Nealon Federal Building
    Suite 311
    235 N. Washington Avenue
    Scranton, Pennsylvania  18503

FOR THE DEFENDANT:
    GINO A. BARTOLAI, JR., ESQ.
    238 William Street
    Pittston, Pennsylvania  18640


**Proceedings recorded by machine shorthand, transcript produced by computer-aided transcription.**
_____

KRISTIN L. YEAGER, RMR, CRR
CERTIFIED REALTIME REPORTER
235 N. WASHINGTON AVENUE
SCRANTON, PENNSYLVANIA 18503

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| For the Government: | | | | |
| Aurelia Morales | 3 | 21 | 54 | 58 |
| James Mundy | 61 | 67 | -- | -- |
| Jeff Burke | 75 | 107 | 160 | 161 |
| | | | | |
| For the Defendant: | | | | |
| Felney Augustine | 162 | -- | -- | -- |
| Douglas Vetrano | 167 | -- | -- | -- |


E X H I B I T    I N D E X

| For the Government: | Identified | Admitted |
|---|---|---|
| Exhibit No. 1 | 9,22 | 10 |
| Exhibit No. 2 | 66,67 | 66 |
| Exhibit No. 5 | 80,84,102,110,116,131,159 | 84 |
| Exhibit Nos. 3&4 | 83 | 84 |
| Exhibit No. 6 | 85,122 | 86 |
| Exhibit No. 7 | 88,123 | 89 |
| Exhibit No. 8 | 91 | 92 |
| Exhibit No. 9 | 93,158,159 | 93 |
| Exhibit No. 10 | 95,149 | 97 |
| Exhibit No. 11 | 101 | 102 |
| Exhibit No. 12 | 102,157 | 107 |
| | | |
| For the Defendant: | | |
| | | |
| Exhibits D,E & F | 73,141 | -- |

3

09:38AM 1      THE COURT: Good morning, everyone.

09:38AM 2      MR. HINKLEY: Good morning, Your Honor.

09:38AM 3      MR. BARTOLAI: Good morning, Judge.

09:39AM 4      THE COURT: This is the matter of United States v. Ross

09:39AM 5  Roggio. We are here on two motions filed by Mr. Roggio. The

09:39AM 6  first is a Motion to Suppress Mr. Roggio's statement and

09:39AM 7  related evidence, which is document 64, and in addition to

09:39AM 8  that, there is document 46, a Motion to Suppress evidence

09:39AM 9  seized in violation of the United States Constitution. Both of

09:39AM 10  those motions will be heard today.

09:39AM 11      Mr. Hinkley, are you ready to proceed?

09:39AM 12      MR. HINKLEY: We are, Your Honor.

09:39AM 13      THE COURT: You can call your first witness.

09:39AM 14      MR. HINKLEY: We call Aurelia Morales, Your Honor.

09:39AM 15  A U R E L I A    M O R A L E S   IS CALLED, AND HAVING BEEN

09:39AM 16  DULY SWORN, TESTIFIED AS FOLLOWS:

09:40AM 17      THE CLERK: Please state and spell your name for the record.

09:40AM 18      THE WITNESS: Aurelia Morales, A-U-R-E-L-I-A, M-O-R-A-L-E-S.

09:41AM 19      THE CLERK: Thank you. You may be seated.

09:41AM 20      THE COURT: You can proceed.

09:41AM 21      MR. HINKLEY: Thank you, Your Honor.

09:41AM 22                      DIRECT EXAMINATION

09:41AM 23  BY MR. HINKLEY:

09:41AM 24  Q.   Ms. Morales, how are you employed?

09:41AM 25  A.   As a U.S. Customs and Border Protection Officer.

**4**

09:41AM 1   Q.    How long have you been with the Customs Border

09:41AM 2   Enforcement?

09:41AM 3   A.    For 13 years.

09:41AM 4   Q.    Can you give the Court a little background in regards to

09:41AM 5   your education? What type of education have you had?

09:41AM 6   A.    I graduated John Jay College of Criminal Justice in 2007

09:41AM 7   with two degrees, an Associate in Criminal Justice and

09:41AM 8   Bachelor's in International Criminal Justice. And I started my

09:41AM 9   Master's in International Relations at N.Y.U., but I didn't

09:41AM 10  graduate yet.

09:41AM 11  Q.    I see. You've indicated that you're with U.S. Customs and

09:41AM 12  Border Protection for 13 years. What type of position do you

09:42AM 13  hold today with that agency?

09:42AM 14  A.    I'm an officer, and I have a lot of experience in

09:42AM 15  processing people and doing different inspections with U.S.

09:42AM 16  Customs and Border Protection through different teams and

09:42AM 17  different assignments.

09:42AM 18  Q.    Would you move the microphone a little bit closer to your

09:42AM 19  mouth, I'm having a little bit of difficulty understanding you.

09:42AM 20        What type of training have you received from Customs and

09:42AM 21  Border Protection, in regards to your position there?

09:42AM 22  A.    I'm sorry, I couldn't hear the first part of the question.

09:42AM 23  Q.    What kind of training have you received from the agency,

09:42AM 24  in regards to your position there?

09:42AM 25  A.    The training with the CBP, which is Customs and Border

09:42AM 1  Protection, stems from Immigration Law, Customs Law,

09:43AM 2  counterterrorism measures, assessing terror threats, assessing

09:43AM 3  criminality, and so on.

09:43AM 4  Q.    Okay. As part of your duties, are you someone who will do

09:43AM 5  what they call secondary inspections or secondary interviews at

09:43AM 6  borders? Is that part of your duties?

09:43AM 7  A.    Could you repeat the question?

09:43AM 8  Q.    Sure. As part of your duties, do you do with what's

09:43AM 9  commonly called a secondary inspection or a secondary interview

09:43AM 10 at borders?

09:43AM 11 A.    Yes.

09:43AM 12 Q.    Can you describe to the Judge, basically, what that means,

09:43AM 13 what that is?

09:43AM 14 A.    Secondary inspection is when a person that was processed

09:43AM 15 through primary inspection needs additional assessing, in terms

09:44AM 16 of Immigration Laws, Customs Laws or any threats, any

09:44AM 17 criminality involved with that person.

09:44AM 18 Q.    Can you give the Court an idea of how many, if you know,

09:44AM 19 secondary inspections you've been involved with, during your

09:44AM 20 career?

09:44AM 21 A.    That's hard to assess. Probably -- I know only when I was

09:44AM 22 on the specialized team, I conducted, at least, 5,000

09:44AM 23 interviews in three years, but I want to say, throughout my

09:44AM 24 entire career, maybe, over 10,000.

09:44AM 25 Q.    So this is not an infrequent thing that's done by you or

09:44AM 1    your agency; is that correct?

09:44AM 2    A.    Not at all.

09:44AM 3    Q.    During February of 2017, were you employed by Customs and

09:45AM 4    Border Protection?

09:45AM 5    A.    Yes.

09:45AM 6    Q.    On February 26 of 2017, where were you stationed?

09:45AM 7    A.    At John F. Kennedy International Airport in New York City.

09:45AM 8    Q.    Likewise, on that day, were you working in your capacity

09:45AM 9    to do secondary inspections at the airport?

09:45AM 10   A.    Correct. That day, I was actually on a specialized team

09:45AM 11   called TTRT Tactical Terrorism Response Team.

09:45AM 12   Q.    Could you give the Judge a little bit of background, in

09:45AM 13   regards to that particular team? What was that team all about?

09:45AM 14   A.    Okay. Historically, in 2015, TTRT was initiated by the

09:46AM 15   Government and United States Customs and Border Protection as a

09:46AM 16   response to fight against the terrorist group ISIS, the Islamic

09:46AM 17   State of Iraq and Al sham, Syria.

09:46AM 18        So we were instructed to interview passengers that arrived

09:46AM 19   from, primarily, Iraq, Syria and conflict zones and the

09:46AM 20   countries around, in order to get more information on the fight

09:46AM 21   on the ground, stemming from, maybe, reporting criminality to

09:46AM 22   intelligence information, in terms of where the battle was

09:46AM 23   situated or where the conflict was taking place, including

09:47AM 24   names of people involved or possibly involved or if they have

09:47AM 25   personal experience with any conflict coming from those places,

09:47AM 1  in the hopes that we would get more information.

09:47AM 2      At that time, the terrorist network was going under the

09:47AM 3  black internet, the dark internet, meaning, that Government

09:47AM 4  agents in the area could not get more information from their

09:47AM 5  sources on the ground, via following internet analysis, so our

09:47AM 6  team was created to get more information from people coming

09:47AM 7  from those places, basically. I hope that answers the question.

09:47AM 8  Q.   So on February 26, 2017, you were working at J.F.K.

09:48AM 9  Airport. Was it -- on that particular day, were your duties,

09:48AM 10 basically, to do secondary interviews of Travelers who were

09:48AM 11 coming in from foreign places?

09:48AM 12 A.   Yes.

09:48AM 13 Q.   And why don't you just describe to the Court, if you

09:48AM 14 would, what that means? How that would work? In other words,

09:48AM 15 someone comes, is going to be secondary, what happens?

09:48AM 16 A.   So the primary officer will process the passenger, and if

09:48AM 17 the passenger will need additional screening or assessing, the

09:48AM 18 passenger will get referred into secondary. In secondary, the

09:48AM 19 passenger will have to wait for an officer that is specialized

09:48AM 20 in the issue that the passenger is bringing and along with

09:48AM 21 other passengers in the room.

09:49AM 22     Sometimes there's a wait, because J.F.K. is very busy all

09:49AM 23 the time with all different cases, but on that particular day,

09:49AM 24 I was instructed to interview him. I don't remember exactly

09:49AM 25 when I got there, I knew I had interviews before and after him

09:49AM 1 and, probably, different places, as well.

09:49AM 2 Q.    Okay, I'll get into the interview with Mr. Roggio in a

09:49AM 3 moment, I'm just trying to set the stage for the Judge so he

09:49AM 4 can understand how your job works.

09:49AM 5        Typical day on February 26 of 2017, you show up to work,

09:49AM 6 and you were assigned to do interviews, secondary interviews of

09:49AM 7 folks; is that right?

09:49AM 8 A.    Yes.

09:49AM 9 Q.    And let me ask you, you indicated that there were

09:49AM 10 interviews before and after Mr. Roggio. During the time, let's

09:49AM 11 say, the eight-hour shift or whatever, approximately, how many

09:49AM 12 interviews would you do, in your approximation?

09:49AM 13 A.    Approximation, it could be 2 to 3 to 25 to 30 a day. And

09:50AM 14 it could be up to five different locations, buildings, where I

09:50AM 15 have to drive and meet the passenger.

09:50AM 16 Q.    And, more specifically, I want to get into, you've

09:50AM 17 indicated that when someone is going to be secondary, they are,

09:50AM 18 let's say, recommended to you or one of your colleagues, they

09:50AM 19 come to a room, and then they wait to be interviewed.

09:50AM 20        Could you describe what an interview room would look like

09:50AM 21 at J.F.K. where you actually would do an interview? Physically,

09:50AM 22 what is it? How is it set up?

09:50AM 23 A.    It could vary, depending on the location. But in his

09:50AM 24 particular case, I remember the terminal, it was Terminal 1, so

09:50AM 25 everything was a configuration, at that point, being so busy,

09:51AM 1   it was pretty much wherever we can conduct an interview. But

09:51AM 2   for that day, I remember I had a room that was, like, maybe, 10

09:51AM 3   x 12, and maybe a desk, a chair, and that's about it.

09:51AM 4   Q.   So, specifically, I'd like to ask you a few questions, in

09:51AM 5   regards to your secondary interview of Mr. Roggio.

09:51AM 6        Before I do that, I've left on the table up there a number

09:51AM 7   of exhibits, on the top is Government Exhibit No. 1 for

09:51AM 8   identification purposes.

09:51AM 9   A.   May I put my glasses on?

09:51AM 10  Q.   Sure.

09:52AM 11  A.   Yes.

09:52AM 12  Q.   Would you take a look at that document, and if you would

09:52AM 13  identify it for the Court, what is Government's Exhibit No. 1?

09:52AM 14  A.   This is a report of Mr. Roggio arriving at J.F.K., and I'm

09:52AM 15  assuming it's a TECS record with -- yeah, it's a TECS record,

09:52AM 16  it's an automatic record generated by the system through Mr.

09:52AM 17  Roggio's processing.

09:52AM 18  Q.   Okay. Would the information that's in this document, would

09:52AM 19  that have been keyed in by yourself as the interviewer of Mr.

09:52AM 20  Roggio?

09:52AM 21  A.   This is done automatically by the system.

09:53AM 22  Q.   Second page of Government's Exhibit 1.

09:53AM 23  A.   Yes.

09:53AM 24  Q.   Would you describe what that is?

09:53AM 25  A.   This is my report, my interview that I conducted with Mr.

**10**

09:53AM 1 Roggio, my close-out.

09:53AM 2 Q.   So would this report be something you prepared at or close

09:53AM 3 to the time of Mr. Roggio's interview?

09:53AM 4 A.   Correct, afterwards.

09:53AM 5 Q.   Obviously, prior to today's testimony, you had an

09:53AM 6 opportunity to read over that report?

09:53AM 7 A.   Yes.

09:53AM 8 Q.   Does it accurately reflect the interview that you gave Mr.

09:53AM 9 Roggio on February 26 of 2017?

09:53AM 10 A.   100 percent.

09:53AM 11     MR. HINKLEY: Your Honor, the Government is going to move

09:53AM 12 for admission of Government's Exhibit No. 1.

09:53AM 13     MR. BARTOLAI: We have no objection, Judge. In fact, we had

09:53AM 14 submitted this, I believe, as Exhibit B to one of our previous

09:54AM 15 filings. Our copy was redacted, of course.

09:54AM 16     THE COURT: Very well. Government's 1 is admitted.

09:54AM 17     (At this time Government's Exhibit No. 1 was admitted into

09:54AM 18      evidence.)

09:54AM 19 BY MR. HINKLEY:

09:54AM 20 Q.   Ms. Morales, would it aid your testimony today if you had

09:54AM 21 Government's Exhibit 1, specifically, the report available to

09:54AM 22 make reference, as you're testifying as to the interview of Mr.

09:54AM 23 Roggio? Would that assist you today?

09:54AM 24 A.   Yes.

09:54AM 25 Q.   So let me ask, more particularly, in regards to Mr.

11

09:54AM 1    Roggio, he was referred to you for a secondary inspection; is

09:54AM 2    that right?

09:54AM 3    A.    Yes.

09:54AM 4    Q.    Do you recall the name of the officer who referred him to

09:54AM 5    you?

09:54AM 6    A.    No.

09:54AM 7    Q.    If you look at Government's Exhibit No. 1, would that help

09:54AM 8    your recollection in regards to that, on the first page?

09:55AM 9    A.    Augustine, Felney.

09:55AM 10   Q.    So Officer Augustine is the one who, according to the

09:55AM 11   paperwork, referred Mr. Roggio to secondary; is that correct?

09:55AM 12   A.    Yes.

09:55AM 13   Q.    And does the paperwork indicate the time of the referral?

09:55AM 14   A.    Yes.

09:55AM 15   Q.    And what time would that be?

09:55AM 16   A.    1928 Eastern time.

09:55AM 17   Q.    As Mr. Roggio was referred to you, was his referral any

09:55AM 18   different from any other referrals that you received that day,

09:55AM 19   meaning, did anyone speak to you, before he was referred to

09:55AM 20   you, in regards to what he was being referred for, for what

09:56AM 21   reason?

09:56AM 22   A.    No.

09:56AM 23   Q.    Okay. So I want you to describe how it happened, from your

09:56AM 24   perspective, as a referring officer or the person for whom that

09:56AM 25   was referred to?

09:56AM 1  A.   So it's four years ago, as much as I remember, I called

09:56AM 2  Mr. Roggio from the secondary holding area and I directed him

09:56AM 3  to the office where I conducted an interview.

09:56AM 4  Q.   So would this be the same as any other secondary?

09:56AM 5  A.   Yes, every time.

09:56AM 6  Q.   I think you indicated earlier that you would have had

09:56AM 7  other interviews prior to Mr. Roggio and interviews after Mr.

09:56AM 8  Roggio?

09:56AM 9  A.   Yes.

09:56AM 10  Q.   Do you know -- can you tell, from your report, what time

09:56AM 11  it is that you actually called Mr. Roggio to the room to be

09:56AM 12  interviewed? And if you can't, that's fine.

09:57AM 13  A.   No, I can't.

09:57AM 14       MR. BARTOLAI: What was the question again? I'm sorry. What

09:57AM 15  was the question Todd?

09:57AM 16       MR. HINKLEY: The question was whether or not she could

09:57AM 17  recall when, exactly, she called Mr. Roggio to the interview

09:57AM 18  room.

09:57AM 19       MR. BARTOLAI: The time, okay. Judge, if I may, I didn't

09:57AM 20  ask previously, but if there are any witnesses present in the

09:57AM 21  courtroom, I would ask that they be sequestered. That would

09:57AM 22  exclude, of course, the case agent.

09:57AM 23       MR. HINKLEY: Only the case agent, Your Honor, and I would

09:57AM 24  join in that if you have any witnesses.

09:57AM 25       MR. BARTOLAI: No, I don't.

09:57AM 1      THE COURT: Very well.

09:57AM 2  BY MR. HINKLEY:

09:57AM 3  Q.    So Ms. Morales, why don't you describe for the Court your

09:57AM 4  interview of Mr. Roggio, and I'll just ask you to give a

09:57AM 5  narrative, from your recollection, of how the interview went

09:57AM 6  and what questions you asked and Mr. Roggio's replies?

09:57AM 7  A.    So because I interviewed so many people around that time

09:58AM 8  and it has been four years already, I could only remember him

09:58AM 9  based on my notes.

09:58AM 10  Q.    Okay.

09:58AM 11  A.    So when I read my notes, I remember an interview

09:58AM 12  being -- he was very pleasant, very cooperative, very forward,

09:58AM 13  I remember he was giving me, actually, more information that I

09:58AM 14  didn't request at that point, but I just allowed him to speak,

09:58AM 15  in the hopes that he will tell me more information, the kind of

09:58AM 16  derogatory information I was expecting coming from Iraq and,

09:58AM 17  also, based on his story that he told me that happened to him.

09:58AM 18      But for the most part, I thought he was a nice gentleman,

09:58AM 19  he was trying to answer my questions correctly, and I didn't

09:58AM 20  have anything to complain about him. I also put at the end that

09:58AM 21  he was cooperative, meaning, that he didn't complain about the

09:58AM 22  questions.

09:59AM 23      Usually, when a passenger complains, I put in my report

09:59AM 24  that they complain or they thought it was too invasive or too

09:59AM 25  intrusive or they asked for a supervisor, any of that stuff.

**14**

09:59AM 1   Q.   And none of that happened here?

09:59AM 2   A.   No. So I put he was cooperative, so I remember him being

09:59AM 3   very pleasant and very forward with his answers.

09:59AM 4   Q.   So, more particularly, how did you kick off the interview,

09:59AM 5   what questions did you ask, if you can recall?

09:59AM 6   A.   So basic questions that I ask every passenger traveling

09:59AM 7   from international travel. So the five W's. Who, where, when,

09:59AM 8   how -- who, where, when and the other ones -- the instances,

09:59AM 9   the events that occurred during the passenger's travel, from

10:00AM 10  when they left the United States until they came back to the

10:00AM 11  United States.

10:00AM 12  Q.   And would those type of questions include where the person

10:00AM 13  went?

10:00AM 14  A.   Correct.

10:00AM 15  Q.   And what the person was doing?

10:00AM 16  A.   Correct.

10:00AM 17  Q.   Would you and did you ask Mr. Roggio those questions?

10:00AM 18  A.   Yes.

10:00AM 19  Q.   Did you ask him what type of business he was involved

10:00AM 20  with?

10:00AM 21  A.   Yes.

10:00AM 22  Q.   In regards to the question of what business he was

10:00AM 23  involved with, is that a question that you generally or

10:00AM 24  routinely ask international travelers?

10:00AM 25  A.   Yes.

10:00AM 1   Q.    So do you recall the answers Mr. Roggio gave you, in

10:00AM 2   regards to these questions? I'm just asking you to give a

10:00AM 3   narrative for the Court what Mr. Roggio told you?

10:00AM 4   A.    So, for the most part, he was a construction company owner

10:01AM 5   with workers in Iraq, they were building infrastructure

10:01AM 6   buildings business, and he was part owner with somebody from

10:01AM 7   over there.

10:01AM 8   Q.    Did he give you the actual address that he indicated was

10:01AM 9   his business address in Iraq?

10:01AM 10  A.    I believe so, yes.

10:01AM 11  Q.    That's reflected in your report, is that correct?

10:01AM 12  A.    Yes, yes.

10:01AM 13  Q.    And I assume you asked him the nature of his business,

10:01AM 14  what he was doing?

10:01AM 15  A.    Yes.

10:01AM 16  Q.    And he provided to you information in regards to that, is

10:01AM 17  that correct?

10:01AM 18  A.    Yes.

10:01AM 19  Q.    And as I read your report, you indicated that he owned

10:01AM 20  something called Roggio Consulting Company?

10:02AM 21  A.    Yes.

10:02AM 22  Q.    That he was involved in overseeing construction of

10:02AM 23  high-rise residential buildings in Iraq?

10:02AM 24  A.    Yes.

10:02AM 25  Q.    Now, did Mr. Roggio indicate to you that there was some

10:02AM 1  type of issue that occurred in his business relationships in

10:02AM 2  Iraq?

10:02AM 3  A.   I don't remember, I don't remember if he told me of any

10:02AM 4  issues with the business --

10:02AM 5  Q.   Okay.

10:02AM 6  A.   -- from the beginning of the interview.

10:02AM 7  Q.   So I notice in your report of interview with Mr. Roggio,

10:03AM 8  he had indicated that he was paid $9 million by his Iraqi

10:03AM 9  counterparts, but there was some dispute in regards to how much

10:03AM 10  money he received?

10:03AM 11  A.   Yes.

10:03AM 12  Q.   According to your report, Mr. Roggio indicated to you that

10:03AM 13  he was told that he had to pay money back to his investors

10:03AM 14  there or business associates, and that he was kidnapped by

10:03AM 15  them--

10:03AM 16  A.   Yes.

10:03AM 17  Q.   -- until he paid that back.

10:03AM 18  A.   Yes.

10:03AM 19  Q.   Again, is this the recollection of the statements you

10:04AM 20  received from Mr. Roggio, at the time of the interview?

10:04AM 21  A.   Correct. I remember this information, however, I think it

10:04AM 22  started with him traveling on the temporary passport, and I

10:04AM 23  asked him what happened to the real passport, and that's how he

10:04AM 24  got into the him being kidnapped and whoever kidnapped him took

10:04AM 25  his real passport.

10:04AM 1   Q.   I see.

10:04AM 2   A.   And then I think we got into the problems with the

10:04AM 3   business and all of that stuff.

10:04AM 4   Q.   Okay, so I was getting in front of myself a little bit

10:04AM 5   when I was asking about the issues. So you indicated he was

10:04AM 6   traveling on a temporary passport?

10:04AM 7   A.   Yes. I think I put it in my report at the beginning,

10:04AM 8   Temporary United States passport, and a copy of his stolen

10:04AM 9   United States passport.

10:04AM 10  Q.   Okay. Someone who is traveling on a temporary passport, is

10:05AM 11  that, alone, an issue that you would explore?

10:05AM 12  A.   Definitely.

10:05AM 13  Q.   With anybody?

10:05AM 14  A.   Definitely, 100 percent.

10:05AM 15  Q.   And you did so here?

10:05AM 16  A.   Yes.

10:05AM 17  Q.   And is that when Mr. Roggio then gave the explanation of

10:05AM 18  how he lost his passport and why he was on a temporary

10:05AM 19  passport?

10:05AM 20  A.   Correct, especially, losing it in Iraq, and anybody could

10:05AM 21  have, like, used his real passport to gain entry to the U.S.,

10:05AM 22  and that would have been a big issue for us.

10:05AM 23  Q.   After he gave you the information, in regards to the

10:05AM 24  kidnapping, what other information did you elicit from him, at

10:05AM 25  that point, if you recall?

10:05AM 1   A.   I was trying to get as much information -- I remember him

10:06AM 2   just telling me the story, and I don't remember asking too many

10:06AM 3   questions because I wanted him to see -- I mean, to have his

10:06AM 4   chance to tell me what happened to him, especially, assuming

10:06AM 5   that he got kidnapped, and I wanted to see if, maybe, there was

10:06AM 6   more people involved, maybe, there was more people kidnapped

10:06AM 7   with him at the same time.

10:06AM 8        So I don't remember asking too many questions, I wanted

10:06AM 9   him to just tell me what he remembered, and pretty much whoever

10:06AM 10  was implicated, and if he can remember any, like, names or

10:06AM 11  places that he was taken or any of that stuff.

10:06AM 12  Q.   And so my question to you is, was Mr. Roggio fairly open

10:06AM 13  with this?

10:06AM 14  A.   Yes.

10:06AM 15  Q.   And you recorded the information in your notes?

10:06AM 16  A.   Yes.

10:06AM 17  Q.   And that information is in this report that you've

10:06AM 18  prepared?

10:06AM 19  A.   Yes.

10:07AM 20  Q.   Did Mr. Roggio, to your recollection, have a conversation

10:07AM 21  with you, in regards to why he was traveling back to the United

10:07AM 22  States, specifically, about his father, his father's health?

10:07AM 23  A.   Yes.

10:07AM 24  Q.   What was that about?

10:07AM 25  A.   He said that his father was in the hospital, and he wants

**19**

10:07AM 1  to come and see him, make sure he's okay.

10:07AM 2  Q.    Okay. Did Mr. Roggio indicate that's where he was headed,

10:07AM 3  to see his father?

10:07AM 4  A.    Yes.

10:07AM 5  Q.    At the conclusion of your interview with Mr. Roggio, did

10:07AM 6  you have any type of conversation, in regards to electronic

10:07AM 7  devices that he had with him while traveling?

10:07AM 8  A.    I don't remember.

10:08AM 9  Q.    So let me ask you this. How long, to your recollection,

10:08AM 10 did this interview take, from the time that you brought Mr.

10:08AM 11 Roggio back to the interview room until you were completed with

10:08AM 12 your secondary interview of him?

10:08AM 13 A.    I want to say 15 to 20 minutes.

10:08AM 14 Q.    Once you were done with your interview, what happened with

10:08AM 15 Mr. Roggio?

10:08AM 16 A.    He left.

10:08AM 17 Q.    Okay. Were you part or present when -- well, let me ask

10:08AM 18 you this. I'll withdraw that question.

10:08AM 19      The day of this particular interview, were there other

10:08AM 20 agents who were present during the interview or at the time of

10:08AM 21 Mr. Roggio's secondary inspection?

10:08AM 22 A.    Yes.

10:09AM 23 Q.    Do you recall those folks' names?

10:09AM 24 A.    So based on my statement, Special Agent Vetrano and Agent

10:09AM 25 Cy Mundy and other CBP officers at that time.

10:09AM 1  Q.   Now, did either of those officers or agents coach you, in

10:09AM 2  regards to what type of questions to ask Mr. Roggio?

10:09AM 3  A.   I don't remember.

10:09AM 4  Q.   At the conclusion of your interview with Mr. Roggio, did

10:09AM 5  those agents have interaction with Mr. Roggio, in regards to

10:09AM 6  the electronics Mr. Roggio was keeping?

10:09AM 7  A.   I don't remember.

10:09AM 8  Q.   So when you're done with your interview, what happened,

10:09AM 9  basically?

10:09AM 10  A.   I went to the next interview.

10:09AM 11  Q.   Okay. And any of the questions that you asked Mr. Roggio,

10:10AM 12  would they be different or unique as to any question you would

10:10AM 13  ask any person that was traveling internationally at that point

10:10AM 14  or is it just your routine questions that you asked him?

10:10AM 15  A.   They were routine questions, up to the point where he said

10:10AM 16  he was kidnapped, and a couple of -- I had a couple experiences

10:10AM 17  with people being kidnapped, so, then, I probably asked more

10:10AM 18  questions, in terms of, like, names, if he heard any names

10:10AM 19  while he was taken or locations or if he remembers specifics

10:10AM 20  about the kidnapping itself.

10:10AM 21  Q.   So is it your testimony that any questions that you would

10:10AM 22  have posed to Mr. Roggio would have been prompted by whatever

10:11AM 23  information he was providing you, is that correct?

10:11AM 24  A.   Correct.

10:11AM 25  Q.   During your interview of Mr. Roggio, do you recall him

10:11AM 1  asking whether or not he should have an attorney present?

10:11AM 2  A.   I don't remember if he asked that.

10:11AM 3  Q.   If he had asked that question, would that appear in your

10:11AM 4  report, as part of your narrative that you took down?

10:11AM 5  A.   I believe so.

10:11AM 6      MR. BARTOLAI: I'm sorry, what was that question, Todd?

10:11AM 7      MR. HINKLEY: I asked the witness whether, had Mr. Roggio

10:11AM 8  inquired about having an attorney, would that have appeared in

10:11AM 9  her narrative report, in regards to her interview of Mr.

10:12AM 10  Roggio?

10:12AM 11     MR. BARTOLAI: Okay.

10:12AM 12     MR. HINKLEY: No further questions, Your Honor.

10:12AM 13     THE COURT: Cross-examine.

10:12AM 14     MR. BARTOLAI: May I have a moment, Judge?

10:12AM 15     THE COURT: All right.

10:12AM 16                    CROSS EXAMINATION

10:12AM 17  BY MR. BARTOLAI:

10:12AM 18  Q.   Good morning, ma'am. It's Ms. Morales; right?

10:12AM 19  A.   Yes.

10:12AM 20  Q.   My name is Gino Bartolai, I represent Ross Roggio in this

10:13AM 21  case. So I have some questions. I'm going to start with just

10:13AM 22  some of your background.

10:13AM 23      You've been with CBP, Customs Border Protection for 13

10:13AM 24  years?

10:13AM 25  A.   Correct.

10:13AM 1   Q.   All right. Can you hear me okay?

10:13AM 2   A.   Yes.

10:13AM 3   Q.   And I believe, now, you're an officer, you said?

10:13AM 4   A.   Yes.

10:13AM 5   Q.   What does that mean? What is an officer? How is that,

10:13AM 6   like, in the hierarchy versus, like, whatever you were the day

10:13AM 7   of this interview with Mr. Roggio?

10:13AM 8   A.   Okay, so as an officer, you process people who arrive from

10:13AM 9   international travel.

10:13AM 10  Q.   So were you an officer, then, at the time?

10:13AM 11  A.   I was an intelligence officer, correct.

10:13AM 12  Q.   Okay. That would have been on February 26, 2017?

10:13AM 13  A.   Yes.

10:13AM 14  Q.   So on that date, you were an intelligence officer with the

10:13AM 15  CBP, which is the Customs Border Patrol Agency?

10:14AM 16  A.   Correct -- Protection.

10:14AM 17  Q.   Okay. On that particular day, you were with, I guess it

10:14AM 18  was, the TTR Tactical Terrorism Response Team.

10:14AM 19  A.   Yes.

10:14AM 20  Q.   Now, in front of you, the Government has shown you an

10:14AM 21  exhibit, it's part of your report and it's Exhibit No. 1. You

10:14AM 22  have that there; correct?

10:14AM 23  A.   Yes.

10:14AM 24  Q.   If we look at the first page of that towards the bottom,

10:14AM 25  Referring officer code, TTR, Tactical Terrorism Response Team.

23

10:14AM 1  Is that -- can you explain why that block contains that

10:14AM 2  information?

10:14AM 3  A.    Because I was the officer on the Tactical Terrorism

10:14AM 4  Response Team who closed out the referral.

10:14AM 5  Q.    Okay. In other words, there's no -- that doesn't indicate,

10:14AM 6  in any way, that Mr. Roggio was suspected of terrorism or

10:14AM 7  anything like that, does it?

10:15AM 8  A.    No. That's just my identification for closing the report.

10:15AM 9  Q.    Okay. And I notice on the very top -- now, this report,

10:15AM 10 the one I have, Government's Exhibit 1, it says -- at the very

10:15AM 11 top -- generated by Jeffrey Burke. Does your report say the

10:15AM 12 same thing?

10:15AM 13 A.    Yes.

10:15AM 14 Q.    Okay. The contents of this report, the data that's in this

10:15AM 15 report is your data, is your information that you put in there;

10:15AM 16 right?

10:15AM 17 A.    Yes.

10:15AM 18 Q.    And he, apparently, is the one who printed the report out;

10:15AM 19 is that a fair statement?

10:15AM 20 A.    Yes.

10:15AM 21 Q.    Okay. And we could see up to the left of where it says

10:15AM 22 Jeffrey Burke, 2/27/17 would be the date, and that date we

10:15AM 23 talked about there is the date that the report was printed;

10:15AM 24 correct?

10:15AM 25 A.    Yes.

**10:15AM 1** Q.   Okay. And this secondary inspection or interview that you

**10:15AM 2** conducted with Mr. Roggio would have been on February 26, 2017;

**10:15AM 3** right?

**10:15AM 4** A.   Correct.

**10:15AM 5** Q.   And I see on Government Exhibit 1, the very first page,

**10:16AM 6** the very first block, it says, Referred by, and it says

**10:16AM 7** Augustine, Felney. Was that the primary contact?

**10:16AM 8** A.   Yes.

**10:16AM 9** Q.   Am I saying that correct, when I say primary?

**10:16AM 10** A.   Primary officer who processed Mr. Roggio.

**10:16AM 11** Q.   Primary officer. He was the one that Mr. Roggio and the

**10:16AM 12** other passengers or people coming through this port would have

**10:16AM 13** met at the Customs desk, I guess?

**10:16AM 14** A.   Correct.

**10:16AM 15** Q.   Is it like a desk, is it?

**10:16AM 16** A.   Yes. So as soon as the passenger gets off the plane, from

**10:16AM 17** the gate, they walk through, and the first person -- the first

**10:16AM 18** officer they see is the primary officer.

**10:16AM 19** Q.   Where is he at, a turnstile or --

**10:16AM 20** A.   So the setup is multiple booths that officers stay in and

**10:16AM 21** process people throughout the day.

**10:16AM 22** Q.   And these -- when you're coming out of the line, you just

**10:16AM 23** pick a booth -- there are several officers there?

**10:17AM 24** A.   Correct.

**10:17AM 25** Q.   And it's basically up to you or where you are in the line

10:17AM 1  that determines who this primary person is going to be?

10:17AM 2  A.   Yes, there's lines -- there's somebody from the airport

10:17AM 3  that work -- that will direct people to what officer number

10:17AM 4  they should go to, to contain the line.

10:17AM 5  Q.   Mr. -- is it Felney, Augustine? Was his first name Felney

10:17AM 6  or --

10:17AM 7  A.   I believe so, yes.

10:17AM 8  Q.   Okay, so this individual would have been the first one to

10:17AM 9  encounter Mr. Roggio; is that right?

10:17AM 10 A.   Yes.

10:17AM 11 Q.   And this is the individual that referred him for a

10:17AM 12 secondary inspection; is that right?

10:17AM 13 A.   Yes.

10:17AM 14 Q.   I see on Page 2 of your report, you state as much. I see

10:17AM 15 here, and I'm going to ask you, what is a CTR Lookout?

10:18AM 16 A.   CTR Lookout is Counter Terrorism Response Lookout.

10:18AM 17 Q.   Counter Terrorism Response Lookout. I see your report

10:18AM 18 says, Subject, meaning, Roggio, was referred to secondary as a

10:18AM 19 CTR Lookout. Can you explain that to us?

10:18AM 20 A.   Yes, he was referred by the system automatically as a

10:18AM 21 Counter Terrorism Response Lookout, based on his P and R, which

10:18AM 22 is his travel identification.

10:18AM 23 Q.   Travel identification, okay. Now, that's not something

10:18AM 24 that Officer Felney -- Augustine Felney would have done;

10:18AM 25 correct?

10:18AM 1 A.   Correct.

10:18AM 2 Q.   He wouldn't have put that in the system; is that right?

10:18AM 3 A.   No, it's an automatic generated by a computer system,

10:19AM 4 based on the P and R and the fact that he was coming from a

10:19AM 5 conflict zone, Iraq. Anybody that came from Iraq or Syria, the

10:19AM 6 system -- the computer system would generate an additional

10:19AM 7 screening for that person.

10:19AM 8 Q.   Okay, and I want to bring you down to -- I want to go to

10:19AM 9 the very bottom of Page 2 there, where you see -- you could see

10:19AM 10 Referral Reason History, referred by Augustine Felney, referral

10:19AM 11 date and time, it says that, the time 2/26/17, and it's

10:19AM 12 referred from Primary Airport Pack CTR one day lookout hit.

10:19AM 13 Could you explain that?

10:19AM 14 A.   At the end of the referral, the system will also give an

10:19AM 15 automatic response that would generate, Referred by, the name,

10:19AM 16 the date, the time and the location of the officer, and the

10:20AM 17 comments that the officer put in the system, based on the

10:20AM 18 lookout.

10:20AM 19 Q.   What is a one-day lookout hit?

10:20AM 20 A.   One-day lookout hit is an automatic lookout placed in the

10:20AM 21 system by the computer system when it tracks people with P and

10:20AM 22 R's coming from conflict zones.

10:20AM 23 Q.   Okay, do you know who put that information in the system

10:20AM 24 in this case? Only if you know?

10:20AM 25 A.   I know it's coming from the National Targeting Center at

27

10:20AM 1 NTC in Washington, D.C., it's a branch within U.S. Customs and

10:20AM 2 Border Protection, and then they place bulk -- they make bulk

10:20AM 3 rules for specific interests that Customs has.

10:21AM 4 Q.    All right. Did you ever speak to a -- prior to this

10:21AM 5 interview with Mr. Roggio, did you ever have the occasion to

10:21AM 6 speak with Homeland Security Agent Jeffrey Burke?

10:21AM 7 A.    No.

10:21AM 8 Q.    So you never met him in person?

10:21AM 9 A.    No.

10:21AM 10 Q.    He wasn't there that day that you recall?

10:21AM 11 A.    I don't recall.

10:21AM 12 Q.    Okay. And you don't recall having a conversation with him,

10:21AM 13 either, in person or, maybe, on the telephone; is that right?

10:21AM 14 A.    Correct.

10:21AM 15 Q.    All right.

10:21AM 16 A.    But the fact that I put it in my report, they were there,

10:21AM 17 it's just that I don't remember.

10:21AM 18 Q.    I notice you mentioned at the bottom in this report, and

10:21AM 19 we will talk about it a little bit more, but it says here that

10:21AM 20 you do note that Homeland Security Investigator Mundy was

10:22AM 21 there, as well as FBI Special Agent Vetrano was there, as well,

10:22AM 22 right?

10:22AM 23 A.    Yes.

10:22AM 24 Q.    Are they normally present -- is the FBI normally present

10:22AM 25 at a secondary inspection?

10:22AM 1  A.    Yes.

10:22AM 2  Q.    They are?

10:22AM 3  A.    Well, while I was on the intelligence TTRT team, I want to

10:22AM 4  say I saw them on a daily basis, but different agents.

10:22AM 5  Q.    All right. I mean, how many interviews -- I know you're

10:22AM 6  not 100 percent sure of this -- how many secondary interviews

10:22AM 7  did you conduct that day, on February 26, 2017?

10:22AM 8  A.    Did I?

10:22AM 9  Q.    Yes.

10:22AM 10 A.    Two.

10:22AM 11 Q.    Only two?

10:22AM 12 A.    Only two.

10:22AM 13 Q.    Was Agent Vetrano present on the other interview, if you

10:22AM 14 recall?

10:22AM 15 A.    I don't remember, but I don't think I put it in my report,

10:22AM 16 so I don't think he was.

10:22AM 17 Q.    And regarding Homeland Security Investigator Mundy, was he

10:23AM 18 present -- how often are members from Homeland Security present

10:23AM 19 on secondary interviews?

10:23AM 20 A.    Very often, in my experience.

10:23AM 21 Q.    Do you know if he was present on your earlier interview

10:23AM 22 that day?

10:23AM 23 A.    No.

10:23AM 24 Q.    These agents -- you testified -- do you recall speaking

10:23AM 25 with them, regarding Mr. Roggio?

29

10:23AM 1    A.    I don't remember.

10:23AM 2    Q.    You don't remember; right?

10:23AM 3    A.    No.

10:23AM 4    Q.    And I think the question Mr. Hinkley had asked you is, can

10:23AM 5    you recall any other interaction between Mr. Roggio and those

10:23AM 6    agents, Homeland Security Mundy and FBI Agent Vetrano, and you

10:24AM 7    don't recall any interaction; is that right?

10:24AM 8    A.    No.

10:24AM 9    Q.    Now, your job, when you -- how would you describe the

10:24AM 10   purpose of these inspections, both the primary -- did you ever

10:24AM 11   do a primary inspection?

10:24AM 12   A.    Yes.

10:24AM 13   Q.    The purpose of the primary inspection, as well as the

10:24AM 14   purpose or goal of the secondary inspection?

10:24AM 15   A.    The primary purpose is to keep the country safe, so to

10:24AM 16   assess terrorist activities or affiliation or anything related

10:24AM 17   to national security, that's the first job of the primary

10:24AM 18   officer and secondary officer, and then determine if the person

10:24AM 19   is a good person or a bad person or about to commit a crime,

10:24AM 20   committed a crime, or it's good to go.

10:25AM 21   Q.    So in other words -- and it says Customs Border

10:25AM 22   Protection, that is it, protecting the border; correct?

10:25AM 23   A.    Correct.

10:25AM 24   Q.    From the National Security threats, terroristic threats,

10:25AM 25   terror-type threats and, also, Customs, right, there's also

10:25AM  1  admissibility is an issue, as well?

10:25AM  2  A.   Correct.

10:25AM  3  Q.   When a traveler comes into the country, they must go

10:25AM  4  through an inspection to make sure that they're legally

10:25AM  5  admissible; is that right?

10:25AM  6  A.   Correct.

10:25AM  7  Q.   And to make sure all the items they're bringing in with

10:25AM  8  them are lawfully able to come into the country?

10:25AM  9  A.   Yes.

10:25AM  10  Q.   I guess, some people are not admissible; is that right?

10:25AM  11  A.   Correct.

10:25AM  12  Q.   Would -- a citizen is typically admissible?

10:25AM  13  A.   A United States citizen is always admissible.

10:25AM  14  Q.   And then there can be so many different types of things

10:25AM  15  coming into the country, certain things, obviously, can't come

10:25AM  16  in, like, contraband, drugs and such; right?

10:26AM  17  A.   Correct.

10:26AM  18  Q.   And I'm sure some other things are on the list that aren't

10:26AM  19  allowed, maybe, agriculture, produce or things like that?

10:26AM  20  A.   Yes.

10:26AM  21  Q.   You're aware of pretty much all these things; right?

10:26AM  22  A.   Yes.

10:26AM  23  Q.   In this particular case, you did speak to Mr. Roggio

10:26AM  24  regarding his citizenship?

10:26AM  25  A.   Yes -- well, I saw his temporary passport, and I knew it

10:26AM  1   wasn't a question of admissibility. He was an American, so I'm

10:26AM  2   going to let him go at the end.

10:26AM  3   Q.   Okay. And, also, I know that he had some bags, and they

10:26AM  4   were -- they were gone through or looked at or inspected, let's

10:26AM  5   say?

10:26AM  6   A.   I want to say, yes, but I wasn't there for that, I was

10:26AM  7   only the officer instructed to conduct the interview.

10:26AM  8   Q.   Okay, and if you look at your report, again, it's

10:26AM  9   Government Exhibit 1, it does mention, I think -- okay, if we

10:27AM 10   look at, Bag examined, you know what that is?

10:27AM 11   A.   Yes.

10:27AM 12   Q.   It indicates they were searched; right?

10:27AM 13   A.   Yes.

10:27AM 14   Q.   And that there was no -- it was negative, there was

10:27AM 15   nothing in those bags that required a positive indicator?

10:27AM 16   A.   Yes.

10:27AM 17   Q.   Negative means that everything was admissible?

10:27AM 18   A.   Yes.

10:27AM 19   Q.   Okay, so you're looking for admissibility, at that point,

10:27AM 20   as well. How are you notified -- where were you when Ross

10:27AM 21   Roggio came through the primary inspection and met Agent Felney

10:27AM 22   Augustine?

10:27AM 23   A.   I don't remember.

10:27AM 24   Q.   How are you notified that there's -- that you need to do a

10:27AM 25   second interview, if you recall, or typically?

10:27AM 1 A.   I don't remember exactly the circumstances, but typically

10:28AM 2 I would come in to Terminal 4 of J.F.K. Airport and sign in for

10:28AM 3 the day, and my supervisor will instruct me with my duties for

10:28AM 4 the day. So the way I came to meet Mr. Roggio was probably my

10:28AM 5 supervisor said, Go handle something at Terminal 8, then, at

10:28AM 6 that time, go to Terminal 1 and talk to -- and do whatever

10:28AM 7 lookouts you have for the day over there.

10:28AM 8      And that would be every day, on a regular basis, what I

10:28AM 9 would do. I would drive around from one place to the other to

10:28AM 10 speak to passengers.

10:28AM 11 Q.   So you're not in another room, at another desk, behind

10:28AM 12 that primary inspection line?

10:28AM 13 A.   Once I'm ready for the interview, yes, I have to be in the

10:28AM 14 secondary inspection area.

10:28AM 15 Q.   So you go to that area, and there's an area right there?

10:29AM 16 A.   Yes.

10:29AM 17 Q.   Not far from where Mr. Roggio would have encountered his

10:29AM 18 primary inspection?

10:29AM 19 A.   Correct.

10:29AM 20 Q.   You went there that day?

10:29AM 21 A.   Yes.

10:29AM 22 Q.   You described -- again, you don't recall, specifically,

10:29AM 23 all the circumstances that day; right?

10:29AM 24 A.   Yes.

10:29AM 25 Q.   But you do recall that it was busy that day, and that

10:29AM 1   there was -- they improvised with the room, is that it?

10:29AM 2   A.    Yes.

10:29AM 3   Q.    And the room was about 10 feet x 12 feet?

10:29AM 4   A.    Yes.

10:29AM 5   Q.    And it had a desk and a chair?

10:29AM 6   A.    Yes.

10:29AM 7   Q.    Do you recall if there was any more -- how many chairs

10:29AM 8   there would have been?

10:29AM 9   A.    I don't remember.

10:29AM 10  Q.    You don't remember. You do remember a desk and a chair,

10:29AM 11  okay. Do you recall, specifically, where you first encountered

10:29AM 12  Mr. Roggio?

10:29AM 13  A.    Probably, in the secondary area, secondary waiting room

10:29AM 14  area.

10:29AM 15  Q.    All right. Now, again, I know -- and I'm not trying to

10:30AM 16  trick you here -- I know that you said, probably, in the

10:30AM 17  secondary waiting area. If someone were in the secondary

10:30AM 18  waiting area, at that particular place, on the date when Mr.

10:30AM 19  Roggio was referred for secondary, is there a bathroom there?

10:30AM 20  A.    Yes.

10:30AM 21  Q.    Is it a holding cell-type of situation?

10:30AM 22  A.    Yes.

10:30AM 23  Q.    And if that individual -- if someone were waiting -- if

10:30AM 24  someone had been referred for a secondary inspection and they

10:30AM 25  were in that waiting area -- is it a room with, like, chairs

10:30AM 1   where people wait?

10:30AM 2   A.   Yes.

10:30AM 3   Q.   Is there another agent in that room that, kind of, is

10:30AM 4   watches things?

10:30AM 5   A.   Yes.

10:30AM 6   Q.   Where does he or she sit?

10:30AM 7   A.   By the door.

10:30AM 8   Q.   Okay, so how big is that room, that secondary --

10:30AM 9   A.   Probably, almost as big as this(indicating).

10:30AM 10  Q.   How many people could be in there at one time?

10:30AM 11  A.   At least, 20 to 30 people at one time.

10:31AM 12  Q.   And this is where these people are directed, after the

10:31AM 13  primary inspection, when they're going to have a secondary, and

10:31AM 14  they're waiting there for you to come and do that secondary;

10:31AM 15  right?

10:31AM 16  A.   Yes.

10:31AM 17  Q.   And you mentioned that there's, also, another CBP agent at

10:31AM 18  the door there?

10:31AM 19  A.   Yes.

10:31AM 20  Q.   And I guess -- are they free to walk around -- are they

10:31AM 21  free to leave the room, without checking with that agent?

10:31AM 22  A.   They're not allowed to leave the room until they're

10:31AM 23  completely 100 percent cleared.

10:31AM 24  Q.   And if they have to use the bathroom there, there is a

10:31AM 25  bathroom, but it's in a holding cell; right?

35

10:31AM 1    A.    Yes.

10:31AM 2    Q.    If Mr. Roggio had to use that bathroom on the date in

10:31AM 3    question, on February 26, 2017, he would have had to use that

10:31AM 4    holding cell, as well; correct?

10:31AM 5    A.    Correct.

10:31AM 6    Q.    Who would let him in that area?

10:31AM 7    A.    Another officer.

10:31AM 8    Q.    So is it adequately staffed? Are there a lot of --

10:31AM 9    A.    I want to say, in my experience, for the most part, is

10:32AM 10   there are never enough officers working.

10:32AM 11   Q.    Fair enough. Now, if somebody has -- did you ever do that

10:32AM 12   job?

10:32AM 13   A.    Yes, just to cover for somebody else that had to handle

10:32AM 14   something else for the moment.

10:32AM 15   Q.    All right, you said it's busy that day. If someone had to

10:32AM 16   use the bathroom, they would have to go to the holding cell;

10:32AM 17   right?

10:32AM 18   A.    Yes.

10:32AM 19   Q.    Could they lock the door behind them?

10:32AM 20   A.    The door locks automatically, I think.

10:32AM 21   Q.    So if an agent -- if an individual had to use the

10:32AM 22   facilities, the men's room or the bathroom, and he was in that

10:32AM 23   big room, the secondary area, he would be escorted to this

10:32AM 24   holding cell, where he would use the bathroom, and the door

10:32AM 25   would lock behind him; right?

10:32AM 1   A.    Yes.

10:32AM 2   Q.    And he would have to, essentially -- someone would have to

10:32AM 3   open the door to let him out?

10:32AM 4   A.    Yes.

10:32AM 5   Q.    And I know you don't recall that, you don't recall exactly

10:33AM 6   where you met Roggio that day; is that right?

10:33AM 7   A.    Yes.

10:33AM 8   Q.    Could it have been that he was in the bathroom and you

10:33AM 9   escorted him from the bathroom with another agent? I'm just

10:33AM 10  asking you.

10:33AM 11  A.    It could be, but I don't remember if that happened.

10:33AM 12  Q.    Thank you. When an individual approaches the primary

10:33AM 13  inspection and he encounters the primary inspection officer,

10:33AM 14  like, in this case, Augustine Felney, and for whatever reason,

10:33AM 15  there's going to be a secondary inspection, what happens then?

10:33AM 16        Are they directed to go down the hall and make a right? Or

10:33AM 17  how would they get to that secondary inspection area?

10:33AM 18  A.    Could you repeat the first part of the question?

10:33AM 19  Q.    In other words, when someone approaches the primary

10:33AM 20  inspection area and they encounter the primary inspection

10:33AM 21  officer, in this case, Augustine Felney, and that officer, for

10:34AM 22  whatever reason, determines that a secondary inspection is

10:34AM 23  warranted. What happens then?

10:34AM 24        Like, how does this individual, the traveler, make it to

10:34AM 25  that secondary inspection area or room?

10:34AM 1  A.   So in my experience, the primary officer will close his

10:34AM 2  booth and escort the passenger to the secondary area. However,

10:34AM 3  because of the volume at J.F.K., many times, there will be a

10:34AM 4  person that would be just assigned to direct the flow of

10:34AM 5  people, so whoever is getting referred, they would take that

10:34AM 6  person and direct them to secondary, so in this way, they will

10:34AM 7  not get lost in the crowd and with all the passengers that were

10:34AM 8  already cleared.

10:34AM 9      So in this case, I want to say the primary officer did it,

10:34AM 10 but if the line was backed up and there was a lot of people

10:34AM 11 waiting to get processed, he probably had another officer

10:34AM 12 taking the passenger into secondary area.

10:35AM 13     It's just for separation of the people who were processed

10:35AM 14 and were cleared and the ones that need secondary inspection.

10:35AM 15 Q.   Okay, so, at that point in time, someone is

10:35AM 16 going -- either, the primary officer or the person who is kind

10:35AM 17 of helping out is going to actually escort this person to that

10:35AM 18 area?

10:35AM 19 A.   They need to do that, yes, that's how they do it every

10:35AM 20 time. Because there are instances when we have had criminals

10:35AM 21 escape without being escorted.

10:35AM 22 Q.   I understand. Now, I'm going to talk a little bit about

10:36AM 23 the relationship between the primary inspector and the

10:36AM 24 secondary inspector, you, in this case, and just some of your

10:36AM 25 testimony.

10:36AM 1    And I think what you said, when you were describing this
10:36AM 2    process, not necessarily with Mr. Roggio, but the process, when
10:36AM 3    you were asked about that, the primary inspector can refer a
10:36AM 4    person for additional screening or assessment; is that a fair
10:36AM 5    statement?
10:36AM 6    A.   Yes.
10:36AM 7    Q.   And, then, your job, as a secondary inspection inspector,
10:36AM 8    is to basically process that. And I think you said -- and
10:36AM 9    correct me if I'm wrong -- it's to determine or look at what
10:36AM 10   issue was raised or what issue was presented; is that right?
10:36AM 11   A.   Yes.
10:36AM 12   Q.   Will the primary say there's an issue, say, in this case,
10:37AM 13   generally, with a passport? Or there's an issue with something
10:37AM 14   else, citizenship or alien issue?
10:37AM 15   A.   So the way primary officer refers a passenger into
10:37AM 16   secondary is, also, based on the seriousness of the lookout,
10:37AM 17   let's say. If a person has issues, in terms of passport, and
10:37AM 18   also has a lookout in the system, if the lookout in the system
10:37AM 19   is a little more serious than the passport problem, the primary
10:37AM 20   officer is instructed to address the most serious issue with
10:37AM 21   the passenger first, before anything else. In this case, it was
10:37AM 22   Counter Terrorism Response augmented interview.
10:37AM 23   Q.   Okay, and I was just going to ask you that. So in other
10:37AM 24   words, when you know you have to work, when you know you have
10:37AM 25   to do a secondary inspection, you know why, you know what the

10:38AM 1  primary officer's concern was?

10:38AM 2  A.    Yes.

10:38AM 3  Q.    It's, like, in other words, you start off with that, and

10:38AM 4  if I could just speak freely, Well, I'm referring him because

10:38AM 5  of this, he's got a problem with his passport, or he has a CTR

10:38AM 6  Lookout?

10:38AM 7  A.    Yes.

10:38AM 8  Q.    They tell you, right? They would tell you?

10:38AM 9  A.    If they don't tell me, I see it in the system, I see it

10:38AM 10 right there.

10:38AM 11 Q.    That was the issue here, that was the issue that Mr.

10:38AM 12 Roggio was having; correct?

10:38AM 13 A.    Yes.

10:38AM 14 Q.    All right, it would have been the CTR Lookout Counter

10:38AM 15 Terrorism Response?

10:38AM 16 A.    Yes, computer-generated lookout.

10:38AM 17 Q.    And I think when you were testifying, you were saying that

10:38AM 18 you were instructed to interview him, to interview Roggio?

10:38AM 19 A.    I knew I had to speak to him, based on the CTR Lookout.

10:39AM 20 Q.    So it was just that fact alone that caused you to

10:39AM 21 interview him?

10:39AM 22 A.    As far as I remember, yes.

10:39AM 23 Q.    You were never asked by the FBI Agent Vetrano or Homeland

10:39AM 24 Security, either, Burke or this other fella, Mundy, to

10:39AM 25 interview him?

10:39AM 1   A.   I don't remember that.

10:39AM 2   Q.   You don't remember, okay. You do recall they were present,

10:39AM 3   though, during the interview?

10:39AM 4   A.   Yes.

10:39AM 5   Q.   Again, some of these -- discussing your techniques or the

10:39AM 6   way these interviews generally go is, you mentioned those five

10:39AM 7   questions, is that it, you know, the basics, who, where, when,

10:40AM 8   how, and what the event is like or something? In other words,

10:40AM 9   I'm coming home to -- I was visiting my relatives or something

10:40AM 10  like that?

10:40AM 11  A.   Correct.

10:40AM 12  Q.   I was on vacation?

10:40AM 13  A.   Yes.

10:40AM 14  Q.   These are the things, right. And he was -- so you

10:40AM 15  asked -- these questions that you asked him were, essentially,

10:40AM 16  routine?

10:40AM 17  A.   Yes.

10:40AM 18  Q.   And he was very forthcoming?

10:40AM 19  A.   Yes.

10:40AM 20  Q.   Not only that, he had -- he even gave more than what you

10:40AM 21  had required?

10:40AM 22  A.   That's what I felt at that moment, yes.

10:40AM 23  Q.   He was polite and he was a gentleman, those were your

10:40AM 24  words; right?

10:40AM 25  A.   Yes.

10:40AM 1    Q.    And he told you -- again, when we look at this, this is a

10:40AM 2    report, you were questioned a little bit about some of the

10:40AM 3    things that he had mentioned to you, regarding him being

10:40AM 4    kidnapped.

10:40AM 5    A.    Yes.

10:40AM 6    Q.    And that's happened before, right, you've heard that

10:40AM 7    before, I'm sure, from international travelers?

10:41AM 8    A.    Yes.

10:41AM 9    Q.    And he had told you about some business dealings that he

10:41AM 10   had in that country, in Iraq?

10:41AM 11   A.    Yes.

10:41AM 12   Q.    And he had told you that there were -- you know, again, we

10:41AM 13   have your report, so I know your report is better than your

10:41AM 14   recollection -- but he had mentioned that there was issues

10:41AM 15   regarding them claiming that, you know, he owed them money, and

10:41AM 16   so on and so forth; right?

10:41AM 17   A.    Yes.

10:41AM 18   Q.    That was the reason or part of the reason?

10:41AM 19   A.    Yes.

10:41AM 20   Q.    So regarding these two -- if there were two reasons for

10:41AM 21   primary inspection to refer him to you, if one of them was the

10:41AM 22   passport issue, you checked that out; is that right?

10:41AM 23   A.    Yes.

10:41AM 24   Q.    You talked to him about his passport, and he had satisfied

10:42AM 25   you that --

10:42AM 1    A.    I don't remember if I told him, but for the most part, if

10:42AM 2    somebody comes up with a temporary passport, we want to know

10:42AM 3    the circumstances of how they lost it. And we inform them this

10:42AM 4    is only in case -- we need to know where the location where you

10:42AM 5    lost it, in case somebody else will try to use it as an

10:42AM 6    imposter and pose as you coming into the United States.

10:42AM 7    Q.    All right. And did you talk to him about that; right?

10:42AM 8    A.    Yes, I believe I speak about the subject to everybody that

10:42AM 9    lost their passport or had it stolen.

10:42AM 10   Q.    And he answered your questions in such a way that he

10:42AM 11   satisfied you; is that right?

10:42AM 12   A.    Yes.

10:42AM 13   Q.    And regarding -- then, this other thing, the CTR hit,

10:42AM 14   again, that was something that you -- what are you required to

10:42AM 15   do, then, on a CTR hit? What's that about? How do you resolve

10:42AM 16   that?

10:42AM 17   A.    The CTR is mainly -- in his case, it was for him traveling

10:42AM 18   to ISIS-infested area in Iraq, and at that time, it was a war

10:43AM 19   zone, meaning, everybody was coming with different type of

10:43AM 20   stories, ranging from military, American military personnel,

10:43AM 21   retired and going over there and become super heroes and fight

10:43AM 22   against ISIS, and some of them, maybe, getting kidnapped and

10:43AM 23   then may turn against other Americans or different stories.

10:43AM 24        It pretty much was a war conflict zone, so I conducted

10:43AM 25   many interviews on returning Americans who fought against ISIS

10:43AM 1 and the terrorists in Iraq and Syria, and they told me terrible

10:43AM 2 stories. But, again, valuable information for -- in the whole

10:44AM 3 scheme of defending the group.

10:44AM 4 Q.   So you've heard a lot about that -- you're familiar with

10:44AM 5 all of that?

10:44AM 6 A.   Yes.

10:44AM 7 Q.   Based upon your experience and the facts presented to you

10:44AM 8 that day, Mr. Roggio, again, he satisfied your concern, if

10:44AM 9 there was one, that he should be admitted; is that right?

10:44AM 10 A.   Yes.

10:44AM 11 Q.   All right. So you had determined, then, as a result of his

10:44AM 12 interview, his secondary interview and the inspection of his

10:44AM 13 bags, that there was no reason to deny him admissibility;

10:44AM 14 correct?

10:44AM 15 A.   Correct.

10:44AM 16 Q.   And that he had nothing that needed to be confiscated or

10:44AM 17 was not admissible into the country; is that right?

10:44AM 18 A.   Correct.

10:44AM 19 Q.   And, in fact, you and Customs Border Protection did not

10:44AM 20 seize any of his devices that day; correct?

10:44AM 21 A.   Correct.

10:44AM 22 Q.   But you do know that devices were seized; right?

10:44AM 23 A.   Yes.

10:44AM 24 Q.   And they were seized by Homeland Security and FBI Agent

10:45AM 25 Vetrano?

10:45AM  1   A.    Yes.

10:45AM  2   Q.    So you had -- the question is, you, essentially, had

10:45AM  3   no -- now, you can, as a Customs Border Protection Agent,

10:45AM  4   you're able to look at the electronic devices; correct?

10:45AM  5   A.    Yes.

10:45AM  6   Q.    Do you recall, in that room, when you were talking to Mr.

10:45AM  7   Roggio, do you recall his devices being present?

10:45AM  8   A.    Vaguely, yes.

10:45AM  9   Q.    Okay. And they would normally be there, as well; correct?

10:45AM 10   A.    Yes, they would be on the table.

10:45AM 11   Q.    His bags would have been there, as well; right?

10:45AM 12   A.    No. For the most part, I would have another officer going

10:45AM 13   through the bags, and I'm assuming that that's what happened

10:45AM 14   while I was conducting the interview, just to speed up the

10:45AM 15   process a little bit for the passenger.

10:45AM 16   Q.    Are you armed, typically, on these days?

10:46AM 17   A.    Yes.

10:46AM 18   Q.    You're carrying -- are you in uniform?

10:46AM 19   A.    No.

10:46AM 20   Q.    How are you dressed, typically?

10:46AM 21   A.    For the -- for this particular team, I was in plain

10:46AM 22   clothes most of the time.

10:46AM 23   Q.    Do you have a side arm?

10:46AM 24   A.    Yes.

10:46AM 25   Q.    Pistol?

45

10:46AM 1   A.   Yes, but it would be covered.

10:46AM 2   Q.   It would be covered?

10:46AM 3   A.   Yes.

10:46AM 4   Q.   By your jacket?

10:46AM 5   A.   Yes.

10:46AM 6   Q.   And you had your jacket on?

10:46AM 7   A.   Yes.

10:46AM 8   Q.   These other agents, FBI Agent Vetrano and Homeland

10:46AM 9   Security Mundy, do you recall them being armed?

10:46AM 10  A.   They have to be armed, yes.

10:46AM 11  Q.   So they're armed, as well?

10:46AM 12  A.   Yes.

10:46AM 13  Q.   And, again, it's a service pistol; is that right?

10:46AM 14  A.   Yes.

10:46AM 15  Q.   They have to be, that's a requirement?

10:46AM 16  A.   Yes.

10:46AM 17  Q.   Do you recall Mr. -- that particular interview with Mr.

10:46AM 18  Roggio -- him being offered any type of refreshments or

10:46AM 19  beverages?

10:46AM 20  A.   No.

10:46AM 21  Q.   He didn't -- he wasn't; is that fair?

10:47AM 22  A.   Not from me, anyway.

10:47AM 23  Q.   Is that typically offered?

10:47AM 24  A.   Yes.

10:47AM 25  Q.   It is?

10:47AM 1   A.    Yes.

10:47AM 2   Q.    But you don't recall, okay. Do you recall -- were you

10:47AM 3   standing or sitting for that interview?

10:47AM 4   A.    I don't remember. But I sit down most of the time because

10:47AM 5   I'm tired from going around.

10:47AM 6   Q.    All right, so you probably were sitting that time, is that

10:47AM 7   it?

10:47AM 8   A.    Yes.

10:47AM 9   Q.    And the other agents, would they have been sitting or

10:47AM 10   standing, if you know?

10:47AM 11   A.    I don't remember that part.

10:47AM 12   Q.    You don't remember, okay. You mentioned that there was

10:47AM 13   yourself, Agent Vetrano, Homeland Security Mundy, and there

10:47AM 14   were other agents, as well, in the room, Customs Border

10:47AM 15   Protection?

10:47AM 16   A.    No.

10:47AM 17   Q.    Just the three of you?

10:47AM 18   A.    Yes, it would be just me from Customs.

10:48AM 19   Q.    Again, we were talking about electronic devices. Now, you

10:48AM 20   know that you can look at those devices; right?

10:48AM 21   A.    Yes.

10:48AM 22   Q.    You can pick them up and manually check them --

10:48AM 23   A.    Yes.

10:48AM 24   Q.    -- to make sure they're actual devices?

10:48AM 25   A.    Correct.

47

10:48AM 1  Q.   Have you ever encountered situations where there's false

10:48AM 2  compartments or?

10:48AM 3  A.   Yes.

10:48AM 4  Q.   So that, certainly, could be a case; right?

10:48AM 5  A.   Yes.

10:48AM 6  Q.   Do you recall looking at the devices that day?

10:48AM 7  A.   No, I don't remember.

10:48AM 8  Q.   So you could manually touch them and inspect them, and you

10:48AM 9  could require that the traveler turn them on, as well; right?

10:48AM 10  A.   Yes.

10:48AM 11  Q.   So in other words, if you ask him -- you could ask him for

10:48AM 12  his passcode, like, on a cell phone, if it's like three things

10:48AM 13  to open it up, you could say, Give me -- I'm sorry, strike

10:48AM 14  that. You could say, Please give me your passcode so I could

10:48AM 15  access your device; right?

10:48AM 16  A.   Yes.

10:48AM 17  Q.   They're required to do that, under the regulations;

10:48AM 18  correct?

10:48AM 19  A.   Yes.

10:48AM 20  Q.   Then, you could use that passcode to open up the device

10:48AM 21  and to basically look at it, scroll through it. Now, you're not

10:49AM 22  able to put -- but that's under your authority, as you know it,

10:49AM 23  is that right?

10:49AM 24  A.   Yes.

10:49AM 25  Q.   Have you done that in the past?

**48**

10:49AM 1   A.    Many times.

10:49AM 2   Q.    Many times, okay. If you want to, there are certain

10:49AM 3   circumstances where can make a copy of it and give it back

10:49AM 4   to the traveler, do you know -- have you ever done that before

10:49AM 5   with electronic devices?

10:49AM 6   A.    Could you repeat the question, please?

10:49AM 7   Q.    In other words, under certain circumstances, if you had a

10:49AM 8   concern about some of the -- after opening up the device and

10:49AM 9   viewing parts of its contents, if you had a concern that,

10:49AM 10  perhaps, further inspection of that device was warranted, you

10:49AM 11  can, either, detain the device or make a copy of it and give

10:49AM 12  the device back to the traveler and let him go on his way; is

10:49AM 13  that right?

10:49AM 14  A.    Yes, we can detain devices, but it didn't happen in this

10:49AM 15  case.

10:50AM 16  Q.    And you could also make a copy, correct? Do you know what

10:50AM 17  I mean by that? Has that ever been done, to your knowledge,

10:50AM 18  where a copy of the device was made, a copy of the hard drive

10:50AM 19  or the internal operations?

10:50AM 20  A.    Okay, I understand. Yes.

10:50AM 21  Q.    So in other words, that way, you have -- the evidence is

10:50AM 22  preserved, so to speak, and the device itself -- the traveler

10:50AM 23  still has the benefit of walking out of the airport with the

10:50AM 24  device; right?

10:50AM 25  A.    Yes.

10:50AM 1  Q.    Do you encounter a lot of -- when you start -- you had

10:50AM 2  noted that, sometimes, if a traveler doesn't necessarily

10:50AM 3  appreciate your inspections and such, you would note that on a

10:50AM 4  report. Do you ever notice, when it comes to these, you going

10:50AM 5  through their electronic devices, that there are concerns, that

10:50AM 6  the travelers express a concern like that?

10:50AM 7  A.    Sometimes, yes.

10:50AM 8  Q.    Okay. And what is it a privacy concern, is that what

10:50AM 9  they're mostly complaining of?

10:51AM 10  A.    Yes, I guess, yes.

10:51AM 11  Q.    And you talked to Mr. Roggio about who, where, when, how

10:51AM 12  and what was doing, and one of the reasons I think he said he

10:51AM 13  was coming back in the country that he told you was to see his

10:51AM 14  father; right?

10:51AM 15  A.    Yes.

10:51AM 16  Q.    And did he -- I think he told you -- did he tell you that

10:51AM 17  his father was 93 years old?

10:51AM 18  A.    I don't remember that part, the only part I remember is

10:51AM 19  that he was -- his father is sick and he needs to go see him in

10:51AM 20  the hospital.

10:51AM 21  Q.    And, again, your report would be -- you would know -- if

10:51AM 22  it's in your report, that would be more accurate or better

10:51AM 23  serve your memory, at the time; right?

10:51AM 24  A.    Yes.

10:51AM 25  Q.    Are these -- I think your interaction with Mr. Roggio was

10:52AM 1   15 to 20 minutes was your testimony?

10:52AM 2   A.   Yes.

10:52AM 3   Q.   What did you do afterwards? Did you just leave? Did you

10:52AM 4   leave the room or --

10:52AM 5   A.   I would leave the room immediately, yes.

10:52AM 6   Q.   And do you recall leaving the room then?

10:52AM 7   A.   No.

10:52AM 8   Q.   What happens after you leave the room? What happens to the

10:52AM 9   traveler? Do you recall what happened to Mr. Roggio at that

10:52AM 10  time?

10:52AM 11  A.   I would give him his passport back and tell him he's good

10:52AM 12  to go.

10:52AM 13  Q.   And then he would leave the room, as well?

10:52AM 14  A.   Yes.

10:52AM 15  Q.   Is somebody going to escort him through?

10:52AM 16  A.   Maybe a little bit, because, what I remember, Terminal 1

10:52AM 17  is a little bit of a maze, so just for his security, so he's

10:52AM 18  not going to bump into something harmful to him, just direct

10:52AM 19  him to go the right way to the exit.

10:52AM 20  Q.   Are these interviews recorded?

10:52AM 21  A.   Electronically?

10:52AM 22  Q.   Yes, is there recording, like, in that interview room?

10:52AM 23  A.   No.

10:52AM 24  Q.   There's no recording being taken of them?

10:53AM 25  A.   No.

10:53AM 1  Q.    Audio, video or mere audio?

10:53AM 2  A.    No, not that I know of.

10:53AM 3  Q.    In this particular case, you said this, "Customs Border

10:53AM 4  Protection did not seize the devices". Correct?

10:53AM 5  A.    Correct.

10:53AM 6  Q.    You had nothing to do with the seizure of those devices?

10:53AM 7  A.    No.

10:53AM 8  Q.    You didn't refer -- you didn't direct anyone to seize

10:53AM 9  them?

10:53AM 10  A.    No.

10:53AM 11  Q.    And you had no suspicion that there would be anything on

10:53AM 12  those devices that would require them being seized?

10:53AM 13  A.    No.

10:53AM 14      MR. BARTOLAI: May I have a moment, Judge?

10:53AM 15      THE COURT: Sure

10:55AM 16  BY MR. BARTOLAI:

10:55AM 17  Q.    So in your training as a Customs Border Protection Agent,

10:55AM 18  are you required to undergo training on a regular basis?

10:55AM 19  A.    Yes -- it depends.

10:55AM 20  Q.    It depends. Like, what kind of -- do you have any type of

10:55AM 21  yearly requirements where you have to go for refreshers on any

10:55AM 22  of these things? Policy, procedure?

10:55AM 23  A.    Yes, everybody, as an officer, has to refresh their memory

10:55AM 24  on policy, Immigration law, Customs law.

10:55AM 25  Q.    Right.

52

10:55AM 1  A.   Hazardous materials, all that stuff, every year.

10:55AM 2  Q.   Every year. I guess, part of your job is that you've got

10:55AM 3  to keep up on that stuff; is that right?

10:55AM 4  A.   Yes.

10:55AM 5       MR. BARTOLAI: I have a few exhibits I would like to have

10:55AM 6  the witness see, Your Honor, so I don't know if I should

10:56AM 7  approach her or should I give them to your clerk or --

10:56AM 8       THE COURT: Give them to my courtroom deputy.

10:56AM 9  BY MR. BARTOLAI:

10:56AM 10 Q.   Ms. Morales, if you would like -- I could put them on the

10:56AM 11 computer screen, if that would be helpful.

10:57AM 12      THE COURT: Do you have any objection, Mr. Hinkley?

10:57AM 13      MR. HINKLEY: No, although, I would ask for a proffer as to

10:57AM 14 the relevancy of the documents.

10:57AM 15      MR. BARTOLAI: I'm going to identify the exhibits, Your

10:57AM 16 Honor. The witness has these now.

10:57AM 17      Defendant's Exhibit D is a Primary Impact Assessment For

10:57AM 18 Border Searches Of Electronic Devices, this is authored by the

10:57AM 19 U.S. Department of Homeland Security, and it's dated August 25,

10:57AM 20 2009.

10:57AM 21      And then there's a U.S. Customs and Border Protection

10:57AM 22 directive. This is Government's -- or Defendant's Exhibit E,

10:57AM 23 Customs Border Protection Directive No. 3340-49A, and that's

10:57AM 24 issued January 4 of 2018.

10:57AM 25      And, then, as Defendant's Exhibit F, is also another -- or

10:57AM  1   an updated U.S. Department of Homeland Security Privacy Impact

10:58AM  2   Assessment For Customs Border Protection Border Searches Of

10:58AM  3   Electronic Devices.

10:58AM  4       So I have these three exhibits. It's not my intention,

10:58AM  5   Your Honor, to quiz or question Mrs. Morales about these or the

10:58AM  6   particulars of these, but instead to have her authenticate

10:58AM  7   them, as, you know, updates of the policy and things that she

10:58AM  8   would be familiar with, as these border searches and techniques

10:58AM  9   have evolved in the past few years, since Mr. Roggio's search.

10:58AM 10       THE COURT: Mr. Hinkley?

10:58AM 11       MR. HINKLEY: I'm not sure that they're relevant for these

10:58AM 12   proceedings, inasmuch as the witness has already indicated that

10:58AM 13   her agency did not detain the electronic devices in this case,

10:58AM 14   it was actually a Homeland Security investigation.

10:58AM 15       THE COURT: That seems to be a valid point.

10:58AM 16       MR. BARTOLAI: Judge, my concern is, I know that

10:59AM 17   it's -- they would apply -- they're authored by Homeland

10:59AM 18   Security, and, although, she has indicated that Customs and

10:59AM 19   Border Protection did not seize the devices, these policies

10:59AM 20   pertain to Customs Border Protection, as well as to Homeland

10:59AM 21   Security, and I would like to have them, as part of the record,

10:59AM 22   so that, as the case progresses, we can -- I guess, I could ask

10:59AM 23   the Court to take Judicial notice of them, but I thought the

10:59AM 24   best thing would be to have the witness authenticate them.

10:59AM 25       THE COURT: Well, I can take Judicial notice of Official

10:59AM 1    Government Regulations, to the extent that's what these are.

10:59AM 2    Alternatively, if you wish, you can present these documents to

10:59AM 3    someone from Homeland Security who, I'm certain, will testify.

10:59AM 4          MR. BARTOLAI: Okay, that would work, as well.

10:59AM 5          THE COURT: All right. In that case, do you have anything

11:00AM 6    else for her?

11:00AM 7          MR. BARTOLAI: One moment. No, I'm fine, thanks.

11:00AM 8          THE COURT: Redirect?

11:00AM 9          MR. HINKLEY: If I may, Your Honor, just a few quick

11:00AM 10   questions.

11:00AM 11                    REDIRECT EXAMINATION

11:00AM 12   BY MR. HINKLEY:

11:00AM 13   Q.   Ms. Morales, during your cross examination, Mr. Bartolai

11:00AM 14   had inquired about Mr. Roggio being referred to secondary, and

11:00AM 15   you had indicated -- and I want to make sure I have this clear

11:00AM 16   -- that Mr. Roggio would have been referred to you, because he

11:00AM 17   was traveling from Iraq, regardless of anything else, the

11:00AM 18   system would have referred him to you, in any event; is that

11:00AM 19   correct?

11:00AM 20   A.   Correct.

11:00AM 21   Q.   You also indicated, if I heard your testimony correctly,

11:00AM 22   that it's not unusual to have agents from the FBI or from

11:01AM 23   Homeland Security Investigations present, especially, during

11:01AM 24   this time frame when your job was to interview folks who were

11:01AM 25   traveling from the war zones of where ISIS was involved; is

11:01AM 1   that correct?

11:01AM 2   A.   That is correct.

11:01AM 3   Q.   So it would not have been unusual for the two agents to be

11:01AM 4   there for Mr. Roggio's secondary inspection?

11:01AM 5   A.   Correct.

11:01AM 6   Q.   Finally, I just want to make sure I understand your

11:01AM 7   testimony -- well, actually, I have two areas, very quickly.

11:01AM 8         Mr. Bartolai was speaking to you a little bit about the

11:01AM 9   bathroom facilities that were available to Mr. Roggio and other

11:01AM 10  folks who were referred to secondary inspection.

11:01AM 11        Now, this area is a controlled area by the Government, is

11:01AM 12  that correct, meaning, that you want to make sure folks are not

11:01AM 13  able to dispose of contraband, and that they're not allowed to

11:02AM 14  destroy evidence; is that right?

11:02AM 15  A.   Yes.

11:02AM 16  Q.   And is that, at least, part of the reason why the area is

11:02AM 17  set up as it is?

11:02AM 18  A.   Yes.

11:02AM 19  Q.   Go ahead.

11:02AM 20  A.   In many instances, people use the rest rooms to flush down

11:02AM 21  drugs and documents and any evidence of crimes.

11:02AM 22  Q.   Is that, also, a reason why Customs and Border Protection

11:02AM 23  would take electronic devices from a traveler, prior to the

11:02AM 24  interview of the traveler?

11:02AM 25  A.   Yes.

11:02AM 1  Q.   So that the traveler would not be able to erase or tamper

11:02AM 2  with evidence that may be in the electronic devices?

11:02AM 3  A.   Yes, and, also, for their own safety, so they're not going

11:03AM 4  to use it as a weapon towards the officer or towards

11:03AM 5  themselves.

11:03AM 6  Q.   Finally, Mr. Bartolai had asked you on a couple different

11:03AM 7  occasions whether or not Mr. Roggio satisfied you, in regards

11:03AM 8  to his admittance to the United States, and I believe you

11:03AM 9  indicated, Yes, he did.

11:03AM 10  A.   Yes.

11:03AM 11  Q.   I want to make sure that's clear on the record, in regards

11:03AM 12  to what that means.

11:03AM 13       In other words, one of the areas that you looked into was

11:03AM 14  why Mr. Roggio had lost his original passport and had been

11:03AM 15  issued a temporary passport; is that correct?

11:03AM 16  A.   Yes.

11:03AM 17  Q.   When you say that you are satisfied that he was able to be

11:04AM 18  admitted, you're not indicating, are you, that you were

11:04AM 19  satisfied that he was, in fact, kidnapped and, in fact, these

11:04AM 20  things happened to him, but rather you were satisfied he is the

11:04AM 21  actual holder of the passport, temporary passport, which would

11:04AM 22  allow him to be admitted. Is that an accurate statement?

11:04AM 23  A.   Yes. His kidnapping situation, as much as I didn't really

11:04AM 24  believe it, I had to, for that day and that specific reason, I

11:04AM 25  had to treat it as it happened, even though, personally, I have

11:04AM  1  doubts about the whole thing. But like I said before, for the

11:04AM  2  security of other people, if it did, in fact, happen and other

11:04AM  3  people were involved or other people were held hostage, it

11:04AM  4  would have been very good information for us.

11:04AM  5  Q.   In fact, isn't it true that, based on the information Mr.

11:05AM  6  Roggio provided to you, in regards to the kidnapping and his

11:05AM  7  business dealings and the potential that he was overpaid or was

11:05AM  8  defrauding his business partners, that you could have, based on

11:05AM  9  that --

11:05AM  10       MR. BARTOLAI: Objection. Leading, Judge.

11:05AM  11       THE COURT: Sustained.

11:05AM  12       MR. HINKLEY: I'm sorry, what was the objection?

11:05AM  13       THE COURT: The objection was leading. Try it again,

11:05AM  14  please.

11:05AM  15  BY MR. HINKLEY:

11:05AM  16  Q.   Could you have detained and looked at Mr. Roggio's

11:05AM  17  electronic devices, based on the information he provided you?

11:05AM  18  A.   Yes.

11:05AM  19       MR. BARTOLAI: Well, just, I'd move to strike, Judge, the

11:05AM  20  answer. It's speculative. She indicated that she did not detain

11:05AM  21  them and she was not going to. So it's just speculative, at

11:05AM  22  this point, whether or not she could have.

11:05AM  23       THE COURT: I think many of your questions were posed in

11:05AM  24  the same fashion. Overruled.

11:06AM  25       MR. HINKLEY: Thank you, Your Honor. I have no further

11:06AM 1    questions. Thank you.

11:06AM 2         THE COURT: Anything else, Mr. Bartolai?

11:06AM 3         MR. BARTOLAI: Yes, Judge, just to follow up.

11:06AM 4                    RECROSS EXAMINATION

11:06AM 5    BY MR. BARTOLAI:

11:06AM 6    Q.   Customs Border Protection did not detain his devices;

11:06AM 7    right?

11:06AM 8    A.   Yes.

11:06AM 9    Q.   And for one minute, if you thought they needed to be

11:06AM 10   detained, you would not have hesitated to detain them; is that

11:06AM 11   right?

11:06AM 12   A.   Yes.

11:06AM 13   Q.   And, in fact, that's what happened here -- well, strike

11:06AM 14   that. Regarding the secondary inspection, the reason why he was

11:06AM 15   referred for the secondary inspection was this CTR hit;

11:06AM 16   correct?

11:06AM 17   A.   Yes.

11:06AM 18   Q.   And that was because, as far as you know, was because he

11:06AM 19   was coming from Iraq?

11:06AM 20   A.   Yes.

11:06AM 21   Q.   If he had -- does your computer or the information that's

11:06AM 22   given to you at that time, does that tell you, at all, how many

11:06AM 23   times an individual had been in Iraq or in the past or any

11:06AM 24   other information, other than the fact that there's a lookout?

11:07AM 25   A.   Could you repeat the question, please?

11:07AM  1   Q.   In other words, when you got the information that there

11:07AM  2   was a CTR Lookout or hit on him, on Mr. Roggio that day, is any

11:07AM  3   other information provided relative to that?

11:07AM  4   A.   No, that's it.

11:07AM  5   Q.   It wouldn't tell you how many times an individual had been

11:07AM  6   to Iraq?

11:07AM  7   A.   Not in that particular lookout, but I have the option to

11:07AM  8   look at past travel to the conflict zone.

11:07AM  9   Q.   Okay, and do you recall if you did?

11:07AM 10   A.   I don't remember --

11:07AM 11   Q.   You don't remember?

11:07AM 12   A.   -- if I did.

11:07AM 13   Q.   Again, on that particular day, I know that you were part

11:07AM 14   of the Tactical Terrorism Response Team. If an individual, say,

11:07AM 15   was coming from the Bahamas, and they had a secondary

11:08AM 16   inspection, would you have also conducted that secondary

11:08AM 17   inspection?

11:08AM 18   A.   No.

11:08AM 19   Q.   Why wouldn't that be?

11:08AM 20   A.   In that particular -- on that particular day? Because I

11:08AM 21   was part of the Tactical Terrorism Response Team, I was only

11:08AM 22   assigned to speak to people who, directly or indirectly,

11:08AM 23   traveled on that trip only from the conflict zone.

11:08AM 24   Q.   That would have been another --

11:08AM 25   A.   It would have been another secondary officer, like, the

60

11:08AM 1   regular type of secondary officer, if it needed to be

11:08AM 2   addressed.

11:08AM 3        MR. BARTOLAI: All right, that's it. Thank you.

11:08AM 4        THE COURT: Anything further?

11:08AM 5        MR. HINKLEY: No, Your Honor. Thank you.

11:08AM 6        THE COURT: Thank you, Ms. Morales. You can step down.

11:08AM 7        MR. HINKLEY: Your Honor, may the witness be dismissed? She

11:08AM 8   traveled in from Canada.

11:08AM 9        THE COURT: Any objection to her being excused?

11:08AM 10       MR. BARTOLAI: I'll tell you, Judge, we had subpoenaed Mrs.

11:08AM 11  Morales, as well, and now that her testimony is finished, she

11:09AM 12  can be excused.

11:09AM 13       THE COURT: Very well. You are excused.

11:09AM 14       THE WITNESS: Thank you.

11:09AM 15       MR. HINKLEY: The Government calls James Mundy, Your Honor.

11:09AM 16       THE COURT: Let's take 10 minutes for a break.

11:09AM 17       (At this time a brief recess was taken.)

11:09AM 18       THE COURT: Mr. Hinkley, call your witness.

11:23AM 19       MR. HINKLEY: James Mundy.

11:23AM 20  J A M E S     M U N D Y   IS CALLED, AND HAVING BEEN DULY

11:23AM 21  SWORN, TESTIFIED AS FOLLOWS:

11:23AM 22       THE CLERK: Would you please state and spell your name for

11:23AM 23  the record?

11:23AM 24       THE WITNESS: James Leo Mundy, M-U-N-D-Y.

11:23AM 25       THE CLERK: Thank you. You may be seated.

61

11:23AM 1      MR. HINKLEY: May I proceed, Your Honor?

11:23AM 2      THE COURT: Yes, you may.

11:23AM 3                  DIRECT EXAMINATION

11:23AM 4  BY MR. HINKLEY:

11:23AM 5  Q.   Mr. Mundy, how are you employed?

11:23AM 6  A.   I'm a Special Agent with the United States Department of

11:23AM 7  Homeland Security, Homeland Security Investigations.

11:24AM 8  Q.   How long have you been so employed?

11:24AM 9  A.   Since August of 2007.

11:24AM 10 Q.   What's your position?

11:24AM 11 A.   Special Agent.

11:24AM 12 Q.   How long have you been a Special Agent with them?

11:24AM 13 A.   Coming up on 14 years.

11:24AM 14 Q.   In February of 2017, obviously, you were a Special Agent

11:24AM 15 with HSI at that point?

11:24AM 16 A.   Yes.

11:24AM 17 Q.   Where was your duty station?

11:24AM 18 A.   At that time, I was assigned to J.F.K. Airport, we have an

11:24AM 19 office there.

11:24AM 20 Q.   What were your duties there?

11:24AM 21 A.   On that day, I was assigned to be the general duty agent

11:24AM 22 for the entire office.

11:24AM 23 Q.   This would be on the 26th of February 2017?

11:24AM 24 A.   Yes.

11:24AM 25 Q.   So what, exactly, does that mean? What would you be doing?

11:24AM 1  A.    So as the general duty agent, everybody has to -- every

11:24AM 2  agent has to assume that position, probably, about every two

11:24AM 3  months, and you wear many hats that day, from answering phone

11:24AM 4  calls, to liaisoning for agents in other parts of the country

11:25AM 5  that need assistance, to signing for FedEx packages. There's

11:25AM 6  many jobs and responsibilities on the day of the duty agent.

11:25AM 7  Q.    Obviously, you know why you're here testifying today, in

11:25AM 8  regards to Mr. Roggio.

11:25AM 9  A.    I do.

11:25AM 10 Q.    And were you involved in a secondary inspection that

11:25AM 11 involved Mr. Roggio?

11:25AM 12 A.    I was.

11:25AM 13 Q.    And what was your duty? What were you doing there?

11:25AM 14 A.    I was contacted by Special Agent Burke from our

11:25AM 15 Philadelphia office and advised that a target of theirs was

11:25AM 16 going to be arriving at the airport, and my job was to meet

11:25AM 17 with CBP, Customs and Border Protection, and liaison between

11:25AM 18 the agent in Philadelphia, Agent Burke, and CBP.

11:25AM 19 Q.    Did you do so?

11:25AM 20 A.    I did.

11:25AM 21 Q.    Describe to the Court what you did.

11:25AM 22 A.    Essentially, I was present at J.F.K. Airport when the

11:26AM 23 Defendant arrived, and, really, I did nothing, but CBP

11:26AM 24 performed their normal job function, and I was present, and

11:26AM 25 they detained the electronic devices, I took custody of them

63

11:26AM 1   and sent them to Agent Burke for forensic examination.

11:26AM 2   Q.    So let me ask you a few more detailed questions. How were

11:26AM 3   you dressed that day, if you recall?

11:26AM 4   A.    If I was general duty agent, I would have been in a suit

11:26AM 5   and tie or a sport coat and slacks, button down. I can't recall

11:26AM 6   exactly how I dressed that day.

11:26AM 7   Q.    Now, when you say you can't recall, it's a number of years

11:26AM 8   ago this occurred, is that correct?

11:26AM 9   A.    Yes.

11:26AM 10  Q.    And over the course of your career, I assume that you've

11:26AM 11  done this type of liaison work on a number of occasions?

11:27AM 12  A.    Yes, it's a very common request.

11:27AM 13  Q.    Was there anything about the inspection of Mr. Roggio on

11:27AM 14  that day that was unusual or made him memorable, in any way?

11:27AM 15  A.    Not at all.

11:27AM 16  Q.    Would you have been carrying a weapon on this particular

11:27AM 17  day?

11:27AM 18  A.    Yes.

11:27AM 19  Q.    Would you be carrying your weapon whenever you're on duty

11:27AM 20  at J.F.K., as you've described?

11:27AM 21  A.    Yes.

11:27AM 22  Q.    And would that weapon have been visible to the traveling

11:27AM 23  public?

11:27AM 24  A.    No.

11:27AM 25  Q.    Why is that?

11:27AM 1  A.    In order to not cause alarm, you know, if I'm in plain

11:27AM 2  clothes at an airport with a firearm displayed, it could cause

11:27AM 3  alarm, so I keep it concealed.

11:27AM 4  Q.    In your liaison work between Philadelphia and Agent Burke

11:28AM 5  and the CBP folks at J.F.K., did you have discussions with the

11:28AM 6  person who was assigned to interview Mr. Roggio, prior to Mr.

11:28AM 7  Roggio being interviewed, in regards to what type of questions

11:28AM 8  to ask or what areas to explore?

11:28AM 9  A.    No.

11:28AM 10  Q.    So why don't you just describe to the Court, basically,

11:28AM 11  what happened, as far as you can recollect?

11:28AM 12  A.    As far as I can recall, you know, the subject was brought

11:28AM 13  into a secondary exam and, essentially, I linked up with the

11:28AM 14  agents from the Bureau, and CBP performed their normal routine

11:28AM 15  secondary examination, and the request from the Agent Burke was

11:29AM 16  to detain the electronic devices, in accordance with a border

11:29AM 17  search, which I did, and I FedEx'd them to Agent Burke.

11:29AM 18  Q.    And when you were -- when you detained those electronics,

11:29AM 19  did you have a conversation with Mr. Roggio or would you have

11:29AM 20  had a conversation with Mr. Roggio, in regards to what that

11:29AM 21  means and what the process is?

11:29AM 22  A.    I don't recall, specifically, having a conversation with

11:29AM 23  Mr. Roggio, but given that this is a common occurrence to

11:29AM 24  liaison, it would have been my practice to give the subject,

11:29AM 25  whether it be Mr. Roggio or somebody else, the contact

11:29AM 1   information for the agent from the originating office. As you

11:29AM 2   may imagine, J.F.K. is a very busy airport and office for us,

11:29AM 3   we have a lot of requests, so I would often guide the

11:29AM 4   passengers to the agent that's handling the request, in this

11:30AM 5   case, Agent Burke.

11:30AM 6   Q.   I take it from the tone of your testimony that this is not

11:30AM 7   an unusual occurrence that you get requested to detain

11:30AM 8   electronics?

11:30AM 9        MR. BARTOLAI: Objection; leading.

11:30AM 10       THE COURT: It's a little early, but since it has been

11:30AM 11  made, do you want to reform your question?

11:30AM 12       MR. HINKLEY: Certainly, Your Honor.

11:30AM 13  BY MR. HINKLEY:

11:30AM 14  Q.   Well, is it unusual for you to be involved in these type

11:30AM 15  of situations where other agents within your agency ask you to

11:30AM 16  liaison and to detain electronics from travelers?

11:30AM 17  A.   Not at all, it's a very common occurrence and request.

11:30AM 18  Q.   Is it the general practice that, once the items are

11:30AM 19  detained, you then send them on to the investigating officer or

11:30AM 20  agent?

11:30AM 21  A.   That is correct, yes.

11:31AM 22  Q.   Okay. So you don't really get involved in the

11:31AM 23  investigation; is that correct?

11:31AM 24  A.   Correct.

11:31AM 25  Q.   In front of you, there are a number of documents, I'll ask

11:31AM 1    you to look through there, there should be a Government's

11:31AM 2    Exhibit No. 2.

11:31AM 3    A.    I have it here.

11:31AM 4    Q.    Could you take a look and identify what it is?

11:31AM 5    A.    It is a chain of custody, commonly known as DHS Form

11:31AM 6    6051-D, D standing for Detained, and it was filled out on

11:31AM 7    February 26, 2017 by myself, and that is my signature.

11:31AM 8    Q.    Would this be the Detention Notice and Custody Receipt for

11:31AM 9    the property that was detained from Mr. Roggio?

11:31AM 10   A.    It would be, yes.

11:31AM 11        MR. HINKLEY: Your Honor, I'm going to move for admission

11:31AM 12   of Government's Exhibit No. 2.

11:31AM 13        MR. BARTOLAI: No objection.

11:31AM 14        THE COURT: Government's 2 is admitted.

11:31AM 15        (At this time Government's Exhibit No. 2 was admitted into

11:32AM 16         evidence.)

11:32AM 17   BY MR. HINKLEY:

11:32AM 18   Q.    The information that you put on this document -- well, let

11:32AM 19   me ask you this. Are you the one that filled out this document?

11:32AM 20   A.    I am.

11:32AM 21   Q.    And the information you provided in this document, did you

11:32AM 22   also provide that to Mr. Roggio?

11:32AM 23   A.    It would have been my practice to have provided a copy to

11:32AM 24   the passenger, yes.

11:32AM 25   Q.    I'd note in the remarks in box no. 13, you indicate,

11:32AM 1    Password for all devices, and then you indicate what those

11:32AM 2    passwords are.

11:32AM 3        If you recall, do you know from whom you received the

11:32AM 4    passwords?

11:32AM 5    A.   I do not recall. I don't recall.

11:32AM 6    Q.   Okay.

11:33AM 7        MR. HINKLEY: No further questions, Your Honor.

11:33AM 8        THE COURT: Cross-examine.

11:33AM 9        MR. BARTOLAI: Thank you.

11:33AM 10                     CROSS EXAMINATION

11:33AM 11   BY MR. BARTOLAI:

11:33AM 12   Q.   Good morning, Agent. You were present earlier, you know

11:33AM 13   that I'm the attorney for Mr. Roggio. I'm going to ask

11:33AM 14   you -- Government's Exhibit 2, you just testified about that,

11:33AM 15   and that's in front of you; correct?

11:33AM 16   A.   It is in front of me, yes.

11:33AM 17   Q.   And this is the Detention Notice and Custody Receipt for

11:33AM 18   the detained property; right?

11:33AM 19   A.   Correct.

11:33AM 20   Q.   And it says, Block A, Time 2000 hours. Is that it?

11:33AM 21   A.   That's what's listed, yes.

11:33AM 22   Q.   So that would have been, in laymen's terms, around 8 p.m.?

11:33AM 23   A.   Yes.

11:33AM 24   Q.   And that would have been at the beginning or actually

11:33AM 25   prior to the secondary interview inspection; correct?

11:34AM 1   A.    No.

11:34AM 2   Q.    That would have occurred after the secondary inspection?

11:34AM 3   A.    Yes.

11:34AM 4   Q.    Okay. So you were the person who detained the devices?

11:34AM 5   A.    Yes.

11:34AM 6   Q.    Okay. You're the person who completed this form; right?

11:34AM 7   A.    I am.

11:34AM 8   Q.    And you were directed by Agent Homeland Security Officer

11:34AM 9   or Investigative Officer Agent Burke to detain the devices?

11:34AM 10  A.    Yes.

11:34AM 11  Q.    All right. When do you recall him directing you to do so?

11:34AM 12  A.    I don't have a specific date, but I would imagine it would

11:34AM 13  have been in the day or so leading up to this point, this date.

11:34AM 14  Q.    Do you recall -- did you have a conversation with Agent

11:34AM 15  Burke?

11:34AM 16  A.    I'm sure I did, I don't recall it.

11:34AM 17  Q.    You don't recall having it.

11:34AM 18  A.    A conversation?

11:34AM 19  Q.    Yeah, I mean, do you recall speaking with him, either, in

11:35AM 20  person or on the telephone?

11:35AM 21  A.    I don't recall, but it would be my practice to have had

11:35AM 22  established communication with the agent.

11:35AM 23  Q.    Do you have any writing or memorandum of a conversation

11:35AM 24  that you had with Agent Burke?

11:35AM 25  A.    I do not.

11:35AM 1   Q.   But you're clear it was Agent Burke who directed you to
11:35AM 2   detain these devices; correct?
11:35AM 3   A.   It was his request to have this secondary examination and
11:35AM 4   to have the devices detained, yes.
11:35AM 5   Q.   Okay. You say that that's not -- the detention of
11:35AM 6   electronic devices, under these circumstances, are a very
11:35AM 7   common occurrence?
11:35AM 8   A.   It's common.
11:35AM 9   Q.   It's common for an agent to request that electronic
11:35AM 10  devices be detained, and you, as the liaison officer would
11:36AM 11  detain them?
11:36AM 12  A.   It is.
11:36AM 13  Q.   You, yourself, did not inspect these devices, in any way;
11:36AM 14  right?
11:36AM 15  A.   By visually inspecting them and placing them in a bag and
11:36AM 16  then sending them in a FedEx -- if that's -- what's your
11:36AM 17  definition of inspect?
11:36AM 18  Q.   All right, let's talk about visually inspecting them. Did
11:36AM 19  you look at them like -- did you look and make sure they were
11:36AM 20  electronic devices and something not other than that?
11:36AM 21  A.   I'm sure I would have, yes.
11:36AM 22  Q.   You don't recall, specifically, though, is that right?
11:36AM 23  A.   I don't, but with this document, I can see that I have
11:36AM 24  listed them as electronic devices.
11:36AM 25  Q.   Okay. In other words, sometimes, an electronic device

11:36AM 1  could have a false compartment in it; correct?

11:36AM 2  A.   Not to my knowledge.

11:36AM 3  Q.   You've never seen a false compartment in an electronic

11:36AM 4  device?

11:36AM 5  A.   Not that I can recall at this time.

11:37AM 6  Q.   Okay. Have you ever had occasions where people were trying

11:37AM 7  to smuggle contraband, we'll say, in an electronic device, such

11:37AM 8  as, a phone, a laptop, a game station, like, a Playstation or

11:37AM 9  anything like that?

11:37AM 10 A.   Not that I can recall right now, but I'm sure -- I would

11:37AM 11 imagine it occurs.

11:37AM 12 Q.   You did not have any occasion, in this particular case, to

11:37AM 13 manipulate these devices, like, take out the batteries or look

11:37AM 14 inside them, in any way?

11:37AM 15 A.   Not that I recall, no.

11:37AM 16 Q.   And, in fact, you had asked Mr. Roggio to provide the

11:37AM 17 passcodes for these devices?

11:37AM 18 A.   I don't recall how the passcodes were obtained.

11:37AM 19 Q.   Okay, but I know Government's Exhibit 2, the Detention

11:37AM 20 Notice and Custody Receipt for the detained property, block 13,

11:38AM 21 does indicate that the password for the devices was -- and it

11:38AM 22 sets forth there; right?

11:38AM 23 A.   That's what's listed there.

11:38AM 24 Q.   You completed this form?

11:38AM 25 A.   I did.

11:38AM  1  Q.   Where did you get that information?

11:38AM  2  A.   I don't recall.

11:38AM  3  Q.   Do you recall -- again, have you ever searched electronic

11:38AM  4  devices, in your capacity, under these circumstances, as a

11:38AM  5  liaison with the Customs Border Protection, in a secondary

11:38AM  6  interview inspection?

11:38AM  7  A.   As far as inspecting them, I've never -- as far as a

11:38AM  8  forensic examination?

11:38AM  9  Q.   No, no, just an inspection.

11:38AM  10 A.   Just a physical and visual inspection, sure, yes.

11:38AM  11 Q.   Okay. You don't recall doing that here. Do you

11:38AM  12 recall -- have you ever opened a device to look at it? Have you

11:38AM  13 ever used a passcode to open -- you know, turn the device on

11:38AM  14 and look at the contents?

11:39AM  15 A.   In acting as a liaison in this similar instance?

11:39AM  16 Q.   Yes.

11:39AM  17 A.   Not that I recall.

11:39AM  18 Q.   And you did not do that here; is that right?

11:39AM  19 A.   Not that I recall.

11:39AM  20 Q.   This particular day, February 26, 2017, you were on duty

11:39AM  21 that whole day; is that right?

11:39AM  22 A.   Yeah, the duty responsibility is a 24-hour period.

11:39AM  23 Q.   So you were there all day?

11:39AM  24 A.   I would have been there for a block -- a period of those

11:39AM  25 24 hours, but I'm on call for that 24-hour period.

11:39AM 1   Q.    When you're on call in that particular role you had that

11:39AM 2   day, it's pretty much anything; correct?

11:39AM 3   A.    Yes.

11:39AM 4   Q.    You said, answering the phone, secondary inspection,

11:39AM 5   whatever is required?

11:39AM 6   A.    Yes, during the normal course of the business day, you are

11:40AM 7   -- unless there is some sort of request from a -- from another

11:40AM 8   agency or from another agent, I would be in the office at the

11:40AM 9   front desk, answering calls, signing for FedEx packages and

11:40AM 10  planning my day around requests that we received, in which

11:40AM 11  J.F.K. receives many.

11:40AM 12  Q.    During this same question, February 26, 2017, you were

11:40AM 13  called to be present at this secondary inspection?

11:40AM 14  A.    Yes.

11:40AM 15  Q.    And to detain these devices?

11:40AM 16  A.    Yes.

11:40AM 17  Q.    Do you recall anything -- speaking or having any

11:40AM 18  interaction with Customs Border Protection Agent Morales who

11:40AM 19  previously testified?

11:40AM 20  A.    I do not recall, no.

11:40AM 21  Q.    Do you recall participating in any of the questions asked

11:41AM 22  by Agent Morales of Mr. Roggio?

11:41AM 23  A.    I don't recall.

11:41AM 24  Q.    Does anything about the interview with Mr. Roggio -- are

11:41AM 25  you able to recall any of the specifics of the interview with

73

11:41AM  1    Mr. Roggio that day?

11:41AM  2    A.    No.

11:41AM  3    Q.    Are you familiar with what is a CTR Lookout?

11:41AM  4    A.    I'm familiar with -- no, not by its definition, no.

11:41AM  5    Q.    Or anything like a one-day hit, does that ring a bell to

11:41AM  6    you, at all?

11:42AM  7    A.    I've heard of it, sure.

11:42AM  8    Q.    What?

11:42AM  9    A.    I've heard of that, yes.

11:42AM 10    Q.    Does it mean anything? What does it mean to you?

11:42AM 11    A.    You know, that's CBP terminology -- phrase, I've heard it

11:42AM 12    used, and I believe, you know, in terms of the sense of a

11:42AM 13    one-day -- it's the person -- actually, do you know what? I

11:42AM 14    can't factually testify to exactly what it means.

11:42AM 15    Q.    I appreciate that. So you've been a Homeland Security

11:42AM 16    Agent for, approximately, 15 years?

11:42AM 17    A.    August will be 14 years.

11:42AM 18    Q.    Fourteen years, all right. And as part of your job, you're

11:42AM 19    required to undergo training and updating, is that right, is

11:43AM 20    training a part of that, continuing training?

11:43AM 21    A.    Periodic training, sure.

11:43AM 22    Q.    Periodic training. All right, I'm going to show you --

11:43AM 23          MR. BARTOLAI: If I may, I have these exhibits, Defendant's

11:43AM 24    Exhibits E, F -- no, D, E and F that I'd ask the Court if I can

11:43AM 25    show to Mr. --

74

11:43AM 1        THE COURT: Sure. You may.

11:43AM 2    BY MR. BARTOLAI:

11:43AM 3    Q.    Just take a minute and look at them. I'm not going to ask

11:43AM 4    you anything in depth about those, but I want to see if you're

11:43AM 5    able to identify them or if you've ever seen these documents

11:43AM 6    before.

11:43AM 7    A.    I have never seen this document before.

11:43AM 8    Q.    All right. So as part of your training, are you instructed

11:43AM 9    as to what is permissible regarding border searches and the

11:44AM 10   border search document?

11:44AM 11   A.    Yes.

11:44AM 12   Q.    Is that -- you're trained regularly on that?

11:44AM 13   A.    No, I would say it's more, you know in the academy.

11:44AM 14   Q.    Pardon me?

11:44AM 15   A.    During the academy phase.

11:44AM 16   Q.    Oh, during the academy, okay. You're not required to

11:44AM 17   undergo any type of continuing training on such topics?

11:44AM 18   A.    Not that I recall.

11:44AM 19        MR. BARTOLAI: May I have a moment, Judge?

11:44AM 20        THE COURT: Yes.

11:44AM 21        MR. BARTOLAI: Nothing further.

11:44AM 22        THE COURT: Redirect?

11:44AM 23        MR. HINKLEY: No questions, Your Honor.

11:44AM 24        THE COURT: Thank you, Agent Mundy. You can step down.

11:45AM 25        MR. HINKLEY: Your Honor, can the witness be excused? I

11:45AM 1  don't think he's required anymore.

11:45AM 2      MR. BARTOLAI: Your Honor, we also subpoenaed him, as well,

11:45AM 3  and we're agreeable that he should be excused.

11:45AM 4      THE COURT: Very well. Agent Mundy, you are excused.

11:45AM 5      THE WITNESS: Thank you.

11:45AM 6      THE COURT: Mr. Hinkley, do you have another witness?

11:45AM 7      MR. HINKLEY: I do, Your Honor. The Government calls

11:45AM 8  Jeffrey Burke, Your Honor.

11:45AM 9  J E F F    B U R K E   IS CALLED, AND HAVING BEEN DULY SWORN,

11:45AM 10 TESTIFIED AS FOLLOWS:

11:46AM 11     THE CLERK: Would you please state and spell your name for

11:46AM 12 the record.

11:46AM 13     THE WITNESS: It's Jeff Burke, J-E-F-F, B-U-R-K-E.

11:46AM 14     THE CLERK: Thank you. You may be seated.

11:46AM 15     MR. HINKLEY: May I proceed, Your Honor?

11:46AM 16     THE COURT: Yes, you may.

11:46AM 17                    DIRECT EXAMINATION

11:46AM 18 BY MR. HINKLEY:

11:46AM 19 Q.   Mr. Burke, how are you employed, sir?

11:46AM 20 A.   I'm currently employed as a Special Agent with Homeland

11:46AM 21 Security Investigations out of Philadelphia.

11:46AM 22 Q.   How long have you been a Special Agent with that agency?

11:46AM 23 A.   I am also going on my 14th year.

11:46AM 24 Q.   Were you or are you involved in the investigation into Mr.

11:46AM 25 Ross Roggio?

11:46AM 1   A.   Yes, I am.

11:46AM 2   Q.   As part of your investigation, did you know that Mr.

11:47AM 3   Roggio was traveling internationally and the subject of today's

11:47AM 4   proceedings, did you seek to find out when he would be

11:47AM 5   returning to the United States?

11:47AM 6   A.   Yes.

11:47AM 7   Q.   All right. Let me go back a little bit. What agencies are

11:47AM 8   involved in this investigation?

11:47AM 9   A.   Agencies involved include Homeland Security

11:47AM 10  Investigations, Federal Bureau of Investigation and the

11:47AM 11  Department of Commerce Office of Export Enforcement Bureau of

11:47AM 12  Industry Security.

11:47AM 13  Q.   And as part of preparation for today, as well as just a

11:48AM 14  part of being a case agent in this matter, have you reviewed

11:48AM 15  documents prepared by the other agents and agencies and, also,

11:48AM 16  talked to the other agents, in regards to the investigation

11:48AM 17  into Mr. Roggio?

11:48AM 18  A.   Yes, I have.

11:48AM 19  Q.   Were you part of the investigation from the beginning or

11:48AM 20  did you come in at some point after it already started?

11:48AM 21  A.   I came in at some point after it had already begun.

11:48AM 22  Q.   Okay. There's been some testimony today that there was a

11:48AM 23  CTR Lookout for Mr. Roggio that the Government knew that he was

11:48AM 24  traveling and where a secondary inspection was requested of Mr.

11:48AM 25  Roggio.

11:48AM 1      Can you explain to the Court what your part in that was
11:48AM 2  and what all that means?
11:48AM 3  A.   Sure. With this investigation, as with any investigation
11:49AM 4  that I open, I enter in subject records to an automated case
11:49AM 5  system. The subject records include -- in this case would have
11:49AM 6  been Mr. Roggio, his company, and other various subjects and
11:49AM 7  names of individuals that were part of or coming up in the
11:49AM 8  investigation.
11:49AM 9      Within those subject records, I have the option to
11:49AM 10 designate them for a referral to Customs, a referral to
11:49AM 11 Immigration or as a Silent Hit, so that if they are traveling,
11:49AM 12 I get to see that and nobody else does. It kind of allows me to
11:49AM 13 understand, you know, what the pattern of travel is, if they
11:49AM 14 are coming in, and in Mr. Roggio's case, he was coming in from
11:49AM 15 Iraq. It would provide us the opportunity to conduct a border
11:50AM 16 search of Mr. Roggio.
11:50AM 17     And in this case, in particular, I believe, it was January
11:50AM 18 25, I received both notices from my automated lookout that he
11:50AM 19 was traveling back to the U.S. from Iraq, and I was also
11:50AM 20 notified by the FBI of the travel, as well.
11:50AM 21 Q.   Having received that information, what, if anything, did
11:50AM 22 you do?
11:50AM 23 A.   I'm sorry, what was that?
11:50AM 24 Q.   Having received that information, did you do anything?
11:50AM 25 A.   So leading up to when I became involved in the case, I

11:50AM 1  believe, we had a case coordination meeting, it may have been

11:50AM 2  early January, where we all sat down and were kind of, Hey,

11:51AM 3  here's what we're looking at, what can we do, in an

11:51AM 4  investigative fashion, moving forward?

11:51AM 5       At that point, I had discussed our border search

11:51AM 6  authorities, as an HSI Special Agent designated as a customs

11:51AM 7  official, CBP officers and HSI agents are designated as customs

11:51AM 8  officials and permitted to conduct border search authority and

11:51AM 9  given border search authorities.

11:51AM 10      Upon receiving that information, Mr. Roggio was planning

11:51AM 11 to fly back, I consulted, first, with my supervisor to advise

11:51AM 12 him of my intent to request a border search and detention of

11:51AM 13 electronic devices, when Mr. Roggio crossed the border,

11:51AM 14 returning to the U.S. at J.F.K. International Airport.

11:51AM 15      I was given the go-ahead, it's more of an informal thing,

11:51AM 16 it's not a formal policy, and then consulted with the

11:52AM 17 investigative team to make sure that everybody was good with

11:52AM 18 us, you know, conducting this. I coordinated with my FBI case

11:52AM 19 agent, Department of Commerce case agents, and from there, made

11:52AM 20 arrangements with CBP and J.F.K. and HSI and J.F.K. to make

11:52AM 21 sure that Mr. Roggio was secondaried, is the term we use.

11:52AM 22      The one-day lookout, you know, I can shed some light on

11:52AM 23 that, as well. The one-day lookout is something that HSI agents

11:52AM 24 or CBP officers can, basically, tag a traveler to, basically,

11:52AM 25 to make sure that they're not missed, because it happens, it

11:52AM 1  happens very frequently, where a secondary request could be

11:53AM 2  made and it just -- it's missed.

11:53AM 3  The one-day lookout is just, kind of, an extra, Hey,

11:53AM 4  listen, we know this individual is traveling, we have confirmed

11:53AM 5  that they've boarded the plane, and we get that information

11:53AM 6  from international carriers who are flying to the U.S., as a

11:53AM 7  normal course of business, they have to send an advance

11:53AM 8  manifest electronically to Customs and Border Protection, which

11:53AM 9  is uploaded into their system, and it gives Customs and Border

11:53AM 10 Protection the opportunity to, essentially, do a data check on

11:53AM 11 incoming travelers.

11:53AM 12 Are there fugitives? Are there anyone with criminal

11:53AM 13 histories that need to be further examined? Potential issues

11:53AM 14 from other countries. Interpol red flag notices, there's an

11:53AM 15 entire list of terrorists, the list goes on and on. So we went

11:54AM 16 forward with having the secondary exam conducted.

11:54AM 17 Q.   So I take it from your testimony, then, that there was an

11:54AM 18 ongoing investigation into Mr. Roggio, prior to being alerted

11:54AM 19 that he was traveling internationally, coming back to the

11:54AM 20 United States; is that correct?

11:54AM 21 A.   Absolutely. And I had reviewed the investigative findings

11:54AM 22 from the FBI and commerce, as well, leading up to that, so I

11:54AM 23 was up to speed on what the allegations were against Mr.

11:54AM 24 Roggio.

11:54AM 25 Q.   Were part of the allegations or the investigation into

11:54AM **1** export violations?

11:54AM **2** A.   Yes, they were.

11:54AM **3** Q.   Export violations would be something that would be within

11:54AM **4** the authority of HSI, as well as Customs Border Patrol, to

11:55AM **5** investigate; is that correct?

11:55AM **6** A.   Absolutely. And, specifically, my assignment was to the

11:55AM **7** Counter Proliferations Unit, who were responsible for

11:55AM **8** investigating attempts to import or export controlled items,

11:55AM **9** either, on the Commerce Control list or on the Department of

11:55AM **10** State United States Munitions list.

11:55AM **11** Q.   So in front of you, you will, I believe, find a document

11:55AM **12** marked as Government's Exhibit No. 5.

11:55AM **13** A.   Yes, I have it.

11:55AM **14** Q.   What is Government's Exhibit No. 5?

11:55AM **15** A.   Exhibit No. 5 is the application and affidavit in support

11:55AM **16** of that application for a search warrant for the electronic

11:55AM **17** devices that had been detained for Mr. Roggio and his travel

11:56AM **18** companion.

11:56AM **19** Q.   Are you the Affiant on this particular search warrant?

11:56AM **20** A.   I am not, the affidavit is mine, but since we were trying

11:56AM **21** to do this as expeditiously as possible, I was traveling for

11:56AM **22** business, and I had an another agent within the Counter

11:56AM **23** Proliferations Group drive up to Scranton to swear the warrant

11:56AM **24** out.

11:56AM **25** Q.   So you were part of the preparation of the affidavit; is

11:56AM 1    that correct?

11:56AM 2    A.   Outside of the opening paragraphs by Agent Hertzog, the

11:56AM 3    entire affidavit -- well, I shouldn't say -- the affidavit is

11:56AM 4    made up of probable cause from a Commerce Affidavit, and then

11:56AM 5    contains additional findings from the investigation.

11:56AM 6    Q.   I take it that the Affiant was familiar with the

11:57AM 7    investigation and, also, spoke to you about the investigation

11:57AM 8    and reviewed the affidavit, prior to his signing for the

11:57AM 9    subpoena -- excuse me -- for the search warrant; is that

11:57AM 10   correct?

11:57AM 11   A.   Yes, that is correct.

11:57AM 12   Q.   So what I'd like to do is go through the affidavit with

11:57AM 13   you, kind of, paragraph by paragraph, in order to, kind of,

11:57AM 14   establish where the investigation was, up to the point where

11:57AM 15   you learned Mr. Roggio was returning to the United States.

11:57AM 16   A.   Okay.

11:57AM 17   Q.   And in that effort, I guess, we will start

11:57AM 18   at -- on -- it's not paged, but on Paragraph 17 of the

11:57AM 19   affidavit.

11:57AM 20   A.   Very good.

11:57AM 21   Q.   So maybe even to make this a little bit simpler, why don't

11:58AM 22   you give a narrative to the Court, basically, how the

11:58AM 23   investigation developed and what facts were known to the

11:58AM 24   investigative team, as it went forward, from where it first

11:58AM 25   started.

11:58AM 1  A.    Very good. In March of 2016, a representative employee

11:58AM 2  from the Drill Masters Eldorado Tool Company contacted the FBI,

11:58AM 3  in regards to suspicions that controlled items were being

11:58AM 4  exported to Iraq, specifically, machinery bits, tools, to

11:58AM 5  manufacture firearms.

11:58AM 6       From that, FBI conducted several interviews to confirm

11:58AM 7  this, obtained documents and brought in the Department of

11:59AM 8  Commerce to further investigate.

11:59AM 9       As they reviewed documents obtained by Eldorado Tool

11:59AM 10 Company, they confirmed that there were certain tools that

11:59AM 11 appear to have been shipped through a private shipping company

11:59AM 12 in East Stroudsburg, The Packaging Place, I believe, the name

11:59AM 13 of it is, Special Agent from Commerce ran licensing checks to

11:59AM 14 see if a license had been obtained or approvals had been

11:59AM 15 obtained from the Department of Commerce to ship those items

11:59AM 16 because they had found that they were, indeed, controlled items

11:59AM 17 that were not allowed to be exported from the U.S. to Iraq

11:59AM 18 without specific licensing and authorizations.

11:59AM 19      When it was determined that no licensing had been found,

11:59AM 20 search warrants were obtained for various email addresses for

12:00PM 21 Mr. Roggio. If I'm recalling the fact pattern correctly, Mr.

12:00PM 22 Roggio was having his former wife ship these items to him in

12:00PM 23 Iraq, and, I guess, when the Eldorado Tool Company employee had

12:00PM 24 received a phone call from The Packaging Place asking for an

12:00PM 25 official description of the items, and that's what kind of

83

12:00PM 1    tipped off the employee that these controlled items were being

12:00PM 2    exported.

12:00PM 3          Further investigation confirmed that, yes, they were

12:00PM 4    exported via mail by The Packaging Place, and additional

12:00PM 5    documents were obtained from the package place, from the

12:00PM 6    shipper, as well, and, you know, all that went towards the

12:00PM 7    probable cause of the search warrants that were obtained by the

12:01PM 8    Commerce Special Agent in the investigation. I believe there

12:01PM 9    were two email search warrants that they applied for and

12:01PM 10   received.

12:01PM 11   Q.    Would the search warrants for those emails be email

12:01PM 12   accounts controlled by the Defendant Mr. Roggio?

12:01PM 13   A.    Yes, based on the probable cause I reviewed, both were

12:01PM 14   submitted on various forms of paperwork, in conjunction with

12:01PM 15   the exportation of these items, either, the ordering of them

12:01PM 16   from Eldorado Tool Company, but, also, on the process of

12:01PM 17   exporting the items out of the country.

12:01PM 18   Q.    Now, before you, in addition to Government's Exhibit No.

12:01PM 19   5, there's a Government's Exhibit No. 3 and 4. Would you take a

12:01PM 20   quick look at those?

12:02PM 21   A.    I have number 3 in front of me.

12:02PM 22   Q.    Would you identify what No. 3 is, please?

12:02PM 23   A.    This is the Search Warrant Application and Affidavit by

12:02PM 24   Special Agent Scott Dunberg of U.S. Department of Commerce for

12:02PM 25   the yahoo email account Rwroggio, R-O-G-G-I-O, @yahoo.com.

12:02PM 1  Q.   How about Government's Exhibit No. 4?

12:02PM 2  A.   No. 4 is the Application and Affidavit Search Warrant

12:02PM 3  applied for and received by Special Agent Scott Dunberg, U.S.

12:02PM 4  Department of Commerce, for the yahoo email account Roggio,

12:03PM 5  R-O-G-G-I-O, @yahoo.com.

12:03PM 6      MR. HINKLEY: Your Honor, these are documents that were

12:03PM 7  docketed with the Court, as indicated, but for purposes of

12:03PM 8  today's proceedings, I am moving for admission of 3, 4 and 5.

12:03PM 9      MR. BARTOLAI: No objection.

12:03PM 10     THE COURT: Government's 3, 4 and 5 are admitted.

12:03PM 11     (At this time Government's Exhibit Nos. 3-5 were admitted

12:03PM 12      into evidence.)

12:03PM 13 BY MR. HINKLEY:

12:03PM 14 Q.   If we can go back to 17, Paragraph 17 in Government's

12:03PM 15 Exhibit No. 5, I want to, kind of, walk you through the

12:03PM 16 affidavit.

12:03PM 17     First of all, these facts that were included here, they

12:03PM 18 were the facts known by the investigation, prior to Mr.

12:03PM 19 Roggio's equipment being detained at the border, is that

12:03PM 20 correct?

12:03PM 21 A.   Correct.

12:03PM 22 Q.   And Paragraph 17, doesn't that, kind of, just describe how

12:04PM 23 the investigation was kicked off with the tip from the Drill

12:04PM 24 Masters Eldorado Tool people?

12:04PM 25 A.   Yes.

12:04PM 1   Q.    And if I can ask you to take a look at Government's

12:04PM 2   Exhibit No. 6?

12:04PM 3   A.    I have it.

12:04PM 4   Q.    Could you describe what Government's Exhibit No. 6 is?

12:04PM 5   A.    Government's Exhibit No. 6 is an invoice under Sales Order

12:04PM 6   No. 0160983 for Drill Masters Eldorado Tool, Incorporated,

12:04PM 7   identifying the customer as Ross Roggio 116 Turkey Hill Road,

12:05PM 8   Stroudsburg, Pennsylvania, zip code 18360, and it's a

12:05PM 9   multi-page document, document being purchase orders obtained by

12:05PM 10  Mr. Roggio.

12:05PM 11  Q.    Would this be the equipment that was the subject of the

12:05PM 12  tip that these items were being trans-shipped from Drill

12:05PM 13  Masters to somewhere in the Middle District of Pennsylvania and

12:05PM 14  then on to Iraq?

12:05PM 15  A.    Yes.

12:05PM 16  Q.    Okay. And this is, again, things that were known by the

12:05PM 17  investigation, prior to Mr. Roggio's return?

12:05PM 18  A.    Yes, there was a number of items that he had ordered, I

12:05PM 19  don't believe every item is controlled, but the controlled

12:05PM 20  items are listed within these purchase orders.

12:05PM 21       MR. HINKLEY: Your Honor, the Government moves for

12:05PM 22  Government's Exhibit No. 6 to be admitted.

12:05PM 23       MR. BARTOLAI: No objection.

12:05PM 24       THE COURT: Government's 6 is admitted.

12:05PM 25       (At this time Government's Exhibit No. 6 was admitted into

12:06PM 1      evidence.)

12:06PM 2  BY MR. HINKLEY:

12:06PM 3  Q.    Moving on to No. 18 and 19, Paragraphs 18 and 19 of the

12:06PM 4  Government's Exhibit No. 5.

12:06PM 5      Can you explain, kind of, how the investigation was

12:06PM 6  developing at that point?

12:06PM 7  A.    In Paragraph 18, it's documenting the FBI's inclusion of

12:06PM 8  the Department of Commerce into the investigation, and in

12:06PM 9  Paragraph 19, it is documenting an FBI Special Agent interview

12:06PM 10  that was conducted telephonically with Mr. Roggio.

12:06PM 11  Q.    You're familiar with that part of the investigation, are

12:06PM 12  you not?

12:06PM 13  A.    Yes.

12:06PM 14  Q.    So could you describe what that interview was about and

12:07PM 15  what the information gathered by the agents was?

12:07PM 16  A.    The FBI agent was following up on the lead provided by

12:07PM 17  Eldorado Tool Company, and I believe, if I'm correct, had

12:07PM 18  traveled to Mr. Roggio's current address, where he initially

12:07PM 19  spoke with his former wife who called -- either called Mr.

12:07PM 20  Roggio or the FBI agent received a phone number and called Mr.

12:07PM 21  Roggio, himself.

12:07PM 22      During that conversation, he was asked if Mr. Roggio had

12:07PM 23  ordered these parts and if he had exported these parts to Iraq,

12:07PM 24  in violation of U.S. law. Mr. Roggio advised the agents that he

12:07PM 25  did remember ordering them but didn't remember where they were,

12:07PM 1  said they could be in a safe or other location within either

12:08PM 2  his primary residence or his parents' residence.

12:08PM 3  Q.    Did the investigation follow up with conversations or

12:08PM 4  interviews with any people at Drill Masters Eldorado Tool?

12:08PM 5  A.    Yes, it did.

12:08PM 6  Q.    What is the gist of that part of the investigation?

12:08PM 7  A.    The gist -- the employee at Eldorado Tool was able to

12:08PM 8  confirm the orders and also confirmed that specific tools,

12:08PM 9  essentially, drill bits -- let me get the specific name -- I

12:09PM 10  believe they're called, like, buttons, but, essentially,

12:09PM 11  they're used to drill out a barrel and impart the rifling

12:09PM 12  within the barrel for various calibers. And she confirmed that

12:09PM 13  the parts, indeed, are controlled and not supposed to be

12:09PM 14  exported without a license.

12:09PM 15  Q.    Now, having received that information, did the

12:09PM 16  investigative agents then go to the place that was used to ship

12:09PM 17  these items?

12:09PM 18  A.    Yes.

12:09PM 19  Q.    And where is that located, if you know?

12:09PM 20  A.    That is located at 18 Milford Road East Stroudsburg,

12:09PM 21  Pennsylvania.

12:09PM 22  Q.    What's the name of that company, if you know?

12:09PM 23  A.    The Packaging Place.

12:09PM 24  Q.    Did members of the investigative team speak to anyone

12:10PM 25  there?

12:10PM  1  A.   Yes, they spoke to the owner Frank Monteforte who was

12:10PM  2  interviewed by an FBI Special Agent, to which he also provided

12:10PM  3  paperwork and confirmed that items fitting the description of

12:10PM  4  these tools that are restricted, that he did recall having

12:10PM  5  exported those to Iraq to Mr. Roggio, indicated that his wife

12:10PM  6  had come in, brought them in, and, I believe, they documented

12:10PM  7  them as just various tools.

12:10PM  8  Q.   I'm going to ask you to look at Government's Exhibit No.

12:10PM  9  7, please.

12:10PM  10  A.   Yes.

12:10PM  11  Q.   Could you identify what Government's Exhibit No. 7 is?

12:10PM  12  A.   This is The Packaging Place invoice, indicating that

12:11PM  13  Kristy Roggio had signed to have these items shipped to Ross

12:11PM  14  Roggio to an address in the Baharan Residential Complex

12:11PM  15  Building 42, Office 10, Sulaymaniyah, Kurdistan Region of Iraq,

12:11PM  16  further identifying a phone number of 570-977-8102 to the

12:11PM  17  attention of Ross Roggio from Kristy L. Roggio at, I believe,

12:11PM  18  143 Indian Spring Drive, Stroudsburg, Pennsylvania. Declared a

12:11PM  19  value of $800. And then it's a multi-page document which breaks

12:11PM  20  down, specifically, what the items were.

12:11PM  21  Q.   Would this have been retrieved by the investigation from

12:12PM  22  The Packaging Place business?

12:12PM  23  A.   Yes, yes, Mr. Monteforte provided this.

12:12PM  24  Q.   Would this have been available to the investigation, prior

12:12PM  25  to Mr. Roggio's return to the United States on February 26 of

89

12:12PM 1  2017?

12:12PM 2  A.   Yes, this is signed and dated February 6 of 2016.

12:12PM 3       MR. HINKLEY: The Government moves for admission of

12:12PM 4  Government's Exhibit No. 7.

12:12PM 5       MR. BARTOLAI: No objection.

12:12PM 6       THE COURT: Government's 7 is admitted.

12:12PM 7       (At this time Government's Exhibit No. 7 was admitted into

12:12PM 8        evidence.)

12:12PM 9  BY MR. HINKLEY:

12:12PM 10 Q.   On Government's Exhibit No. 7, it appears that there's a

12:12PM 11 yahoo email account that is referenced on the first page.

12:12PM 12 A.   Yes, in the lower box, it is designated as Rwroggio,

12:12PM 13 R-O-G-G-I-O, @yahoo.com.

12:12PM 14 Q.   That would be one of the emails that, ultimately, a search

12:13PM 15 warrant was sought and granted for; is that correct?

12:13PM 16 A.   Correct.

12:13PM 17 Q.   So having gone to the shipping address and speaking to the

12:13PM 18 actual shipper for these items, what was the next step of the

12:13PM 19 investigation?

12:13PM 20 A.   Next step was taking the information they had obtained,

12:13PM 21 the licensing determinations were requested and determined that

12:13PM 22 the rifling combo buttons, that's the term I was missing

12:13PM 23 earlier, the rifling combo buttons were, indeed, controlled

12:13PM 24 items and required a license to be exported from the U.S.

12:14PM 25 Q.   Are they, in fact, controlled items?

12:14PM 1  A.   Yes, they are.

12:14PM 2  Q.   And was there a search done to determine whether or not

12:14PM 3  Mr. Roggio or his businesses or anyone associated with the

12:14PM 4  shipment of these items, whether they had been granted

12:14PM 5  permission or an exporter license to send these things?

12:14PM 6  A.   Yes, Special Agent Scott Dunberg, prior to issuing the

12:14PM 7  search warrants, conducted these searches, requested these

12:14PM 8  searches, and on May 26, 2016, BIS, Bureau of Industry and

12:14PM 9  Security, issued a license determination stating that the

12:14PM 10 rifling combo buttons purchased by Roggio from Drill Masters

12:14PM 11 Eldorado Tools, Incorporated and believed to have been exported

12:14PM 12 to Iraq on or about March 30 of 2016 required an export license

12:15PM 13 from Bureau of Industry and Security, in order to be lawfully

12:15PM 14 exported from the United States to Iraq, from January 1, 2016

12:15PM 15 through May 19 of 2016.

12:15PM 16      Specifically, these rifling combo buttons fall under

12:15PM 17 Export Control, Commerce Control No. 2B018.E and are controlled

12:15PM 18 for export to Iraq for the following reasons:

12:15PM 19      National security, regional stability and United Nations

12:15PM 20 Embargo concerns.

12:15PM 21      A license history check was also performed on Mr. Roggio's

12:15PM 22 name, your sending identifiers, dates of birth, Social Security

12:15PM 23 numbers, addresses, anything associated with what would be

12:15PM 24 requested when filing for a license legally, and under all of

12:15PM 25 these search terms, no license was found.

12:16PM 1   Q.   Was it, at this point, that search warrants were sought

12:16PM 2   for two email accounts associated with Mr. Roggio?

12:16PM 3   A.   Yes, it appears in November of 2016.

12:16PM 4   Q.   And, obviously, they're granted because they're exhibits

12:16PM 5   now. Were you able to review the fruits of those searches?

12:16PM 6   A.   Yes, when I was asked to join the investigative team, it's

12:16PM 7   the first thing that I requested was to review all

12:16PM 8   investigative documents so I could bring myself up to speed on

12:16PM 9   the investigation that had been ongoing.

12:16PM 10  Q.   I'm going to ask you to look at Government's Exhibit No.

12:16PM 11  8.

12:17PM 12  A.   Okay.

12:17PM 13  Q.   Could you identify what this document is?

12:17PM 14  A.   This is a printout of an email from Ross Roggio using

12:17PM 15  email Rwroggio, R-O-G-G-I-O, @yahoo.com, to Alina Caddagia,

12:17PM 16  title -- or sent November 14th, 2015, has an attachment,

12:17PM 17  Weapons and Ammunition Feasibility Report No. 1, with the

12:17PM 18  request that Ms. Caddagia -- I'm sorry I'm butchering the name

12:17PM 19  -- ""Please print out and get to Biam. Thanks, Ross."

12:17PM 20  Q.   And is this a document that was found as a result of

12:18PM 21  searching the email account Rwroggio@yahoo.com?

12:18PM 22  A.   Yes.

12:18PM 23       MR. HINKLEY: Your Honor, the Government is moving for

12:18PM 24  admission of Government's Exhibit No. 8.

12:18PM 25       THE COURT: Any objection?

92

12:18PM  1    MR. BARTOLAI: No objection.

12:18PM  2    THE COURT: Government's 8 is admitted.

12:18PM  3    (At this time Government's Exhibit No. 8 was admitted into

12:18PM  4     evidence.)

12:18PM  5  BY MR. HINKLEY:

12:18PM  6  Q.   You testified you reviewed, among other documents, this

12:18PM  7  document; is that correct?

12:18PM  8  A.   Yes.

12:18PM  9  Q.   How does this document fit into the investigation?

12:18PM 10  A.   This document appears to be a Weapons and Ammunition

12:18PM 11  Feasibility Report created by Roggio Consulting Company, in

12:18PM 12  which it is outlining the steps, costs and analysis to develop

12:18PM 13  a weapons manufacturing facility, based on the internal

12:18PM 14  document statements in Iraq.

12:19PM 15  Q.   Again, this is a document that Mr. Roggio, using that

12:19PM 16  email account, emailed to another individual; is that correct?

12:19PM 17  A.   Correct.

12:19PM 18  Q.   And found as a result of the search warrant on that email

12:19PM 19  account?

12:19PM 20  A.   Correct.

12:19PM 21  Q.   This information was gathered by the investigation, prior

12:19PM 22  to Mr. Roggio's travel on February 26 of '17?

12:19PM 23  A.   Correct.

12:19PM 24  Q.   I'm going to ask you to take a look at Government's No. 9

12:19PM 25  for identification purposes.

12:19PM 1  A.    I have it.

12:19PM 2  Q.    And could you describe what Government's No. 9 is?

12:20PM 3  A.    This is an invoice, printout of an invoice dated March 28,

12:20PM 4  2016, Invoice No. 10523 from OML Global in Fayetteville, North

12:20PM 5  Carolina, listing a customer as Ross Roggio, Salesperson as

12:20PM 6  William Mathis, and an order for 15,000 gas rings, 3200 cotter

12:20PM 7  pins, firing pin retainers, and the gas rings are further

12:20PM 8  described as M4 bolt gas rings MIL.

12:20PM 9  Q.    Is this document a document that was obtained through the

12:20PM 10 service of one or both of those search warrants you were

12:20PM 11 talking about, in regards to email accounts?

12:20PM 12 A.    Yes, this document is sourced from the Rwroggio email

12:21PM 13 account, the Rwroggio@yahoo.com email account.

12:21PM 14       MR. HINKLEY: At this point, Your Honor, the Government

12:21PM 15 will move for admission of Government's Exhibit No. 9.

12:21PM 16       MR. BARTOLAI: No objection.

12:21PM 17       THE COURT: Government's Exhibit No. 9 is admitted.

12:21PM 18       (At this time Government's Exhibit No. 9 was admitted into

12:21PM 19        evidence.)

12:21PM 20 BY MR. HINKLEY:

12:21PM 21 Q.    Again, is this a document that the investigation knew

12:21PM 22 about and reviewed prior to Mr. Roggio's travel on February 26

12:21PM 23 of 2017?

12:21PM 24 A.    Yes.

12:21PM 25 Q.    How does this document fit into the investigation,

12:21PM 1  generally?

12:21PM 2  A.    This is a document that showed Mr. Roggio was obtaining

12:21PM 3  large quantities of materials that would be needed to develop

12:21PM 4  an M4 style, AR15 style assault rifle. These items,

12:21PM 5  specifically, would be integral to the development of the

12:22PM 6  firing pin retaining -- or, I'm sorry, the firing pin bolt

12:22PM 7  action within the rifle.

12:22PM 8  Q.    So it would be incorporated into the production of

12:22PM 9  firearms?

12:22PM 10  A.    Yes.

12:22PM 11  Q.    Are these particular items, do you know whether or not

12:22PM 12  they are controlled?

12:22PM 13  A.    They are. As part of my -- it's part of my job in Counter

12:22PM 14  Proliferations, we work hand in hand with Department of

12:22PM 15  Commerce, as well as with the Department of State. In this

12:22PM 16  case, these items were submitted -- a description of these

12:22PM 17  items were submitted, along with Mr. Roggio's names, you know,

12:22PM 18  variations of his names, companies, addresses, identifiers to

12:22PM 19  the Department of State, Defense Director of Trade Controls,

12:22PM 20  which controls licensing for the United States Munitions List

12:22PM 21  Items, and they were found to be controlled items, under the

12:22PM 22  United States Munitions List that would acquire licensing and

12:23PM 23  approvals to export from the United States.

12:23PM 24  Q.    Now, during your investigation, is there any evidence that

12:23PM 25  you gathered or that was gathered by the investigative team

12:23PM 1 that Mr. Roggio is producing rifles during this time frame in

12:23PM 2 the United States?

12:23PM 3 A.    At this time, no. Mr. Roggio appeared to or did own a

12:23PM 4 firearms manufacturing facility in Fayetteville, North Carolina

12:23PM 5 years before. That company went defunct, no longer existed. We

12:23PM 6 believe Mr. Roggio was also attempting to start a partnership

12:23PM 7 in the East Stroudsburg area, however, that partnership did not

12:23PM 8 move forward to manufacture firearms, as well.

12:24PM 9     So as of our investigation, Mr. Roggio was not

12:24PM 10 manufacturing firearms professionally in the United States.

12:24PM 11 Q.    I'm going ask you to take a look at Government's Exhibit

12:24PM 12 10 for identification purposes.

12:24PM 13 A.    Exhibit No. 10 is my Homeland Security Investigations

12:24PM 14 Report of Investigation documenting the February 26, 2017

12:24PM 15 HSI-directed Secondary Inspection and Border Search of Ross

12:24PM 16 Roggio and Christina Sidiropoulou at their arrival at J.F.K.

12:24PM 17 from Iraq.

12:24PM 18 Q.    Let me ask you more specifically, with regards to your

12:24PM 19 request for secondary inspection. Do you recall speaking to

12:25PM 20 James Mundy, the previous witness, from HSI?

12:25PM 21 A.    I'm sure we spoke over the phone, at some point. I would

12:25PM 22 have -- A, I think this was on a Sunday --

12:25PM 23     MR. BARTOLAI: Your Honor, I'm going to object. It's

12:25PM 24 speculative, it's speculation. He's not able to say that he

12:25PM 25 spoke to him.

12:25PM 1    THE WITNESS: I spoke to James Mundy on the phone, prior to

12:25PM 2  this --

12:25PM 3    THE COURT: Just a moment. What's your objection, Mr.

12:25PM 4  Bartolai?

12:25PM 5    MR. BARTOLAI: Your Honor, he said that he wasn't sure if

12:25PM 6  he had spoke to Mr. Mundy, you know, prior to the secondary

12:25PM 7  inspection, and I objected to it on the basis of speculation. I

12:25PM 8  think he's cleared that up since then, Judge.

12:25PM 9    THE COURT: I believe he has. Do you want to clarify the

12:25PM 10  state the record on this?

12:25PM 11  BY MR. HINKLEY:

12:25PM 12  Q.   Do you recall whether or not you spoke to Mr. Mundy before

12:25PM 13  the secondary inspection of Mr. Roggio?

12:25PM 14  A.   Yes, I would have.

12:25PM 15  Q.   And did you advise Mr. Mundy of any particular questions

12:26PM 16  or areas of concern that you wished to have Mr. Roggio

12:26PM 17  interviewed about upon his arrival?

12:26PM 18  A.   No, I would have given -- I gave Mr. Mundy an

12:26PM 19  overview -- a very general overview of what the case was and

12:26PM 20  what Mr. Roggio's part in that would be. As for specific

12:26PM 21  questioning, I would note what we did not want to do was ask

12:26PM 22  any specific questions that would have tipped Mr. Roggio off to

12:26PM 23  the fact that there was an ongoing investigation. We wanted

12:26PM 24  this to be as plain and ordinary as possible, you know, what

12:26PM 25  CBP would normally ask, that's what they would ask, you know, I

12:26PM 1 believe, the prior witness even described the kind of five W's,

12:27PM 2 Who, What, Where, When and Why's of the travel and their

12:27PM 3 activities in the country that they're coming from.

12:27PM 4     And that's -- we didn't tailor it, we didn't want to

12:27PM 5 tailor it, we did not want to tip Mr. Roggio off to the fact

12:27PM 6 that there was an ongoing investigation.

12:27PM 7     Now, we knew, at some point, he would become aware,

12:27PM 8 especially, when the devices were detained and he was provided

12:27PM 9 my information to follow up on to retrieve the devices, but for

12:27PM 10 the point of questioning, we just wanted the basics.

12:27PM 11     MR. HINKLEY: Your Honor, if I haven't already done so, I'm

12:27PM 12 moving for admission of Government's Exhibit No. 10.

12:27PM 13     THE COURT: You haven't moved yet. Any objection?

12:27PM 14     MR. BARTOLAI: No.

12:27PM 15     THE COURT: Government's Exhibit 10 is admitted.

12:27PM 16     (At this time Government's Exhibit No. 10 was admitted

12:27PM 17      into evidence.)

12:27PM 18 BY MR. HINKLEY:

12:28PM 19 Q.   Once the items were detained by Mr. Mundy, what happened

12:28PM 20 to them at that point?

12:28PM 21 A.   The items were packaged in a FedEx packaging, I provided

12:28PM 22 our -- the SAC Philadelphia office's funding code, so that

12:28PM 23 J.F.K. HSI wouldn't have to pay for the shipping, those items

12:28PM 24 were addressed to me and shipped down to the SAC Philadelphia

12:28PM 25 office, where I took custody of them.

12:28PM 1    Q.    Once you received custody of these items, what happened at

12:28PM 2    that point?

12:28PM 3    A.    At that point, I'm signing the custody form to show that I

12:28PM 4    received them, I'm returning a copy of that custody form to

12:28PM 5    Special Agent Mundy for his records, so he's aware that I did

12:28PM 6    receive them, and I am immediately turning those items over to

12:29PM 7    our computer forensics group, based on a request -- we fill out

12:29PM 8    an office request indicating what devices we have and what

12:29PM 9    we're looking to accomplish.

12:29PM 10        They were aware this was a border search detention, which

12:29PM 11   places -- you know, a little bit of -- you know, a fire

12:29PM 12   underneath them. They're extremely backlogged, it's the reason

12:29PM 13   the devices come down to Philadelphia and didn't remain up in

12:29PM 14   New York.

12:29PM 15        If New York was responsible for forensically evaluating

12:29PM 16   every item, they would never get them done in a timely fashion.

12:29PM 17   So the practice is is to have them sent to the requesting

12:29PM 18   office, that requesting office's forensics -- computer

12:29PM 19   forensics agents conduct the analysis, and once that report is

12:29PM 20   generated, it's something that I then can review.

12:30PM 21        We no longer -- to search a phone on-site, we, A, we don't

12:30PM 22   want to open the phone and manipulate it, in any way, because

12:30PM 23   we could change something on that phone, possibly, destroy

12:30PM 24   evidence, we don't want to do that.

12:30PM 25        In addition, to examine a phone on-site takes a large

12:30PM 1  amount of time, even with extraction tools, and we would, you

12:30PM 2  know -- people would miss their flights. So if we're doing a

12:30PM 3  full examination, those phones are being sent to the requesting

12:30PM 4  office and examined there, and, then, in a timely fashion, if

12:30PM 5  we are not going to keep those devices, we return them.

12:30PM 6       Basically, if we're satisfied that the image created from

12:30PM 7  the forensics analysis is full and complete, then, we will

12:31PM 8  return the electronic devices to the individual that we

12:31PM 9  detained them from.

12:31PM 10 Q.   Was that done in this particular case?

12:31PM 11 A.   Yes, it was.

12:31PM 12 Q.   And why don't you go through the process. So what

12:31PM 13 happened? Once you got those and you forwarded them to your

12:31PM 14 forensics folks, describe to the Court, kind of, what happened

12:31PM 15 in this particular investigation, with these particular

12:31PM 16 electronic devices?

12:31PM 17 A.   So with this investigation, I'm coordinating relatively

12:31PM 18 closely with our computer forensics agent. As I said, these

12:31PM 19 things take time, they can take a couple days to fully do a

12:31PM 20 complete extraction.

12:31PM 21      As a device was finished, the forensics agent would put it

12:31PM 22 on an internal reviewing system within our office. This is a

12:31PM 23 system that's closed off from the internet, it basically allows

12:32PM 24 -- an evidence reviewing station -- which allows me, then, to

12:32PM 25 perform a cursory examination of items on the phone. Looking

12:32PM 1  through photos, looking through contact lists, looking through

12:32PM 2  emails, looking through apps that are on the phone. There's a

12:32PM 3  number of things that we're looking for.

12:32PM 4      In this case, because we had the advance knowledge of Mr.

12:32PM 5  Roggio and had an idea of what he was involved in, I was able

12:32PM 6  to tailor those searches using key words. And I believe one of

12:32PM 7  the key words -- we had a known partner of his in Iraq, the

12:32PM 8  name Palad(phonetic), it's unique, it would be something that,

12:32PM 9  you know, would pop out, and allow me to do a quick search, in

12:32PM 10  order to determine, Is there contraband? Is there evidence? Is

12:33PM 11  there fruits of the crime on this phone?

12:33PM 12      Those cursory examinations were done on each of the phones

12:33PM 13  and documented within my report. You know, not everything, just

12:33PM 14  a couple things to say, Hey, yep, there's evidence on this

12:33PM 15  phone, and those items were secured. Once we were satisfied

12:33PM 16  that all the devices, there were extractions performed on them,

12:33PM 17  and the computer forensics agent confirmed that the data was

12:33PM 18  there, that it was sufficient, you know, I can't speak to all

12:33PM 19  the things they're looking at, but they're looking to make sure

12:33PM 20  that data is not corrupted and that it appears to be a full

12:33PM 21  extraction.

12:33PM 22      The items are then turned back over to me and arrangements

12:33PM 23  were made with Mr. Roggio's attorney, at the time, in East

12:33PM 24  Stroudsburg, to have them returned. And then those items were

12:34PM 25  returned by me, I drove them up to East Stroudsburg from

12:34PM 1  Philadelphia, and coordinated with his attorney's office to

12:34PM 2  return them there, at which point, one of the employees at the

12:34PM 3  attorney's office signed the form to show that she had accepted

12:34PM 4  them, and then Mr. Roggio -- they were turned over to Mr.

12:34PM 5  Roggio at that time.

12:34PM 6  Q.    You indicated that the telephones or cell phones were

12:34PM 7  searched, but there was also other electronic devices that were

12:34PM 8  searched, is that correct?

12:34PM 9  A.    Yes, correct, the iPad, laptop computer, there were some

12:34PM 10 Sandisk media cards, as well as an iPod, I believe, that were

12:34PM 11 all submitted for forensic analysis.

12:34PM 12 Q.    The testimony today indicates that the devices were

12:34PM 13 detained on February 26 of 2017. Do you recall the day that you

12:34PM 14 surrendered those items back to Mr. Roggio's attorney?

12:35PM 15 A.    So February 26, they were detained, it may have been a

12:35PM 16 little over -- I want to say March 30th is the date I'm

12:35PM 17 thinking, so a little over 30 days.

12:35PM 18 Q.    I'll ask you to take a look at Government's Exhibit No.

12:35PM 19 11, please.

12:35PM 20 A.    I have it. This is my Homeland Security Investigations

12:35PM 21 Report of Investigation. The report is detailing the events

12:35PM 22 surrounding March 21, 2017, Federal search warrants executed on

12:35PM 23 electronic devices obtained from Ross Roggio and Christine

12:35PM 24 Sidiropoulou on February 26.

12:35PM 25       MR. HINKLEY: First of all, the Government would move for

12:35PM   1    admission of Government's Exhibit No. 11.

12:36PM   2         MR. BARTOLAI: No objection.

12:36PM   3         THE COURT: Government's 11 is admitted.

12:36PM   4         (At this time Government's Exhibit No. 11 was admitted

12:36PM   5          into evidence.)

12:36PM   6    BY MR. HINKLEY:

12:36PM   7    Q.   The search warrant referenced in this document, would that

12:36PM   8    be Government's Exhibit No. 5?

12:36PM   9    A.   Yes.

12:36PM  10    Q.   Finally, I'm going to ask you to look at Government's

12:36PM  11    Exhibit No. 12.

12:36PM  12    A.   Okay. This is Homeland Security Investigations Report of

12:36PM  13    Investigation documenting and detailing the initial summary of

12:36PM  14    evidence recovered from the search warrant, forensics review of

12:36PM  15    the Roggio and Sidiropoulou electronic devices.

12:36PM  16    Q.   So I'm clear, what you're saying is, it documents those

12:36PM  17    items which you, on your quick review of each of these

12:37PM  18    electronic devices, found in there established that there was

12:37PM  19    some type of evidence that was germane to the investigation, is

12:37PM  20    that right?

12:37PM  21    A.   Correct.

12:37PM  22    Q.   So this is your report documenting the things that you

12:37PM  23    found before there was a full search of the items?

12:37PM  24    A.   Well, the items are fully -- there's no way to partially

12:37PM  25    extract.

12:37PM **1** Q.   Okay, explain that.

12:37PM **2** A.   The devices are fully extracted. This is my report on a

12:37PM **3** cursory review of whether or not we are going to seize these

12:37PM **4** phones. And based on -- the phones and the electronic devices.

12:37PM **5** Based on these initial findings, it was an investigative

12:37PM **6** decision to seize the phones, at that point, and an iPad and

12:37PM **7** all the electronic devices that were in their possession when

12:37PM **8** they were secondary to J.F.K. on the 26th.

12:38PM **9**      MR. HINKLEY: Your Honor, the Government moves to admit

12:38PM **10** Government's Exhibit 12.

12:38PM **11**      THE COURT: Mr. Bartolai?

12:38PM **12**      MR. BARTOLAI: Yes, Your Honor. May I have a moment? Your

12:38PM **13** Honor, I'm going to object to No. 12. My understanding from the

12:38PM **14** testimony is that this No. 12 contains information that

12:38PM **15** was -- that resulted from a phone extraction of these

12:39PM **16** electronic devices, so under those circumstances, Your Honor,

12:39PM **17** this would have been -- the information contained in No. 12

12:39PM **18** would have been information that was only learned after this

12:39PM **19** border search. So I would object, Your Honor, on that basis.

12:39PM **20**      THE COURT: Mr. Hinkley?

12:39PM **21**      MR. HINKLEY: As I understand the testimony, this was the

12:39PM **22** initial search of the items, so it would have been the

12:39PM **23** equivalent of someone looking into each of the items and seeing

12:39PM **24** whatever they saw, which would then, as I understand the

12:39PM **25** testimony, given the agent's belief, there was additional

12:39PM 1 information which would be germane to the investigation, so a

12:39PM 2 more thorough search would thereafter be completed.

12:39PM 3     And I think this document only -- what it does is it

12:40PM 4 documents what the initial reviewing of the evidence was

12:40PM 5 determined by the agents.

12:40PM 6     THE WITNESS: I could explain a little further, if you'd

12:40PM 7 like.

12:40PM 8     THE COURT: Mr. Burke, is this a summary of the efforts of

12:40PM 9 the various agencies who have been involved in the

12:40PM 10 investigation of Mr. Roggio, both prior to and after February

12:40PM 11 26?

12:40PM 12     THE WITNESS: This is specific to the border search that

12:40PM 13 I -- this is, in fact, the border search that I conducted of

12:40PM 14 the electronic devices, which I refer to as a cursory review of

12:40PM 15 the data that had been extracted. And this was done in

12:40PM 16 concurrence with our border search authorities, which are an

12:40PM 17 exemption under the Fourth Amendment.

12:41PM 18     THE COURT: What I see in the document are references

12:41PM 19 beginning much earlier than the time of your cursory review. So

12:41PM 20 is it fair to say what I'm looking at is not only your review

12:41PM 21 of the forensic analysis but, also, all of the events and

12:41PM 22 undertakings that took place before that?

12:41PM 23     THE WITNESS: So the dates referred to in the past are

12:41PM 24 referring to emails that I recovered during this border

12:41PM 25 search --

12:41PM **1**   THE COURT: I see.

12:41PM **2**   THE WITNESS: -- that I determined to be or believed to be

12:41PM **3**   evidence, as part of this investigation.

12:41PM **4**   THE COURT: So I'm not sure -- I want to make clear my own

12:41PM **5**   understanding of what the objection is.

12:41PM **6**   Tell me again why you're objecting to this document?

12:41PM **7**   MR. BARTOLAI: My understanding, Your Honor, is that this

12:42PM **8**   individual searched the phone after the border search, after

12:42PM **9**   the items were detained, and the items referred to in

12:42PM **10**   Government Exhibit 12 are the results of that search that he

12:42PM **11**   conducted after the phone was seized, after the electronic

12:42PM **12**   devices were seized.

12:42PM **13**   THE COURT: And why does that make the document itself

12:42PM **14**   inadmissible?

12:42PM **15**   MR. BARTOLAI: Well, Your Honor, we would submit that it

12:42PM **16**   would have no bearing upon his -- you know, it would have no

12:42PM **17**   bearing upon the initial decision to seize the phone, by way of

12:42PM **18**   the border search. He wasn't even there, at that point in time,

12:42PM **19**   Your Honor. So this is like post-search data.

12:42PM **20**   And I believe it was extracted, which would be forensic. I

12:42PM **21**   don't think this is a cursory review of the phones, I think his

12:42PM **22**   testimony is that it has been -- it was an extraction, a phone

12:42PM **23**   dump, I think.

12:43PM **24**   THE COURT: Before I speak, go ahead, Mr. Hinkley, do you

12:43PM **25**   want to say something?

12:43PM 1      MR. HINKLEY: Well, I think that's the subject of today's

12:43PM 2  hearing, is it not?

12:43PM 3      THE COURT: It is.

12:43PM 4      MR. HINKLEY: So I think it's admissible.

12:43PM 5      THE COURT: Well, let's go back to the basic Rules of

12:43PM 6  Evidence. Does this document -- is there sufficient indicia of

12:43PM 7  admissibility to allow it in, even though the inferences that

12:43PM 8  you would draw from the exhibit are obviously different, and,

12:43PM 9  in fact, it would seem to me that the arguments that are being

12:43PM 10 made, essentially, go to whether or not reasonable suspicion

12:43PM 11 existed at a sufficient point in time to allow this in or

12:43PM 12 whether, in fact, there was not reasonable suspicion prior to

12:43PM 13 February 26.

12:43PM 14     Now, that's a decision I'm going to have to make, but the

12:43PM 15 document itself, in terms of its preparation, is a classic

12:43PM 16 business record here generated in the course of Homeland

12:43PM 17 Security's activities, is it not? How could I exclude this, as

12:44PM 18 lacking the requisite indicia of admissibility under the Rules

12:44PM 19 of Evidence, understanding that both of you would draw

12:44PM 20 different inferences from it, presumably?

12:44PM 21     MR. HINKLEY: You wouldn't be surprised to hear that I

12:44PM 22 agree with the Court.

12:44PM 23     MR. BARTOLAI: I have to agree, as well. I understand.

12:44PM 24     THE COURT: Fine. Let's go.

12:44PM 25     (At this time Government's Exhibit No. 12 was admitted

| | | |
|---|---|---|
| 12:44PM | 1 | into evidence.) |
| 12:44PM | 2 | MR. HINKLEY: I have no further questions, Your Honor. |
| 12:44PM | 3 | Thank you. |
| 12:44PM | 4 | THE COURT: All right. Mr. Bartolai? |
| 12:44PM | 5 | MR. BARTOLAI: Your Honor, may we take a break? |
| 12:44PM | 6 | THE COURT: Sure. It's 12:43. How much time do you want? Do |
| 12:44PM | 7 | you want to take 30 minutes here? |
| 12:44PM | 8 | MR. BARTOLAI: That would be fine, Judge. |
| 12:44PM | 9 | THE COURT: All right, so 1:15. |
| 01:15PM | 10 | (At this time a luncheon recess was taken.) |
| 01:16PM | 11 | THE COURT: Mr. Bartolai, are you ready to proceed? |
| 01:19PM | 12 | MR. BARTOLAI: Yes. |
| 01:19PM | 13 | CROSS EXAMINATION |
| 01:19PM | 14 | BY MR. BARTOLAI: |
| 01:19PM | 15 | Q.    Good afternoon. |
| 01:19PM | 16 | A.    Good afternoon, sir. |
| 01:19PM | 17 | Q.    How are you? Okay, so I understand this is a multi-agency |
| 01:19PM | 18 | investigation; is that right? |
| 01:19PM | 19 | A.    Correct. |
| 01:19PM | 20 | Q.    And we have the FBI involved and Customs Border |
| 01:19PM | 21 | Protection, as well as the Commerce Department? |
| 01:19PM | 22 | A.    Correct. |
| 01:19PM | 23 | Q.    When did you become involved in this investigation? |
| 01:19PM | 24 | A.    I believe we were initially -- we were initially talked to |
| 01:19PM | 25 | about it by the U.S. Attorney's Office in late December or |

01:20PM 1  early January of 2017, so December of '16 or -- I'm thinking

01:20PM 2  January 2017. At some point, I requested all the case

01:20PM 3  information and updates, which I reviewed throughout early

01:20PM 4  January of 2017, and our first case coordination meeting was, I

01:20PM 5  believe, January 24th, 2017.

01:20PM 6  Q.    Is this the meeting where you determined that the border

01:20PM 7  search option was discussed?

01:20PM 8  A.    Yes.

01:20PM 9  Q.    What would the date have been?

01:20PM 10  A.    I'm sorry, what was that?

01:20PM 11  Q.    What date do you recall? January 24th?

01:20PM 12  A.    I think it's January 24th.

01:20PM 13  Q.    1/24/17?

01:20PM 14  A.    Correct.

01:20PM 15  Q.    Now, this case or this investigation initially kicked off,

01:21PM 16  approximately, March 30th, 2016; correct?

01:21PM 17  A.    Correct.

01:21PM 18  Q.    So it had been ongoing for some time before Homeland

01:21PM 19  Security Investigations got involved; is that right?

01:21PM 20  A.    Correct.

01:21PM 21  Q.    And were you the first agent from Homeland Security

01:21PM 22  Investigations to take on the case?

01:21PM 23  A.    Yes, I was.

01:21PM 24  Q.    All right, so you -- okay. So up until that point in time,

01:21PM 25  it was ongoing, and it was -- this was Homeland Security's

01:21PM 1  first part in the investigation, around January -- or December,

01:21PM 2  like you said, 2016; right?

01:21PM 3  A.    Correct.

01:21PM 4  Q.    You were requested by the U.S. Attorney's Office to become

01:21PM 5  involved?

01:21PM 6  A.    I believe what had happened was, when they were evaluating

01:21PM 7  the evidence that they had obtained from the search warrants on

01:21PM 8  Mr. Roggio's email addresses, there were items that were -- an

01:21PM 9  item can be controlled by the Department of Commerce, an item

01:21PM 10 can be controlled by the Department of State.

01:22PM 11      Because there were items that appeared to, possibly, be

01:22PM 12 controlled by the Department of State and because of the export

01:22PM 13 issues being involved, which is, Homeland Security

01:22PM 14 Investigations' main purview, I mean, this is one of the major

01:22PM 15 things that we investigate. We were originally customs, U.S.

01:22PM 16 Customs.

01:22PM 17      I mean, we're essentially the same entity as CBP, but when

01:22PM 18 they created the Department of Homeland Security in 2003, they

01:22PM 19 removed the investigative component from Customs and put us in

01:22PM 20 as Immigration Customs Enforcement, and it just -- we're the

01:22PM 21 same but different, it's kind of weird.

01:22PM 22      But CBP officers are border authorities, HSI agents are

01:22PM 23 also border authorities, and it all stems from us being under

01:22PM 24 the same umbrella, under U.S. Customs, before the Homeland

01:23PM 25 Security switch.

01:23PM 1   Q.   All right, so when you had this meeting -- now, up until

01:23PM 2   that point in time, the investigation has been ongoing, and you

01:23PM 3   testified a little bit about what you learned from reviewing

01:23PM 4   the documents and speaking to the agents; right?

01:23PM 5   A.   Correct.

01:23PM 6   Q.   And I'm going to take you through that, as well. I think,

01:23PM 7   at some point in time, you had -- do you still have

01:23PM 8   Government's Exhibit 1 up there, the Homeland Security Agent

01:23PM 9   Hertzog's Application for Search Warrant?

01:23PM 10   A.   Is that 5?

01:23PM 11   Q.   It's No. 5, I'm sorry.

01:23PM 12   A.   I do, yes.

01:23PM 13   Q.   I believe you testified relative to that?

01:23PM 14   A.   Yes.

01:23PM 15   Q.   And I think Mr. Hinkley directed you to where this

01:23PM 16   investigation began, and that would have been around Paragraph

01:23PM 17   17; correct?

01:23PM 18   A.   Correct.

01:23PM 19   Q.   And that's on March 30th, 2016 when this tip came in; is

01:23PM 20   that right?

01:23PM 21   A.   Yes.

01:23PM 22   Q.   All right, so I want to talk to you, like, first, broad

01:24PM 23   and then we can get into more specifics, so it was -- and

01:24PM 24   correct me if I'm wrong -- on March 30, 2016, someone from

01:24PM 25   Drill Masters Tool, Drill Masters Eldorado Tool had called the

01:24PM 1    FBI tip line, relative to -- I think the search warrant

01:24PM 2    application mentions gun parts being re-shipped to Iraq;

01:24PM 3    correct?

01:24PM 4    A.    Correct.

01:24PM 5    Q.    Now, would you agree -- now, at this point in time, what

01:24PM 6    would be the gun parts that were alleged to have been shipped

01:24PM 7    to Iraq?

01:24PM 8    A.    I believe this is referring to the buttons that I had

01:24PM 9    originally spoken to. I don't believe there's actual gun parts,

01:25PM 10   at this point, that Eldorado is talking about, in the name of

01:25PM 11   barrels, firing pins, that kind of thing.

01:25PM 12   Q.    I understand. That's, essentially, my question. So 17 is

01:25PM 13   somewhat inaccurate, in that, it's not really gun parts, it's

01:25PM 14   more or less, perhaps, tools that can be used to, maybe, ream a

01:25PM 15   barrel; is that right?

01:25PM 16   A.    Gun manufacturing parts.

01:25PM 17   Q.    Kind of like the difference between a wheel and a tire

01:25PM 18   mounter, a tool that would be used to mount a tire. Two

01:25PM 19   different things?

01:25PM 20   A.    Sure.

01:25PM 21   Q.    All right, so this is the tip, and this would have been on

01:25PM 22   March 30, 2016 to the FBI?

01:25PM 23   A.    Correct.

01:25PM 24   Q.    And at this point in time, is the FBI, essentially, the

01:25PM 25   lead on this investigation?

01:25PM 1  A.   I would call them -- since the tip came in to them, I

01:26PM 2  would, yes, refer to them as the lead.

01:26PM 3  Q.   For the beginning there, they're pretty much doing the

01:26PM 4  legwork; would you agree?

01:26PM 5  A.   Correct.

01:26PM 6  Q.   In fact, it was the FBI -- would that be FBI agent

01:26PM 7  O'Donnell -- or Donnelly?

01:26PM 8  A.   Thomas O'Donnell, yes.

01:26PM 9  Q.   He would have been the guy -- when the search warrant

01:26PM 10 application refers to the FBI Special Agent, we're referring to

01:26PM 11 Mr. O'Donnell; right?

01:26PM 12 A.   Correct.

01:26PM 13 Q.   And he would have been the individual who spoke with the

01:26PM 14 people from Drill Masters; right?

01:26PM 15 A.   Yes.

01:26PM 16 Q.   And he would have been the person that spoke to the

01:26PM 17 individual from the package place; correct?

01:26PM 18 A.   Correct.

01:26PM 19 Q.   And The Packaging Place is the actual place that was

01:26PM 20 involved in the shipping of items; right?

01:26PM 21 A.   Yes, correct.

01:26PM 22 Q.   And Drill Masters Tool Eldorado, that's in Connecticut;

01:26PM 23 correct?

01:26PM 24 A.   Yes.

01:26PM 25 Q.   And this package place is up here near -- around

01:27PM 1  Stroudsburg, in Pennsylvania, in the Middle District?

01:27PM 2  A.    Correct.

01:27PM 3  Q.    And it would have been Agent Donnelly(sic) that spoke with

01:27PM 4  people from Drill Masters?

01:27PM 5  A.    Yes.

01:27PM 6  Q.    And do you recall -- again, this is from your

01:27PM 7  investigation, from your notes, from your reviews, that he

01:27PM 8  spoke to a person by the name of Debbie Cornwall?

01:27PM 9  A.    Correct.

01:27PM 10 Q.    And she had provided information relative to an order that

01:27PM 11 was made regarding these 15 rifle combo buttons; correct?

01:27PM 12 A.    Yes.

01:27PM 13 Q.    And the payment for those products; correct?

01:27PM 14 A.    Correct.

01:27PM 15 Q.    And where they were shipped; correct?

01:27PM 16 A.    Yes.

01:27PM 17 Q.    And her information that she provided was that these -- it

01:27PM 18 was Roggio that had purchased these items; correct?

01:27PM 19 A.    Based on the invoicing that she supplied, yes.

01:27PM 20 Q.    It wasn't just rifle combo buttons, there were other items

01:28PM 21 involved, as well; correct?

01:28PM 22 A.    Correct.

01:28PM 23 Q.    And these items were shipped to Pennsylvania?

01:28PM 24 A.    Yes.

01:28PM 25 Q.    And Drill Masters never shipped these items to Iraq;

01:28PM 1  correct?

01:28PM 2  A.   Correct.

01:28PM 3  Q.   She had provided you with some documentation, and we will

01:28PM 4  look at that in a little bit, but she had provided the

01:28PM 5  information to Special Agent Donnelly; right?

01:28PM 6  A.   O'Donnell.

01:28PM 7  Q.   I'm sorry, I'll keep saying that, it's a tick, I guess.

01:28PM 8  O'Donnell, very good.

01:28PM 9      And it was, also, Agent O'Donnell that had the occasion to

01:28PM 10 speak with Frank Monteforte from The Packing Place?

01:28PM 11 A.   Yes.

01:28PM 12 Q.   He's the individual who actually met with Kristy Roggio

01:28PM 13 and observed these items and called Drill Masters to get a

01:28PM 14 description of them; right?

01:28PM 15 A.   Correct.

01:28PM 16 Q.   And, again, this is all -- it's all contained in the

01:28PM 17 search warrant application of Officer Hertzog, as well as what

01:29PM 18 you would have reviewed in your -- in coming up to speed in the

01:29PM 19 investigation; right?

01:29PM 20     Now, as a result of your investigation into these

01:29PM 21 preliminary matters, it turns out that this -- when Mr.

01:29PM 22 Monteforte had contacted Drill Masters for a description of

01:29PM 23 certain items so that he could complete what is known as an SED

01:29PM 24 or Shippers Export Declaration?

01:29PM 25 A.   Yes.

115

01:29PM 1  Q.   Did you ever see the Shippers Export Declaration?

01:29PM 2  A.   At some point, I'm sure I did.

01:29PM 3  Q.   Do you have it with you today?

01:29PM 4  A.   Unless -- if it's not up here, I do not have it.

01:29PM 5  Q.   Okay, all right. And this would have been a document that

01:29PM 6  was completed by a Frank Monteforte of The Packaging Place?

01:30PM 7  A.   Yes.

01:30PM 8  Q.   And he had contacted Drill Masters for a description of

01:30PM 9  the items; correct?

01:30PM 10 A.   Correct.

01:30PM 11 Q.   And he was told that they were gun reamers -- they were

01:30PM 12 reamers for drills?

01:30PM 13 A.   I don't know the specific conversation that Mr. Monteforte

01:30PM 14 had with Ms. Cornwall at Eldorado.

01:30PM 15 Q.   All right. You have Government's No. 5 there?

01:30PM 16 A.   Yes.

01:30PM 17 Q.   Would you look at Paragraph 24, please?

01:30PM 18 A.   Sure.

01:30PM 19 Q.   I'm going to read -- and you can just correct me if I'm

01:30PM 20 wrong.

01:30PM 21      "Monteforte stated that Roggio's packages were shipped to

01:30PM 22 Iraq via DHL (DHL Airway Bill 5622077020) and that the items

01:30PM 23 were described as reamers and drill bits."

01:30PM 24      Right?

01:31PM 25 A.   Yes.

01:31PM 1    Q.    Okay, so this is -- this search warrant application,

01:31PM 2    Paragraph 24, says that these items were described as reamers

01:31PM 3    and drill bits; correct?

01:31PM 4    A.    Correct.

01:31PM 5    Q.    And that would have been after Mr. Monteforte had

01:31PM 6    contacted Drill Masters Eldorado and spoke to Debbie Cornwall

01:31PM 7    inquiring about a description of the items; correct?

01:31PM 8    A.    Correct.

01:31PM 9    Q.    And, also, Mrs. Cornwall from Drill Masters, she had

01:31PM 10   mentioned that Mr. Roggio, at some point in time, ordered 15

01:31PM 11   rifling combo buttons; correct?

01:31PM 12   A.    Yes, correct.

01:31PM 13   Q.    And she was specific in describing them as rifling combo

01:31PM 14   buttons; correct?

01:31PM 15   A.    Yes.

01:31PM 16   Q.    And, in fact, she said that she would not ship rifling

01:32PM 17   combo buttons to Iraq; correct?

01:32PM 18   A.    Correct.

01:32PM 19   Q.    Because she knows that that's a controlled item; right?

01:32PM 20   A.    Correct.

01:32PM 21   Q.    Now, regarding Mr. Monteforte, when he was interviewed by

01:32PM 22   Special Agent O'Donnell, he had mentioned that part of the

01:32PM 23   parcel that was to be shipped to Iraq by Mrs. Roggio included

01:32PM 24   Zippo liters; correct?

01:32PM 25   A.    Yes.

01:32PM 1  Q.   But that he would not ship those Zippo liters, because

01:32PM 2  they were an item that couldn't be shipped; is that right?

01:32PM 3  A.   Yeah, my understanding is they weren't able to determine

01:32PM 4  if there was fluid, flammable fluid within the liters.

01:32PM 5  Q.   Okay, so he would not ship them; is that right?

01:32PM 6  A.   DHL would not ship them.

01:32PM 7  Q.   So whatever Kristy Roggio brought to Frank Monteforte at

01:32PM 8  The Packaging Place in Pennsylvania there, was, in fact,

01:33PM 9  shipped to Iraq; correct?

01:33PM 10  A.   Correct.

01:33PM 11  Q.   And it was shipped by DHL; correct?

01:33PM 12  A.   Correct.

01:33PM 13  Q.   And we see here, we see here, I guess -- I don't know what

01:33PM 14  you would call it -- an airway bill, an identifier; right?

01:33PM 15  A.   Yes.

01:33PM 16  Q.   Okay, now, this would have been, approximately, March 29

01:33PM 17  when this package was to be shipped or when she presented it to

01:33PM 18  Packaging Place?

01:33PM 19  A.   I believe they referenced it as March 30, 2016 DHL

01:33PM 20  shipment.

01:33PM 21  Q.   The tip also came in on March 30, 2016; right?

01:33PM 22  A.   Yes.

01:33PM 23  Q.   The package was never interdicted, was it?

01:33PM 24  A.   No.

01:33PM 25  Q.   No one has ever determined from observation what was in

01:33PM 1   that package; correct?

01:33PM 2   A.    I mean, through interviews with Mr. Monteforte and

01:34PM 3   descriptions of how the buttons would look in packaging

01:34PM 4   obtained from the Eldorado Tool, he identified them as

01:34PM 5   believing that those items were part of the shipment that had

01:34PM 6   been sent to Iraq.

01:34PM 7   Q.    My question to you, though, is, no one has ever -- no one

01:34PM 8   was ever on the other end of that package and opened it up and

01:34PM 9   saw it, from law enforcement, either, yourself or --

01:34PM 10  A.    Yes, the package was never inspected by law enforcement.

01:34PM 11  Q.    No photos were ever taken by either -- by anyone, Mr.

01:34PM 12  Monteforte or anyone, regarding that?

01:34PM 13  A.    No.

01:34PM 14  Q.    This would have gone -- a package being sent from

01:34PM 15  Pennsylvania to Iraq through DHL would have gone through

01:35PM 16  Customs?

01:35PM 17  A.    Yes.

01:35PM 18  Q.    All right. And it would have been subjected to a border

01:35PM 19  search there if required or if necessary?

01:35PM 20  A.    Correct.

01:35PM 21  Q.    This SED would have accompanied that package, as well?

01:35PM 22  A.    Yes.

01:35PM 23  Q.    And that description of reamers and drill bits would have

01:35PM 24  been on that SED?

01:35PM 25  A.    In some form or fashion, yes.

01:35PM 1   Q.   And some of them could have seen that and determined that

01:35PM 2   a further look would be required; correct?

01:35PM 3   A.   Depending on -- you have to understand -- the number of

01:35PM 4   packages coming through for CBP, it's immense. They would

01:35PM 5   normally have to have some sort of targeting in advance.

01:35PM 6   They're not looking, specifically, at wording on Shipping

01:35PM 7   Export Declarations for something that looks suspicious.

01:35PM 8        So, maybe, out of chance, it could have been inspected,

01:35PM 9   but in this case, it wasn't.

01:36PM 10  Q.   So in other words, if it was, would we know?

01:36PM 11  A.   There would have been a report indicating that that

01:36PM 12  package was inspected and found to contain, you know,

01:36PM 13  suspicious items.

01:36PM 14  Q.   If it was, in fact, inspected and found to contain

01:36PM 15  suspicion items, there would have been a report; correct?

01:36PM 16  A.   Correct.

01:36PM 17  Q.   And there's no report; correct?

01:36PM 18  A.   Correct.

01:36PM 19  Q.   And if it was inspected and not found to contain, would

01:36PM 20  there have been a report?

01:36PM 21  A.   CBP may have an internal system to document just packages

01:36PM 22  that they are opening and inspecting. Typically, they put a

01:36PM 23  letter in the package to indicate that the package had been

01:36PM 24  opened for inspection and then sealed with, basically, like,

01:36PM 25  green evidence tape, indicating Customs and Border Protection

01:36PM 1  had, in fact, inspected the package.

01:37PM 2  Q.    But in this case, there's been no report about that;

01:37PM 3  correct?

01:37PM 4  A.    Correct.

01:37PM 5  Q.    And, in fact, now, I think you had indicated that, by

01:37PM 6  chance, a package such as this could have gone through; is that

01:37PM 7  right?

01:37PM 8  A.    Oh, absolutely.

01:37PM 9  Q.    Now, if you had put an alert, or if someone -- I know you

01:37PM 10  weren't involved at this point in time -- but if someone had

01:37PM 11  alerted, when they received this tip on March 30th, 2016,

01:37PM 12  regarding this package from Packaging Place going to Iraq with

01:37PM 13  an airbill, a DHL airway bill number, I mean, that certainly

01:37PM 14  could have been interdicted; correct?

01:37PM 15  A.    Potentially, yes. As part of my -- as I said, as part of

01:37PM 16  my normal course, whenever I open an investigation in my case

01:37PM 17  system, I'm entering as much information on subjects as I can,

01:37PM 18  which would include all known information, addresses, you know,

01:38PM 19  both foreign and domestic, phone numbers, emails, if I had had

01:38PM 20  a lookout with the information provided, it would be determined

01:38PM 21  on what was included in the Shipping Export Declaration.

01:38PM 22      If Mr. Roggio's name had appeared on it, if a phone number

01:38PM 23  that matched my record appeared on it, then, there should be an

01:38PM 24  indicator alerting me that there is an outbound package going.

01:38PM 25  It is not fool proof. There is the volume of materials going in

01:38PM 1  and out of the country, our system just isn't -- it's fallible.

01:38PM 2  Q.   All right, so in other words, this package, this package

01:38PM 3  was never interdicted?

01:38PM 4  A.   I was unaware of this package at the time, yes.

01:38PM 5  Q.   You weren't on the case at this point?

01:39PM 6  A.   Correct.

01:39PM 7  Q.   But an alert could have been put out for the package;

01:39PM 8  right?

01:39PM 9  A.   If I had been on the case prior to, yes, there's a good

01:39PM 10 probability that we would have interdicted that package.

01:39PM 11 Q.   Thank you. Now, okay, so while we're here --

01:39PM 12      MR. BARTOLAI: Judge, I'd like to use the Elmo. Should I

01:39PM 13 wear my mask while I do that?

01:39PM 14      THE COURT: Unless someone has an objection to you not

01:39PM 15 wearing it, you can do so. Everybody's all right. Okay.

01:39PM 16      MR. BARTOLAI: Thank you.

01:39PM 17 BY MR. BARTOLAI:

01:39PM 18 Q.   You have testified regarding some of these exhibits, and I

01:39PM 19 just wanted to go over some of it with you now.

01:40PM 20      When Special Agent O'Donnell was following through on this

01:40PM 21 investigation, he had the occasion to speak with people from

01:40PM 22 Drill Masters Eldorado Tool, Inc. Right?

01:40PM 23 A.   Yes.

01:40PM 24 Q.   And they provided him with some documentation relevant to

01:40PM 25 the matters that -- relative to the orders that Mr. Roggio had

01:40PM 1    placed; is that right?

01:40PM 2    A.   Yes.

01:40PM 3    Q.   And I'm going to just show you -- do you have Government's

01:40PM 4    Exhibit 6 up there?

01:40PM 5    A.   I do.

01:40PM 6    Q.   Okay, so I'm putting it on this Elmo, and you could see it

01:40PM 7    there, as well.

01:40PM 8         When we look at this, I'll go through each page with you,

01:40PM 9    it's a multi-page document, we see a sales order from Drill

01:40PM 10   Masters Eldorado; right?

01:40PM 11   A.   Yes.

01:40PM 12   Q.   And this order was made on December 3, 2015?

01:41PM 13   A.   Correct.

01:41PM 14   Q.   And part of the description is a quantity of 15 full-bore

01:41PM 15   reamers?

01:41PM 16   A.   Yes.

01:41PM 17   Q.   And 15 combo buttons, right, and the dimensions are there,

01:41PM 18   are located, right?

01:41PM 19   A.   Yes.

01:41PM 20   Q.   Now, turning the page, part of the same exhibit, this is

01:41PM 21   just a continuation, is it not, of that?

01:41PM 22   A.   Yes, shipping numbers are still the same.

01:41PM 23   Q.   Yes, the packing list. Again, it talks about the items

01:41PM 24   etc., right? And then I'm going to turn the page. Again, this

01:41PM 25   is from Drill Masters, and it's regarding that 12/3 order;

01:41PM 1  correct?

01:41PM 2  A.   Okay.

01:41PM 3  Q.   And it lists various items; correct?

01:42PM 4  A.   Yes.

01:42PM 5  Q.   Okay, so there's a machine rod, a wire slot on rod, button

01:42PM 6  grinding, rolo-matic NPS grind, button lapping, rifle cut and

01:42PM 7  so on, you could see grinder taper for rod, button braze, etc.,

01:42PM 8  so in other words, Mr. Roggio, when he placed this order on the

01:42PM 9  3rd of December 2015, he ordered more than just rifle combo

01:42PM 10 buttons; would you agree?

01:42PM 11 A.   Yes

01:42PM 12 Q.   And then, as Special Agent O'Donnell conducted his

01:43PM 13 investigation, he also obtained documents from The Packaging

01:43PM 14 Place; right?

01:43PM 15 A.   Yes.

01:43PM 16 Q.   I'm going to show you Government's Exhibit 7 in a minute,

01:43PM 17 but do you have that up there with you?

01:43PM 18 A.   I'm sure I do, yes.

01:43PM 19 Q.   All right. I'll put this on the Elmo. So Government's

01:43PM 20 Exhibit No. 7 is a document entitled on top, The Package Place.

01:43PM 21 This would have been a form that was completed by Kristy

01:43PM 22 Roggio, when she brought these items to The Package Place to be

01:43PM 23 sent to Iraq; is that right?

01:43PM 24 A.   I believe so, yes.

01:44PM 25 Q.   In fact, you could see Mrs. Roggio's signature there?

01:44PM 1   A.   Yes, at the bottom, yes.

01:44PM 2   Q.   It says, Ship to, and it's Ross Roggio?

01:44PM 3   A.   Yes.

01:44PM 4   Q.   In Iraq; right?

01:44PM 5   A.   Yes.

01:44PM 6   Q.   And, then, again, Government's No. 7 is a multi-page

01:44PM 7   document, I'm turning the page. This would be the

01:44PM 8   actual -- this is to prepare the shipment, right, this would

01:44PM 9   have been something The Package Place would have prepared?

01:44PM 10  A.   Yes.

01:44PM 11  Q.   And they, as part of their shipping, they identify -- they

01:44PM 12  describe the merchandise that was being shipped; right?

01:44PM 13  A.   Yes.

01:44PM 14  Q.   And they highlight it here, torque wrenches, lower

01:44PM 15  receiver, vice blocks, magnetic soft jaws, torque hand tool,

01:44PM 16  barrel nut wrench, castle nut wrench --

01:45PM 17       MR. BARTOLAI: Judge, may I have a moment?

01:45PM 18       THE COURT: Sure.

01:45PM 19  BY MR. BARTOLAI:

01:45PM 20  Q.   Pin D-10 tool, bolt catch pin punch, etc., and turning the

01:46PM 21  page, running boards, running board brackets.

01:46PM 22  A.   Okay.

01:46PM 23  Q.   Is this a document that was provided by The Package Place

01:46PM 24  to Special Agent Donnelly?

01:46PM 25  A.   Yes.

01:46PM 1    Q.   Also, again, continuing with the page M-tech axe -- I'm

01:46PM 2    sorry, if I may just start again here, I apologize.

01:46PM 3         We talked about Government Exhibit 7, the very first page,

01:46PM 4    Packaging Place signed by Kristy Roggio, where she talks about

01:46PM 5    the box of tools, and, then, this pen and keyboard. Then, when

01:46PM 6    I turned the page, I notice some of these items that I

01:47PM 7    discussed were in reference to a February 8, 2016 shipment?

01:47PM 8    A.   Okay.

01:47PM 9    Q.   I mean, is that -- I see an annotation up there regarding

01:47PM 10   a February 8, 2016 shipment. Can you tell us about that, what

01:47PM 11   that is?

01:47PM 12   A.   I believe these are prior shipments, so when Special Agent

01:47PM 13   Donnelly -- I mean, O'Donnell -- went to The Packaging Place,

01:47PM 14   he would have requested any and all shipments that Mr. Roggio

01:47PM 15   had conducted.

01:47PM 16   Q.   Okay, all right, so thank you for that clarification.

01:47PM 17   A.   I believe this package of documents is copies of the

01:47PM 18   documents that Mr. Monteforte had turned over.

01:47PM 19   Q.   Now, this second page, this is the second page of

01:47PM 20   Government Exhibit 7. This second page that says, View

01:48PM 21   Commercial Invoice February 8, 2016 shipment, that is not the

01:48PM 22   shipment that drew the attention of Drill Masters; correct?

01:48PM 23   A.   I don't know.

01:48PM 24   Q.   Well, in other words -- okay, well, Drill Masters -- Mr.

01:48PM 25   Monteforte from Package Place contacted Drill Masters on the

01:48PM **1**  30th of March, correct, and inquired as to what parts were

01:48PM **2**  being sent to -- described the items in the package being sent

01:48PM **3**  to Iraq; right?

01:48PM **4**  A.    Which would mean the commercial invoice that has the

01:48PM **5**  notation March 30th of 2016.

01:48PM **6**  Q.    Right.

01:48PM **7**  A.    That's probably the one in reference.

01:48PM **8**  Q.    Specifically, rifle combo buttons; correct?

01:49PM **9**  A.    Yes.

01:49PM **10**  Q.    We're looking at what's in front of the Elmo now, the

01:49PM **11**  second page of Government's Exhibit 7, the February 8, 2016

01:49PM **12**  shipment, this does not mention rifle combo buttons; correct?

01:49PM **13**  A.    The February 8 shipment, no.

01:49PM **14**  Q.    And, then, the third page, again, I see this one at the

01:49PM **15**  top references another prior shipment; is that right?

01:49PM **16**  A.    Yes.

01:49PM **17**  Q.    And that was -- that says January 19, 2016; correct?

01:49PM **18**  A.    Correct.

01:49PM **19**  Q.    Again, this is not the subject of that March 30 inquiry;

01:49PM **20**  right?

01:49PM **21**  A.    No.

01:49PM **22**  Q.    Again, on this one, just for clarity, there's no rifle

01:49PM **23**  combo buttons here; correct?

01:49PM **24**  A.    No.

01:49PM **25**  Q.    Now, finally, the fourth page is regarding that March 30th

01:49PM 1   2016 shipment; right?

01:50PM 2   A.   Yes.

01:50PM 3   Q.   And, again, the items shipped by or sent, you know, taken

01:50PM 4   to Package Place from Kristy Roggio to be shipped to Iraq would

01:50PM 5   have included -- and here there are Mtech axe, 44 of those. Do

01:50PM 6   you know what they would be?

01:50PM 7   A.   I do not know.

01:50PM 8   Q.   OAI gauge; 2, right? I mean, you could see a description

01:50PM 9   of the merchandise and the quantity that's being sent; right?

01:50PM 10  A.   Yes.

01:50PM 11  Q.   Several gauges, reamers, it says?

01:50PM 12  A.   Yes.

01:50PM 13  Q.   It mentions 20, right? Drill bits, it mentions 19; 9mm

01:50PM 14  drill bits, 1; right?

01:50PM 15  A.   Yes.

01:50PM 16  Q.   Shoe polish, saddle soap, 5.56 bits, that's 1; hollow

01:51PM 17  handle hand tool, a shoe shine buff cloth, urine test kits and

01:51PM 18  shoe shine brushes; correct?

01:51PM 19  A.   Yes.

01:51PM 20  Q.   All right. So would you agree that this Page 4 of this

01:51PM 21  Government Exhibit 7, relative to this shipment on March 30th,

01:51PM 22  2016, it never mentions rifle combo buttons; correct?

01:51PM 23  A.   Not specifically, no.

01:51PM 24  Q.   We know, from the discussion Agent O'Donnell had with the

01:51PM 25  people from Drill Masters and the invoices that they provided,

01:51PM 1    the quantity of those rifle combo buttons would have been 15;

01:51PM 2    correct?

01:51PM 3    A.    Yes.

01:51PM 4    Q.    And there are no items that are 15 here; correct?

01:51PM 5    A.    The 9mm drill bits, even though it's a quantity of 1, the

01:51PM 6    package is a package of 15, based on my reading of this.

01:52PM 7    Q.    Really? What do you base your conclusion on?

01:52PM 8    A.    The unit value broken down next to the quantity. Based on

01:52PM 9    my experience of reviewing countless forms such as this, I

01:52PM 10   would look at this and think that it was a one package of 9mm

01:52PM 11   drill bits, and within that package, there were 15 units.

01:52PM 12   Q.    All right, I see. And that's just based upon your

01:52PM 13   experience. How would you come up with that again? I see

01:52PM 14   quantity 1, unit value, is that 15?

01:52PM 15   A.    If you look up at the first line item, that Mtech MT axe.

01:52PM 16   It says a quantity of 44.

01:53PM 17   Q.    Right.

01:53PM 18   A.    And then the unit value is 12. So the total number of

01:53PM 19   Mtech mount axes sent is 44 times 12, which I'm guessing is the

01:53PM 20   528 line total at the end.

01:53PM 21   Q.    So you're guessing, okay.

01:53PM 22   A.    I don't have a calculator in front of me.

01:53PM 23   Q.    You're not guessing --

01:53PM 24   A.    I'm estimating.

01:53PM 25   Q.    I understand, all right. So you're, more or less, doing

01:53PM 1  the same with the drill bits. Instead of -- when they say

01:53PM 2  quantity 1, you're assuming that it's a package that contains

01:53PM 3  15; is that right?

01:53PM 4  A.    Yes.

01:53PM 5       MR. BARTOLAI: May I have a moment, Judge?

01:53PM 6       THE COURT: Yes.

01:55PM 7  BY MR. BARTOLAI:

01:55PM 8  Q.    Sir, relative to this -- to the commercial invoice that we

01:55PM 9  have together, and I appreciate how you're trying to determine

01:55PM 10 the number, but when we see -- when we're talking about these

01:55PM 11 9mm drill bits, and we're talking about -- do you know the type

01:55PM 12 of weapons that were being alleged to have been produced in

01:55PM 13 Iraq?

01:55PM 14 A.    I believe, based on the Weapons Feasibility Report, the

01:55PM 15 plan was to do 9mm Glocks and 556 M4's, basically, .223

01:55PM 16 caliber, which is 53, 56 M4-style rifle, assault rifle.

01:55PM 17 Q.    Now, when we're talking about the 9mm drill bit, which

01:56PM 18 is -- this is a metric drill bit, right, 9mm?

01:56PM 19 A.    I can't comment to that.

01:56PM 20 Q.    Okay, I understand.

01:56PM 21 A.    From an investigative viewpoint, to me, I would, based on

01:56PM 22 my composite knowledge of the case, I would think that seeing

01:56PM 23 9mm drill bits and 556 bits are reference to push button -- the

01:56PM 24 combo buttons for drilling a barrel for a 9mm weapon and a 556

01:56PM 25 weapon.

01:56PM 1  Q.    In other words -- so you're saying that the description

01:56PM 2  here that Mr. Monteforte at Packaging Place put on this report

01:56PM 3  after he had discussed with the people from Drill Masters is

01:56PM 4  different than rifle combo buttons; right?

01:57PM 5  A.    I can't speak as to why Mr. Monteforte did not call them

01:57PM 6  combo buttons and went with drill bits.

01:57PM 7  Q.    There's no claim that Mr. Monteforte at Packaging Place,

01:57PM 8  somehow, was involved in or a party to or complicit with

01:57PM 9  shipping these -- or knowing, at least, willfully, shipping

01:57PM 10 these items to Iraq; correct?

01:57PM 11 A.    Based on my knowledge of the case, he was not considered a

01:57PM 12 suspect, and he was cooperative, up to and including an

01:57PM 13 interview that I accompanied Mr. O'Donnell on -- or Agent

01:57PM 14 O'Donnell on with Mr. Monteforte.

01:58PM 15 Q.    Now, you had testified that Mr. Monteforte had looked at a

01:58PM 16 photograph of these rifle combo buttons or identified a

01:58PM 17 photograph or items depicted in a photograph?

01:58PM 18 A.    If I understand the sequence of events correctly,

01:58PM 19 recalling them correctly, Agent O'Donnell obtained photos of

01:58PM 20 what these materials would look like, went to Mr. Monteforte,

01:58PM 21 showed him these photos and asked if these were representative

01:58PM 22 of the items that were packaged within this shipment, to which

01:58PM 23 he replied in the affirmative that they did match what he had

01:58PM 24 packaged in the shipment.

01:58PM 25 Q.    So do you have a copy of the photograph that Agent

131

01:58PM 1    O'Donnell showed Mr. Monteforte?

01:59PM 2    A.    Not in front of me.

01:59PM 3    Q.    Have you ever seen a copy of that photo?

01:59PM 4    A.    I don't recall.

01:59PM 5    Q.    Do you know if he has it?

01:59PM 6    A.    I would imagine that he has that.

01:59PM 7    Q.    He's present today; correct?

01:59PM 8    A.    Yes.

01:59PM 9    Q.    All right, good. And so, now, I'm going to direct your

01:59PM 10   attention to Paragraph 26 of Government's No. 5, which is the

01:59PM 11   Search Warrant Application. I'll read it to you and I'll ask

01:59PM 12   you, it says;

01:59PM 13       During this interview, the FBI Special Agent" -- we know

01:59PM 14   that would be Mr. O'Donnell; correct?

01:59PM 15   A.    Yes.

01:59PM 16   Q.    -- "showed Monteforte a photograph of two cylindrical

01:59PM 17   items, which, based upon interviews with Drill Masters, is how

01:59PM 18   rifling combo buttons are packaged and shipped from Drill

02:00PM 19   Masters Tool, Inc." Correct?

02:00PM 20   A.    Yes.

02:00PM 21   Q.    So according to Paragraph 26, the photo that Mr. -- that

02:00PM 22   Agent O'Donnell showed Monteforte was a photograph of two

02:00PM 23   cylindrical items; right?

02:00PM 24   A.    Yes.

02:00PM 25   Q.    Which depicted how the buttons are packaged and shipped;

1   right?

2   A.   Correct.

3   Q.   So he -- in essence, what he showed Monteforte was two

4   items of the packages, not necessarily the rifle combo buttons;

5   correct?

6   A.   I can't speak for that, I was not there.

7   Q.   So would it be fair to say that you don't know?

8   A.   Yes.

9   Q.   And, then, when we continue on the next page, Paragraph 26

10  continued on the next page. It says;

11       "Monteforte looked at the photograph and said, yes, that

12  looks like them. They were in plastic tubes, and they were

13  about 36-inches long."  Correct?

14  A.   Correct.

15  Q.   So what he's saying is, these are in plastic tubes, and

16  they were 36-inches long; right?

17  A.   That's what it reads, yes.

18  Q.   Now, there came a point in time when Special Agent

19  O'Donnell had a telephone conversation with Mr. Roggio; right?

20  A.   Correct.

21  Q.   That would have been, according to the Search Warrant

22  Affidavit on April 29, 2016, Paragraph 19?

23  A.   Okay, yes.

24  Q.   And it mentions that, does it not, April 29, 2016?

25  A.   Yes.

02:02PM 1  Q.   And Roggio was telephonically interviewed by the Special

02:02PM 2  Agent we know to be O'Donnell; right?

02:02PM 3  A.   Yes.

02:02PM 4  Q.   And, now, at this point in time, Special Agent O'Donnell

02:02PM 5  did not call Mr. Roggio directly; correct?

02:02PM 6  A.   Again, I'm recalling back, I believe that Mr. Roggio's

02:02PM 7  ex-wife called and put him on the phone, if I'm correct on

02:02PM 8  that.

02:02PM 9  Q.   All right, you know that Mr. Roggio -- when you say Mr.

02:02PM 10 Roggio's ex-wife, you know that he's married; correct?

02:02PM 11 A.   Is he still married to Kristy Roggio? I'm not following

02:02PM 12 the saga.

02:02PM 13 Q.   In other words, you knew, at the time, that he was married

02:02PM 14 -- on April 29, 2016, as far as you know, from looking back on

02:03PM 15 your investigation -- he was married to this Kristy Roggio;

02:03PM 16 correct?

02:03PM 17 A.   Yes.

02:03PM 18 Q.   So that would have been his wife, at the time; right?

02:03PM 19 A.   Yes.

02:03PM 20 Q.   Would you agree with me -- although, it may not say this

02:03PM 21 in this affidavit -- that Special Agent O'Donnell went to the

02:03PM 22 Roggio house, in an attempt to talk to Mr. Roggio, but he was

02:03PM 23 not there.

02:03PM 24 A.   That's my understanding of it, yes.

02:03PM 25 Q.   He was in Iraq, at the time; right?

134

02:03PM  1   A.    Yes.

02:03PM  2   Q.    So on April 29, 2016, when Special Agent O'Donnell went to

02:03PM  3   speak with Roggio at the house in Pennsylvania, he wasn't

02:03PM  4   there, he was in Iraq, and he spoke to his wife Kristy Roggio;

02:03PM  5   right?

02:03PM  6   A.    Yes.

02:03PM  7   Q.    And it was Kristy Roggio that called up Ross Roggio, her

02:03PM  8   husband, in Iraq, and handed the phone to the Special Agent

02:03PM  9   O'Donnell; is that right?

02:03PM  10  A.    Sounds correct, yes.

02:03PM  11  Q.    It was then that Agent O'Donnell asked him had he bought

02:04PM  12  these rifle combo buttons; is that right?

02:04PM  13  A.    Yes.

02:04PM  14  Q.    Okay, well, I'm going to -- he said that he may

02:04PM  15  have -- was that your testimony, he may have?

02:04PM  16  A.    Again, if that's what I said, that's what I said.

02:04PM  17  Q.    Okay. And he was asked where they were, if you recall?

02:04PM  18  A.    Roggio responded, No, and Roggio went on to say that he

02:04PM  19  may have shipped cleaning kits for an AR-15, approximately, six

02:04PM  20  weeks ago.

02:04PM  21  Q.    Again, when we talked about Paragraph 19 of the Search

02:05PM  22  Warrant Application, we're talking about -- again, I'm going to

02:05PM  23  just read it to you.

02:05PM  24        "On April 29 in Stroudsburg, Pennsylvania, Roggio was

02:05PM  25  telephonically interviewed by FBI Special Agent regarding the

02:05PM 1  export of gun products from the United States to Iraq. Roggio

02:05PM 2  was asked by the Special Agent if he had shipped any gun parts

02:05PM 3  or gun tools to Iraq, and Roggio responded, No."

02:05PM 4      Is that right?

02:05PM 5  A.    Correct.

02:05PM 6  Q.    And he went on to say that he may have shipped cleaning

02:05PM 7  kits for an AR-15 six weeks earlier; is that right?

02:05PM 8  A.    Yes.

02:05PM 9  Q.    And, then, he was asked about these guns -- about the

02:05PM 10 reamers or drills; right?

02:05PM 11 A.    Yes.

02:05PM 12 Q.    He was asked, Where are they, essentially; right?

02:05PM 13 A.    Yes.

02:05PM 14 Q.    And he said, Well, they may be there -- he said, "They may

02:05PM 15 be at the house, they were shipped there."

02:05PM 16     Is that what he told him?

02:06PM 17 A.    "Roggio stated he was unsure where the reamers and rifling

02:06PM 18 buttons were, because he had a safe and lock box at both his

02:06PM 19 and his parents' house in Stroudsburg, Pennsylvania."

02:06PM 20 Q.    All right, so, at this point in time, you knew that these

02:06PM 21 buttons were ordered from Drill Masters, and they were sent to

02:06PM 22 his residence in Pennsylvania; right?

02:06PM 23 A.    Yes.

02:06PM 24 Q.    And, in fact, he's telling you -- and when you confronted

02:06PM 25 him or when Special Agent O'Donnell confronted him about where

136

02:06PM 1   they were, he basically said, They're probably in Pennsylvania

02:06PM 2   there. Is that right?

02:06PM 3   A.   That was his answer, based on the paragraph, yes.

02:07PM 4   Q.   So you had a meeting -- we're getting to that

02:07PM 5   investigative meeting, when you came into the case. You hadn't

02:07PM 6   come into the case until December 16 and sometime in January

02:07PM 7   2017, sitting down with the various agencies for this meeting,

02:07PM 8   and the border search option was discussed. Is that right?

02:07PM 9   A.   Yes, I brought it up.

02:07PM 10  Q.   All right, you brought it up. Now, at that point in time,

02:07PM 11  January of 2017, Agent Donnelly had received a tip from Drill

02:07PM 12  Masters, he had spoke to people from Drill Masters, he had

02:07PM 13  spoke to Monteforte from Packaging Place, he had spoke to Mr.

02:08PM 14  Roggio in Iraq, there had been search warrants issued by, I

02:08PM 15  guess it was, Agent Dunberg?

02:08PM 16  A.   Correct.

02:08PM 17  Q.   For these emails from Mr. Roggio, and, in fact, he had

02:08PM 18  already received some of those emails; correct?

02:08PM 19  A.   Yes.

02:08PM 20  Q.   I think you had mentioned that you were the first Homeland

02:08PM 21  Security agent that had been involved in the case; is that

02:08PM 22  right?

02:08PM 23  A.   Correct.

02:08PM 24  Q.   But isn't Agent -- isn't Dunberg also a Homeland Security

02:08PM 25  guy?

02:08PM 1   A.   No, he's not.

02:08PM 2   Q.   What is he, I'm sorry?

02:08PM 3   A.   He is with the -- he's a Special Agent for the U.S.

02:08PM 4   Department of Commerce Office of Export Enforcement, Bureau of

02:08PM 5   Industry and Security.

02:08PM 6   Q.   Okay.

02:08PM 7   A.   They have a similar role in examining and preventing the

02:09PM 8   export of controlled items that appear on the commerce control

02:09PM 9   list.

02:09PM 10  Q.   I see. I apologize for that, I don't know what I was

02:09PM 11  thinking when I asked you that.

02:09PM 12       So in other words, at this point in time, during this

02:09PM 13  pow-wow, this investigative meeting, all these things had

02:09PM 14  already occurred; correct?

02:09PM 15  A.   Yes.

02:09PM 16  Q.   And the decision was made or the choice was made that,

02:09PM 17  perhaps, a border search would be something that should be

02:09PM 18  considered?

02:09PM 19  A.   If the opportunity presented itself. What I had proposed

02:09PM 20  was, explained the border search authority capabilities, what

02:09PM 21  it entails, and said if we have the opportunity and we identify

02:09PM 22  that Mr. Roggio is traveling back into the country, that we

02:09PM 23  could refer him to secondary to see if he has anything in his

02:10PM 24  luggage, and, then, specifically, detain the devices for

02:10PM 25  examination.

02:10PM 1  Q.   So in other words, you thought that, perhaps, regardless

02:10PM 2  of how he presented himself to primary and regardless of how

02:10PM 3  the secondary interview or examination went, it would be a

02:10PM 4  chance to detain the devices; is that right?

02:10PM 5  A.   Based on my review of all case materials and the search

02:10PM 6  warrant findings and the emails within, I believed it was very

02:10PM 7  reasonable to suspect that Mr. Roggio was engaged in some type

02:10PM 8  of illegal export activities, as well as brokerage and service

02:10PM 9  activities in Iraq, without the permission of the Department of

02:10PM 10 State.

02:10PM 11 Q.   To seize his devices, is that it?

02:10PM 12 A.   To not seize them, to detain them for a border search

02:10PM 13 examination.

02:10PM 14 Q.   To detain them, in other words, to actually take them,

02:11PM 15 right, from him, and to have them ultimately forensically

02:11PM 16 examined?

02:11PM 17 A.   Correct.

02:11PM 18 Q.   Is that right? Did anyone discuss getting a search warrant

02:11PM 19 at that point in time?

02:11PM 20 A.   We probably -- we were throwing out all sorts of ideas as

02:11PM 21 to the best courses of action, whatever we were going to do. I

02:11PM 22 explained to them that border search is a lawfully lawful

02:11PM 23 exemption of the Fourth Amendment, and it gives us the

02:11PM 24 opportunity to do a cursory review to see if we can find

02:11PM 25 anything that would substantiate seizing the devices.

02:11PM  1   Q.   All right, so in other words -- so the decision was made

02:11PM  2   to not go with the search warrant; is that right?

02:11PM  3   A.   Didn't need to, he was -- if he was going to travel and he

02:11PM  4   was going to come from international space into the U.S., he

02:12PM  5   had to cross the border and be examined. During that

02:12PM  6   examination, we have the authority to detain electronic devices

02:12PM  7   and conduct a forensic search of them.

02:12PM  8   Q.   Now, you said -- your answer there mentioned forensic

02:12PM  9   search. Earlier, you had said cursory review.

02:12PM 10   A.   Well, we don't want to take the chance anymore of -- the

02:12PM 11   old term was fat fingering the phones, because you run the risk

02:12PM 12   of opening the device and altering the device that could

02:12PM 13   possibly be used later down the road as evidence.

02:12PM 14        If you delete something, if you change the format of that

02:12PM 15   device, you substantially change its admissibility in court.

02:12PM 16   By detaining them, the process is, if the individual, in this

02:12PM 17   case Mr. Roggio, provided his passwords, passwords were

02:12PM 18   provided, they were documented, the phones are then taken and

02:13PM 19   they are placed in airplane mode, so that they cannot be

02:13PM 20   remotely activated and deleted. They are then bagged as

02:13PM 21   evidence and submitted and packaged in the FedEx box and sent

02:13PM 22   to me.

02:13PM 23        I make no alterations to the phone, I simply sign for them

02:13PM 24   and then I hand it over to our computer forensics people who

02:13PM 25   are trained in the extraction of data.

140

02:13PM 1   Q.   That's what you did in this case?

02:13PM 2   A.   It's what I do in all cases. This is not unique to Mr.

02:13PM 3   Roggio.

02:13PM 4   Q.   So you never conducted cursory review of the data on the

02:13PM 5   phone; is that right?

02:13PM 6   A.   No, I did. So once the extraction is done by the computer

02:13PM 7   forensics analyst, we're under a clock, basically, we're trying

02:13PM 8   to get this done in an orderly amount of time. I believe

02:13PM 9   policy -- we would like it to be within 30 days, but it doesn't

02:13PM 10  always fall that way, sometimes forensics guys are backed up.

02:14PM 11       So line item -- I forget the sequencing of it -- but as

02:14PM 12  the first device is extracted in its entirety, so we're

02:14PM 13  not -- we do that so that we are not manipulating the phone and

02:14PM 14  changing it whatsoever. That extraction is posted to an

02:14PM 15  internal evidence review system where I can then conduct a

02:14PM 16  cursory review of the data that's there. For me to do a full

02:14PM 17  review of that device would take weeks, if not months.

02:14PM 18       MR. BARTOLAI: Your Honor, may I have a moment?

02:14PM 19       THE COURT: Yes.

02:14PM 20       THE WITNESS: So it is a cursory review that I conducted.

02:14PM 21  I extract -- or based on that review, I'm looking at items

02:15PM 22  that, I think, are of evidentiary value in our case or support

02:15PM 23  the fact that Mr. Roggio is engaged in some sort of illegal

02:15PM 24  activity in Iraq.

02:15PM 25  BY MR. BARTOLAI:

02:15PM 1  Q.    So wait, Agent, you're saying that your cursory review of

02:15PM 2  this data, of Mr. Roggio's electronic devices, occurred after

02:15PM 3  the forensic search; is that right?

02:15PM 4  A.    Correct, it is an extension of the border search. There is

02:15PM 5  no search, it's border search includes the detention of the

02:15PM 6  devices, the transit to an appropriate area that can

02:15PM 7  forensically examine them, and then my examination.

02:15PM 8  Q.    Okay.

02:15PM 9  A.    It's an extension of the border, and that's all laid out.

02:15PM 10  Q.    All right, so let's talk about the border search and the

02:15PM 11  search of the electronic devices.

02:15PM 12        Do you have -- I asked if the Deputy Courtroom Clerk place

02:16PM 13  in front of you what's been marked as Defendant's Exhibit D, E

02:16PM 14  and F. Do you have them there?

02:16PM 15  A.    Yes.

02:16PM 16  Q.    All right. Have you ever seen these before?

02:16PM 17  A.    No.

02:16PM 18  Q.    As part of your training and duties as a Homeland Security

02:16PM 19  Investigator, are you required to know the policies of the

02:16PM 20  Department of Homeland Security, regarding border searches of

02:16PM 21  electronic devices?

02:16PM 22  A.    Yes.

02:16PM 23  Q.    And do you receive training in that area?

02:16PM 24  A.    Yes.

02:16PM 25  Q.    On a continuing basis?

02:16PM 1  A.    It's on -- maybe not a continuing annual basis, but we do

02:16PM 2  engage in virtual training, as well as periodic law updates

02:16PM 3  when there are changes to a policy.

02:16PM 4  Q.    Would you agree that the policy regarding Homeland

02:16PM 5  Security's conducting a border search of an electronic device

02:17PM 6  has changed, since Mr. Roggio's devices were seized?

02:17PM 7  A.    Since they've -- I see Exhibits E and F fall outside

02:17PM 8  January 4th of 2018, so this occurred -- whatever these

02:17PM 9  documents are occurred after -- well after Mr. Roggio's border

02:17PM 10 search.

02:17PM 11 Q.    Right, and you've never heard of -- you've never heard of

02:17PM 12 these documents that I've placed in front of you, you never had

02:17PM 13 a chance to review them?

02:17PM 14 A.    Exhibit E is a CBP Directive, so that would be something

02:17PM 15 internal to CBP and not Homeland Security Investigations, that

02:17PM 16 applies to F, as well, and these are privacy -- Exhibit D is a

02:17PM 17 Privacy Impact Assessment. This is something that would have

02:17PM 18 been done, probably, at the DHS headquarters level, and then

02:18PM 19 I'm sure this is part of or incorporated somewhat in the policy

02:18PM 20 that works its way down to us.

02:18PM 21     But as for looking at that specific, no, I don't believe

02:18PM 22 I've ever -- that does not look familiar to me.

02:18PM 23 Q.    All right. Let's talk about what you know about these

02:18PM 24 border searches. Have you ever conducted a border search at the

02:18PM 25 border?

02:18PM 1   A.   Let me think of this. Yes. So as part of my job, prior to

02:18PM 2   Counter Proliferations, it involved investigations at the

02:18PM 3   seaport. So a ship that comes into the U.S., the seaport, the

02:18PM 4   airports are functional equivalents of the border.

02:18PM 5   Q.   Would you agree with me, as a law enforcement agent at the

02:18PM 6   border, you can inspect an individual and his belongings for,

02:19PM 7   essentially, no reason?

02:19PM 8   A.   Yes.

02:19PM 9   Q.   You can ask him questions; correct?

02:19PM 10  A.   Yes.

02:19PM 11  Q.   You can look -- search him; right?

02:19PM 12  A.   Correct.

02:19PM 13  Q.   His person, his belongings?

02:19PM 14  A.   If there is a reason to go into that depth, yes.

02:19PM 15  Q.   In other words, his bags?

02:19PM 16  A.   There's a number of indicators, you know, that CBP uses as

02:19PM 17  they're evaluating passengers.

02:19PM 18  Q.   But you don't need any reason to search an individual at

02:19PM 19  the border; right?

02:19PM 20  A.   Based on the law, no.

02:19PM 21  Q.   When we talk about these electronic devices, again, I'm

02:19PM 22  asking you regarding the policy of -- you know, the policies

02:19PM 23  for Homeland Security on a border search.

02:19PM 24       MR. HINKLEY: Your Honor, if I may interrupt. I'm going to

02:19PM 25  object to the questions about policy. I don't think it's really

**144**

02:19PM 1    relevant for today's proceedings.

02:20PM 2         THE COURT: Well, I'll allow the question, if you can be

02:20PM 3    more specific, Mr. Bartolai. A lot of what you're asking this

02:20PM 4    witness, right now, is permissible, but it's bordering on

02:20PM 5    asking him for legal conclusions and, perhaps, even conclusions

02:20PM 6    on ultimate issues in this case.

02:20PM 7         I'm willing to allow it to a degree, and I'm going to

02:20PM 8    continue to allow you to question the witness, but as far as

02:20PM 9    policy considerations, you've got to narrow your questions,

02:20PM 10   because I'm not even sure that I understand where you're headed

02:20PM 11   here.

02:20PM 12        MR. BARTOLAI: Very good.

02:20PM 13   BY MR. BARTOLAI:

02:20PM 14   Q.   So Agent, I can pick up a phone and look at it and inspect

02:20PM 15   it at the border; correct?

02:20PM 16   A.   Yes.

02:20PM 17   Q.   And that means that you can manually manipulate it, turn

02:20PM 18   it back and forth, make sure -- take the battery out -- I'm not

02:20PM 19   talking about just phones, but any electronic device, and make

02:21PM 20   sure there's not a hidden compartment in there; correct?

02:21PM 21   A.   Hidden compartments, there are cell phones disguised as

02:21PM 22   handguns, you can investigate and look and make share there's

02:21PM 23   no explosives.

02:21PM 24   Q.   Right, and that is like a manual type of search of the

02:21PM 25   phone itself; correct?

**145**

02:21PM 1   A.   A physical search, yes.

02:21PM 2   Q.   A physical search, you don't have to open the phone for

02:21PM 3   that?

02:21PM 4   A.   You can.

02:21PM 5   Q.   But you don't have to?

02:21PM 6   A.   Well, it would be part of the physical search to make sure

02:21PM 7   that it's active and operates the way a cell phone would.

02:21PM 8   Q.   So we will go to the next level then. And you could

02:21PM 9   also -- not only could you manually manipulate it and look at

02:21PM 10  it and examine it, you can actually turn it on; right?

02:21PM 11  A.   Yes.

02:21PM 12  Q.   And that includes asking the traveler or the owner of the

02:21PM 13  cell phone for his passcode; correct?

02:21PM 14  A.   Right.

02:21PM 15  Q.   He would provide it to you, and you could open it up and

02:21PM 16  look at it. Right?

02:22PM 17  A.   It's up to them whether they want to provide their

02:22PM 18  passcode or not.

02:22PM 19  Q.   But if he gives you the passcode, you can certainly look

02:22PM 20  in the phone, right?

02:22PM 21  A.   Absolutely, yes.

02:22PM 22  Q.   That's all part of your understanding of what can be done

02:22PM 23  at the border; right?

02:22PM 24  A.   Yes.

02:22PM 25  Q.   Although, you weren't involved in this particular case,

02:22PM  1  with respect to the handling of his devices that night on

02:22PM  2  February 26, 2017, that certainly could have been done, that

02:22PM  3  would have been within the border search authority of the

02:22PM  4  agents there; correct?

02:22PM  5  A.   Based on the CBP officer's testimony, if we weren't

02:22PM  6  involved whatsoever, CBP more than likely would have examined

02:22PM  7  his phones.

02:22PM  8  Q.   But we know they weren't examined; right?

02:22PM  9  A.   No, because the call was already made that we were

02:22PM  10  forensically going to examine those phones, as part of the

02:22PM  11  border search. So we don't want any -- the whole point is, we

02:23PM  12  don't want anybody opening the phones, we want them as is, as

02:23PM  13  they came, placed -- other than opening them up, powering them

02:23PM  14  on, entering the code to make sure that it works, placing the

02:23PM  15  phone into airplane mode, that is the level of manipulation

02:23PM  16  that would be required prior to packaging as evidence and

02:23PM  17  sending it down for the forensics examination to the requesting

02:23PM  18  office.

02:23PM  19  Q.   So the determination was made, prior to Mr. Roggio

02:23PM  20  crossing the border, that his devices were going to be detained

02:23PM  21  and forensically examined; correct?

02:23PM  22  A.   Correct.

02:23PM  23  Q.   So there was no need for anyone to open those phones and

02:23PM  24  search them; correct?

02:23PM  25  A.   They weren't opened or searched, they were powered on,

02:23PM 1   activated, verified the codes worked, and the airplane

02:24PM 2   mode -- placed into airplane mode and packaged.

02:24PM 3   Q.   Who did that?

02:24PM 4   A.   That I don't know, that could have been CBP, it could have

02:24PM 5   been HSI Agent Mundy, I wasn't there, I don't know how the

02:24PM 6   delineation of duties were separated.

02:24PM 7   Q.   Did you do that?

02:24PM 8   A.   No, I was not in New York at the time.

02:24PM 9   Q.   In fact, you were never at the J.F.K. Airport?

02:24PM 10  A.   No, I offered to drive up and was told that it was not

02:24PM 11  needed.

02:24PM 12  Q.   You were always in Philadelphia regarding this -- during

02:24PM 13  this time?

02:24PM 14  A.   Yes.

02:24PM 15  Q.   We have seen exhibits offered earlier by -- the reports

02:24PM 16  relative to the border inspection people, Customs and

02:24PM 17  Protection, Government's No. 1 was a report of -- by Mrs.

02:24PM 18  Morales, regarding the interview of Mr. Roggio, that was

02:25PM 19  identified -- the report at the very top said it was generated

02:25PM 20  by Burke, Jeffrey Burke. You would have been able to get that

02:25PM 21  report remotely from Philly?

02:25PM 22  A.   Correct.

02:25PM 23  Q.   So you didn't have to go there to get that?

02:25PM 24  A.   No, I have access to CBP's systems, as part of my normal

02:25PM 25  course of duties with Homeland Security Investigations.

02:25PM 1    Q.   So it was, essentially, as easy as someone -- you even

02:25PM 2    provided the bag with the postage to get the phone.

02:25PM 3    A.   It's kind of a courtesy, so if J.F.K. is conducting this,

02:25PM 4    and rather than -- so they don't have to incur the expense of

02:25PM 5    shipping, it's customary to provide them with our office FedEx

02:25PM 6    client code, so that the bill is sent to the SAC of

02:25PM 7    Philadelphia, as opposed to New York having to pay for it.

02:25PM 8        That's customary throughout any office that's requesting

02:26PM 9    service at J.F.K. or elsewhere.

02:26PM 10   Q.   Now, when did you provide that, that courtesy?

02:26PM 11   A.   It would have been that day. As I said, I'm talking with

02:26PM 12   SA Mundy before and after the secondary event, and, you know,

02:26PM 13   providing details and trying to find out, Hey, how'd it go, you

02:26PM 14   know, just get information on how everything went and if there

02:26PM 15   were any problems.

02:26PM 16   Q.   Now, earlier, when you testified, I think, at first, you

02:26PM 17   were unsure if you spoke to Agent Mundy?

02:26PM 18   A.   My hesitation -- I was trying to -- I wouldn't call SA

02:26PM 19   Mundy directly on my whim to say, Hey, I want a border search.

02:27PM 20   That call is routed -- so I'm talking to my supervisor. I

02:27PM 21   believe, in this case, my supervisor of Counter Proliferations

02:27PM 22   in Philadelphia called up to New York and spoke to the group

02:27PM 23   supervisor of Counter Proliferations there and said, Hey, this

02:27PM 24   is what we're looking to do, what's the best course of action?

02:27PM 25       At some point, I'm provided the name of SA Mundy as my

02:27PM 1   point of contact who is the duty agent. So your request -- I

02:27PM 2   did talk to him, but it wasn't -- there was sequential people

02:27PM 3   that I spoke to. I was trying to craft my answer and you didn't

02:27PM 4   let me finish.

02:27PM 5   Q.   I understand. But, now, earlier, as you pointed out, you

02:27PM 6   weren't sure if you talked to him, but now I think it's clear--

02:27PM 7   A.   That's not what I said.

02:27PM 8   Q.   Okay, but now you've talked to him before and afterwards?

02:27PM 9   Is that what happened?

02:27PM 10   A.   Absolutely.

02:27PM 11   Q.   Now, you recall speaking to him before the search and

02:27PM 12   afterwards --

02:27PM 13   A.   Again, I'm going to go back, you did not let me finish the

02:27PM 14   crafting of my answer. I spoke to him, I have no doubt that I

02:28PM 15   spoke to him both before and after.

02:28PM 16   Q.   All right. Do you have any type of memo, any type of note,

02:28PM 17   regarding that that would memorialize that?

02:28PM 18   A.   No, it's a general phone call to make sure that -- let me

02:28PM 19   actually -- hold on. So not documenting the phone call, but as

02:29PM 20   part of my report, Government Exhibit 10, on Page 5 of 6,

02:29PM 21   indicates on February 28, "SA Burke received the above items

02:29PM 22   from SA Mundy, confirmed the contents, and secured them pending

02:29PM 23   submission to HSI Philadelphia Forensics Lab."

02:29PM 24        But as for documenting the context of the phone calls, no,

02:29PM 25   that's simply a formality. I want to make sure that they have

02:29PM 1 everything they need because they're doing me the favor. I

02:29PM 2 would much prefer to have been up there to do it, myself, but

02:29PM 3 there was no need for me to waste Government time and resources

02:29PM 4 when it could be done just as easily by SA Mundy.

02:29PM 5 Q.    Now, you just mentioned Government Exhibit 10, and you

02:29PM 6 noted on Page 5;

02:29PM 7       "On February 28, 2017, SA Burke received the above items

02:29PM 8 from SA Mundy, confirmed the contents and secured them pending

02:30PM 9 submission to the HSI Philadelphia Forensic Lab". That wasn't a

02:30PM 10 phone call, that was that pre-bagged --

02:30PM 11 A.    Correct, but that's a reference to SA Mundy within my

02:30PM 12 report.

02:30PM 13 Q.    But your notes don't reference any phone calls before and

02:30PM 14 after; right?

02:30PM 15 A.    As far as I'm aware, no, and I don't know that I would, in

02:30PM 16 the normal course of business, make that an addendum to a

02:30PM 17 report -- make that part of a report. That's spelled out in the

02:30PM 18 CBP detention forms as Mundy is the seizing agent, and I'm just

02:30PM 19 coordinating with him to get that stuff down to me.

02:30PM 20 Q.    That's really all that is done -- that's really all that

02:30PM 21 Agent Mundy was, was the seizing agent; right?

02:30PM 22 A.    Correct, he's just standing in for me.

02:30PM 23 Q.    He had no discretion regarding whether or not to seize

02:31PM 24 that?

02:31PM 25 A.    No, not at all. It's my decision as a case agent to do it,

02:31PM 1  and he is simply making it happen for me.

02:31PM 2  Q.    Had you put out a hit -- you talked a little bit about

02:31PM 3  that CTR Lookout.

02:31PM 4  A.    No, I did not do a CTR Lookout, that is a CBP designation,

02:31PM 5  which, I believe, based on Officer Aurelia's comments was

02:31PM 6  something that CBP assigns to travelers from Iraq. My lookout

02:31PM 7  is from an internal case system within HSI that links to TECS,

02:31PM 8  which is the CBP database and allows me to monitor a person's

02:31PM 9  travel -- and not a person, a subject of an investigation.

02:32PM 10     At this point, I am involved in the investigation, Mr.

02:32PM 11  Roggio is a subject of the investigation, and we reasonably

02:32PM 12  suspect that he is involved in weapons manufacturing and

02:32PM 13  illegal exportation of goods to Iraq without getting the

02:32PM 14  appropriate licensing.

02:32PM 15     I enter that record, I tag it, initially, as a silent hit

02:32PM 16  because I don't want anybody doing anything with him that could

02:32PM 17  jeopardize the overall investigation. When it becomes apparent

02:32PM 18  that he is going to travel, and it's confirmed, at that point,

02:32PM 19  I'm changing the silent hit to what is -- what you're referring

02:32PM 20  to as a one-day lookout .

02:32PM 21     The CBP -- what was the designation? CTR? That is not a

02:33PM 22  designation that I -- that's a CBP issue, and what that tells

02:33PM 23  me is, is that, if I was not involved in this case whatsoever,

02:33PM 24  CBP had already shown interest in Mr. Roggio's travel, based on

02:33PM 25  whatever metrics they were looking at, and they were going to

02:33PM 1   secondary him, regardless of my involvement, based on his

02:33PM 2   travel from Iraq.

02:33PM 3   Q.   Make no mistake about it, you arranged for him to have a

02:33PM 4   secondary inspection; correct?

02:33PM 5   A.   I had an active record in to have him secondaried,

02:33PM 6   absolutely.

02:33PM 7   Q.   In other words, when you say a silent hit --

02:33PM 8   A.   When I designate a subject's record in an investigation

02:33PM 9   that I believe is potentially traveling into the U.S. or out of

02:33PM 10  the U.S., maybe they're a fugitive, maybe I suspect them of

02:33PM 11  carrying contraband, maybe they're carrying money, maybe

02:33PM 12  they're carrying narcotics, maybe they're a material witness to

02:34PM 13  an investigation, if I have an opportunity to grab them at the

02:34PM 14  airport and talk to them and interview them, absolutely, it's

02:34PM 15  an invaluable investigative technique that I use in almost all

02:34PM 16  my cases.

02:34PM 17  Q.   But this is different, though. What happened here was you

02:34PM 18  entered a subject matter record within your case management

02:34PM 19  system that let you know he was coming into the country;

02:34PM 20  correct?

02:34PM 21  A.   Correct.

02:34PM 22  Q.   And that was a silent hit; correct?

02:34PM 23  A.   Correct.

02:34PM 24  Q.   And then you took action. When you found out that he was

02:34PM 25  coming into the country, you arranged for his electronic

02:34PM 1    devices to be seized and for him to undergo a secondary

02:34PM 2    interview; correct?

02:34PM 3        MR. HINKLEY: Your Honor, I'm going to object. This has

02:34PM 4    been asked and answered a number of times.

02:34PM 5        MR. BARTOLAI: I don't think it has, Judge, he hasn't

02:34PM 6    answered this question. It's a simple yes or no answer.

02:34PM 7        THE COURT: Go ahead.

02:34PM 8        THE WITNESS: Ask the question again, please.

02:34PM 9        THE COURT: Read it back, Kristin.

02:34PM 10       (At this time the reporter read back the referred-to

02:34PM 11       portion of the record.)

02:34PM 12       THE REPORTER: "QUESTION: And then you took action. When

02:34PM 13   you found out that he was coming into the country, you arranged

02:34PM 14   for his electronic devices to be seized and for him to undergo

02:34PM 15   a secondary interview; correct?"

02:35PM 16       THE WITNESS: That is correct. As I explained before, when

02:35PM 17   we got the confirmation that he, indeed, was traveling back to

02:35PM 18   the United States, that silent hit, I then change to a one-day

02:35PM 19   lookout, so that we don't miss him and he doesn't slip through,

02:35PM 20   because, unfortunately, if you -- the one-day lookout is just

02:35PM 21   kind of an almost, Let's highlight it and just make sure that

02:35PM 22   it doesn't slip through, puts everybody on notice, CBP,

02:35PM 23   especially, and prior to doing that, I'm consulting with the

02:36PM 24   investigative team.

02:36PM 25       Hey, we have this opportunity, you know, this is what I'd

02:36PM 1    like to do, and we went forward and I conducted it.

02:36PM 2    BY MR. BARTOLAI:

02:36PM 3    Q.   So are you saying that after you determined that he was

02:36PM 4    coming into the country but prior to having him

02:36PM 5    secondarily-inspected and his devices seized, you consulted

02:36PM 6    with the team?

02:36PM 7    A.   Absolutely. I'm not going to do something on my own

02:36PM 8    without, you know, the team knowing what I'm doing. I didn't

02:36PM 9    take over this investigation, I'm not running this

02:36PM 10   investigation, it's a team effort, and just the same way I

02:36PM 11   wouldn't go execute a search warrant on Mr. Roggio's house

02:36PM 12   without consulting the investigative team.

02:36PM 13   Q.   All right, now, let's talk about -- so these devices,

02:36PM 14   ultimately, are seized from Mr. Roggio on February 26, 2017,

02:37PM 15   and they are sent to you; is that right?

02:37PM 16   A.   Correct.

02:37PM 17   Q.   And when you look at Government's Exhibit 5, it

02:37PM 18   highlights -- it picks up, basically, on Paragraph 54, if you

02:37PM 19   could take a look at that. You actually received these items

02:37PM 20   from Special Agent Mundy; right?

02:37PM 21   A.   Yes.

02:37PM 22   Q.   And you secured them -- when I say, these items, I mean,

02:37PM 23   the electronic devices; correct?

02:37PM 24   A.   You're on Paragraph 54?

02:37PM 25   Q.   Yes.

02:37PM 1  A.    Yes, February 28 is when I received them --

02:37PM 2  Q.    You received them --

02:37PM 3  A.    -- in the FedEx package.

02:37PM 4  Q.    -- on March 1st, the next day, you submitted them to the

02:37PM 5  Forensic Agent Green --

02:37PM 6  A.    Correct.

02:37PM 7  Q.    -- who began a forensic examination of the items; right?

02:38PM 8  A.    Yes.

02:38PM 9  Q.    And then between the time you received those items until

02:38PM 10  the time you gave them to Agent Green, you never performed a

02:38PM 11  cursory inspection?

02:38PM 12  A.    Absolutely, it was simply taking them out of the FedEx

02:38PM 13  box, make sure everything was accounted for, sign the custody

02:38PM 14  sheet that I had received them, send that -- a copy of that

02:38PM 15  sheet back to SA Mundy for his records, and then I'm making

02:38PM 16  sure that everything is exactly the way it's supposed to be.  I

02:38PM 17  believe I would have submitted them that day to SA Green, but

02:38PM 18  he was not in, he was not available to take custody that day,

02:38PM 19  so these would have been locked away and secured.

02:38PM 20       I come in the following day, I take custody of them again,

02:38PM 21  I walk them over to the CFA lab and turn them over to Special

02:38PM 22  Agent Green.

02:38PM 23  Q.    Do you know the difference between a cursory investigation

02:39PM 24  of an electronic device and a forensic examination of an

02:39PM 25  electronic device?

02:39PM 1    A.    I know what my definition is.

02:39PM 2    Q.    Do you know the Homeland Security definition?

02:39PM 3    A.    I don't know that there's an official definition.

02:39PM 4    Q.    If I were to say that the difference between a casual

02:39PM 5    inspection and a forensic examination is that, in a forensic

02:39PM 6    examination, a device is attached to an outside source that

02:39PM 7    would examine it. Would you agree with me?

02:39PM 8    A.    Yes.

02:39PM 9    Q.    So that's the difference that Mr. Green would use, he

02:39PM 10   would use tools, software, etc., to extract data from these

02:39PM 11   devices; correct?

02:39PM 12   A.    Right, and that's all we do anymore.

02:39PM 13   Q.    Now, this -- when we hear about travelers and their phones

02:39PM 14   being detained and a copy being made and them continuing on

02:40PM 15   their way with their phone, that doesn't happen anymore?

02:40PM 16   A.    It depends on the phone. So Smart phones, it takes -- it

02:40PM 17   depends on the phone and how much data there is, and it also

02:40PM 18   depends on how much time we have with the passenger.

02:40PM 19        If that passenger is on a four-hour layover, there's a

02:40PM 20   very good chance that they might agree to do an extraction

02:40PM 21   on-site.

02:40PM 22   Q.    And they can do that; right?

02:40PM 23   A.    They have the equipment up there, the same equipment that

02:40PM 24   we have in Philadelphia they have up there.

02:40PM 25   Q.    So in other words, and that wasn't done, there was no

02:40PM  1   extraction done there?

02:40PM  2   A.   Correct.

02:40PM  3   Q.   Okay. And likewise -- and they could always make a copy of

02:40PM  4   the device?

02:40PM  5   A.   Well, a copy is the forensic -- that's the image being

02:40PM  6   extracted.

02:40PM  7   Q.   Right, okay, but none of that was done, the phones were

02:40PM  8   actually seized from Mr. Roggio?

02:40PM  9   A.   They were detained --

02:40PM 10        THE COURT: I think I understand what happened here. Let's

02:41PM 11   move on.

02:41PM 12        MR. BARTOLAI: Very good.

02:41PM 13   BY MR. BARTOLAI:

02:41PM 14   Q.   You referenced -- when we were talking about, earlier

02:41PM 15   -- later in your testimony you mentioned Government's Exhibit

02:41PM 16   No. 12, I think that you had indicated, correct me if I'm

02:41PM 17   wrong, that that was a cursory search of the data on Mr.

02:41PM 18   Roggio's device?

02:41PM 19   A.   Now, that report, 12, is the results of the search warrant

02:41PM 20   which we had applied for and received on March 21.

02:41PM 21   Q.   All right, so No. 12 was after the search warrant, right,

02:41PM 22   the results?

02:41PM 23   A.   Correct, yes.

02:41PM 24   Q.   And what happened here was the devices were seized --

02:42PM 25   A.   Detained.

02:42PM 1   Q.   -- on February 26 of 2017, they were forensically

02:42PM 2   examined, and then the search warrant was issued or was

02:42PM 3   obtained to further examine them; correct?

02:42PM 4   A.   Once our border search of the detained devices showed that

02:42PM 5   there was evidence, in relation to the crime that we reasonably

02:42PM 6   suspected Mr. Roggio of committing, we made the decision, in an

02:42PM 7   overabundance of caution, to apply for search warrants then to

02:42PM 8   officially seize the devices.

02:42PM 9        And this was -- we were kind of, if I'm correctly

02:42PM 10  recalling the change to border search policy, we were ahead of

02:42PM 11  our time, because we did not need, at the time, we did not need

02:42PM 12  to apply for search warrants.

02:43PM 13  BY MR. BARTOLAI:

02:43PM 14  Q.   I'm going to show you Government's No. 9. This is an

02:43PM 15  invoice from OML Global; correct?

02:43PM 16  A.   Yes.

02:43PM 17  Q.   As a result of your -- as a result of the search warrants

02:43PM 18  on Mr. Roggio's email accounts, this device, this invoice,

02:43PM 19  Government Exhibit 9 was discovered; is that right?

02:43PM 20  A.   Yes, but let's be specific. This was recovered during the

02:43PM 21  search warrants prior to the border search that were conducted

02:43PM 22  by SA Dunberg of Commerce.

02:43PM 23  Q.   That's right, okay, very good. It mentions here, a gas

02:44PM 24  ring, M4 bolt gas ring, right, firing pain retainer; correct?

02:44PM 25  A.   Yes.

02:44PM 1   Q.   You testified, earlier, regarding this, haven't you?

02:44PM 2   A.   Yes.

02:44PM 3   Q.   And as you pointed out, this was the subject of search

02:44PM 4   warrants being executed on those yahoo accounts; right?

02:44PM 5   A.   Correct.

02:44PM 6   Q.   Do you have anything that would show that these items were

02:44PM 7   shipped to Iraq?

02:44PM 8        MR. HINKLEY: Your Honor, I'm going to object to the

02:44PM 9   question, unless he has a time frame. It would only be relevant

02:44PM 10  if the information was known to the investigation prior to.

02:44PM 11       THE COURT: Sustained. You'll have to reformulate your

02:44PM 12  question.

02:44PM 13  BY MR. BARTOLAI:

02:44PM 14  Q.   We see, when we look at Government's Exhibit 9, that there

02:44PM 15  was items ordered from Mr. Roggio from OML Global that included

02:44PM 16  a bolt gas ring and firing pin retainer; correct?

02:45PM 17  A.   Correct.

02:45PM 18  Q.   Nowhere in Government's Exhibit 5, the search warrant,

02:45PM 19  does it mention where these items were shipped, does it?

02:45PM 20  A.   Correct.

02:45PM 21  Q.   So, in fact, all we know is that they were ordered and no

02:45PM 22  one knows where they were shipped to; correct?

02:45PM 23  A.   Based on that document, correct.

02:45PM 24  Q.   And I think you point out that, at the time that he had

02:45PM 25  ordered them, he was in Iraq; is that it?

02:45PM 1  A.   Based on that document, correct.

02:45PM 2       MR. BARTOLAI: May I have a moment, Judge?

02:45PM 3       THE COURT: Yes.

02:48PM 4       MR. BARTOLAI: Judge, may I have a short recess?

02:48PM 5       THE COURT: How short?

02:48PM 6       MR. BARTOLAI: Five minutes, Judge?

02:48PM 7       THE COURT: Five minutes.

02:48PM 8       (At this time a brief recess was taken.)

02:54PM 9       THE COURT: Mr. Bartolai?

02:54PM 10      MR. BARTOLAI: Yes, Your Honor, thank you. I have nothing

02:54PM 11 further.

02:54PM 12      THE COURT: Redirect?

02:54PM 13      MR. HINKLEY: Just a few questions, Your Honor.

02:54PM 14                    REDIRECT EXAMINATION

02:54PM 15 BY MR. HINKLEY:

02:54PM 16 Q.   Mr. Burke, on cross examination, Mr. Bartolai asked what

02:54PM 17 the crimes were that were under investigation, and you

02:54PM 18 indicated that there were export violations, obviously, but you

02:55PM 19 also mentioned something called Defense Services. I wonder if

02:55PM 20 you could explain what you mean by that.

02:55PM 21 A.   Defense Services, if I want to go to a foreign country and

02:55PM 22 manufacture weapons, providing a service to a foreign

02:55PM 23 government, I have to obtain permission from the Department of

02:55PM 24 State, I have to be licensed, and I have to get approvals to

02:55PM 25 conduct those activities; be it, training personnel or

02:55PM 1 manufacturing, any service that could be construed as a defense

02:55PM 2 service, meaning, you know, military-type defense service, you

02:55PM 3 have to be appropriately licensed and have the permissions to

02:55PM 4 do so.

02:55PM 5 Q.   Was there a records check done to determine whether or not

02:55PM 6 Mr. Roggio had such licensure or permission to do that?

02:55PM 7 A.   Yes, I submitted license determinations and license

02:56PM 8 history requests to the Department of State, Defense Director

02:56PM 9 of Trade Controls that issues such licenses for Mr. Roggio,

02:56PM 10 aliases, dates of birth, all the identifiers that I have, and

02:56PM 11 we received -- no licenses were ever issued,

02:56PM 12 Q.   Was this all done prior to February 26 of 2017, the day

02:56PM 13 that the Defendant was traveling back to the United States?

02:56PM 14 A.   Yes.

02:56PM 15     MR. HINKLEY: No further questions, Your Honor.

02:56PM 16     THE COURT: Recross?

02:56PM 17                 RECROSS EXAMINATION

02:56PM 18 BY MR. BARTOLAI:

02:56PM 19 Q.   Now, you know that Mr. Roggio has a background in firearms

02:56PM 20 manufacturing?

02:56PM 21 A.   I know he has some type of background in firearms

02:56PM 22 manufacturing, yes.

02:56PM 23 Q.   You know that he had a tool shop or a manufacturing shop

02:57PM 24 in Fayetteville, North Carolina?

02:57PM 25 A.   Had, back in, I believe, 2009.

162

02:57PM 1   Q.   You know he had that, right?

02:57PM 2   A.   Yes.

02:57PM 3   Q.   And you know that he was also involved in another venture

02:57PM 4   that proposed -- that never launched, Rebel Arms, which was

02:57PM 5   also going to manufacture firearms.

02:57PM 6   A.   Yes, I'm familiar with that, as well.

02:57PM 7   Q.   As I said, it never launched; correct?

02:57PM 8   A.   Correct.

02:57PM 9        MR. BARTOLAI: Nothing further.

02:57PM 10       THE COURT: Thank you, Agent. You can step down.

02:57PM 11       MR. HINKLEY: We have no further witnesses, Your Honor.

02:57PM 12       THE COURT: Very well.

02:57PM 13       MR. BARTOLAI: Judge, if I understand right, there's two

02:57PM 14  witnesses that I subpoenaed that are present, Vetrano and Agent

02:57PM 15  Fenley Augustine, so we could call them, Judge. We will call

02:57PM 16  Mr. Augustine first.

02:58PM 17       THE COURT: Is he sitting outside?

02:58PM 18       MR. BARTOLAI: Yes.

02:58PM 19  F E N L E Y   A U G U S T I N E   IS CALLED, AND HAVING BEEN

02:58PM 20  DULY SWORN, TESTIFIED AS FOLLOWS:

02:59PM 21       THE CLERK: Please state and spell your name for the

02:59PM 22  record.

02:59PM 23       THE WITNESS: Felney Augustine F-E-L-N-E-Y,

02:59PM 24  A-U-G-U-S-T-I-N-E.

02:59PM 25       THE CLERK: Thank you. You may be seated.

163

DIRECT EXAMINATION

BY MR. BARTOLAI:

Q.    Good afternoon, Mr. Augustine.

A.    Good afternoon.

Q.    My name is Gino Bartolai, I represent Ross Roggio today.
I subpoenaed you, and I appreciate you showing up. Can you tell
us where you're employed?

A.    I'm employed at Customs and Border Protection over at
J.F.K. Airport.

Q.    How long have you been employed there?

A.    Since 2015.

Q.    When?

A.    2015.

Q.    2015?

A.    Yes, sir.

Q.    What's your primary function there?

A.    There are many functions that are primary. I assist with
passenger assistance, as far as checking documents, anything
like that, also, I can escort passengers over to the secondary
office, as well.

Q.    Okay. Were you working on February 26, 2017, if you
recall?

A.    Apparently, I was.

Q.    So your recollection of the specifics of some of these
events is questionable?

03:00PM 1   A.   As far as the procedure, I am familiar, yes.

03:00PM 2   Q.   You're familiar with that?

03:00PM 3   A.   Yes, sir.

03:00PM 4   Q.   When you look at the individual seated to my right, Mr.

03:00PM 5   Roggio --

03:00PM 6   A.   I don't know.

03:00PM 7   Q.   You have no idea; right?

03:00PM 8   A.   No.

03:00PM 9   Q.   Were you ever given a report to review, prior to your

03:00PM 10  testimony?

03:00PM 11  A.   A report? I have seen a Secondary Officer's Statement,

03:00PM 12  that's correct.

03:00PM 13  Q.   I'm sorry, what?

03:00PM 14  A.   I have seen a Secondary Officer's statement, yes.

03:01PM 15  Q.   You saw her report?

03:01PM 16  A.   As far as, pretty much what --

03:01PM 17  Q.   To review it?

03:01PM 18  A.   Yes, the background, as far as what happened that day and

03:01PM 19  why I'm here.

03:01PM 20  Q.   All right, after reviewing that report, can you say with

03:01PM 21  any certainty whether or not you were working that day?

03:01PM 22  A.   No, I can't.

03:01PM 23  Q.   You still can't?

03:01PM 24  A.   No.

03:01PM 25  Q.   Typically, you do primary inspections; is that right?

03:01PM 1   A.   Yes, sir.

03:01PM 2   Q.   That means that you would be the first person that a

03:01PM 3   traveler would meet when coming into the country?

03:01PM 4   A.   One of the first people, yes, sir.

03:01PM 5   Q.   And you don't recall, specifically, that day meeting Mr.

03:01PM 6   Roggio?

03:01PM 7   A.   No, sir, I don't.

03:01PM 8   Q.   If you were to refer an individual to secondary -- for

03:01PM 9   secondary inspection, what would be some of the reasons,

03:01PM 10  typically, that you would do so?

03:01PM 11  A.   It could be a number of reasons. It could range from,

03:01PM 12  there might be a similar name in the system, as far as you're

03:01PM 13  being referred so to be verified in the office, it could be

03:02PM 14  there is a system lookout, what that might be specific to, I am

03:02PM 15  not too sure, since the secondary officer would then go in

03:02PM 16  detail with the passenger.

03:02PM 17  Q.   Let's talk about that, because I know you don't recall,

03:02PM 18  specifically, what happened here, when you encountered Mr.

03:02PM 19  Roggio; correct?

03:02PM 20  A.   No.

03:02PM 21  Q.   But if there was a system alert -- how did you describe

03:02PM 22  it?

03:02PM 23  A.   The system alert?

03:02PM 24  Q.   Yes.

03:02PM 25  A.   So if I'm a primary officer, the system -- I would then

03:02PM 1    get a notification that this individual needs to go through

03:02PM 2    additional screening in the office.

03:02PM 3    Q.   All right, so that has nothing to do with you?

03:02PM 4    A.   No, it does not, no.

03:02PM 5    Q.   If you're there as a primary and you see someone, you have

03:02PM 6    an idea something might be wrong, you could refer them,

03:02PM 7    yourself, to secondary; right?

03:02PM 8    A.   I can also do that, yes.

03:02PM 9    Q.   And that's discretionary on your part; correct?

03:02PM 10   A.   It is, yes, sir.

03:02PM 11   Q.   Even if you thought this was -- there was no issues, with

03:02PM 12   respect to this person, regarding admissibility, etc., if that

03:02PM 13   alert is in the system, they're going to get sent to secondary?

03:03PM 14   A.   That is the procedure.

03:03PM 15   Q.   And that procedure is followed all the time?

03:03PM 16   A.   Yes.

03:03PM 17   Q.   Are they escorted from there to secondary?

03:03PM 18   A.   Yes, sir.

03:03PM 19   Q.   Do you recall -- have you ever -- do you know Agent

03:03PM 20   Morales who testified earlier?

03:03PM 21   A.   When I saw the face, I was familiar.

03:03PM 22        MR. BARTOLAI: That's all I have, Judge.

03:03PM 23        THE COURT: Any questions?

03:03PM 24        MR. HINKLEY: No, Your Honor. Thank you.

03:03PM 25        THE COURT: Thank you, Mr. Augustine. You can step down.

03:03PM 1   Thank you.

03:03PM 2        MR. HINKLEY: May he be dismissed, Your Honor?

03:03PM 3        THE COURT: Yes, he may.

03:03PM 4        MR. HINKLEY: Thank you, sir.

03:03PM 5        MR. BARTOLAI: So, now, we have Special Agent Douglas

03:03PM 6   Vetrano, he's an FBI agent.

03:03PM 7   D O U G L A S    V E T R A N O   IS CALLED, AND HAVING BEEN

03:03PM 8   DULY SWORN, TESTIFIED AS FOLLOWS:

03:05PM 9        THE CLERK: Please state and spell your name for the

03:05PM 10  record.

03:05PM 11       THE WITNESS: Douglas A. Vetrano, Douglas, one S, Anthony,

03:05PM 12  and Vetrano, V-E-T-R-A-N-O.

03:05PM 13       THE CLERK: Thank you. You may be seated.

03:05PM 14                    DIRECT EXAMINATION

03:05PM 15  BY MR. BARTOLAI:

03:05PM 16  Q.   Good afternoon, Agent.

03:05PM 17  A.   Good afternoon.

03:05PM 18  Q.   Gino Bartolai is my name, I'm an attorney for Mr. Roggio.

03:05PM 19  You were subpoenaed today, and thank you for coming.

03:05PM 20       I'm going to direct your attention to an incident that

03:05PM 21  occurred on February 26, 2017 at J.F.K. Airport involving a

03:05PM 22  secondary inspection. Do you recall any specific incident that

03:05PM 23  day?

03:05PM 24  A.   I do not recall a specific incident that day.

03:05PM 25  Q.   You know that you were subpoenaed, and have you had the

03:06PM 1    occasion to speak with anybody, perhaps, why you were

03:06PM 2    testifying today?

03:06PM 3    A.    Yes, I spoke with some people about why I was testifying,

03:06PM 4    and I read some material about the secondary inspection that

03:06PM 5    you are referring to.

03:06PM 6    Q.    All right, so you had, prior to testifying, you had a

03:06PM 7    chance to look at one of the Customs and Border Protection

03:06PM 8    reports, regarding the secondary inspection?

03:06PM 9    A.    Yes.

03:06PM 10   Q.    Did it refresh your recollection, in any way?

03:06PM 11   A.    Not really.

03:06PM 12   Q.    The man seated to my right, Ross Roggio, would you know

03:06PM 13   him? Does looking at him recall any of your memory regarding

03:06PM 14   that incident?

03:06PM 15   A.    No.

03:06PM 16   Q.    All right. From looking at that report, the reports that

03:06PM 17   you looked at earlier or prior, can you say, with certainty,

03:06PM 18   that -- or are you aware that you were working on February 26,

03:06PM 19   2017?

03:06PM 20   A.    Yes.

03:06PM 21   Q.    All right. When you work -- and you recall the

03:07PM 22   circumstance of you being present at this secondary inspection

03:07PM 23   on that date. Why, typically, are you there? What is that

03:07PM 24   about?

03:07PM 25   A.    So, typically, as a Special Agents assigned to the Joint

03:07PM  1  Terrorism Task Force of the FBI at the airport, we have what we

03:07PM  2  call a duty agent rotation, where we are on call for one week

03:07PM  3  at a time, and during that particular day, I was the duty

03:07PM  4  agent, and that's the only reason why I can think of why I was

03:07PM  5  there.

03:07PM  6  Q.   All right, so in other words, this was your week?

03:07PM  7  A.   Yes.

03:07PM  8  Q.   This was your week, and here you are, now, in Scranton,

03:07PM  9  Pennsylvania, with a subpoena. Is that right?

03:07PM  10 A.   Yes.

03:07PM  11 Q.   And you really have no recollection of what happened?

03:07PM  12 A.   No.

03:07PM  13 Q.   Would you have been in the room during this secondary

03:07PM  14 inspection interview?

03:07PM  15 A.   I might have.

03:08PM  16 Q.   Would you have been dressed in plain clothes, typically,

03:08PM  17 or?

03:08PM  18 A.   Typically, I'm dressed in plain clothes, yes.

03:08PM  19 Q.   Would you have a service weapon with you?

03:08PM  20 A.   Yes.

03:08PM  21 Q.   A pistol, perhaps?

03:08PM  22 A.   Yes.

03:08PM  23 Q.   Concealed, is that right?

03:08PM  24 A.   Yes.

03:08PM  25 Q.   It would be concealed. Do you know Homeland Security

170

03:08PM 1    Special Agent Mundy?

03:08PM 2    A.    Not personally.

03:08PM 3    Q.    I mean, do you recall ever meeting him before?

03:08PM 4    A.    No. Today, when I saw him, I do not recall meeting him

03:08PM 5    prior.

03:08PM 6    Q.    Do you recall ever speaking with any of these guys on the

03:08PM 7    Government's side, Special Agent Donnelly or Homeland Security

03:08PM 8    Investigator Burke?

03:08PM 9    A.    No.

03:08PM 10   Q.    You wouldn't be able to recollect any conversations you

03:08PM 11   had with them that day or previous to it; is that right?

03:08PM 12   A.    Correct.

03:08PM 13        MR. BARTOLAI: Thank you. I have no further questions.

03:08PM 14        MR. HINKLEY: No questions, Your Honor.

03:08PM 15        THE COURT: Thank you, Agent Vetrano. You can step down and

03:09PM 16   you're excused.

03:09PM 17        THE WITNESS: Thank you, Your Honor.

03:09PM 18        MR. BARTOLAI: May I have a moment, Judge?

03:09PM 19        THE COURT: Yes.

03:09PM 20        MR. BARTOLAI: That's all we have, Judge.

03:09PM 21        THE COURT: All right, let's talk about how we proceed from

03:09PM 22   here. Is it the parties' wishes, respectively, to submit

03:09PM 23   post-hearing briefs?

03:09PM 24        MR. BARTOLAI: If I may, Judge, yes, I think so. I would

03:09PM 25   like to, of course, get a copy of the transcript and submit

03:09PM 1   briefs post. I think it's also been raised once before, as the

03:09PM 2   Court knows, we had filed a Motion to Continue this matter

03:09PM 3   pending seeing what happens with respect to this Alasad

03:10PM 4   Petition for Writ of Certiori that's been filed. And I think

03:10PM 5   that that certainly is a consideration of ours, as well, so.

03:10PM 6   Having said that, I don't know what Mr. Hinkley's position is.

03:10PM 7       THE COURT: Mr. Hinkley, what's the Government's view as to

03:10PM 8   how to proceed?

03:10PM 9       MR. HINKLEY: I'm happy to file a post-hearing brief, if

03:10PM 10  the Court feels it's necessary. I don't know that it is. This

03:10PM 11  was briefed pretty thoroughly, and the evidence is fairly

03:10PM 12  narrow, but we are certainly happy to do that, if the

03:10PM 13  Court -- if it would aid the Court's decision.

03:10PM 14      In regards to Alasad, I'd like to think about that more,

03:10PM 15  but off the top of my head, it seems to me we should probably

03:10PM 16  learn whether the Supreme Court will take that decision up

03:11PM 17  fairly quickly, and if it does take it up, I think, I would

03:11PM 18  probably want to give some thought to whether or not, given the

03:11PM 19  facts and circumstances here, whether a decision would really

03:11PM 20  impact the Court . And I say that off the top of my head for a

03:11PM 21  couple reasons.

03:11PM 22      Alasad seems to comport or comply with the various Circuit

03:11PM 23  decisions, in regards to the level of suspicion needed to

03:11PM 24  search items, as it happened here. And here we had that, but we

03:11PM 25  have also got a search warrant, which would alleviate any -- at

03:11PM 1   least, in our view, and I understand the Defense may have a

03:11PM 2   different view of that -- would alleviate any decision that the

03:12PM 3   Supreme Court might make, because I think we have a belt and

03:12PM 4   suspenders-type of approach here, so I hate to see this case

03:12PM 5   further delayed for a reason, which, given the facts of this

03:12PM 6   case, probably, don't matter that much.

03:12PM 7        But I'm certainly happy to wait and see whether cert is

03:12PM 8   granted, and if it is, then, maybe, we can have a discussion at

03:12PM 9   that point whether it really is necessary to wait for the

03:12PM 10  Supreme Court to speak.

03:12PM 11       THE COURT: Well, apparently, from my hearing, there are

03:12PM 12  two approaches to this issue of whether the Supreme Court will

03:12PM 13  grant certiorari in Alasad.

03:12PM 14       One would be for the parties to obtain the transcript and

03:12PM 15  brief this issue after you receive the transcript. The other

03:13PM 16  would be wait to submit your briefs until after the Supreme

03:13PM 17  Court determines whether or not it's going to grant the writ.

03:13PM 18  Alasad certainly raises issues that are germane to our case,

03:13PM 19  but I would not say it's on all fours with what's before me,

03:13PM 20  but it may be useful. I guess it's a question of timing more

03:13PM 21  than anything else.

03:13PM 22       It seems to me that, under the case law that's come out of

03:13PM 23  the Third Circuit, although, its most recent case is a Federal

03:13PM 24  Appendix case of 2010, St. Vallier, but I'm fully aware of what

03:13PM 25  the Circuit has done here. I'm also aware of the Fourth and the

03:13PM 1    Seventh and the Ninth. I think the matter could be briefed

03:14PM 2    without waiting for the decision as to whether cert will be

03:14PM 3    granted, but if it is granted, I'd certainly give you an

03:14PM 4    opportunity, then, to decide whether we should wait further.

03:14PM 5        But either way, I'm willing to accommodate the parties

03:14PM 6    here. There's delay involved here, to the extent we want to

03:14PM 7    respect the fact that there's a pending Motion for Cert one way

03:14PM 8    or the other. So how would you like to proceed?

03:14PM 9        I think -- in fact, I'll submit to you that each of you

03:14PM 10   can certainly write your briefs without having to heavily rely

03:14PM 11   on Alasad.

03:14PM 12       MR. HINKLEY: I agree with that, I think we should go ahead

03:14PM 13   and brief this.

03:14PM 14       THE COURT: Okay. If it turns out that the Supreme Court

03:14PM 15   grants the Petition for Cert, then, we'll re-visit the issue.

03:15PM 16   I think that's the best way to do it.

03:15PM 17       So how much time -- these will not be simultaneous briefs.

03:15PM 18   So how are you going to handle this? In the past, at this

03:15PM 19   stage, I've had Defense counsel submit their brief and the

03:15PM 20   Government respond and vice versa. So have you discussed this,

03:15PM 21   at all, between yourselves?

03:15PM 22       MR. HINKLEY: No. Historically, when I've had cases like

03:15PM 23   this, the transcript is prepared, the Defense writes a brief,

03:15PM 24   and then the Government responds from that, and, usually, it's

03:15PM 25   a few weeks between each.

174

03:15PM 1      THE COURT: That's been my general experience, with a few

03:15PM 2 exceptions. Is that acceptable to you?

03:15PM 3      MR. BARTOLAI: I could get the transcript, Judge, and have

03:15PM 4 the briefs due within 30 days after receipt of the transcript.

03:15PM 5 I think that's a timetable.

03:15PM 6      THE COURT: If you think you need 30 days, I'm not going to

03:15PM 7 tell you no. And then you'll have -- if you want 30 after that,

03:15PM 8 you can.

03:16PM 9      MR. HINKLEY: How about if you give me that, but in all

03:16PM 10 likelihood, I won't take that long to get it done.

03:16PM 11      THE COURT: All right. So after the transcript is provided

03:16PM 12 to counsel, Mr. Bartolai will have 30 days after receipt to

03:16PM 13 file his brief. Upon receipt of Mr. Bartolai's brief, Mr.

03:16PM 14 Hinkley will have 30 days to submit his brief, on behalf of the

03:16PM 15 Government.

03:16PM 16      Should, in the meantime, the Supreme Court grant the writ

03:16PM 17 in Alasad, we will have a conference call and discuss the

03:16PM 18 issue.

03:16PM 19      MR. HINKLEY: Thank you, Your Honor.

03:16PM 20      THE COURT: All right. Well, thank you all very much for

03:16PM 21 your attention and your testimony. I appreciate the time

03:16PM 22 involved.

03:16PM 23      (At this time the proceedings were adjourned.)

24

25

175

1                    C E R T I F I C A T E

2

3        I, KRISTIN L. YEAGER, Official Court Reporter for the

4   United States District Court for the Middle District of

5   Pennsylvania, appointed pursuant to the provisions of

6   Title 28, United States Code, Section 753, do hereby certify

7   that the foregoing is a true and correct transcript of the

8   within-mentioned proceedings had in the above-mentioned and

9   numbered cause on the date or dates hereinbefore set forth; and

10  I do further certify that the foregoing transcript has

11  been prepared by me or under my supervision.

12

13                         S/Kristin L. Yeager
                           KRISTIN L. YEAGER, RMR,CRR
14                         Official Court Reporter

15

REPORTED BY:
16
        KRISTIN L. YEAGER, RMR,CRR
17      Official Court Reporter
        United States District Court
18      Middle District of Pennsylvania
        P.O. Box 5
19      Scranton, Pennsylvania  18501

20

21

22        (The foregoing certificate of this transcript
    does not apply to any reproduction of the same by any means
23  unless under the direct control and/or supervision of the
    certifying reporter.)

24

25

## $

**$800** [1] - 88:19

## '

**'16** [1] - 108:1
**'17** [1] - 92:22

## 0

**0160983** [1] - 85:6

## 1

**1** [25] - 2:10, 8:24, 9:7, 9:13, 9:22, 10:12, 10:16, 10:17, 10:21, 11:7, 22:21, 23:10, 24:5, 31:9, 32:6, 50:16, 90:14, 91:17, 110:8, 127:14, 127:16, 128:5, 128:14, 129:2, 147:17
**1/24/17** [1] - 108:13
**10** [13] - 2:10, 2:14, 9:2, 33:3, 60:16, 88:15, 95:12, 95:13, 97:12, 97:15, 97:16, 149:20, 150:5
**10,000** [1] - 5:24
**100** [4] - 10:10, 17:14, 28:6, 34:23
**101** [1] - 2:15
**102** [1] - 2:15
**102,157** [1] - 2:15
**10523** [1] - 93:4
**107** [2] - 2:4, 2:15
**11** [5] - 2:15, 101:19, 102:1, 102:3, 102:4
**116** [1] - 85:7
**12** [15] - 2:15, 9:3, 33:3, 102:11, 103:10, 103:13, 103:14, 103:17, 105:10, 106:25, 128:18, 128:19, 157:16, 157:19, 157:21
**12/3** [1] - 122:25
**12:43** [1] - 107:6
**13** [5] - 4:3, 4:12, 21:23, 66:25, 70:20
**14** [2] - 61:13, 73:17
**143** [1] - 88:18
**14th** [2] - 75:23, 91:16
**15** [13] - 19:13, 50:1, 73:16, 113:11, 116:10, 122:14,

122:17, 128:1, 128:4, 128:6, 128:11, 128:14, 129:3
**15,000** [1] - 93:6
**16** [1] - 136:6
**160** [1] - 2:4
**161** [1] - 2:4
**162** [1] - 2:6
**167** [1] - 2:6
**17** [6] - 81:18, 84:14, 84:22, 110:17, 111:12
**18** [4] - 86:3, 86:7, 87:20
**18-CR-97** [1] - 1:5
**18360** [1] - 85:8
**18501** [1] - 175:19
**18503** [2] - 1:16, 1:25
**18640** [1] - 1:19
**19** [8] - 86:3, 86:9, 90:15, 126:17, 127:13, 132:22, 134:21
**1928** [1] - 11:16
**1:15** [1] - 107:9
**1st** [1] - 155:4

## 2

**2** [11] - 2:11, 8:13, 25:14, 26:9, 66:2, 66:12, 66:14, 66:15, 67:14, 70:19, 127:8
**2/26/17** [1] - 26:11
**2/27/17** [1] - 23:22
**20** [4] - 19:13, 34:11, 50:1, 127:13
**2000** [1] - 67:20
**2003** [1] - 109:18
**2007** [2] - 4:6, 61:9
**2009** [2] - 52:20, 161:25
**2010** [1] - 172:24
**2015** [7] - 6:14, 91:16, 122:12, 123:9, 163:11, 163:13, 163:14
**2016** [28] - 82:1, 89:2, 90:8, 90:12, 90:14, 90:15, 91:3, 93:4, 108:16, 109:2, 110:19, 110:24, 111:22, 117:19, 117:21, 120:11, 125:7, 125:10, 125:21, 126:5, 126:11, 126:17, 127:1, 127:22, 132:22, 132:24,

133:14, 134:2
**2017** [33] - 6:3, 6:6, 7:8, 8:5, 10:9, 22:12, 24:2, 28:7, 35:3, 61:14, 61:23, 66:7, 71:20, 72:12, 89:1, 93:23, 95:14, 101:13, 101:22, 108:1, 108:2, 108:4, 108:5, 136:7, 136:11, 146:2, 150:7, 154:14, 158:1, 161:12, 163:21, 167:21, 168:19
**2018** [2] - 52:24, 142:8
**2021** [1] - 1:11
**21** [3] - 2:3, 101:22, 157:20
**223** [1] - 129:15
**235** [2] - 1:16, 1:24
**238** [1] - 1:18
**24** [3] - 71:25, 115:17, 116:2
**24-hour** [2] - 71:22, 71:25
**24th** [3] - 108:5, 110:11, 108:12
**25** [3] - 8:13, 52:19, 77:18
**26** [31] - 6:6, 7:8, 8:5, 10:9, 22:12, 24:2, 28:7, 35:3, 66:7, 71:20, 72:12, 88:25, 90:8, 92:22, 93:22, 95:14, 101:13, 101:15, 101:24, 104:11, 106:13, 131:10, 131:21, 132:9, 146:2, 154:14, 158:1, 161:12, 163:21, 167:21, 168:18
**26th** [2] - 61:23, 103:8
**27** [1] - 1:11
**28** [5] - 93:3, 149:21, 150:7, 155:1, 175:6
**29** [6] - 117:16, 132:22, 132:24, 133:14, 134:2, 134:24
**2B018.E** [1] - 90:17

## 3

**3** [8] - 2:3, 8:13, 83:19, 83:21, 83:22, 84:8, 84:10, 122:12
**3&4** [1] - 2:12
**3-5** [1] - 84:11

**30** [16] - 8:13, 34:11, 90:12, 101:17, 107:7, 110:24, 111:22, 117:19, 117:21, 126:19, 140:9, 174:4, 174:6, 174:7, 174:12, 174:14
**30th** [8] - 101:16, 108:16, 110:19, 120:11, 126:1, 126:5, 126:25, 127:21
**311** [1] - 1:15
**3200** [1] - 93:6
**3340-49A** [1] - 52:23
**36-inches** [2] - 132:13, 132:16
**3rd** [1] - 123:9

## 4

**4** [8] - 32:2, 52:24, 83:19, 84:1, 84:2, 84:8, 84:10, 127:20
**42** [1] - 88:15
**44** [3] - 127:5, 128:16, 128:19
**46** [1] - 3:8
**4th** [1] - 142:8

## 5

**5** [19] - 2:11, 80:12, 80:14, 80:15, 83:19, 84:8, 84:10, 84:15, 86:4, 102:8, 110:10, 110:11, 115:15, 131:10, 149:20, 150:6, 154:17, 159:18, 175:18
**5,000** [1] - 5:22
**5.56** [1] - 127:16
**528** [1] - 128:20
**53** [1] - 129:16
**54** [3] - 2:3, 154:18, 154:24
**556** [3] - 129:15, 129:23, 129:24
**56** [1] - 129:16
**5622077020** [1] - 115:22
**570-977-8102** [1] - 88:16
**58** [1] - 2:3

## 6

**6** [10] - 2:12, 85:2, 85:4, 85:5, 85:22,

85:24, 85:25, 89:2, 122:4, 149:20
**6051-D** [1] - 66:6
**61** [1] - 2:4
**64** [1] - 3:7
**66** [1] - 2:11
**66,67** [1] - 2:11
**67** [1] - 2:4

## 7

**7** [14] - 2:13, 88:9, 88:11, 89:4, 89:6, 89:7, 89:10, 123:16, 123:20, 124:6, 125:3, 125:20, 126:11, 127:21
**73,141** [1] - 2:17
**75** [1] - 2:4
**753** [1] - 175:6

## 8

**8** [12] - 2:13, 32:5, 67:22, 91:11, 91:24, 92:2, 92:3, 125:7, 125:10, 125:21, 126:11, 126:13
**80,84,102,110,116, 131,159** [1] - 2:11
**83** [1] - 2:12
**84** [2] - 2:11, 2:12
**85,122** [1] - 2:12
**86** [1] - 2:12
**88,123** [1] - 2:13
**89** [1] - 2:13

## 9

**9** [10] - 2:14, 16:8, 92:24, 93:2, 93:15, 93:17, 93:18, 158:14, 158:19, 159:14
**9,22** [1] - 2:10
**91** [1] - 2:13
**92** [1] - 2:13
**93** [2] - 2:14, 49:17
**93,158,159** [1] - 2:14
**95,149** [1] - 2:14
**97** [1] - 2:14
**9:30** [1] - 1:11
**9mm** [9] - 127:13, 128:5, 128:10, 129:11, 129:15, 129:17, 129:18, 129:23, 129:24

## A

**A-U-G-U-S-T-I-N-E** [1] - 162:24
**A.M** [1] - 1:11
**able** [15] - 30:8, 44:4, 47:22, 55:13, 56:1, 56:17, 72:25, 74:5, 87:7, 91:5, 95:24, 100:5, 117:3, 147:20, 170:10
**above-mentioned** [1] - 175:8
**absolutely** [8] - 79:21, 80:6, 120:8, 149:10, 152:6, 152:14, 154:7, 155:12
**Absolutely** [1] - 145:21
**academy** [3] - 74:13, 74:15, 74:16
**acceptable** [1] - 174:2
**accepted** [1] - 101:3
**access** [2] - 47:15, 147:24
**accommodate** [1] - 173:5
**accompanied** [2] - 118:21, 130:13
**accomplish** [1] - 98:9
**accordance** [1] - 64:16
**according** [4] - 11:10, 16:12, 131:21, 132:21
**account** [8] - 83:25, 84:4, 89:11, 91:21, 92:16, 92:19, 99:13
**accounted** [1] - 155:13
**accounts** [5] - 83:12, 91:2, 93:11, 158:18, 159:4
**accurate** [2] - 49:22, 56:22
**accurately** [1] - 10:8
**acquire** [1] - 94:22
**acting** [1] - 71:15
**action** [5] - 94:7, 138:21, 148:24, 152:24, 153:12
**activated** [2] - 139:20, 147:1
**active** [2] - 145:7, 152:5
**activities** [6] - 29:16, 97:3, 106:17, 138:8, 138:9, 160:25
**activity** [1] - 140:24
**actual** [7] - 15:8,

46:24, 56:21, 89:18, 111:9, 112:19, 124:8
**addendum** [1] - 150:16
**addition** [3] - 3:7, 83:18, 98:25
**additional** [8] - 5:15, 7:17, 26:6, 38:4, 81:5, 83:4, 103:25, 166:2
**address** [6] - 15:8, 15:9, 38:20, 86:18, 88:14, 89:17
**addressed** [2] - 60:2, 97:24
**addresses** [5] - 82:20, 90:23, 94:18, 109:8, 120:18
**adequately** [1] - 35:8
**adjourned** [1] - 174:23
**admissibility** [8] - 30:1, 31:1, 31:19, 43:13, 106:7, 106:18, 139:15, 166:12
**admissible** [7] - 30:5, 30:10, 30:12, 30:13, 31:17, 43:17, 106:4
**admission** [6] - 10:12, 66:11, 84:8, 89:3, 91:24, 93:15, 97:12, 102:1
**admit** [1] - 103:9
**admittance** [1] - 56:8
**admitted** [23] - 10:16, 10:17, 43:9, 56:18, 56:22, 66:14, 66:15, 84:10, 84:11, 85:22, 85:24, 85:25, 89:6, 89:7, 92:2, 92:3, 93:17, 93:18, 97:15, 97:16, 102:3, 102:4, 106:25
**Admitted** [1] - 2:9
**advance** [3] - 79:7, 100:4, 119:5
**advise** [2] - 78:11, 96:15
**advised** [2] - 62:15, 86:24
**Affiant** [2] - 80:19, 81:6
**affidavit** [10] - 80:15, 80:20, 80:25, 81:3, 81:8, 81:12, 81:19, 84:16, 133:21
**Affidavit** [4] - 81:4, 83:23, 84:2, 132:22
**affiliation** [1] - 29:16
**afternoon** [6] -

107:15, 107:16, 163:3, 163:4, 167:16, 167:17
**afterwards** [4] - 10:4, 50:3, 149:8, 149:12
**agencies** [5] - 76:7, 76:9, 76:15, 104:9, 136:7
**agency** [8] - 4:13, 4:23, 6:1, 53:13, 65:15, 72:8, 75:22, 107:17
**Agency** [1] - 22:15
**Agent** [93] - 19:24, 27:6, 27:21, 28:13, 29:6, 31:21, 39:23, 43:24, 44:3, 45:8, 46:13, 51:17, 61:6, 61:11, 61:12, 61:14, 62:14, 62:18, 63:1, 64:4, 64:15, 64:17, 65:5, 67:12, 68:8, 68:9, 68:14, 68:24, 69:1, 72:18, 72:22, 73:16, 74:24, 75:20, 75:22, 78:6, 81:2, 82:13, 83:8, 83:24, 84:3, 86:9, 88:2, 90:6, 98:5, 110:8, 112:10, 113:3, 114:5, 114:9, 116:22, 121:20, 123:12, 124:24, 125:12, 127:24, 130:13, 130:19, 130:25, 131:13, 131:22, 132:18, 133:2, 133:4, 133:21, 134:2, 134:8, 134:11, 134:25, 135:2, 135:25, 136:11, 136:15, 136:24, 137:3, 141:1, 144:14, 147:5, 148:17, 150:21, 154:20, 155:5, 155:10, 155:22, 162:10, 162:14, 166:19, 167:5, 167:16, 170:1, 170:7, 170:15
**agent** [39] - 12:22, 12:23, 34:3, 34:17, 34:21, 35:21, 36:9, 61:21, 62:1, 62:2, 62:6, 62:18, 63:4, 65:1, 65:4, 65:20, 68:22, 69:9, 72:8, 75:4, 76:14, 78:19,

80:22, 86:16, 86:20, 99:18, 99:21, 100:17, 108:21, 112:6, 136:21, 143:5, 149:1, 150:18, 150:21, 150:25, 167:6, 169:2, 169:4
**agent's** [1] - 103:25
**Agents** [1] - 168:25
**agents** [28] - 7:4, 19:20, 20:1, 20:5, 28:4, 28:24, 29:6, 45:8, 46:9, 46:14, 54:22, 55:3, 62:4, 64:14, 65:15, 76:15, 76:16, 78:7, 78:19, 78:23, 86:15, 86:24, 87:16, 98:19, 104:5, 109:22, 110:4, 146:4
**ago** [3] - 12:1, 63:8, 134:20
**agree** [12] - 106:22, 106:23, 111:5, 112:4, 123:10, 127:20, 133:20, 142:4, 143:5, 156:7, 156:20, 173:12
**agreeable** [1] - 75:3
**agreement** [1] - 75:3
**agriculture** [1] - 30:19
**ahead** [6] - 55:19, 78:15, 105:24, 153:7, 158:10, 173:12
**aid** [2] - 10:20, 171:13
**aided** [1] - 1:22
**airbill** [1] - 120:13
**airplane** [4] - 139:19, 146:15, 147:1, 147:2
**Airport** [10] - 6:7, 7:9, 26:12, 32:2, 61:18, 62:22, 78:14, 147:9, 163:9, 167:21
**airport** [8] - 6:9, 25:2, 48:23, 62:16, 64:2, 65:2, 152:14, 169:1
**airports** [1] - 143:4
**Airway** [1] - 115:22
**airway** [2] - 117:14, 120:13
**AI** [1] - 6:17
**alarm** [2] - 64:1, 64:3
**Alasad** [7] - 171:3, 171:14, 171:22, 172:13, 172:18, 173:11, 174:17
**alert** [5] - 120:9, 121:7, 165:21, 165:23, 166:13
**alerted** [2] - 79:18,

120:11
**alerting** [1] - 120:24
**aliases** [1] - 161:10
**alien** [1] - 38:14
**Alina** [1] - 91:15
**allegations** [2] - 79:23, 79:25
**alleged** [2] - 111:6, 129:12
**alleviate** [2] - 171:25, 172:2
**allow** [7] - 56:22, 100:9, 106:7, 106:11, 144:2, 144:7, 144:8
**allowed** [5] - 13:14, 30:19, 34:22, 55:13, 82:17
**allows** [4] - 77:12, 99:23, 99:24, 151:8
**almost** [3] - 34:9, 152:15, 153:21
**alone** [2] - 17:11, 39:20
**alterations** [1] - 139:23
**altering** [1] - 139:12
**alternatively** [1] - 54:2
**Amendment** [2] - 104:17, 138:23
**AMERICA** [1] - 1:3
**American** [2] - 31:1, 42:20
**Americans** [2] - 42:23, 42:25
**Ammunition** [2] - 91:17, 92:10
**amount** [2] - 99:1, 140:8
**analysis** [6] - 7:5, 92:12, 98:19, 99:7, 101:11, 104:21
**analyst** [1] - 140:7
**AND** [5] - 3:15, 60:20, 75:9, 162:19, 167:7
**annotation** [1] - 125:9
**annual** [1] - 142:1
**answer** [7] - 13:19, 57:20, 136:3, 139:8, 149:3, 149:14, 153:6
**answered** [3] - 42:10, 153:4, 153:6
**answering** [3] - 62:3, 72:4, 72:9
**answers** [3] - 7:7, 14:3, 15:1
**Anthony** [1] - 167:11
**anyway** [1] - 45:22
**apologize** [2] - 125:2, 137:10

**apparent** [1] - 151:17
**appear** [3] - 21:3, 82:11, 137:8
**appeared** [5] - 21:8, 95:3, 109:11, 120:22, 120:23
**Appendix** [1] - 172:24
**application** [6] - 80:15, 80:16, 111:2, 112:10, 114:17, 116:1
**Application** [5] - 83:23, 84:2, 110:9, 131:11, 134:22
**applied** [3] - 83:9, 84:3, 157:20
**applies** [1] - 142:16
**apply** [4] - 53:17, 158:7, 158:12, 175:22
**appointed** [1] - 175:5
**appreciate** [5] - 49:3, 73:15, 129:9, 163:6, 174:21
**approach** [2] - 52:7, 172:4
**approaches** [3] - 36:12, 36:19, 172:12
**appropriate** [2] - 141:6, 151:14
**appropriately** [1] - 161:3
**approvals** [3] - 82:14, 94:23, 160:24
**approximation** [2] - 8:12, 8:13
**apps** [1] - 100:2
**April** [5] - 132:22, 132:24, 133:14, 134:2, 134:24
**AR-15** [2] - 134:19, 135:7
**AR15** [1] - 94:4
**area** [25] - 7:4, 12:2, 32:14, 32:15, 33:13, 33:14, 33:17, 33:18, 33:25, 35:6, 35:23, 36:17, 36:20, 36:25, 37:2, 37:12, 37:18, 42:18, 55:11, 55:16, 95:7, 141:6, 141:23
**areas** [4] - 55:7, 56:13, 64:8, 96:16
**arguments** [1] - 106:9
**arm** [1] - 44:23
**armed** [4] - 44:16, 45:9, 45:10, 45:11
**Arms** [1] - 162:4
**arranged** [2] - 152:3, 152:25, 153:13

**arrangements** [2] - 78:20, 100:22
**arrival** [2] - 95:16, 96:17
**arrive** [1] - 22:8
**arrived** [2] - 6:18, 62:23
**arriving** [2] - 9:14, 62:16
**AS** [5] - 3:16, 60:21, 75:10, 162:20, 167:8
**assault** [2] - 94:4, 129:16
**assess** [1] - 5:21, 29:16
**assessing** [4] - 5:2, 5:15, 7:17
**Assessment** [3] - 52:17, 53:2, 142:17
**assessment** [1] - 38:4
**assigned** [7] - 8:6, 37:4, 59:22, 61:18, 61:21, 64:6, 168:25
**assignment** [1] - 80:6
**assignments** [1] - 4:17
**assigns** [1] - 151:6
**assist** [2] - 10:23, 163:17
**assistance** [2] - 62:5, 163:18
**Assistant** [1] - 1:14
**Associate** [1] - 4:7
**associated** [3] - 90:3, 90:23, 91:2
**associates** [1] - 16:14
**assume** [3] - 15:13, 62:2, 63:10
**assuming** [4] - 9:15, 18:4, 44:13, 129:2
**attached** [1] - 156:6
**attachment** [1] - 91:16
**attempt** [1] - 133:22
**attempting** [1] - 95:6
**attempts** [1] - 80:8
**attention** [5] - 88:17, 125:22, 131:10, 167:20, 174:21
**attorney** [6] - 21:1, 21:8, 67:13, 100:23, 101:14, 167:18
**Attorney** [1] - 1:14
**attorney's** [2] - 101:1, 101:3
**Attorney's** [2] - 107:25, 109:4
**audio** [2] - 51:1
**augmented** [1] - 38:22
**August** [3] - 52:19, 61:9, 73:17

**Augustine** [15] - 2:6, 11:9, 11:10, 24:7, 25:5, 25:24, 26:10, 31:22, 36:14, 36:21, 162:15, 162:16, 162:23, 163:3, 166:25
**AURELIA** [1] - 3:18
**Aurelia** [3] - 2:3, 3:14, 3:18
**Aurelia's** [1] - 151:5
**authenticate** [2] - 53:6, 53:24
**authored** [2] - 52:18, 53:17
**authorities** [5] - 78:6, 78:9, 104:16, 109:22, 109:23
**authority** [6] - 47:22, 78:8, 80:4, 137:20, 139:6, 146:3
**authorizations** [1] - 82:18
**automated** [2] - 77:4, 77:18
**automatic** [4] - 9:16, 26:3, 26:15, 26:20
**automatically** [3] - 9:21, 25:20, 35:20
**available** [4] - 10:21, 55:9, 88:24, 155:18
**Avenue** [1] - 1:16
**AVENUE** [1] - 1:24
**aware** [8] - 30:21, 97:7, 98:5, 98:10, 150:15, 168:18, 172:24, 172:25
**axe** [3] - 125:1, 127:5, 128:15
**axes** [1] - 128:19

## B

**B-U-R-K-E** [1] - 75:13
**Bachelor's** [1] - 4:8
**backed** [2] - 37:10, 140:10
**background** [6] - 4:4, 6:12, 21:22, 161:19, 161:21, 164:18
**backlogged** [1] - 98:12
**bad** [1] - 29:19
**bag** [2] - 69:15, 148:2
**Bag** [1] - 31:10
**bagged** [2] - 139:20, 150:10
**bags** [6] - 31:3, 31:15, 43:13, 44:11, 44:13, 143:15

**Bahamas** [1] - 59:15
**Baharan** [1] - 88:14
**barrel** [5] - 87:11, 87:12, 111:15, 124:16, 129:24
**barrels** [1] - 111:11
**Bartolai** [15] - 21:20, 54:13, 55:8, 56:6, 58:2, 96:4, 103:11, 107:4, 107:11, 144:3, 160:9, 160:16, 163:5, 167:18, 174:12
**BARTOLAI** [84] - 1:18, 3:3, 10:13, 12:14, 12:19, 12:25, 21:6, 21:11, 21:14, 21:17, 51:14, 51:16, 52:5, 52:9, 52:15, 53:16, 54:4, 54:7, 57:10, 57:19, 58:3, 58:5, 60:3, 60:10, 65:9, 66:13, 67:9, 67:11, 73:23, 74:2, 74:19, 74:21, 75:2, 84:9, 85:23, 89:5, 92:1, 93:16, 95:23, 96:5, 97:14, 102:2, 103:12, 105:7, 105:15, 106:23, 107:5, 107:8, 107:12, 107:14, 121:12, 121:16, 121:17, 124:17, 124:19, 129:5, 129:7, 140:18, 140:25, 144:12, 144:13, 153:5, 154:2, 157:12, 157:13, 158:13, 159:13, 160:2, 160:4, 160:6, 160:10, 161:18, 162:9, 162:13, 162:18, 163:2, 166:22, 167:5, 167:15, 170:13, 170:18, 170:20, 170:24, 174:3
**Bartolai's** [1] - 174:13
**base** [1] - 128:7
**based** [35] - 13:9, 13:17, 19:24, 25:21, 26:4, 26:17, 38:16, 39:19, 43:7, 57:5, 57:8, 57:17, 83:13, 92:13, 98:7, 103:4, 103:5, 113:19, 128:6, 128:8, 128:12, 129:14,

**129:21, 130:11, 131:17, 136:3, 138:5, 140:21, 143:20, 146:5, 151:5, 151:24, 152:1, 159:23, 160:1
**basic** [2] - 14:6, 106:5
**basics** [2] - 40:7, 97:10
**basis** [7] - 28:4, 32:8, 51:18, 96:7, 103:19, 141:25, 142:1
**bathroom** [10] - 33:19, 34:24, 34:25, 35:2, 35:16, 35:22, 35:24, 36:8, 36:9, 55:9
**batteries** [1] - 70:13
**battery** [1] - 144:18
**battle** [1] - 6:22
**bearing** [2] - 105:16, 105:17
**became** [1] - 77:25
**become** [4] - 42:21, 97:7, 107:23, 109:4
**becomes** [1] - 151:17
**BEEN** [5] - 3:15, 60:20, 75:9, 162:19, 167:7
**BEFORE** [1] - 1:10
**began** [2] - 110:16, 155:7
**beginning** [6] - 16:6, 17:7, 67:24, 76:19, 104:19, 112:3
**begun** [1] - 76:21
**behalf** [1] - 174:14
**behind** [3] - 32:11, 35:19, 35:25
**belief** [1] - 103:25
**bell** [1] - 73:5
**belongings** [2] - 143:6, 143:13
**belt** [1] - 172:3
**benefit** [1] - 48:23
**best** [4] - 53:24, 138:21, 148:24, 173:16
**better** [2] - 41:13, 49:22
**between** [10] - 29:5, 37:23, 62:17, 64:4, 111:17, 155:9, 155:23, 156:4, 173:21, 173:25
**beverages** [1] - 45:19
**Biam** [1] - 91:19
**big** [4] - 17:22, 34:8, 34:9, 35:23
**Bill** [1] - 115:22
**bill** [3] - 117:14,

120:13, 148:6
**birth** [2] - 90:22, 161:10
**BIS** [1] - 90:8
**bit** [19] - 4:18, 4:19, 6:12, 17:4, 27:19, 37:22, 41:2, 44:15, 50:16, 50:17, 55:8, 76:7, 81:21, 98:11, 110:3, 114:4, 129:17, 129:18, 151:2
**bits** [15] - 82:4, 87:9, 115:23, 116:3, 118:23, 127:13, 127:14, 127:16, 128:5, 128:11, 129:1, 129:11, 129:23, 130:6
**black** [1] - 7:3
**block** [4] - 23:1, 24:6, 70:20, 71:24
**Block** [1] - 67:20
**blocks** [1] - 124:15
**board** [1] - 124:21
**boarded** [1] - 79:5
**boards** [1] - 124:21
**bolt** [5] - 93:8, 94:6, 124:20, 158:24, 159:16
**booth** [2] - 24:23, 37:2
**booths** [1] - 24:20
**Border** [37] - 3:25, 4:1, 4:12, 4:16, 4:21, 4:25, 6:4, 6:15, 21:23, 22:15, 27:2, 29:21, 43:19, 44:3, 46:14, 51:3, 51:17, 52:18, 52:21, 52:23, 53:2, 53:19, 53:20, 55:22, 58:6, 62:17, 71:5, 72:18, 79:8, 79:9, 80:4, 95:15, 107:20, 119:25, 163:8, 168:7
**border** [54] - 29:22, 53:8, 64:16, 74:9, 74:10, 77:15, 78:5, 78:8, 78:9, 78:12, 78:13, 84:19, 98:10, 103:19, 104:12, 104:13, 104:16, 104:24, 105:8, 105:18, 108:6, 109:22, 109:23, 118:18, 136:8, 137:17, 137:20, 138:12, 138:22, 139:5, 141:4, 141:5, 141:9, 141:10,

141:20, 142:5, 142:9, 142:24, 142:25, 143:4, 143:6, 143:19, 143:23, 144:15, 145:23, 146:3, 146:11, 146:20, 147:16, 148:19, 158:4, 158:10, 158:21
**bordering** [1] - 144:4
**borders** [2] - 5:6, 5:10
**bore** [1] - 122:14
**bottom** [4] - 22:24, 26:9, 27:18, 124:1
**bought** [1] - 134:11
**box** [6] - 66:25, 89:12, 125:5, 135:18, 139:21, 155:13
**Box** [1] - 175:18
**brackets** [1] - 124:21
**branch** [1] - 27:1
**braze** [1] - 123:7
**break** [2] - 60:16, 107:5
**breaks** [1] - 88:19
**brief** [6] - 60:17, 160:8, 171:9, 172:15, 173:13, 173:19, 173:23, 174:13, 174:14
**briefed** [2] - 171:11, 173:1
**briefs** [6] - 170:23, 171:1, 172:16, 173:10, 173:17, 174:4
**bring** [2] - 26:8, 91:8
**bringing** [2] - 7:20, 30:7
**broad** [1] - 110:22
**broken** [1] - 128:8
**brokerage** [1] - 138:8
**brought** [8] - 19:10, 64:12, 82:7, 88:6, 117:7, 123:22, 136:9, 136:10
**brushes** [1] - 127:18
**buff** [1] - 127:17
**building** [1] - 15:5
**Building** [2] - 1:15, 88:15
**buildings** [3] - 8:14, 15:6, 15:23
**bulk** [2] - 27:2
**bump** [1] - 50:18
**Bureau** [6] - 64:14, 76:10, 76:11, 90:8, 90:13, 137:4
**Burke** [26] - 2:4,

23:11, 23:22, 27:6, 39:24, 62:14, 62:18, 63:1, 64:4, 64:15, 64:17, 65:5, 68:9, 68:15, 68:24, 69:1, 75:8, 75:13, 75:19, 104:8, 147:20, 149:21, 150:7, 160:16, 170:8
**business** [18] - 14:19, 14:22, 15:6, 15:9, 15:13, 16:1, 16:4, 16:14, 17:3, 41:9, 57:7, 57:8, 72:6, 79:7, 80:22, 88:22, 106:16, 150:16
**businesses** [1] - 90:3
**busy** [5] - 7:22, 8:25, 32:25, 35:15, 65:2
**butchering** [1] - 91:18
**button** [5] - 63:5, 123:5, 123:6, 123:7, 129:23
**buttons** [29] - 87:10, 89:22, 89:23, 90:10, 90:16, 111:8, 113:11, 113:20, 116:11, 116:14, 116:17, 118:3, 122:17, 123:10, 126:8, 126:12, 126:23, 127:22, 128:1, 129:24, 130:4, 130:6, 130:16, 131:18, 131:25, 132:4, 134:12, 135:18, 135:21
**BY** [38] - 3:23, 10:19, 13:2, 21:17, 51:16, 52:9, 54:12, 57:15, 58:5, 61:4, 65:13, 66:17, 67:11, 74:2, 75:18, 84:13, 86:2, 89:9, 92:5, 93:20, 96:11, 97:18, 102:6, 107:14, 121:17, 124:19, 129:7, 140:25, 144:13, 154:2, 157:13, 158:13, 159:13, 160:15, 161:18, 163:2, 167:15, 175:15

### C

**Caddagia** [2] - 91:15, 91:18
**calculator** [1] - 128:22

**caliber** [1] - 129:16
**calibers** [1] - 87:12
**CALLED** [3] - 3:15, 60:20, 75:9, 162:19, 167:7
**Canada** [1] - 60:8
**cannot** [1] - 139:19
**capabilities** [1] - 137:20
**capacity** [2] - 6:8, 71:4
**cards** [1] - 101:10
**career** [3] - 5:20, 5:24, 63:10
**Carolina** [3] - 93:5, 95:4, 161:24
**carriers** [1] - 79:6
**carrying** [6] - 44:18, 63:16, 63:19, 152:11, 152:12
**case** [67] - 8:24, 12:22, 12:23, 21:21, 26:24, 30:23, 36:14, 36:21, 37:9, 37:24, 38:12, 38:21, 42:4, 42:5, 42:17, 47:4, 48:15, 51:3, 53:13, 53:22, 54:5, 65:5, 70:12, 76:14, 77:4, 77:5, 77:14, 77:17, 77:25, 78:1, 78:18, 78:19, 94:16, 96:19, 99:10, 100:4, 108:2, 108:4, 108:15, 108:22, 119:9, 120:2, 120:16, 121:5, 121:9, 129:22, 130:11, 136:5, 136:6, 136:21, 138:5, 139:17, 140:1, 140:22, 144:6, 145:25, 148:21, 150:25, 151:7, 151:23, 152:18, 172:4, 172:6, 172:18, 172:22, 172:23, 172:24
**cases** [4] - 7:23, 140:2, 152:16, 173:22
**castle** [1] - 124:16
**casual** [1] - 156:4
**catch** [1] - 124:20
**caused** [1] - 39:20
**caution** [1] - 158:7
**CBP** [33] - 4:25, 19:25, 21:23, 22:15, 34:17, 62:17, 62:18, 62:23, 64:5, 64:14, 73:11, 78:7, 78:20, 78:24,

96:25, 109:17, 109:22, 119:4, 119:21, 142:14, 142:15, 143:16, 146:5, 146:6, 147:4, 150:18, 151:4, 151:6, 151:8, 151:21, 151:22, 151:24, 153:22
**CBP's** [1] - 147:24
**cell** [10] - 33:21, 34:25, 35:4, 35:16, 35:24, 47:12, 101:6, 144:21, 145:7, 145:13
**cell-type** [1] - 33:21
**Center** [1] - 26:25
**Cert** [2] - 173:7, 173:15
**cert** [2] - 172:7, 173:2
**certain** [6] - 30:15, 48:2, 48:7, 54:3, 82:10, 114:23
**certainly** [11] - 47:4, 65:12, 120:13, 145:19, 146:2, 171:5, 171:12, 172:7, 172:18, 173:3, 173:10
**certainty** [2] - 164:21, 168:17
**certificate** [1] - 175:22
**CERTIFIED** [1] - 1:24
**certify** [2] - 175:6, 175:10
**certifying** [1] - 175:23
**certiorari** [1] - 172:13
**Certiori** [1] - 171:4
**CFA** [1] - 155:21
**chain** [1] - 66:5
**chair** [3] - 9:3, 33:5, 33:10
**chairs** [2] - 33:7, 33:25
**chance** [8] - 18:4, 119:8, 120:6, 138:4, 139:10, 142:13, 156:20, 168:7
**change** [5] - 98:23, 139:14, 139:15, 153:18, 158:10
**changed** [1] - 142:6
**changes** [1] - 142:3
**changing** [2] - 140:14, 151:19
**check** [4] - 46:22, 79:10, 90:21, 161:5
**checked** [1] - 41:22
**checking** [2] - 34:21, 163:18

**checks** [1] - 82:13
**choice** [1] - 137:16
**Christina** [1] - 95:16
**Christine** [1] - 101:23
**Circuit** [3] - 171:22, 172:23, 172:25
**circumstance** [1] - 168:22
**circumstances** [9] - 32:1, 32:23, 42:3, 48:3, 48:7, 69:6, 71:4, 103:16, 171:19
**citizen** [2] - 30:12, 30:13
**citizenship** [2] - 30:24, 38:14
**City** [1] - 6:7
**claim** [1] - 130:7
**claiming** [1] - 41:15
**clarification** [1] - 125:16
**clarify** [1] - 96:9
**clarity** [1] - 126:22
**classic** [1] - 106:15
**cleaning** [2] - 134:19, 135:6
**clear** [6] - 54:15, 56:11, 69:1, 102:16, 105:4, 149:6
**cleared** [4] - 34:23, 37:8, 37:14, 96:8
**CLERK** [10] - 3:17, 3:19, 60:22, 60:25, 75:11, 75:14, 162:21, 162:25, 167:9, 167:13
**clerk** [1] - 52:7
**Clerk** [1] - 141:12
**client** [1] - 148:6
**clock** [1] - 140:7
**close** [3] - 10:1, 10:2, 37:1
**close-out** [1] - 10:1
**closed** [2] - 23:4, 99:23
**closely** [1] - 99:18
**closer** [1] - 4:18
**closing** [1] - 23:8
**cloth** [1] - 127:17
**clothes** [4] - 44:22, 64:2, 169:16, 169:18
**coach** [1] - 20:1
**coat** [1] - 63:5
**Code** [1] - 175:6
**code** [5] - 22:25, 85:8, 97:22, 146:14, 148:6
**codes** [1] - 147:1
**colleagues** [1] - 8:18
**College** [1] - 4:6
**combo** [23] - 89:22,

89:23, 90:10, 90:16, 113:11, 113:20, 116:11, 116:13, 116:17, 122:17, 123:9, 126:8, 126:12, 126:23, 127:22, 128:1, 129:24, 130:4, 130:6, 130:16, 131:18, 132:4, 134:12
**coming** [30] - 6:25, 7:6, 7:11, 13:16, 24:12, 24:22, 26:4, 26:22, 26:25, 30:15, 40:9, 42:6, 42:19, 49:13, 58:19, 59:15, 61:13, 77:7, 77:14, 79:19, 97:3, 114:18, 119:4, 152:19, 152:25, 153:13, 154:4, 165:3, 167:19
**comment** [1] - 129:19
**comments** [2] - 26:17, 151:5
**commerce** [2] - 79:22, 137:8
**Commerce** [17] - 76:11, 78:19, 80:9, 81:4, 82:8, 82:13, 82:15, 83:8, 83:24, 84:4, 86:8, 90:17, 94:15, 107:21, 109:9, 137:4, 158:22
**Commercial** [1] - 125:21
**commercial** [2] - 126:4, 129:8
**commit** [1] - 29:19
**committed** [1] - 29:20
**committing** [1] - 158:6
**common** [6] - 63:12, 64:23, 65:17, 69:7, 69:8, 69:9
**commonly** [2] - 5:9, 66:5
**communication** [1] - 68:22
**companies** [1] - 94:18
**companion** [1] - 80:18
**company** [5] - 15:4, 77:6, 82:11, 87:22, 95:5
**Company** [7] - 15:20, 82:2, 82:10, 82:23, 83:16, 86:17, 92:11
**compartment** [3] - 70:1, 70:3, 144:20
**compartments** [2] - 47:2, 144:21

**complain** [3] - 13:20, 13:21, 13:24
**complaining** [1] - 49:9
**complains** [1] - 13:23
**complete** [3] - 99:7, 99:20, 114:23
**completed** [6] - 19:11, 68:6, 70:24, 104:2, 115:6, 123:21
**completely** [1] - 34:23
**Complex** [1] - 88:14
**complicit** [1] - 130:8
**comply** [1] - 171:22
**component** [1] - 109:19
**comport** [1] - 171:22
**composite** [1] - 129:22
**computer** [14] - 1:22, 26:3, 26:6, 26:21, 39:16, 52:11, 58:21, 98:7, 98:18, 99:18, 100:17, 101:9, 139:24, 140:6
**computer-aided** [1] - 1:22
**computer-generated** [1] - 39:16
**concealed** [3] - 64:3, 169:23, 169:25
**concern** [8] - 39:1, 43:8, 48:8, 48:9, 49:6, 49:8, 53:16, 96:16
**concerns** [2] - 49:5, 90:20
**conclusion** [3] - 19:5, 20:4, 128:7
**conclusions** [2] - 144:5
**concurrence** [1] - 104:16
**conduct** [9] - 9:1, 28:7, 31:7, 77:15, 78:8, 98:19, 139:7, 140:15, 160:25
**conducted** [19] - 5:22, 9:25, 12:3, 24:2, 42:24, 59:16, 79:16, 82:6, 86:10, 90:7, 104:13, 105:11, 123:12, 125:15, 140:4, 140:20, 142:24, 154:1, 158:21
**conducting** [4] - 44:14, 78:18, 142:5, 148:3
**conference** [1] - 174:17

**configuration** [1] - 8:25
**confirm** [2] - 82:6, 87:8
**confirmation** [1] - 153:17
**confirmed** [10] - 79:4, 82:10, 83:3, 87:8, 87:12, 88:3, 100:17, 149:22, 150:8, 151:18
**confiscated** [1] - 43:16
**conflict** [8] - 6:19, 6:23, 6:25, 26:5, 26:22, 42:24, 59:8, 59:23
**confronted** [2] - 135:24, 135:25
**conjunction** [1] - 83:14
**Connecticut** [1] - 112:22
**consideration** [1] - 171:5
**considerations** [1] - 144:9
**considered** [2] - 130:11, 137:18
**Constitution** [1] - 3:9
**construction** [2] - 15:4, 15:22
**construed** [1] - 161:1
**consulted** [3] - 78:11, 78:16, 154:5
**Consulting** [2] - 15:20, 92:11
**consulting** [2] - 153:23, 154:12
**contact** [4] - 24:7, 64:25, 100:1, 149:1
**contacted** [6] - 62:14, 82:2, 114:22, 115:8, 116:6, 125:25
**contain** [4] - 25:4, 119:12, 119:14, 119:19
**contained** [2] - 103:17, 114:16
**contains** [4] - 23:1, 81:5, 103:14, 129:2
**contents** [5] - 23:14, 48:9, 71:14, 149:22, 150:8
**context** [1] - 149:24
**continuation** [1] - 122:21
**Continue** [1] - 171:2
**continue** [2] - 132:9, 144:8

**continued** [1] - 132:10
**continuing** [6] - 73:20, 74:17, 125:1, 141:25, 142:1, 156:14
**contraband** [5] - 30:16, 55:13, 70:7, 100:10, 152:11
**Control** [3] - 80:9, 90:17
**control** [2] - 137:8, 175:23
**controlled** [19] - 55:11, 80:8, 82:3, 82:16, 83:1, 83:12, 85:19, 87:13, 89:23, 89:25, 90:17, 94:12, 94:21, 109:9, 109:10, 109:12, 116:19, 137:8
**Controls** [2] - 94:19, 161:9
**controls** [1] - 94:20
**conversation** [12] - 18:20, 19:6, 27:12, 64:19, 64:20, 64:22, 68:14, 68:18, 68:23, 86:22, 115:13, 132:19
**conversations** [2] - 87:3, 170:10
**cooperative** [4] - 13:12, 13:21, 14:2, 130:12
**coordinated** [2] - 78:18, 101:1
**coordinating** [2] - 99:17, 150:19
**coordination** [2] - 78:1, 108:4
**copies** [1] - 125:17
**copy** [16] - 10:15, 17:8, 48:3, 48:11, 48:16, 48:18, 66:23, 98:4, 130:25, 131:3, 155:14, 156:14, 157:3, 157:5, 170:25
**Cornwall** [4] - 113:8, 115:14, 116:6, 116:9
**correct** [224] - 6:1, 6:10, 10:4, 11:11, 14:14, 14:16, 15:11, 15:17, 16:21, 17:20, 20:23, 20:24, 21:25, 22:11, 22:16, 22:22, 23:24, 24:4, 24:9, 24:14, 24:24, 25:25, 26:1, 27:14, 29:22, 29:23, 30:2, 30:6, 30:11, 30:17, 32:19,

35:4, 35:5, 38:9, 39:12, 40:11, 43:14, 43:15, 43:18, 43:20, 43:21, 44:4, 44:9, 46:25, 47:18, 48:16, 51:4, 51:5, 54:19, 54:20, 55:1, 55:2, 55:5, 55:12, 56:15, 58:16, 63:8, 65:21, 65:23, 65:24, 67:15, 67:19, 67:25, 69:2, 70:1, 72:2, 79:20, 80:5, 81:1, 81:10, 81:11, 84:20, 84:21, 86:17, 89:15, 89:16, 92:7, 92:16, 92:17, 92:20, 92:23, 101:8, 101:9, 102:21, 107:19, 107:22, 108:14, 108:16, 108:17, 108:20, 109:3, 110:5, 110:17, 110:18, 110:24, 111:3, 111:4, 111:23, 112:5, 112:12, 112:17, 112:18, 112:21, 112:23, 113:2, 113:9, 113:11, 113:13, 113:14, 113:15, 113:18, 113:21, 113:22, 114:1, 114:2, 114:15, 115:9, 115:10, 115:19, 116:3, 116:4, 116:7, 116:8, 116:11, 116:12, 116:14, 116:17, 116:18, 116:20, 116:24, 117:9, 117:10, 117:11, 117:12, 118:1, 118:20, 119:2, 119:15, 119:16, 119:17, 119:18, 120:3, 120:4, 120:14, 121:6, 122:13, 123:1, 123:3, 125:22, 126:1, 126:8, 126:12, 126:17, 126:18, 126:23, 127:18, 127:22, 128:2, 128:4, 130:10, 131:7, 131:14, 131:19, 132:2, 132:5, 132:13, 132:14, 132:20, 133:5, 133:7, 133:10,

133:16, 134:10, 135:5, 136:16, 136:18, 136:23, 137:14, 138:17, 141:4, 143:9, 143:12, 144:15, 144:20, 144:25, 145:13, 146:4, 146:21, 146:22, 146:24, 147:22, 150:11, 150:22, 152:4, 152:20, 152:21, 152:22, 152:23, 153:2, 153:15, 153:16, 154:16, 154:23, 155:6, 156:11, 157:2, 157:16, 157:23, 158:3, 158:15, 158:24, 159:16, 159:17, 159:20, 159:22, 159:23, 160:1, 162:7, 162:8, 164:12, 165:19, 166:9, 170:12, 175:7
**Correct** [1] - 159:5
**correctly** [6] - 13:19, 54:21, 82:21, 130:18, 130:19, 158:9
**corrupted** [1] - 100:20
**costs** [1] - 92:12
**cotter** [1] - 93:6
**counsel** [2] - 173:19, 174:12
**Counter** [10] - 25:16, 25:21, 38:22, 39:14, 80:7, 80:22, 94:13, 143:2, 148:21, 148:23
**counter** [1] - 25:17
**counterparts** [1] - 16:9
**counterterrorism** [1] - 5:2
**countless** [1] - 128:9
**countries** [2] - 6:20, 79:14
**country** [18] - 29:15, 30:3, 30:8, 30:15, 41:10, 43:17, 49:13, 62:4, 83:17, 97:3, 121:1, 137:22, 152:19, 152:25, 153:13, 154:4, 160:21, 165:3
**couple** [6] - 20:16, 56:6, 99:19, 100:14, 171:21

**course** [11] - 10:15, 12:22, 63:10, 72:6, 79:7, 106:16, 120:16, 147:25, 148:24, 150:16, 170:25
**courses** [1] - 138:21
**COURT** [95] - 1:1, 3:1, 3:4, 3:13, 3:20, 10:16, 13:1, 21:13, 21:15, 51:15, 52:8, 52:12, 53:10, 53:15, 53:25, 54:5, 54:8, 57:11, 57:13, 57:23, 58:2, 60:4, 60:6, 60:9, 60:13, 60:16, 60:18, 61:2, 65:10, 66:14, 67:8, 74:1, 74:20, 74:22, 74:24, 75:4, 75:6, 75:16, 84:10, 85:24, 89:6, 91:25, 92:2, 93:17, 96:3, 96:9, 97:13, 97:15, 102:3, 103:11, 103:20, 104:8, 104:18, 105:1, 105:4, 105:13, 105:24, 106:3, 106:5, 106:24, 107:4, 107:6, 107:9, 107:11, 121:14, 124:18, 129:6, 140:19, 144:2, 153:7, 153:9, 157:10, 159:11, 160:3, 160:5, 160:7, 160:9, 160:12, 161:16, 162:10, 162:12, 162:17, 166:23, 166:25, 167:3, 170:15, 170:19, 170:21, 171:7, 172:11, 173:14, 174:1, 174:6, 174:11, 174:20
**Court** [31] - 4:4, 5:18, 7:13, 9:13, 13:3, 15:3, 53:23, 62:21, 64:10, 73:24, 77:1, 81:22, 84:7, 99:14, 106:22, 171:2, 171:10, 171:13, 171:16, 171:20, 172:3, 172:10, 172:12, 172:17, 173:14, 174:16, 175:3, 175:4, 175:14, 175:17, 175:17

**court** [1] - 139:15
**Court's** [1] - 171:13
**courtesy** [2] - 148:3, 148:10
**courtroom** [2] - 12:21, 52:8
**Courtroom** [1] - 141:12
**cover** [1] - 35:13
**covered** [2] - 45:1, 45:2
**craft** [1] - 149:3
**crafting** [1] - 149:14
**created** [4] - 7:6, 92:11, 99:6, 109:18
**crime** [4] - 29:19, 29:20, 100:11, 158:5
**crimes** [2] - 55:21, 160:17
**criminal** [1] - 79:12
**Criminal** [3] - 4:6, 4:7, 4:8
**criminality** [3] - 5:3, 5:17, 6:21
**criminals** [1] - 37:20
**Cross** [1] - 2:2
**cross** [5] - 21:13, 54:13, 67:8, 139:5, 160:16
**CROSS** [3] - 21:16, 67:10, 107:13
**cross-examine** [2] - 21:13, 67:8
**crossed** [1] - 78:13
**crossing** [1] - 146:20
**crowd** [1] - 37:7
**CRR** [1] - 1:23
**CTR** [17] - 25:15, 25:16, 25:19, 26:12, 39:5, 39:14, 39:19, 42:13, 42:15, 42:17, 58:15, 59:2, 73:3, 76:23, 151:3, 151:4, 151:21
**current** [1] - 86:18
**cursory** [15] - 99:25, 100:12, 103:3, 104:14, 104:19, 105:21, 138:24, 139:9, 140:4, 140:16, 140:20, 141:1, 155:11, 155:23, 157:17
**custody** [9] - 62:25, 66:5, 97:25, 98:1, 98:3, 98:4, 155:13, 155:18, 155:20
**Custody** [3] - 66:8, 67:17, 70:20
**customary** [2] - 148:5,

148:8
**customer** [2] - 85:7, 93:5
**customs** [4] - 58:6, 78:6, 78:7, 109:15
**Customs** [47] - 3:25, 4:1, 4:11, 4:16, 4:20, 4:25, 5:1, 5:16, 6:3, 6:15, 21:23, 22:15, 24:13, 27:1, 27:3, 29:21, 29:25, 43:19, 44:3, 46:14, 46:18, 51:3, 51:17, 51:24, 52:21, 52:23, 53:2, 53:18, 53:20, 55:22, 62:17, 71:5, 72:18, 77:10, 79:8, 79:9, 80:4, 107:20, 109:16, 109:19, 109:20, 109:24, 118:16, 119:25, 147:16, 163:8, 168:7
**cut** [1] - 123:6
**Cy** [1] - 19:25
**cylindrical** [2] - 131:16, 131:23

**D**

**D,E** [1] - 2:17
**D-10** [1] - 124:20
**D.C** [1] - 27:1
**daily** [1] - 28:4
**dark** [1] - 7:3
**data** [14] - 23:14, 23:15, 79:10, 100:17, 100:20, 104:15, 105:19, 139:25, 140:4, 140:16, 141:2, 156:10, 156:17, 157:17
**database** [1] - 151:8
**date** [15] - 22:14, 23:22, 23:23, 26:11, 26:16, 33:18, 35:2, 68:12, 68:13, 101:16, 108:9, 108:11, 168:23, 175:9
**dated** [3] - 52:19, 89:2, 93:3
**dates** [4] - 90:22, 104:23, 161:10, 175:9
**days** [8] - 44:16, 99:19, 101:17, 140:9, 174:4, 174:6, 174:12, 174:14
**dealings** [2] - 41:9,

57:7
**Debbie** [2] - 113:8,
116:6
**December** [6] -
107:25, 108:1,
109:1, 122:12,
123:9, 136:6
**decide** [1] - 173:4
**decision** [12] - 103:6,
105:17, 106:14,
137:16, 139:1,
150:25, 158:6,
171:13, 171:16,
171:19, 172:2, 173:2
**decisions** [1] - 171:23
**Declaration** [3] -
114:24, 115:1,
120:21
**Declarations** [1] -
119:7
**Declared** [1] - 88:18
**Defendant** [6] - 1:7,
2:5, 2:16, 62:23,
83:12, 161:13
**DEFENDANT** [1] -
1:17
**Defendant's** [5] -
52:17, 52:22, 52:25,
73:23, 141:13
**defending** [1] - 43:3
**defense** [3] - 160:21,
161:1, 161:2
**Defense** [6] - 94:19,
160:19, 161:8,
172:1, 173:19,
173:23
**definitely** [2] - 17:12,
17:14
**definition** [5] - 69:17,
73:4, 156:1, 156:2,
156:3
**defrauding** [1] - 57:8
**defunct** [1] - 95:5
**degree** [1] - 144:7
**degrees** [1] - 4:7
**delay** [1] - 173:6
**delayed** [1] - 172:5
**delete** [1] - 139:14
**deleted** [1] - 139:20
**delineation** [1] - 147:6
**deny** [1] - 43:13
**Department** [24] -
52:19, 53:1, 61:6,
76:11, 78:19, 80:9,
82:7, 82:15, 83:24,
84:4, 86:8, 94:14,
94:15, 94:19,
107:21, 109:9,
109:10, 109:12,
109:18, 137:4,

138:9, 141:20,
160:23, 161:8
**depicted** [2] - 130:17,
131:25
**depth** [2] - 74:4,
143:14
**deputy** [1] - 52:8
**Deputy** [1] - 141:12
**derogatory** [1] - 13:16
**describe** [16] - 5:12,
7:13, 8:20, 9:24,
11:23, 13:3, 29:9,
62:21, 64:10, 84:22,
85:4, 86:14, 93:2,
99:14, 124:12,
165:21
**described** [7] - 32:22,
63:20, 93:8, 97:1,
115:23, 116:2, 126:2
**describing** [2] - 38:1,
116:13
**description** [11] -
82:25, 88:3, 94:16,
114:14, 114:22,
115:8, 116:7,
118:23, 122:14,
127:8, 130:1
**descriptions** [1] -
118:3
**designate** [2] - 77:10,
152:8
**designated** [3] - 78:6,
78:7, 89:12
**designation** [3] -
151:4, 151:21,
151:22
**desk** [7] - 9:3, 24:13,
24:15, 32:11, 33:5,
33:10, 72:9
**destroy** [2] - 55:14,
98:23
**detail** [1] - 165:16
**detailed** [1] - 63:2
**detailing** [2] - 101:21,
102:13
**details** [1] - 148:13
**detain** [18] - 48:11,
48:14, 53:13, 57:20,
58:6, 58:10, 64:16,
65:7, 65:16, 68:9,
69:2, 69:11, 72:15,
137:24, 138:4,
138:12, 138:14,
139:6
**detained** [24] - 57:16,
58:10, 62:25, 64:18,
65:19, 66:9, 67:18,
68:4, 69:4, 69:10,
70:20, 80:17, 84:19,
97:8, 97:19, 99:9,

101:13, 101:15,
105:9, 146:20,
156:14, 157:9,
157:25, 158:4
**Detained** [1] - 66:6
**detaining** [1] - 139:16
**Detention** [3] - 66:8,
67:17, 70:19
**detention** [5] - 69:5,
78:12, 98:10, 141:5,
150:18
**determination** [2] -
90:9, 146:19
**determinations** [2] -
89:21, 161:7
**determine** [7] - 29:18,
38:9, 90:2, 100:10,
117:3, 129:9, 161:5
**determined** [10] -
43:11, 82:19, 89:21,
104:5, 105:2, 108:6,
117:25, 119:1,
120:20, 154:3
**determines** [3] - 25:1,
36:22, 172:17
**develop** [2] - 92:12,
94:3
**developed** [1] - 81:23
**developing** [1] - 86:6
**development** [1] -
94:5
**device** [28] - 47:15,
47:20, 48:8, 48:10,
48:11, 48:12, 48:18,
48:22, 48:24, 69:25,
70:4, 70:7, 71:12,
71:13, 99:21,
139:12, 139:15,
140:12, 140:17,
142:5, 144:19,
155:24, 155:25,
156:6, 157:4,
157:18, 158:18
**devices** [80] - 19:7,
43:20, 43:22, 44:4,
44:7, 46:19, 46:20,
46:24, 47:6, 48:5,
48:14, 49:5, 51:6,
51:12, 53:13, 53:19,
55:23, 56:2, 57:17,
58:6, 62:25, 64:16,
67:1, 68:4, 68:9,
69:2, 69:4, 69:6,
69:10, 69:13, 69:20,
69:24, 70:13, 70:17,
70:21, 71:4, 72:15,
78:13, 80:17, 97:8,
97:9, 98:8, 98:13,
99:5, 99:8, 99:16,
100:16, 101:7,

101:12, 101:23,
102:15, 102:18,
103:2, 103:4, 103:7,
103:16, 104:14,
105:12, 137:24,
138:4, 138:11,
138:25, 139:6,
141:2, 141:6,
141:11, 141:21,
142:6, 143:21,
146:1, 146:20,
153:1, 153:14,
154:5, 154:13,
154:23, 156:11,
157:24, 158:4, 158:8
**Devices** [2] - 52:18,
53:3
**devices"** [1] - 51:4
**DHL** [7] - 115:22,
117:6, 117:11,
117:19, 118:15,
120:13
**DHS** [2] - 66:5, 142:18
**difference** [4] -
111:17, 155:23,
156:4, 156:9
**different** [20] - 4:15,
4:16, 4:17, 7:23, 8:1,
8:14, 11:18, 20:12,
28:4, 30:14, 42:19,
42:23, 56:6, 106:8,
106:20, 109:21,
111:19, 130:4,
152:17, 172:2
**difficulty** [1] - 4:19
**dimensions** [1] -
122:17
**direct** [8] - 25:3, 37:4,
37:6, 50:18, 51:8,
131:9, 167:20,
175:23
**DIRECT** [5] - 3:22,
61:3, 75:17, 163:1,
167:14
**Direct** [1] - 2:2
**directed** [7] - 12:2,
34:12, 36:16, 68:8,
69:1, 95:15, 110:15
**directing** [1] - 68:11
**directive** [1] - 52:22
**Directive** [2] - 52:23,
142:14
**directly** [3] - 59:22,
133:5, 148:19
**Director** [2] - 94:19,
161:8
**discovered** [1] -
158:19
**discretion** [1] - 150:23
**discretionary** [1] -

166:9
**discuss** [2] - 138:18,
174:17
**discussed** [6] - 78:5,
108:7, 125:7, 130:3,
136:8, 173:20
**discussing** [1] - 40:5
**discussion** [2] -
127:24, 172:8
**discussions** [1] - 64:5
**disguised** [1] - 144:21
**dismissed** [2] - 60:7,
167:2
**displayed** [1] - 64:2
**dispose** [1] - 55:13
**dispute** [1] - 16:9
**DISTRICT** [2] - 1:1, 1:1
**District** [6] - 85:13,
113:1, 175:4,
175:17, 175:18
**docketed** [1] - 84:7
**document** [42] - 3:7,
3:8, 9:12, 9:18,
66:18, 66:19, 66:21,
69:23, 74:7, 74:10,
80:11, 85:9, 88:19,
91:13, 91:20, 92:7,
92:9, 92:10, 92:14,
92:15, 93:9, 93:12,
93:21, 93:25, 94:2,
102:7, 104:3,
104:18, 105:6,
105:13, 106:6,
106:15, 115:5,
119:21, 122:9,
123:20, 124:7,
124:23, 159:23,
160:1
**documentation** [2] -
114:3, 121:24
**documented** [3] -
88:6, 100:13, 139:18
**documenting** [7] -
86:7, 86:9, 95:14,
102:13, 102:22,
149:19, 149:24
**documents** [21] -
52:14, 54:2, 55:21,
65:25, 74:5, 76:15,
82:7, 82:9, 83:5,
84:6, 91:8, 92:6,
102:16, 104:4,
110:4, 123:13,
125:17, 125:18,
142:9, 142:12,
163:18
**domestic** [1] - 120:19
**done** [29] - 5:25, 9:21,
19:14, 20:8, 25:24,
47:25, 48:4, 48:17,

63:11, 90:2, 97:11, 98:16, 99:10, 100:12, 104:15, 140:6, 140:8, 142:18, 145:22, 146:2, 150:4, 150:20, 156:25, 157:1, 157:7, 161:5, 161:12, 172:25, 174:10

**Donnelly** [6] - 112:7, 114:5, 124:24, 125:13, 136:11, 170:7

**Donnelly(sic** [1] - 113:3

**door** [6] - 34:7, 34:18, 35:19, 35:20, 35:24, 36:3

**doubt** [1] - 149:14

**doubts** [1] - 57:1

**Douglas** [4] - 2:6, 167:5, 167:11

**down** [21] - 21:4, 26:8, 36:16, 46:4, 55:20, 60:6, 63:5, 74:24, 78:2, 88:20, 97:24, 98:13, 128:8, 136:7, 139:13, 142:20, 146:17, 150:19, 162:10, 166:25, 170:15

**draw** [2] - 106:8, 106:19

**dressed** [5] - 44:20, 63:3, 63:6, 169:16, 169:18

**drew** [1] - 125:22

**Drill** [30] - 82:2, 84:23, 85:6, 85:12, 87:4, 90:10, 110:25, 112:14, 112:22, 113:4, 113:25, 114:13, 114:22, 115:8, 116:6, 116:9, 121:22, 122:9, 122:25, 125:22, 125:24, 125:25, 127:25, 130:3, 131:17, 131:18, 135:21, 136:11, 136:12

**drill** [15] - 87:9, 87:11, 115:23, 116:3, 118:23, 127:13, 127:14, 128:5, 128:11, 129:1, 129:11, 129:17, 129:18, 129:23, 130:6

**drilling** [1] - 129:24

**drills** [2] - 115:12, 135:10

**drive** [5] - 8:15, 32:9, 48:18, 80:23, 147:10

**Drive** [1] - 88:18

**drove** [1] - 100:25

**drugs** [2] - 30:16, 55:21

**due** [1] - 174:4

**DULY** [5] - 3:16, 60:20, 75:9, 162:20, 167:8

**dump** [1] - 105:23

**Dunberg** [6] - 83:24, 84:3, 90:6, 136:15, 136:24, 158:22

**during** [24] - 5:19, 6:3, 8:10, 14:9, 19:20, 20:25, 40:3, 54:13, 54:23, 72:6, 72:12, 74:15, 74:16, 86:22, 94:24, 95:1, 104:24, 131:13, 137:12, 139:5, 147:12, 158:20, 169:3, 169:13

**duties** [9] - 5:4, 5:6, 5:8, 7:9, 32:3, 61:20, 141:18, 147:6, 147:25

**duty** [12] - 61:17, 61:21, 62:1, 62:6, 62:13, 63:4, 63:19, 71:20, 71:22, 149:1, 169:2, 169:3

**E**

**early** [4] - 65:10, 78:2, 108:1, 108:3

**easily** [1] - 150:4

**East** [5] - 82:12, 87:20, 95:7, 100:23, 100:25

**Eastern** [1] - 11:16

**easy** [1] - 148:1

**education** [2] - 4:5

**effort** [2] - 81:17, 154:10

**efforts** [1] - 104:8

**eight** [1] - 8:11

**eight-hour** [1] - 8:11

**either** [13] - 20:1, 27:13, 37:16, 39:24, 48:11, 68:19, 80:9, 83:15, 86:19, 87:1, 118:9, 118:11, 173:5

**Eldorado** [18] - 82:2, 82:9, 82:23, 83:16,

84:24, 85:6, 86:17, 87:4, 87:7, 90:11, 110:25, 111:10, 112:22, 115:14, 116:6, 118:4, 121:22, 122:10

**Electronic** [2] - 52:18, 53:3

**electronic** [44] - 19:6, 44:4, 46:19, 48:5, 49:5, 53:13, 55:23, 56:2, 57:17, 62:25, 64:16, 69:6, 69:9, 69:20, 69:24, 69:25, 70:3, 70:7, 71:3, 78:13, 80:16, 99:8, 99:16, 101:7, 101:23, 102:15, 102:18, 103:4, 103:7, 103:16, 104:14, 105:11, 139:6, 141:2, 141:11, 141:21, 142:5, 143:21, 144:19, 152:25, 153:14, 154:23, 155:24, 155:25

**electronically** [2] - 50:21, 79:8

**electronics** [4] - 20:6, 64:18, 65:8, 65:16

**elicit** [1] - 17:24

**Elmo** [4] - 121:12, 122:6, 123:19, 126:10

**elsewhere** [1] - 148:9

**email** [17] - 82:20, 83:9, 83:11, 83:25, 84:4, 89:11, 91:2, 91:14, 91:15, 91:21, 92:16, 92:18, 93:11, 93:12, 93:13, 109:8, 158:18

**emailed** [1] - 92:16

**emails** [8] - 83:11, 89:14, 100:2, 104:24, 120:19, 136:17, 136:18, 138:6

**Embargo** [1] - 90:20

**employed** [9] - 3:24, 6:3, 61:5, 61:8, 75:19, 75:20, 163:7, 163:8, 163:10

**employee** [4] - 82:1, 82:23, 83:1, 87:7

**employees** [1] - 101:2

**encounter** [2] - 25:9, 36:20, 49:1

**encountered** [4] -

32:17, 33:11, 47:1, 165:18

**encounters** [1] - 36:13

**end** [5] - 13:20, 26:14, 31:2, 118:8, 128:20

**enforcement** [3] - 118:9, 118:10, 143:5

**Enforcement** [4] - 4:2, 76:11, 109:20, 137:4

**engage** [1] - 142:2

**engaged** [2] - 138:7, 140:23

**entails** [1] - 137:21

**enter** [2] - 77:4, 151:15

**entered** [1] - 152:18

**entering** [2] - 120:17, 146:14

**entire** [4] - 5:24, 61:22, 79:15, 81:3

**entirety** [1] - 140:12

**entitled** [2] - 123:20

**entity** [1] - 109:17

**entry** [1] - 17:21

**equipment** [4] - 84:19, 85:11, 156:23

**equivalent** [1] - 103:23

**equivalents** [1] - 143:4

**erase** [1] - 56:1

**escape** [1] - 37:21

**escort** [4] - 37:2, 37:17, 50:15, 163:19

**escorted** [4] - 35:23, 36:9, 37:21, 166:17

**especially** [5] - 17:20, 18:4, 54:23, 97:8, 153:23

**ESQ** [2] - 1:14, 1:18

**essence** [1] - 132:3

**essentially** [15] - 36:2, 40:15, 44:2, 62:22, 64:13, 79:10, 87:9, 87:10, 106:10, 109:17, 111:12, 111:24, 135:12, 143:7, 148:1

**establish** [1] - 81:14

**established** [2] - 68:22, 102:18

**estimating** [1] - 128:24

**etc** [5] - 122:24, 123:7, 124:20, 156:10, 166:12

**evaluating** [3] - 98:15, 109:6, 143:17

**event** [3] - 40:8, 54:18, 148:12

**events** [5] - 14:9, 101:21, 104:21, 130:18, 163:25

**Evidence** [2] - 106:6, 106:19

**evidence** [33] - 3:7, 3:8, 10:18, 48:21, 55:14, 55:21, 56:2, 66:16, 84:12, 86:1, 89:8, 92:4, 93:19, 94:24, 97:17, 98:24, 99:24, 100:10, 100:14, 102:5, 102:14, 102:19, 104:4, 105:3, 107:1, 109:7, 119:25, 139:13, 139:21, 140:15, 146:16, 158:5, 171:11

**evidentiary** [1] - 140:22

**evolved** [1] - 53:9

**ex** [2] - 133:7, 133:10

**ex-wife** [2] - 133:7, 133:10

**exactly** [8] - 7:24, 12:17, 32:1, 36:5, 61:25, 63:6, 73:14, 155:16

**exam** [2] - 64:13, 79:16

**examination** [18] - 54:13, 63:14, 64:15, 69:3, 71:8, 99:3, 99:25, 137:25, 138:3, 138:13, 139:6, 141:7, 146:17, 155:7, 155:24, 156:5, 156:6, 160:16

**EXAMINATION** [12] - 3:22, 21:16, 54:11, 58:4, 61:3, 67:10, 75:17, 107:13, 160:14, 161:17, 163:1, 167:14

**examinations** [1] - 100:12

**examine** [8] - 21:13, 67:8, 98:25, 141:7, 145:10, 146:10, 156:7, 158:3

**examined** [9] - 31:10, 79:13, 99:4, 138:16, 139:5, 146:6, 146:8, 146:21, 158:2

**examining** [1] - 137:7

**exceptions** [1] - 174:2

**exclude** [2] - 12:22, 106:17

**excuse** [1] - 81:9
**excused** [7] - 60:9, 60:12, 60:13, 74:25, 75:3, 75:4, 170:16
**execute** [1] - 154:11
**executed** [2] - 101:22, 159:4
**exemption** [2] - 104:17, 138:23
**exhibit** [6] - 22:21, 80:15, 95:13, 106:8, 122:20, 142:14
**Exhibit** [84] - 2:10, 2:11, 2:11, 2:12, 2:12, 2:13, 2:13, 2:14, 2:14, 2:15, 2:15, 9:7, 9:13, 9:22, 10:12, 10:14, 10:17, 10:21, 11:7, 22:21, 23:10, 24:5, 31:9, 52:17, 52:22, 52:25, 66:2, 66:12, 66:15, 67:14, 70:19, 80:12, 80:14, 83:18, 83:19, 84:1, 84:11, 84:15, 85:2, 85:4, 85:5, 85:22, 85:25, 86:4, 88:8, 88:11, 89:4, 89:7, 89:10, 91:10, 91:24, 92:3, 93:15, 93:17, 93:18, 95:11, 97:12, 97:15, 97:16, 101:18, 102:1, 102:4, 102:8, 102:11, 103:10, 105:10, 106:25, 110:8, 122:4, 123:16, 123:20, 125:3, 125:20, 126:11, 127:21, 141:13, 142:16, 149:20, 150:5, 154:17, 157:15, 158:19, 159:14, 159:18
**Exhibits** [3] - 2:17, 73:24, 142:7
**exhibits** [8] - 9:7, 52:5, 52:15, 53:4, 73:23, 91:4, 121:18, 147:15
**existed** [2] - 95:5, 106:11
**exit** [1] - 50:19
**expecting** [1] - 13:16
**expeditiously** [1] - 80:21
**expense** [1] - 148:4
**experience** [9] - 4:14, 6:25, 28:20, 35:9,

37:1, 43:7, 128:9, 128:13, 174:1
**experiences** [1] - 20:16
**explain** [8] - 23:1, 25:19, 26:13, 77:1, 86:5, 103:1, 104:6, 160:20
**explained** [3] - 137:20, 138:22, 153:16
**explanation** [1] - 17:17
**explore** [2] - 17:11, 64:8
**explosives** [1] - 144:23
**export** [11] - 80:1, 80:3, 80:8, 90:12, 90:18, 94:23, 109:12, 135:1, 137:8, 138:8, 160:18
**Export** [7] - 76:11, 90:17, 114:24, 115:1, 119:7, 120:21, 137:4
**exportation** [2] - 83:15, 151:13
**exported** [10] - 82:4, 82:17, 83:2, 83:4, 86:23, 87:14, 88:5, 89:24, 90:11, 90:14
**exporter** [1] - 90:5
**exporting** [1] - 83:17
**express** [1] - 49:6
**extension** [2] - 141:4, 141:9
**extent** [2] - 54:1, 173:6
**extra** [1] - 79:3
**extract** [3] - 102:25, 140:21, 156:10
**extracted** [5] - 103:2, 104:15, 105:20, 140:12, 157:6
**extraction** [10] - 99:1, 99:20, 100:21, 103:15, 105:22, 139:25, 140:6, 140:14, 156:20, 157:1
**extractions** [1] - 100:16
**extremely** [1] - 98:12

---

**F**

---

**face** [1] - 166:21
**facilities** [2] - 35:22, 55:9

**facility** [2] - 92:13, 95:4
**fact** [33] - 10:13, 26:4, 27:16, 39:20, 43:19, 56:19, 57:2, 57:5, 58:13, 58:24, 70:16, 82:21, 89:25, 96:23, 97:5, 104:13, 106:9, 106:12, 112:6, 116:16, 117:8, 119:14, 120:1, 120:5, 123:25, 135:24, 136:17, 140:23, 147:9, 159:21, 173:7, 173:9
**facts** [6] - 43:7, 81:23, 84:17, 84:18, 117:19, 172:5
**factually** [1] - 73:14
**fair** [6] - 23:19, 35:11, 38:4, 45:21, 104:20, 132:7
**fairly** [3] - 18:12, 171:11, 171:17
**fall** [3] - 90:16, 140:10, 142:7
**fallible** [1] - 121:1
**false** [3] - 47:1, 70:1, 70:3
**familiar** [11] - 43:4, 53:8, 73:3, 73:4, 81:6, 86:11, 142:22, 162:6, 164:1, 164:2, 166:21
**far** [15] - 32:17, 39:22, 58:18, 64:11, 64:12, 71:7, 133:14, 144:8, 150:15, 163:18, 164:1, 164:16, 164:18, 165:12
**fashion** [5] - 57:24, 78:4, 98:16, 99:4, 118:25
**fat** [1] - 139:11
**father** [6] - 18:22, 18:25, 19:3, 49:14, 49:17, 49:19
**father's** [1] - 18:22
**favor** [1] - 150:1
**Fayetteville** [3] - 93:4, 95:4, 161:24
**FBI** [27] - 27:21, 27:24, 29:6, 39:23, 43:24, 45:8, 54:22, 77:20, 78:18, 79:22, 82:2, 82:6, 86:9, 86:16, 86:20, 88:2, 107:20, 111:1, 111:22, 111:24, 112:6, 112:10, 131:13,

134:25, 167:6, 169:1
**FBI's** [1] - 86:7
**Feasibility** [3] - 91:17, 92:11, 129:14
**February** [39] - 6:3, 6:6, 7:8, 8:5, 10:9, 22:12, 24:2, 28:7, 35:3, 61:14, 61:23, 66:7, 71:20, 72:12, 88:25, 89:2, 92:22, 93:22, 95:14, 101:13, 101:15, 101:24, 104:10, 106:13, 125:7, 125:10, 125:21, 126:11, 126:13, 146:2, 149:21, 150:7, 154:14, 155:1, 158:1, 161:12, 163:21, 167:21, 168:18
**Federal** [4] - 1:15, 76:10, 101:22, 172:23
**FedEx** [8] - 62:5, 69:16, 72:9, 97:21, 139:21, 148:5, 155:3, 155:12
**FedEx'd** [1] - 64:17
**feet** [2] - 33:3
**fella** [1] - 39:24
**Felney** [12] - 2:6, 11:9, 24:7, 25:5, 25:24, 26:10, 31:21, 36:14, 36:21, 162:23
**FELNEY** [1] - 162:23
**felt** [1] - 40:22
**Fenley** [1] - 162:15
**few** [6] - 9:4, 52:5, 53:9, 54:9, 63:2, 160:13, 173:25, 174:1
**fight** [3] - 6:16, 6:20, 42:21
**file** [2] - 171:9, 174:13
**filed** [3] - 3:5, 171:2, 171:4
**filing** [1] - 90:24
**filings** [1] - 10:15
**fill** [1] - 98:7
**filled** [2] - 66:6, 66:19
**finally** [4] - 55:6, 56:6, 102:10, 126:25
**findings** [4] - 79:21, 81:5, 103:5, 138:6
**fine** [4] - 12:12, 54:7, 106:24, 107:8
**fingering** [1] - 139:11
**finish** [2] - 149:4, 149:13

**finished** [2] - 60:11, 99:21
**fire** [1] - 98:11
**firearm** [1] - 64:2
**firearms** [8] - 82:5, 94:9, 95:4, 95:8, 95:10, 161:19, 161:21, 162:5
**firing** [6] - 93:7, 94:6, 111:11, 158:24, 159:16
**first** [33] - 3:6, 3:13, 4:22, 11:8, 22:24, 24:5, 24:6, 24:17, 25:5, 25:8, 29:17, 33:11, 36:18, 38:21, 78:11, 81:24, 84:17, 89:11, 91:7, 101:25, 108:4, 108:21, 109:1, 110:22, 125:3, 128:15, 136:20, 140:12, 148:16, 162:16, 165:2, 165:4
**fit** [2] - 92:9, 93:25
**fitting** [1] - 88:3
**five** [6] - 8:14, 14:7, 40:6, 97:1, 160:6, 160:7
**flag** [1] - 79:14
**flammable** [1] - 117:4
**flights** [1] - 99:2
**flow** [1] - 37:4
**fluid** [2] - 117:4
**flush** [1] - 55:20
**fly** [1] - 78:11
**flying** [1] - 79:6
**folks** [6] - 8:7, 54:24, 55:10, 55:12, 64:5, 99:14
**folks'** [1] - 19:23
**follow** [3] - 58:3, 87:3, 97:9
**followed** [1] - 166:15
**following** [6] - 7:5, 86:16, 90:18, 121:20, 133:11, 155:20
**FOLLOWS** [5] - 3:16, 60:21, 75:10, 162:20, 167:8
**fool** [1] - 120:25
**FOR** [3] - 1:1, 1:13, 1:17
**Force** [1] - 169:1
**foregoing** [3] - 175:7, 175:10, 175:22
**foreign** [4] - 7:11, 120:19, 160:21, 160:22

**forensic** [13] - 63:1, 71:8, 101:11, 104:21, 105:20, 139:7, 139:8, 141:3, 155:7, 155:24, 156:5, 157:5
**Forensic** [2] - 150:9, 155:5
**forensically** [6] - 98:15, 138:15, 141:7, 146:10, 146:21, 158:1
**Forensics** [1] - 149:23
**forensics** [13] - 98:7, 98:18, 98:19, 99:7, 99:14, 99:18, 99:21, 100:17, 102:14, 139:24, 140:7, 140:10, 146:17
**forget** [1] - 140:11
**Form** [1] - 66:5
**form** [7] - 68:6, 70:24, 98:3, 98:4, 101:3, 118:25, 123:21
**formal** [1] - 78:16
**formality** [1] - 149:25
**format** [1] - 139:14
**former** [2] - 82:22, 86:19
**forms** [3] - 83:14, 128:9, 150:18
**forth** [4] - 41:16, 70:22, 144:18, 175:9
**forthcoming** [1] - 40:18
**forward** [7] - 13:12, 14:3, 78:4, 79:16, 81:24, 95:8, 154:1
**forwarded** [1] - 99:13
**fought** [1] - 42:25
**four** [3] - 12:1, 13:8, 156:19
**four-hour** [1] - 156:19
**fours** [1] - 172:19
**fourteen** [1] - 73:18
**Fourth** [3] - 104:17, 138:23, 172:25
**fourth** [1] - 126:25
**frame** [3] - 54:24, 95:1, 159:9
**Frank** [4] - 88:1, 114:10, 115:6, 117:7
**free** [2] - 34:20, 34:21
**freely** [1] - 39:4
**frequently** [1] - 79:1
**front** [13] - 17:4, 22:20, 65:25, 67:15, 67:16, 72:9, 80:11, 83:21, 126:10, 128:22, 131:2,

141:13, 142:12
**fruits** [2] - 91:5, 100:11
**fugitive** [1] - 152:10
**fugitives** [1] - 79:12
**full** [6] - 99:3, 99:7, 100:20, 102:23, 122:14, 140:16
**full-bore** [1] - 122:14
**fully** [4] - 99:19, 102:24, 103:2, 172:24
**function** [2] - 62:24, 163:16
**functional** [1] - 143:4
**functions** [1] - 163:17
**funding** [1] - 97:22

## G

**gain** [1] - 17:21
**game** [1] - 70:8
**gas** [6] - 93:6, 93:7, 93:8, 158:23, 158:24, 159:16
**gate** [1] - 24:17
**gathered** [4] - 86:15, 92:21, 94:25
**gauge** [1] - 127:8
**gauges** [1] - 127:11
**general** [7] - 61:21, 62:1, 63:4, 65:18, 96:19, 149:18, 174:1
**generally** [4] - 14:23, 38:13, 40:6, 94:1
**generate** [2] - 26:6, 26:15
**generated** [7] - 9:16, 23:11, 26:3, 39:16, 98:20, 106:16, 147:19
**gentleman** [2] - 13:18, 40:23
**germane** [3] - 102:19, 104:1, 172:18
**GINO** [1] - 1:18
**Gino** [3] - 21:20, 163:5, 167:18
**gist** [2] - 87:6, 87:7
**given** [9] - 58:22, 64:23, 78:9, 78:15, 96:18, 103:25, 164:9, 171:18, 172:5
**glasses** [1] - 9:9
**Global** [3] - 93:4, 158:15, 159:15
**Glocks** [1] - 129:15
**go-ahead** [1] - 78:15
**goal** [1] - 29:14
**goods** [1] - 151:13

**GOVERNMENT** [1] - 1:13
**government** [1] - 160:23
**Government** [31] - 2:3, 2:9, 6:15, 7:3, 9:7, 10:11, 22:20, 24:5, 31:9, 54:1, 55:11, 60:15, 75:7, 76:23, 85:21, 89:3, 91:23, 93:14, 101:25, 103:9, 105:10, 125:3, 125:20, 127:21, 149:20, 150:3, 150:5, 158:19, 173:20, 173:24, 174:15
**Government's** [64] - 9:13, 9:22, 10:12, 10:17, 10:21, 11:7, 23:10, 52:22, 66:1, 66:12, 66:15, 67:14, 70:19, 80:12, 80:14, 83:18, 83:19, 84:1, 84:11, 84:14, 85:1, 85:4, 85:22, 85:25, 86:4, 88:8, 88:11, 89:4, 89:7, 89:10, 91:10, 91:24, 92:3, 92:24, 93:2, 93:15, 93:17, 93:18, 95:11, 97:12, 97:16, 101:18, 102:1, 102:4, 102:8, 102:10, 103:10, 106:25, 110:8, 115:15, 122:3, 123:16, 123:19, 124:6, 126:11, 131:10, 147:17, 154:17, 157:15, 158:14, 159:14, 159:18, 170:7, 171:7
**government's** [9] - 10:16, 66:14, 84:10, 85:5, 85:24, 89:6, 92:2, 97:15, 102:3
**grab** [1] - 152:13
**graduate** [1] - 4:10
**graduated** [1] - 4:6
**grant** [3] - 172:13, 172:17, 174:16
**granted** [6] - 89:15, 90:4, 91:4, 172:8, 173:3
**grants** [1] - 173:15
**green** [2] - 119:25, 156:9
**Green** [4] - 155:5,

155:10, 155:17, 155:22
**grind** [1] - 123:6
**grinder** [1] - 123:7
**grinding** [1] - 123:6
**ground** [2] - 6:21, 7:5
**Group** [1] - 80:23
**group** [4] - 6:16, 43:3, 98:7, 148:22
**guess** [13] - 22:17, 24:13, 30:10, 34:20, 49:10, 52:2, 53:22, 81:17, 82:23, 114:7, 117:13, 136:15, 172:20
**guessing** [3] - 128:19, 128:21, 128:23
**guide** [1] - 65:3
**gun** [9] - 111:2, 111:6, 111:9, 111:13, 111:16, 115:11, 135:1, 135:2, 135:3
**guns** [1] - 135:9
**guy** [2] - 112:9, 136:25
**guys** [2] - 140:10, 170:6

## H

**hall** [1] - 36:16
**hand** [5] - 94:14, 124:15, 127:17, 139:24
**handed** [1] - 134:8
**handguns** [1] - 144:22
**handle** [4] - 32:5, 35:13, 127:17, 173:18
**handling** [2] - 65:4, 146:1
**happy** [3] - 171:9, 171:12, 172:7
**hard** [2] - 5:21, 48:18
**harmful** [1] - 50:18
**hate** [1] - 172:4
**hats** [1] - 62:3
**HAVING** [5] - 3:15, 60:20, 75:9, 162:19, 167:7
**hazardous** [1] - 52:1
**head** [2] - 171:15, 171:20
**headed** [2] - 19:2, 144:10
**headquarters** [1] - 142:18
**health** [1] - 18:22
**hear** [4] - 4:22, 22:1, 106:21, 156:13
**heard** [10] - 3:10,

20:18, 41:6, 43:4, 54:21, 73:7, 73:9, 73:11, 142:11
**hearing** [4] - 106:2, 170:23, 171:9, 172:11
**Hearing** [1] - 1:10
**heavily** [1] - 173:10
**held** [1] - 57:3
**help** [1] - 11:7
**helpful** [1] - 52:11
**helping** [1] - 37:17
**hereby** [1] - 175:6
**hereinbefore** [1] - 175:9
**heroes** [1] - 42:21
**Hertzog** [2] - 81:2, 114:17
**Hertzog's** [1] - 110:9
**hesitated** [1] - 58:10
**hesitation** [1] - 148:18
**hidden** [2] - 144:20, 144:21
**hierarchy** [1] - 22:6
**high** [1] - 15:23
**high-rise** [1] - 15:23
**highlight** [2] - 124:14, 153:21
**highlights** [1] - 154:18
**Hill** [1] - 85:7
**himself** [2] - 86:21, 138:2
**HINKLEY** [73] - 1:14, 3:2, 3:12, 3:14, 3:21, 3:23, 10:11, 10:19, 12:16, 12:23, 13:2, 21:7, 21:12, 52:13, 53:11, 54:9, 54:12, 57:12, 57:15, 57:25, 60:5, 60:7, 60:15, 60:19, 61:1, 61:4, 65:12, 65:13, 66:11, 66:17, 67:7, 74:23, 74:25, 75:7, 75:15, 75:18, 84:6, 84:13, 85:21, 86:2, 89:3, 89:9, 91:23, 92:5, 93:14, 93:20, 96:11, 97:11, 97:18, 101:25, 102:6, 103:9, 103:21, 106:1, 106:4, 106:21, 107:2, 143:24, 153:3, 159:8, 160:13, 160:15, 161:15, 162:11, 166:24, 167:2, 167:4, 170:14, 171:9, 173:12, 173:22,

174:9, 174:19
**Hinkley** [11] - 3:11,
29:4, 52:12, 53:10,
60:18, 75:6, 103:20,
105:24, 110:15,
171:7, 174:14
**Hinkley's** [1] - 171:6
**historically** [2] - 6:14,
173:22
**histories** [1] - 79:13
**History** [1] - 26:10
**history** [2] - 90:21,
161:8
**Hit** [1] - 77:11
**hit** [14] - 26:12, 26:19,
26:20, 42:13, 42:15,
58:15, 59:2, 73:5,
151:2, 151:15,
151:19, 152:7,
152:22, 153:18
**hold** [2] - 4:13, 149:19
**holder** [1] - 56:21
**holding** [6] - 12:2,
33:21, 34:25, 35:4,
35:16, 35:24
**hollow** [1] - 127:16
**home** [1] - 40:9
**Homeland** [44] - 27:6,
27:20, 28:17, 28:18,
29:6, 39:23, 43:24,
45:8, 46:13, 52:19,
53:1, 53:14, 53:17,
53:20, 54:3, 54:23,
61:7, 68:8, 73:15,
75:20, 76:9, 95:13,
101:20, 102:12,
106:16, 108:18,
108:21, 108:25,
109:13, 109:18,
109:24, 110:8,
136:20, 136:24,
141:18, 141:20,
142:4, 142:15,
143:23, 147:25,
156:2, 169:25, 170:7
**Honor** [55] - 3:2, 3:12,
3:14, 3:21, 10:11,
12:23, 21:12, 52:6,
52:16, 53:5, 54:9,
57:25, 60:5, 60:7,
60:15, 61:1, 65:12,
66:11, 67:7, 74:23,
74:25, 75:2, 75:7,
75:8, 75:15, 84:6,
85:21, 91:23, 93:14,
95:23, 96:5, 97:11,
103:9, 103:12,
103:13, 103:16,
103:19, 105:7,
105:15, 105:19,

107:2, 107:5,
140:18, 143:24,
153:3, 159:8,
160:10, 160:13,
161:15, 162:11,
166:24, 167:2,
170:14, 170:17,
174:19
**HONORABLE** [1] -
1:10
**hope** [1] - 7:7
**hopes** [2] - 7:1, 13:15
**hospital** [2] - 18:25,
49:20
**hostage** [1] - 57:3
**hour** [2] - 8:11, 156:19
**hours** [2] - 67:20,
71:25
**house** [5] - 133:22,
134:3, 135:15,
135:19, 154:11
**how'd** [1] - 148:13
**HSI** [14] - 61:15, 78:6,
78:7, 78:20, 78:23,
80:4, 95:15, 95:20,
97:23, 109:22,
147:5, 149:23,
150:9, 151:7
**HSI-directed** [1] -
95:15
**husband** [1] - 134:8

## I

**idea** [4] - 5:18, 100:5,
164:7, 166:6
**ideas** [1] - 138:20
**identification** [6] - 9:8,
23:8, 25:22, 25:23,
92:25, 95:12
**Identified** [1] - 2:9
**identified** [3] - 118:4,
130:16, 147:19
**identifier** [1] - 117:14
**identifiers** [3] - 90:22,
94:18, 161:10
**identify** [9] - 9:13,
52:15, 66:4, 74:5,
83:22, 88:11, 91:13,
124:11, 137:21
**identifying** [2] - 85:7,
88:16
**illegal** [3] - 138:8,
140:23, 151:13
**image** [2] - 99:6, 157:5
**imagine** [4] - 65:2,
68:12, 70:11, 131:6
**immediately** [2] -
50:5, 98:6
**immense** [1] - 119:4

**Immigration** [5] - 5:1,
5:16, 51:24, 77:11,
109:20
**impact** [1] - 171:20
**Impact** [3] - 52:17,
53:1, 142:17
**impart** [1] - 87:11
**implicated** [1] - 18:10
**import** [1] - 80:8
**imposter** [1] - 42:6
**improvised** [1] - 33:1
**IN** - 1:1
**inaccurate** [1] -
111:13
**inadmissible** [1] -
105:14
**inasmuch** [1] - 53:12
**Inc** [2] - 121:22,
131:19
**incident** [4] - 167:20,
167:22, 167:24,
168:14
**include** [4] - 14:12,
76:9, 77:5, 120:18
**included** [5] - 84:17,
116:23, 120:21,
127:5, 159:15
**includes** [2] - 141:5,
145:12
**including** [2] - 6:23,
130:12
**inclusion** [1] - 86:7
**incoming** [1] - 79:11
**incorporated** [2] -
94:8, 142:19
**Incorporated** [2] -
85:6, 90:11
**incur** [1] - 148:4
**indeed** [4] - 82:16,
87:13, 89:23, 153:17
**Indian** [1] - 88:18
**indicate** [8] - 11:13,
15:25, 19:2, 23:5,
66:25, 67:1, 70:21,
119:23
**indicated** [21] - 4:11,
8:9, 8:17, 12:6, 15:8,
15:19, 16:8, 16:12,
17:5, 53:12, 53:18,
54:15, 54:21, 56:9,
57:20, 84:7, 88:5,
101:6, 120:5,
157:16, 160:18
**indicates** [3] - 31:12,
101:12, 149:21
**indicating** [5] - 56:18,
88:12, 98:8, 119:11,
119:25
**indicator** [2] - 31:15,
120:24

**indicators** [1] - 143:16
**indicia** [2] - 106:6,
106:18
**indirectly** [1] - 59:22
**individual** [22] - 25:8,
25:11, 33:23, 35:21,
36:12, 36:24, 58:23,
59:5, 59:14, 79:4,
92:16, 99:8, 105:8,
112:13, 112:17,
114:12, 139:16,
143:6, 143:18,
164:4, 165:8, 166:1
**individuals** [1] - 77:7
**Industry** [4] - 76:12,
90:8, 90:13, 137:5
**inferences** [2] - 106:7,
106:20
**infested** [1] - 42:18
**inform** [1] - 42:3
**informal** [1] - 78:15
**information** [54] -
6:20, 6:22, 7:1, 7:4,
7:6, 9:18, 13:13,
13:15, 13:16, 15:16,
16:21, 17:23, 17:24,
18:1, 18:15, 18:17,
20:23, 23:2, 23:15,
26:23, 43:2, 57:4,
57:5, 57:17, 58:21,
58:24, 59:1, 59:3,
65:1, 66:18, 66:21,
71:1, 77:21, 77:24,
78:10, 79:5, 86:15,
87:15, 89:20, 92:21,
97:9, 103:14,
103:17, 103:18,
104:1, 108:3,
113:10, 113:17,
114:5, 120:17,
120:18, 120:20,
148:14, 159:10
**infrastructure** [1] -
15:5
**infrequent** [1] - 5:25
**initial** [5] - 102:13,
103:5, 103:22,
104:4, 105:17
**initiated** [1] - 6:14
**inquired** [2] - 21:8,
54:14, 126:1
**inquiring** [1] - 116:7
**inquiry** [1] - 126:19
**inside** [1] - 70:14
**inspect** [5] - 47:8,
69:13, 69:17, 143:6,
144:14
**inspected** [8] - 31:4,
118:10, 119:8,
119:12, 119:14,

119:19, 120:1, 154:5
**inspecting** [4] - 69:15,
69:18, 71:7, 119:22
**Inspection** [1] - 95:15
**inspection** [62] - 5:9,
5:14, 5:15, 11:1,
19:21, 24:1, 25:12,
27:25, 29:11, 29:13,
29:14, 30:4, 31:21,
32:12, 32:14, 32:18,
33:24, 34:13, 36:13,
36:15, 36:17, 36:20,
36:22, 36:25, 37:14,
38:7, 38:25, 41:21,
43:12, 48:10, 55:4,
55:10, 58:14, 58:15,
59:16, 59:17, 62:10,
63:13, 67:25, 68:2,
71:6, 71:9, 71:10,
72:4, 72:13, 76:24,
95:19, 96:7, 96:13,
119:24, 147:16,
152:4, 155:11,
156:5, 165:9,
167:22, 168:4,
168:8, 168:22,
169:14
**inspections** [7] - 4:15,
5:5, 5:19, 6:9, 29:10,
49:3, 164:25
**inspector** [4] - 37:23,
37:24, 38:3, 38:7
**instance** [1] - 71:15
**instances** [3] - 14:8,
37:20, 55:20
**instead** [2] - 53:6,
129:1
**instruct** [1] - 32:3
**instructed** [6] - 6:18,
7:24, 31:7, 38:20,
39:18, 74:8
**integral** [1] - 94:5
**intelligence** [4] - 6:22,
22:11, 22:14, 28:3
**intent** [1] - 78:12
**intention** [1] - 53:4
**interaction** [5] - 20:5,
29:5, 29:7, 49:25,
72:18
**interdicted** [4] -
117:23, 120:14,
121:3, 121:10
**interest** [1] - 151:24
**interests** [1] - 27:3
**internal** [7] - 48:19,
92:13, 99:22,
119:21, 140:15,
142:15, 151:7
**international** [6] -
14:7, 14:24, 22:9,

41:7, 79:6, 139:4
**International** [4] - 4:8, 4:9, 6:7, 78:14
**internationally** [3] - 20:13, 76:3, 79:19
**internet** [4] - 7:3, 7:5, 99:23
**interpol** [1] - 79:14
**interrupt** [1] - 143:24
**interview** [70] - 5:9, 6:18, 7:24, 8:2, 8:20, 8:21, 9:1, 9:5, 9:25, 10:3, 10:8, 10:22, 12:3, 12:17, 13:4, 13:5, 13:11, 14:4, 16:6, 16:7, 16:20, 19:5, 19:10, 19:11, 19:12, 19:14, 19:19, 19:20, 20:4, 20:8, 20:10, 20:25, 21:9, 22:7, 24:1, 27:5, 28:13, 28:21, 31:7, 31:25, 32:13, 38:22, 39:18, 39:21, 39:25, 40:3, 43:12, 44:14, 45:17, 46:3, 50:22, 54:24, 55:24, 64:6, 67:25, 71:6, 72:24, 72:25, 86:9, 86:14, 130:13, 131:13, 138:3, 147:18, 152:14, 153:2, 153:15, 169:14
**interviewed** [9] - 8:19, 12:12, 13:7, 64:7, 88:2, 96:17, 116:21, 133:1, 134:25
**interviewer** [1] - 9:19
**interviews** [20] - 5:5, 5:23, 7:10, 7:25, 8:6, 8:10, 8:12, 12:7, 28:5, 28:6, 28:19, 40:6, 42:25, 50:20, 82:6, 87:4, 118:2, 131:17
**intrusive** [1] - 13:25
**invaluable** [1] - 152:15
**invasive** [1] - 13:24
**investigate** [4] - 80:5, 82:8, 109:15, 144:22
**investigating** [2] - 65:19, 80:8
**investigation** [70] - 53:14, 65:23, 75:24, 76:2, 76:8, 76:16, 76:19, 77:3, 77:8, 79:18, 79:25, 81:5, 81:7, 81:14, 81:23, 83:3, 83:8, 84:18,

54:25, 57:3, 62:10, 62:11, 65:14, 65:22, 75:24, 76:8, 76:9, 77:25, 100:5, 104:9, 107:20, 107:23, 108:19, 109:5, 109:13, 112:20, 113:21, 120:10, 130:8, 136:21, 143:2, 145:25, 146:6, 151:10, 151:12, 151:23, 162:3, 173:6, 174:22
**involvement** [1] - 152:1
**involving** [1] - 167:21
**iPad** [2] - 101:9, 103:6
**iPod** [1] - 101:10
**Iraq** [61] - 6:17, 6:19, 13:16, 15:5, 15:9, 15:23, 16:2, 17:20, 26:5, 41:10, 42:18, 43:1, 54:17, 58:19, 58:23, 59:6, 77:15, 77:19, 82:4, 82:17, 82:23, 85:14, 86:23, 88:5, 88:15, 90:12, 90:14, 90:18, 92:14, 95:17, 100:7, 111:2, 111:7, 113:25, 115:22, 116:17, 116:23, 117:9, 118:6, 118:15, 120:12, 123:23, 124:4, 126:3, 127:4, 129:13, 130:10, 133:25, 134:4, 134:8, 135:1, 135:3, 136:14, 138:9, 140:24, 151:6, 151:13, 152:2, 159:7, 159:25
**Iraqi** [1] - 16:8
**IS** [5] - 3:15, 60:20, 75:9, 162:19, 167:7
**ISIS** [5] - 6:16, 42:18, 42:22, 42:25, 54:25
**ISIS-infested** [1] - 42:18
**Islamic** [1] - 6:16
**issue** [19] - 7:20, 16:1, 17:11, 17:22, 30:1, 38:10, 38:12, 38:13, 38:14, 38:20, 39:11, 41:22, 151:22, 172:12, 172:15, 173:15, 174:18
**issued** [6] - 52:24, 56:15, 90:9, 136:14, 158:2, 161:11

**issues** [10] - 16:4, 17:5, 38:17, 41:14, 79:13, 109:13, 144:6, 161:9, 166:11, 172:18
**issuing** [1] - 90:6
**item** [8] - 85:19, 98:16, 109:9, 116:19, 117:2, 128:15, 140:11
**items** [85] - 30:7, 65:18, 80:8, 82:3, 82:15, 82:16, 82:22, 82:25, 83:1, 83:15, 83:17, 85:12, 85:18, 85:20, 87:17, 88:3, 88:13, 88:20, 89:18, 89:24, 89:25, 90:4, 94:4, 94:11, 94:16, 94:17, 94:21, 97:19, 97:21, 97:23, 98:1, 98:6, 99:25, 100:15, 100:22, 100:24, 101:14, 102:17, 102:23, 102:24, 103:22, 103:23, 105:9, 109:8, 109:11, 112:20, 113:18, 113:20, 113:23, 113:25, 114:13, 114:23, 115:9, 115:22, 116:2, 116:7, 118:5, 119:13, 119:15, 122:23, 123:3, 123:22, 125:6, 126:2, 127:3, 128:4, 130:10, 130:17, 130:22, 131:17, 131:23, 132:4, 137:8, 140:21, 149:21, 150:7, 154:19, 154:22, 155:7, 155:9, 159:6, 159:15, 159:19, 171:24
**Items** [1] - 94:21
**itself** [6] - 20:20, 48:22, 105:13, 106:15, 137:19, 144:25

---

## J

**J.F.K** [23] - 7:8, 7:22, 8:21, 9:14, 32:2, 37:3, 61:18, 62:22, 63:20, 64:5, 65:2, 72:11, 78:14, 78:20, 95:16, 97:23, 103:8, 147:9, 148:3, 148:9,

163:9, 167:21
**jacket** [2] - 45:4, 45:6
**James** [6] - 2:4, 60:15, 60:19, 60:24, 95:20, 96:1
**January** [15] - 52:24, 77:17, 78:2, 90:14, 108:1, 108:2, 108:4, 108:5, 108:11, 108:12, 109:1, 126:17, 136:6, 136:11, 142:8
**jaws** [1] - 124:15
**Jay** [1] - 4:6
**JEFF** [1] - 75:13
**Jeff** [2] - 2:4, 75:13
**Jeffrey** [5] - 23:11, 23:22, 27:6, 75:8, 147:20
**jeopardize** [1] - 151:17
**job** [12] - 8:4, 29:9, 29:17, 35:12, 38:7, 52:2, 54:24, 62:16, 62:24, 73:18, 94:13, 143:1
**jobs** [1] - 62:6
**John** [2] - 4:6, 6:7
**join** [2] - 12:24, 91:6
**Joint** [1] - 168:25
**JR** [1] - 1:18
**Judge** [24] - 3:3, 5:12, 6:12, 8:3, 10:13, 21:14, 51:14, 57:10, 57:19, 58:3, 60:10, 74:19, 96:8, 107:8, 129:5, 153:5, 160:2, 160:6, 162:15, 166:22, 170:18, 170:20, 170:24, 174:3
**judge** [6] - 12:19, 53:16, 121:12, 124:17, 160:4, 162:13
**Judicial** [1] - 53:23, 53:25
**Justice** [3] - 4:6, 4:7, 4:8

---

## K

**keep** [5] - 29:15, 52:3, 64:3, 99:5, 114:7
**keeping** [1] - 20:6
**Kennedy** [1] - 6:7
**key** [2] - 100:6, 100:7
**keyboard** [1] - 125:5
**keyed** [1] - 9:19
**kick** [1] - 14:4

84:23, 85:17, 86:5, 86:8, 86:11, 87:3, 87:6, 88:21, 88:24, 89:19, 91:9, 92:9, 92:21, 93:21, 93:25, 94:24, 95:9, 96:23, 97:6, 99:15, 99:17, 102:19, 104:1, 104:10, 105:3, 107:18, 107:23, 108:15, 109:1, 110:2, 110:16, 111:25, 113:7, 114:19, 114:20, 120:16, 121:21, 123:13, 133:15, 151:9, 151:10, 151:11, 151:17, 152:8, 152:13, 154:9, 154:10, 155:23, 159:10, 160:17
**Investigation** [4] - 76:10, 95:14, 101:21, 102:13
**investigations** [1] - 143:2
**Investigations** [11] - 54:23, 61:7, 75:21, 76:10, 95:13, 101:20, 102:12, 108:19, 108:22, 142:15, 147:25
**Investigations'** [1] - 109:14
**Investigative** [1] - 68:9
**investigative** [17] - 78:4, 78:17, 79:21, 81:24, 87:16, 87:24, 91:6, 91:8, 94:25, 103:5, 109:19, 129:21, 136:5, 137:13, 152:15, 153:24, 154:12
**Investigator** [4] - 27:20, 28:17, 141:19, 170:8
**investors** [1] - 16:13
**Invoice** [2] - 93:4, 125:21
**invoice** [8] - 85:5, 88:12, 93:3, 126:4, 129:8, 158:15, 158:18
**invoices** [1] - 127:25
**invoicing** [1] - 113:19
**involved** [39] - 5:17, 5:19, 6:24, 14:19, 14:23, 15:22, 18:6,

**kicked** [2] - 84:23,
108:15
**kidnapped** [10] -
16:14, 16:24, 18:5,
18:6, 20:16, 20:17,
41:4, 42:22, 56:19
**kidnapping** [4] -
17:24, 20:20, 56:23,
57:6
**kind** [22] - 4:23, 13:15,
34:3, 37:16, 51:20,
77:12, 78:2, 79:3,
81:13, 82:25, 84:15,
84:22, 86:5, 97:1,
99:14, 109:21,
111:11, 111:17,
148:3, 153:21, 158:9
**kits** [3] - 127:17,
134:19, 135:7
**knowing** [2] - 130:9,
154:8
**knowledge** [5] -
48:17, 70:2, 100:4,
129:22, 130:11
**known** [8] - 66:5,
81:23, 84:18, 85:16,
100:7, 114:23,
120:18, 159:10
**knows** [3] - 116:19,
159:22, 171:2
**KRISTIN** [4] - 1:23,
175:3, 175:13,
175:16
**Kristin** [1] - 153:9
**Kristy** [11] - 88:13,
88:17, 114:12,
117:7, 123:21,
125:4, 127:4,
133:11, 133:15,
134:4, 134:7
**Kurdistan** [1] - 88:15

---

**L**

**lab** [1] - 155:21
**Lab** [1] - 149:23
**Lab"** [1] - 150:9
**lacking** [1] - 106:18
**laid** [1] - 141:9
**lapping** [1] - 123:6
**laptop** [2] - 70:8,
101:9
**large** [2] - 94:3, 98:25
**late** [1] - 107:25
**launched** [2] - 162:4,
162:7
**law** [9] - 51:24, 86:24,
118:9, 118:10,
142:2, 143:5,
143:20, 172:22

**Law** [2] - 5:1
**lawful** [1] - 138:22
**lawfully** [3] - 30:8,
90:13, 138:22
**Laws** [2] - 5:16
**laymen's** [1] - 67:22
**layover** [1] - 156:19
**lead** [3] - 86:16,
111:25, 112:2
**leading** [6] - 57:10,
57:13, 65:9, 68:13,
77:25, 79:22
**learn** [1] - 171:16
**learned** [3] - 81:15,
103:18, 110:3
**least** [5] - 5:22, 34:11,
55:16, 130:9, 172:1
**leave** [7] - 34:21,
34:22, 50:3, 50:4,
50:5, 50:8, 50:13
**leaving** [1] - 50:6
**left** [4] - 9:6, 14:10,
19:16, 23:21
**legal** [1] - 144:5
**legally** [2] - 30:4,
90:24
**legwork** [1] - 112:4
**Leo** [1] - 60:24
**less** [2] - 111:14,
128:25
**letter** [1] - 119:23
**level** [4] - 142:18,
145:8, 146:15,
171:23
**liaison** [8] - 62:17,
63:11, 64:4, 64:24,
65:16, 69:10, 71:5,
71:15
**liaisoning** [1] - 62:4
**license** [11] - 82:14,
87:14, 89:24, 90:5,
90:9, 90:12, 90:21,
90:24, 90:25, 161:7
**licensed** [2] - 160:24,
161:3
**licenses** [2] - 161:9,
161:11
**licensing** [7] - 82:13,
82:18, 82:19, 89:21,
94:20, 94:22, 151:14
**licensure** [1] - 161:6
**light** [1] - 78:22
**likelihood** [1] - 174:10
**likely** [1] - 146:6
**likewise** [2] - 6:8,
157:3
**line** [9] - 24:22, 24:25,
25:4, 32:12, 37:10,
111:1, 128:15,
128:20, 140:11

**lines** [1] - 25:2
**linked** [1] - 64:13
**links** [1] - 151:7
**List** [2] - 94:20, 94:22
**list** [7] - 30:18, 79:15,
80:9, 80:10, 122:23,
137:9
**listed** [4] - 67:21,
69:24, 70:23, 85:20
**listen** [1] - 79:4
**listing** [1] - 93:5
**lists** [2] - 100:1, 123:3
**liters** [3] - 116:24,
117:1, 117:4
**located** [3] - 87:19,
87:20, 122:18
**location** [4] - 8:23,
26:16, 42:4, 87:1
**locations** [2] - 8:14,
20:19
**lock** [3] - 35:19, 35:25,
135:18
**locked** [1] - 155:19
**locks** [1] - 35:20
**look** [48] - 8:20, 9:12,
11:7, 22:24, 31:8,
31:10, 38:9, 41:1,
44:4, 46:20, 47:21,
59:8, 66:1, 66:4,
69:19, 70:13, 71:12,
71:14, 74:3, 83:20,
85:1, 88:8, 91:10,
92:24, 95:11,
101:18, 102:10,
114:4, 115:17,
118:3, 119:2, 122:8,
128:10, 128:15,
130:20, 142:22,
143:11, 144:14,
144:22, 145:9,
145:16, 145:19,
154:17, 154:19,
159:14, 164:4, 168:7
**looked** [6] - 31:4,
56:13, 57:16,
130:15, 132:11,
168:17
**looking** [22] - 31:19,
47:6, 78:3, 98:9,
99:25, 100:1, 100:2,
100:3, 100:19,
103:23, 104:20,
119:6, 126:10,
133:14, 140:21,
142:21, 148:24,
151:25, 168:13,
168:16
**Lookout** [14] - 25:15,
25:16, 25:17, 25:19,
25:21, 39:6, 39:14,

39:19, 59:2, 73:3,
76:23, 151:3, 151:4
**lookout** [21] - 26:12,
26:18, 26:19, 26:20,
38:16, 38:18, 39:16,
58:24, 59:7, 77:18,
78:22, 78:23, 79:3,
120:20, 151:6,
151:20, 153:19,
153:20, 165:14
**lookouts** [1] - 32:7
**looks** [2] - 119:7,
132:12
**losing** [1] - 17:20
**lost** [6] - 17:18, 37:7,
42:3, 42:5, 42:9,
56:14
**lower** [2] - 89:12,
124:14
**luggage** [1] - 137:24
**luncheon** [1] - 107:10

---

**M**

**M-O-R-A-L-E-S** [1] -
3:18
**M-tech** [1] - 125:1
**M-U-N-D-Y** [1] - 60:24
**M4** [3] - 93:8, 94:4,
158:24
**M4's** [1] - 129:15
**M4-style** [1] - 129:16
**ma'am** [1] - 21:18
**machine** [2] - 1:21,
123:5
**machinery** [1] - 82:4
**magnetic** [1] - 124:15
**mail** [1] - 83:4
**main** [1] - 109:14
**major** [1] - 109:14
**man** [1] - 168:12
**management** [1] -
152:18
**manifest** [1] - 79:8
**manipulate** [4] -
70:13, 98:22,
144:17, 145:9
**manipulating** [1] -
140:13
**manipulation** [1] -
146:15
**manual** [1] - 144:24
**manually** [4] - 46:22,
47:8, 144:17, 145:9
**manufacture** [4] -
82:5, 95:8, 160:22,
162:5
**manufacturing** [9] -
92:13, 95:4, 95:10,
111:16, 151:12,

161:1, 161:20,
161:22, 161:23
**March** [20] - 82:1,
90:12, 93:3, 101:16,
101:22, 108:16,
110:19, 110:24,
111:22, 117:16,
117:19, 117:21,
120:11, 126:1,
126:5, 126:19,
126:25, 127:21,
155:4, 157:20
**MARIANI** [1] - 1:10
**marked** [2] - 80:12,
141:13
**married** [4] - 133:10,
133:11, 133:13,
133:15
**mask** [1] - 121:13
**Master's** [1] - 4:9
**Masters** [30] - 82:2,
84:24, 85:6, 85:13,
87:4, 90:10, 110:25,
112:14, 112:22,
113:4, 113:25,
114:13, 114:22,
115:8, 116:6, 116:9,
121:22, 122:10,
122:25, 125:22,
125:24, 125:25,
127:25, 130:3,
131:17, 131:19,
135:21, 136:12
**match** [1] - 130:23
**matched** [1] - 120:23
**material** [2] - 152:12,
168:4
**materials** [5] - 52:1,
94:3, 120:25,
130:20, 138:5
**Mathis** [1] - 93:6
**matic** [1] - 123:6
**matter** [6] - 3:4, 76:14,
152:18, 171:2,
172:6, 173:1
**matters** [2] - 114:21,
121:25
**MAY** [1] - 1:11
**maze** [1] - 50:17
**mean** [19] - 18:3, 22:5,
28:5, 48:17, 61:25,
68:19, 73:10,
109:14, 109:17,
118:2, 120:13,
125:9, 125:13,
126:4, 127:8,
154:22, 160:20,
170:3
**meaning** [7] - 7:3,
11:19, 13:21, 25:18,

42:19, 55:12, 161:2
**means** [10] - 5:12, 7:14, 31:17, 56:12, 64:21, 73:14, 77:2, 144:17, 165:2, 175:22
**meantime** [1] - 174:16
**measures** [1] - 5:2
**media** [1] - 101:10
**meet** [4] - 8:15, 32:4, 62:16, 165:3
**meeting** [11] - 78:1, 108:4, 108:6, 110:1, 136:4, 136:5, 136:7, 137:13, 165:5, 170:3, 170:4
**members** [2] - 28:18, 87:24
**memo** [1] - 149:16
**memorable** [1] - 63:14
**memorandum** [1] - 68:23
**memorialize** [1] - 149:17
**memory** [3] - 49:23, 51:23, 168:13
**men's** [1] - 35:22
**mention** [3] - 31:9, 126:12, 159:19
**mentioned** [15] - 27:18, 34:17, 40:6, 41:3, 41:14, 46:12, 116:10, 116:22, 136:20, 139:8, 150:5, 157:15, 160:19, 175:8
**mentions** [6] - 111:2, 127:13, 127:22, 132:24, 158:23
**merchandise** [2] - 124:12, 127:9
**mere** [1] - 51:1
**met** [5] - 24:13, 27:8, 31:21, 36:6, 114:12
**metric** [1] - 129:18
**metrics** [1] - 151:25
**microphone** [1] - 4:18
**MIDDLE** [1] - 1:1
**Middle** [4] - 85:13, 113:1, 175:4, 175:18
**might** [6] - 156:20, 165:12, 165:14, 166:6, 169:15, 172:3
**MIL** [1] - 93:8
**Milford** [1] - 87:20
**military** [3] - 42:20, 161:2
**military-type** [1] - 161:2
**million** [1] - 16:8

**mine** [1] - 80:20
**minute** [3] - 58:9, 74:3, 123:16
**minutes** [6] - 19:13, 50:1, 60:16, 107:7, 160:6, 160:7
**miss** [2] - 99:2, 153:19
**missed** [2] - 78:25, 79:2
**missing** [1] - 89:22
**mistake** [1] - 152:3
**mode** [4] - 139:19, 146:15, 147:2
**moment** [14] - 8:3, 21:14, 35:14, 40:22, 51:14, 54:7, 74:19, 96:3, 103:12, 124:17, 129:5, 140:18, 160:2, 170:18
**money** [4] - 16:10, 16:13, 41:15, 152:11
**monitor** [1] - 151:8
**Monteforte** [26] - 88:1, 88:23, 114:10, 114:22, 115:6, 115:13, 115:21, 116:5, 116:21, 117:7, 118:2, 118:12, 125:18, 125:25, 130:2, 130:5, 130:7, 130:14, 130:15, 130:20, 131:1, 131:16, 131:22, 132:3, 132:11, 136:13
**months** [2] - 62:3, 140:17
**Morales** [15] - 2:3, 3:14, 3:18, 3:24, 10:20, 21:18, 52:10, 53:5, 54:13, 60:6, 60:11, 72:18, 72:22, 147:18, 166:20
**morales** [1] - 13:3
**morning** [5] - 3:1, 3:2, 3:3, 21:18, 67:12
**most** [9] - 13:18, 15:4, 35:9, 38:20, 42:1, 44:12, 44:22, 46:4, 172:23
**mostly** [1] - 49:9
**Motion** [4] - 3:6, 3:8, 171:2, 173:7
**motions** [2] - 3:5, 3:10
**mount** [2] - 111:18, 128:19
**mounter** [1] - 111:18
**mouth** [1] - 4:19

**move** [8] - 4:18, 10:11, 57:19, 66:11, 93:15, 95:8, 101:25, 157:11
**moved** [1] - 97:13
**moves** [3] - 85:21, 89:3, 103:9
**moving** [5] - 78:4, 84:8, 86:3, 91:23, 97:12
**MR** [155] - 3:2, 3:3, 3:12, 3:14, 3:21, 3:23, 10:11, 10:13, 10:19, 12:14, 12:16, 12:19, 12:23, 12:25, 13:2, 21:6, 21:7, 21:11, 21:12, 21:14, 21:17, 51:14, 51:16, 52:5, 52:9, 52:13, 52:15, 53:11, 53:16, 54:4, 54:7, 54:9, 54:12, 57:10, 57:12, 57:15, 57:19, 57:25, 58:3, 58:5, 60:3, 60:5, 60:7, 60:10, 60:15, 60:19, 61:1, 61:4, 65:9, 65:12, 65:13, 66:11, 66:13, 66:17, 67:7, 67:9, 67:11, 73:23, 74:2, 74:19, 74:21, 74:23, 74:25, 75:2, 75:7, 75:15, 75:18, 84:6, 84:9, 84:13, 85:21, 85:23, 86:2, 89:3, 89:5, 89:9, 91:23, 92:1, 92:5, 93:14, 93:16, 93:20, 95:23, 96:5, 96:11, 97:11, 97:14, 97:18, 101:25, 102:2, 102:6, 103:9, 103:12, 103:21, 105:7, 105:15, 106:1, 106:4, 106:21, 106:23, 107:2, 107:5, 107:8, 107:12, 107:14, 121:12, 121:16, 121:17, 124:17, 124:19, 129:5, 129:7, 140:18, 140:25, 143:24, 144:12, 144:13, 153:3, 153:5, 154:2, 157:12, 157:13, 158:13, 159:8, 159:13, 160:2, 160:4, 160:6, 160:10, 160:13, 160:15, 161:15,

161:18, 162:9, 162:11, 162:13, 162:18, 163:2, 166:22, 166:24, 167:2, 167:4, 167:5, 167:15, 170:13, 170:14, 170:18, 170:20, 170:24, 171:9, 173:12, 173:22, 174:3, 174:9, 174:19
**MT** [1] - 128:15
**Mtech** [3] - 127:5, 128:15, 128:19
**multi** [5] - 85:9, 88:19, 107:17, 122:9, 124:6
**multi-agency** [1] - 107:17
**multi-page** [4] - 85:9, 88:19, 122:9, 124:6
**multiple** [1] - 24:20
**Mundy** [36] - 2:4, 19:25, 27:20, 28:17, 29:6, 39:24, 45:9, 46:13, 60:15, 60:19, 60:24, 61:5, 74:24, 75:4, 95:20, 96:1, 96:6, 96:12, 96:15, 96:18, 97:19, 98:5, 147:5, 148:12, 148:17, 148:19, 148:25, 149:22, 150:4, 150:8, 150:11, 150:18, 150:21, 154:20, 155:15, 170:1
**Munitions** [3] - 80:10, 94:20, 94:22
**must** [1] - 30:3

# N

**N.Y.U** [1] - 4:9
**name** [22] - 3:17, 11:4, 21:20, 25:5, 26:15, 60:22, 75:11, 82:12, 87:9, 87:22, 90:22, 91:18, 100:8, 111:10, 113:8, 120:22, 148:25, 162:21, 163:5, 165:12, 167:9, 167:18
**names** [8] - 6:24, 18:10, 19:23, 20:18, 77:7, 94:17, 94:18
**narcotics** [1] - 152:12
**narrative** [5] - 13:5, 15:3, 21:4, 21:9, 81:22

**narrow** [2] - 144:9, 171:12
**national** [2] - 29:17, 90:19
**National** [2] - 26:25, 29:24
**Nations** [1] - 90:19
**nature** [1] - 15:13
**Nealon** [1] - 1:15
**near** [1] - 112:25
**necessarily** [3] - 38:2, 49:2, 132:4
**necessary** [3] - 118:19, 171:10, 172:9
**need** [15] - 7:17, 31:24, 37:14, 37:19, 42:4, 62:5, 79:13, 139:3, 143:18, 146:23, 150:1, 150:3, 158:11, 174:6
**needed** [6] - 43:16, 58:9, 60:1, 94:3, 147:11, 171:23
**needs** [3] - 5:15, 49:19, 166:1
**negative** [2] - 31:14, 31:17
**network** [1] - 7:2
**never** [20] - 27:8, 35:10, 39:23, 70:3, 71:7, 74:7, 98:16, 113:25, 117:23, 118:10, 121:3, 127:22, 140:4, 142:11, 142:12, 147:9, 155:10, 162:4, 162:7
**New** [6] - 6:7, 98:14, 98:15, 147:8, 148:7, 148:22
**next** [8] - 20:10, 89:18, 89:20, 128:8, 132:9, 132:10, 145:8, 155:4
**nice** [1] - 13:18
**night** [1] - 146:1
**Ninth** [1] - 173:1
**nobody** [1] - 77:12
**none** [2] - 14:1, 157:7
**normal** [7] - 62:24, 64:14, 72:6, 79:7, 120:16, 147:24, 150:16
**normally** [5] - 27:24, 44:9, 96:25, 119:5
**North** [3] - 93:4, 95:4, 161:24
**Nos** [2] - 2:12, 84:11
**notation** [1] - 126:5
**note** [5] - 27:20, 49:3,

66:25, 96:21, 149:16
**noted** [2] - 49:2, 150:6
**notes** [5] - 13:9,
13:11, 18:15, 113:7,
150:13
**nothing** [8] - 31:15,
43:16, 51:6, 62:23,
74:21, 160:10,
162:9, 166:3
**Notice** [3] - 66:8,
67:17, 70:20
**notice** [8] - 16:7, 23:9,
27:18, 49:4, 53:23,
53:25, 125:6, 153:22
**notices** [2] - 77:18,
79:14
**notification** [1] - 166:1
**notified** [3] - 31:20,
31:24, 77:20
**November** [2] - 91:3,
91:16
**nowhere** [1] - 159:18
**NPS** [1] - 123:6
**NTC** [1] - 27:1
**number** [18] - 9:6,
25:3, 63:7, 63:11,
65:25, 83:21, 85:18,
86:20, 88:16, 100:3,
119:3, 120:13,
120:22, 128:18,
129:10, 143:16,
153:4, 165:11
**numbered** [1] - 175:9
**numbers** [3] - 90:23,
120:19, 122:22
**nut** [2] - 124:16

# O

**O'Donnell** [25] - 112:7,
112:8, 112:11,
114:6, 114:8, 114:9,
116:22, 121:20,
123:12, 125:13,
127:24, 130:13,
130:14, 130:19,
131:1, 131:14,
131:22, 132:19,
133:2, 133:4,
133:21, 134:2,
134:9, 134:11,
135:25
**OAI** [1] - 127:8
**object** [6] - 95:23,
103:13, 103:19,
143:25, 153:3, 159:8
**objected** [1] - 96:7
**objecting** [1] - 105:6
**objection** [19] - 10:13,
52:12, 57:10, 57:12,

57:13, 60:9, 65:9,
66:13, 84:9, 85:23,
89:5, 91:25, 92:1,
93:16, 96:3, 97:13,
102:2, 105:5, 121:14
**observation** [1] -
117:25
**observed** [1] - 114:13
**obtain** [2] - 160:23,
172:14
**obtained** [17] - 70:18,
82:7, 82:9, 82:14,
82:15, 82:20, 83:5,
83:7, 85:9, 89:20,
93:9, 101:23, 109:7,
118:4, 123:13,
130:19, 158:3
**obtaining** [1] - 94:2
**obviously** [7] - 10:5,
30:15, 61:14, 62:7,
91:4, 106:8, 160:18
**occasion** [5] - 27:5,
70:12, 114:9,
121:21, 168:1
**occasions** [3] - 56:7,
63:11, 70:6
**occurred** [9] - 14:9,
16:1, 63:8, 68:2,
137:14, 141:2,
142:8, 142:9, 167:21
**occurrence** [4] -
64:23, 65:7, 65:17,
69:7
**occurs** [1] - 70:11
**OF** [3] - 1:1, 1:3, 1:9
**offered** [4] - 45:18,
45:23, 147:10,
147:15
**Office** [5] - 76:11,
88:15, 107:25,
109:4, 137:4
**office** [20] - 12:3,
61:19, 61:22, 62:15,
65:1, 65:2, 72:8,
97:25, 98:8, 98:18,
99:4, 99:22, 101:1,
101:3, 146:18,
148:5, 148:8,
163:20, 165:13,
166:2
**office's** [2] - 97:22,
98:18
**Officer** [7] - 3:25,
11:10, 25:24, 68:8,
68:9, 114:17, 151:5
**officer** [42] - 4:14,
7:16, 7:19, 11:4,
11:24, 22:3, 22:5,
22:8, 22:10, 22:11,
22:14, 22:25, 23:3,

24:10, 24:11, 24:18,
25:3, 26:16, 26:17,
29:18, 31:7, 35:7,
36:13, 36:21, 37:1,
37:9, 37:11, 37:16,
38:15, 38:20, 44:12,
51:23, 56:4, 59:25,
60:1, 65:19, 69:10,
165:15, 165:25
**officer's** [2] - 39:1,
146:5
**Officer's** [2] - 164:11,
164:14
**officers** [8] - 19:25,
20:1, 24:20, 24:23,
35:10, 78:7, 78:24,
109:22
**Official** [4] - 53:25,
175:3, 175:14,
175:17
**official** [3] - 78:7,
82:25, 156:3
**officially** [1] - 158:8
**officials** [1] - 78:8
**often** [3] - 28:18,
28:20, 65:3
**old** [2] - 49:17, 139:11
**OML** [3] - 93:4,
158:15, 159:15
**on-site** [3] - 98:21,
98:25, 156:21
**once** [11] - 19:14,
32:13, 65:18, 97:19,
98:1, 98:19, 99:13,
100:15, 140:6,
158:4, 171:1
**one** [47] - 8:18, 10:14,
11:10, 23:10, 23:18,
24:11, 25:8, 26:12,
26:19, 26:20, 32:9,
34:10, 34:11, 41:21,
43:9, 49:12, 54:7,
56:13, 58:9, 66:19,
73:5, 73:13, 78:22,
78:23, 79:3, 84:14,
93:10, 100:6, 101:2,
109:14, 117:25,
118:7, 126:7,
126:14, 126:22,
128:10, 151:20,
153:18, 153:20,
159:22, 165:4,
167:11, 168:7,
169:2, 172:14, 173:7
**one-day** [10] - 26:19,
26:20, 73:5, 73:13,
78:22, 78:23, 79:3,
151:20, 153:18,
153:20
**ones** [2] - 14:8, 37:14

**ongoing** [7] - 79:18,
91:9, 96:23, 97:6,
108:18, 108:25,
110:2
**open** [11] - 18:12,
36:3, 47:13, 47:20,
71:13, 77:4, 98:22,
120:16, 145:2,
145:15, 146:23
**opened** [4] - 71:12,
118:8, 119:24,
146:25
**opening** [6] - 48:8,
81:2, 119:22,
139:12, 146:12,
146:13
**operates** [1] - 145:7
**operations** [1] - 48:19
**opportunity** [9] - 10:6,
77:15, 79:10,
137:19, 137:21,
138:24, 152:13,
153:25, 173:4
**opposed** [1] - 148:7
**option** [4] - 59:7, 77:9,
108:7, 136:8
**Order** [1] - 85:5
**order** [11] - 6:20, 64:1,
81:13, 90:13, 93:6,
100:10, 113:10,
122:9, 122:12,
122:25, 123:8
**ordered** [8] - 85:18,
86:23, 116:10,
123:9, 135:21,
159:15, 159:21,
159:25
**ordering** [2] - 83:15,
86:25
**orderly** [1] - 140:8
**orders** [4] - 85:9,
85:20, 87:8, 121:25
**ordinary** [1] - 96:24
**original** [1] - 56:14
**originally** [2] - 109:15,
111:9
**originating** [1] - 65:1
**outbound** [1] - 120:24
**outlining** [1] - 92:12
**outside** [4] - 81:2,
142:7, 156:6, 162:17
**overabundance** [1] -
158:7
**overall** [1] - 151:17
**overpaid** [1] - 57:7
**overruled** [1] - 57:24
**overseeing** [1] - 15:22
**overview** [2] - 96:19
**owed** [1] - 41:15
**own** [4] - 56:3, 95:3,

105:4, 154:7
**owned** [1] - 15:19
**owner** [4] - 15:4, 15:6,
88:1, 145:12

# P

**p.m** [1] - 67:22
**P.O** [1] - 175:18
**Pack** [1] - 26:12
**Package** [6] - 123:20,
123:22, 124:9,
124:23, 125:25,
127:4
**package** [30] - 83:5,
112:17, 112:25,
117:17, 117:23,
118:1, 118:8,
118:10, 118:14,
118:21, 119:12,
119:23, 120:1,
120:6, 120:12,
120:24, 121:2,
121:4, 121:7,
121:10, 125:17,
126:2, 128:6,
128:10, 128:11,
129:2, 155:3
**packaged** [7] - 97:21,
130:22, 130:24,
131:18, 131:25,
139:21, 147:2
**packages** [6] - 62:5,
72:9, 115:21, 119:4,
119:21, 132:4
**Packaging** [17] -
82:12, 82:24, 83:4,
87:23, 88:12, 88:22,
112:19, 115:6,
117:8, 117:18,
120:12, 123:13,
125:4, 125:13,
130:2, 130:7, 136:13
**packaging** [3] - 97:21,
118:3, 146:16
**Packing** [1] - 114:10
**packing** [1] - 122:23
**page** [25] - 9:22, 11:8,
22:24, 24:5, 85:9,
88:19, 89:11, 122:8,
122:9, 122:20,
122:24, 124:6,
124:7, 124:21,
125:1, 125:3, 125:6,
125:19, 125:20,
126:11, 126:14,
126:25, 132:9,
132:10
**Page** [5] - 25:14, 26:9,
127:20, 149:20,

150:6
**paged** [1] - 81:18
**paid** [2] - 16:8, 16:17
**pain** [1] - 158:24
**Palad(phonetic** [1] - 100:8
**paperwork** [4] - 11:11, 11:13, 83:14, 88:3
**paragraph** [3] - 81:13, 136:3
**Paragraph** [15] - 81:18, 84:14, 84:22, 86:7, 86:9, 110:16, 115:17, 116:2, 131:10, 131:21, 132:9, 132:22, 134:21, 154:18, 154:24
**Paragraphs** [1] - 86:3
**paragraphs** [1] - 81:2
**parcel** [1] - 116:23
**pardon** [1] - 74:14
**parents'** [2] - 87:2, 135:19
**part** [58] - 4:22, 5:4, 5:6, 5:8, 13:18, 15:4, 15:6, 19:17, 21:4, 22:21, 35:9, 36:18, 41:18, 42:1, 44:12, 46:11, 49:18, 52:2, 53:21, 55:16, 59:13, 59:21, 73:18, 73:20, 74:8, 76:2, 76:13, 76:14, 76:19, 77:1, 77:7, 79:25, 80:25, 86:11, 87:6, 94:13, 96:20, 105:3, 109:1, 116:22, 118:5, 120:15, 122:14, 122:20, 124:11, 141:18, 142:19, 143:1, 145:6, 145:22, 146:10, 147:24, 149:20, 150:17, 166:9
**partially** [1] - 102:24
**participating** [1] - 72:21
**particular** [28] - 6:13, 7:9, 7:23, 8:24, 19:19, 22:17, 30:23, 33:18, 44:21, 45:17, 51:3, 59:7, 59:13, 59:20, 63:16, 70:12, 71:20, 72:1, 77:17, 80:19, 94:11, 96:15, 99:10, 99:15, 145:25, 169:3
**particularly** [2] - 10:25, 14:4

**particulars** [1] - 53:6
**parties** [2] - 172:14, 173:5
**parties'** [1] - 170:22
**partner** [1] - 100:7
**partners** [1] - 57:8
**partnership** [2] - 95:6, 95:7
**parts** [12] - 48:9, 62:4, 86:23, 87:13, 111:2, 111:6, 111:9, 111:13, 111:16, 126:1, 135:2
**party** [1] - 130:8
**passcode** [7] - 47:12, 47:14, 47:20, 71:13, 145:13, 145:18, 145:19
**passcodes** [2] - 70:17, 70:18
**passenger** [19] - 7:16, 7:17, 7:18, 7:19, 7:20, 8:15, 13:23, 14:6, 24:16, 37:2, 37:12, 38:15, 38:21, 44:15, 66:24, 156:18, 156:19, 163:18, 165:16
**passenger's** [1] - 14:9
**passengers** [8] - 6:18, 7:21, 24:12, 32:10, 37:7, 65:4, 143:17, 163:19
**passport** [24] - 16:22, 16:23, 16:25, 17:6, 17:8, 17:9, 17:10, 17:18, 17:19, 17:21, 30:25, 38:13, 38:17, 38:19, 39:5, 41:22, 41:24, 42:2, 42:9, 50:11, 56:14, 56:15, 56:21
**Password** [1] - 67:1
**password** [1] - 70:21
**passwords** [4] - 67:2, 67:4, 139:17
**past** [6] - 47:25, 53:9, 58:23, 59:8, 104:23, 173:18
**Patrol** [2] - 22:15, 80:4
**pattern** [1] - 77:13, 82:21
**pay** [3] - 16:13, 97:23, 148:7
**payment** [1] - 113:13
**pen** [1] - 125:5
**pending** [4] - 149:22, 150:8, 171:3, 173:7
**PENNSYLVANIA** [3] - 1:1, 1:11, 1:25

**Pennsylvania** [19] - 1:16, 1:19, 85:8, 85:13, 87:21, 88:18, 113:1, 113:23, 117:8, 118:15, 134:3, 134:24, 135:19, 135:22, 136:1, 169:9, 175:5, 175:18, 175:19
**people** [40] - 4:15, 6:24, 7:6, 13:7, 18:6, 20:17, 22:8, 24:12, 24:21, 25:3, 26:21, 30:10, 34:1, 34:10, 34:11, 34:12, 37:5, 37:10, 37:13, 55:20, 57:2, 57:3, 59:22, 70:6, 84:24, 87:4, 99:2, 112:14, 113:4, 121:21, 127:25, 130:3, 136:12, 139:24, 147:16, 149:2, 165:4, 168:3
**percent** [4] - 10:10, 17:14, 28:6, 34:23
**perform** [1] - 99:25
**performed** [5] - 62:24, 64:14, 90:21, 100:16, 155:10
**perhaps** [7] - 48:10, 111:14, 137:17, 138:1, 144:5, 168:1, 169:21
**period** [3] - 71:22, 71:24, 71:25
**periodic** [3] - 73:21, 73:22, 142:2
**permissible** [2] - 74:9, 144:4
**permission** [4] - 90:5, 138:9, 160:23, 161:6
**permissions** [1] - 161:3
**permitted** [1] - 78:8
**person** [31] - 5:14, 5:17, 11:24, 14:12, 14:15, 20:13, 24:17, 25:1, 26:7, 27:8, 27:13, 29:18, 29:19, 37:4, 37:6, 37:16, 37:17, 38:4, 38:17, 64:6, 68:4, 68:6, 68:20, 73:13, 112:16, 113:8, 143:13, 151:9, 165:2, 166:12
**person's** [1] - 151:8
**personal** [1] - 6:25
**personally** [2] - 56:25, 170:2

**personnel** [2] - 42:20, 160:25
**perspective** [1] - 11:24
**pertain** [1] - 53:20
**Petition** [2] - 171:4, 173:15
**phase** [1] - 74:15
**Philadelphia** [14] - 62:15, 62:18, 64:4, 75:21, 97:22, 97:24, 98:13, 101:1, 147:12, 148:7, 148:22, 149:23, 150:9, 156:24
**Philly** [1] - 147:21
**phone** [45] - 47:12, 62:3, 70:8, 72:4, 82:24, 86:20, 88:16, 95:21, 96:1, 98:21, 98:22, 98:23, 98:25, 99:25, 100:2, 100:11, 100:15, 103:15, 105:8, 105:11, 105:17, 105:22, 120:19, 120:22, 133:7, 134:8, 139:23, 140:5, 140:13, 144:14, 144:25, 145:2, 145:7, 145:13, 145:20, 146:15, 148:2, 149:18, 149:19, 149:24, 150:10, 150:13, 156:15, 156:16, 156:17
**phones** [18] - 99:3, 100:12, 101:6, 103:4, 103:6, 105:21, 139:11, 139:18, 144:19, 144:21, 146:7, 146:10, 146:12, 146:23, 156:13, 156:16, 157:7
**photo** [2] - 131:3, 131:21
**photograph** [7] - 130:16, 130:17, 130:25, 131:16, 131:22, 132:11
**photos** [4] - 100:1, 118:11, 130:19, 130:21
**phrase** [1] - 73:11
**physical** [4] - 71:10, 145:1, 145:2, 145:6
**physically** [1] - 8:21
**pick** [3] - 24:23, 46:22,

144:14
**picks** [1] - 154:18
**pin** [6] - 93:7, 94:6, 124:20, 159:16
**pins** [2] - 93:7, 111:11
**pistol** [3] - 44:25, 45:13, 169:21
**Pittston** [1] - 1:19
**place** [11] - 6:23, 27:2, 32:9, 33:18, 83:5, 87:16, 104:22, 112:17, 112:19, 112:25, 141:12
**Place** [24] - 82:12, 82:24, 83:4, 87:23, 88:12, 88:22, 112:19, 114:10, 115:6, 117:8, 117:18, 120:12, 123:14, 123:20, 123:22, 124:9, 124:23, 125:4, 125:13, 125:25, 127:4, 130:2, 130:7, 136:13
**placed** [7] - 26:20, 122:1, 123:8, 139:19, 142:12, 146:13, 147:2
**places** [6] - 6:25, 7:7, 7:11, 8:1, 18:11, 98:11
**placing** [2] - 69:15, 146:14
**plain** [5] - 44:21, 64:1, 96:24, 169:16, 169:18
**plaintiff** [1] - 1:4
**plan** [1] - 129:15
**plane** [2] - 24:16, 79:5
**planning** [2] - 72:10, 78:10
**plastic** [2] - 132:12, 132:15
**Playstation** [1] - 70:8
**pleasant** [2] - 13:12, 14:3
**point** [52] - 8:25, 13:14, 17:25, 20:13, 20:15, 31:19, 37:15, 53:15, 57:22, 61:15, 68:13, 76:20, 76:21, 78:5, 81:14, 86:6, 91:1, 93:14, 95:21, 97:7, 97:10, 97:20, 98:2, 98:3, 101:2, 103:6, 105:18, 106:11, 108:2, 108:24, 110:2, 110:7, 111:5,

111:10, 111:24,
115:2, 116:10,
120:10, 121:5,
132:18, 133:4,
135:20, 136:10,
137:12, 138:19,
146:11, 148:25,
149:1, 151:10,
151:18, 159:24,
172:9
**pointed** [2] - 149:5,
159:3
**policies** [3] - 53:19,
141:19, 143:22
**policy** [12] - 51:22,
51:24, 53:7, 78:16,
140:9, 142:3, 142:4,
142:19, 143:22,
143:25, 144:9,
158:10
**polish** [1] - 127:16
**polite** [1] - 40:23
**pop** [1] - 100:9
**port** [1] - 24:12
**portion** [1] - 153:11
**pose** [1] - 42:6
**posed** [2] - 20:22,
57:23
**position** [6] - 4:12,
4:21, 4:24, 61:10,
62:2, 171:6
**positive** [1] - 31:15
**possession** [1] -
103:7
**possible** [2] - 80:21,
96:24
**possibly** [4] - 6:24,
98:23, 109:11,
139:13
**post** [4] - 105:19,
170:23, 171:1, 171:9
**post-hearing** [2] -
170:23, 171:9
**post-search** [1] -
105:19
**postage** [1] - 148:2
**posted** [1] - 140:14
**potential** [2] - 57:7,
79:13
**potentially** [2] -
120:15, 152:9
**pow** [1] - 137:13
**pow-wow** [1] - 137:13
**powered** [1] - 146:25
**powering** [1] - 146:13
**practice** [5] - 64:24,
65:18, 66:23, 68:21,
98:17
**pre** [1] - 150:10
**pre-bagged** [1] -

150:10
**prefer** [1] - 150:2
**preliminary** [1] -
114:21
**preparation** [3] -
76:13, 80:25, 106:15
**prepare** [1] - 124:8
**prepared** [6] - 10:2,
18:18, 76:15, 124:9,
173:23, 175:11
**present** [21] - 12:20,
19:17, 19:20, 21:1,
27:24, 28:13, 28:18,
28:21, 40:2, 44:7,
54:2, 54:23, 62:22,
62:24, 67:12, 72:13,
131:7, 162:14,
168:22
**presented** [5] - 38:10,
43:7, 117:17,
137:19, 138:2
**preserved** [1] - 48:22
**presumably** [1] -
106:20
**pretty** [8] - 9:1, 18:9,
30:21, 42:24, 72:2,
112:3, 164:16,
171:11
**preventing** [1] - 137:7
**previous** [3] - 10:14,
95:20, 170:11
**previously** [2] - 12:20,
72:19
**primarily** [1] - 6:19
**primary** [37] - 5:15,
7:16, 24:7, 24:9,
24:10, 24:18, 25:1,
29:10, 29:11, 29:13,
29:15, 29:17, 31:21,
32:12, 32:18, 34:13,
36:12, 36:13, 36:19,
36:20, 37:1, 37:9,
37:16, 37:23, 38:3,
38:12, 38:15, 38:19,
39:1, 41:21, 87:2,
138:2, 163:16,
163:17, 164:25,
165:25, 166:5
**Primary** [3] - 24:11,
26:12, 52:17
**print** [1] - 91:19
**printed** [2] - 23:18,
23:23
**printout** [2] - 91:14,
93:3
**Privacy** [2] - 53:1,
142:17
**privacy** [2] - 49:8,
142:16
**private** [1] - 82:11

**probability** [1] -
121:10
**probable** [3] - 81:4,
83:7, 83:13
**problem** [2] - 38:19,
39:5
**problems** [2] - 17:2,
148:15
**procedure** [4] - 51:22,
164:1, 166:14,
166:15
**proceed** [8] - 3:11,
3:20, 61:1, 75:15,
107:11, 170:21,
171:8, 173:8
**PROCEEDINGS** [1] -
1:9
**proceedings** [6] -
53:12, 76:4, 84:8,
144:1, 174:23, 175:8
**Proceedings** [1] -
1:21
**process** [11] - 7:16,
22:8, 24:21, 38:2,
38:8, 44:15, 64:21,
83:16, 99:12, 139:16
**processed** [4] - 5:14,
24:10, 37:11, 37:13
**processing** [2] - 4:15,
9:17
**produce** [1] - 30:19
**produced** [2] - 1:21,
129:12
**producing** [1] - 95:1
**production** [1] - 94:8
**products** [2] - 113:13,
135:1
**professionally** [1] -
95:10
**proffer** [1] - 52:13
**progresses** [1] - 53:22
**Proliferations** [6] -
80:7, 80:23, 94:14,
143:2, 148:21,
148:23
**prompted** [1] - 20:22
**proof** [1] - 120:25
**property** [3] - 66:9,
67:18, 70:20
**proposed** [2] - 137:19,
162:4
**protecting** [1] - 29:22
**Protection** [33] - 3:25,
4:12, 4:16, 4:21, 5:1,
6:4, 6:15, 21:23,
22:16, 27:2, 29:22,
43:19, 44:3, 46:15,
51:4, 51:17, 52:21,
52:23, 53:2, 53:19,
53:20, 55:22, 58:6,

62:17, 71:5, 72:18,
79:8, 79:10, 107:21,
119:25, 147:17,
163:8, 168:7
**provide** [7] - 66:22,
70:16, 77:15,
145:15, 145:17,
148:5, 148:10
**provided** [24] - 15:16,
57:6, 57:17, 59:3,
66:21, 66:23, 86:16,
88:2, 88:23, 97:8,
97:21, 113:10,
113:17, 114:3,
114:4, 120:20,
121:24, 124:23,
127:25, 139:17,
139:18, 148:2,
148:25, 174:11
**providing** [3] - 20:23,
148:13, 160:22
**provisions** [1] - 175:5
**public** [1] - 63:23
**punch** [1] - 124:20
**purchase** [2] - 85:9,
85:20
**purchased** [2] - 90:10,
113:18
**purpose** [4] - 29:10,
29:13, 29:14, 29:15
**purposes** [4] - 9:8,
84:7, 92:25, 95:12
**pursuant** [1] - 175:5
**purview** [1] - 109:14
**push** [1] - 129:23
**put** [23] - 9:9, 13:20,
13:23, 14:2, 17:7,
23:15, 26:2, 26:17,
26:23, 27:16, 28:15,
47:22, 52:10, 66:18,
99:21, 109:19,
119:22, 120:9,
121:7, 123:19,
130:2, 133:7, 151:2
**puts** [1] - 153:22
**putting** [1] - 122:6

## Q

**quantities** [1] - 94:3
**quantity** [8] - 122:14,
127:9, 128:1, 128:5,
128:8, 128:14,
128:16, 129:2
**questionable** [1] -
163:25
**questioned** [1] - 41:2
**questioning** [2] -
96:21, 97:10
**questions** [41] - 9:4,

13:6, 13:19, 13:22,
14:5, 14:6, 14:12,
14:17, 15:2, 18:3,
18:8, 20:2, 20:11,
20:14, 20:15, 20:18,
20:21, 21:12, 21:21,
40:7, 40:15, 42:10,
54:10, 57:23, 58:1,
63:2, 64:7, 67:7,
72:21, 74:23, 96:15,
96:22, 107:2, 143:9,
143:25, 144:9,
160:13, 161:15,
166:23, 170:13,
170:14
**quick** [4] - 54:9, 83:20,
100:9, 102:17
**quickly** [2] - 55:7,
171:17
**quiz** [1] - 53:5

## R

**R's** [1] - 26:22
**raised** [2] - 38:10,
171:1
**raises** [1] - 172:18
**ran** [1] - 82:13
**range** [1] - 165:11
**ranging** [1] - 42:20
**rather** [2] - 56:20,
148:4
**re** [2] - 111:2, 173:15
**re-shipped** [1] - 111:2
**re-visit** [1] - 173:15
**read** [8] - 10:6, 13:11,
15:19, 115:19,
131:11, 134:23,
153:10, 168:4
**Read** [1] - 153:9
**reading** [1] - 128:6
**reads** [1] - 132:17
**ready** [3] - 3:11, 32:13,
107:11
**real** [3] - 16:23, 16:25,
17:21
**really** [12] - 56:23,
62:23, 65:22,
111:13, 128:7,
143:25, 150:20,
168:11, 169:11,
171:19, 172:9
**REALTIME** [1] - 1:24
**ream** [1] - 111:14
**reamers** [9] - 115:11,
115:12, 115:23,
116:2, 118:23,
122:15, 127:11,
135:10, 135:17
**Reason** [1] - 26:10

**reason** [16] - 11:21, 36:14, 36:22, 41:18, 43:13, 55:16, 55:22, 56:24, 58:14, 98:12, 143:7, 143:14, 143:18, 169:4, 172:5
**reasonable** [3] - 106:10, 106:12, 138:7
**reasonably** [2] - 151:11, 158:5
**reasons** [6] - 41:20, 49:12, 90:18, 165:9, 165:11, 171:21
**Rebel** [1] - 162:4
**recalling** [4] - 82:21, 130:19, 133:6, 158:10
**receipt** [3] - 174:4, 174:12, 174:13
**Receipt** [3] - 66:8, 67:17, 70:20
**receive** [3] - 98:6, 141:23, 172:15
**received** [29] - 4:20, 4:23, 11:18, 16:10, 16:20, 67:3, 72:10, 77:18, 77:21, 77:24, 82:24, 83:10, 84:3, 86:20, 87:15, 98:1, 98:4, 120:11, 136:11, 136:18, 149:21, 150:7, 154:19, 155:1, 155:2, 155:9, 155:14, 157:20, 161:11
**receiver** [1] - 124:15
**receives** [1] - 72:11
**receiving** [1] - 78:10
**recent** [4] - 172:23
**recess** [4] - 60:17, 107:10, 160:4, 160:8
**recollect** [2] - 64:11, 170:10
**recollection** [9] - 11:8, 13:5, 16:19, 18:20, 19:9, 41:14, 163:24, 168:10, 169:11
**recommended** [1] - 8:18
**record** [18] - 3:17, 9:15, 9:16, 53:21, 56:11, 60:23, 75:12, 96:10, 106:16, 120:23, 151:15, 152:5, 152:8, 152:18, 153:11, 162:22, 167:10
**recorded** [3] - 1:21,

18:15, 50:20
**recording** [2] - 50:22, 50:24
**records** [6] - 77:4, 77:5, 77:9, 98:5, 155:15, 161:5
**recovered** [3] - 102:14, 104:24, 158:20
**Recross** [1] - 2:2
**recross** [1] - 161:16
**RECROSS** [2] - 58:4, 161:17
**red** [1] - 79:14
**redacted** [1] - 10:15
**redirect** [3] - 54:8, 74:22, 160:12
**Redirect** [1] - 2:2
**REDIRECT** [2] - 54:11, 160:14
**refer** [8] - 38:3, 41:21, 51:8, 104:14, 112:2, 137:23, 165:8, 166:6
**reference** [6] - 10:22, 125:7, 126:7, 129:23, 150:11, 150:13
**referenced** [4] - 89:11, 102:7, 117:19, 157:14
**references** [2] - 104:18, 126:15
**Referral** [1] - 26:10
**referral** [7] - 11:13, 11:17, 23:4, 26:10, 26:14, 77:10
**referrals** [1] - 11:18
**Referred** [2] - 24:6, 26:15
**referred** [25] - 7:18, 11:1, 11:4, 11:11, 11:17, 11:19, 11:20, 11:25, 25:11, 25:18, 25:20, 26:10, 26:12, 33:19, 33:24, 37:5, 54:14, 54:16, 54:18, 55:10, 58:15, 104:23, 105:9, 153:10, 165:13
**referred-to** [1] - 153:10
**referring** [7] - 11:24, 39:4, 104:24, 111:8, 112:10, 151:19, 168:5
**Referring** [1] - 22:25
**refers** [2] - 38:15, 112:10
**reflect** [1] - 10:8
**reflected** [1] - 15:11

**reform** [1] - 65:11
**reformulate** [1] - 159:11
**refresh** [2] - 51:23, 168:10
**refreshers** [1] - 51:21
**refreshments** [1] - 45:18
**regarding** [29] - 28:17, 28:25, 30:24, 41:3, 41:15, 41:20, 42:13, 58:14, 74:9, 113:11, 116:21, 118:12, 120:12, 121:18, 122:25, 125:9, 126:25, 134:25, 141:20, 142:4, 143:22, 147:12, 147:18, 149:17, 150:23, 159:1, 166:12, 168:8, 168:13
**regardless** [4] - 54:17, 138:1, 138:2, 152:1
**regards** [30] - 4:4, 4:21, 4:24, 6:13, 9:5, 10:25, 11:8, 11:20, 14:22, 15:2, 15:16, 16:9, 17:23, 18:21, 19:6, 20:2, 20:5, 21:9, 56:7, 56:11, 57:6, 62:8, 64:7, 64:20, 76:16, 82:3, 93:11, 95:18, 171:14, 171:23
**Region** [1] - 88:15
**regional** [1] - 90:19
**regular** [3] - 32:8, 51:18, 60:1
**regularly** [1] - 74:12
**regulations** [1] - 47:17
**Regulations** [1] - 54:1
**related** [2] - 3:7, 29:16
**relation** [1] - 158:5
**Relations** [1] - 4:9
**relationship** [1] - 37:23
**relationships** [1] - 16:1
**relative** [8] - 59:3, 110:13, 111:1, 113:10, 121:25, 127:21, 129:8, 147:16
**relatively** [1] - 99:17
**relatives** [1] - 40:9
**relevancy** [1] - 52:14
**relevant** [4] - 53:11, 121:24, 144:1, 159:9
**rely** [1] - 173:10

**remain** [1] - 98:13
**remarks** [1] - 66:25
**remember** [44] - 7:24, 8:24, 9:2, 12:1, 13:8, 13:11, 13:13, 14:2, 16:3, 16:21, 18:1, 18:2, 18:8, 18:10, 19:8, 20:3, 20:7, 21:2, 27:17, 28:15, 29:1, 29:2, 31:23, 32:1, 33:9, 33:10, 36:11, 39:22, 40:1, 40:2, 42:1, 46:4, 46:11, 46:12, 47:7, 49:18, 50:16, 59:10, 59:11, 86:25
**remembered** [1] - 18:9
**remembers** [1] - 20:19
**remotely** [2] - 139:20, 147:21
**removed** [1] - 109:19
**repeat** [4] - 5:7, 36:18, 48:6, 58:25
**replied** [1] - 130:23
**replies** [1] - 13:6
**report** [59] - 9:14, 9:25, 10:2, 10:6, 10:21, 12:10, 13:23, 15:11, 15:19, 16:7, 16:12, 17:7, 18:17, 21:4, 21:9, 22:21, 23:8, 23:9, 23:11, 23:14, 23:15, 23:18, 23:23, 25:14, 25:17, 27:16, 27:18, 28:15, 31:8, 41:2, 41:13, 49:4, 49:21, 49:22, 98:19, 100:13, 101:21, 102:22, 103:2, 119:11, 119:15, 119:17, 119:20, 120:2, 130:2, 147:17, 147:19, 147:21, 149:20, 150:12, 150:17, 157:19, 164:9, 164:11, 164:15, 164:20, 168:16
**Report** [6] - 91:17, 92:11, 95:14, 101:21, 102:12, 129:14
**REPORTED** [1] - 175:15
**reporter** [2] - 153:10, 175:23
**Reporter** [3] - 175:3, 175:14, 175:17
**REPORTER** [2] - 1:24,

153:12
**reporting** [1] - 6:21
**reports** [3] - 147:15, 168:8, 168:16
**represent** [2] - 21:20, 163:5
**representative** [2] - 82:1, 130:21
**reproduction** [1] - 175:22
**request** [15] - 13:14, 63:12, 64:15, 65:4, 65:17, 69:3, 69:9, 72:7, 78:12, 79:1, 91:18, 95:19, 98:7, 98:8, 149:1
**requested** [9] - 65:7, 76:24, 89:21, 90:7, 90:24, 91:7, 108:2, 109:4, 125:14
**requesting** [5] - 98:17, 98:18, 99:3, 146:17, 148:8
**requests** [3] - 65:3, 72:10, 161:8
**require** [2] - 47:9, 51:12
**required** [15] - 31:15, 40:21, 42:14, 47:17, 51:18, 72:5, 73:19, 74:16, 75:1, 89:24, 90:12, 118:19, 119:2, 141:19, 146:16
**requirement** [1] - 45:15
**requirements** [1] - 51:21
**requisite** [1] - 106:18
**residence** [3] - 87:2, 135:22
**residential** [1] - 15:23
**Residential** [1] - 88:14
**resolve** [1] - 42:15
**resources** [1] - 150:3
**respect** [4] - 146:1, 166:12, 171:3, 173:7
**respectively** [1] - 170:22
**respond** [1] - 173:20
**responded** [2] - 134:18, 135:3
**responds** [1] - 173:24
**Response** [11] - 6:11, 22:18, 22:25, 23:4, 25:16, 25:17, 25:21, 38:22, 39:15, 59:14, 59:21
**response** [2] - 6:16, 26:15

**responsibilities** [1] - 62:6
**responsibility** [1] - 71:22
**responsible** [2] - 80:7, 98:15
**rest** [1] - 55:20
**restricted** [1] - 88:4
**result** [6] - 43:11, 91:20, 92:18, 114:20, 158:17
**resulted** [1] - 103:15
**results** [3] - 105:10, 157:19, 157:22
**retainer** [2] - 158:24, 159:16
**retainers** [1] - 93:7
**retaining** [1] - 94:6
**retired** [1] - 42:21
**retrieve** [1] - 97:9
**retrieved** [1] - 88:21
**return** [5] - 85:17, 88:25, 99:5, 99:8, 101:2
**returned** [2] - 100:24, 100:25
**returning** [5] - 42:25, 76:5, 78:14, 81:15, 98:4
**review** [23] - 91:5, 91:7, 98:20, 102:14, 102:17, 103:3, 104:14, 104:19, 104:20, 105:21, 138:5, 138:24, 139:9, 140:4, 140:15, 140:16, 140:17, 140:20, 140:21, 141:1, 142:13, 164:9, 164:17
**reviewed** [9] - 76:14, 79:21, 81:8, 82:9, 83:13, 92:6, 93:22, 108:3, 114:18
**reviewing** [6] - 99:22, 99:24, 104:4, 110:3, 128:9, 164:20
**reviews** [1] - 113:7
**rifle** [17] - 94:4, 94:7, 113:11, 113:20, 123:6, 123:9, 126:8, 126:12, 126:22, 127:22, 128:1, 129:16, 130:4, 130:16, 132:4, 134:12
**rifles** [1] - 95:1
**rifling** [10] - 87:11, 89:22, 89:23, 90:10,

90:16, 116:11, 116:13, 116:16, 131:18, 135:17
**ring** [4] - 73:5, 158:24, 159:16
**rings** [3] - 93:6, 93:7, 93:8
**rise** [1] - 15:23
**risk** [1] - 139:11
**RMR** [1] - 1:23
**RMR,CRR** [2] - 175:13, 175:16
**Road** [2] - 85:7, 87:20
**road** [1] - 139:13
**ROBERT** [1] - 1:10
**rod** [3] - 123:5, 123:7
**Roggio** [200] - 3:5, 8:2, 8:10, 9:5, 9:14, 9:20, 10:1, 10:9, 10:23, 11:1, 11:11, 11:17, 12:2, 12:7, 12:8, 12:11, 12:17, 13:4, 14:17, 15:1, 15:3, 15:20, 15:25, 16:7, 16:12, 16:20, 17:17, 18:12, 18:20, 19:2, 19:5, 19:11, 19:15, 20:2, 20:4, 20:5, 20:6, 20:11, 20:22, 20:25, 21:7, 21:10, 21:20, 22:7, 23:6, 24:2, 24:10, 24:11, 25:9, 25:18, 27:5, 28:25, 29:5, 30:23, 31:21, 32:4, 32:17, 33:12, 33:19, 35:2, 36:6, 38:2, 39:12, 39:18, 43:8, 44:7, 45:18, 49:11, 49:25, 50:9, 54:14, 54:16, 55:9, 56:7, 56:14, 57:6, 59:2, 62:8, 62:11, 63:13, 64:6, 64:7, 64:19, 64:20, 64:23, 64:25, 66:9, 66:22, 67:13, 70:16, 72:22, 72:24, 73:1, 75:25, 76:3, 76:17, 76:23, 76:25, 77:6, 77:16, 78:10, 78:13, 78:21, 79:18, 79:24, 80:17, 81:15, 82:21, 82:22, 83:12, 84:4, 85:7, 85:10, 86:10, 86:20, 86:21, 86:22, 86:24, 88:5, 88:13, 88:14, 88:17, 90:3, 90:10, 91:2, 91:14, 92:11, 92:15, 93:5, 94:2, 95:1, 95:3,

95:6, 95:9, 95:16, 96:13, 96:16, 96:22, 97:5, 100:5, 101:4, 101:5, 101:23, 102:15, 104:10, 113:18, 114:12, 116:10, 116:23, 117:7, 121:25, 123:8, 123:22, 124:2, 125:4, 125:14, 127:4, 132:19, 133:1, 133:5, 133:9, 133:11, 133:15, 133:22, 134:3, 134:4, 134:7, 134:18, 134:24, 135:1, 135:3, 135:17, 136:14, 136:17, 137:22, 138:7, 139:17, 140:3, 140:23, 146:19, 147:18, 151:11, 154:14, 157:8, 158:6, 159:15, 161:6, 161:9, 161:19, 163:5, 164:5, 165:6, 165:19, 167:18, 168:12
**ROGGIO** [5] - 1:6, 83:25, 84:5, 89:13, 91:15
**Roggio's** [33] - 3:6, 9:17, 10:3, 13:6, 19:21, 53:9, 55:4, 57:16, 77:14, 84:19, 85:17, 86:18, 88:25, 90:21, 92:22, 93:22, 94:17, 96:20, 100:23, 101:14, 109:8, 115:21, 120:22, 123:25, 133:6, 133:10, 141:2, 142:6, 142:9, 151:24, 154:11, 157:18, 158:18
**role** [2] - 72:1, 137:7
**rolo** [1] - 123:6
**rolo-matic** [1] - 123:6
**room** [28] - 7:21, 8:19, 8:20, 9:2, 12:11, 12:18, 19:11, 32:11, 33:1, 33:3, 33:13, 33:25, 34:3, 34:8, 34:21, 34:22, 35:22, 35:23, 36:25, 44:6, 46:14, 50:4, 50:5, 50:6, 50:8, 50:13, 50:22, 169:13

**rooms** [1] - 55:20
**Ross** [16] - 3:4, 21:20, 31:20, 75:25, 85:7, 88:13, 88:17, 91:14, 91:19, 93:5, 95:15, 101:23, 124:2, 134:7, 163:5, 168:12
**ROSS** [1] - 1:6
**rotation** [1] - 169:2
**routed** [1] - 148:20
**routine** [4] - 20:14, 20:15, 40:16, 64:14
**routinely** [1] - 14:24
**rules** [1] - 27:3
**Rules** [2] - 106:5, 106:18
**run** [1] - 139:11
**running** [3] - 124:21, 154:9
**Rwroggio** [4] - 83:25, 89:12, 91:15, 93:12
**Rwroggio@yahoo. com** [2] - 91:21, 93:13

**S**

**s/Kristin** [1] - 175:13
**SA** [12] - 148:12, 148:18, 148:25, 149:21, 149:22, 150:4, 150:7, 150:8, 150:11, 155:15, 155:17, 158:22
**SAC** [3] - 97:22, 97:24, 148:6
**saddle** [1] - 127:16
**safe** [3] - 29:15, 87:1, 135:18
**safety** [1] - 56:3
**saga** [1] - 133:12
**sales** [1] - 122:9
**Sales** [1] - 85:5
**Salesperson** [1] - 93:5
**Sandisk** [1] - 101:10
**sat** [1] - 78:2
**satisfied** [9] - 41:24, 42:11, 43:8, 56:7, 56:17, 56:19, 56:20, 99:6, 100:15
**saw** [7] - 28:4, 30:25, 103:24, 118:9, 164:15, 166:21, 170:4
**scheme** [1] - 43:3
**Scott** [3] - 83:24, 84:3, 90:6
**SCRANTON** [2] - 1:11, 1:25
**Scranton** [4] - 1:16,

80:23, 169:8, 175:19
**screen** [1] - 52:11
**screening** [4] - 7:17, 26:7, 38:4, 166:2
**scroll** [1] - 47:21
**sealed** [1] - 119:24
**seaport** [2] - 143:3
**Search** [7] - 83:23, 84:2, 95:15, 110:9, 131:11, 132:21, 134:21
**search** [95] - 53:9, 64:17, 74:10, 77:16, 78:5, 78:8, 78:9, 78:12, 80:16, 80:19, 81:9, 82:20, 83:7, 83:9, 83:11, 89:14, 90:2, 90:7, 90:25, 91:1, 92:18, 93:10, 98:10, 98:21, 100:9, 101:22, 102:7, 102:14, 102:23, 103:19, 103:22, 104:2, 104:12, 104:13, 104:16, 104:25, 105:8, 105:10, 105:18, 105:19, 108:7, 109:7, 111:1, 112:9, 114:17, 116:1, 118:19, 136:8, 136:14, 137:17, 137:20, 138:5, 138:12, 138:18, 138:22, 139:2, 139:7, 139:9, 141:3, 141:4, 141:5, 141:10, 141:11, 142:5, 142:10, 142:24, 143:11, 143:18, 143:23, 144:24, 145:1, 145:2, 145:6, 146:3, 146:11, 146:24, 148:19, 149:11, 154:11, 157:17, 157:19, 157:21, 158:2, 158:4, 158:7, 158:10, 158:12, 158:17, 158:21, 159:3, 159:18, 171:24, 171:25
**searched** [6] - 31:12, 71:3, 101:7, 101:8, 105:8, 146:25
**Searches** [2] - 52:18, 53:2
**searches** [8] - 53:8, 74:9, 90:7, 90:8, 91:5, 100:6, 141:20,

142:24
searching [1] - 91:21
seated [7] - 3:19,
60:25, 75:14,
162:25, 164:4,
167:13, 168:12
second [6] - 9:22,
31:25, 125:19,
125:20, 126:11
secondaried [2] -
78:21, 152:5
secondarily [1] -
154:5
secondarily-
inspected [1] - 154:5
secondary [96] - 5:5,
5:9, 5:14, 5:19, 6:9,
7:10, 7:15, 7:18, 8:6,
8:17, 9:5, 11:1,
11:11, 12:2, 12:4,
19:12, 19:21, 24:1,
25:12, 25:18, 27:25,
28:6, 28:19, 29:14,
29:18, 32:14, 33:13,
33:17, 33:19, 33:24,
34:8, 34:13, 34:14,
35:23, 36:15, 36:17,
36:22, 36:25, 37:2,
37:6, 37:12, 37:14,
37:24, 38:7, 38:16,
38:25, 43:12, 54:14,
55:4, 55:10, 58:14,
58:15, 59:15, 59:16,
59:25, 60:1, 62:10,
64:13, 64:15, 67:25,
68:2, 69:3, 71:5,
72:4, 72:13, 76:24,
79:1, 79:16, 95:19,
96:6, 96:13, 103:8,
137:23, 138:3,
148:12, 152:1,
152:4, 153:1,
153:15, 163:19,
165:8, 165:9,
165:15, 166:7,
166:13, 166:17,
167:22, 168:4,
168:8, 168:22,
169:13
Secondary [3] - 95:15,
164:11, 164:14
Section [1] - 175:6
secured [5] - 100:15,
149:22, 150:8,
154:22, 155:19
security [4] - 29:17,
50:17, 57:2, 90:19
Security [47] - 27:6,
27:20, 28:17, 28:18,
29:6, 29:24, 39:24,

43:24, 45:9, 46:13,
52:19, 53:1, 53:14,
53:18, 53:21, 54:3,
54:23, 61:7, 68:8,
73:15, 75:21, 76:9,
76:12, 90:9, 90:13,
90:22, 95:13,
101:20, 102:12,
108:19, 108:21,
109:13, 109:18,
109:25, 110:8,
136:21, 136:24,
137:5, 141:18,
141:20, 142:15,
143:23, 147:25,
156:2, 169:25, 170:7
Security's [3] -
106:17, 108:25,
142:5
SED [3] - 114:23,
118:21, 118:24
see [46] - 4:11, 17:1,
18:3, 18:5, 19:1,
19:3, 23:21, 24:5,
24:18, 25:14, 25:17,
26:9, 39:9, 49:13,
49:19, 52:6, 69:23,
74:4, 77:12, 82:14,
104:18, 105:1,
115:1, 117:13,
122:6, 122:9, 123:7,
123:25, 125:9,
126:14, 127:8,
128:12, 128:13,
129:10, 137:10,
137:23, 138:24,
142:7, 159:14,
166:5, 172:4, 172:7
seeing [3] - 103:23,
129:22, 171:3
seek [1] - 76:4
seem [1] - 106:9
seize [11] - 43:20,
51:4, 51:8, 53:19,
103:3, 103:6,
105:17, 138:11,
138:12, 150:23,
158:8
seized [13] - 3:9,
43:22, 43:24, 51:12,
105:11, 105:12,
142:6, 153:1,
153:14, 154:5,
154:14, 157:8,
157:24
seizing [3] - 138:25,
150:18, 150:21
seizure [1] - 51:6
send [4] - 65:19, 79:7,
90:5, 155:14

sending [3] - 69:16,
90:22, 146:17
sense [1] - 73:12
sent [17] - 63:1, 91:16,
98:17, 99:3, 118:6,
118:14, 123:23,
126:2, 127:3, 127:9,
128:19, 135:21,
139:21, 148:6,
154:15, 166:13
separated [1] - 147:6
separation [1] - 37:13
sequence [1] - 130:18
sequencing [1] -
140:11
sequential [1] - 149:2
sequestered [1] -
12:21
serious [2] - 38:19,
38:20
seriousness [1] -
38:16
serve [1] - 49:23
service [9] - 45:13,
93:10, 138:8, 148:9,
160:22, 161:1,
161:2, 169:19
Services [2] - 160:19,
160:21
set [4] - 8:3, 8:22,
55:17, 175:9
sets [1] - 70:22
setup [1] - 24:20
Seventh [1] - 173:1
several [3] - 24:23,
82:6, 127:11
sham [1] - 6:17
share [1] - 144:22
shed [1] - 78:22
sheet [2] - 155:14,
155:15
shift [1] - 8:11
shine [2] - 127:17,
127:18
Ship [1] - 124:2
ship [8] - 82:15, 82:22,
87:16, 116:16,
117:1, 117:5, 117:6,
143:3
shipment [15] - 90:4,
117:20, 118:5,
124:8, 125:7,
125:10, 125:21,
125:22, 126:12,
126:13, 126:15,
127:1, 127:21,
130:22, 130:24
shipments [2] -
125:12, 125:14
shipped [27] - 82:11,

85:12, 88:13, 97:24,
111:2, 111:6,
113:15, 113:23,
113:25, 115:21,
116:23, 117:2,
117:9, 117:11,
117:17, 124:12,
127:3, 127:4,
131:18, 131:25,
134:19, 135:2,
135:6, 135:15,
159:7, 159:19,
159:22
shipper [2] - 83:6,
89:18
Shippers [2] - 114:24,
115:1
shipping [9] - 82:11,
89:17, 97:23,
112:20, 122:22,
124:11, 130:9, 148:5
Shipping [2] - 119:6,
120:21
shoe [3] - 127:16,
127:17, 127:18
shop [2] - 161:23
short [2] - 160:4,
160:5
shorthand [1] - 1:21
show [9] - 8:5, 73:22,
73:25, 98:3, 101:3,
122:3, 123:16,
158:14, 159:6
showed [7] - 94:2,
130:21, 131:1,
131:16, 131:22,
132:3, 158:4
showing [1] - 163:6
shown [2] - 22:20,
151:24
sick [1] - 49:19
side [2] - 44:23, 170:7
Sidiropoulou [3] -
95:16, 101:24,
102:15
sign [3] - 32:2, 139:23,
155:13
signature [2] - 66:7,
123:25
signed [4] - 88:13,
89:2, 101:3, 125:4
signing [4] - 62:5,
72:9, 81:8, 98:3
Silent [1] - 77:11
silent [5] - 151:15,
151:19, 152:7,
152:22, 153:18
similar [3] - 71:15,
137:7, 165:12
simple [1] - 153:6

simpler [1] - 81:21
simply [4] - 139:23,
149:25, 151:1,
155:12
simultaneous [1] -
173:17
sit [2] - 34:6, 46:4
site [3] - 98:21, 98:25,
156:21
sitting [5] - 46:3, 46:6,
46:9, 136:7, 162:17
situated [1] - 6:23
situation [2] - 33:21,
56:23
situations [2] - 47:1,
65:15
six [2] - 134:19, 135:7
slacks [1] - 63:5
slip [2] - 153:19,
153:22
slot [1] - 123:5
Smart [1] - 156:16
smuggle [1] - 70:7
soap [1] - 127:16
Social [1] - 90:22
soft [1] - 124:15
software [1] - 156:10
someone [19] - 5:4,
7:15, 8:17, 17:10,
33:17, 33:23, 33:24,
35:15, 36:2, 36:19,
37:15, 54:3, 103:23,
110:24, 120:9,
120:10, 121:14,
148:1, 166:5
sometime [1] - 136:6
sometimes [5] - 7:22,
49:2, 49:7, 69:25,
140:10
somewhat [2] -
111:13, 142:19
somewhere [1] -
85:13
soon [2] - 24:16
sorry [14] - 4:22,
12:14, 21:6, 47:13,
57:12, 77:23, 91:18,
94:6, 108:10,
110:11, 114:7,
125:2, 137:2, 164:13
sort [3] - 72:7, 119:5,
140:23
sorts [1] - 138:20
sought [2] - 89:15,
91:1
sounds [1] - 134:10
source [1] - 156:6
sourced [1] - 93:12
sources [1] - 7:5
space [1] - 139:4

**speaking** [9] - 28:24, 55:8, 68:19, 72:17, 89:17, 95:19, 110:4, 149:11, 170:6
**Special** [42] - 19:24, 27:21, 61:6, 61:11, 61:12, 61:14, 62:14, 75:20, 75:22, 78:6, 82:13, 83:8, 83:24, 84:3, 86:9, 88:2, 90:6, 98:5, 112:10, 114:5, 116:22, 121:20, 123:12, 124:24, 125:12, 131:13, 132:18, 133:1, 133:4, 133:21, 134:2, 134:8, 134:25, 135:2, 135:25, 137:3, 154:20, 155:21, 167:5, 168:25, 170:1, 170:7
**specialized** [3] - 5:22, 6:10, 7:19
**specific** [17] - 27:3, 56:24, 68:12, 82:18, 87:8, 87:9, 96:20, 96:22, 104:12, 115:13, 116:13, 142:21, 144:3, 158:20, 165:14, 167:22, 167:24
**specifically** [20] - 8:16, 9:4, 10:21, 18:22, 32:22, 33:11, 64:22, 69:22, 80:6, 82:4, 88:20, 90:16, 94:5, 95:18, 119:6, 126:8, 127:23, 137:24, 165:5, 165:18
**specifics** [4] - 20:19, 72:25, 110:23, 163:24
**speculation** [2] - 95:24, 96:7
**speculative** [3] - 57:20, 57:21, 95:24
**speed** [4] - 44:14, 79:23, 91:8, 114:18
**spell** [5] - 3:17, 60:22, 75:11, 162:21, 167:9
**spelled** [1] - 150:17
**spoken** [1] - 111:9
**sport** [1] - 63:5
**Spring** [1] - 88:18
**St** [1] - 172:24
**stability** [1] - 90:19
**staffed** [1] - 35:8
**stage** [2] - 8:3, 173:19

**standing** [4] - 46:3, 46:10, 66:6, 150:22
**start** [6] - 21:21, 39:3, 49:1, 81:17, 95:6, 125:2
**started** [4] - 4:8, 16:22, 76:20, 81:25
**State** [9] - 6:17, 80:10, 94:15, 94:19, 109:10, 109:12, 138:10, 160:24, 161:8
**state** [7] - 3:17, 25:14, 60:22, 75:11, 96:10, 162:21, 167:9
**Statement** [1] - 164:11
**statement** [6] - 3:6, 19:24, 23:19, 38:5, 56:22, 164:14
**statements** [2] - 16:19, 92:14
**STATES** [2] - 1:1, 1:3
**States** [30] - 1:14, 3:4, 3:9, 6:15, 14:10, 14:11, 17:8, 17:9, 18:22, 30:13, 42:6, 56:8, 61:6, 76:5, 79:20, 80:10, 81:15, 88:25, 90:14, 94:20, 94:22, 94:23, 95:2, 95:10, 135:1, 153:18, 161:13, 175:4, 175:6, 175:17
**stating** [1] - 90:9
**station** [3] - 61:17, 70:8, 99:24
**stationed** [1] - 6:6
**stay** [1] - 24:20
**stemming** [1] - 6:21
**stems** [2] - 5:1, 109:23
**step** [7] - 60:6, 74:24, 89:18, 89:20, 162:10, 166:25, 170:15
**steps** [1] - 92:12
**still** [5] - 48:23, 110:7, 122:22, 133:11, 164:23
**stolen** [2] - 17:8, 42:9
**stories** [3] - 42:20, 42:23, 43:2
**story** [2] - 13:17, 18:2
**Street** [1] - 1:18
**strike** [3] - 47:13, 57:19, 58:13
**Stroudsburg** [10] - 82:12, 85:8, 87:20, 88:18, 95:7, 100:24, 100:25, 113:1, 134:24, 135:19

**stuff** [6] - 13:25, 17:3, 18:11, 52:1, 52:3, 150:19
**style** [2] - 94:4
**Subject** [1] - 25:18
**subject** [14] - 42:8, 64:12, 64:24, 76:3, 77:4, 77:5, 77:9, 85:11, 106:1, 126:19, 151:9, 151:11, 152:18, 159:3
**subject's** [1] - 152:8
**subjected** [1] - 118:18
**subjects** [2] - 77:6, 120:17
**submission** [2] - 149:23, 150:9
**submit** [7] - 105:15, 170:22, 170:25, 172:16, 173:9, 173:19, 174:14
**submitted** [9] - 10:14, 83:14, 94:16, 94:17, 101:11, 139:21, 155:4, 155:17, 161:7
**subpoena** [2] - 81:9, 169:9
**subpoenaed** [6] - 60:10, 75:2, 162:14, 163:6, 167:19, 167:25
**substantially** [1] - 139:15
**substantiate** [1] - 138:25
**sufficient** [3] - 100:18, 106:6, 106:11
**suit** [1] - 63:4
**suite** [1] - 1:15
**Sulaymaniyah** [1] - 88:15
**summary** [2] - 102:13, 104:8
**Sunday** [1] - 95:22
**super** [1] - 42:21
**supervision** [2] - 175:11, 175:23
**supervisor** [7] - 13:25, 32:3, 32:5, 78:11, 148:20, 148:21, 148:23
**supplied** [1] - 113:19
**support** [2] - 80:15, 140:22
**supposed** [2] - 87:13, 155:16
**Suppress** [2] - 3:6, 3:8
**suppression** [1] - 1:10
**Supreme** [7] - 171:16,

172:3, 172:10, 172:12, 172:16, 173:14, 174:16
**surprised** [1] - 106:21
**surrendered** [1] - 101:14
**surrounding** [1] - 101:22
**suspect** [4] - 130:12, 138:7, 151:12, 152:10
**suspected** [2] - 23:6, 158:6
**suspenders** [1] - 172:4
**suspenders-type** [1] - 172:4
**suspicion** [5] - 51:11, 106:10, 106:12, 119:15, 171:23
**suspicions** [1] - 82:3
**suspicious** [2] - 119:7, 119:13
**sustained** [2] - 57:11, 159:11
**swear** [1] - 80:23
**switch** [1] - 109:25
**SWORN** [5] - 3:16, 60:21, 75:9, 162:20, 167:8
**Syria** [4] - 6:17, 6:19, 26:5, 43:1
**system** [32] - 9:16, 9:21, 25:20, 26:2, 26:3, 26:6, 26:14, 26:17, 26:21, 26:23, 38:18, 39:9, 54:18, 77:5, 79:9, 99:22, 99:23, 119:21, 120:17, 121:1, 140:15, 151:7, 152:19, 165:12, 165:14, 165:21, 165:23, 165:25, 166:13
**systems** [1] - 147:24

**T**

**table** [2] - 9:6, 44:10
**Tactical** [6] - 6:11, 22:18, 22:25, 23:3, 59:14, 59:21
**tag** [2] - 78:24, 151:15
**tailor** [3] - 97:4, 97:5, 100:6
**talks** [2] - 122:23, 125:4
**tamper** [1] - 56:1
**tape** [1] - 119:25

**taper** [1] - 123:7
**target** [1] - 62:15
**targeting** [1] - 119:5
**Targeting** [1] - 26:25
**Task** [1] - 169:1
**team** [17] - 5:22, 6:10, 6:13, 7:6, 28:3, 44:21, 78:17, 81:24, 87:24, 91:6, 94:25, 153:24, 154:6, 154:8, 154:10, 154:12
**Team** [6] - 6:11, 22:18, 22:25, 23:4, 59:14, 59:21
**teams** [1] - 4:16
**tech** [1] - 125:1
**technique** [1] - 152:15
**techniques** [2] - 40:5, 53:8
**TECS** [3] - 9:15, 151:7
**telephone** [3] - 27:13, 68:20, 132:19
**telephones** [1] - 101:6
**telephonically** [3] - 86:10, 133:1, 134:25
**temporary** [8] - 16:22, 17:6, 17:10, 17:18, 30:25, 42:2, 56:15, 56:21
**Temporary** [1] - 17:8
**term** [3] - 78:21, 89:22, 139:11
**terminal** [1] - 8:24
**Terminal** [5] - 8:24, 32:2, 32:5, 32:6, 50:16
**terminology** [1] - 73:11
**terms** [8] - 5:15, 6:22, 20:18, 38:17, 67:22, 73:12, 90:25, 106:15
**terrible** [1] - 43:1
**terror** [2] - 5:2, 29:25
**terror-type** [1] - 29:25
**terrorism** [1] - 23:6
**Terrorism** [12] - 6:11, 22:18, 22:25, 23:3, 25:16, 25:17, 25:21, 38:22, 39:15, 59:14, 59:21, 169:1
**terrorist** [3] - 6:16, 7:2, 29:16
**terroristic** [1] - 29:24
**terrorists** [2] - 43:1, 79:15
**test** [1] - 127:17
**TESTIFIED** [5] - 3:16, 60:21, 75:10, 162:20, 167:8

**testified** [11] - 28:24, 67:14, 72:19, 92:6, 110:3, 110:13, 121:18, 130:15, 148:16, 159:1, 166:20
**testify** [2] - 54:3, 73:14
**testifying** [6] - 10:22, 39:17, 62:7, 168:2, 168:3, 168:6
**testimony** [21] - 10:5, 10:20, 20:21, 37:25, 50:1, 54:21, 55:7, 60:11, 65:6, 76:22, 79:17, 101:12, 103:14, 103:21, 103:25, 105:22, 134:15, 146:5, 157:15, 164:10, 174:21
**THE** [126] - 1:1, 1:1, 1:10, 1:13, 1:17, 3:1, 3:4, 3:13, 3:17, 3:18, 3:19, 3:20, 10:16, 13:1, 21:13, 21:15, 51:15, 52:8, 52:12, 53:10, 53:15, 53:25, 54:5, 54:8, 57:11, 57:13, 57:23, 58:2, 60:4, 60:6, 60:9, 60:13, 60:14, 60:16, 60:18, 60:22, 60:24, 60:25, 61:2, 65:10, 66:14, 67:8, 74:1, 74:20, 74:22, 74:24, 75:4, 75:5, 75:6, 75:11, 75:13, 75:14, 75:16, 84:10, 85:24, 89:6, 91:25, 92:2, 93:17, 96:1, 96:3, 96:9, 97:13, 97:15, 102:3, 103:11, 103:20, 104:6, 104:8, 104:12, 104:18, 104:23, 105:1, 105:2, 105:4, 105:13, 105:24, 106:3, 106:5, 106:24, 107:4, 107:6, 107:9, 107:11, 121:14, 124:18, 129:6, 140:19, 140:20, 144:2, 153:7, 153:8, 153:9, 153:12, 153:16, 157:10, 159:11, 160:3, 160:5, 160:7, 160:9, 160:12, 161:16, 162:10, 162:12,

162:17, 162:21, 162:23, 162:25, 166:23, 166:25, 167:3, 167:9, 167:11, 167:13, 170:15, 170:17, 170:19, 170:21, 171:7, 172:11, 173:14, 174:1, 174:6, 174:11, 174:20
**theirs** [1] - 62:15
**themselves** [1] - 56:5
**thereafter** [1] - 104:2
**they've** [2] - 79:5, 142:7
**thinking** [3] - 101:17, 108:1, 137:11
**Third** [1] - 172:23
**third** [1] - 126:14
**this(indicating)** [1] - 34:9
**Thomas** [1] - 112:8
**thorough** [1] - 104:2
**thoroughly** [1] - 171:11
**threats** [5] - 5:2, 5:16, 29:24, 29:25
**three** [4] - 5:23, 46:17, 47:12, 53:4
**throughout** [4] - 5:23, 24:21, 108:3, 148:8
**throwing** [1] - 138:20
**THURSDAY** [1] - 1:11
**tick** [1] - 114:7
**tie** [1] - 63:5
**timely** [2] - 98:16, 99:4
**timetable** [1] - 174:5
**timing** [1] - 172:20
**tip** [10] - 84:23, 85:12, 97:5, 110:19, 111:1, 111:21, 112:1, 117:21, 120:11, 136:11
**tipped** [2] - 83:1, 96:22
**tire** [2] - 111:17, 111:18
**tired** [1] - 46:5
**Title** [1] - 175:6
**title** [1] - 91:16
**today** [14] - 3:10, 4:13, 10:20, 10:23, 62:7, 76:13, 76:22, 101:12, 115:3, 131:7, 163:5, 167:19, 168:2, 170:4
**today's** [5] - 10:5, 76:3, 84:8, 106:1, 144:1

**TODD** [1] - 1:14
**Todd** [2] - 12:15, 21:6
**together** [1] - 129:9
**tone** [1] - 65:6
**took** [7] - 16:24, 21:4, 62:25, 97:25, 104:22, 152:24, 153:12
**Tool** [15] - 82:2, 82:9, 82:23, 83:16, 84:24, 85:6, 86:17, 87:4, 87:7, 110:25, 112:22, 118:4, 121:22, 131:19
**tool** [5] - 111:18, 124:15, 124:20, 127:17, 161:23
**tools** [10] - 82:4, 82:10, 87:8, 88:4, 88:7, 99:1, 111:14, 125:5, 135:3, 156:10
**Tools** [1] - 90:11
**top** [8] - 9:7, 23:9, 23:11, 123:20, 126:15, 147:19, 171:15, 171:20
**topics** [1] - 74:17
**torque** [2] - 124:14, 124:15
**total** [2] - 128:18, 128:20
**touch** [1] - 47:8
**towards** [4] - 22:24, 56:4, 83:6
**tracks** [1] - 26:21
**Trade** [2] - 94:19, 161:9
**trained** [2] - 74:12, 139:25
**training** [16] - 4:20, 4:23, 4:25, 51:17, 51:18, 73:19, 73:20, 73:21, 73:22, 74:8, 74:17, 141:18, 141:23, 142:2, 160:25
**trans** [1] - 85:12
**trans-shipped** [1] - 85:12
**TRANSCRIPT** [1] - 1:9
**transcript** [11] - 1:21, 170:25, 172:14, 172:15, 173:23, 174:3, 174:4, 174:11, 175:7, 175:10, 175:22
**transcription** [1] - 1:22
**transit** [1] - 141:6
**travel** [17] - 14:7, 14:9,

22:9, 25:22, 25:23, 59:8, 77:13, 77:20, 80:17, 92:22, 93:22, 97:2, 139:3, 151:9, 151:18, 151:24, 152:2
**traveled** [3] - 59:23, 60:8, 86:18
**traveler** [14] - 30:3, 36:24, 47:9, 48:4, 48:12, 48:22, 49:2, 50:9, 55:23, 55:24, 56:1, 78:24, 145:12, 165:3
**Travelers** [1] - 7:10
**travelers** [7] - 14:24, 41:7, 49:6, 65:16, 79:11, 151:6, 156:13
**traveling** [22] - 14:6, 16:22, 17:6, 17:10, 18:21, 19:7, 20:13, 42:17, 54:17, 54:25, 63:22, 76:3, 76:24, 77:11, 77:19, 79:4, 79:19, 80:21, 137:22, 152:9, 153:17, 161:13
**treat** [1] - 56:25
**trick** [1] - 33:16
**trip** [1] - 59:23
**true** [2] - 57:5, 175:7
**try** [2] - 42:5, 57:13
**trying** [11] - 8:3, 13:19, 18:1, 33:15, 70:6, 80:20, 129:9, 140:7, 148:13, 148:18, 149:3
**TTR** [2] - 22:18, 22:25
**TTRT** [3] - 6:11, 6:14, 28:3
**tubes** [2] - 132:12, 132:15
**Turkey** [1] - 85:7
**turn** [7] - 42:23, 47:9, 71:13, 122:24, 144:17, 145:10, 155:21
**turned** [4] - 100:22, 101:4, 125:6, 125:18
**turning** [4] - 98:6, 122:20, 124:7, 124:20
**turns** [2] - 114:21, 173:14
**turnstile** [1] - 24:19
**two** [18] - 3:5, 4:7, 28:10, 28:11, 28:12, 41:20, 55:3, 55:7, 62:2, 83:9, 91:2, 111:18, 131:16,

131:22, 132:3, 162:13, 172:12
**type** [27] - 4:5, 4:12, 4:20, 14:12, 14:19, 16:1, 19:6, 20:2, 29:25, 33:21, 42:19, 45:18, 51:20, 60:1, 63:11, 64:7, 65:14, 74:17, 102:19, 129:11, 138:7, 144:24, 149:16, 161:2, 161:21, 172:4
**types** [1] - 30:14
**typical** [1] - 8:5
**typically** [13] - 30:12, 31:25, 32:1, 44:16, 44:20, 45:23, 119:22, 164:25, 165:10, 168:23, 168:25, 169:16, 169:18

## U

**U.S** [25] - 3:25, 4:11, 4:15, 17:21, 27:1, 52:19, 52:21, 53:1, 77:19, 78:14, 79:6, 82:17, 83:24, 84:3, 86:24, 89:24, 107:25, 109:4, 109:15, 109:24, 137:3, 139:4, 143:3, 152:9, 152:10
**ultimate** [1] - 144:6
**ultimately** [3] - 89:14, 138:15, 154:14
**umbrella** [1] - 109:24
**unaware** [1] - 121:4
**under** [20] - 7:2, 47:17, 47:22, 48:7, 69:6, 71:4, 85:5, 90:16, 90:24, 94:21, 103:16, 104:17, 106:18, 109:23, 109:24, 140:7, 160:17, 172:22, 175:11, 175:23
**undergo** [5] - 51:18, 73:19, 74:17, 153:1, 153:14
**underneath** [1] - 98:12
**undertakings** [1] - 104:22
**unfortunately** [1] - 153:20
**uniform** [1] - 44:18
**unique** [3] - 20:12, 100:8, 140:2

**unit** [3] - 128:8, 128:14, 128:18
**Unit** [1] - 80:7
**UNITED** [2] - 1:1, 1:3
**United** [31] - 1:14, 3:4, 3:9, 6:15, 14:10, 14:11, 17:8, 17:9, 18:21, 30:13, 42:6, 56:8, 61:6, 76:5, 79:20, 80:10, 81:15, 88:25, 90:14, 90:19, 94:20, 94:22, 94:23, 95:2, 95:10, 135:1, 153:18, 161:13, 175:4, 175:6, 175:17
**units** [1] - 128:11
**unless** [5] - 72:7, 115:4, 121:14, 159:9, 175:23
**unsure** [2] - 135:17, 148:17
**unusual** [5] - 54:22, 55:3, 63:14, 65:7, 65:14
**up** [64] - 8:5, 8:14, 8:22, 9:6, 20:15, 23:21, 24:25, 37:10, 42:2, 44:14, 46:22, 47:13, 47:20, 48:8, 52:3, 55:17, 58:3, 61:13, 64:13, 68:13, 77:7, 77:25, 79:22, 79:23, 80:23, 81:4, 81:14, 86:16, 87:3, 91:8, 96:8, 97:9, 98:13, 100:25, 108:24, 110:1, 110:8, 112:25, 114:18, 115:4, 118:8, 122:4, 123:17, 125:9, 128:13, 128:15, 130:12, 134:7, 136:9, 136:10, 140:10, 144:14, 145:15, 145:17, 146:13, 147:10, 148:22, 150:2, 154:18, 156:23, 156:24, 163:6, 171:16, 171:17
**updated** [1] - 53:1
**updates** [3] - 53:7, 108:3, 142:2
**updating** [1] - 73:19
**uploaded** [1] - 79:9
**urine** [1] - 127:17
**useful** [1] - 172:20
**uses** [1] - 143:16

## V

**V-E-T-R-A-N-O** [1] - 167:12
**vacation** [1] - 40:12
**vaguely** [1] - 44:8
**valid** [1] - 53:15
**Vallier** [1] - 172:24
**valuable** [1] - 43:2
**value** [5] - 88:19, 128:8, 128:14, 128:18, 140:22
**variations** [1] - 94:18
**various** [9] - 77:6, 82:20, 83:14, 87:12, 88:7, 104:9, 123:3, 136:7, 171:22
**vary** [1] - 8:23
**venture** [1] - 162:3
**verified** [2] - 147:1, 165:13
**versa** [1] - 173:20
**versus** [1] - 22:6
**Vetrano** [14] - 2:6, 19:24, 27:21, 28:13, 29:6, 39:23, 43:25, 45:8, 46:13, 162:14, 167:6, 167:11, 167:12, 170:15
**via** [3] - 7:5, 83:4, 115:22
**vice** [2] - 124:15, 173:20
**video** [1] - 51:1
**View** [1] - 125:20
**view** [3] - 171:7, 172:1, 172:2
**viewing** [1] - 48:9
**viewpoint** [1] - 129:21
**violation** [2] - 3:9, 86:24
**violations** [3] - 80:1, 80:3, 160:18
**virtual** [1] - 142:2
**visible** [1] - 63:22
**visit** [1] - 173:15
**visiting** [1] - 40:9
**visual** [1] - 71:10
**visually** [2] - 69:15, 69:18
**volume** [2] - 37:3, 120:25
**vs** [1] - 1:5

## W

**W's** [2] - 14:7, 97:1
**wait** [9] - 7:19, 7:22, 8:19, 34:1, 141:1, 172:7, 172:9,

172:16, 173:4
**waiting** [8] - 33:13, 33:17, 33:18, 33:23, 33:25, 34:14, 37:11, 173:2
**walk** [4] - 24:17, 34:20, 84:15, 155:21
**walking** [1] - 48:23
**wants** [1] - 18:25
**war** [3] - 42:18, 42:24, 54:25
**Warrant** [6] - 83:23, 84:2, 110:9, 131:11, 132:21, 134:22
**warrant** [21] - 80:16, 80:19, 80:23, 81:9, 89:15, 92:18, 102:7, 102:14, 111:1, 112:9, 114:17, 116:1, 138:6, 138:18, 139:2, 154:11, 157:19, 157:21, 158:2, 159:18, 171:25
**warranted** [2] - 36:23, 48:10
**warrants** [15] - 82:20, 83:7, 83:9, 83:11, 90:7, 91:1, 93:10, 101:22, 109:7, 136:14, 158:7, 158:12, 158:17, 158:21, 159:4
**Washington** [2] - 1:16, 27:1
**WASHINGTON** [1] - 1:24
**waste** [1] - 150:3
**watches** [1] - 34:4
**weapon** [7] - 56:4, 63:16, 63:19, 63:22, 129:24, 129:25, 169:19
**Weapons** [3] - 91:17, 92:10, 129:14
**weapons** [4] - 92:13, 129:12, 151:12, 160:22
**wear** [2] - 62:3, 121:13
**wearing** [1] - 121:15
**week** [3] - 169:2, 169:6, 169:8
**weeks** [4] - 134:20, 135:7, 140:17, 173:25
**weird** [1] - 109:21
**whatsoever** [3] - 140:14, 146:6, 151:23
**wheel** [1] - 111:17

**whim** [1] - 148:19
**whole** [4] - 43:2, 57:1, 71:21, 146:11
**Why's** [1] - 97:2
**wife** [7] - 82:22, 86:19, 88:5, 133:7, 133:10, 133:18, 134:4
**willfully** [1] - 130:9
**William** [3] - 1:15, 1:18, 93:6
**willing** [2] - 144:7, 173:5
**wire** [1] - 123:5
**wish** [1] - 54:2
**wished** [1] - 96:16
**wishes** [1] - 170:22
**withdraw** [1] - 19:18
**within-mentioned** [1] - 175:8
**witness** [15] - 3:13, 21:7, 52:6, 52:16, 53:12, 53:24, 60:7, 60:18, 74:25, 75:6, 95:20, 97:1, 144:4, 144:8, 152:12
**WITNESS** [16] - 3:18, 60:14, 60:24, 75:5, 75:13, 96:1, 104:6, 104:12, 104:23, 105:2, 140:20, 153:8, 153:16, 162:23, 167:11, 170:17
**Witnesses** [1] - 2:2
**witnesses** [4] - 12:20, 12:24, 162:11, 162:14
**wonder** [1] - 160:19
**wording** [1] - 119:6
**words** [30] - 7:14, 23:5, 29:21, 36:19, 38:24, 39:3, 40:8, 40:24, 47:11, 48:7, 48:21, 56:13, 59:1, 69:25, 100:6, 100:7, 119:10, 121:2, 123:8, 125:24, 130:1, 133:13, 137:12, 138:1, 138:14, 139:1, 143:15, 152:7, 156:25, 169:6
**workers** [1] - 15:5
**works** [3] - 8:4, 142:20, 146:14
**wow** [1] - 137:13
**wrench** [2] - 124:16
**wrenches** [1] - 124:14
**Writ** [1] - 171:4
**writ** [2] - 172:17,

174:16
**write** [1] - 173:10
**writes** [1] - 173:23
**writing** [1] - 68:23

## Y

**yahoo** [4] - 83:25, 84:4, 89:11, 159:4
**yahoo.com** [4] - 83:25, 84:5, 89:13, 91:15
**YEAGER** [1] - 1:23, 175:3, 175:13, 175:16
**Yeager** [1] - 175:13
**year** [3] - 52:1, 52:2, 75:23
**yearly** [1] - 51:21
**years** [14] - 4:3, 4:12, 5:23, 12:1, 13:8, 21:24, 49:17, 53:9, 61:13, 63:7, 73:16, 73:17, 73:18, 95:5
**York** [6] - 6:7, 98:14, 98:15, 147:8, 148:7, 148:22
**yourself** [5] - 9:19, 46:13, 69:13, 118:9, 166:7
**yourselves** [1] - 173:21

## Z

**zip** [1] - 85:8
**Zippo** [2] - 116:24, 117:1
**zone** [5] - 26:5, 42:19, 42:24, 59:8, 59:23
**zones** [3] - 6:19, 26:22, 54:25