# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:CR-18-0097 |
| | : | |
| v. | : | (Judge Mariani) |
| | : | |
| ROSS ROGGIO | : | (Electronically filed) |

## ROGGIO'S POST-SUPPRESSION HEARING BRIEF IN SUPPORT OF MOTION TO SUPPRESS STATEMENT AND RELATED EVIDENCE

**Procedural History**

On March 20, 2018, Roggio was charged in an Indictment with conspiracy to commit an offense against the United States, in violation of Title 18, United States Code, Section 371; violations of the Arms Export Control Act, Title 22, United States Code, Sections 2778(b) and ( c); and the International Emergency Powers Act, Title 50, United States Code, Sections 1702 and 1705( c); smuggling goods from the United States, in violation of Title 18 United States Code Sections 554 and 2; wire fraud, in violation of Title 18, United States Code Section 1342; and money laundering, in violation of Title 18 United States Code, Sections 1956(a)(2)(A) and 2.

On March 23, 2018, Roggio appeared before Magistrate Judge Karoline Mehalchick for an initial appearance and arraignment and entered a plea of not guilty to the charges.

On March 29, 2019, Roggio's former counsel filed a Motion to Suppress Evidence Seized in Violation of the United States Constitution, (Document 46), with supporting brief. (Document 47)  On May 20, 2019, the Government filed a Brief in Opposition to Roggio's Motion to Suppress Evidence. (Document 56). Roggio filed a Reply Brief on July 10, 2020. (Document 61).

On October 11, 2019, Roggio filed a Motion for Leave to File a Motion to Suppress Roggio's Statement and Related Evidence, (Document 62), which was granted by the Court by Order on June 8, 2020. (Document 63). On June 15, 2020, Roggio filed a Motion to Suppress Roggio's Statement and Related Evidence, with a supporting brief. (Documents 64, 65). On October 7, 2020, the Government filed its brief in opposition (Document 72).

On May 4, 2021, the Government filed a Supplemental Response to Defense Motion to Suppress Evidence. (Document 96). Thereafter, on May 11, 2021, Roggio filed a Reply to the Government's Supplemental Response to the Defense Motion to Suppress Evidence. (Document 97).

On May 27, 2021, this Honorable Court conducted a Suppression Hearing at the conclusion of which the Court granted counsels request to file additional

briefs.  The present filing constitutes Roggio's post suppression hearing brief.

Roggio hereby incorporates by reference his previously filed briefs as set forth above.

**Statement of Facts**

On or about April 2016, the Department of Commerce, (DOC), the Federal Bureau of Investigation, (FBI), and Homeland Security Investigation, (HSI), were actively investigating Roggio for the potential export of controlled items, including rifling combo buttons, from the United States to Iraq without the requisite DOC's Bureau of Industry and Security export license.  **Government Exhibit 5, Paragraphs 3 and 18.**

As early as November 2016, the DOC had availed itself to the use of the Court's in its investigation of Roggio, having obtained and executed a court-authorized search warrant on e-mail service provider Yahoo! Inc. for the contents of two email accounts used by Roggio.  **Government Exhibit 5, Paragraph 31.** By January 27, 2017, the joint investigation had reached a point where HSI Special Agent Jeff Burke created a subject record within the HSI Investigative case management system for Roggio which included a 24-hour advance notification of any travel by Roggio.  **Government Exhibit 5, Paragraph 41.**

On February 25, 2017, Special Agent Burke received an automatic notification via the DHS reporting system that Roggio was scheduled to arrive at JFK Airport on February 26, 2017, at approximately 6:25 p.m. aboard Turkish Airlines Flight #1. Special Agent Burke then coordinated with the HSI New York JFK Office and U.S. Customs and Border Protection to arrange for Roggio, and his traveling companion Christina Sidiropoulou, to undergo a secondary examination and border search upon their arrival at JFK customs. **Government Exhibit 5, Paragraph 42.**

On February 26, 2017, Roggio and Sidiropoulou arrived in the United States aboard Turkish Airlines flight #1 from Erbil, Iraq via Instanbul, Turkey, and pursuant to Special Agent Burke's directives, were referred for secondary inspection at JFK customs at approximately 7:28 p.m. Both Roggio's and Sidiropoulou's bags were inspected with negative results and both were interviewed. **Government Exhibit 5, Paragraph 43.**

At the Suppression Hearing Customs Border Protection Officer Aurelia Morales testified relative to the circumstances of Roggio's secondary inspection. According to Morales, Customs Border Protection Officer Felney Augustine was the primary inspection officer who first encountered Roggio upon his arrival in the United States, and it was Officer Augustine who referred Roggio for the secondary inspection. **Notes Testimony, Pages 11, 25.**

According to Officer Morales, a traveler such as Roggio who is referred for a secondary inspection is escorted to the secondary inspection area where another Customs Border Protection Officer watches over him.  The traveler is not free to leave the area until he is cleared.  **Notes Testimony, Pages 34, 37.**  If the traveler needs to use the bathroom they would have to use a toilet in a holding cell in which the door locks automatically behind them.  **Notes Testimony, Pages 34-35**.

Officer Morales recalled that Roggio's secondary inspection occurred in a room that was approximately 10ft x 12ft and was equipped with a desk and a chair.  **Notes Testimony, Page 9**.  Officer Morales conducted the secondary interview in the presence of FBI Special Agent Douglas Vetrano**,** HSI Special Agent James Mundy, and other Customs Border Protection Officers, all of which were armed.  **Notes Testimony, Page 19, 44-45.**   Roggio was not offered any refreshments.  **Notes Testimony, Page 45**.  At the suppression hearing Officer Morales could not recall if Roggio requested that an attorney be present.  **Notes Testimony, Page 21.**

According to Officer Morales, at the secondary inspection Roggio was very pleasant and cooperative.  **Notes Testimony, Page 13.**  Officer Morales questioned Roggio regarding his travel from Iraq based upon a CTR (Counter Terrorism Response) Lookout.  **Notes Testimony, Pages 25-26,  38-39**.  Further,

when she saw that Roggio was traveling with a temporary passport that became another area of inquiry.  **Notes Testimony, Pages 16-17, 42**.  Because Roggio was a United States Citizen Officer Morales concluded that he was admissible.  Roggio's bags were also inspected for contraband with negative results and thus were also admissible.  **Notes Testimony, Pages 30-31.**  Based upon Roggio's answers, Officer Morales was satisfied that there were no issues regarding Roggio's admissibility, that he was not in possession of any contraband, and that his electronic devices need not be examined.  **Notes Testimony, Pages 43, 51, 58.**  After conducting the secondary examination of Roggio Officer Morales left the room at which time HSI Special Agent Mundy detained Roggio's electronic devices.  **Notes Testimony, Pages 20, 43-44.**

On February 26, 2017, at approximately 8:00 p.m., HSI Special Agent James Mundy of the Department of Homeland Security seized the following electronic devices from Roggio; 1 MacBook Pro Laptop Computer, 1 Apple Ipad Tablet, 2 Apple Iphone 6's, and 1 Scandisk Flash Drive.  **Government Exhibits 2 and 5, Paragraph 53.**  At the same time, Special Agent Mundy seized the following electronic devices from Sidiropoulou; 1 Apple Iphone S, 1 Apple Iphone 7, and 1 Apple Ipod.  **Government Exhibits 2 and 5, Paragraph 53.**  On February 28, 2017, Special Agent Mundy transferred custody of said devices to HSI Special Agent Burke.  **Government Exhibits 2 and 5, Paragraphs 53-54.**

On March 1, 2017, Special Agent Burke submitted the electronic devices to Computer Forensics Agent Doug Green who conducted a forensic examination of the items. **Government Exhibit 5, Paragraph 55.** During the course of the next week all of the electronic devices seized from Roggio and Sidiropoulou, with the exception of Roggio's Scandisk Flash Drive and Sidiropoulou's Apple IPod, were forensically examined without a search warrant. **Government Exhibit 5, Paragraph 56, 82, 90, 107, 115, 119.**

On March 21, 2017, HSI Special Agent Christopher Hertzog used the data retrieved from the forensic searches of the electronic devices, along with the involuntary statements of Roggio, in an Application for a Search Warrant which sought the continued seizure and search of the seized devices as well as the forensic images made therefrom. **Government Exhibit 5, Paragraph 4.**

On March 21, 2017, Magistrate Judge Karoline Mehalchick granted the requested Search Warrant which was executed by HSI that same day. **Government Exhibit 5, last page.**

Argument

I. <u>**The search and seizure of Roggio's electronic devices were unreasonable.**</u>

    **A. There was no reasonable suspicion to seize and search Roggio's electronic devices.**

When Roggio entered the United States at JFK International Airport on February 26, 2017, he was referred for a secondary inspection by Customs Border Protection Officer Felney Augustine based upon a "CTR lookout" automatically placed in the computer system due to Roggio traveling from Iraq as well as a "one-day lookout" manually placed in the computer system by HSI Special Agent Jeffrey Burke. **Notes Testimony, Pages 39, 152-153.**

The secondary inspection was done by Customs Border Protection Officer Aurelia Morales who questioned Roggio concerning his travels in Iraq and the fact that he was traveling with a temporary passport. **Notes Testimony, Pages 13-17.** Customs Border Protection Officers also searched Roggio's baggage and determined that there was no contraband present. **Notes Testimony, Page 31.** Based upon her secondary examination, Officer Morales was satisfied that Roggio and his personal affects, including his electronic devices, were admissible and that there was no reason to conduct even a physical examination of his electronic

devices. **Notes Testimony, Pages 43-44, 51, 58.** Upon concluding her secondary inspection of Roggio, Officer Morales left the room and HSI Special Agent James Mundy, acting as a liaison for HSI Special Agent Burke, who was in Philadelphia at the time, seized Roggio's electronic devices. **Notes Testimony, Pages 20, 68, Government Exhibit 2.** Without even so much as a prior cursory examination of the electronic devises, Special Agent Burke forwarded the devices to Computer Forensics Agent Doug Green who conducted a warrantless search of the devices in the form of a forensic extraction/examination of the items. **Government Exhibit 5, Paragraph 55.**

Roggio submits that there was no reasonable suspicion to seize and search his electronic devices.

At the suppression hearing, Special Agent Burke testified concerning the prior ongoing investigation of Roggio concerning export violations of controlled items. **Notes Testimony, Pages 79-80**. According to Burke, he had become a member of the investigative team several months after its inception and needed to review the investigative findings from the FBI and the Department of Commerce in order to get up to speed on what the allegations were against Roggio. **Notes Testimony, Page 79.**

According to the investigative findings of the Department of Commerce Special Agent Scott Dunberg, the investigation against Roggio began on March

30, 2016, when an individual from Drill Masters Eldorado Tool Inc. contacted the FBI Public Access Line to report a suspicious shipment of *gun parts* to Iraq. **Government Exhibits 3 and 4, Paragraph 10 respectively, Notes Testimony, Pages 110-111.** At the suppression hearing, Special Agent Burke acknowledged the inaccuracy of that claim, admitting instead that the investigation had revealed that the subject of the alleged shipment to Iraq were rifling combo buttons and not gun parts and that the rifling combo buttons were sent by Drill Masters to Roggio's address in Pennsylvania. **Notes Testimony, Pages 111, 113, Government Exhibit 6, Page 2**.

According to the investigative findings reviewed by Special Agent Burke, Debbie Cornwall of Drill Masters Eldorado Tools was interviewed and described how Frank Monteforte of the Package Place in Pennsylvania had contacted her for a description of items in boxes that Roggio had purchased from Drill Masters in order to complete a Shipper's Export Declaration[1] (SED). **Government Exhibits 3 and 4, Paragraph 13.** However, at the suppression hearing Special Agent Burke testified that Frank Monteforte, after his conversation with Cornwall, described the items sent to Iraq in a DHL Airway Bill as reamers and drill bits, not rifling combo buttons. **Notes Testimony, Page 115-116.** Roggio submits that if

---

[1] The Government did not produce a copy of the Shipper's Export Declaration at the suppression hearing. **Notes Testimony, Page 115**.

Cornwall had described the items to Monteforte as rifle combo buttons which require an export license to ship to Iraq then Monteforte would have described the items as such and would not have shipped them to Iraq. **Government Exhibit 7, Page 4, Notes Testimony, Page 127.** There is certainly no claim made by the Government that Monteforte was in anyway complicit with Roggio in shipping these alleged items to Iraq. **Notes Testimony, Page 130.** Obviously, Monteforte had some knowledge of export restrictions as he would not even ship Zippo lighters to Iraq. **Notes Testimony, Page 116-117**.

According to the investigative findings reviewed by Special Agent Burke, Monteforte was shown a photograph[2] of two cylindrical items, which based upon interviews with Drill Masters is how rifling combo buttons *are packaged and shipped* from Drill Masters and Monteforte stated "yes, that looks like them". **Government Exhibits 3 and 4, Paragraph 14.** At the suppression hearing, Agent Burke acknowledged that the photograph shown to Monteforte did not depict rifle combo buttons but instead was a photograph of two cylindrical items, plastic tubes, possibly used for packaging. **Notes Testimony, Pages 131-132.**

Agent Burke would also have known from his review of the investigative findings of the FBI and Department of Commerce that on April 29, 2016, Roggio

---

[2] The Government did not produce a copy of the photograph at the suppression hearing. **Notes Testimony, Pages 130-131**.

was telephonically interviewed by FBI Special Agent Donnelly and asked if he had ever had any gun parts or gun tools shipped to Iraq to which he replied no. **Notes Testimony, Pages 134-135**. When pressed on whether he had ordered the rifle combo buttons from drill masters Roggio indicated that he did order them and that they were probably in a safe or other location at his primary residence or his parents residence. **Notes Testimony, Page 86-87**.

Finally, with reference to the allegation that Roggio was involved in having rifle combo buttons shipped to Iraq, it is notable that the package in question and accompanying Shipper's Export Declaration, (SED), would have had to clear customs. **Notes Testimony, Page 118-119**. As noted in Government Exhibits 3 and 4 at Paragraph13, a Shippers Export Declaration is used by law enforcement official to detect and disrupt illegal smuggling activities. Surely a package containing reemers and drill bits being sent to Iraq would draw some attention by Customs. The testimony at the suppression hearing was that if the package had been intercepted and if it contained suspicious items a report would be put into the CBP system but that no such report was made. **Notes Testimony, Page 119.** Further, despite having received the tip regarding the suspicious package on March 30, 2016, no effort was made by law enforcement to interdict the package. **Notes Testimony, Pages 117, 121.**

Additionally, Special Agent Burke would have learned from reviewing the

investigative findings of the FBI and Department of Commerce that Roggio had a background in firearms manufacturing having been involved with two lawful firearms manufacturing ventures here in the United States.  **Notes Testimony, Pages 161-162.**  Roggio submits that would serve as an explanation for his March 28, 2016, purchase of gas ring and firing pin retainers from OML Global.  **Government Exhibit 9.**  As importantly, there was no evidence that would suggest that the OML Global items were sent to Iraq.  **Notes Testimony, Page 159.**  The knowledge that Roggio was involved in two lawful firearms manufacturing ventures also is consistent with Government Exhibit 8 which is an email from Roggio to Elina Kadaja with an attached "Weapons and Ammunition Feasibility Report".  Page 9 of the report contains the header "LEGAL FEASIBILITY" and goes on to describe the need for ITAR, (International Traffic in Arms Regulations), compliance.  **Government Exhibit 8, Pages 9-10**.  Thus, the Weapons and Feasibility Report contemplates *a legal* firearms manufacture compliant with ITAR and governmental approvals and regulations.

### B. The search at issue exceeded the scope of any permissible border search.

The decision to seize and forensically search Roggio's electronic devices was made by HSI Special Agent Burke before Roggio arrived at JFK International Airport. **Notes Testimony, Page 146.** In fact, Special Agent Burke was not even close to JFK International Airport when Roggio and his devices were detained. **Notes Testimony, Page 147**. According to the testimony at the Suppression Hearing, Special Agent Burke used the Border Search Doctrine as an investigative tool, an exemption of the Fourth Amendment, to forensically examine Roggio's electronic devices. **Notes Testimony, Pages 78, 138-139**.

It was Special Agent Burke who placed the "hit" on Roggio in the form of a one-day lookout which caused him to be referred for a secondary examination. **Notes Testimony, Pages 78, 152-153**. Notwithstanding the secondary examining officer's satisfaction that there were no issues which would warrant even a cursory examination of Roggio's electronic devices, HSI Special Agent James Mundy, acting as a liaison for Special Agent Burke seized Roggios devices.[3] **Notes**

---

[3] CBP Officer Morales testified that she had no suspicion to physically examine Roggio's electronic devices despite having the authority to do so. **Notes Testimony, Pages 46-48, 51, 58** In fact, the capability to forensically search/extract electronic devices, and make a copy of the data contained therein, is present at JFK International Airport. **Notes Testimony, Pages 156-157.**

**Testimony, Pages 43, 51, 58, 64, 68.**  Even though Special Agent Mundy was on the scene and present during Roggio's secondary examination, according to the testimony at the suppression hearing, he had no discretion in the matter.  **Notes Testimony, Page 150**.  Upon Seizing Roggio's electronic devices, Special Agent Mundy forwarded them to Special Agent Burke in Philadelphia who, in turn, submitted the devices to Computer Forensics Agent Doug Green who conducted a warrantless search of the devices in the form of a forensic extraction/examination of the items.  **Government Exhibit 5, Paragraph 55.**

At no point *prior to the forensic examination* did anyone conduct a cursory examination of Roggio's electronic devices.  **Notes Testimony, Pages 139-140, 155-156.**  Instead, the process employed in this case was that the data on Roggio's devices was fully searched/extracted and placed on an evidence reviewing station for Agent Burke to review.  **Notes Testimony, Pages 99-102**, **140-141**.  It was only after the data on Roggio's devices were fully searched/extracted and reviewed that the Government sought, and obtained, a warrant to search the devices.  **Government Exhibit 11.**

## Conclusion

Based upon the foregoing Argument, Roggio requests that this Honorable Court issue an Order directing that his statement given to law enforcement on February 26, 2017, and all the physical evidence that resulted from the searches of the electronic devices seized from Roggio and Sidiropoulou on February 26, 2017, be suppressed.

Respectfully submitted,

Date: September 3, 2021

s/Gino Bartolai
**Gino Bartolai, Esquire**
**Attorney ID# PA 56642**

238 William Street
Pittston, Pennsylvania 18640
(570) 654-3572
E-mail: Bartolai@ptd.net
Attorney for Ross Roggio

# CERTIFICATE OF SERVICE

I, Gino Bartolai, Esquire, do hereby certify that I electronically served, via e-mail, a copy of the foregoing **Roggio's Post-Suppression Brief in Support of Motion to Suppress Statement and Related Evidence,** to the following

        Todd. K. Hinkley, Esquire
        Assistant United States Attorney

        Ross Roggio

Date: September 3, 2021          s/Gino Bartolai
                                               **Gino Bartolai, Esquire**