UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 3:CR-18-0097 |
| | ) | |
| v. | ) | (Judge Mariani) |
| | ) | |
| ROSS ROGGIO | ) | (Filed Electronically) |

## GOVERNMENT'S POST SUPPRESSION HEARING BRIEF IN OPPOSITION TO SUPPRESSION

### I.  Introduction

The Government files this post-hearing brief in opposition to
motions by the defendant to suppress both his statements made and
evidence of his that was detained during a secondary inspection and
border search.

With respect to the seized evidence – electronic devices that the
defendant brought into the United States from Iraq – Roggio argues
that it was unreasonable for the Government to detain and examine the
devices prior to obtaining a search warrant. Defendant's argument
ignores the long-standing and wide-ranging case law on the border
search exception to the warrant requirement. All of the testimony
elicited at the motions hearing was consistent with the proper

procedures for the physical examination of a traveler's possessions for contraband pursuant to lawful authorities.

Roggio failed to address in his post-hearing brief his motion to suppress the statements he gave to law enforcement officials during his secondary inspection. Nonetheless, the Government contends that his motion should fail because none of the testimony at the hearing supports defendant's argument that he was subject to an unconstitutional custodial interrogation rather than a routine border inquiry conducted pursuant to relevant policy and practice.

## II. <u>Procedural History</u>

On March 20, 2018, a federal grand jury sitting in Scranton, Pennsylvania returned a multicount indictment charging Ross Roggio with: conspiracy to commit an offense against the United States, in violation of 18 U.S.C. § 371; violations of the Arms Export Control Act, 22 U.S.C. § 2278(b) and (c); violations of the International Emergency Economic Powers Act, 50 U.S.C. §§ 1702 and 1705(c); smuggling goods from the United States, in violation of 18 U.S.C. §§ 554 and 2; wire fraud, in violation of 18 U.S.C. § 1343; and money laundering, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2.

On March 29, 2019, Roggio filed two pre-trial motions in the above docket, to include: (1) Motion to Suppress Evidence Seized in Violation of the United States Constitution (Doc. 46); and (2) Motion for Early Disclosure of *Jencks* Act Material. (Doc. 48). On June 15, 2020, Roggio filed an additional Motion to Suppress Roggio's Statement and Related Evidence (Doc. 64).

This Honorable Court held a suppression hearing on May 27, 2021. At the conclusion of that hearing the Court ordered the parties to file post-hearing briefs outlining their respective arguments in light of the testimony and evidence of record. H.T. 174.[1] Roggio filed his brief on September 3, 2021. Doc. 108. This brief is filed in opposition to both Roggio's motion to suppress evidence as well as his motion to suppress his statements.

## III. <u>Factual Background</u>

The instant prosecution is the result of a joint investigation being conducted by the Federal Bureau of Investigation ("FBI"); the U.S. Department of Homeland Security, Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"); and

---

[1] H.T. refers to Hearing Transcript.

the U.S. Department of Commerce ("DOC"), Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE"). H.T. 76. Ross Roggio, a United States citizen, is alleged to have exported firearms parts, firearms manufacturing tools, and defense services in support of the development of a firearms factory in the Kurdistan region of Iraq. Doc. 1.

Roggio formerly resided at 143 Indian Spring Drive, Stroudsburg, Pennsylvania. He operated Roggio Consulting Company, LLC, with a business address of 116 Turkey Hill Court, Stroudsburg, Pennsylvania[2]. Roggio has a background in firearms sales and manufacturing, having been involved with two failed manufacturing enterprises in the United States. H.T. 94. Roggio Arsenal, the first manufacturing venture, was located in Fayetteville, North Carolina and produced AR-15 style weapons, which are the semi-automatic civilian version of the M16 military rifle. H.T. 95. In 2014, Roggio also attempted to manufacture weapons in a partnership business that failed in the planning stages and was in Stroudsburg, Pennsylvania. H.T. 95. During the time frame

---

[2] This is also the residence of Roggio's parents.

of these alleged crimes, Roggio was not manufacturing firearms in the United States. H.T. 95.

In March of 2016, this investigation was initiated when an individual from Drill Masters Eldorado Tools, Inc., located in Connecticut, contacted the FBI Public Access Line to report a suspicious shipment of gun manufacturing tools to Iraq. H.T. 82. The report indicated that a customer by the name of Ross Roggio had purchased items from the company and had them delivered to Roggio's residential address in Pennsylvania before being transshipped to Iraq. H.T. 82–83.

Roggio was subsequently telephonically interviewed on April 20, 2016, by a Special Agent of the FBI concerning the alleged shipment of controlled firearms manufacturing items to Iraq. H.T. 86. Roggio acknowledged purchasing the items but advised the agent that the items were shipped to and stored at either his own house or his parent's house, both of which are located in Stroudsburg, Pennsylvania. H.T. 86–87. Roggio explained that he may have shipped cleaning kits for an AR-15 to Iraq approximately six weeks earlier. H.T. 134.

Subsequent interviews with: (1) employees of Drill Master Eldorado Tools, Inc.; (2) Ross Roggio's wife Kristy Merring-Roggio, and

(3) the owner of Package Place, a commercial packing and shipping company located in Stroudsburg, Pennsylvania, showed that Roggio had directed the items purchased from Drill Mater Eldorado Tools, Inc. to be transshipped from Stroudsburg, to Kurdistan, Iraq. H.T. 87−88. Records checks with the proper licensing authorities determined that the items purchased by Roggio were both controlled for export to Iraq, and that Roggio had failed to obtain the necessary licenses to make such an export. H.T. 89−90.

On November 17, 2016, based upon information obtained from the investigation, agents obtained a court-authorized search warrant to the email service provider Yahoo! Inc. for the contents of two email accounts utilized by Roggio. H.T. 91. Review of the fruits of that search showed, among other things, that on November 4, 2015, Roggio had emailed a document entitled "Weapons and Ammunition Feasibility Report" to his employee. H.T. 91−92. That report contained a detailed description of the requirements to build a weapons and ammunition plant in the Kurdish region of Iraq.  H.T. 92; Gov. Exhibit 8. One section of this report entitled "LEGAL FEASIBILITY" states, in part:

> The largest pool of skilled gun manufacturers will come from the USA.  In order for these selected personnel to work on

the project, they must be compliant to The International Traffic in Arms Regulations (ITAR). They will require the approval of the United States State Department. Failure to get proper approvals places the selected personnel in grave danger in incarceration and heavy fines.

*Id.* The email search revealed additional evidence of criminal wrongdoing by Roggio, including the purchase of firearms parts for M4 type weapons which, the investigation has determined, were illegally exported to Iraq in support of Roggio's arms and ammunition plant. H.T. 92–93; Gov. Exhibit 9.

As a result of the ongoing investigation, members of the investigative team requested HSI to provide 24-hour advance notification of any travel by Roggio. H.T. 78–79. On February 25, 2017, HSI notified agents that Roggio was scheduled to arrive at John F. Kennedy International Airport (JFK) airport the next day, aboard a Turkish Airlines flight. H.T. 95; Gov. Exhibit 10. Upon receipt of this notification, agents conducted various records checks and confirmed that Roggio was returning to the United States and that he was doing so with a travel companion by the name Christina Sidiropolulou. *Id.* Case agents coordinated with HSI New York JFK Office and U.S. Customs and Boarder Protection ("CBP") to arrange that Roggio and his

travel companion undergo a secondary examination and border search upon their arrival at JFK customs. H.T. 96–99.

Upon arrival on Turkish Airlines, from Erbil, Iraq, via Istanbul, Turkey, Roggio and Sidiropoulou were referred for secondary inspection at JFK customs. H.T. 10–11. Roggio indicated that he was traveling from Iraq, where he had worked in construction and was a part owner of a business building infrastructure. H.T. 15. Roggio stated that he was working as consultant for the project and advised on building construction to include the foundation to the metal structure development and everything in between. Roggio explained that his business partners paid him approximately $9 million to complete a project. H.T. 16. Roggio explained that there was a dispute regarding the amount of money he received, and as a result, he was kidnapped by his business partners. *Id.*

Roggio stated that the kidnappers took his passport and that he was traveling on a temporary passport. H.T. 16. The full secondary interview took 15 to 20 minutes. H.T. 19. The CBP Agent asked Roggio basic questions she would have asked any international traveler. H.T. 14.

At the conclusion of the interviews of Roggio was advised that his and Sidiropoulou's electronic devices were being detained for a border search. As a result, HSI agents detained from Roggio: (1) a MacBook Pro Laptop Computer; (2) an Apple iPad Tablet; (3) an Apple iPhone 6s; and (4) a Scandisk Flash Drive. H.T. 64–65; Gov. Exhibit 2.

The government obtained a search warrant for the electronic devices seized from Roggio on March 21, 2017, from United States Magistrate Judge Karoline Mehalchick. *See* Dkt. No. 3:17-MC-197 (M.D. Pa. Mar. 21, 2017).

The court-ordered searches of electronic devices seized from Roggio revealed additional evidence of his crimes, including, among other things: (1) communications with his Kurdistan customers; (2) detailed information concerning the arms and ammunition manufacturing plant project; (3) communications concerning possible fraud committed by Roggio in completing the arms factory; (4) financial records related to payment to Roggio for his work in Kurdistan; and (5) evidence of his knowledge of export control laws.

## IV.  Argument

At the suppression hearing, the Court heard from CBP Officers Aurelia Morales and Felney Augustine, HSI Special Agents James Mundy and Jeff Burke, and FBI Special Agent Douglas Vetrano. To the extent they had a recollection at all, each described an interaction with Roggio upon his entry to the country that followed procedure and did not include anything out of the ordinary that would merit suppression of either evidence seized from him or statements that he gave.

### Motion to Suppress Evidence Seized at Border

Under the "border search" exception to the warrant requirement, routine border stops and searches of persons, luggage, personal effects, and vehicles may be conducted without probable cause or reasonable suspicion. *United States v. Montoya de Hernandez*, 473 U.S. 531, 538 (1985); *see also United States v. Flores-Montano,* 541 U.S. 149, 154–55 (2004) (no probable cause or reasonable suspicion needed for border search of car, including nondestructive disassembly and reassembly of fuel tank). Indeed, neither the Supreme Court nor any lower courts have *ever* required a warrant for a border search, and the Supreme Court has *only once* required a degree of individualized suspicion for a

border search or seizure, in *Montoya de Hernandez. See United States v. Kolsuz*, 890 F.3d 133, 147 (4th Cir. 2018) (stating that lower "courts consistently have required only reasonable suspicion even when reviewing the most intrusive of nonroutine border searches and seizures.").

"Time and again," the Supreme Court has held that "'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" *Flores-Montano*, 541 U.S. at 152–53 (quoting *United States v. Ramsey*, 431 U.S. 606, 616 (1977)). It is thus well-settled that "[r]outine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538.

As the Third Circuit has recognized, "it is beyond peradventure" that "'the events of September 11, 2001, only emphasize the heightened need to conduct searches' at our borders." *Bradley*, 299 F.3d at 202 (quoting *United States v. Yang*, 286 F.3d 940, 944 n.1 (7th Cir. 2002)). Thus, this "realization that important national security interests are at

stake has resulted in courts giving the broadest interpretation compatible with our constitutional principles in construing the statutory powers of customs officials." *United States v. Ickes*, 393 F.3d 501, 505 (4th Cir. 2005) (internal quotation marks omitted).

The review of Roggio's electronics at the border was conducted to uncover additional information about the ongoing, illegal export of weapons—a purpose within the very core of the national security rationale underlying the border search doctrine. *See Defense Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458–59 (5th Cir. 2016) (internal quotation marks omitted) (stating that the illegal export of weapons parts in violation of the Arms Export Control Act directly implicates both "the public's keen interest in restricting the export of defense articles" and "the government's exceptionally strong interest in national defense and national security"); *accord United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003) ("The United States's interest in preventing the export of weapons to other countries also implicates the sovereign's interest in protecting itself."). As HSI Special Agent Burke testified, Roggio's devices were detained for examination because "it was reasonable to suspect that Mr. Roggio was engaged in

some type of illegal export activities, as well as brokerage and service activities in Iraq, without the permission of the Department of State." H.T. 138.

In his post-hearing brief, Roggio makes two related arguments. Roggio first asserts that the Government lacked reasonable suspicion to seize and search his electronics. Doc. 108 at 8–13. Assuming reasonable suspicion existed, Roggio next claims that the Government exceeded the scope of permissible border search by forensically examining the electronics without first giving a cursory examination of the same. Doc. 108 at 14–16. Roggio also incorporates his previous filings related to the issue at bar, as does the Government.

### A. Though no reasonable suspicion was necessary for the border search of Roggio's electronics, it was clearly present here.

As argued above, as well as in previous filings by the Government, this search was routine. "Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant." *Montoya de Hernandez*, 473 U.S. at 538. Even if the search was "non-routine," there was sufficient reasonable suspicion to justify the detention and examination of Roggio's electronic devices. Roggio notes that CBP Officer Morales, who conducted Roggio's

secondary questioning, was satisfied that "Roggio and his personal effects, including his electronic devices, were admissible and that there was no reason to conduct even a physical examination of his electronic devices." Doc. 106 at 8–9 (citing H.T. 43–44, 51, 58). However, CBP Officer Morales testified that "under the regulations" she would have been able to "manually touch . . . and inspect" Roggio's devices, ask Roggio for his passcode, "open up the device and . . . scroll through it," and even under certain circumstances "detain the device or make a copy of it." H.T. 47-48. So, even though she ultimately did not do so, CBP Officer Morales could have conducted a routine search of Roggio's devices, and in fact she testified that she has done such searches "many times" in the past. H.T. 48. Moreover, CBP Officer Morales also testified that Roggio's electronics could have been detained solely as the result of information he provided to her during her secondary questioning. H.T. 57. Among other things, Officer Morales had serious doubts about Roggio's story of being kidnapped. H.T. 56–57.

Whether CBP Officer Morales thought she had authority to detain Roggio's devices – or whether she should have, is beside the point. CBP Officer Morales was unaware of the ongoing investigation into Roggio's

illegal export of firearms and firearms parts and understood only that she was instructed to interview the defendant based on a Counter Terrorist Response Lookout. H.T. 58. Rather, another officer – HSI Special Agent Mundy – had similar authority to detain Roggio's devices, and he did so based on a request from his colleague, Special Agent Burke, who was part of the cross-agency team investigating Roggio's illegal activities. H.T. 64. It was, according to Special Agent Mundy, "a very common occurrence and request," to detain electronic devices found at the border belonging to a subject of an ongoing criminal investigation. H.T. 65. Thus, nothing about the detention of the devices was contrary to standard practice. And, at the time of the detention and subsequent forensic search of Roggio's devices, the Government had more than enough evidence of criminal violations committed by Roggio – indeed, not just reasonable suspicion, but probable cause, as evidenced by the issuance of a search warrant quickly following the initial search of the devices.

### B. The limited search conducted by HSI did not exceed the authority under the border search.

Roggio next argues that HSI failed to conduct a cursory examination of Roggio's electronic devices and rather conducted a full

forensic examination from the start. Doc. 108 at 15. HSI Special Agent Burke testified at the suppression hearing concerning the detention and forensic examination made of Roggio's devices. H.T. 138–40. In short, the devices were taken from Roggio and provided to HSI forensic specialists who utilized passwords provided by the defendant to make a forensic copy of the data. H.T. 138–39. The Agent was then able to access the data on a computer server maintained by HSI for that purpose, and to conduct a limited cursory review "to see if we can find anything that would substantiate seizing the devices." H.T. 138–39. This process is not unique to this matter. *Id.* The process was developed by HSI to protect the integrity of data extracted from the electronic devices. H.T. 139. Once the data is extracted and ready, the Agent is "under the clock" to do his cursory review to determine if a more thorough examination is appropriate. H.T. 140. A full review of the data would have taken weeks, if not months. *Id.* Once the cursory review of the electronic devices showed evidence related to the crimes under investigation, the investigatory team decided to apply for a search warrant and officially seize the devices. H.T. 158. The affidavit in support of the search warrant included both facts known to the

investigation prior to the limited boarder search, as well as the results of the cursory review by S.A. Burke. Gov. Exhibit 3. Agents were aware that Roggio had purchased controlled items and had exported them to Iraq in violation of law. Roggio had utilized commercial email to send a document entitled "Weapons and Ammunition Feasibility Report" that contained a detailed description of the requirements (both physical and legal) to build a weapons and ammunition plant in Kurdistan, Iraq. Gov. Exhibit 3 ¶ 34. Other emails generated or received by Roggio detailed the purchase of firearms parts – 15,000 "Gas Ring MIL" gas rings and 3,200 "Cotter Pin – Firing Pin Retainer" – firearm parts, controlled for export, which were ordered and paid for while Roggio was outside the United States. *Id.* at ¶¶ 35−40. On February 26, 2017, Roggio had arrived at the United States from Erbil, Iraq, via Istanbul, Turkey and had with him the various electronic devices and storage media seized by customs officials. *Id.* at ¶¶ 41−43. When interviewed, Roggio offered that he was doing business as a construction "consultant" in Kurdistan Iraq building residential housing, had been paid nine million dollars for his work, and was suspected of defrauding his Iraqi partners. *Id.* at ¶¶ 44−46. Roggio also confirmed his business addresses

in Pennsylvania and Kurdistan Iraq, together with his telephone numbers and email addresses. *Id.* at ¶ 47. Put succinctly, the government had reasonable suspicion to believe that Roggio had violated export law, together with committing wire fraud and money laundering. The government had, prior to the boarder search, discovered that these activities occurred both in the United States and in Iraq. The government had documentation that showed that Roggio used international electronic communications to order and purchase items he illegally exported. The government had reasonable suspicion to believe that Roggio was providing defense services in Iraq in violation of law. Finally, the government knew that Roggio was traveling back to the United States from Iraq, with electronic devices capable of storing and transmitting information about his illegal activities. *Id.*

No precedent exists requiring a search warrant to forensically examine Roggio's devices the investigation detained at the border. In his original brief, Roggio argues that the search of his electronics was "not a border search but rather an end run around the warrant requirement . . . ." Doc. 47 at 9; *see also id.* at 6 (calling the border search "mere pretext"). But by merely landing at an international

airport, Roggio subjected himself and his property to a border search. *See Montoya de Hernandez*, 473 U.S. at 539 (when defendant "presented herself at the border," she "subjected herself to the criminal enforcement powers of the Federal Government," including border search authority). Standing alone, the fact that someone is already under investigation for suspected criminal activity does not change a search at the border into something other than a routine border search. *See Kolsuz*, 890 F.3d at 138 (holding that the manual search of defendant's phone at the airport was a routine border search even though he was "well known to government authorities" and CBP officers were "ready for him"). The fact that the Government utilized a "belt and suspender" approach to the search of Roggio's electronics does not confer upon him a Fourth Amendment right not otherwise recognized by the Courts. The fact that the Government chose to seek a search warrant does not avail Roggio, but it does assure this Court that suppression is not necessary nor appropriate here.

The border search, if nonroutine, was well justified by reasonable suspicion. More than sufficient facts known to the government established reasonable suspicion that Roggio had violated, and was

continuing to violate the law, and that the devices and electronic storage media he possessed would contain evidence of the same.

The remaining arguments advanced in Roggio's brief take issue with various investigative findings including (1) the FBI Public Access Line report that kicked off the investigation reported suspicious shipment of *gun parts*, rather than more accurately describing gun manufacturing equipment (Doc. 108 at 10); (2) the specifics regarding a third party conversation between the local shipper of the controlled items to Iraq and the retailer who sold the items to Roggio (third party discussions of reamers, drill bits, rather than combo buttons) (Doc. 108 at 10); (3) the fact that the local shipper identified rifling combo button packaging, rather than actual rifling combo buttons) (Doc. 108 at 11); (4) that Roggio explained to an investigative Agent that he had purchased rifle combo buttons but that the buttons were "probably" located on property he controls in Pennsylvania (Doc. 108 at 12); (5) that the Government failed to intercept the suspicious package being shipped by Roggio despite having been tipped off the same day it was shipped (*Id.*); (6) that Roggio had a background in firearms manufacturing and thus might have been purchasing controlled items

in support of such a business (Doc. 108 at 13); and (7) that the "Weapons and Ammunition Feasibility Report" found by the investigation including a "LEGAL FEASIBILITY" section describing the need for ITAR compliance – suggesting that a legal firearms project was in the offering in Iraq. (*Id.*)

Roggio is conflating argument with fact. Roggio's brief reads more like a closing argument to a jury than a pretrial evidentiary analysis. He suggests that reasonable suspicion is absent because the facts should be viewed from a perspective favorable to the defense. Even if the Court were to buy into this erroneous process, Roggio would fail. For example, he complains that his purchase of firearm parts might be explained by the fact that he has in the past been involved in lawful manufacturing in the United States. Doc. 108 at 13. However, the testimony of record indicated that at the time of the purchase of these controlled items, his prior businesses had either failed or never got off the ground and he was no longer manufacturing firearms in the United States. H.T. 95. Similarly, the Government could point-for-point argue that each of the items raised by Roggio suggest his guilt. Should this matter go to trial, the Court will no doubt have the pleasure of hearing

such arguments. For the purposes of the instant motions to suppress, such argument is unavailing to Roggio. *See e.g. United States v. McHugh*, 639 F.3d 1250, 1256–57 (10th Cir. 2011) ("We agree with the district court that the facts, viewed in the entirety and in the light most favorable to the government, establish that reasonable suspicion existed to justify the stop."). In the context of investigatory stops of individuals, the courts look to the "totality of the circumstances, rather than assessing each factor or piece of evidence in isolation." *Id.* at 1256. "Additionally, we 'need not rule out the possibility of innocent conduct,' and reasonable suspicion may exist 'even if it is more likely than not that the individual is not involved in any illegality.' All reasonable suspicion requires is 'some minimal level of objective justification.'" *Id.* (internal cites omitted).

Viewing the evidence and testimony presented at the suppression hearing *in totum* and in a light most favorable to the Government leads to the inescapable conclusion that the investigation had reasonable suspicion to detain and examine Roggio's electronics at the border. These same facts convinced a United States Magistrate Judge that

probable cause existed to search Roggio's email. H.T. 83–84; Gov. Exhibit 3.

Roggio's motion to suppress should be denied.

## Motion to Suppress Roggio's Statements

While not addressed in Roggio's post-hearing brief, his Motion to Suppress Statement and Related Evidence was nonetheless before the Court at the suppression hearing. H.T. 3. Roggio's earlier motion argued that statements he made during his secondary inspection should be suppressed, as well as any evidence obtained as a result (including electronic evidence), because his interview with CBP was an unconstitutional custodial interrogation of Roggio conducted contrary to the Fifth Amendment and *Miranda*. The Government already addressed these arguments in its opposition brief, which is incorporated herein by reference.

None of the testimony at the hearing suggested the scary interrogation painted by Roggio's opening brief.  Rather the testimony demonstrated that Roggio's experience was that of a routine secondary border questioning. CBP Officer Morales testified that Roggio was pleasant and cooperative and was only questioned regarding the

circumstances of his travel—a routine line of questioning asked of all travelers selected for secondary inspection. H.T. 14-20. She was not aware of the criminal investigation at all. H.T. 39 – 40. Thus, the questioning did not cross the line beyond which *Miranda* would apply. *See United States v. Kiam*, 432 F.3d 524, 530 (3d Cir. 2006).

Similarly, CBP Officer Morales testified that agents from other agencies such as HSI and FBI are "very often" ("on a daily basis") present during secondary interviews. H.T. 28, 54-55. But she was not asked by them to interview Roggio; he was selected for secondary inspection due to the CTR lookout. H.T. 39. Roggio was sent to secondary inspection with CBP Officer Morales because of a computer-generated Counter Terrorism Response. H.T. 39. When asked whether the two agents present during the secondary inspection or Case Agent Burke asked her to interview Roggio, CBP Officer Morales replied that she did not remember that. H.T. 39 -40. CBP Officer Morales offered that while she doesn't specifically recall the circumstances of how she came to conduct the secondary inspection and interview of Roggio that she would typically sign in to work and her supervisor would instruct her as to her duties for the day. H.T. 32. "So the way I came to meet

Mr. Roggio was probably my supervisor said, Go handle something at Terminal 8, then, at that time, go to Terminal 1 and talk to – and do whatever lookouts you have for the day over there."  H.T. 32.

Roggio made several other frivolous arguments in his original brief relating to whether the agents present for his questioning brandished weapons or acted menacing by standing up; whether he was refused refreshments; or whether the bathroom facilities turned the CBP inspection area into a prison. Needless to say, CBP Officer Morales testified that nothing that occurred during Roggio's secondary inspection was out of the ordinary, let alone rising to the level of a constitutional violation. *See, e.g.,* H.T. 44 (government agents in plain clothes and side arms), 55 (bathroom explanation).

Roggio's motion to suppress his statement should also be denied.

## Conclusion

All of the defendant's motions to suppress should be denied on the basis of the aforestated reasons.

Respectfully submitted:

BRUCE D. BRANDLER
ACTING UNITED STATES ATTORNEY

s/ Todd K. Hinkley

Todd K. Hinkley
Assistant U.S. Attorney
235 North Washington Ave.
Scranton, PA 18503
570-348-2800
Attorney ID PA-68881