THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | 3:CR-18-0097 |
| | : | (JUDGE MARIANI) |
| ROSS ROGGIO, | : | |
| | : | |
| Defendant | : | |

## MEMORANDUM OPINION
### I. BACKGROUND

Defendant Ross Roggio's Motion to Suppress Evidence Seized in Violation of the

United States Constitution (Doc. 46) and Motion to Suppress Roggio's Statement and

Related Evidence (Doc. 64) are pending before the Court.  In the March 20, 2018, thirty-

seven count Indictment, Defendant Roggio is charged with conspiracy to commit an offense

against the United States, in violation of Title 18, United States Code, Section 371;

violations of the Arms Export Control Act, Title 22, United States Code, Sections 2778(b)

and (c); and the International Emergency Powers Act, Title 50, United States Code,

Sections 1702 and 1705(c); smuggling goods from the United States, in violation of Title 18

United States Code Sections 554 and 2; wire fraud, in violation of Title 18, United States

Code Section 1342; and money laundering, in violation of Title 18 United States Code,

Sections 1956(a)(2)(A) and 2.  (Doc. 1.)

Following full briefing of the motions (Docs. 47, 56, 61, 65, 72, 96, 97), a

Suppression Hearing was held on May 27, 2021 (*see* Hr'g Tr. (Doc. 103)). As agreed at

the Suppression Hearing (Doc. 103 at 170-174), the parties filed supplemental briefs after

the filing of the Official Transcript of the Hearing. Defendant filed his brief (Doc. 108) on

September 3, 2021, and the Government filed its brief (Doc. 109) on October 13, 2021.

Therefore, this matter is ripe for disposition.

## II. BACKGROUND

At the Suppression Hearing, Jeff Burke, a Special Agent with Homeland Security out

of the Philadelphia, Pennsylvania, office, testified at length about the investigation which led

to the March 20, 2018, Indictment. (Hr'g Tr. 75-162 (Doc. 103).) In addition to Homeland

Security Investigations ("HSI"), the agencies involved include the Federal Bureau of

Investigation ("FBI") and the Department of Commerce Office of Export Enforcement

Bureau of Industry Security. (*Id.* 76:7-12.) Burke provided a narrative as to how the

investigation began and developed:[1]

> In March of 2016, a representative employee from the Drill Masters Eldorado
> Tool Company contacted the FBI, in regards to suspicions that controlled items
> were being exported to Iraq, specifically, machinery bits, tools, to manufacture
> firearms.
>
> From that, FBI conducted several interviews to confirm this, obtained
> documents and brought in the Department of Commerce to further investigate.
>
> As they reviewed documents obtained by Eldorado Tool Company, they
> confirmed that there were certain tools that appear to have been shipped

---

[1] Burke joined the investigative team sometime after November 2016. (Hr'g Tr. 91:3-6.) He
testified that the first thing he did upon joining the team was to review all investigative documents. (*Id.*
91:6-9.) At the outset, the FBI was the lead on the investigation. (*Id.* 111:21-25.)

through a private shipping company in East Stroudsburg, The Packaging Place, I believe, the name of it is, Special Agent from Commerce ran licensing checks to see if a license had been obtained or approvals had been obtained from the Department of Commerce to ship those items because they had found that they were, indeed, controlled items that were not allowed to be exported from the U.S. to Iraq without specific licensing and authorizations.

When it was determined that no licensing had been found, search warrants were obtained for various email addresses for Mr. Roggio. If I'm recalling the fact pattern correctly, Mr. Roggio was having his former wife ship these items to him in Iraq, and, I guess, when the Eldorado Tool Company employee had received a phone call from The Packaging Place asking for an official description of the items, and that's what kind of tipped off the employee that these controlled items were being exported.

Further investigation confirmed that, yes, they were exported via mail by The Packaging Place, and additional documents were obtained from the package place, from the shipper, as well, and, you know, all that went towards the probable cause of the search warrants that were obtained by the Commerce Special Agent in the investigation. I believe there were two email search warrants that they applied for and received.

(Hr'g Tr. 82:1-83:10 (Doc. 103).)

When Roggio was telephonically interviewed on April 29, 2016, by a Special Agent

of the FBI as a follow up to the March 16, 2016, Drill Masters Eldorado Tool Co. ("Drill

Masters" "Eldorado Tool") call, he acknowledged that he had ordered the parts that had

been the subject of the Drill Masters call but he did not remember where they were, saying

they were either at his house or his parents' house. (*Id.* 86:16-87:2.)  Burke testified that

further contact with Eldorado Tool confirmed

the orders and also confirmed that specific tools, essentially, drill bits -- let me get the specific name -- I believe they're called, like, buttons, but, essentially, they're used to drill out a barrel and impart the rifling within the barrel for various calibers. And she confirmed that the parts, indeed, are controlled and not

3

supposed to be exported without a license.

(Hr'g Tr. 87:8-14.)

On cross-examination, Burke verified that, regarding the March 30, 2016, call from

Eldorado Tool, the search warrant application mentions "gun parts being reshipped to Iraq."

(Hr'g Tr. 110:24-111:3.)  Burke clarified that he did not believe that Eldorado Tool was

talking about "actual gun parts" like "barrels, firing pins, that kind of thing" but rather the

caller was referring to "gun manufacturing parts" like the "buttons" to which he had

previously referred.  (*Id.* 111:5-16.)  Burke further clarified that Eldorado Tool had shipped

the products, including the 15 rifle combo buttons, from their facility in Connecticut to

Pennsylvania.  (*Id.* 112:22-113:23.)

Investigative agents also went to the shipping company in East Stroudsburg,

Pennsylvania, that was used to ship the Eldorado Tool products, The Packaging Place, and

spoke with the owner, Frank Montaforte.  (*Id.* 87:15-88:2.)  Burke testified that Monteforte

"provided paperwork and confirmed that items fitting the description of these tools that are

restricted, that he did recall having exported those to Iraq to Mr. Roggio, indicated that his

wife had come in, brought them in, and, I believe, they documented them as just various

tools." (*Id.* 88:2-7.)  In reviewing Government's Exhibit 7, Burke identified it as The

Packaging Place invoice

> indicating that Kristy Roggio had signed to have these items shipped to Ross
> Roggio to an address in the Baharan Residential Complex Building 42, Office
> 10, Sulaymaniyah, Kurdistan Region of Iraq, further identifying a phone number
> of 570-977-8102 to the attention of Ross Roggio from Kristy L. Roggio at, I

4

believe, 143 Indian Spring Drive, Stroudsburg, Pennsylvania. Declared a value of $800. And then it's a multi-page document which breaks down, specifically, what the items were.

(*Id.* 88:12-20.)

On cross-examination, Burke acknowledged that Monteforte had contacted Eldorado Tool and spoken with Debbie Cornwall about a description of the items to be shipped.  (Hr'g Tr. 115:8-10.)  When Defendant's counsel asked if Monteforte "was told that they were gun reamers – they were reamers for drills," Burke responded that he did not know the specific conversation Monteforte had with Cornwall.  (*Id.* 115:11-14.)  Upon review of the March 21, 2017, Application for a Search Warrant" (Gov't Ex. 5 ¶ 24), Burke agreed that the items described in the March 30, 2016, shipment (Waybill # 5622077020) were reamers and drill bits.  (*Id.* 115:21-116:4.)  Burke further agreed that Cornwall had previously specifically described rifling combo buttons by name regarding Roggio's order for fifteen rifling combo buttons.  (*Id.* 116:9-15.)

When asked to confirm that "[n]o one has ever determined from observation what was in the Package," Burke responded that "through interviews with Mr. Monteforte and descriptions of how the buttons would look in packaging obtained from Eldorado Tool, he identified them as believing that those items were part of the shipment that had been sent to Iraq." (Id. 117:25-118:6.)  Thereafter, Burke confirmed that the package had never been inspected by law enforcement and no photos were ever taken of it.  (*Id.* 118:7-13.)

Burke explained that after The Packaging Place interview, the next step in the

investigation was to take the information obtained and request licensing determinations about the products shipped. (*Id.* 89:18-21.) The request revealed that the rifling combo buttons were controlled items which required a license to be exported from the United States and no license was found for the export of these items. (*Id.* 90:9-25.)

Based on information obtained from the investigation, in November 2016 search warrants were sought for two email accounts associated with Roggio. (*Id.* 91:1-2.) Search of the email accounts found a document titled "Weapons and Ammunition Feasibility Report No. 1)," which Burke testified "appears to be [a report] in which it is outlining the steps, costs and analysis to develop a weapons manufacturing facility . . in Iraq." (*Id.* 91:14-17, 92:10-13.) Burke also pointed to a March 28, 2016, invoice from OML Global in Fayetteville, North Carolina, listing Ross Roggio as the customer and indicating an order for "15,000 gas rings, 3200 cotter pins, firing pin retainers, and the gas rings are further described as M4 bolt gas rings MIL." (*Id.* 93:3-8.) Burke explained that

> [t]his is a document that showed Mr. Roggio was obtaining large quantities of materials that would be needed to develop an M4 style, AR15 style assault rifle. These items, specifically, would be integral to the development of the . . . firing pin bolt action within the rifle [which] would be incorporated into the production of firearms.

(Hr'g Tr. 94:2-10.) Burke further testified that these items are controlled under the United States Munitions List and would require licensing and approval for export from the United States. (*Id.* 94:11-23.) He added that, during this time frame, Roggio was not producing rifles in the United States but he had owned a manufacturing facility in Fayetteville years

6

before and he attempted to start a partnership in the East Stroudsburg area but that did not

move forward to manufacture firearms "[s]o as of our investigation, Mr. Roggio was not

manufacturing firearms professionally in the United States." (*Id.* 95:1-8.)

Burke testified that investigative agents had a case coordination meeting and border

search authority was discussed in early January 2017. (Hr'g Tr. 78:1-5)  When he learned

that Roggio was planning to fly back from Iraq, Burke said he first consulted with his

supervisor about his intent to request a border search and detention of electronic devices

when Roggio crossed the border, returning to the United States through JFK International

Airport.  (Hr'g Tr. 78:10-14.)  By way of background, Burke explained that

> [w]ith this investigation, as with any investigation that I open, I enter in subject records to an automated case system. The subject records include -- in this case would have been Mr. Roggio, his company, and other various subjects and names of individuals that were part of or coming up in the investigation.
>
> Within those subject records, I have the option to designate them for a referral to Customs, a referral to Immigration or as a Silent Hit, so that if they are traveling, I get to see that and nobody else does. It kind of allows me to understand, you know, what the pattern of travel is, if they are coming in, and in Mr. Roggio's case, he was coming in from Iraq. It would provide us the opportunity to conduct a border search of Mr. Roggio.
>
> And in this case, in particular, I believe, it was January 25, I received both notices  from my automated lookout that he was traveling back to the U.S. from Iraq, and I was also notified by the FBI of the travel, as well.

(Hr'g Tr. 77:3-20.)

Burke confirmed that export violations were part of the ongoing investigation into

Roggio and export violations would be something that Homeland Security Investigations

("HSI") as well as Customs Border Patrol would have the authority to investigate. (*Id.* 79:25-80:5.)

As to events at the border, HSI agents confirmed that Roggio and Christina Sidiropoulou, his travel companion, were returning to the United States on February 26, 2017, aboard a Turkish Airlines flight. (Hr'g Tr. 95:13-17.)   Case agents coordinated with HSI New York JFK Office and U.S. Customs and Boarder Protection ("CBP") to arrange for Roggio and Sidiropoulou to undergo a secondary examination and border search upon arrival. (*Id.* 96:12 -97:10.)

U.S. Customs and Border Protection Officer Aurelia Morales testified that she conducts secondary inspections as part of her duties. (Hr'g Tr. 5:4-11.)   She described a secondary inspection: "when a person that was processed through primary inspection needs additional assessing, in terms of Immigration Laws, Customs Laws or any threats, any criminality involved with that person." (*Id.* 5:14-17.)

Upon arrival on Turkish Airlines, Roggio and Sidiropoulou were referred for secondary inspection at JFK customs which was conducted by Morales. (*Id.* 11:1-3.) FBI Special Agent Douglas Vetrano, HSI Special Agent James Mundy, and other CBP officers were present during the secondary interview. (*Id.* 19:19-25.)   Morales testified that she had never spoken with Burke before she interviewed Roggio and she could not recall if she spoke with the agents who were present about Roggio. (*Id.* 27:4-7, 28:24-25:3.)

Morales said she asked Roggio basic questions she would have asked any

international traveler and she recalled that he was pleasant and very forward with his answers. (*Id.* 14:2-11.) Roggio indicated that he was traveling from Iraq where he had worked in construction and was a part owner of a business building infrastructure, his business partners paid him approximately $9 million to complete a project, there had been a dispute regarding the amount of money he received which resulted in his being kidnapped by his business partners, and the kidnappers took his passport so he was traveling on a temporary passport. (*Id.* 15:4-17:22.) At the close of her interview, based on the initial interview, the secondary interview, and the inspection of his bags, there was no reason to deny Roggio admissibility and nothing to be confiscated. (*Id.* 43:11-15.) Morales estimated that the secondary interview took 15 to 20 minutes. (*Id.* 19:9-13.) She could not recall whether Roggio had asked to have an attorney present, but she confirmed that she believed she would have put it in her notes if he had asked. (*Id.* 21:1-5.)

Special Agent Mundy testified as to his recollection of the events of February 26, 2017.

> As far as I can recall, you know, the subject was brought into a secondary exam and, essentially, I linked up with the agents from the Bureau, and CBP performed their normal routine secondary examination, and the request from the Agent Burke was to detain the electronic devices, in accordance with a border search, which I did, and I FedEx'd them to Agent Burke.

(Hr'g Tr. 64:12-17.)

On February 26, 2017, Mundy detained Roggio's electronic devices. (*Id.* 68:1-5.) According to the Affidavit in Support of a Search and Seizure Warrant attached to the March

9

21, 2017, Application for a Search Warrant,

> [f]ollowing the interviews, ROGGIO and SIDIROPOULOU were advised that
> their electromic devices were being detained for a border search.  HSI SA
> James Mundy detained the follow devices from ROGGIO: 1 MacBook Pro
> Labtop Computer w/ storage bag . . . ; 1 Apple IPad Tablet . . . ; 2 Apple IPhone
> 6's . . . ; and 1 Scandisk Flash Drive . . . .  HSI SA James Mundy then detained
> the following devices from SIDIROPOULOU: 1 Apple IPhone S . . . ;1 Apple
> IPhone 1 . . . ;and 1 Apple IPod . . . .  ROGGIO provided his passwords for all
> password-protected devices, and the border search process was explained to
> both ROGGIO and SIDIROPOULOU.  SA Mundy provided them with HSI SA
> Burke's contact information and explained that the items would be sent to
> Pennsylvania for examination and returned to ROGGIO and SIDIROPOULOU
> upon the completion of the forensic review of the devices.

(Gov't Ex. 5 ¶ 53.)

On February 28, 2017, Burke received the items from Mundy, confirmed the

contents, and secured them pending submission to the HSI Philadelphia Forensics Lab.  (*Id.*

¶ 54.)  On March 1, 2017, Burke submitted all items to Computer Forensics Agent ("CFA")

Doug Green for a forensics examination of the detained items.  (*Id.* ¶ 55.)  The Government

obtained a search warrant for the electronic devices on March 21, 2017, from United

Magistrate Judge Karoline Mehalchick.  (*Id.*, last page.)

### III. ANALYSIS

In his post-hearing brief, Roggio asserts that the search and seizure of his electronic

devices was unreasonable for two reasons: 1) there was no reasonable suspicion to seize

and search the devices; and 2) the search exceeded the scope of any reasonable border

search.  (Doc. 108 at 8, 14.)   Defendant's pending motions require the Court to consider

the requirements of the Fourth Amendment where the government conduct at issue occurs

in the context of a search and/or seizure at a United States border.

The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

In *Riley v. California*, 573 U.S. 373 (2014), the Supreme Court noted that the text of the Fourth Amendment "makes clear [] 'the ultimate touchstone of the Fourth Amendment is reasonableness.'" *Id.* at 381 (quoting *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006)).

*Riley* added that

[o]ur cases have determined that "[w]here a search is undertaken by law enforcement officials to discover evidence of criminal wrongdoing, ... reasonableness generally requires the obtaining of a judicial warrant." *Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 653, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995). . . . In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement. See *Kentucky v. King,* 563 U.S. [563 U.S. 452], 131 S.Ct. 1849, 1856–1857, 179 L.Ed.2d 865 (2011).

*Riley*, 573 U.S. at 382.

The border search is an exception to the warrant requirement which is well-established. *See Boyd v. United States*, 116 U.S. 616, 623 (1886). "Time and again, we have stated that 'searches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border.'" *United*

11

*States v. Flores-Montano*, 541 U.S. 149, 152–53 (2004) (quoting *United States v. Ramsey,* 431 U.S. 606, 616 (1977)).

In the case of a forensic search of electronic devices, as happened here after Mundy sent the detained devices to Burke and Burke forwarded them to Green for a forensic examination, *see supra* p. 10, reasonable suspicion to conduct the advanced search is required for the search to pass muster under the Fourth Amendment. *Alasaad v. Mayorkas*, 988 F.3d 8, 12-13 (1st Cir. 2021), *cert. denied sub nom. Merchant v. Mayorkas*, 141 S. Ct. 2858 (June 28, 2021); *United States v. Cano*, 988 F.3d 1002, 1014 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 2877 (June 28, 2021); *United States v. Kolsuz*, 890 F.3d 133, 138 (4th Cir. 2018). Where a basic border search of electronic devices is a "routine" search which may be conducted without reasonable suspicion, a forensic search is a nonroutine search which is permissible under the Fourth Amendment upon a showing of reasonable suspicion. *Id.* Although *Cano* limited the scope of a forensic search based on reasonable suspicion to searches for contraband, 988 F.3d at 1017, *Alasaad* and *Kolsuz* did not, *see* 988 F.3d at 20-21, 890 F.3d at 143-44. As stated in *Alasaad*, "the border search exception is not limited to searches for contraband itself rather than evidence of contraband or a border-related crime." 988 F.3d at 20. *Kolsuz* reasoned that "[t]he justification behind the border search exception is broad enough to accommodate not only the direct interception of contraband as it crosses the border, but also the prevention and disruption of ongoing efforts to export

12

contraband illegally, through searches initiated at the border." 890 F.3d at 143-44 (citations

omitted).

> By way of background, *Kolsuz* stated that,

> [a]s a general rule, the scope of a warrant exception should be defined by its justifications. *See Riley*, 134 S. Ct. at 2484–88 (asking whether "application of the search incident to arrest doctrine to this particular category of effects would untether the rule from the justifications underlying the [search incident to arrest] exception"). As a result, where the government interests underlying a Fourth Amendment exception are not implicated by a certain type of search, and where the individual's privacy interests outweigh any ancillary governmental interests, the government must obtain a warrant based on probable cause. *See id.* At some point, in other words, even a search initiated at the border could become so attenuated from the rationale for the border search exception that it no longer would fall under that exception. *See [United States v. Molina–Isidoro*, 884 F.3d 287, 295–97 (5th Cir. 2018)] (Costa, J., concurring) (questioning whether search for evidence as opposed to contraband is consistent with justifications for border search exception).

*Kolsuz*, 890 F.3d at 143.

Thus, courts look to the link between between the forensic search and the interest

that justifies the border exception to ascertain whether the border exception is triggered in

the circumstances of the case. *Id.* at 143. *Kolsuz* found that attempting to export firearms

illegally and without a license is "a transactional offense that goes to the heart of the border

search exception which rests in part on 'the sovereign interest of protecting and monitoring

exports from the country.'" *Id.* (quoting *United States v. Oriakhi*, 57 F.3d 1290, 1297 (4th Cir.

1995); citing *United States v. Boumelhem*, 339 F.3d 414, 423 (6th Cir. 2003)).

The Fourth Circuit further explained the requisite nexus in *United States v.*

*Aigbekaen*, 943 F.3d 713 (4th Cir. 2019), *cert. denied*, 141 S. Ct. 2871 (June 28, 2021):

13

our decision in *Kolsuz* teaches that the Government may not "invoke[ ] the border exception on behalf of its generalized interest in law enforcement and combatting crime." 890 F.3d at 143. This restriction makes particularly good sense as applied to intrusive, nonroutine forensic searches of modern digital devices, which store vast quantities of uniquely sensitive and intimate personal information, *id.* at 145 (citing *Riley*, 573 U.S. at 393–97, 134 S.Ct. 2473), yet cannot contain many forms of contraband, like drugs or firearms, the detection of which constitutes "the strongest historic rationale for the border-search exception," *United States v. Molina-Isidoro*, 884 F.3d 287, 295 (5th Cir. 2018) (Costa, J., concurring).

Accordingly, as we explained in *Kolsuz*, 890 F.3d at 143, to conduct such an intrusive and nonroutine search under the border search exception (that is, without a warrant), the Government must have individualized suspicion of an offense that bears some nexus to the border search exception's purposes of protecting national security, collecting duties, blocking the entry of unwanted persons, or disrupting efforts to export or import contraband. *See also United States v. Ramsey*, 431 U.S. 606, 620, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977)

943 F.3d at 721.

*Aigbekaen* found an insufficient nexus to justify the nonroutine border search in the

circumstances of the case: the Government's justified suspicion that the defendant had

previously committed

grave *domestic* crimes . . . were entirely unmoored from the Government's sovereign interests in protecting national security, collecting or regulating duties, blocking Aigbekaen's own entry, or excluding contraband. Thus, holding the border search exception applicable here, based simply on the Government's knowledge of domestic crimes, would "untether" that exception from its well-established justifications.

943 F.3d at 721 (quoting *Riley*, 573 U.S. at 386).

The First Circuit's reasoning in *Alasaad* is consistent with that of the Fourth Circuit.

In noting its disagreement with the Ninth Circuit's limitation of the border exception to

searches for contraband, the First Circuit noted:

> We cannot agree with its narrow view of the border search exception
> because Cano fails to appreciate the full range of justifications for the border
> search exception beyond the prevention of contraband itself entering the
> country. Advanced border searches of electronic devices may be used to
> search for contraband, evidence of contraband, or for evidence of activity in
> violation of the laws enforced or administered by CBP or ICE.

988 F.3d at 21.

Although the Third Circuit has not addressed this issue, the Court concludes that the

reasoning of the First and Fourth Circuits is appropriately applied in this case because the

search of Roggio's devices and the interest that justifies border searches are sufficiently

linked to support a forensic search of his electronic devices based on reasonable suspicion.

The Supreme Court has defined reasonable suspicion as a "particularized and

objective basis for suspecting the particular person stopped of criminal activity." *United*

*States v. Cortez*, 449 U.S. 4111, 417-18 (1981). In the border search context, this means

that "officials must possess a particularized and objective basis for suspecting the person

stopped of criminal activity to engage in a forensic examination" of electronic devices.

*Cano*, 934 F.3d at 1015. In determining whether reasonable suspicion existed at the

relevant time, the reviewing court considers "the totality of the circumstances." *United*

*States v. Whitted*, 541 F.3d 480, 489 (3d Cir. 2008) (citing *United States v. Arvizu*, 534 U.S.

266, 274 (2002)).

Whereas in *Kolsuz* border agents had found firearm parts upon inspection of luggage, 890 F.3d at 136, the Circuit Court did not establish such a finding as a prerequisite to finding a nexus sufficient to justify a search based on reasonable suspicion, *id.* at 143-44. Further, the clear nexus between national security and suspected export of firearm parts to Iraq without a license (contraband) justify a search based on reasonable suspicion in the framework set out above.  *Kolsuz*, 143-44; see also Defense Distributed v. U.S. Dep't of State, 838 F.3d 451, 458–59 (5th Cir. 2016) (recognizing "the State Department's stated interest in preventing foreign nationals—including all manner of enemies of this country— from obtaining technical data on how to produce weapons and weapon parts is not merely tangentially related to national defense and national security; it lies squarely within that interest" and "the public's keen interest in restricting the export of defense articles"); *accord Boumelhem*, 339 F.3d at 423 ("The government's control and regulation of the export of weapons implicates significant government interests in the realms of national security and relations with other nations.")

With this finding, the question remains whether reasonable suspicion existed to conduct a forensic search of Roggio's devices.  Despite Defendant's argument to the contrary (*see, e.g.*, Doc. 108 at 8-13), the Court concludes that reasonable suspicion existed.

Burke testified that

[based] on my review of all case materials and the [November 14, 2016,] search warrant findings and the emails within, I believed it was very reasonable to suspect that Mr. Roggio was engaged in some type of illegal export activities, as well as brokerage and service activities in Iraq, without the permission of the Department of State.

(Hr'g Tr. 138:5-10.) As set out above, before Mundy detained Roggio's devices at Burke's request, investigating agents were aware that Roggio had purchased controlled items and had, based on interviews with Monteforte and his description of items shipped to Roggio in Iraq, reasonably believed that prohibited items were exported to Iraq in violation of law. *See supra* pp. 2-6. Roggio's email contained a document titled "Weapons and Ammunition Feasibility Report" that contained a detailed description of the requirements (both physical and legal) to build a weapons and ammunition plant in Iraq. *See supra* pp. 6-7, Govt. Ex. 5 ¶ 34. Other emails generated or received by Roggio detailed the purchase of controlled firearms parts which were ordered and paid for while Roggio was outside the United States. Gov't Ex. 5 ¶¶ 35-40. This purchase occurred at a time when Roggio was not engaged in a weapons production undertaking in the United States. *See supra* pp 6-7. The electronic devices were detained when Roggio had arrived at the United States from Erbil, Iraq, via Istanbul, Turkey, Gov't Ex. 5 ¶ 43, with Iraq being the suspected destination of the prohibited firearms parts.

Considering the totality of the circumstances in this case, the Court concludes that the decision to detain Roggio's electronic devices was based on a particularized and objective basis to suspect that Roggio was involved in illegal activity related to the export of

17

prohibited firearms parts.  Therefore, the forensic examination of Roggio's electronic

devices did not violate his Fourth Amendment rights.[2]

## IV. CONCLUSION

For the reasons discussed, the Motion to Suppress Evidence Seized in Violation of

the United States Constitution (Doc. 46) and Motion to Suppress Roggio's Statement and

Related Evidence (Doc. 64) will be denied.  A separate Order is filed with this Memorandum

Opinion.

Robert D. Mariani
United States District Judge

---

[2] With this determination, the Court notes that Roggio asserted in his Motion to Suppress Roggio's Statement and Related Evidence (Doc. 64) and supporting brief (Doc. 65) that he should have been advised his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and his "statement should be suppressed as violative of *Miranda* and the Fifth Amendment" (Doc. 65 at 18-19).  However, Roggio does not raise this basis for suppression in his post-hearing brief. (*See* Doc. 108.)  As the Government correctly asserts, the circumstances of this case do not give rise to the applicability of *Miranda* and Roggio's claim that his statement and related evidence must be suppressed due to the lack of Miranda warnings is without merit. (*See* Doc. 72 at 12-19.)