# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | )    Case No. 3:CR-18-0097 |
| | ) |
| v. | ) |
| | ) |
| ROSS ROGGIO, and | ) |
| ROGGIO CONSULTING CO, LLC. | ) |
| | ) |
| Defendants. | ) |

## SUPERSEDING INDICTMENT

**THE GRAND JURY CHARGES:**

### COUNT ONE

### (Conspiracy to Commit Torture)

FILED
SCRANTON
FEB 1 5 2022
PER _____ DEPUTY CLERK

### Background

At times material to this Superseding Indictment:

1.  The defendant, ROSS ROGGIO, was a citizen of the United States. ROGGIO's last known address is in Stroudsburg, Pennsylvania, in the Middle District of Pennsylvania.

2.  Kurdistan is located in northern Iraq. Kurdistan is recognized in Iraq's constitution as a federal region. As a federal region, Kurdistan is part of Iraq but also has its own government and its own soldiers who exercise authority within Kurdistan.

3.  In 2015, ROGGIO and Kurdish officials began a business relationship in which ROGGIO agreed to manage a project to construct a weapons factory and produce weapons for Kurdish soldiers ("the weapons project") in the Kurdistan region of Iraq.

4.  Kurdish officials made resources available to assist ROGGIO, including Kurdish soldiers who were under these officials' control.

5.  An employee ("the victim") raised concerns about the weapons project. To prevent the victim from interfering with the weapons project by exposing the existence of the weapons project to individuals and entities outside of Kurdistan, and by revealing to Kurdish officials that ROGGIO did not have the ability to produce the weapons and was diverting their money for his personal use, ROGGIO directed Kurdish soldiers to abduct the victim, detain the victim at a Kurdish military compound for approximately thirty-nine (39) days, and torture the victim during multiple interrogation sessions led by ROGGIO.

<u>The Conspiracy</u>

6.  Paragraphs one through five are incorporated here.

7.    Beginning on or about October 14, 2015, and continuing through on or about November 21, 2015, while outside of the United States and in the Kurdistan region of Iraq, the defendant, ROSS ROGGIO, did knowingly combine, conspire, confederate, and agree with others both known and unknown to the Grand Jury to commit torture, in that ROGGIO and others conspired to commit acts, under color of law, specifically intended to inflict severe physical and mental pain and suffering (other than pain and suffering incidental to lawful sanctions) upon another person within the conspirators' custody and physical control.

### Objects

8.    It was an object of the conspiracy to threaten and intimidate the victim, by means of torture, to ensure that the victim did not interfere with the weapons project.

9.    It was also an object of the conspiracy to threaten and intimidate ROGGIO's other employees, by demonstrating through torture of the victim, what could happen to them if they tried to interfere with the weapons project.

## Manner and Means

10.    The manner and means by which ROGGIO and his co-conspirators sought to accomplish the objects of the conspiracy included, among others:

a.    It was part of the conspiracy that, at ROGGIO's direction, co-conspirators abducted the victim at the victim's residence in the Kurdistan region of Iraq and took the victim forcibly against his will to a nearby military compound.

b.    It was further part of the conspiracy that, at ROGGIO's direction, co-conspirators detained the victim against his will at the military compound for approximately thirty-nine (39) days.

c.    It was further part of the conspiracy that, at ROGGIO's direction, ROGGIO and his co-conspirators committed acts specifically intended to inflict severe physical and mental pain and suffering upon the victim while he was in their custody and physical control at the military compound.

d.    It was further part of the conspiracy that, at ROGGIO's direction, at times, some of ROGGIO's other employees were forced to watch while co-conspirators committed acts specifically intended to inflict severe physical and mental pain and suffering upon the victim.

## Acts in Furtherance of the Conspiracy

11.    In furtherance of the conspiracy and to accomplish the objects of the conspiracy, the acts described below, among others, were committed

while ROGGIO and his co-conspirators were outside of the United States and in the Kurdistan region of Iraq.

12. On or about October 14, 2015, ROGGIO arranged for armed Kurdish soldiers in uniform to abduct the victim at his residence in the Kurdish region of Iraq, place a bag over the victim's head, and take the victim against his will to a nearby Kurdish military compound.

13. From on or about October 14, 2015, and continuing through November 21, 2015, ROGGIO directed the Kurdish soldiers to detain the victim against his will at a Kurdish military compound in the Kurdish region of Iraq.

14. While the victim was detained at the military compound, ROGGIO led multiple interrogation sessions in which he directed Kurdish soldiers to commit acts specifically intended to inflict severe physical and mental pain and suffering upon the victim, including the following:

   a. placing a plastic bag over the victim's head to suffocate him, causing the victim to lose consciousness and think he was going to die;

   b. using a taser to inflict repeated electrical shocks to the victim's arms, throat, nose, and groin, to the point where the victim's arms bled and his hands twitched uncontrollably;

c.    applying pressure to one of the victim's fingers with the blades of a large cutting tool similar to a bolt cutter, increasing the pressure while threatening to cut off the finger;

d.    using rubber hoses to beat the victim's back, legs, stomach, and chest;

e.    beating the victim with fists on his ears, nose, throat, arms, stomach, chest, and other parts of his body;

f.    jumping violently on the victim's chest while wearing military boots, as the victim lay prone on the floor; and

g.    forcing the victim to run barefoot on sharp gravel.

15.    While the victim was detained at the military compound, ROGGIO, during at least one of the interrogation sessions that he led, wrapped his belt around the victim's neck, yanked the victim off the ground and suspended the victim in the air, causing the victim to lose consciousness.    As the victim regained consciousness, at ROGGIO's direction, a Kurdish soldier beat the victim in the groin with a stick.

16.    While the victim was detained at the military compound, ROGGIO repeatedly threatened the victim with more abuse and stated that the victim might not make it out of the military compound alive.

17.    While the victim was detained at the military compound, ROGGIO brought other employees to the compound on one or more

occasions to watch while ROGGIO directed Kurdish soldiers to commit acts specifically intended to inflict severe physical and mental pain and suffering upon the victim through the methods described above.

In violation of Title 18, United States Code, Sections 2340 and 2340A(c).

THE GRAND JURY FURTHER CHARGES:

## COUNT TWO

### (Torture)

18.     Paragraphs one through five are incorporated here.

19.     Beginning on or about October 14, 2015, and continuing through on or about November 21, 2015, while outside of the United States and in the Kurdistan region of Iraq, the defendant, ROSS ROGGIO, together with others both known and unknown to the Grand Jury did, while specifically intending to inflict severe physical and mental pain and suffering (other than pain and suffering incidental to lawful sanctions), commit and attempt to commit torture, while acting under color of law, by committing and causing and aiding and abetting others to commit acts against another person known to the Grand Jury as the victim, that is, by:

a.      placing a plastic bag over the victim's head to suffocate him, causing the victim to lose consciousness and think he was going to die;

b.      using a taser to inflict repeated electrical shocks to the victim's arms, throat, nose, and groin, to the point where the victim's arms bled and his hands twitched uncontrollably;

c.    applying pressure to one of the victim's fingers with the blades of a large cutting tool similar to a bolt cutter, increasing the pressure while threatening to cut off the finger;

d.    using rubber hoses to beat the victim's back, legs, stomach, and chest;

e.    beating the victim with fists on his ears, nose, throat, arms, stomach, chest, and other parts of his body;

f.    jumping violently on the victim's chest while wearing military boots, as the victim lay prone on the floor;

g.    forcing the victim to run barefoot on sharp gravel;

h.    wrapping a belt around the victim's neck from behind, yanking the victim off the ground, suspending the victim in the air, and causing the victim to lose consciousness while beating the victim in the groin with a stick; and

i.    repeatedly threatening the victim with more abuse and stating that the victim might not make it out of the military compound alive;

all while the victim was within their custody and physical control, and, further, the defendant, ROSS ROGGIO, together with others both known and unknown to the Grand Jury, did knowingly and intentionally aid, abet, counsel, command, induce, and procure each others' participation in the commission of said offense.

In violation of Title 18, United States Code, Sections 2340, 2340A(a) and 2.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT THREE

### (Conspiracy to Commit an Offense Against the United States)

### Background

20.     Paragraph one is incorporated here.

21.     Roggio Consulting Company, LLC was a business owned and operated by ROSS ROGGIO with an address of 116 Turkey Hill Road, Stroudsburg, Pennsylvania.

22.     The Arms Export Control Act, Title 22, United States Code, Section 2778 ("AECA" or the "Act") authorized the President to control the export of defense articles and defense services from the United States. Unless a specific exception applied, the Act provided that no defense articles or defense services may be exported without a license for such export. 22 U.S.C. § 2778(b). The regulations promulgated pursuant to the Act were the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Sections 120 through 130.

23.     The United States Department of State, Directorate of Defense Trade Controls ("DDTC") administered the ITAR and regulated the export

of defense articles and defense services. Section 2778(c) of the AECA established criminal penalties for any willful violation of Section 2778 or any rule or regulation thereunder. Under Sections 123.1 and 124.1 of the ITAR, any person who intended to export a defense article or provide defense services had to obtain the approval of the DDTC before such export occurred or services were furnished. Pursuant to the ITAR, exporting, or attempting to export, a defense article from the United States without a license or written approval from the DDTC was unlawful. 22 C.F.R. § 127.1(a)(1). The ITAR defined exporting to include, among other things: "[s]ending or taking a defense article out of the United States in any manner" and "[p]erforming a defense service on behalf of, or for the benefit of, a foreign person, whether in the United States or abroad." 22 C.F.R. § 120.17.

24. The term "defense article" referred to any item or technical data designated on the United States Munitions List ("USML"). 22 C.F.R. § 120.6. The USML set forth twenty-one categories of defense articles that are subject to export licensing controls by the DDTC. 22 C.F.R. § 121.1.

25. The term "defense service" meant:

a.    "The furnishing of assistance (including training) to foreign persons, whether in the United States or abroad in the design, development, engineering, manufacture, production, assembly, testing, repair, maintenance, modification, operation, demilitarization, destruction, processing or use of defense articles;"

b.    "The furnishing to foreign persons of any technical data controlled [by the ITAR];" and

c.    "Military training of foreign units and forces, regular and irregular, including formal or informal instruction of foreign persons in the United States or abroad or by correspondence courses, technical, educational, or information publications and media of all kinds, training aid, orientation, training exercise, and military advice."

22 C.F.R. § 120.9.

26.    The terms "defense article" and "defense service" referred to both U.S.-origin and foreign-origin defense articles and defense services on the USML. 22 C.F.R. § 120.44.

27.    The following items were defense articles designated on the USML in Category I(h), which could not be lawfully exported from the United States without a license or written approval from the DDTC:

a.    M4 Bolt Gas Rings MIL, and

b.    Firing Pin Retainers.

28.    It was also unlawful for a person to violate United States smuggling laws. Title 18, United States Code, Section 554(a) made it a

federal crime to "fraudulently or knowingly export[] or send[] from the United States, or attempt[] to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, or receive[], conceal[], buy[], sell[], or in any manner facilitate[] the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States."

29.    Neither ROGGIO nor any co-conspirator identified herein ever applied for, received, or possessed a license or other written approval from the DDTC to export defense articles or defense services to Iraq or to Iraqi foreign nationals (including but not limited to the Kurdistan federal region or to Kurdish individuals).

30.    It was the policy of the United States to deny licenses or other approvals for the export of defense articles and defense services destined for Iraq, or originating in Iraq, except that a license or other approval may be issued, on a case-by-case basis for: (1) non-lethal military equipment, and (2) lethal military equipment required by the Government of Iraq or coalition forces.

31.     Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States, where such unusual and extraordinary threats had their source in whole or substantial part outside the United States. 50 U.S.C. § 1701(a). Under IEEPA, the President could declare a national emergency through Executive Orders that had the full force and effect of law.

32.     Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. 66 Fed. Reg. 44,025 (Aug. 22, 2001). While in effect, the EAA regulated the export of goods, technology, and software from the United States. Pursuant to the provisions of the EAA, the Department of Commerce's Bureau of Industry and Security ("BIS") promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§

730-774, which contained restrictions on the export of goods outside of the United States, consistent with the policies and provisions of the EAA. *See* 15 C.F.R. § 730.02. In Executive Order 13,222, pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13,222 from the time period covered by that Executive Order through the present. *See, e.g.*, 82 Fed. Reg. 39,005 (Aug. 16, 2017).

33. For various national security reasons, the EAR prohibited the export of certain goods to specific countries, absent permission from the U.S. Department of Commerce issued in the form of an export license. The BIS maintained the Commerce Control List, which consisted of general categories of goods that were controlled for export. Individual items within the Commerce Control List were identified by an Export Control Classification Number, or "ECCN."

34. Rifling combo buttons were on the Commerce Control List (assigned ECCN 2B018.e) for reasons of national security and regional

stability, and required a license from the BIS to be lawfully exported from the United States to certain countries, including Iraq.

35.   Neither ROGGIO nor any co-conspirator identified herein ever applied for, received, or possessed a license from the BIS to export rifling combo buttons to Iraq.

36.   Under IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute.   50 U.S.C. § 1705(a).

37.   Pursuant to United States law and regulation, exporters and shippers or freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States.  Typically, those documents were filed electronically through the Automated Export System ("AES") managed by the United States Department of Homeland Security ("DHS"), Customs and Border Protection.  A Shipper's Export Declaration ("SED") was an official document submitted to DHS in connection with export shipments from the

United States. These forms were used by the United States Bureau of Census to collect trade statistics and by BIS for export control purposes.

## The Conspiracy

38. Beginning on or before January 2013 and continuing through on or about February 2017, the exact dates being unknown to the Grand Jury, in the Middle District of Pennsylvania, and elsewhere, the defendants, ROSS ROGGIO and ROGGIO CONSULTING COMPANY, LLC, together with Unindicted Co-Conspirator #1 and Unindicted Co-Conspirator #2, did knowingly and willfully conspire with other individuals, both known and unknown to the Grand Jury, to willfully export defense services and defense articles from the United States to Iraq, without having first obtained a license or written approval from the United States Department of State's DDTC, in violation of Title 22, United States Code, Sections 2778(b) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 124.1, and 127.1, and to fraudulently and knowingly export merchandise, articles, and objects contrary to a law of the United States, in violation of Title 18, United States Code, Section 554(a).

<u>Objects</u>

39.  It was an object of the conspiracy to construct and operate a factory in Iraq for the purpose of manufacturing and assembling fully automatic less than .50 caliber rifles and carbines (*i.e.*, "the weapons project" described in paragraphs three and five of this Superseding Indictment) without the required license or written approval of the DDTC.

40.  It was an object of the conspiracy to purchase firearms parts in the United States and to export them to Iraq without the required license or written approval from the DDTC, for the purpose of manufacturing and assembling firearms in Iraq.

<u>Manner and Means</u>

41.  The manner and means by which the co-conspirators, including ROGGIO, sought to accomplish the object of the conspiracy included, among others:

a.  It was part of the conspiracy that co-conspirators, including ROGGIO, would and did purchase and attempt to purchase firearms parts in the United States with the intent to send firearms parts to Iraq.

b.  It was further part of the conspiracy that, upon arrival in Iraq, firearms parts would be utilized and incorporated in the manufacture

and assembly of complete firearms in a firearms manufacturing plant constructed and operated in part by ROSS ROGGIO.

c. It was further part of the conspiracy that co-conspirators, including ROGGIO, would and did agree to ship and transport firearms parts from locations outside the Middle District of Pennsylvania into the Middle District of Pennsylvania, for purposes of shipping and transporting the firearms parts to overseas countries, including Iraq.

d. It was further part of the conspiracy that co-conspirators misrepresented, concealed, hid, and caused to be misrepresented, concealed, and hidden, the purposes and acts done in furtherance of the conspiracy to avoid detection and apprehension by the United States Government.

<u>Overt Acts in Furtherance of the Conspiracy</u>

42. In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Middle District of Pennsylvania and elsewhere:

a. On or about November 14, 2015, ROSS ROGGIO emailed a "Weapons and Ammunition Feasibility Report" with respect to a firearms manufacturing project in the Kurdistan region of Iraq.

b. On or about March 9, 2016, ROSS ROGGIO, d/b/a Roggio Consulting Company, prepared a "Budget Increase" spreadsheet, affixing costs to various aspects of a firearms manufacturing project in the Kurdistan region of Iraq.

c. On or about March 28, 2016, ROSS ROGGIO purchased 15,000 M4 Bolt Gas Rings and 3,200 Firing Pin Retainers from OML Global, which was located in Fayetteville, North Carolina.

20

d.    On or about April 6, 2016, ROSS ROGGIO emailed an individual at a company that provides metal injection molding, metal powder production, and powder metallurgy, and wrote, "Let's move on this!" in response to inquiries from the individual regarding that company fabricating molds to produce gun parts by metal injection molding.

e.    On or about September 26, 2016, ROSS ROGGIO emailed test videos of firearms manufactured by ROSS ROGGIO in the Kurdistan region of Iraq to an Iraqi national for whom ROSS ROGGIO was providing defense services and manufacturing firearms incorporating U.S.-origin defense articles.

f.    On or about February 3, 2015, $1,329,608.65 was deposited into PNC Bank account xx-xxxx-6274 held by Roggio Consulting Co. LLC., via international wire from the Kurdistan International Bank, 70 Abdulsalam Barzani, Arbil, Iraq.

In violation of Title 18, United States Code, Section 371.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT FOUR

### (Arms Export Control Act)

43. Paragraphs one and twenty-one through thirty-seven are incorporated here.

44. Between on or about March 28, 2016, and on or about September 26, 2016, in or near Monroe County, Pennsylvania, within the Middle District of Pennsylvania, and elsewhere the defendants, ROSS ROGGIO and ROGGIO CONSULTING COMPANY, LLC, did willfully export and attempt to export from the United States to Iraq M4 Bolt Gas Rings and Firing Pin Retainers, which were designated as defense articles on the United States Munitions List, the export of which was controlled under the Arms Export Control Act, without first having obtained from the United States Department of State a license or written approval for such export.

In violation of Title 22, United States Code, Sections 2778(b) and 2778(c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT FIVE

### International Emergency Economic Powers Act

45.    Paragraphs one and twenty-one through thirty-seven are incorporated here.

46.    On or about March 29, 2016, in or near Monroe County, Pennsylvania, within the Middle District of Pennsylvania, the defendants, ROSS ROGGIO and ROGGIO CONSULTING COMPANY, LLC, aided and abetted by others known and unknown to the Grand Jury, did knowingly and willfully export, attempt to export, and cause to be exported from the United States to Iraq rifling combo buttons, without first having obtained the required license from the United States Department of Commerce for such export.

In violation of Title 50, United States Code, Sections 1702 and 1705(c); Title 15, Code of Federal Regulations, Section 764.2; Title 18, United States Code, Sections 2 and 3551, *et seq.*

**THE GRAND JURY FURTHER CHARGES:**

## COUNT SIX

### Arms Export Control Act

47.    Paragraphs one and twenty-one through thirty-seven are incorporated here.

48.    Between on or about October 2010, and on or about April 2017, the defendants, ROSS ROGGIO and ROGGIO CONSULTING COMPANY, LLC, and others known and unknown to the Grand Jury, did willfully violate and attempt to violate the Arms Export Control Act by exporting, attempting to export, furnishing, and causing to export and furnish defense services to Iraq without a license or other approval obtained from the United States Department of State.

In violation of Title 22, United States Code, Sections 2778(b) and 2778(c), and Title 22, Code of Federal Regulations, Sections 124.1 and 127.1.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT SEVEN

### Smuggling Goods from the United States

49.   Paragraphs one and twenty-one through thirty-seven are incorporated here.

50.   On or about March 29, 2016, within the Middle District of Pennsylvania and elsewhere, the defendants, ROSS ROGGIO and ROGGIO CONSULTING COMPANY LLC, did fraudulently and knowingly export and attempt to export and send, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of, merchandise, articles and objects, to wit, rifling combo buttons, prior to exportation, knowing the same to be intended for exportation contrary to law and regulation of the United States, that is, the International Emergency Economic Powers Act, Title 50, United States Code, Sections 1705(a) and (c).

In violation of Title 18, United States Code, Sections 554 and 2.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT EIGHT

### Smuggling Goods from the United States

51.     Paragraphs one and twenty-one through thirty-seven are incorporated here.

52.     Between on or about March 28, 2016, and on or about September 26, 2016, in or near Monroe County, Pennsylvania, within the Middle District of Pennsylvania, and elsewhere the defendants, ROSS ROGGIO and ROGGIO CONSULTING COMPANY LLC, did fraudulently and knowingly export and attempt to export and send, and receive, conceal, buy, sell, and facilitate the transportation, concealment, and sale of, merchandise, articles and objects, to wit, M4 Bolt Gas Rings, and Firing Pin Retainers, prior to exportation, knowing the same to be intended for exportation contrary to a law and regulation of the United States, that is, the Arms Export Control Act, Title 22, United States Code, Section 2778(b) and (c), and the International Traffic in Arms Regulations, Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1.

In violation of Title 18, United States Code, Section 554 and 2

THE GRAND JURY FURTHER CHARGES:

## COUNTS NINE THROUGH ELEVEN

### Wire Fraud

53.     Paragraphs one and twenty-one through thirty-seven are incorporated here.

### The Scheme

54.     From in or about 2015 to on about the date of this Superseding Indictment, the defendants ROSS ROGGIO and ROGGIO CONSULTING COMPANY, LLC, devised and intended to devise a scheme to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### Manner and Means

It was part of the scheme that:

55.     The defendant ROSS ROGGIO would purchase items from a company located in the United States, and provide the United States company with false information about the end-user of the items, thereby obtaining money and property through false pretenses.

56. On or about the dates listed as to each count below, within the Middle District of Pennsylvania and elsewhere, the defendant, ROSS ROGGIO, for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate and foreign commerce the signals and sounds described below for each count, each transmission constituting a separate count:

| COUNT | DATE | DESCRIPTION |
|-------|------|-------------|
| 9 | 11/14/2015 | ROSS ROGGIO emailed a "Weapons and Ammunition Feasibility Report. |
| 10 | 12/3/2015 | ROSS ROGGIO ordered 15 rifling buttons from a United States supplier, paying for them via credit card processing with Discovery Card bearing number xxx-xxxx-xxxx-4170. |
| 11 | 09/26/2016 | ROSS ROGGIO emailed test videos of firearms. |

In violation of Title 18, United States Code, Section 1343.

**THE GRAND JURY FURTHER CHARGES:**

## COUNTS TWELVE THROUGH THIRTY

### Money Laundering

57. Paragraphs one and twenty-one through thirty-seven are incorporated here.

58. On or about the following dates, in the Middle District of Pennsylvania, and elsewhere, the defendants ROSS ROGGIO and ROGGIO CONSULTING COMPANY, LLC, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds to a place in the United States, namely, a bank account with PNC Bank in the Middle District of Pennsylvania, from and through a place outside the United States, namely Erbil, Iraq, with the intent to promote the carrying on of a specified unlawful activity, that is, violations of Title 18, United States Code, Section 554, and the Arms Export Control Act, Title 22, United States Code, Sections 2778(b) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1:

| COUNT | DATE | AMOUNT |
|-------|------|--------|
| 12 | 9/26/2014 | $647,550.00 |
| 13 | 11/4/2014 | $71,950.00 |
| 14 | 11/14/2014 | $71,950.00 |
| 15 | 11/18/2014 | $10,126.32 |
| 16 | 11/20/2014 | $4,960.00 |
| 17 | 11/28/2014 | $73,477.90 |
| 18 | 1/16/2015 | $59,829.00 |
| 19 | 1/16/2015 | $341,850.00 |
| 20 | 1/27/2015 | $62,156.00 |
| 21 | 2/3/2015 | $1,329,608.65 |
| 22 | 2/25/2015 | $84,950.00 |
| 23 | 3/17/2015 | $8,854.40 |
| 24 | 3/25/2015 | $68,850.00 |
| 25 | 3/30/2015 | $24,321.56 |
| 26 | 4/14/2015 | $24,321.56 |
| 27 | 4/22/2015 | $88,347.00 |
| 28 | 5/7/2015 | $640,000.00 |

| 29 | 5/14/2015 | $344,070.00 |
| 30 | 6/4/2015 | $89,950.00 |

In violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

**THE GRAND JURY FURTHER CHARGES:**

## COUNTS THIRTY-ONE THROUGH THIRTY-NINE

### Money Laundering

59. Paragraphs one and twenty-one through thirty-seven are incorporated here.

60. On or about the following dates, in the Middle District of Pennsylvania, and elsewhere, the defendants ROSS ROGGIO and ROGGIO CONSULTING COMPANY, LLC, transported, transmitted, and transferred, and attempted to transport, transmit, and transfer, a monetary instrument and funds to a place in the United States, namely, a bank account with Wells Fargo Bank, NA in the Middle District of Pennsylvania, from and through a place outside the United States, namely Erbil, Iraq, with the intent to promote the carrying on of a specified unlawful activity, that is, violations of Title 18, United States Code, Section 554, and the Arms Export Control Act, Title 22, United States Code, Sections 2778(b) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1:

| Count | Date | Amount |
|-------|------|--------|
| 31 | 08/06/2015 | $137,868.06 |
| 32 | 08/21/2015 | $108,988.00 |
| 33 | 10/7/2015 | $730,575.00 |
| 34 | 10/27/2015 | $189,377.00 |
| 35 | 10/28/2015 | $21,717.00 |
| 36 | 11/3/2015 | $163,471.00 |
| 37 | 11/13/2015 | $127,192.00 |
| 38 | 11/27/2015 | $22,182.87 |
| 39 | 12/16/2015 | $602,197.00 |

In violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

**THE GRAND JURY FURTHER FINDS:**

## FORFEITURE ALLEGATION

a.    Counts Three through Thirty-Nine are incorporated here for the purpose of alleging forfeitures to the United States of America pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); Title 28 United States Code, Section 2461; and Title 22, United States Code, Section 401.

b.    Upon conviction of the violations alleged in this Superseding Indictment, the defendants, ROSS ROGGIO and ROGGIO CONSULTING COMPANY, LLC, shall forfeit to the United States of America any property, real or personal, which constitutes or is derived from proceeds traceable to said violations and/or any property which the defendant used or intended to be used in any manner or part to commit or to facilitate the commission of such violation.

a.    The property subject to forfeiture includes, but is not limited to:

    i.    Real property located at 143 Indian Spring Drive, Stroudsburg, Monroe County, Pennsylvania, Tax Map or Parcel ID Number 07/86262, current owner of record Ross William Roggio, former owner of record and estranged wife of Ross William Roggio, Kristy Merring-

Roggio, with all appurtenances, improvements, and attachments thereon, legally described as:

ALL THAT CERTAIN lot, tract, piece or parcel of land situate in the Township of Hamilton, County of Monroe, and Commonwealth of Pennsylvania, being described as follows, to wit:

BEING Lot No. 13, Section Three, Indian Spring Farm, as shown on a plan of Indian Spring Farm (Section Three) prepared by J. Lavern Marshall drawn June 27, 1988, and recorded in the Office for the Recording of Deeds, in and for the County of Monroe, at Stroudsburg, Pennsylvania, in Plot Book 61, Page 116.

ii. Wells Fargo account #2089401166 titled ROGGIO CONSULTING COMPANY LLC with Ross W. Roggio as an authorized signer on the account;

iii. Wells Fargo account #2089401158 titled ROGGIO CONSULTING COMPANY LLC with Ross W. Roggio as an authorized signer on the account;

iv. 2015 BMW Model I8, VIN WBY2Z2C59FV392441 registered to Ross Roggio and Kristy Roggio;

v. 2016 McLaren Automotive 570S Coup, VIN SBM13DAA7GW000134 registered to Ross Roggio and Kristy Roggio;

vi. 2015 Mercedes GL350 BLUETEC, VIN 4JGDF2EE3FA606052 registered to Ross William Roggio;

vii.   Four Rolex watches seized from Ross William Roggio more fully described as:

    i.   Rolex Oyster Perpetual Cosmograph "Daytona" 18K Rose Gold with a chocolate dial with a possible serial no. 4H2E2303;

    ii.   Rolex Geneve Cellini 18K Rose Gold with a black leather band and a black dial with a possible serial no. 50525 512F28Q1;

    iii.   Rolex Oyster Perpetual Day Date President with 18K Rose Gold and a possible serial no. H42V39543; and

    iv.   Rolex "Daytona" 18K Yellow Gold, Mother of Pearl and diamond dial with a possible serial no. 8Q0291C3.

viii.   Miscellaneous firearms, scopes, sights, bipods, magnifiers and other firearms accessories seized from Ross William Roggio more fully described in Exhibit A of this document.

b.   If the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

i.   Cannot be located upon the exercise of due diligence;

ii.   Has been transferred, sold, or deposited with a third person;

iii.   Has been placed beyond the jurisdiction of the Court;

iv.    Has been substantially diminished in value; or

v.    Has been commingled with other property without cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

All pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1); Title 28 United States Code, Section 2461; and Title 22, United States Code, Section 401.

A TRUE BILL

February 15, 2022
DATE

JOHN C. GURGANUS
United States Attorney

By: _Todd K. Hinkley_
Todd K. Hinkley
Assistant United States Attorney

37

KENNETH A. POLITE, JR.
Assistant Attorney General
Criminal Division
U.S. Department of Justice


By: _____
Patrick Jasperse
Christian Levesque
Trial Attorneys
Human Rights and Special Prosecutions Section