## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

**UNITED STATES OF AMERICA**     :
           :    No.    3:18-cr-0097
        v.            :
           :    (Judge Mariani)
**ROSS ROGGIO,**            :
       Defendant.       :    (electronically filed)

## GOVERNMENT'S BRIEF IN OPPOSITION TO
## APPEAL OF MAGISTRATE JUDGE'S RELEASE ORDER

The United States of America, by its undersigned counsel and,
pursuant to Title 18, United States Code, Section 3145, in opposition to
the defendant's Motion for Revocation of the United States Magistrate
Judge's February 17, 2022, Release Order, submits the following Brief
in Opposition. The Magistrate Judge's Order detaining the Defendant,
Ross Roggio, should be affirmed.

## I.     Background.

On March 20, 2018, a Grand Jury sitting in the Middle District of
Pennsylvania returned a multi-count Indictment against Ross Roggio.
The Indictment charged Roggio with conspiracy to commit an offense
against the United States, in violation of Title 18, United States Code,
Section 371; violations of the Arms Export Control Act, Title 22, United

States Code, Sections 2778 (b) and (c); the International Emergency

Powers Act, Title 50, United States Code, Sections 1702 and 1705(c);

smuggling goods from the United States, in violation of Title 18, United

States Code, Sections 554 and 2; wire fraud, in violation of Title 18,

United States Code, Section 1343; and money laundering, in violation of

Title 18, United States Code, Sections 1956(a)(2)(A) and 2.   Doc. 1.

The Indictment charges a scheme in which Roggio traveled to the

Kurdistan region of Iraq to set up an arms and ammunition

manufacturing plant.   The Indictment alleged that Roggio conspired to

export defense services and defense articles from the United States to

Iraq from 2013 through February of 2017.   The substantive counts in

the Indictment are based on Roggio's failure to obtain approval from the

State Department to export M4 bolt gas rings and firing pin retainers

and to provide defense services; and approval from the Commerce

Department to export rifling combo buttons.   The wire fraud charges

are based on email messages and credit card transactions carried out in

connection with the scheme.   The money laundering charges in the

Indictment are based on the transfer of funds in connection with the

scheme from Kurdistan to banks in the Middle District of Pennsylvania.

On March 23, 2018, Roggio appeared before Magistrate Judge Karoline Mehalchick for an initial appearance and arraignment and entered a not-guilty plea to the Indictment. Roggio was detained pending a home inspection and viability review of electronic monitoring by pretrial services. Doc. 10. An Order of Release was issued by Magistrate Judge Mehalchick, and Roggio commenced pretrial release on April 3, 2018. Doc. 13. This Honorable Court granted Roggio's unopposed Motion to Modify the Conditions of Release, which removed home detention and location monitoring from the pretrial release order. Doc. 26.

A Federal Grand Jury returned a Superseding Indictment on February 15, 2022, adding to the original charges one count of conspiracy to commit torture in violation of Title 18, United States Code, Sections 2340 and 2340A(c), and one count of torture in violation of Title 18, United States Code, Sections 2340, 2340A(a) and 2. Doc. 122. Roggio was arrested on a warrant issued by the Court on February 17, 2022. Doc. 129.

A pretrial services report generated by the United States Probation Office determined that Roggio was both a risk of nonappearance and a danger to other persons or the community. Regarding the assessment of nonappearance, the report noted: (1) the offense charged and/or defendant's conduct during arrest for the instant offenses; (2) the defendant's mental health history; (3) the defendant's substance abuse history; and (4) the defendant's ties to a foreign country. Regarding the assessment of danger, the report noted (1) the nature of the instant offenses; (2) the defendant's substance abuse history; (3) the defendant's mental health history; (4) safety concerns for the community or a specific individual; (5) the defendant's violent behavior history; (6) the charge involving violence; and (7) the defendant's history of weapons use. The Probation Officer's recommendation stated:

> Ross William Roggio has no prior criminal convictions. However, the nature of the instant offense allegedly involve the torture of an individual for in excess of a month and raise serious community safety concerns. The defendant has ties to a foreign county through his girlfriend who lives in Greece. There is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the

safety of the community. Therefore, I respectfully recommend the defendant be detained.

At his bail hearing, the United States moved for Roggio's detention pending trial. The United States argued that Roggio was both a danger to the community and a flight risk and that no condition or combination of conditions would reasonably ensure the safety of the community and his appearance in the Middle District of Pennsylvania. At the conclusion of the detention hearing, Magistrate Judge Joseph F. Saporito, Jr. ordered Roggio to be detained. Doc. 134.

## II. BASIS AND STANDARD FOR THIS COURT'S REVIEW

The defendant seeks revocation of United States Magistrate Judge Saporito's detention order dated February 17, 2022, pursuant to 18 U.S.C. § 3145(b).[1] This Court's review of a Magistrate Judge's bail order must be *de novo*, and "the Court must make an independent determination of the proper pretrial detention or conditions for

_____

[1] "If a person is ordered detained by a magistrate judge . . . the attorney for the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b).

release."[2]   In other words, the Court should "review the evidence before the magistrate [judge] and make its own independent determination whether the magistrate's [judge's] findings are correct, with no deference."[3]

In so doing, the district court may hold additional evidentiary hearings, although it is not required to do so.[4]   Because the rules of evidence do not apply at a pretrial detention hearing,[5] it is permissible for the Government or Roggio to introduce a transcript of the hearing conducted by the Magistrate Judge and then, if desired, supplement that transcript with additional evidence and/or proffer.

---

[2] *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir.1992); *see also United States v. Koenig*, 912 F.2d 1190, 1191 (9th Cir. 1990); *United States v. Fortna*, 769 F.2d 243, 249-50 (5th Cir. 1985); *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985); *United States v. Maull*, 773 F.2d 1479, 1481 (8th Cir. 1985); *United States v. Stewart*, 19 Fed.Appx. 46, 48 (4th Cir. 2001).

[3] *Koenig*, 912 F.2d at 1193.

[4] *Id.*

[5] 18 U.S.C. § 3142(f)(2).

## III.   ARGUMENT

Roggio was properly detained.   He is a danger to the community and a flight risk.   Normally, a person may be released on bail when awaiting trial.[6]   In certain cases, however, Congress has seen fit to provide the Government with the ability to seek detention for "the most serious of crimes."[7]   Roggio has been charged with just such a serious crime – torture.[8]   Indeed, Congress considered this category of crime so serious that not only did it permit detention, but it created a rebuttable presumption that no condition or combination of conditions will assure the safety of the community and Roggio's appearance as required.[9]

This presumption may be rebutted only if Roggio produces some rebuttal evidence.[10]   If he does, then the Court must determine

---

[6] 18 U.S.C. § 3142(c).

[7] *United States v. Salerno*, 481 U.S. 739, 747 (1987) (citing 18 U.S.C. § 3142(f)).

[8] 18 U.S.C. § 3142(f)(1)(A); 18 U.S.C. § 2332b(g)(5)(B).

[9] 18 U.S.C. § 3142 (e)(3)(C).   The torture statute, 18 U.S.C. § 2340A, is an offense listed in 18 U.S.C. § 2332b(g)(5)(B)(i) and prescribes a maximum term of imprisonment of 20 years.

[10] *United States v. Dillon*, 938 F.2d 1412, 1416 (1st Cir. 1991) (noting that the presumption shifts the burden of production to the defendant, but the government maintains the burden of persuasion); *United States v. Portes*, 786 F.2d 758, 764 (7th Cir. 1985).

whether any condition or combination of conditions will reasonably assure the safety of the community and the appearance of the defendant as required.[11] "[T]he lack of reasonable assurance of *either* the defendant's appearance *or* the safety of others or the community is sufficient [to justify detention]; both are not required."[12]

In this case, Magistrate Judge Saporito found, by clear and convincing evidence,[13] that no combination of conditions of release would reasonably assure the safety of any other person and the community. Doc. 134. Magistrate Judge Saporito made his finding without reference to the rebuttable presumption set out in 18 U.S.C. § 3142(e)(3)(C).[14] Magistrate Judge Saporito noted that the weight of the evidence against the defendant was strong and that Roggio was subject to a lengthy period of incarceration if convicted. Doc. 134 at 2. The judge stated:

---

[11] 18 U.S.C. § 3142(e).

[12] *Fortna*, 769 F.2d at 249 (emphasis in the original) (citations omitted); *see also United States v. King*, 849 F.2d 485, 488 (11th Cir. 1988).

[13] 18 U.S.C. § 3142(f)(2).

[14] Government counsel incorrectly advised the Magistrate Judge that the rebuttal presumption did not apply to the charges contained in the Superseding Indictment.

The charges in the Superseding Indictment, conspiracy to commit torture and torture, are crimes of violence which, if proven, are extremely troubling to the court. The weight of the evidence against defendant with respect to the newly charged offenses is very strong, and it includes recorded statements made by the defendant at the time of the alleged torture.

*Id.* at 5.

## A. There Are No Conditions, Which Will Reasonably Assure Roggio's Appearance and the Safety of the Community.

There are no conditions or combination of conditions that will assure either Roggio's appearance or the safety of the community. In determining whether there are conditions of release that will reasonably assure Roggio's appearance or the safety of any other person and the community, the Court must take into account the following: (1) the nature and seriousness of the offense charged, including whether the charged crime is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.[15] All of

---

[15] 18 U.S.C. § 3142(g); *see also United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991).

these considerations weigh heavily toward finding that the detention of Roggio is necessary.

### 1.  Nature and Circumstances of Roggio's Offense.

Roggio is charged with one of the most serious federal crimes in the Criminal Code.   Congress feels so strongly about this crime that it has imposed a maximum sentence of 20 years of imprisonment for committing, attempting to commit, or conspiring to commit torture.

The Superseding Indictment returned by the Grand Jury spells out in stark terms the brutality of which Roggio is accused.   The Grand Jury found probable cause to believe that Roggio and his co-conspirators abducted the victim from the victim's residence in Kurdistan and detained the victim against his will at a military compound for approximately 39 days.   During the time of the victim's detention, and at the direction of Roggio, his co-conspirators committed acts specifically intended to inflict severe physical and mental pain and suffering upon the victim while he was in their custody and physical control at the military compound.   At times, some of Roggio's other employees were forced to watch while Roggio and his co-conspirators

committed acts specifically intended to inflict severe physical and mental pain and suffering upon the victim. According to the Superseding Indictment, these acts included (1) placing a plastic bag over the victim's head to suffocate him, causing the victim to lose consciousness and think he was going to die; (2) using a taser to inflict repeated electrical shocks to the victim's arms, throat, nose, and groin, to the point where the victim's arms bled and his hands twitched uncontrollably; (3) applying pressure to one of the victim's fingers with the blades of a large cutting tool similar to a bolt cutter, increasing the pressure while threatening to cut off the finger; (4) using rubber hoses to beat the victim's back, legs, stomach, and chest; (5) beating the victim with fists on his ears, nose, throat, arms, stomach, chest, and other parts of his body; (6) jumping violently on the victim's chest while wearing military boots, as the victim lay prone on the floor; and (7) forcing the victim to run barefoot on sharp gravel. The Superseding Indictment notes that during at least one of the interrogation sessions while the victim was detained at the military compound, Roggio wrapped his belt around the victim's neck, yanked the victim off the

ground and suspended the victim in the air, causing the victim to lose consciousness.   As the victim regained consciousness, at Roggio's direction, a Kurdish soldier beat the victim in the groin with a stick.

## 2.   The Weight of the Evidence.

The weight of the evidence against Roggio is very strong. Roggio's torture victim is prepared to testify about what Roggio did to him.   In addition, other individuals employed by Roggio in Kurdistan are ready to testify and corroborate certain of the details of the victim's torture.   Roggio forced these witnesses to observe some of the torture of the victim, with the goal of threatening and intimidating those witnesses about what could happen to them if they questioned or interfered with his illegal and fraudulent weapons project in Iraq. What is more, a few weeks after the victim was released from the military compound where he was tortured, one of the witnesses covertly recorded a conversation during which Roggio acknowledged having tortured the victim. During that conversation Roggio claimed that the victim of the torture was planning to blackmail him.   The following exchange ensued:

*Witness: Is it true? He wanted to do that? Are you sure?*

*Roggio: Enough to beat him. Enough to torture him.*

A little later in the recorded conversation, Roggio said that he could not look the victim in the eye "because of what I did to him." Roggio bragged that the victim "experienced the overwhelming ability of mine to crush somebody."

Regarding the export violation-related allegations charged in the Superseding Indictment, these charges will be proven through documentary evidence seized from Roggio or acquired from witnesses during the investigation.   There will also be witness testimony to establish that Roggio exported weapons parts and defense services from the United States to Iraq for which he did not have the required approvals from the Commerce and State Departments.   During the recorded conversations mentioned above, Roggio also spoke to his export violation crimes:

> *Roggio: I have to pay taxes, and I cannot give receipts to the IRS for this shit.   See, when I make a million dollars, like this year, $4 million came into my account, right?*
>
> *Witness: Yeah.*

*Roggio: They know that – then, when I do my taxes, if I say I spent 4 million, well, then I owe no taxes right? They wanna see the receipts of everything I bought. Now, the moment I turn those receipts over to them, that's evidence. Because, when you turn a receipt in to the IRS, you're turning it in to the U.S. federal government. And once they have those receipts, it's admissible for any type of criminal crime. You understand?*

*Witness: Yeah, I understand.*

*Roggio: So, so by paying taxes as profits on all of it, it costs them more money, but it keeps my ass out the fire, because the moment – "OK, you turned in $4 million – what are you doing with gun drills, gun-making parts? This – this is all used for guns, and here's all the evidence that you gave us." Remember, busting me comes from the finances.*

**3.    Roggio's history and characteristics, including the defendant's financial resources and any record concerning appearance at court proceedings.**

**A.    Financial Resources**

Financial records obtained during the investigation show multiple millions of dollars were paid directly to Roggio by his Kurdish co-conspirators. Contemporaneously to the Grand Jury's original Indictment return, the Government seized bank accounts together with extremely high value assets such as exotic sports cars worth hundreds of thousands of dollars; four Rolex watches worth tens of thousands of

dollars each; as well as numerous firearms worth thousands of dollars. The pretrial services report indicates that Roggio is self-employed in a business known as Renovatr, Inc. since June of 2019. The pretrial services report notes his monthly income as "unknown." From the time he was originally released on the Indictment until June of 2019 – over a year – Roggio was not employed. It is unclear how Roggio supports himself, let alone pay the court-ordered child support for his two daughters as noted in the pretrial services report. Given that Roggio was paid millions of dollars in illicit funds, the Government is concerned that the defendant may have access to large sums of cash or financial accounts unknown to authorities.

### B. Record Concerning Appearance

Roggio has voluntarily appeared at court proceedings, but it appears he violated the condition of his release that required him to surrender "any passport." Doc. 13 at ¶ 7(d). Roggio surrendered his passport book at the time of his original Indictment in 2018, but when he was arrested last month following the return of the Superseding Indictment, a passport card was found in his wallet. A passport card

can be used to enter Canada, Mexico, the Caribbean, and Bermuda[16] and should have been surrendered with his passport book at the time of his original Indictment in 2018.

In addition, the pretrial services report noted that Roggio has ties to a foreign country through his girlfriend who lives in Greece.

Moreover, Roggio is now facing a wholly different criminal case. Given the likely prison sentence he faces if convicted, Roggio's motivation to flee is clear. If convicted at trial of the charges in the original Indictment, the Government estimates that Roggio's offense level in the United States Sentencing Guidelines would be 26. If Roggio is a Criminal History category I offender, such a conviction would carry an advisory guideline sentence of 63 to 78 months in prison. If convicted at trial of the torture charges, the Government estimates that Roggio's offense level could be as high as 44. An offense level 44 carries an advisory Guideline range sentence of life in prison.

---

[16] *See* https://travel.state.gov/content/travel/en/News/passports/how-a-passport-can-help-you-fly-domestically.html#:~:text=The%20Transportation%20Security%20Administration%20(TSA,it%20for%20international%20air%20travel.

Roggio argues that he already was facing serious charges with a statutory maximum sentence of 705 years imprisonment (Doc. 134 at 11), but as the Court well knows, Roggio's advisory Guidelines Sentence is a far better gauge of what his sentence might be if he is convicted.

## C.    Defendant's History and Characteristics

The pretrial services report states that Roggio is in good health, but adds that he suffers from a history of mental health and substance abuse issues.

## 4.    The nature and seriousness of the danger to any person or the community that would be posed by Roggio's release.

The pretrial services report does not mention that prior to being charged, Roggio threatened witnesses.   The probation officer was unaware of this circumstance.   According to witnesses interviewed by the investigators, while Roggio was in Kurdistan in 2015 he spoke frequently to his employees about the importance of loyalty and warned them against the consequences of what the defendant characterized as betrayal.   In the recording referenced above, Roggio bluntly laid out what would happen if the employee/witness returned to her home country and "betrayed" him.   Having witnessed Roggio's control of the

Kurdish soldiers who tortured the victim and seen Roggio's close relationship with other Kurdish officials, the employee did not believe that she would be able to leave Kurdistan without Roggio's permission. During the recorded conversation, the employee pleaded with Roggio to allow her to leave Kurdistan and to go home.

*Witness: I really am scared of you. I really am.*

*Roggio: Well, [first name of witness/employee], you should be.*

*Witness: Yeah, I know, I – I know I should be.*

* * * * * *

*Roggio: Look, I'm going to lay this out for you very easily. Stop me if you don't understand what I'm saying because you have to understand what I'm about to tell you. If you want to quit, nothing will happen to you. You can leave anytime you choose. You understand? I do – I do not view you as a security risk or a threat.*

*Witness: No?*

*Roggio: No.*

*Witness: How come? Because I was like the biggest worst person in Kurdistan.*

*Roggio: Because you know why?*

*Witness: No?*

*Roggio: Because of this. Because you know if you went to [name of witness's/employee's home country] and betrayed me, I'd come for you.*

*Witness: I know that. That's why I'm scared.*

*Roggio: As long as you don't betray me, I never have to come for you. Am I right?*

*Witness: Yeah, I know that.*

*Roggio: No one can touch you, [first name of witness/employee]. I won't allow it.*

*Witness: I don't know that. Because said, you told you have so many Kurds in [two countries near witness's/employee's home country] that will come and kill me.*

*Roggio: No, I'd come get you myself.*

The victim of torture and the eyewitnesses to the torture all remain fearful of Roggio, due to the power he exercised over them while they were in Iraq and threats such as this that he made to them.

There is no reason to reverse Magistrate Judge Saporito's decision. The evidence cited in Roggio's motion falls far short of what is needed to overcome the statute's presumption that he should be detained. Roggio points to his age, military service, education, lack of

prior criminal record, status as the father of two minor children who live with their mother, care for his elderly parents, residence in this district for 12 years, and surrender of his passport.   Doc. 136 at 10-11. Roggio also attaches four letters from well-meaning neighbors and friends who are not privy to the evidence.   Docs. 135-2, 135-3, 135-4, and 135-5.   As noted above, although Roggio surrendered his passport book following his original Indictment, he was carrying a passport card at the time of his arrest on the Superseding Indictment, in violation of the conditions of his release.   His military service was relatively brief and took place more than 30 years ago.[17]   The factors Roggio cites in support of his release simply do not stack up against the factors summarized above that favor detention, including the violent offense with which he is charged, the strength of the evidence against him, the lengthy prison sentence he faces upon conviction, and the (pre-

_____

[17] Roggio served in the Army in 1989-1990.   During his less than two years of service, he was subject to four Article 15 hearings for misconduct.   He was discharged under honorable conditions, but with a separation code for unspecified misconduct.

indictment) threats he already made to witnesses in the event they

"betrayed" him.[18]

## IV. CONCLUSION

The United States Magistrate Judge's Order detaining the

Defendant, Ross Roggio, should be affirmed. Roggio is a flight risk who

---

[18] The three cases Roggio cites in which courts ordered defendants released pre-trial are distinguishable. Dkt. 136 at 9. All three defendants in those cases were charged with narcotics offenses, not the violent crime of torture with which Roggio is charged in the Superseding Indictment. All three defendants overcame the rebuttable presumption outlined in 18 U.S.C. § 3142(e)(3)(A), which governs defendants charged with sentences for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act, whereas Roggio must overcome the rebuttable presumption in 18 U.S.C. § 3142(e)(3)(C), which governs defendants charged with even more serious crimes such as the production of biological weapons, the assassination of members of Congress, the Cabinet, or the Supreme Court, conspiring to murder a person abroad, and torture. The family and community ties of the defendants in the three cases cited by Roggio were considerably stronger than Roggio's family and community ties. *United States v. Carbone*, 793 F.2d 559, 561 (3d Cir. 1986), was a 2-1 decision in which the majority noted that friends of the defendant had posted $1 million in property as surety. In *United States v. Lopez*, 827 F. Supp. 1107, 1110 (D.N.J. 1993), the district court stated that 27 friends and neighbors wrote to the court on behalf of the defendant and some of those friends had pledged their own homes, valued close to $450,000 in total, as security for defendant's appearance. In *United States v. Giampa*, 755 F. Supp. 665, 670 (W.D. Pa. 1990), the court stated that the defendant "does not appear to live the life of a serious drug dealer."

poses a danger to the safety of the community, and no conditions of

release will assure the safety of the community or his appearance at

future proceedings.

Respectfully submitted,

JOHN C. GURGANUS
United States Attorney

Dated: March 2, 2022        By: _Todd K. Hinkley_
Todd K. Hinkley
Assistant United States Attorney
235 North Washington Ave.
Scranton, PA 18503
Phone: 570-348-2800

KENNETH A. POLITE, JR.
Assistant Attorney General

By: _Patrick Jasperse_
Patrick Jasperse
Christian Levesque
Trial Attorneys
Criminal Division
U.S. Department of Justice
Human Rights and Special
Prosecutions Section
1301 New York Avenue, NW
Washington, DC 20530
Phone: 202-616-8917;
(202) 616-2609

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA    :
:    No.   3:18-CR-0097
        v.     :
:    (Judge Mariani)
ROSS ROGGIO,         :
        Defendant.    :    (electronically filed)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That this Wednesday, March 2, 2022, he served a copy of the attached

## GOVERNMENT'S BRIEF IN OPPOSITION TO
## APPEAL OF MAGISTRATE JUDGE'S DETENTION ORDER

by electronic means to:
Gino Bartolai
Bartolai@ptd.net


/s/ Todd K. Hinkley
Todd K. Hinkley
Assistant United States Attorney