1

1   IN THE UNITED STATES DISTRICT COURT
    FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2

3  UNITED STATES OF AMERICA,          )
                                      )
4              Plaintiff             )
                                      )
5          vs                        )   3:18-CR-00097
                                      )
6  ROSS ROGGIO,                       )
                                      )
7              Defendant             )
   _____ )

8

9        TRANSCRIPT OF PROCEEDINGS - DETENTION HEARING
         BEFORE THE HONORABLE JOSEPH F. SAPORITO, JR.
10              THURSDAY, FEBRUARY 17, 2022
                WILKES-BARRE, PENNSYLVANIA

11

12  FOR THE GOVERNMENT:
        TODD K. HINKLEY, ESQ.
13      Assistant United States Attorney
        Room 311
14      235 N. Washington Avenue
        Scranton, Pennsylvania  18503

15

    FOR THE DEFENDANT:
16      GINO BARTOLAI, ESQ.
        238 William Street
17      Pittston, PA 18640

18

19
    Proceedings recorded by machine shorthand, transcript produced
20  by computer-aided transcription.

21

22              SUZANNE A HALKO, RMR, CRR
                CERTIFIED REALTIME REPORTER
23               235 N. WASHINGTON AVENUE
                SCRANTON, PENNSYLVANIA 18503

24

25

2

1              THE COURT:  We're here in the matter of the United

2    States versus Ross Roggio.  Is that how you pronounce your

3    name?

4              MR. ROGGIO:  Yes, Your Honor.

5              THE COURT:  Will you stand and raise your right hand?

6    ROSS ROGGIO, called as a witness, having been duly sworn or

7    affirmed according to law, testifies as follows:

8              THE COURT:  Sir, you are here today because you have

9    been charged by an indictment, and as a result of the filing of

10   those charges, this is a hearing under Rule 5 of the Federal

11   Rules of Criminal Procedure where you will be advised of your

12   rights.

13             Do you understand that, sir?

14             MR. ROGGIO:  Yes, Your Honor.

15             THE COURT:  You have the right to remain silent.  You

16   are not required to make statements here today.  However,

17   anything that you say in this proceeding may be used against

18   you in any subsequent court proceeding.

19             Do you understand that?

20             MR. ROGGIO:  Yes, Your Honor.

21             THE COURT:  Would you state your name and age,

22   please?

23             MR. ROGGIO:  Ross William Roggio, 53.

24             THE COURT:  It's obvious that you speak and

25   understand the English language, is that correct?

1          MR. ROGGIO:  Yes, Your Honor.

2          THE COURT:  Do you have a copy of the indictment?

3          MR. ROGGIO:  Yes, I do, Your Honor.

4          THE COURT:  In this proceeding, you will be advised

5     of the nature of the charges that have been filed against you.

6     We will also advise you of your right to counsel.  We will set

7     further hearings in the case, or at least discuss a plan to do

8     that, and I will make a decision whether you will be detained

9     or released while this matter is pending.

10         Do you understand the nature of the proceedings

11    taking place here today?

12         MR. ROGGIO:  Yes, Your Honor.

13         THE COURT:  Do you have any physical or mental

14    conditions that would impair your ability to participate in

15    today's proceeding and understand it?

16         MR. ROGGIO:  No, Your Honor.

17         THE COURT:  Have you taken any medication, drugs,

18    alcohol, or any other substance that may impair your ability to

19    participate today and understand it?

20         MR. ROGGIO:  No, Your Honor.

21         THE COURT:  And you do have the right to consult with

22    a lawyer and to be represented in all stages of the proceedings

23    both in and out of court.

24         Do you understand that?

25         MR. ROGGIO:  Yes, Your Honor.

4

1          THE COURT:  Your lawyer may be present with you

2     during any questioning by the authorities.

3          Do you understand that?

4          MR. ROGGIO:  Yes, Your Honor.

5          THE COURT:  Mr. Bartolai, you have already been

6     appointed in this matter.

7          MR. BARTOLAI:  Quite some time.

8          THE COURT:  So you are aware that Mr. Bartolai, as

9     your counsel, is here representing you today.

10         If you have questions as we proceed further that you

11    would like to ask Mr. Bartolai, please let me know that, and I

12    will afford you the opportunity to discuss those matters with

13    him.

14         Do you understand that?

15         MR. ROGGIO:  Yes, Your Honor.

16         THE COURT:  Now, as you are aware, the grand jury out

17    of the Middle District of Pennsylvania has returned a

18    superseding indictment against you charging you with certain

19    offenses.

20         I will ask Mr. Hinkley from the United States

21    Attorney's Office to summarize those charges and to state the

22    maximum potential penalties in the event of a conviction.

23         Mr. Hinkley.

24         MR. HINKLEY:  Thank you, Your Honor.

25         The grand jury did return a superseding indictment

1  which added two charges to the original indictment.  Those two

2  charges are conspiracy to commit torture in violation of Title

3  18, United States Code, Section 2340 and 2340A(c), as well as

4  torture, aided and abet, in violation of Title 18, United

5  States Code, Section 2340, 2340A(a) and 2.

6          Each of those crimes carries a maximum sentence of up

7  to 20 years incarceration, a $250,000 fine, up to 5 years of

8  supervised release, and a $100 special assessment.

9          The Defendant has previously been arraigned on the

10  other charges.  I can, however, go through those, if the Court

11  thinks that would be appropriate.

12          MR. BARTOLAI:  Your Honor, Mr. Hinkley is correct.

13  The additional charges are the identical charges that he's

14  already facing and we know fully well.  We would waive any

15  reading of the superseding indictment, Your Honor.

16          THE COURT:  Okay.  So do you need him to go over the

17  charges that are subject to the previous?

18          MR. BARTOLAI:  They are just the two additional

19  charges, Count 1 and Count 2, as summarized by Mr. Hinkley.

20          THE COURT:  Do you understand the nature of the

21  charges --

22          MR. ROGGIO:  Yes, Your Honor.

23          THE COURT:  -- that are the subject of the

24  superseding indictment, the ones that Mr. Hinkley just went

25  over with you?

1          MR. ROGGIO:  Yes, Your Honor.

2          THE COURT:  In addition to that, do you understand

3  the maximum potential penalties that may be imposed in the

4  event of a conviction?

5          MR. ROGGIO:  Yes, Your Honor.

6          THE COURT:  We will move to your formal arraignment.

7  You do have the right to have the superseding indictment read

8  to you word for word, or do you waive the formal reading that

9  Mr. Bartolai has indicated on your behalf that you're waiving

10  any formal reading of a superseding indictment, is that

11  correct, sir?

12          MR. ROGGIO:  Yes, Your Honor.

13          THE COURT:  Now that you know what the charges are on

14  the superseding indictment and what the penalties carry, how do

15  you plead to those charges in the indictment?

16          MR. ROGGIO:  Not guilty, Your Honor.

17          THE COURT:  Let the record reflect that Mr. Roggio

18  has pled not guilty and has now been arraigned.

19          As you know, your case has previously been assigned

20  to Judge Robert Mariani, who sits in the United States

21  Courthouse in Scranton.

22          Judge Mariani will hand down a pretrial order in the

23  not too distant future, and in that order he will give you

24  dates upon which you must file a pretrial motion or motions,

25  and he will also give you a trial date as well.

7

1          Do you understand that?

2          MR. ROGGIO:  Yes, Your Honor.

3          THE COURT:  He may also provide dates for your

4   counsel and counsel for the Government to meet and discuss any

5   additional pretrial matters, and he may also require them to

6   place on the docket a report of that meeting.

7          Do you understand that?

8          MR. ROGGIO:  Yes, Your Honor.

9          THE COURT:  I'm certain that Mr. Bartolai will

10  provide you prompt notification once that pretrial order is

11  issued by the Court.

12         Do you understand that?

13         MR. ROGGIO:  Yes, Your Honor.

14         THE COURT:  Now we will go to the issues of pretrial

15  release or detention.

16         What is the Government's position?

17         MR. HINKLEY:  Your Honor, we are moving for detention

18  in this matter.

19         THE COURT:  Mr. Bartolai.

20         MR. BARTOLAI:  We're asking the Court to consider

21  releasing Mr. Roggio on conditions.

22         THE COURT:  Are you looking for a detention hearing

23  today?

24         MR. BARTOLAI:  We are, yes, Your Honor.

25         THE COURT:  Is the Government ready to proceed today?

8

1          MR. HINKLEY:  We are, Your Honor.

2          Your Honor, under the Bail Reform Act, Title 18,

3   United States Code, Section 3142(g)(1), one of the factors the

4   Court must consider is the nature and circumstances of the

5   offense charged, including whether the offense is a crime of

6   violence.

7          Mr. Roggio is now charged with a violent crime.  In

8   fact, two; conspiracy to commit torture and torture.  The

9   superseding indictment adds these two counts against Roggio;

10  one count of conspiracy to commit torture and one substantive

11  count of torture, in violation of 18, United States Code,

12  Section 2340 and 2340A.  These are violent crimes.

13         The superseding indictment charges Roggio with

14  multiple torture sessions over a 5-week period in which Roggio

15  directed Kurdish soldiers to inflict physical severe pain on

16  the victim, including placing a plastic bag over the victim's

17  head to suffocate him, causing the victim to lose consciousness

18  and think he was going to die, using a Taser to inflict

19  repeated electrical shocks to the victim's arms, throat, nose,

20  and groin, to the point where the victim's arms bled and his

21  hands twitched uncontrollably, applying pressure to one of the

22  victim's figures with the blades of a large cutting tool

23  similar to a bolt cutter, increasing the pressure while

24  threatening to cut off the finger, using rubber hoses to beat

25  the victim's back legs, stomach, and chest, beating the victim

1  with fists on the ears, nose, throat, arms, stomach, chest and

2  other parts of the body, jumping violently on the victim's

3  chest while wearing military boots as the victim lay prone on

4  the floor, and forcing the victim to run barefoot on sharp

5  gravel.

6          The superseding indictment also alleges that in

7  addition to leading these torture sessions, the Defendant

8  personally inflicted some of the physical pain.

9          For example, the superseding indictment alleges that

10 on at least one occasion Roggio wrapped his belt around the

11 victim's neck from behind, yanking the victim off the ground,

12 suspending him in the air, and causing the victim to lose

13 consciousness.

14         Another factor under the Bail Reform Act, Section

15 3142(g)(2), weight of the evidence against the person.  The

16 evidence against Mr. Roggio is strong.

17         The evidence against Roggio includes in regards to

18 the torture allegation charged in the first two counts of the

19 superseding indictment, not only is the victim prepared to

20 testify about what the Defendant did to him, but at least four

21 other eyewitnesss, who are prepared to testify, can corroborate

22 some of the details of the victim's account.

23         The Defendant forced these four witnesses to observe

24 some of the torture of the victim with the goal of threatening

25 and intimidating those witnesses about what could happen to

1  them if they questioned or interfered with his illegal and

2  fraudulent weapons project in Iraq.

3        In addition, two weeks after the victim was released

4  from a military compound where he was tortured, one of the

5  witnesses covertly recorded the conversation in which the

6  Defendant acknowledged having tortured the victim.  During the

7  conversation, the Defendant claims incorrectly that the victim

8  of the torture was planning to blackmail him.

9        The employee who was covertly making the recording

10  asked the Defendant, is it true he -- the victim's name --

11  wanted to do that?  Are you sure?  The Defendant Roggio

12  answered, enough to beat him and enough to torture him.

13        A little later in the recorded conversation, the

14  Defendant says that he can't look the victim in the eye, quote,

15  because of what I did to him, end quote.  Roggio says that the

16  victim, quote, experienced the overwhelming ability of mine to

17  crush somebody, end quote.

18        Regarding the export violation allegations charged in

19  Counts 3 through 39 of the superseding indictment, documents

20  and witnesses' testimony will establish that the Defendant

21  exported weapons parts and defense services from the United

22  States to Iraq for which he did not have the required approvals

23  from the Commerce and State Departments.

24        There is also admissions contained on the recordings

25  I previously mentioned that Mr. Roggio made during those

1   conversations.

2        Factor (g)(A) of Section 3142 is the history and

3   character of the accused financial resources and record

4   concerning appearances at court proceedings.

5        Regarding financial resources, the evidence shows

6   that multiple millions of dollars were paid directly to

7   Mr. Roggio by his Kurdistan sponsors.

8        During the original takedown of this case, the

9   Government seized bank accounts, together with extremely high

10  valued assets, such as exotic sports cars worth hundreds of

11  thousands of dollars, four Rolex watches worth tens of

12  thousands of dollars each, as well as numerous firearms.

13       I have spoken to the probation office who indicates

14  that Mr. Roggio has no job.  I do not know how he continues to

15  support himself over the last couple of years.

16       The concern of the Government is that Mr. Roggio may

17  have access to large amounts of money he's obtained during the

18  scheme which the Government is unaware of.  Roggio is now

19  facing an even more significant prison sentence increasing his

20  motive to flee.

21       Regarding his record of appearance at court

22  proceedings, Mr. Roggio has been compliant with his bail

23  supervision to date.  However, the Defendant is now facing an

24  even more significant prison sentence increasing his motivation

25  to flee.

1          If convicted at trial of the charges in the original

2    indictment, the Government has estimated that his offense level

3    would be approximately 26.  If Roggio is a criminal history

4    category 1, which we believe he is, such a conviction would

5    have carried an advisory guideline sentence of around 63 to 78

6    months in prison.

7          However, if convicted at trial of the charges in the

8    superseding indictment, the Government estimates that the

9    Defendant's offense level could be as high as a 44.  An offense

10   level of a 44 carries an advisory guideline sentence of life in

11   prison.

12         Title 18, United States Code, Section 3142(g)(4), an

13   additional factor the Court could consider, the nature and

14   seriousness of the danger to any person or the community that

15   would be posed by the Defendant's release.

16         Even prior to being charged, Roggio threatened

17   witnesses.  He was in Kurdistan in 2015.  The Defendant spoke

18   frequently to his employees about the importance of loyalty and

19   warned them against the consequences of what Roggio

20   characterized as betrayal.

21         In the recording referenced earlier, the Defendant

22   bluntly laid out what would happen if the employee returned to

23   her country of origin and betrayed him.

24         Having seen Roggio's control of the Kurdish soldiers

25   who tortured the victim and seen the Defendant's close

1 relationship with those other Kurdish officials, the employee

2 did not believe that she would be able to leave Kurdistan

3 without the Defendant's permission.

4        During a recorded conversation, the employee pleaded

5 with Roggio to allow her to leave Kurdistan and go back to her

6 home country.

7        The following is an excerpt from that conversation as

8 recorded:

9        EMPLOYEE:  I am scared of you.  I really am.

10       THE DEFENDANT:  Well -- name of employee -- you

11 should be.

12       EMPLOYEE:  Yeah, I know.  I know I should be.

13       THE DEFENDANT:  Look, I'm going to lay this out for

14 you very easily.  Stop me if you don't understand what I'm

15 saying because you have to understand what I'm about to tell

16 you.  If you want to quit, nothing will happen to you.  You can

17 leave any time you choose.  Do you understand?

18       I do.

19       I do not view you as a security risk or a threat.

20       EMPLOYEE:  No?

21       ROGGIO:  No.

22       EMPLOYEE:  How come?  Because I was like the biggest

23 person in Kurdistan?

24       THE DEFENDANT:  Because you know why.

25       EMPLOYEE:  No.

1          THE DEFENDANT:  Because of this, because you know if

2  you want to -- excuse me.

3          Because you know if you went to -- that would be the

4  home country the employee was from -- if you went there and

5  betrayed me, I would come for you.

6          EMPLOYEE:  I know that.  That's why I'm scared.

7          THE DEFENDANT:  As long as you don't betray me, I

8  never have to come for you.  Am I right?

9          THE EMPLOYEE:  Yeah, I know that.

10          THE DEFENDANT:  No one can touch you -- the name of

11  the employee.  I won't allow it.

12          THE EMPLOYEE:  I don't know that because -- said you

13  told -- you have so many Kurds in countries near where I live

14  that will come and kill me.

15          THE DEFENDANT:  No.  I'd come get you myself.

16          The victim of the torture and the eyewitnesss to the

17  torture all remain fearful of the Defendant due to the power he

18  exercises over them while they were in Kurdistan and threats

19  such as that made during this recording that he made to each of

20  them.

21          Beyond those witnesses and victims, there are

22  American citizen witnesses who the Government may call if this

23  goes to trial, including Mr. Roggio's ex-wife.

24          The long and short of it, Your Honor, is that all of

25  these factors lead to one conclusion, and that is that

1  Mr. Roggio is a threat to the community and a risk of flight.

2          As indicated in the pretrial services report, the

3  probation department recognizes this, and they are recommending

4  that he be detained pending the trial.

5          Their recommendation indicates that Ross William

6  Roggio has no prior criminal conviction.  However, the nature

7  of the instant offense allegedly involved the torture of an

8  individual for in excess of a month raises serious community

9  safety concerns, which obviously we agree to that statement.

10          The Defendant has ties to a foreign country through

11  his girlfriend who lives in Greece, and there is no condition

12  or combination of conditions that will reasonably assure the

13  appearance of the Defendant as required for the safety of the

14  community.  Therefore, they are respectfully recommending that

15  the Defendant be detained.

16          I would note, as I indicated before, the Defendant is

17  basically looking at a life sentence if convicted on this case,

18  and given the seriousness of the offense, every reason to flee,

19  we believe he is both a danger to the community generally,

20  perhaps a danger to himself, a danger to the witnesses who may

21  be called by the Government, as well as a risk of flight, and

22  so we are recommending detention in this case.

23          THE COURT:  Mr. Bartolai.

24          MR. BARTOLAI:  Yes, Your Honor.  Thank you.

25          Well, Your Honor, I have before me an indictment that

1   was returned on February 15th, 2022, that adds two additional

2   counts.  Count 1, conspiracy to commit torture in 2015, as well

3   as torture, and Count 2, which also occurred in 2015.

4          I note that the basis for jurisdiction here in these

5   charges is the fact that Mr. Roggio is a U.S. citizen.  These

6   crimes are not alleged to have occurred in the Middle District

7   of Pennsylvania.  They are not alleged to have occurred

8   anywhere within the United States, but are alleged to have

9   occurred overseas while he was overseas.

10         I note, Your Honor, that in this indictment, there's

11  statute of limitations that would be applicable under Title 18,

12  3282, which is a limitation period of 5 years.  So it may be,

13  Your Honor, that right off the bat that the allegations

14  contained in this indictment are beyond the limitation period.

15  I bring that to the Court's attention because I think under the

16  Bail Reform Act that the Court can consider that.

17         I would note, Your Honor, a lot of the allegations in

18  this second superseding indictment were presented before to a

19  grand jury and resulted in that first indictment which

20  involved, among other things, this claim that Mr. Roggio was in

21  Iraq to manufacture a weapons facility, and he's been indicted

22  on that, Your Honor.  The case is before Judge Mariani.

23         He was arraigned on that case on March 23, 2018, and

24  in that indictment, which the Government has referred to in its

25  attempt to have Mr. Roggio detained, these charges were brought

1   up before, and Magistrate Judge Mehalchick had a detention

2   hearing and ordered him released.  He was released, subject to

3   conditions, on April 3rd, 2018, and he's been released, subject

4   to conditions, since then, Your Honor.

5          So we have an individual who has been subject to

6   pretrial service supervision for 46 months now.  He has

7   appeared for every court proceeding.  He has appeared -- every

8   time probation wanted to talk to him, he was there.  In fact,

9   he was arrested today when he was told to report to his

10  pretrial officer in Scranton and he showed up.  He was supposed

11  to report at 10.  He was there at 9:30, Your Honor.

12         So we have an individual who ever since he has been

13  released, he has shown up to work and done everything that he

14  was told to do, Your Honor, and certainly he has no history of

15  non-appearance or non-ability to be supervised.

16         So I turn to Count 1 and Count 2 and ask, what's

17  changed since then?  We have two counts that allege torture.  I

18  will tell you that it's an ugly word, and the facts are -- the

19  claims that Mr. Hinkley has -- the accusations that he made

20  certainly are gruesome, and that's something that needs to be

21  taken seriously.  If believed, that would be a crime of

22  violence.  There's no doubt about it, Your Honor.  Certainly

23  that's something the Court can consider.

24         This Court is no stranger to allegations of violent

25  crime.  There are many different types of violent crimes where

1   individuals come before the Court and the Court is required to

2   make a decision relative to being released or not subject to

3   conditions, and this is no different, Your Honor.

4           We have an indictment, which there's no evidence, and

5   the Court knows that.  There's no evidence here.

6           Your Honor, there's what Mr. Hinkley brings up to the

7   Court, and I haven't seen it yet.  I haven't heard those tapes

8   yet.  We certainly will challenge them.  Mr. Roggio has pled

9   not guilty, and we will persist in that plea of not guilty.

10          I submit, Your Honor, that there is a presumption of

11  innocence in this case that applies to Mr. Roggio, that he is

12  presumed to be innocent of these charges, however serious they

13  are.

14          You know, it's funny, getting back to the old

15  instance here where Mr. Roggio came before the Court in the

16  past for a detention hearing, there was a pretrial services

17  report prepared then, and I looked at this pretrial services

18  report under the mental health section, and I see here where it

19  says he reported a history of mental health issues, but he's

20  not having a problem at the moment with active symptoms.

21          The Defendant reported being taken hostage, detained,

22  and tortured in 2016 for approximately 4 months.  He

23  subsequently saw a therapist for that, Your Honor.

24          I have submitted some exhibits for the Court's review

25  today, 1 through 3, and Mr. Hinkley was provided with a copy

1  prior to the hearing, and I'm going to refer to the first one,

2  Defendant's Exhibit 1.  This is a U.S. Customs and Border

3  Protection report that was prepared when Mr. Roggio entered

4  this country from Iraq almost 5 years ago, February 26th, 2017.

5          These agents arranged that he undergo a secondary

6  inspection upon his arrival at JFK and he did.  He was stopped

7  at customs and was brought into the interview room and he was

8  interviewed.  He was questioned by Border Protection about his

9  trip to Iraq and why he didn't have a passport, why he was

10  issued a temporary passport.

11          He says then, Judge, 5 years ago that he was

12  kidnapped while he was over there.  That while he was there, he

13  had a project that he was working on for these individuals,

14  nationals of Iraq of that Kurdistan region, and that on a trip

15  coming home right before Christmas of 2016, he was walking

16  through the airport when someone came and threw a scarf over

17  his head and told him he was going to be kidnapped.

18          He was taken to an unknown location and was held

19  there under February 24th, 2017, a period of time consistent

20  with the time -- with the length of time that Mr. Hinkley

21  claims that Mr. Roggio did this to someone.

22          During that time, he was extorted of money, and he

23  wasn't sure if he was going to get out of there.  I mean, this

24  is something that Mr. Roggio told authorities back in 2017.

25          Your Honor, I have another exhibit, No. 2, and this

1  is a printout from the internet, of course, regarding fellows

2  that the Government has as their witnesses and as some people

3  that are complainants in this case.  These are the Talabani

4  brothers.  I know the Court is not familiar with the facts and

5  circumstances of this case.  I certainly am.  I've had it for

6  quite some time.  There's been thousands of pages of discovery

7  and e-mails that have been exchanged and reviewed.  We have had

8  several hearings on the matter, and Mr. Hinkley certainly knows

9  who these individuals are.  If I speak wrong about them, he can

10  correct me.

11            These are the individuals, Your Honor, who were

12  behind that alleged weapon factory in Iraq, and these are the

13  individuals who since this case has come forward, our case,

14  have been charged in Iraq with all sorts of extortion and

15  kidnapping.

16            There's an individual here who is mentioned.  His

17  picture is on the last page, Bilind Ali Abdulrahman, who was

18  working over there, much like Mr. Roggio, and he was kidnapped

19  and extorted.

20            The last one is No. 3, Lahur Talabani, and this is

21  another individual who is one of these fellows, and that's

22  Defendant's Exhibit 3.  He's been arrested on this, Your Honor,

23  and possibly disposed of.  Now, these were high-ranking

24  officials in that government.

25            So, you see, we're presented with a situation, and

1  when we look at the allegations that are contained in this

2  indictment, which are mere allegations at this point, and we

3  look at the weight of evidence, there's been none.  There's

4  been none, but there has been a claim, an accusation, and

5  there's also been an accusation here by Mr. Roggio that 5 years

6  ago, 5 years ago that he was kidnapped, and it was not just

7  made to his government upon re-entering -- Roggio, a citizen

8  coming back to his country, saying that to his countrymen and

9  to law enforcement, I was kidnapped in Iraq -- but also to

10  pretrial services when he had to appear before that first

11  appearance.

12          Those claims, Your Honor, are corroborated by the

13  facts, by these reports that we have from this foreign land,

14  Kurdistan, a region in Iraq.  These guys are kidnappers.

15  They're extortionists.  They extorted Mr. Roggio.  They were

16  responsible for whatever happened in this case of torturing

17  people, and that's all going to come out, Your Honor.

18          So I ask the Court -- and I know to sit and to listen

19  to Mr. Hinkley make those claims, you could feel it, but I want

20  you to know there are two sides to every story, and it's not as

21  clear cut as Mr. Hinkley would have you think.

22          You know, Judge Mariani has had this case a couple

23  years now, and early on there was a motion submitted to

24  designate it as a complex case, and he designated it as a

25  complex case.  It is, Your Honor.  It is a very complex case.

22

1  There are witnesses all over the world in this case, and I

2  don't know the circumstances that Mr. Hinkley has brought up

3  here.  I'm sure we will get to them and have to address it, but

4  what the issue right now is, I submit, is this individual a

5  risk of flight?  Is he a danger to the community?  That is an

6  issue that I certainly can address, Your Honor.

7          We have a man, Mr. Roggio, who is a U.S. citizen, who

8  is 53 years old now.  He lives in Stroudsburg.  He lives there

9  with his parents and they're elderly.  His father is 97 and in

10 ill health.  His mother is a little younger.  She's in her

11 80's.  I think 81.  I attempted to have her here, Your Honor,

12 but I couldn't get ahold of her.  She would be willing to act

13 as a third-party custodian, but that's for another day.  She's

14 not going to be able to make it and we're not offering that to

15 the Court right at the moment, but this is where Mr. Roggio

16 lives with his older parents.  He was going to cook them a meal

17 tonight.

18         THE COURT:  Mr. Bartolai, you're aware that you do

19 have 5 days to request a postponement?

20         MR. BARTOLAI:  I certainly do.  I am aware of that.

21 Prior to the hearing, Mr. Roggio and I had an occasion to speak

22 and I brought that option to him.  We figured, you know, we're

23 going to go with this right now and we will take that.  We

24 certainly were aware of that, Your Honor.  I appreciate the

25 Court bringing that to our attention.

1       This is where Mr. Roggio lives with his parents

2  there.  He's lived there forever.  He had a house, but it was

3  lost.  When Mr. Roggio was arrested, the Government came in and

4  seized everything; all the bank accounts, all the firearms, all

5  the guns, all the Rolex watches.  Everything that he had was

6  seized, and so he doesn't have access to that anymore.

7       You know, he's been working.  He lives at home and

8  he's been working as a handyman, and that's reflected in the

9  pretrial services report, self-employed with this Renovatr.

10  He's doing what he can to make a little bit of money and make

11  ends meet.

12       He's an engineer by trade.  He has an education.  He

13  has various firearms manufacturing or firearms manufacturing

14  concerns in the United States, but he can't do that line of

15  work now while he's subject to this indictment, and so he's

16  living at home and trying to do some painting for people and

17  making money as a handyman.

18       It's never been a problem with probation.  For 46

19  months, 47 months he's been on pretrial service supervision,

20  and I don't think there is one report ever made or an alleged

21  complaint about Mr. Roggio not working or to go out and get a

22  job.  He certainly does work, Your Honor.  He has an education.

23  That is highlighted in this report, a college education.  He's

24  a veteran.  He served this country.  He has no criminal

25  history, none.  There was a bad check charge years ago that was

1  dismissed on the Government's motion.

2        So we have a person here who has a lot of things

3  going for him; his age, his citizenship, his address, he's got

4  strong ties to this community, his education, he's working now,

5  his past work history in that he always had a job, the fact

6  that he served his country.  He's been on supervision for 46

7  months and he always appeared.

8        Today when he was called in to appear, he appeared.

9  He was arrested.  He was arrested without any incident.  You

10 know, I like to always point that out.  So often we hear about

11 who is running through the woods, who doesn't show up.  You

12 know, maybe he thinks he's going to get arrested and doesn't

13 show up.  We hear that.  I would say that, if asked, these

14 gentlemen would say today that when he was arrested, he was a

15 gentleman, because he's always been a gentleman.

16       We've had a suppression hearing in this case, and

17 this customs officer who authored this report testified and

18 said that her encounter with Mr. Roggio was nothing other than

19 cordial.  He was a gentleman and participated and cooperated in

20 every aspect.

21       So we have that he's been released since 2018.  He

22 has an address in Stroudsburg, 116 Turkey Hill Court.  He had a

23 passport.  It's been surrendered.  It was surrendered then and

24 it's surrendered now.  He's not going anywhere.  He has family

25 here in this country.  He has two children in this country.  He

1  could have fled.  He hasn't fled.  He hasn't made no attempts

2  to flee.

3         It's interesting, Judge.  Prior to the -- I'm going

4  to read from my phone now because I don't have a copy with me.

5  It's in my other file.  Upon Mr. Roggio's arrest back on March

6  23rd, 2018, the Justice Department issued a press release,

7  Pennsylvania man charged with illegally exporting firearm parts

8  to Iraq.  When we read this, when we go through this report, we

9  say -- it says here, the combined maximum penalty under Federal

10 Law for these offenses is 705 years of imprisonment.

11        So, you see, Mr. Roggio -- and the Government points

12 out the fact that he's looking at a lot of time, but he's

13 always been looking at a lot of time, 705 years, and there may

14 now be another additional 20 years here based upon the maximum

15 involved, and of course it would have an impact on the

16 sentencing guidelines, which are advisory, Your Honor.

17        So we have an individual who is faced with serious

18 crimes, but they are allegations at this point.  He's been

19 faced with serious crimes for quite some time now, and he's

20 beared down on that burden that has been pushed upon him and

21 he's behaved himself in every way and will continue to do so.

22        He has no history of violence, Your Honor.  We hear

23 these allegations, but regarding these other instances, the

24 American citizen, his former wife, there is no claim by Mr.

25 Hinkley that he threatened her or that he threatened any

1   witnesses regarding this case.  He's been out all that time and

2   he's done his best not to even have any contact with these

3   witnesses.  Certainly that's been what he's done.  He's behaved

4   while he's out there.

5            So, Your Honor, of course we have serious allegations

6   and they are serious.  He will deal with them.  At this point

7   they're allegations.  He's presumed to be innocent.

8            When it comes to risk of flight, I think there's

9   strong evidence, clear and convincing evidence that he's not

10  going anywhere, that he will appear, as he's done, and that as

11  far as violence, he has no history of violence, never has, Your

12  Honor, and there's no claim that he's intimidated any witnesses

13  relative to this case and he won't, Your Honor.

14           So I submit he's a suitable candidate for release and

15  subject to conditions, any conditions that the Court feels are

16  appropriate.  When he was first arrested, he was placed on home

17  confinement for a period of approximately 30 days, I'm going to

18  guess, but eventually it was taken off of him.  If the Court

19  feels that home confinement is appropriate now, certainly he

20  would be agreeable to it.  He's agreeable to any conditions;

21  electronic monitoring, whatever the Court deems appropriate.

22  We submit, Your Honor, he certainly can be released subject to

23  conditions.

24           That's all I have, Your Honor.

25           THE COURT:  Mr. Hinkley, anything further?

1        MR. HINKLEY:  Very briefly, Your Honor.

2        I just want to make sure it's clear for the record

3   that in regards to the statute of limitations in this case, in

4   accordance with Title 18, United States Code, Section

5   2332b(G)(5)(B), there is actually an 8-year statute of

6   limitations.  So these charges would be well within that

7   statute.

8        In fact, under 18, U.S.C., Section 3286(b), there is

9   no limitation if the commission of the offense, quote, resulted

10  in or created a foreseeable risk of death or serious bodily

11  injury to another person.  That is Title 18, United States

12  Code, Section 3286(b).  So there would not be an issue for

13  statute of limitations in this case, as I understand it.

14        I have one other brief statement, and that is Mr.

15  Bartolai points out that when the Defendant was encountered by

16  the U.S. Customs and Border Protection that he made a statement

17  to a border patrol officer who was doing a secondary search and

18  question with Mr. Roggio.  He indicates during that interview

19  that he was detained and was tortured.

20        He also indicates, though, that the person he was

21  traveling with, Christina Sidiropoulou, he indicated to the

22  customs officer that they had been together, he and this woman,

23  for the last 9 months and that this person worked for

24  Mr. Roggio as his personal assistant.  He indicated he was

25  traveling from Iraq where he had been working for the past 3

1  years.  So he's indicating that during the time where he's

2  alleging himself being tortured that his girlfriend was working

3  for him and with him during that time frame.

4       What wasn't presented to you was an interview with

5  the girlfriend, which she was also interviewed by customs

6  authorities when she entered, and she, herself, indicated that

7  during the time frame that she was working with Mr. Roggio that

8  she was with him daily with the exception of maybe one or two

9  days.

10       So his allegations that he was kidnapped and tortured

11  doesn't match the statement of his girlfriend who was traveling

12  with him and who was present with him during the time frame in

13  Iraq where he's claiming to be tortured.  So I don't know how

14  much the Court can give --

15       THE COURT:  Let me ask you this:  He's been

16  apparently somewhat at least compliant with his conditions,

17  pretrial release conditions, what has changed and why is it

18  that the Government is taking the position it's taking?

19       MR. HINKLEY:  What has changed is the seriousness of

20  a crime which the Government is now aware of, which we were not

21  aware of until this summer when some interviews of additional

22  folks occurred in a country outside of the United States and

23  where these allegations came forward, where we have a victim

24  who has provided this information, disclosed it to the

25  Government, has agreed to come and testify against the

1  Defendant, as well as four other individuals who all give

2  similar stories, indicate that the Defendant had them review

3  and watch the torture that was committed by these Kurdistans at

4  the direction of Mr. Roggio.  That changes this case to a whole

5  different level.

6          The Defendant before was basically a white-collar

7  type of crime.  He was looking at somewhere of 5 to 7 years if

8  convicted on this case.  Now he is facing a potential life

9  sentence if convicted after trial.

10          Additionally, Your Honor, we had no idea of what this

11 person was capable of.  We had no idea what happened.  Now we

12 know.  That changes the whole view of whether or not he's a

13 danger to the community.

14          Now, he may have been compliant with the pretrial

15 services and probation, but now he knows we know what happened.

16          Mr. Bartolai is correct, these are allegations, but

17 they're allegations that were made to a grand jury who found

18 probable cause that these things happened.  So it's just not an

19 allegation that I think.  It's allegations that the grand jury,

20 who have found that it's more probable than not that these

21 crimes occurred that the Defendant was involved with.  So those

22 are the things that changed, Your Honor.

23          THE COURT:  Mr. Bartolai, anything in response to

24 that?

25          MR. BARTOLAI:  Yes, Your Honor.

1      You know, I was in law school when the Salerno case
2  came out, and what it was, I remember we were talking about it
3  in constitutional law.  This was a case, as the Court knows,
4  where for the first time a person was going to be denied bail.
5  It wasn't about money anymore.  It was, is this person a danger
6  to the community?  Salerno was an organized crime case.  They
7  detained him.  It was an extraordinary case to detain someone
8  like that based upon these circumstances.

9      Now, Judge, so many years later we're here and the
10 issue is before the Court.  Again, the only thing that the
11 Government can point to is the seriousness of these
12 allegations.  I'm not going to pretend for a second that they
13 are not serious.  What we hear is serious, no doubt, but it's
14 more than that, Your Honor.  It is more than that.  At this
15 point, they're allegations.  They're mere allegations.  There
16 has been no evidence of this.  Certainly these things are
17 disputed.

18     You hear Mr. Hinkley, when he begins to talk about
19 what Mr. Roggio's girlfriend said about what he said, and it's
20 going to certainly be quite a trial when we finally get to it,
21 but before then, you know, Mr. Roggio is presumed to be
22 innocent.

23     We're dealing with allegations, and the Court has
24 done it before, and this, unlike Salerno, where that person had
25 a history of crimes, where so many of these defendants that

1  come before the Court and are detained for danger to the

2  community, are either committing a violent crime or they have a

3  history of violent crime, there is no history whatsoever of

4  violence on behalf of Mr. Roggio.  53 years, no prior record,

5  all of these things, Your Honor.

6         So although the allegations are serious, the Court

7  certainly has the ability or the other factors to consider in

8  balancing that.  I submit, Your Honor, that this individual is

9  not a danger to the community, that he will behave himself if

10 released.

11        THE COURT:  As you know, this is, I believe, my first

12 contact with this case.  Mr. Bartolai certainly said it best

13 when he said that these charges are disturbing and, if proven,

14 they are obviously egregious violations against humanity, but I

15 recognize that these are allegations at this point.

16        Nevertheless, we agree that the presumption does not

17 apply in this case?

18        MR. HINKLEY:  It does not apply.

19        THE COURT:  So then we look at the 3142 factors to

20 determine whether there are conditions available under these

21 circumstances that could address the issues of flight risk and

22 issues of danger to the community.

23        So the first factor we look at is the nature and

24 circumstances of the offense charged, and those generally

25 include whether the offense is a crime of violence, involves

1 narcotic drugs, or involves minor children.  In this case, it

2 involves a crime of violence.  Next murder.  It doesn't get any

3 worse than torture.

4        The torture allegations in here are obviously very,

5 very troubling.  If proven, it shows that this victim was

6 subjected to obviously beatings where pressure was applied

7 allegedly to the victim's fingers with blades of a large

8 cutting tool similar to a bolt cutter.

9        He beat the victim with fists on his ears, nose,

10 throat, arms, stomach, chest, and other parts of his body.

11        Jumping violently on the victim's chest while wearing

12 military boots.

13        Forcing the victim to run barefoot on sharp gravel.

14        Wrapping a belt around the victim's neck from behind,

15 yanking him off the ground and suspending him in the air,

16 causing the victim to lose consciousness, while beating him in

17 the groin with a stick.

18        Repeatedly threatening the victim with more abuse and

19 saying the victim might not make it out of the military

20 compound alive.

21        The torture that is alleged is just egregious, as we

22 have indicated.

23        We look at the weight of the evidence.  As the

24 Government proffered, the weight of the evidence obviously is

25 very strong, and it looks as though these were statements that

1   were made -- recorded statements that were made by the

2   Defendant at the time of the torture while the threats as well

3   were made.

4          In addition to that, we also are mindful of -- to

5   balance off the weight of the evidence, we are mindful of the

6   presumption of innocence to which the Defendant is entitled.

7   Nothing we say here today is intended to reduce the presumption

8   of innocence or to deprive him of that presumption.

9          The next is the history and characteristics of the

10  person.  That includes various factors, the first of which is

11  the person's character.  We normally hear character testimony

12  in the form of individuals testifying or providing letters of

13  character references that are citizens that are respected in

14  the community and that know the Defendant's propensity to

15  commit crimes, and also are familiar with his reputation as a

16  peaceful, law-abiding citizen.  We have not heard any character

17  testimony today.

18         Next we look at his physical and mental health

19  condition.  His appearance here today, he appears to be in good

20  shape from a physical standpoint.  Then we also take a look at

21  the pretrial services report along those lines, and that, as

22  indicated, he stated to the pretrial services officer that he's

23  in good physical health with no medical problems.

24         The next factor that we look at is his mental

25  condition.  That factor, as identified by the pretrial services

1  office, indicates that his mental health, as reported from

2  Mr. Roggio, has reported a history of mental health issues, but

3  is not presently experiencing any active symptoms.

4          He reported being taken hostage, detained, and

5  tortured in 2016 for 4 months.  He subsequently saw a therapist

6  in the Pocono region in Pennsylvania for several months in

7  2017.

8          Next we look at his family ties.  We see that he has

9  been living in Stroudsburg, and I recognize that although he

10  was born in Spokane, Washington, that he has been here for

11  quite a significant period of time.  When I say here, I'm

12  talking about the Middle District of Pennsylvania.

13          He graduated from East Stroudsburg Pennsylvania High

14  School in 1987.  He studied at East Stroudsburg University.  He

15  also studied at Campbell University, Buies Creek, North

16  Carolina, and most recently at Fayetteville, North Carolina;

17  that is, Fayetteville State University in 2000.

18          He also served in the United States Army from 1987 to

19  1991 and received an honorable discharge.  He denied being

20  court-martialed and received disciplinary action once for

21  fighting.  So we look at that history.

22          We also look at his employment.  His employment

23  history is reflected in the pretrial services report as from

24  June 19th, 2019, to the present.  He is self-employed with

25  Renovatr, R-E-N-O-V-A-T-R, and that is also in Stroudsburg, and

that's been ongoing for the last 2 years and 7 months, and then he was unemployed for a year and 2 months prior to that.

Next we look at his financial resources.  I believe the pretrial services report does not set forth his financial resources, and we did not hear any testimony regarding his financial resources.

Next, we also then look at his ties to the -- the length of residence in the community.  We have already went through that.

We also look at his community ties.  We look to see whether he has been involved in any worthwhile endeavors for the benefit of the greater good; that is, for the community within which he resides and works.  We have not heard any testimony along those lines.

Then we look at any past conduct.  The past conduct that we really can only look to is in 2007 the criminal charge which was eventually dismissed in 2008, a charge of felony of worthless check.  It was charged, but the matter was dismissed.

We then look to see any history related to drug or alcohol abuse.  From that perspective, he reported daily alcohol use.  Sixteen years ago was the time he last used and marijuana use occasionally.  The last use was a year ago.

He also indicated that in 2001 he underwent substance abuse treatment in Fayetteville, North Carolina for alcohol dependency and was satisfactorily discharged and no further

1 treatment was recorded.

2          Then we look to his criminal history, and we

3 recognize that he has no prior criminal history and had no

4 record concerning his appearance in court proceedings.  So that

5 factor doesn't apply.

6          Then we look at the next factor, which is whether at

7 the time of this offense and this arrest, whether he was on

8 probation, on parole, other release pending trial, sentencing,

9 appeal, or completion of sentence for an offense under Federal,

10 State, or local law, and it's my understanding that the

11 substance of these charges relate to matters prior to his

12 arrest here today and relate to matters that occurred in 2015,

13 as I understand it.

14          Then finally we look to the nature and the

15 seriousness of the danger to any person or community that would

16 be posed by his release.

17          From our perspective, when we look at that, the

18 nature of these charges are just so troubling that from my

19 perspective, just based upon what I have heard here today, as I

20 said, it's probably one of the most egregious acts less than

21 murder that can be committed against humanity.

22          MR. BARTOLAI:  Your Honor, may I just address that

23 one point?

24          THE COURT:  Yes.

25          MR. BARTOLAI:  There is something I think that may

1    alleviate some of the Court's concerns.

2           You know, Your Honor, when we look at this, Counts 1

3    and 2, I point out that these allegations are that Mr. Roggio

4    committed these offenses under color of law.

5           What the Government is suggesting in this indictment

6    is that Mr. Roggio, with Kurdish officials, including Kurdish

7    soldiers, committed these offenses, Your Honor.

8           So I would submit that the color of law would no

9    longer be applicable to Mr. Roggio.  He's not in Kurdistan

10   anymore.  He's not affiliated with any of these people.  He's a

11   regular citizen here in the Middle District of Pennsylvania who

12   has no color of law, who has nothing like that.

13          I only bring that to the Court's attention because it

14   is a stellar point that certainly he would not be available.

15          THE COURT:  I recognize that.  I also recognize the

16   fact that these types of matters don't generally come before us

17   too often.  We don't see too many torture cases in the Middle

18   District of Pennsylvania.

19          It is troubling in terms of the nature of the

20   charges, and it's also troubling that the remarks that have

21   been allegedly recorded are remarks made by Mr. Roggio, and if,

22   in fact, they were made by him, then that creates problems for

23   the Court and the safety of the community as well.  That does

24   create issues from our perspective.

25          MR. HINKLEY:  Your Honor, the reason that the Court

38

1 hasn't seen too many of these in the Middle District is because

2 this is the fourth time that this has been charged since the

3 history of the statute being passed.

4          THE COURT:  Very well.  So that says it all right

5 there.  That's why we don't see it that often.

6          So under the circumstances, I'm going to order that

7 you be detained and that you be remanded to the custody of the

8 United States Marshal Service.

9          If there's other matters counsel wish to address with

10 the Court at a later date, you may feel free to address those

11 with us, but at this point -- my decision on detention is made

12 at this point, but if you feel there's other issues that you

13 want to raise, I would certainly not deprive you of making

14 those arguments.

15          Anything further from counsel?

16          MR. HINKLEY:  No, Your Honor.

17          MR. BARTOLAI:  No, Your Honor.

18          THE COURT:  This proceeding is concluded.

19     (At this time, the proceedings in the above-captioned

20 matter adjourned.)

21

22

23

24

25

# C E R T I F I C A T E

I, SUZANNE A. HALKO, Official Court Reporter for the United States District Court for the Middle District of Pennsylvania, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing is a true and correct transcript of the within-mentioned proceedings had in the above-mentioned and numbered cause on the date or dates hereinbefore set forth; and I do further certify that the foregoing transcript has been prepared by me or under my supervision.


_____
SUZANNE A. HALKO, RMR,CRR
Official Court Reporter


REPORTED BY:

    SUZANNE A. HALKO, RMR,CRR
    Official Court Reporter
    United States District Court
    Middle District of Pennsylvania
    Scranton, Pennsylvania  18501


        (The foregoing certificate of this transcript
does not apply to any reproduction of the same by any means
unless under the direct control and/or supervision of the
certifying reporter.)