## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | NO. 3:18-CR-0097 |
| v. | : | |
| | : | (MARIANI, J.) |
| ROSS ROGGIO, and | : | |
| ROGGIO CONSULTING, LLC, | : | |
| Defendants. | : | |

## GOVERNMENT'S MOTIONS IN LIMINE

The United States, by and through the undersigned counsel, moves *in limine* to: (1) allow the Government to present the testimony of the defendant's ex-wife Kristi Merring-Roggio; (2) preclude the defendant from asserting a public-authority defense, pursuant to Federal Rule of Criminal Procedure 12.3; (3) preclude the defendant from asserting a duress defense unless he first meets his burden of establishing the existence of duress; (4) preclude the defendant from introducing his own self-serving hearsay statements; (5) preclude any evidence or argument relating to revisions to the U.S. export control regulatory regime; and (6) admit lay witness opinion testimony of representatives from PNC Bank; Wells Fargo Bank; and William Mathes pursuant to Federal Rule of Evidence, Rule 701.

## STATEMENT OF FACTS[1]

Ross Roggio and his company, Roggio Consulting Co., LLC, are charged with crimes relating to the illegal export of firearm parts, tools, and defense services to the Kurdistan region of Iraq. The Superseding Indictment also charges with Roggio with torture and conspiracy to commit torture. The export charges are based on evidence that Roggio illegally exported weapons parts and tools to Iraq as part of a firearms manufacturing project in Kurdistan. United States laws regulate the export of defense articles and services. Approvals by the State Department and the Commerce Department are required before certain weapons parts and tools to produce weapons can be exported to certain

---

[1] The Statement of Facts reflects Government counsel's good faith belief as to the nature of some of the Government's evidence as of the date and time of preparation of these motions. Defense Counsel and Defendant are cautioned, however, that trial preparation is ongoing, including interviews of potential witnesses. The Statement of Facts does not identify every piece of physical evidence to be offered at trial. The Government's trial exhibits will be available for inspection and defense counsel is welcome to examine them prior to trial. Accordingly, the "Statement of Facts" should not be taken as a complete accounting of all the evidence the Government expects to introduce at trial and, rather, should be viewed as a general summary of evidence.

countries, including Iraq, and Roggio failed to obtain any such

approvals. As alleged in paragraph 30 of the Superseding Indictment:

> It was the policy of the United States to deny licenses or
> other approvals for the export of defense articles and defense
> services destined for Iraq, or originating in Iraq, except that
> a license or other approval may be issued, on a case-by-case
> basis for: (1) non-lethal military equipment, and (2) lethal
> military equipment required by the Government of Iraq or
> coalition forces.

The Superseding Indictment alleges that Roggio conspired to

export defense services and defense articles from the United States to

Iraq without first obtaining a license or written approval from the State

Department, in violation of 18 U.S.C. § 371. The substantive counts are

based on Roggio's failure to obtain approval from the State Department

to export M4 bolt gas rings, firing pin retainers, and defense services,

and failure to obtain approval from the Commerce Department to

export rifling combo buttons. The wire fraud charges are based on email

messages and a credit card transaction carried out in furtherance of the

scheme. The money laundering charges are based on the transfer of

funds in connection with the scheme from Kurdistan to banks in the

Middle District of Pennsylvania.

3

While investigating these violations, the Government discovered that Roggio, acting jointly and in concert with Kurdish soldiers and other Kurdish officials, orchestrated the torture of one of Roggio's employees. This occurred over an approximately five-week period while the employee was detained by soldiers at a Kurdish military facility during October and November of 2015. The military compound was located near Sulaymaniyah, in the Kurdistan region of Iraq. While detained, the victim was interrogated on multiple occasions by Roggio in person and occasionally at the direction of Roggio by telephone. Roggio sometimes participated in the torture, though more frequently Kurdish soldiers carried out Roggio's instructions to inflict severe physical pain and suffering on the victim, including:

1. Placing a plastic bag over the victim's head to suffocate him, causing him to lose consciousness;

2. Wrapping a belt around the victim's neck and lifting him off the ground, causing him to lose consciousness;

3. Using a taser to inflict electrical shocks on the victim's groin, throat, nose, and arms, to the point where the victim's arms bled, and his hands twitched uncontrollably;

4

4. Applying pressure to one of the victim's fingers with the blades of a large cutting tool similar to a bold cutter, increasing the pressure as Roggio threatened to have the finger cut off;

5. Beating the victim's back, legs, stomach, and chest with rubber hoses;

6. Beating the victim in the groin with a plastic stick;

7. Beating the victim on his ears, nose, throat, arms, stomach, and chest with fists;

8. Jumping violently on the victim's chest in military boots, while the victim was lying prone on the floor; and

9. Forcing the victim to run barefoot on sharp gravel.

## PROCEDURAL HISTORY

On March 20, 2018, a grand jury sitting in Scranton, Pennsylvania, returned an Indictment charging Ross Roggio and Roggio Consulting Co., LLC with the following counts: (1) conspiracy (18 U.S.C. § 371); (2) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and 2778(c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1); (3) violation of the International Emergency Powers Act (50 U.S.C. §§ 1702 and 1705(c); 15 C.F.R. § 764.2; and 18 U.S.C. §§ 2 and 3551, *et seq*.); (4) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and

2778(c), and 22 C.F.R. §§ 124.1, and 127.1);[2] (5) and (6) smuggling

goods from the United States (18 U.S.C. §§ 554 and 2); (7) through (9)

wire fraud (18 U.S.C. § 1343); and (10) through (28) money laundering

(18 U.S.C. §§ 1956(a)(2)(A) and 2) (Doc. 1). The Indictment also

contained a forfeiture allegation.

A Superseding Indictment was returned on February 15, 2022,

adding to the Indictment one count of conspiracy to commit torture (18

U.S.C. §§ 2340 and 2340A(c)) and one count of torture (18 U.S.C.

§§ 2340, 2340A(a), and 2) (Doc. 122).

Roggio was originally represented by Assistant Federal Public

Defender Leo A. Latella, then by court-appointed counsel Gino Bartolai,

followed by retained counsel Matthew Thomas Comerford, Curt M.

Parkins, and Jason A. Shrive, and now is again represented by Gino

Bartolai.

---

[2] The Superseding Indictment corrected a scrivener's error in the
Indictment regarding the statutes listed under Count Four.

The trial, which has been continued multiple times, is currently scheduled to commence on May 8, 2023. The trial is expected to take approximately three to four weeks from *voir dire* to verdict.

## THE GOVERNMENT'S ANTICIPATED EVIDENCE

In its case in chief, the Government expects it will call (1) lay witnesses to testify regarding what they personally witnessed relevant to the crimes alleged in the Superseding Indictment; (2) law enforcement witnesses to present evidence derived from electronics seized during the investigation and evidence acquired from third parties (financial institutions, email service providers, etc.); (3) expert government witnesses concerning the requirement for licenses to export goods and services and the lack of such licenses in this matter; and (4) expert witnesses regarding (a) the exercise of control by Kurdish officials, soldiers, and other security forces in the Kurdistan region of Iraq and (b) whether Iraq law in 2015 allowed torture or unlawful detention.

The arms-export investigation began after Roggio had shipped "rifling buttons,"[3] an item requiring licensure to export, from the United States to Iraq. An employee from Drill Masters Eldorado Tools, Inc., located in Connecticut, contacted the FBI to report that a customer by the name of Ross Roggio had purchased controlled items from the company and had them delivered to Roggio's address in Pennsylvania before the items were transshipped to Iraq. FBI Special Agent Thomas O'Donnell visited Roggio's home and spoke to Roggio's then-wife, Kristi Merring-Roggio, concerning the controlled items. Roggio's then-wife called Roggio, who confirmed to Special Agent O'Donnell that he had purchased the items but denied that they had been transshipped to Iraq.

During the investigation, agents determined that Roggio had previously been involved in two unsuccessful firearms manufacturing ventures in the United States. The spouse of an employee who had

---

[3] Rifle Buttons are a tool, similar in appearance to a drill, which are made of an extremely hard metal and used to impart grooves to the inside of a firearm barrel. *See What is Button Rifling?*, Absolute Machine Tools, *https://absolutemachine.com/what-is-button-rifling/*.

worked for Roggio in one of these failed businesses introduced Roggio to Polad Talibani, a Kurdish official who was looking for someone with firearms manufacturing expertise to set up a factory in the Kurdistan region of Iraq. Roggio agreed to the project and emailed his Kurdish customers a business plan to establish an arms factory. That business plan included specific requirements to set up the project, including facility requirements, materials, machine requirements, and personnel with specialized education, training, and experience. The business plan noted that approvals for various aspects of the firearms manufacturing project – including export of firearms parts – needed to be acquired from the United States and Iraqi governments.

Testimonial evidence, together with electronic documents obtained during the investigation, will establish that Roggio attempted to purchase firearms for direct import to Iraq and, when confronted with the requirement to obtain export licenses, traveled to Iraq to build an arms factory to manufacture firearms and ammunition on site. One witness the Government expects to call is Roggio's ex-spouse Kristi Merring-Roggio. As more particularly described below, Kristi Merring-

9

Roggio was married to Roggio during his alleged crimes and unwittingly assisted Roggio by shipping controlled items to Iraq at Roggio's direction.

Once hired by his Kurdish patrons to build the factory in the Kurdistan region of Iraq, Roggio began to receive large payments of money through international bank transfers to his accounts in the Middle District of Pennsylvania. Using these funds, Roggio hired several individuals from the United States, Estonia, Greece, and other countries. These employees had various educational and work backgrounds that Roggio needed for his project, including engineering, machining, accounting, and other administrative and technical backgrounds.

With the assistance of these employees, Roggio undertook to set up the firearms manufacturing plant near Sulaymaniyah, Iraq. Documents acquired during the investigation, together with electronic communications from Roggio's email accounts, show that Roggio acquired machines from China for the manufacturing process. Roggio also acquired firearms parts from the United States, including M4 bolt

gas rings and firing pin retainers which he incorporated into the small number of M4-style rifles he managed to produce. Roggio emailed to his Kurdish customers a video demonstrating the operation of one such rifle, together with an explanation that the firearm was produced at the factory in Sulaymaniyah with a combination of parts that were produced in house in Sulaymaniyah and parts that were manufactured outside of Iraq.

Testimony from witnesses will prove that Roggio was purchasing sub-quality machines for the project that were incapable of manufacturing the type and number of weapons promised. One of Roggio's employees came to believe that Roggio would be incapable of manufacturing the mass quantity of M4-type rifles and Glock pistols he had contracted to make for the Kurds and discovered that Roggio was diverting funds from the project to buy expensive automobiles and other items. Alarmed that this employee might reveal this information to the Kurdish officials who did not yet realize that they were being defrauded, Roggio arranged for Kurdish soldiers to abduct, detain, and torture the employee.

11

For 39 days, the victim was detained at a Kurdish military compound. Kurdish soldiers who were part of the official power structure and who exercised dominion in the Kurdistan region of Iraq carried out Roggio's orders to savagely and repeatedly beat, tase, suffocate, and otherwise torture the victim. To intimidate the other Estonian employees and demonstrate to them his ability to use Kurdish military personnel, Roggio brought the other employees on occasion to the Kurdish military compound to observe the victim's torture. According to the victim and the other employee witnesses who were made to observe the torture, Roggio's purpose was to show them his power over them and make them fear what could happen to them if they were not loyal to Roggio.

Two weeks after the victim was released from the military compound where he was tortured, Roggio summoned to his apartment one of the employees whom Roggio forced to watch the torture. Fearing for her safety, the witness covertly recorded the encounter on her cell phone. At trial the witness will authenticate the recording, which is admissible under Federal Rule of Evidence 801(d)(2)(A).

12

The recording contains powerful evidence in which Roggio acknowledges committing the crimes with which he is now charged. He refers to having gun drills and gun-making parts, and then says he needs to hide what he is doing from U.S. authorities, implicitly acknowledging that he did not have approval to be exporting weapons parts from the United States. A moment later, he mentions the torture victim by name and explicitly admits to having tortured him. The following is a draft transcript of a portion of that recording:

Roggio:      *I've got to pay taxes.*

Witness:     *Yeah.*

Roggio:      *And I cannot hand receipts to the IRS for this shit. See, when – when I make a million dollars – say I make – like this year, $4 million came into my account, right?*

Witness:     *Yeah.*

Roggio:      *They know this. Then they – when I do my taxes, if I say I spent 4 million, well, then I owe no taxes right? They want to see the receipts of everything I bought. Now, the moment I turn those receipts over to them, that's evidence. Because, when you turn a receipt in to the IRS, you're turning it in to the U.S. federal government. And once they have those receipts, it's admissible for any type of crime. You understand?*

Witness:     *Yeah, I understand.*

13

Roggio:       So, by – by paying taxes as profits on all of it, it costs – it costs them more money, but it keeps my ass out of the fire. Because the moment: "OK, you turned in $4 million – what are you doing with gun drills, gun-making parts? This – this is all used for guns, and here's all the evidence that you gave us." Remember, busting me comes from the finances.

Witness:      Yeah, I know that.

Roggio:       Not from what I will say. They can – they can fucking arrest me and torture me 'til the day they die, I'll never talk. It's the finances. This is why [first name of victim] went for the finances.

Witness:      Are you sure that he went for the finances? That he wanted to somehow bust you?

Roggio:       No, he wanted – he wanted to blackmail me – for whatever, for whatever reason.

Witness:      Are you sure?

Roggio:       Yes.

Witness:      Because I know that the first thing you went in the compound with to see him – he – was $1 million and blah blah blah –

Roggio:       100,000.

Witness:      Yeah, but is it true? Is it true? He wanted to do that? Are you sure?

Roggio:       Enough to beat him. Enough to torture him.

Witness:      OK, let's not talk about that.

14

Later in the recorded conversation, Roggio said that he could not look the victim in the eye "because of what I did to him." Roggio also bragged that the victim "experienced the overwhelming ability of mine to crush somebody."

## *IN LIMINE* MOTIONS

The Government will present approximately two dozen witnesses, numerous documents, a video recording, and an audio recording to prove that Roggio illegally exported firearms manufacturing tools, firearms parts, and defense services to develop an arms and ammunition factory in the Kurdistan region of Iraq and – when he feared that an employee might ruin his scheme – used local Kurdish military personnel acting under color of law to torture the employee. The Government makes the following motions *in limine* related to the evidence it will seek to present and evidence Roggio might try to introduce.

## A. GOVERNMENT'S MOTION TO INTRODUCE THE TESTIMONY OF ROGGIO'S EX-SPOUSE

The Government intends to introduce the testimony of Kristy Merring-Roggio, who was Roggio's spouse at the time of the offenses alleged in the Superseding Indictment. Roggio and Kristi Merring-Roggio are now divorced. Kristi Merring-Roggio lived at the marital home located at 143 Indian Spring Drive, Stroudsburg, Pennsylvania, in February 2016. She will testify that in February 2016, when Roggio was living and working in Iraq, he ordered items to be delivered to 116 Turkey Hill Road, Stroudsburg, Pennsylvania – which was both the home of Roggio's parents and the business location of Roggio Consulting LLC. Kristi Merring-Roggio will testify that Roggio requested her to take items he purchased and combine them to be shipped to Iraq. Kristi Merring-Roggio will explain that, at Roggio's request, she took the items – including rifling buttons – to a local shipper named "The Packaging Place," located in East Stroudsburg, Pennsylvania, and mailed these items to "Ross Roggio, Baharan Residential Complex, Building Floor 2, Office 10, Sulaymaniyah, Kurdistan Region of Iraq." Kristi Merring-Roggio will also testify that Roggio had no other sources

16

of income during the relevant time frame of the Superseding Indictment and that he purchased several expensive items including Rolex watches, exotic sports cars, and high-end firearms.

Two separate evidentiary privileges arise from the marital relationship. First, the marital adverse testimony privilege (also called the "spousal communications privilege") prevents one spouse from testifying against the other while the two are married. The testifying spouse holds the privilege and may elect to waive the privilege. *See In re Grand Jury*, 111 F.3d 1083, 1086 (3d Cir. 1997). Because Ross and Kristi Merring-Roggio are divorced, this privilege does not apply.

Second, the marital confidential communications privilege prohibits testimony concerning confidential statements privately communicated between spouses during the marriage. *United States v. Ammar*, 714 F.2d 238, 258 (3d Cir. 1983). "This privilege is held by both spouses, including the non[-]testifying spouse, and can be asserted even after the marriage ends." *United States v. Tartaglione*, 228 F. Supp. 3d 402, 407 (E.D. Pa. 2017). For Roggio to assert this privilege, he must show (1) a valid marriage existed at the time of the communication; (2)

17

the privilege is being applied "only to utterances or expressions intended by one spouse to convey a message to the other"; and (3) the communication was made in confidence. *Id.* (citing *Wolfle v. United States*, 291 U.S. 7, 14 (1934)).

As an initial matter, this privilege goes only to *communications* between Roggio and Kristi Merring-Roggio – that is, to confidential utterances by Roggio to Kristi Merring-Roggio. This privilege does not apply to testimony about what Kristi Merring-Roggio observed, such as that Roggio (1) was working in Iraq, (2) utilized his parents' home as the business address for Roggio Consulting LLC, and (3) purchased expensive items with money obtained from his work in Iraq. These facts and observations are not subject to the privilege.

In addition, the privilege applies only to communications that were intended to be confidential. Communications that are made in the presence of a third party or that are subject to monitoring by a correctional institution, for example, are not privileged. *See Wolfle*, 291 U.S. at 14; *Tartaglione*, 228 F. Supp. 3d at 407. Even if no one else was present when Roggio asked Kristi Merring-Roggio to take the items he

18

purchased (including the rifling buttons) and ship them to him in Iraq,

Roggio's communication cannot have been intended to be confidential

because it was inevitable that third parties would become privy to the

communication. Kristi Merring-Roggio proceeded to The Packaging

Place and openly shipped the items to her husband in Iraq. Roggio must

have known that his wife, acting on his behalf, would follow his

instructions in a public way. When approached by law enforcement,

Kristi Merring-Roggio readily admitted to shipping the items and, in

fact, called Roggio on her cell phone, which she then handed to Special

Agent O'Donnell.

Furthermore, even if this communication was made in confidence

and thus is deemed subject to the marital confidential communications

privilege, the communication should be admissible under the crime-

fraud exception. "[C]ommunications between spouses pertaining to

ongoing or future criminal activity are not protected against disclosure

by the privilege for confidential marital communications." *Ammar*, 714

F.2d at 258. To invoke this exception, the government must show: (1)

the defendant was committing or intending to commit a fraud or crime

and (2) the spousal communications were in furtherance of that alleged crime or fraud. *United States v. Xi*, No. 16-22-5, 2021 WL 3910749, at *18 (E.D. Pa. Sept. 1, 2021) (citing *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000)). Kristi Merring-Roggio's testimony is relevant to proving the arms export violations with which Roggio is charged. Roggio arranged for rifling buttons and other items to be shipped to the address of his parents that was also used by his business. Roggio then instructed his then-wife to bring the rifling buttons and other items to a Pennsylvania shipper for shipment to Roggio in Iraq. In giving Kristi Merring-Roggio these instructions, Roggio was trying to circumvent the requirement that he obtain a license from the U.S. Department of Commerce before exporting the rifling buttons to Iraq.

The fact that Kristi Merring-Roggio may not have realized the illegality of exporting controlled items or defense services to Iraq does not preclude the crime-fraud exception from applying, just as an attorney's ignorance of a client's criminal intent does not preclude the crime-fraud exception from applying in the attorney-client context. *See In re Grand Jury Investigation*, 445 F.3d 266, 279 n.4 (3d Cir. 2006); *In*

20

*re Grand Jury Subpoena*, 223 F.3d at 217. Although the Third Circuit in *United States v. Hill* characterized the crime-fraud exception as applying where the communications in question related to a crime "in which both spouses are participants," 967 F.2d 902, 911 (3d Cir. 1992) (quoting *United States v. Broome*, 732 F.2d 363, 365 (4th Cir. 1984)), it is only necessary that the speaker know the communication is in furtherance of a crime to invoke the exception. *Tartaglione*, 228 F. Supp. 3d at 408 n.3 ("Under the crime-fraud exception, conversations between spouses that would otherwise be protected from disclosure are admissible when the conversations were 'in furtherance of a crime or fraud in which the speaker was a knowing participant . . . or where the husband and wife are joint participants in criminal activity whether or not each spouse is prosecuted.'") (quoting *Andrews v. Holloway*, 256 F.R.D. 136, 147 (D.N.J. 2009)).

For all these reasons, Roggio's communications to Kristi Merring-Roggio are not privileged and her testimony should be admitted.

21

## B. GOVERNMENT'S MOTION TO PRECLUDE THE ASSERTION OF A PUBLIC-AUTHORITY DEFENSE

Roggio has alluded to a potential public-authority defense in a recent filing and in previous statements made to law enforcement agents who were executing a search warrant. The defense's most recent motion to continue the trial, filed on December 31, 2022, stated that Roggio "has identified several witnesses, both in the United States and in Estonia, Greece, and Iraq, that may be able to testify to facts and circumstances that demonstrate that Roggio had the necessary approval to engage in the activity alleged in the Indictment…." (Doc. 207 at ¶20).

Additionally, when agents encountered Roggio while executing a search warrant at his residence in Stroudsburg, Pennsylvania, on May 10, 2017, Roggio made veiled statements intimating that he was part of the intelligence community.[4] In hesitating or declining to answer certain questions about his activities in Iraq, Roggio questioned whether the agents had the "clearance levels" to hear the information he had. When the agents directly asked if he was working for a

---

[4] Roggio spoke to the agents after executing a *Miranda* waiver.

government agency as a source, Roggio replied, "I'm not sure you want the answer to that question." Agents assured Roggio that it was important for investigators to know if he was acting as a source for the U.S. intelligence community. At that point, Roggio indicated that he was working for the CIA and that members of the CIA were brought to him in Sulaymaniyah, Iraq, by members of the Kurdish Counter-Terrorism Group (CTG) in 2014. Roggio claimed that he worked for the CIA until he was purportedly kidnapped in Iraq in December 2016.[5] When asked if his CIA handler had reached out following the kidnapping in Iraq, Roggio explained that he did not have a handler and had been directed by the CIA to pass all intelligence he gathered through Polad Talibani, who would then pass it to the CIA. Roggio was asked who he met with at the CIA for a debriefing after returning to the United States in 2017. Roggio said he had not had any contact with the

---

[5] What supposedly happened to Roggio in December 2016 is irrelevant to whether he committed the crimes he is accused of committing prior to that date. The Court should exclude such evidence pursuant to Federal Rule of Evidence 403.

CIA since his kidnapping, he had not been debriefed by the CIA since his return to the United States, and "it's like nobody cared."

The public-authority defense is a claim that the defendant believed a government agent had authorized the conduct with which the defendant is charged. "A defendant legitimately may rely . . . on a government official's real authority to authorize the defendant's conduct." *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994) (citations omitted). To assert the public-authority defense, Roggio must satisfy a procedural component and a substantive component. *See United States v. Pitt*, 193 F.3d 751, 757 (3d Cir. 1999), as amended (Oct. 15, 1999), *abrogated on other grounds by Honeycutt v. United States*, 581 U.S. 443 (2017).

Satisfying the procedural component of the public-authority defense requires complying with Federal Rule of Criminal Procedure 12.3. *Id.* The rule requires a defendant to (1) give the Government written notice that he intends to assert the public-authority defense, (2) identify the law enforcement or intelligence agency involved, (3) identify the member of such agency on whose behalf the defendant claims to

24

have acted, and (4) specify the time during which the defendant claims

to have acted with public authority. The rule states in relevant part:

**(a) Notice of the Defense and Disclosure of Witnesses.**
  **(1) Notice in General.** If a defendant intends to assert
a defense of actual or believed exercise of public authority on
behalf of a law enforcement agency or federal intelligence
agency at the time of the alleged offense, the defendant must
so notify an attorney for the government in writing and must
file a copy of the notice with the clerk within the time
provided for filing a pretrial motion, or at any later time the
court sets. The notice filed with the clerk must be under seal
if the notice identifies a federal intelligence agency as the
source of public authority.
  **(2) Contents of Notice.** The notice must contain the
following information:
     **(A)** the law enforcement agency or federal
intelligence agency involved;
     **(B)** the agency member on whose behalf the
defendant claims to have acted; and
     **(C)** the time during which the defendant claims to
have acted with public authority.
  **(3) Response to the Notice.** An attorney for the
government must serve a written response on the defendant
or the defendant's attorney within 14 days after receiving
the defendant's notice, but no later than 21 days before trial.
The response must admit or deny that the defendant
exercised the public authority identified in the defendant's
notice.
  **(4) Disclosing Witnesses.**
     **(A) Government's Request.** An attorney for the
government may request in writing that the defendant
disclose the name, address, and telephone number of each
witness the defendant intends to rely on to establish a
public-authority defense. An attorney for the government

may serve the request when the government serves its response to the defendant's notice under Rule 12.3(a)(3), or later, but must serve the request no later than 21 days before trial.

**(B) Defendant's Response.** Within 14 days after receiving the government's request, the defendant must serve on an attorney for the government a written statement of the name, address, and telephone number of each witness.

**(C) Government's Reply.** Within 14 days after receiving the defendant's statement, an attorney for the government must serve on the defendant or the defendant's attorney a written statement of the name of each witness-- and the address and telephone number of each witness other than a victim – that the government intends to rely on to oppose the defendant's public-authority defense.

\*\*\*

**(5) Additional Time.** The court may, for good cause, allow a party additional time to comply with this rule.

**(c) Failure to Comply.** If a party fails to comply with this rule, the court may exclude the testimony of any undisclosed witness regarding the public-authority defense. This rule does not limit the defendant's right to testify.

The purpose of the rule is to avoid unfair surprise, allow the government to prepare for trial, and – like the similar alibi and insanity defense notice requirements in Rules 12.1 and 12.2 – prevent trial delays due to unexpected witnesses. *See United States v. Burrows*, 36 F.3d 875, 881 (9th Cir. 1994); *United States v. Abcasis*, 785 F. Supp. 1113, 1116 (E.D.N.Y. 1992).

26

Roggio has neither provided written notice to the Government of his intent to rely on the public-authority defense nor provided any of the information required in such a notice regarding from whom he believes he received such authority. The rule states that the notice must be filed "within the time provided for filing a pretrial motion, or at any later time the court sets." Fed. R. Crim. P. 12.3(a)(1). The deadline for filing pretrial motions related to the weapons export-related violations alleged in the original Indictment was March 29, 2019 (Doc. 45) and the deadline for filing pretrial motions related to the torture-related charges in the Superseding Indictment was October 14, 2022 (Doc. 165). The failure to provide notice is reason alone for the Court to exclude testimony offered by the defense in support of such a defense. *See* Fed. R. Crim. P. 12.3(c); *United States v. Ware*, 858 F. App'x 499, 509 (3d Cir. 2021). Because Roggio has failed to provide notice that he believed he was acting on behalf of a law enforcement or intelligence agency when he exported firearm parts, tools, and defense services to Iraq without the required State Department and Commerce Department approvals,

27

or when he tortured an employee in the Kurdistan region of Iraq, the Court should preclude Roggio from asserting a public-authority defense.

Even if Roggio had met the procedural requirements of Rule 12.3, which he did not do, he would also have to satisfy the substantive requirements of the public-authority defense, which he will be unable to do. Roggio would have to establish not only that someone in the government authorized his conduct, but that the government official had actual authority to approve Roggio breaking the law. In *Pitt*, 193 F.3d at 758, the Third Circuit adopted the public-authority defense framework set forth by the Eleventh Circuit in *Baptista–Rodriguez*, 17 F.3d at 1368 n.18. The Third Circuit thereby limited "the use of the defense of public authority to those situations where the government agent in fact had the authority to empower the defendant to perform the acts in question. As a corollary, *Baptista–Rodriguez* holds that where the government agent had no such power, the defendant may not rest on the 'public authority.'" *Pitt*, 193 F.3d at 758. Other circuits have adopted the same approach. *See United States v. Hale*, 685 F.3d 522, 542 (5th Cir. 2012) (defendant "must show that he reasonably relied on

28

the actual, not apparent, authority of a government official who
convinced him to engage in covert activity"); *United States v. Sariles*,
645 F.3d 315, 317-19 (5th Cir. 2011), as revised (July 15, 2011)
(summarizing decisions in other circuits that also require actual
authority).

A CIA employee does not have the authority to authorize a person
to violate federal law, thus a CIA employee cannot have authorized
Roggio to violate the arms export statutes or the torture statute. *See*
*United States v. Anderson*, 872 F.2d 1508, 1516 (11th Cir. 1989)
("Officials of the CIA or any other intelligence agency of the United
States do not have the authority to sanction conduct which would
violate the Constitution or statutes of the United States. . . . Because
the CIA had no real authority to violate the statutes of the United
States, appellants' theory that they were acting on apparent authority
of an alleged CIA agent is not a viable defense.; *United States v.*
*Rosenthal*, 793 F.2d 1214, 1236 (11th Cir. 1986) (same, citing Exec.

Order No. 12333; 3 C.F.R. 200; 46 Fed. Reg. 59941; 1981 WL 404179 (1982)).[6]

Roggio has failed to give notice that he intends to raise the public-authority defense. Further, his characteristically vague and self-serving statements that he had the "necessary approval" to commit the crimes with which he is charged fail to establish that he reasonably relied on a government official who had actual authority to authorize him to break the law. For these reasons, Roggio should be precluded at trial from asserting public authority as a defense, eliciting testimony, or otherwise alluding to any alleged relationship Roggio thinks he may have had with the CIA or any other part of the U.S. intelligence community.

---

[6] Because the public-authority defense is an affirmative defense, the burden of proof rests on the defendant. *See, e.g.*, *United States v. Doe*, 705 F.3d 1134, 1145 (9th Cir. 2013); *United States v. Jumah*, 493 F.3d 868, 874-75 (7th Cir. 2007). The Government need not – and will not here – introduce any evidence to disprove the existence of any unsubstantiated public authority for Roggio to have committed his alleged illegal arms export scheme or torture activities.

## C. GOVERNMENT'S MOTION TO PRECLUDE THE ASSERTION OF A DURESS DEFENSE

Similarly, Roggio's last continuance motion also made oblique reference to possible foreign witnesses who could testify that Roggio acted under duress (Doc. 207 at ¶20).

Duress is an affirmative defense. *United States v. Grover*, 831 F. App'x 604, 607 (3d Cir. 2020) (citing *United States v. Alston*, 526 F.3d 91, 95 (3d Cir. 2008)). The defendant bears the burden of proving the defense of duress by a preponderance of the evidence. *Dixon v. United States*, 548 U.S. 1, 17 (2006). A defendant is entitled to present the defense only after first making a *prima facie* showing of duress. *United States v. Naovasaisri*, 150 F. App'x 170, 173 (3d Cir. 2005). It is appropriate for a court to rule "pretrial on a motion to preclude a defendant from presenting a duress defense where the government contends that the evidence in support of that position would be legally insufficient." *United States v. Miller*, 59 F.3d 417, 421 (3d Cir. 1995).

To establish that he was under duress when he committed the crimes, Roggio must show: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried

out, (3) no reasonable opportunity to escape the threatened harm, and (4) that he did not recklessly place himself in a situation in which he would be forced to engage in criminal conduct. *Grover*, 831 F. App'x at 607 (citing *Miller*, 59 F.3d at 422). Since Roggio has failed to proffer any – much less sufficient – evidence to support those four elements, the Court should preclude him from presenting the defense at trial. *Id.* (citing *United States v. Bailey*, 444 U.S. 394, 416 (1980)).

### D. GOVERNMENT'S MOTION TO PRECLUDE THE DEFENDANT FROM INTRODUCING HIS OWN SELF-SERVING HEARSAY STATEMENTS

At trial, the Government intends to introduce statements and admissions made pre-arrest and post-arrest by Roggio as evidence of the charged crimes. During the phone call when his then-wife handed the phone to Special Agent O'Donnell, when interviewed during secondary inspection upon entering the U.S., and during the execution of the search at his residence, Roggio made self-serving statements that the Government anticipates the defense might seek to introduce on cross-examination or otherwise. It is improper for a defendant to introduce

his own out-of-court statements in any manner; therefore, Roggio should be precluded from doing so.

Rule 801(c) of the Federal Rules of Evidence defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). A defendant's own out-of-court statements, offered by and for himself, constitute inadmissible hearsay. The rules of evidence do not provide an exception for self-serving, exculpatory statements made by a defendant seeking to introduce the statements. *See Williamson v. United States*, 512 U.S. 594, 599-600 (1994); *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) ("The rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party."). Accordingly, Roggio should not be permitted to introduce his own inadmissible hearsay statements in his case-in-chief, or "back door" these statements by eliciting them from the government's witnesses on cross-examination. *See United States v. Mitchell*, 502 F.3d

931, 964-65 (9th Cir. 2007) (upholding district judge's ruling precluding on hearsay grounds defense counsel from attempting to elicit defendant's exculpatory statements, on cross-examination, from law enforcement officers); *Ortega*, 203 F.3d at 682 (same); *United States v. Willis*, 759 F.2d 1486, 1501 (11th Cir. 1985) (stating that the defense tactic of seeking "to place [defendant's] remarks before the jury without subjecting [defendant] to cross-examination . . . is precisely what is forbidden by the hearsay rule."); *United States v. Evers*, No. 3:19-CR-250, 2022 WL 16748601, at *3 (M.D. Pa. Nov. 7, 2022) ("[A] defendant cannot elicit his or her own self-serving statements, offered in support of himself or herself, without taking the stand and submitting to cross-examination.").

Rule 801, however, permits the government, as a party opponent in this case, to introduce a defendant's own statements and coconspirators' statements made during and in furtherance of the conspiracy as non-hearsay. Fed. R. Evid. 801(d)(2)(A), (E). The government also may introduce statements which are not being admitted for the truth of the matter asserted but rather to show the

effect on the person who heard the statement. Fed. R. Evid. 801(c); *United States v. Valerio*, 441 F.3d 837, 844 (9th Cir. 2006) (informant's statements on a recording are admissible to give context to defendant's statements). Further, it is entirely proper to admit portions of a statement, whether oral or written, without introducing the entire statement. *Ortega*, 203 F.3d at 682; *United States v. Collicott*, 92 F.3d 973, 983 (9th Cir. 1996).

Defendant, however, is not entitled to offer additional portions of his statements just because they were made next to the admitted statements. *See, e.g., United States v. Holland*, 76 Fed. Appx. 452, 456 (3d Cir. 2003) ("[E]xculpatory portions of statements otherwise inculpatory as to the declarant are inadmissible.") (citing *Williamson*, 512 U.S. at 600); *United States v. Cooya*, No. 4:08-CR-00070, 2012 WL 1414855, at *5 (M.D. Pa. Apr. 24, 2012) ("The self-inculpatory statements, when offered by the Government, would be admissions by a party-opponent and, therefore, not hearsay under Rule 801(d)(2), but the non-self-inculpatory statements would be inadmissible hearsay."). The rule of completeness, codified in Rule 106 of the Federal Rules of

Evidence, does not mandate a different result. This rule is applicable where one party seeks to introduce a tailored snippet of a statement that creates a misleading impression by being taken out of context. *See, e.g.*, *United States v. Poschwatta*, 829 F.2d 1477, 1483 (9th Cir. 1987) (affirming decision declining to apply Rule 106 because portions introduced were not misleading); *United States v. Dorrell*, 758 F.2d 427, 434-35 (9th Cir. 1985) (same). As noted, it is entirely proper, however, for the government to admit segments of defendants' statements without introducing everything, and defendants are not entitled to offer additional statements just because they are there and the government has not offered them. *Collicott*, 92 F.3d at 983; *see also Wilkerson*, 84 F.3d at 696 ("[E]ven if . . . Rule 106 had applied to this testimony, it would not render admissible the evidence which is otherwise inadmissible under the hearsay rules."). Thus, Rule 106 may not be invoked by defendant to require the government to introduce other portions of documents or recordings simply because defendant would like them to be introduced during the government's case. If, after the government's introduction of the excerpted statements and recordings,

defendant believes that the excerpts are misleading because of a lack of context, he can so argue to the Court, at which time the Court "can, in its discretion, permit such limited portions to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence." *United States v. Sutton*, 801 F.2d 1346, 1368-69 (D.C. Cir. 1986). Moreover, Rule 106 does not render admissible evidence which is otherwise inadmissible under the hearsay rules. *United States v. Sine*, 493 F.3d 1021, 1037 & n.17 (9th Cir. 2007); *Collicott*, 92 F.3d at 983. Thus, unless defendant can establish some hearsay exception for any of his own statements that he wishes to introduce, they are inadmissible, regardless of Rule 106. *Collicott*, 92 F.3d at 983.

In this case, the Government does not believe that the portions of Roggio's statements and conversations that it will seek to introduce will be misleadingly tailored so as to warrant application of Rule 106. *See United States v. Weisman*, 624 F.2d 1118, 1128-29 (2d Cir. 1980) (affirming district court's denial of defendant's requests, under Rule 106 and residual hearsay exceptions, to compel government to play tape-

recorded conversations in their entirety and to admit other tape recordings that the government did not intend to use, where omitted portions were not "necessary to clarify, or make not misleading, that which [was] introduced" and recordings were not "more probative" than defendant's own testimony), a*brogated on other grounds by United States v. Indelicato*, 865 F.2d 1370, 1381-10 (2d Cir. 1989) (en banc). Moreover, even if the rule of completeness were to apply, defendant's exculpatory statements must still be excluded as inadmissible hearsay.

### E. GOVERNMENT'S MOTION TO PRECLUDE EVIDENCE OR ARGUMENT ABOUT EXPORT CONTROL REFORM

In addition to several other serious felony offenses, the defendant is charged with illegally exporting three types of firearm parts: (1) M4 Bolt Gas Rings MIL; (2) M4 Firing Pin Retainers; and (3) rifling combo buttons. As the Government will prove at trial, at the time Roggio exported these items in or about March 2016, the M4 Bolt Gas Rings MIL and M4 Firing Pin Retainers were controlled for export by the U.S. Department of State on the United States Munitions List ("USML") (specifically, under USML Category I(h)), while the rifling combo buttons were controlled by the U.S. Department of Commerce on the

38

Commerce Control List ("CCL") (specifically, under Export Control Classification Number ("ECCN") 2B018.e).

In or about March 2020 – in other words, four years after Roggio's illegal exports, and two years after he was indicted for those crimes – final rules issued by the Departments of Commerce and State went into effect, revising the control of certain types of firearms, guns, ammunition, and related articles. *See* 85 Fed. Reg. 3819 (Jan. 23, 2020); 85 Fed. Reg. 4136 (Jan. 23, 2020). Consequently, the M4 Bolt Gas Rings MIL and M4 Firing Pin Retainers were removed from the USML and added to the CCL. This action did not have the effect of removing controls on these items in any way; indeed, an authorization is still required to export these items to Iraq for, among other reasons, national security and regional stability concerns. *See* 15 C.F.R. part 774 (ECCN 0A501.x). The explanation for the change was articulated by the Department of Commerce, in relevant part:

> This final rule does not deregulate the transferred items. [The Bureau of Industry and Security (BIS)] will require authorization to export or reexport to any country a firearm or other weapon that is being moved from the USML to the CCL by this final rule . . . . Rather than decontrolling firearms and other items, in publishing this final rule, BIS, working

with the Departments of Defense and State, is continuing to
ensure that appropriate regulatory oversight will be exercised
over exports, reexports, and transfers (in- country) of these
items while reducing the procedural burdens and costs of
export compliance on the U.S. firearms industry and allowing
the U.S. Government to make better use of its export control
resources.

85 Fed. Reg 4136. *See also* 85 Fed. Reg. 3819 (State Department

explaining that purposes for the changes included "to resolve

jurisdictional confusion between the ITAR and EAR among the

regulated community through revision to 'bright line' positive lists" and

"to provide clarity to the regulated community thereby making it easier

for exporters to comply with the regulations and enable them to

compete more successfully in the global marketplace").

Nonetheless, it is possible that the defendant would attempt to

elicit testimony from the Government's expert witnesses from State and

Commerce, or otherwise argue, that these efforts at export control

reform somehow imply that Roggio's export of the M4 Bolt Gas Rings

MIL and M4 Firing Pin Retainers was a less serious crime because

those items are no longer considered "defense articles" by the U.S.

Government. This argument is irrelevant to the question of Roggio's

40

guilt, because a license was required at the time that he shipped the firearm parts, and also would be required today, so it would be a crime to export the parts at any point in time. Similarly, any attempt by Roggio to argue that the shift in control and licensing regimes (again, years after his crimes) indicates that this area of regulatory compliance is overly complicated and somehow supports a lack of willfulness on his part also is irrelevant and should likewise be prohibited.[7]

Any evidence, testimony, or discussion about the Government's export control reform efforts, or arguments related thereto (whether those described above or others not yet contemplated) are completely irrelevant and would only result in confusing the jury. Generally speaking, evidence that is irrelevant – *i.e.*, evidence that does not have a tendency to make a consequential fact more or less probable than it would be without the evidence – is inadmissible. Fed. R. Evid. 401, 402.

---

[7] These arguments also could inappropriately open the door to jury nullification, an independent basis on which the Court may exclude them. *Cf. United States v. DeMuro*, 677 F.3d 550, 565 (3d Cir. 2012) (upholding the exclusion of testimony relating to alternate remedies that could have supported a lack of willfulness defense because it could lead to confusion of and speculation by the jury).

However, even if evidence is relevant, a court may exclude it "if its probative value is substantially outweighed by a danger of," among other things, "confusing the issues" or "misleading the jury." Fed. R. Evid. 403. *See United States v. Casoni*, 950 F.2d 893, 919 (3d Cir. 1991) ("Rule 403 authorizes a district court in its broad discretion to exclude collateral matters that are likely to confuse the issues."); *United States v. Wright*, 534 F. Supp. 3d 384, 398 (M.D. Pa. 2021).

Here, as explained above, efforts to reform the way the U.S. Government controls firearm parts for export, undertaken several years after the exports in question, are irrelevant to the question of whether Roggio's exports were unlawful at the time. However, even if somehow relevant, any evidence, testimony, or argument regarding these reforms should be excluded due to the high likelihood of jury confusion.

## F. GOVERNMENT'S MOTION TO ADMIT LAY WITNESS OPINION TESTIMONY PURSUANT TO FEDERAL RULES OF EVIDENCE, RULE 701

The Government intends to call representatives from PNC Bank and Wells Fargo Bank who, as records custodians for their respective financial institutions, will testify about transactions in accounts held by

Roggio and Roggio Consulting Company, LLC. Each witness will provide testimony based on his or her knowledge of the banking industry generally and the process of international bank transfers specifically. The witness for each institution will testify that Roggio held financial accounts with their respective banks in the Middle District of Pennsylvania. Each witness will describe how Roggio's local branch, being connected to the institution's electronic records system, will have been aware of the international transfer of funds occurring in the account. Once deposited, the funds were available for Roggio to withdraw from his local branch or spend at his pleasure. The witness will describe generally how international transfers of funds work and will testify that Roggio's accounts received funds from banks outside of the United States.

William Mathes of OML Global will testify that he supplied M4 Bolt Gas Ring MIL and Firing Pin Retainers to Roggio in March 2016. Mr. Mathes' familiarity with the manufacture of firearms and utilization of these firearm parts in generally – and with M4-type weapons specifically – is the result of his personal interest in firearms

43

and knowledge he has acquired as part of the firearms industry. Mr. Mathes will testify that the firearm parts ordered by Roggio are controlled for export. Mr. Mathes will explain how these parts fit into the design and function of M4 rifles, and how the parts are utilized in the manufacture of M4-type rifles. Mr. Mathes will also provide testimony regarding the limited number of manufacturers who produce M4 Bolt Gas Ring MIL and Firing Pin Retainers. The witness will testify that in his experience firearm manufacturers generally do not manufacture gas rings or firing pin retainers themselves. Rather, it is industry standard to purchase these parts and incorporate them into products being manufactured by individual firearm brands.

Federal Rule of Evidence 701 provides that lay testimony must be confined to opinions that are "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. If expert testimony under Rule 702 is implicated, Federal Rule of Criminal Procedure 16 requires the

44

government to provide written summaries of any expert witness testimony it seeks to introduce at trial in its case-in-chief. Fed. R. Crim. P. 16(a)(1)(G). This summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Id.* Since the Government is not calling the bank representatives and Mr. Mathes as experts, notice under Rule 702 is not appropriate and has not been provided to the defense. However, the instant motion summarizes the lay opinion evidence being proffered by the Government. As such, the defense now has notice of the proposed lay opinion testimony.

The testimony of these witnesses is not based on scientific, technical, or specialized knowledge, but arises from their personal and professional experiences. In other words, their testimony is grounded in first-hand knowledge and experience accumulated during their respective employment and personal lives. *See Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1201-02 (3d Cir. 1995) "a lay witness with first-hand knowledge can offer an opinion akin to expert testimony in most cases, so long as the trial judge determines that the

45

witness possesses sufficient and relevant specialized knowledge or experience to offer the opinion"); *United States v. Marshall*, 173 F.3d 1312, 1315 (11th Cir. 1999) (the opinion of a lay witness is "admissible only if it is based on first-hand knowledge or observation"). The testimony is admissible as lay opinion pursuant to Rule 701 and should be accepted by the Court as such.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court issue an order that: (1) allows the Government to present the testimony of the defendant's ex-wife Kristi Merring-Roggio; (2) precludes the defendant from asserting a public-authority defense, pursuant to Federal Rule of Criminal Procedure 12.3; (3) precludes the defendant from asserting a duress defense unless he first meets his burden of establishing the existence of duress; (4) precludes the defendant from introducing his own self-serving hearsay statements; (5) precludes any evidence or argument relating to revisions to the U.S. export control regulatory regime; and (6) allows the Government to present lay opinion testimony of bank representatives and William Mathes in accord with Federal Rule of Evidence 701.

Dated: April 7, 2023                    Respectfully submitted,

                                        GERARD M. KARAM
                                        UNITED STATES ATTORNEY

                                        */s/ Todd K. Hinkley*
                                        Todd K. Hinkley
                                        Assistant U.S. Attorney
                                        Atty ID No. PA 68881
                                        235 N. Washington Ave.
                                        Scranton, PA 18503

                                        KENNETH A. POLITE, JR.
                                        Assistant Attorney General

                                        */s/Patrick Jasperse*
                                        Patrick Jasperse
                                        Trial Attorney
                                        Criminal Division
                                        U.S. Department of Justice
                                        Human Rights and Special
                                        Prosecutions Section

                                        MATTHEW G. OLSEN.
                                        Assistant Attorney General

                                        */s/Scott A. Claffee*
                                        Scott A. Claffee
                                        Trial Attorney
                                        National Security Division
                                        U.S. Department of Justice
                                        Counterintelligence and Export
                                        Control Section

47

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | No.   3:18-CR-0097 |
| v. | : | |
| | : | (Judge Mariani) |
| ROSS ROGGIO, and | : | |
| ROGGIO CONSULTING Co, LLC, | : | |
| Defendants. | : | (electronically filed) |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on April 7, 2023, he served a copy of the attached **GOVERNMENT'S MOTIONS IN LIMINE** by electronic means to:

Gino Bartolai
bartolai@ptd.net

*/s/ Todd K. Hinkley*
Todd K. Hinkley
Assistant United States Attorney

48

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | No.   3:18-CR-0097 |
| v. | : | |
| | : | (Judge Mariani) |
| ROSS ROGGIO, and | : | |
| ROGGIO CONSULTING Co, LLC, | : | |
| Defendants. | : | (electronically filed) |

## CERTIFICATE OF NON-CONCURRENCE

The undersigned hereby certifies that he attempted to speak to Gino A. Bartolai, Esquire, counsel for Ross Roggio concerning the defendant's concurrence/non-concurrence in the attached motions *in limine*. Government's counsel was unable to reach Attorney Bartolai, and thus notes the defendant's non-concurrence in the attached motions.


*/s/ Todd K. Hinkley*
Todd K. Hinkley
Assistant United States Attorney

49