# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | :    NO. 3:18-CR-0097 |
| v. | : |
| | :    (MARIANI, J.) |
| ROSS ROGGIO, and | : |
| ROGGIO CONSULTING, LLC, | : |
|                           Defendants. | : |

## BRIEF IN SUPPORT OF GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE THE ASSERTION OF A DURESS DEFENSE

The United States, by and through the undersigned counsel, moves *in limine* to preclude the assertion of a duress defense at trial.

## STATEMENT OF FACTS[1]

Ross Roggio and his company, Roggio Consulting Co., LLC, are charged with crimes relating to the illegal export of firearm parts, tools, and defense services to the Kurdistan region of Iraq. The Superseding

---

[1] The Statement of Facts reflects Government counsel's good faith belief as to the nature of some of the Government's evidence as of the date and time of preparation of these motions. Defense Counsel and Defendant are cautioned, however, that trial preparation is ongoing, including interviews of potential witnesses. The Statement of Facts does not identify every piece of physical evidence to be offered at trial. The Government's trial exhibits will be available for inspection and defense counsel is welcome to examine them prior to trial. Accordingly, the "Statement of Facts" should not be taken as a complete accounting of all the evidence the Government expects to introduce at trial and, rather, should be viewed as a general summary of evidence.

Indictment also charges with Roggio with torture and conspiracy to commit torture. The export charges are based on evidence that Roggio illegally exported weapons parts and tools to Iraq as part of a firearms manufacturing project in Kurdistan. United States laws regulate the export of defense articles and services. Approvals by the State Department and the Commerce Department are required before certain weapons parts and tools to produce weapons can be exported to certain countries, including Iraq, and Roggio failed to obtain any such approvals. As alleged in paragraph 30 of the Superseding Indictment:

> It was the policy of the United States to deny licenses or other approvals for the export of defense articles and defense services destined for Iraq, or originating in Iraq, except that a license or other approval may be issued, on a case-by-case basis for: (1) non-lethal military equipment, and (2) lethal military equipment required by the Government of Iraq or coalition forces.

The Superseding Indictment alleges that Roggio conspired to export defense services and defense articles from the United States to Iraq without first obtaining a license or written approval from the State Department, in violation of 18 U.S.C. § 371. The substantive counts are based on Roggio's failure to obtain approval from the State Department

2

to export M4 bolt gas rings, firing pin retainers, and defense services, and failure to obtain approval from the Commerce Department to export rifling combo buttons. The wire fraud charges are based on email messages and a credit card transaction carried out in furtherance of the scheme. The money laundering charges are based on the transfer of funds in connection with the scheme from Kurdistan to banks in the Middle District of Pennsylvania.

While investigating these violations, the Government discovered that Roggio, acting jointly and in concert with Kurdish soldiers and other Kurdish officials, orchestrated the torture of one of Roggio's employees. This occurred over an approximately five-week period while the employee was detained by soldiers at a Kurdish military facility during October and November of 2015. The military compound was located near Sulaymaniyah, in the Kurdistan region of Iraq. While detained, the victim was interrogated on multiple occasions by Roggio in person and occasionally at the direction of Roggio by telephone. Roggio sometimes participated in the torture, though more frequently

Kurdish soldiers carried out Roggio's instructions to inflict severe physical pain and suffering on the victim, including:

1. Placing a plastic bag over the victim's head to suffocate him, causing him to lose consciousness;

2. Wrapping a belt around the victim's neck and lifting him off the ground, causing him to lose consciousness;

3. Using a taser to inflict electrical shocks on the victim's groin, throat, nose, and arms, to the point where the victim's arms bled, and his hands twitched uncontrollably;

4. Applying pressure to one of the victim's fingers with the blades of a large cutting tool similar to a bold cutter, increasing the pressure as Roggio threatened to have the finger cut off;

5. Beating the victim's back, legs, stomach, and chest with rubber hoses;

6. Beating the victim in the groin with a plastic stick;

7. Beating the victim on his ears, nose, throat, arms, stomach, and chest with fists;

8. Jumping violently on the victim's chest in military boots, while the victim was lying prone on the floor; and

9. Forcing the victim to run barefoot on sharp gravel.

# PROCEDURAL HISTORY

On March 20, 2018, a grand jury sitting in Scranton, Pennsylvania, returned an Indictment charging Ross Roggio and Roggio Consulting Co., LLC with the following counts: (1) conspiracy (18 U.S.C. § 371); (2) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and 2778(c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1); (3) violation of the International Emergency Powers Act (50 U.S.C. §§ 1702 and 1705(c); 15 C.F.R. § 764.2; and 18 U.S.C. §§ 2 and 3551, *et seq.*); (4) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and 2778(c), and 22 C.F.R. §§ 124.1, and 127.1);[2] (5) and (6) smuggling goods from the United States (18 U.S.C. §§ 554 and 2); (7) through (9) wire fraud (18 U.S.C. § 1343); and (10) through (28) money laundering (18 U.S.C. §§ 1956(a)(2)(A) and 2) (Doc. 1). The Indictment also contained a forfeiture allegation.

A Superseding Indictment was returned on February 15, 2022, adding to the Indictment one count of conspiracy to commit torture (18

---

[2] The Superseding Indictment corrected a scrivener's error in the Indictment regarding the statutes listed under Count Four.

U.S.C. §§ 2340 and 2340A(c)) and one count of torture (18 U.S.C. §§ 2340, 2340A(a), and 2) (Doc. 122).

Roggio was originally represented by Assistant Federal Public Defender Leo A. Latella, then by court-appointed counsel Gino Bartolai, followed by retained counsel Matthew Thomas Comerford, Curt M. Parkins, and Jason A. Shrive, and now is again represented by Gino Bartolai.

The trial, which has been continued multiple times, is currently scheduled to commence on May 8, 2023. The trial is expected to take approximately three to four weeks from *voir dire* to verdict.

## THE GOVERNMENT'S ANTICIPATED EVIDENCE

In its case in chief, the Government expects it will call (1) lay witnesses to testify regarding what they personally witnessed relevant to the crimes alleged in the Superseding Indictment; (2) law enforcement witnesses to present evidence derived from electronics seized during the investigation and evidence acquired from third parties (financial institutions, email service providers, etc.); (3) expert government witnesses concerning the requirement for licenses to export goods and services and the lack of such licenses in this matter; and (4)

expert witnesses regarding (a) the exercise of control by Kurdish officials, soldiers, and other security forces in the Kurdistan region of Iraq and (b) whether Iraq law in 2015 allowed torture or unlawful detention.

The arms-export investigation began after Roggio had shipped "rifling buttons,"[3] an item requiring licensure to export, from the United States to Iraq. An employee from Drill Masters Eldorado Tools, Inc., located in Connecticut, contacted the FBI to report that a customer by the name of Ross Roggio had purchased controlled items from the company and had them delivered to Roggio's address in Pennsylvania before the items were transshipped to Iraq. FBI Special Agent Thomas O'Donnell visited Roggio's home and spoke to Roggio's then-wife, Kristi Merring-Roggio, concerning the controlled items. Roggio's then-wife called Roggio, who confirmed to Special Agent O'Donnell that he had

---

[3] Rifle Buttons are a tool, similar in appearance to a drill, which are made of an extremely hard metal and used to impart grooves to the inside of a firearm barrel. *See What is Button Rifling?*, Absolute Machine Tools, *https://absolutemachine.com/what-is-button-rifling/*.

7

purchased the items but denied that they had been transshipped to Iraq.

During the investigation, agents determined that Roggio had previously been involved in two unsuccessful firearms manufacturing ventures in the United States. The spouse of an employee who had worked for Roggio in one of these failed businesses introduced Roggio to Polad Talibani, a Kurdish official who was looking for someone with firearms manufacturing expertise to set up a factory in the Kurdistan region of Iraq. Roggio agreed to the project and emailed his Kurdish customers a business plan to establish an arms factory. That business plan included specific requirements to set up the project, including facility requirements, materials, machine requirements, and personnel with specialized education, training, and experience. The business plan noted that approvals for various aspects of the firearms manufacturing project – including export of firearms parts – needed to be acquired from the United States and Iraqi governments.

Testimonial evidence, together with electronic documents obtained during the investigation, will establish that Roggio attempted to

purchase firearms for direct import to Iraq and, when confronted with the requirement to obtain export licenses, traveled to Iraq to build an arms factory to manufacture firearms and ammunition on site. One witness the Government expects to call is Roggio's ex-spouse Kristi Merring-Roggio.

Once hired by his Kurdish patrons to build the factory in the Kurdistan region of Iraq, Roggio began to receive large payments of money through international bank transfers to his accounts in the Middle District of Pennsylvania. Using these funds, Roggio hired several individuals from the United States, Estonia, Greece, and other countries. These employees had various educational and work backgrounds that Roggio needed for his project, including engineering, machining, accounting, and other administrative and technical backgrounds.

With the assistance of these employees, Roggio undertook to set up the firearms manufacturing plant near Sulaymaniyah, Iraq. Documents acquired during the investigation, together with electronic communications from Roggio's email accounts, show that Roggio

acquired machines from China for the manufacturing process. Roggio also acquired firearms parts from the United States, including M4 bolt gas rings and firing pin retainers which he incorporated into the small number of M4-style rifles he managed to produce. Roggio emailed to his Kurdish customers a video demonstrating the operation of one such rifle, together with an explanation that the firearm was produced at the factory in Sulaymaniyah with a combination of parts that were produced in house in Sulaymaniyah and parts that were manufactured outside of Iraq.

    Testimony from witnesses will prove that Roggio was purchasing sub-quality machines for the project that were incapable of manufacturing the type and number of weapons promised. One of Roggio's employees came to believe that Roggio would be incapable of manufacturing the mass quantity of M4-type rifles and Glock pistols he had contracted to make for the Kurds and discovered that Roggio was diverting funds from the project to buy expensive automobiles and other items. Alarmed that this employee might reveal this information to the Kurdish officials who did not yet realize that they were being

defrauded, Roggio arranged for Kurdish soldiers to abduct, detain, and torture the employee.

For 39 days, the victim was detained at a Kurdish military compound. Kurdish soldiers who were part of the official power structure and who exercised dominion in the Kurdistan region of Iraq carried out Roggio's orders to savagely and repeatedly beat, tase, suffocate, and otherwise torture the victim. To intimidate the other Estonian employees and demonstrate to them his ability to use Kurdish military personnel, Roggio brought the other employees on occasion to the Kurdish military compound to observe the victim's torture. According to the victim and the other employee witnesses who were made to observe the torture, Roggio's purpose was to show them his power over them and make them fear what could happen to them if they were not loyal to Roggio.

Two weeks after the victim was released from the military compound where he was tortured, Roggio summoned to his apartment one of the employees whom Roggio forced to watch the torture. Fearing for her safety, the witness covertly recorded the encounter on her cell

11

phone. At trial the witness will authenticate the recording, which is admissible under Federal Rule of Evidence 801(d)(2)(A).

The recording contains powerful evidence in which Roggio acknowledges committing the crimes with which he is now charged. He refers to having gun drills and gun-making parts, and then says he needs to hide what he is doing from U.S. authorities, implicitly acknowledging that he did not have approval to be exporting weapons parts from the United States. A moment later, he mentions the torture victim by name and explicitly admits to having tortured him. The following is a draft transcript of a portion of that recording:

*Roggio:*  *I've got to pay taxes.*

*Witness:*  *Yeah.*

*Roggio:*  *And I cannot hand receipts to the IRS for this shit. See, when – when I make a million dollars – say I make – like this year, $4 million came into my account, right?*

*Witness:*  *Yeah.*

*Roggio:*  *They know this. Then they – when I do my taxes, if I say I spent 4 million, well, then I owe no taxes right? They want to see the receipts of everything I bought. Now, the moment I turn those receipts over to them, that's evidence. Because, when you turn a receipt in to the IRS, you're turning it in to the U.S. federal government. And once they have those*

12

> *receipts, it's admissible for any type of crime. You understand?*

*Witness:* *Yeah, I understand.*

*Roggio:* *So, by – by paying taxes as profits on all of it, it costs – it costs them more money, but it keeps my ass out of the fire. Because the moment: "OK, you turned in $4 million – what are you doing with gun drills, gun-making parts? This – this is all used for guns, and here's all the evidence that you gave us." Remember, busting me comes from the finances.*

*Witness:* *Yeah, I know that.*

*Roggio:* *Not from what I will say. They can – they can fucking arrest me and torture me 'til the day they die, I'll never talk. It's the finances. This is why [first name of victim] went for the finances.*

*Witness:* *Are you sure that he went for the finances? That he wanted to somehow bust you?*

*Roggio:* *No, he wanted – he wanted to blackmail me – for whatever, for whatever reason.*

*Witness:* *Are you sure?*

*Roggio:* *Yes.*

*Witness:* *Because I know that the first thing you went in the compound with to see him – he – was $1 million and blah blah blah –*

*Roggio:* *100,000.*

*Witness:* *Yeah, but is it true? Is it true? He wanted to do that? Are you sure?*

13

*Roggio:*   *Enough to beat him. Enough to torture him.*

*Witness:*   *OK, let's not talk about that.*

Later in the recorded conversation, Roggio said that he could not look the victim in the eye "because of what I did to him." Roggio also bragged that the victim "experienced the overwhelming ability of mine to crush somebody."

In sum, the Government will present approximately two dozen witnesses, numerous documents, a video recording, and an audio recording to prove that Roggio illegally exported firearms manufacturing tools, firearms parts, and defense services to develop an arms and ammunition factory in the Kurdistan region of Iraq and – when he feared that an employee might ruin his scheme – used local Kurdish military personnel acting under color of law to torture the employee.

### GOVERNMENT'S *IN LIMINE* MOTION TO PRECLUDE ASSERTION OF A DURESS DEFENSE

The Government believes that Roggio may attempt to assert a duress defense despite lacking sufficient evidence to demonstrate that he

14

was under duress, and even if under duress that he did not place himself in such situation. The defendant's last continuance motion made oblique reference to possible foreign witnesses who could testify that Roggio acted under duress (Doc. 207 at ¶20).

Duress is an affirmative defense. *United States v. Grover*, 831 F. App'x 604, 607 (3d Cir. 2020) (citing *United States v. Alston*, 526 F.3d 91, 95 (3d Cir. 2008)). The defendant bears the burden of proving the defense of duress by a preponderance of the evidence. *Dixon v. United States*, 548 U.S. 1, 17 (2006). A defendant is entitled to present the defense only after first making a *prima facie* showing of duress. *United States v. Naovasaisri*, 150 F. App'x 170, 173 (3d Cir. 2005). It is appropriate for a court to rule "pretrial on a motion to preclude a defendant from presenting a duress defense where the government contends that the evidence in support of that position would be legally insufficient." *United States v. Miller*, 59 F.3d 417, 421 (3d Cir. 1995).

To establish that he was under duress when he committed the crimes, Roggio must show: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the threat will be carried

out, (3) no reasonable opportunity to escape the threatened harm, and (4) that he did not recklessly place himself in a situation in which he would be forced to engage in criminal conduct. *Grover*, 831 F. App'x at 607 (citing *Miller*, 59 F.3d at 422).

Since Roggio has failed to proffer any – much less sufficient – evidence to support those four elements, the Court should preclude him from presenting the defense at trial. *Id.* (citing *United States v. Bailey*, 444 U.S. 394, 416 (1980)).

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court issue an order precluding the defendant from asserting a duress defense.

Dated: April 10, 2023                    Respectfully submitted,

                                         GERARD M. KARAM
                                         UNITED STATES ATTORNEY

                                         */s/ Todd K. Hinkley*
                                         Todd K. Hinkley
                                         Assistant U.S. Attorney
                                         Atty ID No. PA 68881

235 N. Washington Ave.
Scranton, PA 18503

KENNETH A. POLITE, JR.
Assistant Attorney General

*/s/Patrick Jasperse*
Patrick Jasperse
Trial Attorney
Criminal Division
U.S. Department of Justice
Human Rights and Special
Prosecutions Section

MATTHEW G. OLSEN.
Assistant Attorney General

*/s/Scott A. Claffee*
Scott A. Claffee
Trial Attorney
National Security Division
U.S. Department of Justice
Counterintelligence and Export
Control Section

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | No.  3:18-CR-0097 |
| v. : | |
| : | (Judge Mariani) |
| ROSS ROGGIO, and : | |
| ROGGIO CONSULTING Co, LLC, : | |
| Defendants. : | (electronically filed) |

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on April 10, 2023, he served a copy of the attached **GOVERNMENT'S BRIEF IN SUPPORT OF MOTION IN LIMINE** by electronic means to:

Gino Bartolai
bartolai@ptd.net

                                            */s/ Todd K. Hinkley*
                                            Todd K. Hinkley
                                            Assistant United States Attorney