**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | NO. 3:18-CR-0097 |
| v. | : | |
| | : | (MARIANI, J.) |
| ROSS ROGGIO, and | : | |
| ROGGIO CONSULTING, LLC, | : | |
| Defendants. | : | |

## BRIEF IN SUPPORT OF GOVERNMENT'S MOTIONS IN LIMINE TO PRECLUDE THE ASSERTION OF A PUBLIC-AUTHORITY DEFENSE

The United States, by and through the undersigned counsel,

moves *in limine* to preclude the assertion of a public-authority defense

at trial.

## <u>STATEMENT OF FACTS</u>[1]

Ross Roggio and his company, Roggio Consulting Co., LLC, are charged with crimes relating to the illegal export of firearm parts, tools, and defense services to the Kurdistan region of Iraq. The Superseding Indictment also charges with Roggio with torture and conspiracy to commit torture. The export charges are based on evidence that Roggio illegally exported weapons parts and tools to Iraq as part of a firearms manufacturing project in Kurdistan. United States laws regulate the export of defense articles and services. Approvals by the State Department and the Commerce Department are required before certain weapons parts and tools to produce weapons can be exported to certain

---

[1] The Statement of Facts reflects Government counsel's good faith belief as to the nature of some of the Government's evidence as of the date and time of preparation of these motions. Defense Counsel and Defendant are cautioned, however, that trial preparation is ongoing, including interviews of potential witnesses. The Statement of Facts does not identify every piece of physical evidence to be offered at trial. The Government's trial exhibits will be available for inspection and defense counsel is welcome to examine them prior to trial. Accordingly, the "Statement of Facts" should not be taken as a complete accounting of all the evidence the Government expects to introduce at trial and, rather, should be viewed as a general summary of evidence.

countries, including Iraq, and Roggio failed to obtain any such

approvals. As alleged in paragraph 30 of the Superseding Indictment:

> It was the policy of the United States to deny licenses or other approvals for the export of defense articles and defense services destined for Iraq, or originating in Iraq, except that a license or other approval may be issued, on a case-by-case basis for: (1) non-lethal military equipment, and (2) lethal military equipment required by the Government of Iraq or coalition forces.

The Superseding Indictment alleges that Roggio conspired to

export defense services and defense articles from the United States to

Iraq without first obtaining a license or written approval from the State

Department, in violation of 18 U.S.C. § 371. The substantive counts are

based on Roggio's failure to obtain approval from the State Department

to export M4 bolt gas rings, firing pin retainers, and defense services,

and failure to obtain approval from the Commerce Department to

export rifling combo buttons. The wire fraud charges are based on email

messages and a credit card transaction carried out in furtherance of the

scheme. The money laundering charges are based on the transfer of

funds in connection with the scheme from Kurdistan to banks in the

Middle District of Pennsylvania.

3

While investigating these violations, the Government discovered that Roggio, acting jointly and in concert with Kurdish soldiers and other Kurdish officials, orchestrated the torture of one of Roggio's employees. This occurred over an approximately five-week period while the employee was detained by soldiers at a Kurdish military facility during October and November of 2015. The military compound was located near Sulaymaniyah, in the Kurdistan region of Iraq. While detained, the victim was interrogated on multiple occasions by Roggio in person and occasionally at the direction of Roggio by telephone. Roggio sometimes participated in the torture, though more frequently Kurdish soldiers carried out Roggio's instructions to inflict severe physical pain and suffering on the victim, including:

1. Placing a plastic bag over the victim's head to suffocate him, causing him to lose consciousness;

2. Wrapping a belt around the victim's neck and lifting him off the ground, causing him to lose consciousness;

3. Using a taser to inflict electrical shocks on the victim's groin, throat, nose, and arms, to the point where the victim's arms bled, and his hands twitched uncontrollably;

4

4. Applying pressure to one of the victim's fingers with the blades of a large cutting tool similar to a bold cutter, increasing the pressure as Roggio threatened to have the finger cut off;

5. Beating the victim's back, legs, stomach, and chest with rubber hoses;

6. Beating the victim in the groin with a plastic stick;

7. Beating the victim on his ears, nose, throat, arms, stomach, and chest with fists;

8. Jumping violently on the victim's chest in military boots, while the victim was lying prone on the floor; and

9. Forcing the victim to run barefoot on sharp gravel.

## **PROCEDURAL HISTORY**

On March 20, 2018, a grand jury sitting in Scranton, Pennsylvania, returned an Indictment charging Ross Roggio and Roggio Consulting Co., LLC with the following counts: (1) conspiracy (18 U.S.C. § 371); (2) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and 2778(c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1); (3) violation of the International Emergency Powers Act (50 U.S.C. §§ 1702 and 1705(c); 15 C.F.R. § 764.2; and 18 U.S.C. §§ 2 and 3551, *et seq*.); (4) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and

2778(c), and 22 C.F.R. §§ 124.1, and 127.1);[2] (5) and (6) smuggling goods from the United States (18 U.S.C. §§ 554 and 2); (7) through (9) wire fraud (18 U.S.C. § 1343); and (10) through (28) money laundering (18 U.S.C. §§ 1956(a)(2)(A) and 2) (Doc. 1). The Indictment also contained a forfeiture allegation.

A Superseding Indictment was returned on February 15, 2022, adding to the Indictment one count of conspiracy to commit torture (18 U.S.C. §§ 2340 and 2340A(c)) and one count of torture (18 U.S.C. §§ 2340, 2340A(a), and 2) (Doc. 122).

Roggio was originally represented by Assistant Federal Public Defender Leo A. Latella, then by court-appointed counsel Gino Bartolai, followed by retained counsel Matthew Thomas Comerford, Curt M. Parkins, and Jason A. Shrive, and now is again represented by Gino Bartolai.

---

[2] The Superseding Indictment corrected a scrivener's error in the Indictment regarding the statutes listed under Count Four.

The trial, which has been continued multiple times, is currently scheduled to commence on May 8, 2023. The trial is expected to take approximately three to four weeks from *voir dire* to verdict.

## THE GOVERNMENT'S ANTICIPATED EVIDENCE

In its case in chief, the Government will present approximately two dozen witnesses, numerous documents, a video recording, and an audio recording to prove that Roggio illegally exported firearms manufacturing tools, firearms parts, and defense services to develop an arms and ammunition factory in the Kurdistan region of Iraq and – when he feared that an employee might ruin his scheme – used local Kurdish military personnel acting under color of law to torture the employee. The witnesses the Government expects to call include (1) lay witnesses to testify regarding what they personally witnessed relevant to the crimes alleged in the Superseding Indictment; (2) law enforcement witnesses to present evidence derived from electronics seized during the investigation and evidence acquired from third parties (financial institutions, email service providers, etc.); (3) expert government witnesses concerning the requirement for licenses to export goods and services and the lack of such licenses in this matter; and (4)

7

expert witnesses regarding (a) the exercise of control by Kurdish officials, soldiers, and other security forces in the Kurdistan region of Iraq and (b) whether Iraq law in 2015 allowed torture or unlawful detention.

The arms-export investigation began after Roggio had shipped "rifling buttons,"[3] an item requiring licensure to export, from the United States to Iraq. An employee from Drill Masters Eldorado Tools, Inc., located in Connecticut, contacted the FBI to report that a customer by the name of Ross Roggio had purchased controlled items from the company and had them delivered to Roggio's address in Pennsylvania before the items were transshipped to Iraq. FBI Special Agent Thomas O'Donnell visited Roggio's home and spoke to Roggio's then-wife, Kristi Merring-Roggio, concerning the controlled items. Roggio's then-wife called Roggio, who confirmed to Special Agent O'Donnell that he had

---

[3] Rifle Buttons are a tool, similar in appearance to a drill, which are made of an extremely hard metal and used to impart grooves to the inside of a firearm barrel. *See What is Button Rifling?*, Absolute Machine Tools, *https://absolutemachine.com/what-is-button-rifling/*.

purchased the items but denied that they had been transshipped to Iraq.

During the investigation, agents determined that Roggio had previously been involved in two unsuccessful firearms manufacturing ventures in the United States. The spouse of an employee who had worked for Roggio in one of these failed businesses introduced Roggio to Polad Talibani, a Kurdish official who was looking for someone with firearms manufacturing expertise to set up a factory in the Kurdistan region of Iraq. Roggio agreed to the project and emailed his Kurdish customers a business plan to establish an arms factory. That business plan included specific requirements to set up the project, including facility requirements, materials, machine requirements, and personnel with specialized education, training, and experience. The business plan noted that approvals for various aspects of the firearms manufacturing project – including export of firearms parts – needed to be acquired from the United States and Iraqi governments.

Testimonial evidence, together with electronic documents obtained during the investigation, will establish that Roggio attempted to

purchase firearms for direct import to Iraq and, when confronted with the requirement to obtain export licenses, traveled to Iraq to build an arms factory to manufacture firearms and ammunition on site. One witness the Government expects to call is Roggio's ex-spouse Kristi Merring-Roggio.

Once hired by his Kurdish patrons to build the factory in the Kurdistan region of Iraq, Roggio began to receive large payments of money through international bank transfers to his accounts in the Middle District of Pennsylvania. Using these funds, Roggio hired several individuals from the United States, Estonia, Greece, and other countries. These employees had various educational and work backgrounds that Roggio needed for his project, including engineering, machining, accounting, and other administrative and technical backgrounds.

With the assistance of these employees, Roggio undertook to set up the firearms manufacturing plant near Sulaymaniyah, Iraq. Documents acquired during the investigation, together with electronic communications from Roggio's email accounts, show that Roggio

acquired machines from China for the manufacturing process. Roggio also acquired firearms parts from the United States, including M4 bolt gas rings and firing pin retainers which he incorporated into the small number of M4-style rifles he managed to produce. Roggio emailed to his Kurdish customers a video demonstrating the operation of one such rifle, together with an explanation that the firearm was produced at the factory in Sulaymaniyah with a combination of parts that were produced in house in Sulaymaniyah and parts that were manufactured outside of Iraq.

Testimony from witnesses will prove that Roggio was purchasing sub-quality machines for the project that were incapable of manufacturing the type and number of weapons promised. One of Roggio's employees came to believe that Roggio would be incapable of manufacturing the mass quantity of M4-type rifles and Glock pistols he had contracted to make for the Kurds and discovered that Roggio was diverting funds from the project to buy expensive automobiles and other items. Alarmed that this employee might reveal this information to the Kurdish officials who did not yet realize that they were being

defrauded, Roggio arranged for Kurdish soldiers to abduct, detain, and torture the employee.

For 39 days, the victim was detained at a Kurdish military compound. Kurdish soldiers who were part of the official power structure and who exercised dominion in the Kurdistan region of Iraq carried out Roggio's orders to savagely and repeatedly beat, tase, suffocate, and otherwise torture the victim. To intimidate the other Estonian employees and demonstrate to them his ability to use Kurdish military personnel, Roggio brought the other employees on occasion to the Kurdish military compound to observe the victim's torture. According to the victim and the other employee witnesses who were made to observe the torture, Roggio's purpose was to show them his power over them and make them fear what could happen to them if they were not loyal to Roggio.

Two weeks after the victim was released from the military compound where he was tortured, Roggio summoned to his apartment one of the employees whom Roggio forced to watch the torture. Fearing for her safety, the witness covertly recorded the encounter on her cell

phone. At trial the witness will authenticate the recording, which is admissible under Federal Rule of Evidence 801(d)(2)(A).

The recording contains powerful evidence in which Roggio acknowledges committing the crimes with which he is now charged. He refers to having gun drills and gun-making parts, and then says he needs to hide what he is doing from U.S. authorities, implicitly acknowledging that he did not have approval to be exporting weapons parts from the United States. A moment later, he mentions the torture victim by name and explicitly admits to having tortured him. The following is a draft transcript of a portion of that recording:

Roggio:     *I've got to pay taxes.*

Witness:    *Yeah.*

Roggio:     *And I cannot hand receipts to the IRS for this shit. See, when – when I make a million dollars – say I make – like this year, $4 million came into my account, right?*

Witness:    *Yeah.*

Roggio:     *They know this. Then they – when I do my taxes, if I say I spent 4 million, well, then I owe no taxes right? They want to see the receipts of everything I bought. Now, the moment I turn those receipts over to them, that's evidence. Because, when you turn a receipt in to the IRS, you're turning it in to the U.S. federal government. And once they have those*

*receipts, it's admissible for any type of crime. You understand?*

Witness:   *Yeah, I understand.*

Roggio:   *So, by – by paying taxes as profits on all of it, it costs – it costs them more money, but it keeps my ass out of the fire. Because the moment: "OK, you turned in $4 million – what are you doing with gun drills, gun-making parts? This – this is all used for guns, and here's all the evidence that you gave us." Remember, busting me comes from the finances.*

Witness:   *Yeah, I know that.*

Roggio:   *Not from what I will say. They can – they can fucking arrest me and torture me 'til the day they die, I'll never talk. It's the finances. This is why [first name of victim] went for the finances.*

Witness:   *Are you sure that he went for the finances? That he wanted to somehow bust you?*

Roggio:   *No, he wanted – he wanted to blackmail me – for whatever, for whatever reason.*

Witness:   *Are you sure?*

Roggio:   *Yes.*

Witness:   *Because I know that the first thing you went in the compound with to see him – he – was $1 million and blah blah blah –*

Roggio:   *100,000.*

Witness:   *Yeah, but is it true? Is it true? He wanted to do that? Are you sure?*

14

*Roggio:*      *Enough to beat him. Enough to torture him.*

*Witness:*     *OK, let's not talk about that.*

Later in the recorded conversation, Roggio said that he could not look the victim in the eye "because of what I did to him." Roggio also bragged that the victim "experienced the overwhelming ability of mine to crush somebody."

## GOVERNMENT'S *IN LIMINE* MOTION TO PRECLUDE ASSERTION OF A PUBLIC-AUTHORITY DEFENSE

The Government believes that Roggio may attempt to assert a public-authority defense despite failing to provide written notice to the Government of his intention to do so pursuant to Federal Rules of Criminal Procedure, Rule 12.3. Even had the defense provided such written notice, Roggio's use of the defense would be barred, as he is unable to satisfy the substantive requirements for the public-authority defense.

Roggio has alluded to a potential public-authority defense in a recent filing and in previous statements made to law enforcement agents who were executing a search warrant. The defense's most recent

motion to continue the trial, filed on December 31, 2022, stated that
Roggio "has identified several witnesses, both in the United States and
in Estonia, Greece, and Iraq, that may be able to testify to facts and
circumstances that demonstrate that Roggio had the necessary approval
to engage in the activity alleged in the Indictment…." (Doc. 207 at ¶20).

Additionally, when agents encountered Roggio while executing a
search warrant at his residence in Stroudsburg, Pennsylvania, on May
10, 2017, Roggio made veiled statements intimating that he was part of
the intelligence community.[4]  In hesitating or declining to answer
certain questions about his activities in Iraq, Roggio questioned
whether the agents had the "clearance levels" to hear the information
he had. When the agents directly asked if he was working for a
government agency as a source, Roggio replied, "I'm not sure you want
the answer to that question." Agents assured Roggio that it was
important for investigators to know if he was acting as a source for the
U.S. intelligence community. At that point, Roggio indicated that he
was working for the CIA and that members of the CIA were brought to

---

[4] Roggio spoke to the agents after executing a *Miranda* waiver.

him in Sulaymaniyah, Iraq, by members of the Kurdish Counter-Terrorism Group (CTG) in 2014. Roggio claimed that he worked for the CIA until he was purportedly kidnapped in Iraq in December 2016.[5] When asked if his CIA handler had reached out following the kidnapping in Iraq, Roggio explained that he did not have a handler and had been directed by the CIA to pass all intelligence he gathered through Polad Talibani, who would then pass it to the CIA. Roggio was asked who he met with at the CIA for a debriefing after returning to the United States in 2017. Roggio said he had not had any contact with the CIA since his kidnapping, he had not been debriefed by the CIA since his return to the United States, and "it's like nobody cared."

The public-authority defense is a claim that the defendant believed a government agent had authorized the conduct with which the defendant is charged. "A defendant legitimately may rely . . . on a government official's real authority to authorize the defendant's

_____

[5] What supposedly happened to Roggio in December 2016 is irrelevant to whether he committed the crimes he is accused of committing prior to that date. The Court should exclude such evidence pursuant to Federal Rule of Evidence 403.

conduct." *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994) (citations omitted). To assert the public-authority defense, Roggio must satisfy a procedural component and a substantive component. *See United States v. Pitt*, 193 F.3d 751, 757 (3d Cir. 1999), as amended (Oct. 15, 1999), *abrogated on other grounds by Honeycutt v. United States*, 581 U.S. 443 (2017).

Satisfying the procedural component of the public-authority defense requires complying with Federal Rule of Criminal Procedure 12.3. *Id.* The rule requires a defendant to (1) give the Government written notice that he intends to assert the public-authority defense, (2) identify the law enforcement or intelligence agency involved, (3) identify the member of such agency on whose behalf the defendant claims to have acted, and (4) specify the time during which the defendant claims to have acted with public authority. The rule states in relevant part:

**(a) Notice of the Defense and Disclosure of Witnesses.**
  **(1) Notice in General.** If a defendant intends to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense, the defendant must so notify an attorney for the government in writing and must file a copy of the notice with the clerk within the time provided for filing a pretrial motion, or at any later time the

court sets. The notice filed with the clerk must be under seal if the notice identifies a federal intelligence agency as the source of public authority.

**(2) Contents of Notice.** The notice must contain the following information:

    **(A)** the law enforcement agency or federal intelligence agency involved;

    **(B)** the agency member on whose behalf the defendant claims to have acted; and

    **(C)** the time during which the defendant claims to have acted with public authority.

**(3) Response to the Notice.** An attorney for the government must serve a written response on the defendant or the defendant's attorney within 14 days after receiving the defendant's notice, but no later than 21 days before trial. The response must admit or deny that the defendant exercised the public authority identified in the defendant's notice.

**(4) Disclosing Witnesses.**

    **(A) Government's Request.** An attorney for the government may request in writing that the defendant disclose the name, address, and telephone number of each witness the defendant intends to rely on to establish a public-authority defense. An attorney for the government may serve the request when the government serves its response to the defendant's notice under Rule 12.3(a)(3), or later, but must serve the request no later than 21 days before trial.

    **(B) Defendant's Response.** Within 14 days after receiving the government's request, the defendant must serve on an attorney for the government a written statement of the name, address, and telephone number of each witness.

    **(C) Government's Reply.** Within 14 days after receiving the defendant's statement, an attorney for the government must serve on the defendant or the defendant's attorney a written statement of the name of each witness--

and the address and telephone number of each witness other
than a victim – that the government intends to rely on to
oppose the defendant's public-authority defense.

***

     **(5) Additional Time.** The court may, for good cause,
allow a party additional time to comply with this rule.

     **(c) Failure to Comply.** If a party fails to comply with this
rule, the court may exclude the testimony of any undisclosed
witness regarding the public-authority defense. This rule
does not limit the defendant's right to testify.

The purpose of the rule is to avoid unfair surprise, allow the
government to prepare for trial, and – like the similar alibi and insanity
defense notice requirements in Rules 12.1 and 12.2 – prevent trial
delays due to unexpected witnesses. *See United States v. Burrows*, 36
F.3d 875, 881 (9th Cir. 1994); *United States v. Abcasis*, 785 F. Supp.
1113, 1116 (E.D.N.Y. 1992).

Roggio has neither provided written notice to the Government of
his intent to rely on the public-authority defense nor provided any of the
information required in such a notice regarding from whom he believes
he received such authority. The rule states that the notice must be filed
"within the time provided for filing a pretrial motion, or at any later
time the court sets." Fed. R. Crim. P. 12.3(a)(1). The deadline for filing

pretrial motions related to the weapons export-related violations
alleged in the original Indictment was March 29, 2019 (Doc. 45) and the
deadline for filing pretrial motions related to the torture-related
charges in the Superseding Indictment was October 14, 2022 (Doc. 165).
The failure to provide notice is reason alone for the Court to exclude
testimony offered by the defense in support of such a defense. *See* Fed.
R. Crim. P. 12.3(c); *United States v. Ware*, 858 F. App'x 499, 509 (3d Cir.
2021). Because Roggio has failed to provide notice that he believed he
was acting on behalf of a law enforcement or intelligence agency when
he exported firearm parts, tools, and defense services to Iraq without
the required State Department and Commerce Department approvals,
or when he tortured an employee in the Kurdistan region of Iraq, the
Court should preclude Roggio from asserting a public-authority defense.

Even if Roggio had met the procedural requirements of Rule 12.3,
which he did not do, he would also have to satisfy the substantive
requirements of the public-authority defense, which he will be unable to
do. Roggio would have to establish not only that someone in the
government authorized his conduct, but that the government official

had actual authority to approve Roggio breaking the law. In *Pitt*, 193 F.3d at 758, the Third Circuit adopted the public-authority defense framework set forth by the Eleventh Circuit in *Baptista–Rodriguez*, 17 F.3d at 1368 n.18. The Third Circuit thereby limited "the use of the defense of public authority to those situations where the government agent in fact had the authority to empower the defendant to perform the acts in question. As a corollary, *Baptista–Rodriguez* holds that where the government agent had no such power, the defendant may not rest on the 'public authority.'" *Pitt*, 193 F.3d at 758. Other circuits have adopted the same approach. *See United States v. Hale*, 685 F.3d 522, 542 (5th Cir. 2012) (defendant "must show that he reasonably relied on the actual, not apparent, authority of a government official who convinced him to engage in covert activity"); *United States v. Sariles*, 645 F.3d 315, 317-19 (5th Cir. 2011), as revised (July 15, 2011) (summarizing decisions in other circuits that also require actual authority).

A CIA employee does not have the authority to authorize a person to violate federal law, thus a CIA employee cannot have authorized

Roggio to violate the arms export statutes or the torture statute. *See*

*United States v. Anderson*, 872 F.2d 1508, 1516 (11th Cir. 1989)

("Officials of the CIA or any other intelligence agency of the United

States do not have the authority to sanction conduct which would

violate the Constitution or statutes of the United States. . . . Because

the CIA had no real authority to violate the statutes of the United

States, appellants' theory that they were acting on apparent authority

of an alleged CIA agent is not a viable defense.; *United States v.*

*Rosenthal*, 793 F.2d 1214, 1236 (11th Cir. 1986) (same, citing Exec.

Order No. 12333; 3 C.F.R. 200; 46 Fed. Reg. 59941; 1981 WL 404179

(1982)).[6]

Roggio has failed to give notice that he intends to raise the public-

authority defense. Further, his characteristically vague and self-serving

statements that he had the "necessary approval" to commit the crimes

---

[6] Because the public-authority defense is an affirmative defense, the burden of proof rests on the defendant. *See, e.g.*, *United States v. Doe*, 705 F.3d 1134, 1145 (9th Cir. 2013); *United States v. Jumah*, 493 F.3d 868, 874-75 (7th Cir. 2007). The Government need not – and will not here – introduce any evidence to disprove the existence of any unsubstantiated public authority for Roggio to have committed his alleged illegal arms export scheme or torture activities.

with which he is charged fail to establish that he reasonably relied on a government official who had actual authority to authorize him to break the law. For these reasons, Roggio should be precluded at trial from asserting public authority as a defense, eliciting testimony, or otherwise alluding to any alleged relationship Roggio thinks he may have had with the CIA or any other part of the U.S. intelligence community.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court issue an order precluding the defendant from asserting a public-authority defense.

Dated: April 10, 2023                    Respectfully submitted,

GERARD M. KARAM
UNITED STATES ATTORNEY

*/s/ Todd K. Hinkley*
Todd K. Hinkley
Assistant U.S. Attorney
Atty ID No. PA 68881
235 N. Washington Ave.
Scranton, PA 18503

KENNETH A. POLITE, JR.
Assistant Attorney General

*/s/Patrick Jasperse*

24

Patrick Jasperse
Trial Attorney
Criminal Division
U.S. Department of Justice
Human Rights and Special
Prosecutions Section

MATTHEW G. OLSEN.
Assistant Attorney General

*/s/ Scott A. Claffee*
Scott A. Claffee
Trial Attorney
National Security Division
U.S. Department of Justice
Counterintelligence and Export
Control Section

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA      :
                           :     No.    3:18-CR-0097
            v.                     :
                           :     (Judge Mariani)
ROSS ROGGIO, and             :
ROGGIO CONSULTING Co, LLC,    :
      Defendants.            :     (electronically filed)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on April 10, 2023, he served a copy of the attached **GOVERNMENT'S BRIEF IN SUPPORT OF MOTION IN LIMINE** by electronic means to:

Gino Bartolai
bartolai@ptd.net

> */s/ Todd K. Hinkley*
> Todd K. Hinkley
> Assistant United States Attorney

26