## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | NO. 3:18-CR-0097 |
| v. | : | |
| | : | (MARIANI, J.) |
| ROSS ROGGIO, and | : | |
| ROGGIO CONSULTING, LLC, | : | |
| Defendants. | : | |

## BRIEF IN SUPPORT OF GOVERNMENT'S MOTION IN LIMINE TO INTRODUCE THE TESTMONY OF ROGGIO'S EX-SPOUSE

The United States, by and through the undersigned counsel,

moves *in limine* to allow the Government to present the testimony of

the defendant's ex-wife Kristi Merring-Roggio.

## STATEMENT OF FACTS[1]

Ross Roggio and his company, Roggio Consulting Co., LLC, are charged with crimes relating to the illegal export of firearm parts, tools, and defense services to the Kurdistan region of Iraq. The Superseding Indictment also charges with Roggio with torture and conspiracy to commit torture. The export charges are based on evidence that Roggio illegally exported weapons parts and tools to Iraq as part of a firearms manufacturing project in Kurdistan. United States laws regulate the export of defense articles and services. Approvals by the State Department and the Commerce Department are required before certain weapons parts and tools to produce weapons can be exported to certain

---

[1] The Statement of Facts reflects Government counsel's good faith belief as to the nature of some of the Government's evidence as of the date and time of preparation of these motions. Defense Counsel and Defendant are cautioned, however, that trial preparation is ongoing, including interviews of potential witnesses. The Statement of Facts does not identify every piece of physical evidence to be offered at trial. The Government's trial exhibits will be available for inspection and defense counsel is welcome to examine them prior to trial. Accordingly, the "Statement of Facts" should not be taken as a complete accounting of all the evidence the Government expects to introduce at trial and, rather, should be viewed as a general summary of evidence.

countries, including Iraq, and Roggio failed to obtain any such

approvals. As alleged in paragraph 30 of the Superseding Indictment:

> It was the policy of the United States to deny licenses or other approvals for the export of defense articles and defense services destined for Iraq, or originating in Iraq, except that a license or other approval may be issued, on a case-by-case basis for: (1) non-lethal military equipment, and (2) lethal military equipment required by the Government of Iraq or coalition forces.

The Superseding Indictment alleges that Roggio conspired to

export defense services and defense articles from the United States to

Iraq without first obtaining a license or written approval from the State

Department, in violation of 18 U.S.C. § 371. The substantive counts are

based on Roggio's failure to obtain approval from the State Department

to export M4 bolt gas rings, firing pin retainers, and defense services,

and failure to obtain approval from the Commerce Department to

export rifling combo buttons. The wire fraud charges are based on email

messages and a credit card transaction carried out in furtherance of the

scheme. The money laundering charges are based on the transfer of

funds in connection with the scheme from Kurdistan to banks in the

Middle District of Pennsylvania.

3

While investigating these violations, the Government discovered that Roggio, acting jointly and in concert with Kurdish soldiers and other Kurdish officials, orchestrated the torture of one of Roggio's employees. This occurred over an approximately five-week period while the employee was detained by soldiers at a Kurdish military facility during October and November of 2015. The military compound was located near Sulaymaniyah, in the Kurdistan region of Iraq. While detained, the victim was interrogated on multiple occasions by Roggio in person and occasionally at the direction of Roggio by telephone. Roggio sometimes participated in the torture, though more frequently Kurdish soldiers carried out Roggio's instructions to inflict severe physical pain and suffering on the victim, including:

1. Placing a plastic bag over the victim's head to suffocate him, causing him to lose consciousness;

2. Wrapping a belt around the victim's neck and lifting him off the ground, causing him to lose consciousness;

3. Using a taser to inflict electrical shocks on the victim's groin, throat, nose, and arms, to the point where the victim's arms bled, and his hands twitched uncontrollably;

4. Applying pressure to one of the victim's fingers with the blades of a large cutting tool similar to a bold cutter, increasing the pressure as Roggio threatened to have the finger cut off;

5. Beating the victim's back, legs, stomach, and chest with rubber hoses;

6. Beating the victim in the groin with a plastic stick;

7. Beating the victim on his ears, nose, throat, arms, stomach, and chest with fists;

8. Jumping violently on the victim's chest in military boots, while the victim was lying prone on the floor; and

9. Forcing the victim to run barefoot on sharp gravel.

## PROCEDURAL HISTORY

On March 20, 2018, a grand jury sitting in Scranton, Pennsylvania, returned an Indictment charging Ross Roggio and Roggio Consulting Co., LLC with the following counts: (1) conspiracy (18 U.S.C. § 371); (2) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and 2778(c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1); (3) violation of the International Emergency Powers Act (50 U.S.C. §§ 1702 and 1705(c); 15 C.F.R. § 764.2; and 18 U.S.C. §§ 2 and 3551, *et seq*.); (4) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and

2778(c), and 22 C.F.R. §§ 124.1, and 127.1);[2] (5) and (6) smuggling goods from the United States (18 U.S.C. §§ 554 and 2); (7) through (9) wire fraud (18 U.S.C. § 1343); and (10) through (28) money laundering (18 U.S.C. §§ 1956(a)(2)(A) and 2) (Doc. 1). The Indictment also contained a forfeiture allegation.

A Superseding Indictment was returned on February 15, 2022, adding to the Indictment one count of conspiracy to commit torture (18 U.S.C. §§ 2340 and 2340A(c)) and one count of torture (18 U.S.C. §§ 2340, 2340A(a), and 2) (Doc. 122).

Roggio was originally represented by Assistant Federal Public Defender Leo A. Latella, then by court-appointed counsel Gino Bartolai, followed by retained counsel Matthew Thomas Comerford, Curt M. Parkins, and Jason A. Shrive, and now is again represented by Gino Bartolai.

---

[2] The Superseding Indictment corrected a scrivener's error in the Indictment regarding the statutes listed under Count Four.

The trial, which has been continued multiple times, is currently scheduled to commence on May 8, 2023. The trial is expected to take approximately three to four weeks from *voir dire* to verdict.

## THE GOVERNMENT'S ANTICIPATED EVIDENCE

In its case in chief, the Government will present approximately two dozen witnesses, numerous documents, a video recording, and an audio recording to prove that Roggio illegally exported firearms manufacturing tools, firearms parts, and defense services to develop an arms and ammunition factory in the Kurdistan region of Iraq and – when he feared that an employee might ruin his scheme – used local Kurdish military personnel acting under color of law to torture the employee. The Government expects it will call (1) lay witnesses to testify regarding what they personally witnessed relevant to the crimes alleged in the Superseding Indictment; (2) law enforcement witnesses to present evidence derived from electronics seized during the investigation and evidence acquired from third parties (financial institutions, email service providers, etc.); (3) expert government witnesses concerning the requirement for licenses to export goods and services and the lack of such licenses in this matter; and (4) expert

7

witnesses regarding (a) the exercise of control by Kurdish officials, soldiers, and other security forces in the Kurdistan region of Iraq and (b) whether Iraq law in 2015 allowed torture or unlawful detention.

The arms-export investigation began after Roggio had shipped "rifling buttons,"[3] an item requiring licensure to export, from the United States to Iraq. An employee from Drill Masters Eldorado Tools, Inc., located in Connecticut, contacted the FBI to report that a customer by the name of Ross Roggio had purchased controlled items from the company and had them delivered to Roggio's address in Pennsylvania before the items were transshipped to Iraq. FBI Special Agent Thomas O'Donnell visited Roggio's home and spoke to Roggio's then-wife, Kristi Merring-Roggio, concerning the controlled items. Roggio's then-wife called Roggio, who confirmed to Special Agent O'Donnell that he had purchased the items but denied that they had been transshipped to Iraq.

---

[3] Rifle Buttons are a tool, similar in appearance to a drill, which are made of an extremely hard metal and used to impart grooves to the inside of a firearm barrel. *See What is Button Rifling?*, Absolute Machine Tools, *https://absolutemachine.com/what-is-button-rifling/*.

During the investigation, agents determined that Roggio had previously been involved in two unsuccessful firearms manufacturing ventures in the United States. The spouse of an employee who had worked for Roggio in one of these failed businesses introduced Roggio to Polad Talibani, a Kurdish official who was looking for someone with firearms manufacturing expertise to set up a factory in the Kurdistan region of Iraq. Roggio agreed to the project and emailed his Kurdish customers a business plan to establish an arms factory. That business plan included specific requirements to set up the project, including facility requirements, materials, machine requirements, and personnel with specialized education, training, and experience. The business plan noted that approvals for various aspects of the firearms manufacturing project – including export of firearms parts – needed to be acquired from the United States and Iraqi governments.

Testimonial evidence, together with electronic documents obtained during the investigation, will establish that Roggio attempted to purchase firearms for direct import to Iraq and, when confronted with the requirement to obtain export licenses, traveled to Iraq to build an

arms factory to manufacture firearms and ammunition on site. One witness the Government expects to call is Roggio's ex-spouse Kristi Merring-Roggio. As more particularly described below, Kristi Merring-Roggio was married to Roggio during his alleged crimes and unwittingly assisted Roggio by shipping controlled items to Iraq at Roggio's direction.

Once hired by his Kurdish patrons to build the factory in the Kurdistan region of Iraq, Roggio began to receive large payments of money through international bank transfers to his accounts in the Middle District of Pennsylvania. Using these funds, Roggio hired several individuals from the United States, Estonia, Greece, and other countries. These employees had various educational and work backgrounds that Roggio needed for his project, including engineering, machining, accounting, and other administrative and technical backgrounds.

With the assistance of these employees, Roggio undertook to set up the firearms manufacturing plant near Sulaymaniyah, Iraq. Documents acquired during the investigation, together with electronic

communications from Roggio's email accounts, show that Roggio acquired machines from China for the manufacturing process. Roggio also acquired firearms parts from the United States, including M4 bolt gas rings and firing pin retainers which he incorporated into the small number of M4-style rifles he managed to produce. Roggio emailed to his Kurdish customers a video demonstrating the operation of one such rifle, together with an explanation that the firearm was produced at the factory in Sulaymaniyah with a combination of parts that were produced in house in Sulaymaniyah and parts that were manufactured outside of Iraq.

Testimony from witnesses will prove that Roggio was purchasing sub-quality machines for the project that were incapable of manufacturing the type and number of weapons promised. One of Roggio's employees came to believe that Roggio would be incapable of manufacturing the mass quantity of M4-type rifles and Glock pistols he had contracted to make for the Kurds and discovered that Roggio was diverting funds from the project to buy expensive automobiles and other items. Alarmed that this employee might reveal this information to the

11

Kurdish officials who did not yet realize that they were being defrauded, Roggio arranged for Kurdish soldiers to abduct, detain, and torture the employee.

For 39 days, the victim was detained at a Kurdish military compound. Kurdish soldiers who were part of the official power structure and who exercised dominion in the Kurdistan region of Iraq carried out Roggio's orders to savagely and repeatedly beat, tase, suffocate, and otherwise torture the victim. To intimidate the other Estonian employees and demonstrate to them his ability to use Kurdish military personnel, Roggio brought the other employees on occasion to the Kurdish military compound to observe the victim's torture. According to the victim and the other employee witnesses who were made to observe the torture, Roggio's purpose was to show them his power over them and make them fear what could happen to them if they were not loyal to Roggio.

Two weeks after the victim was released from the military compound where he was tortured, Roggio summoned to his apartment one of the employees whom Roggio forced to watch the torture. Fearing

for her safety, the witness covertly recorded the encounter on her cell phone. At trial the witness will authenticate the recording, which is admissible under Federal Rule of Evidence 801(d)(2)(A).

The recording contains powerful evidence in which Roggio acknowledges committing the crimes with which he is now charged. He refers to having gun drills and gun-making parts, and then says he needs to hide what he is doing from U.S. authorities, implicitly acknowledging that he did not have approval to be exporting weapons parts from the United States. A moment later, he mentions the torture victim by name and explicitly admits to having tortured him. The following is a draft transcript of a portion of that recording:

Roggio:     *I've got to pay taxes.*

Witness:    *Yeah.*

Roggio:     *And I cannot hand receipts to the IRS for this shit. See, when – when I make a million dollars – say I make – like this year, $4 million came into my account, right?*

Witness:    *Yeah.*

Roggio:     *They know this. Then they – when I do my taxes, if I say I spent 4 million, well, then I owe no taxes right? They want to see the receipts of everything I bought. Now, the moment I turn those receipts over to them, that's evidence. Because,*

*when you turn a receipt in to the IRS, you're turning it in to the U.S. federal government. And once they have those receipts, it's admissible for any type of crime. You understand?*

*Witness:    Yeah, I understand.*

*Roggio:      So, by – by paying taxes as profits on all of it, it costs – it costs them more money, but it keeps my ass out of the fire. Because the moment: "OK, you turned in $4 million – what are you doing with gun drills, gun-making parts? This – this is all used for guns, and here's all the evidence that you gave us." Remember, busting me comes from the finances.*

*Witness:    Yeah, I know that.*

*Roggio:      Not from what I will say. They can – they can fucking arrest me and torture me 'til the day they die, I'll never talk. It's the finances. This is why [first name of victim] went for the finances.*

*Witness:    Are you sure that he went for the finances? That he wanted to somehow bust you?*

*Roggio:      No, he wanted – he wanted to blackmail me – for whatever, for whatever reason.*

*Witness:    Are you sure?*

*Roggio:      Yes.*

*Witness:    Because I know that the first thing you went in the compound with to see him – he – was $1 million and blah blah blah –*

*Roggio:      100,000.*

14

*Witness:*    *Yeah, but is it true? Is it true? He wanted to do that? Are you sure?*

*Roggio:*    *Enough to beat him. Enough to torture him.*

*Witness:*    *OK, let's not talk about that.*

Later in the recorded conversation, Roggio said that he could not look the victim in the eye "because of what I did to him." Roggio also bragged that the victim "experienced the overwhelming ability of mine to crush somebody."

## GOVERNMENT'S *IN LIMINE* MOTION TO INTRODUCE THE TESTIMONY OF ROGGIO'S EX-SPOUSE

The Government, which intends to introduce the testimony of Kristy Merring-Roggio, who was Roggio's spouse at the time of the offenses alleged in the Superseding Indictment, makes this motion *in limine* related to the evidence and testimony of Roggio's ex-spouse it will seek to present. Roggio and Kristi Merring-Roggio are now divorced. Kristi Merring-Roggio lived at the marital home located at 143 Indian Spring Drive, Stroudsburg, Pennsylvania, in February 2016. She will testify that in February 2016, when Roggio was living and working in Iraq, he ordered items to be delivered to 116 Turkey Hill

Road, Stroudsburg, Pennsylvania – which was both the home of Roggio's parents and the business location of Roggio Consulting LLC. Kristi Merring-Roggio will testify that Roggio requested her to take items he purchased and combine them to be shipped to Iraq. Kristi Merring-Roggio will explain that, at Roggio's request, she took the items – including rifling buttons – to a local shipper named "The Packaging Place," located in East Stroudsburg, Pennsylvania, and mailed these items to "Ross Roggio, Baharan Residential Complex, Building Floor 2, Office 10, Sulaymaniyah, Kurdistan Region of Iraq." Kristi Merring-Roggio will also testify that Roggio had no other sources of income during the relevant time frame of the Superseding Indictment and that he purchased several expensive items including Rolex watches, exotic sports cars, and high-end firearms.

Two separate evidentiary privileges arise from the marital relationship. First, the marital adverse testimony privilege (also called the "spousal communications privilege") prevents one spouse from testifying against the other while the two are married. The testifying spouse holds the privilege and may elect to waive the privilege. *See In*

16

*re Grand Jury*, 111 F.3d 1083, 1086 (3d Cir. 1997). Because Ross and Kristi Merring-Roggio are divorced, this privilege does not apply.

Second, the marital confidential communications privilege prohibits testimony concerning confidential statements privately communicated between spouses during the marriage. *United States v. Ammar*, 714 F.2d 238, 258 (3d Cir. 1983). "This privilege is held by both spouses, including the non[-]testifying spouse, and can be asserted even after the marriage ends." *United States v. Tartaglione*, 228 F. Supp. 3d 402, 407 (E.D. Pa. 2017). For Roggio to assert this privilege, he must show (1) a valid marriage existed at the time of the communication; (2) the privilege is being applied "only to utterances or expressions intended by one spouse to convey a message to the other"; and (3) the communication was made in confidence. *Id.* (citing *Wolfle v. United States*, 291 U.S. 7, 14 (1934)).

As an initial matter, this privilege goes only to *communications* between Roggio and Kristi Merring-Roggio – that is, to confidential utterances by Roggio to Kristi Merring-Roggio. This privilege does not apply to testimony about what Kristi Merring-Roggio observed, such as

17

that Roggio (1) was working in Iraq, (2) utilized his parents' home as the business address for Roggio Consulting LLC, and (3) purchased expensive items with money obtained from his work in Iraq. These facts and observations are not subject to the privilege.

In addition, the privilege applies only to communications that were intended to be confidential. Communications that are made in the presence of a third party or that are subject to monitoring by a correctional institution, for example, are not privileged. *See Wolfle*, 291 U.S. at 14; *Tartaglione*, 228 F. Supp. 3d at 407. Even if no one else was present when Roggio asked Kristi Merring-Roggio to take the items he purchased (including the rifling buttons) and ship them to him in Iraq, Roggio's communication cannot have been intended to be confidential because it was inevitable that third parties would become privy to the communication. Kristi Merring-Roggio proceeded to The Packaging Place and openly shipped the items to her husband in Iraq. Roggio must have known that his wife, acting on his behalf, would follow his instructions in a public way. When approached by law enforcement, Kristi Merring-Roggio readily admitted to shipping the items and, in

18

fact, called Roggio on her cell phone, which she then handed to Special Agent O'Donnell.

Furthermore, even if this communication was made in confidence and thus is deemed subject to the marital confidential communications privilege, the communication should be admissible under the crime-fraud exception. "[C]ommunications between spouses pertaining to ongoing or future criminal activity are not protected against disclosure by the privilege for confidential marital communications." *Ammar*, 714 F.2d at 258. To invoke this exception, the government must show: (1) the defendant was committing or intending to commit a fraud or crime and (2) the spousal communications were in furtherance of that alleged crime or fraud. *United States v. Xi*, No. 16-22-5, 2021 WL 3910749, at *18 (E.D. Pa. Sept. 1, 2021) (citing *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000)). Kristi Merring-Roggio's testimony is relevant to proving the arms export violations with which Roggio is charged. Roggio arranged for rifling buttons and other items to be shipped to the address of his parents that was also used by his business. Roggio then instructed his then-wife to bring the rifling buttons and

19

other items to a Pennsylvania shipper for shipment to Roggio in Iraq. In giving Kristi Merring-Roggio these instructions, Roggio was trying to circumvent the requirement that he obtain a license from the U.S. Department of Commerce before exporting the rifling buttons to Iraq.

The fact that Kristi Merring-Roggio may not have realized the illegality of exporting controlled items or defense services to Iraq does not preclude the crime-fraud exception from applying, just as an attorney's ignorance of a client's criminal intent does not preclude the crime-fraud exception from applying in the attorney-client context. *See In re Grand Jury Investigation*, 445 F.3d 266, 279 n.4 (3d Cir. 2006); *In re Grand Jury Subpoena*, 223 F.3d at 217. Although the Third Circuit in *United States v. Hill* characterized the crime-fraud exception as applying where the communications in question related to a crime "in which both spouses are participants," 967 F.2d 902, 911 (3d Cir. 1992) (quoting *United States v. Broome*, 732 F.2d 363, 365 (4th Cir. 1984)), it is only necessary that the speaker know the communication is in furtherance of a crime to invoke the exception. *Tartaglione*, 228 F. Supp. 3d at 408 n.3 ("Under the crime-fraud exception, conversations

20

between spouses that would otherwise be protected from disclosure are admissible when the conversations were 'in furtherance of a crime or fraud in which the speaker was a knowing participant . . . or where the husband and wife are joint participants in criminal activity whether or not each spouse is prosecuted.'") (quoting *Andrews v. Holloway*, 256 F.R.D. 136, 147 (D.N.J. 2009)).

For all these reasons, Roggio's communications to Kristi Merring-Roggio are not privileged and her testimony should be admitted.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully requests that the Court issue an order that allows the Government to present the testimony of the defendant's ex-wife Kristi Merring-Roggio.

Dated: April 10, 2023                    Respectfully submitted,

                                         GERARD M. KARAM
                                         UNITED STATES ATTORNEY

                                         */s/ Todd K. Hinkley*
                                         Todd K. Hinkley
                                         Assistant U.S. Attorney
                                         Atty ID No. PA 68881
                                         235 N. Washington Ave.
                                         Scranton, PA 18503

KENNETH A. POLITE, JR.
Assistant Attorney General

*/s/Patrick Jasperse*
Patrick Jasperse
Trial Attorney
Criminal Division
U.S. Department of Justice
Human Rights and Special
Prosecutions Section

MATTHEW G. OLSEN.
Assistant Attorney General

*/s/Scott A. Claffee*
Scott A. Claffee
Trial Attorney
National Security Division
U.S. Department of Justice
Counterintelligence and Export
Control Section

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :     No.   3:18-CR-0097
                    v.            :
                                  :     (Judge Mariani)
ROSS ROGGIO, and                  :
ROGGIO CONSULTING Co, LLC,        :
          Defendants.             :     (electronically filed)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on April 10, 2023, he served a copy of the attached **GOVERNMENT'S BRIEF IN SUPPORT OF MOTION IN LIMINE** by electronic means to:

Gino Bartolai
bartolai@ptd.net

> /s/ Todd K. Hinkley
> Todd K. Hinkley
> Assistant United States Attorney

23