**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | NO. 3:18-CR-0097 |
| v. | : | |
| | : | (MARIANI, J.) |
| ROSS ROGGIO, and | : | |
| ROGGIO CONSULTING, LLC, | : | |
| Defendants. | : | |

## BRIEF IN SUPPORT OF GOVERNMENT'S MOTIONS IN LIMINE TO PRECLUDE EVIDENCE OR ARGUMENT ABOUT EXPORT CONTROL REFORM

The United States, by and through the undersigned counsel,
moves *in limine* to preclude the defendant from introducing evidence

that the regulations or law related to the items he is accused of illegally

exporting where revised, or relying on such revisions in argument to the

jury.

## STATEMENT OF FACTS[1]

Ross Roggio and his company, Roggio Consulting Co., LLC, are charged with crimes relating to the illegal export of firearm parts, tools, and defense services to the Kurdistan region of Iraq. The Superseding Indictment also charges with Roggio with torture and conspiracy to commit torture. The export charges are based on evidence that Roggio illegally exported weapons parts and tools to Iraq as part of a firearms manufacturing project in Kurdistan. United States laws regulate the export of defense articles and services. Approvals by the State Department and the Commerce Department are required before certain weapons parts and tools to produce weapons can be exported to certain

---

[1] The Statement of Facts reflects Government counsel's good faith belief as to the nature of some of the Government's evidence as of the date and time of preparation of these motions. Defense Counsel and Defendant are cautioned, however, that trial preparation is ongoing, including interviews of potential witnesses. The Statement of Facts does not identify every piece of physical evidence to be offered at trial. The Government's trial exhibits will be available for inspection and defense counsel is welcome to examine them prior to trial. Accordingly, the "Statement of Facts" should not be taken as a complete accounting of all the evidence the Government expects to introduce at trial and, rather, should be viewed as a general summary of evidence.

countries, including Iraq, and Roggio failed to obtain any such

approvals. As alleged in paragraph 30 of the Superseding Indictment:

> It was the policy of the United States to deny licenses or other approvals for the export of defense articles and defense services destined for Iraq, or originating in Iraq, except that a license or other approval may be issued, on a case-by-case basis for: (1) non-lethal military equipment, and (2) lethal military equipment required by the Government of Iraq or coalition forces.

The Superseding Indictment alleges that Roggio conspired to

export defense services and defense articles from the United States to

Iraq without first obtaining a license or written approval from the State

Department, in violation of 18 U.S.C. § 371. The substantive counts are

based on Roggio's failure to obtain approval from the State Department

to export M4 bolt gas rings, firing pin retainers, and defense services,

and failure to obtain approval from the Commerce Department to

export rifling combo buttons. The wire fraud charges are based on email

messages and a credit card transaction carried out in furtherance of the

scheme. The money laundering charges are based on the transfer of

funds in connection with the scheme from Kurdistan to banks in the

Middle District of Pennsylvania.

3

While investigating these violations, the Government discovered that Roggio, acting jointly and in concert with Kurdish soldiers and other Kurdish officials, orchestrated the torture of one of Roggio's employees. This occurred over an approximately five-week period while the employee was detained by soldiers at a Kurdish military facility during October and November of 2015. The military compound was located near Sulaymaniyah, in the Kurdistan region of Iraq. While detained, the victim was interrogated on multiple occasions by Roggio in person and occasionally at the direction of Roggio by telephone. Roggio sometimes participated in the torture, though more frequently Kurdish soldiers carried out Roggio's instructions to inflict severe physical pain and suffering on the victim, including:

1. Placing a plastic bag over the victim's head to suffocate him, causing him to lose consciousness;

2. Wrapping a belt around the victim's neck and lifting him off the ground, causing him to lose consciousness;

3. Using a taser to inflict electrical shocks on the victim's groin, throat, nose, and arms, to the point where the victim's arms bled, and his hands twitched uncontrollably;

4. Applying pressure to one of the victim's fingers with the blades of a large cutting tool similar to a bold cutter, increasing the pressure as Roggio threatened to have the finger cut off;

5. Beating the victim's back, legs, stomach, and chest with rubber hoses;

6. Beating the victim in the groin with a plastic stick;

7. Beating the victim on his ears, nose, throat, arms, stomach, and chest with fists;

8. Jumping violently on the victim's chest in military boots, while the victim was lying prone on the floor; and

9. Forcing the victim to run barefoot on sharp gravel.

## <u>PROCEDURAL HISTORY</u>

On March 20, 2018, a grand jury sitting in Scranton, Pennsylvania, returned an Indictment charging Ross Roggio and Roggio Consulting Co., LLC with the following counts: (1) conspiracy (18 U.S.C. § 371); (2) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and 2778(c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1); (3) violation of the International Emergency Powers Act (50 U.S.C. §§ 1702 and 1705(c); 15 C.F.R. § 764.2; and 18 U.S.C. §§ 2 and 3551, *et seq*.); (4) violation of the Arms Export Control Act (22 U.S.C. §§ 2778(b) and

2778(c), and 22 C.F.R. §§ 124.1, and 127.1);[2] (5) and (6) smuggling goods from the United States (18 U.S.C. §§ 554 and 2); (7) through (9) wire fraud (18 U.S.C. § 1343); and (10) through (28) money laundering (18 U.S.C. §§ 1956(a)(2)(A) and 2) (Doc. 1). The Indictment also contained a forfeiture allegation.

A Superseding Indictment was returned on February 15, 2022, adding to the Indictment one count of conspiracy to commit torture (18 U.S.C. §§ 2340 and 2340A(c)) and one count of torture (18 U.S.C. §§ 2340, 2340A(a), and 2) (Doc. 122).

Roggio was originally represented by Assistant Federal Public Defender Leo A. Latella, then by court-appointed counsel Gino Bartolai, followed by retained counsel Matthew Thomas Comerford, Curt M. Parkins, and Jason A. Shrive, and now is again represented by Gino Bartolai.

---

[2] The Superseding Indictment corrected a scrivener's error in the Indictment regarding the statutes listed under Count Four.

The trial, which has been continued multiple times, is currently scheduled to commence on May 8, 2023. The trial is expected to take approximately three to four weeks from *voir dire* to verdict.

## THE GOVERNMENT'S ANTICIPATED EVIDENCE

In its case in chief, the Government will present approximately two dozen witnesses, numerous documents, a video recording, and an audio recording to prove that Roggio illegally exported firearms manufacturing tools, firearms parts, and defense services to develop an arms and ammunition factory in the Kurdistan region of Iraq and – when he feared that an employee might ruin his scheme – used local Kurdish military personnel acting under color of law to torture the employee. The Government expects to call (1) lay witnesses to testify regarding what they personally witnessed relevant to the crimes alleged in the Superseding Indictment; (2) law enforcement witnesses to present evidence derived from electronics seized during the investigation and evidence acquired from third parties (financial institutions, email service providers, etc.); (3) expert government witnesses concerning the requirement for licenses to export goods and services and the lack of such licenses in this matter; and (4) expert

7

witnesses regarding (a) the exercise of control by Kurdish officials, soldiers, and other security forces in the Kurdistan region of Iraq and (b) whether Iraq law in 2015 allowed torture or unlawful detention.

The arms-export investigation began after Roggio had shipped "rifling buttons,"[3] an item requiring licensure to export, from the United States to Iraq. An employee from Drill Masters Eldorado Tools, Inc., located in Connecticut, contacted the FBI to report that a customer by the name of Ross Roggio had purchased controlled items from the company and had them delivered to Roggio's address in Pennsylvania before the items were transshipped to Iraq. FBI Special Agent Thomas O'Donnell visited Roggio's home and spoke to Roggio's then-wife, Kristi Merring-Roggio, concerning the controlled items. Roggio's then-wife called Roggio, who confirmed to Special Agent O'Donnell that he had purchased the items but denied that they had been transshipped to Iraq.

---

[3] Rifle Buttons are a tool, similar in appearance to a drill, which are made of an extremely hard metal and used to impart grooves to the inside of a firearm barrel. *See What is Button Rifling?*, Absolute Machine Tools, *https://absolutemachine.com/what-is-button-rifling/*.

During the investigation, agents determined that Roggio had previously been involved in two unsuccessful firearms manufacturing ventures in the United States. The spouse of an employee who had worked for Roggio in one of these failed businesses introduced Roggio to Polad Talibani, a Kurdish official who was looking for someone with firearms manufacturing expertise to set up a factory in the Kurdistan region of Iraq. Roggio agreed to the project and emailed his Kurdish customers a business plan to establish an arms factory. That business plan included specific requirements to set up the project, including facility requirements, materials, machine requirements, and personnel with specialized education, training, and experience. The business plan noted that approvals for various aspects of the firearms manufacturing project – including export of firearms parts – needed to be acquired from the United States and Iraqi governments.

Testimonial evidence, together with electronic documents obtained during the investigation, will establish that Roggio attempted to purchase firearms for direct import to Iraq and, when confronted with the requirement to obtain export licenses, traveled to Iraq to build an

arms factory to manufacture firearms and ammunition on site. One witness the Government expects to call is Roggio's ex-spouse Kristi Merring-Roggio.

Once hired by his Kurdish patrons to build the factory in the Kurdistan region of Iraq, Roggio began to receive large payments of money through international bank transfers to his accounts in the Middle District of Pennsylvania. Using these funds, Roggio hired several individuals from the United States, Estonia, Greece, and other countries. These employees had various educational and work backgrounds that Roggio needed for his project, including engineering, machining, accounting, and other administrative and technical backgrounds.

With the assistance of these employees, Roggio undertook to set up the firearms manufacturing plant near Sulaymaniyah, Iraq. Documents acquired during the investigation, together with electronic communications from Roggio's email accounts, show that Roggio acquired machines from China for the manufacturing process. Roggio also acquired firearms parts from the United States, including M4 bolt

gas rings and firing pin retainers which he incorporated into the small number of M4-style rifles he managed to produce. Roggio emailed to his Kurdish customers a video demonstrating the operation of one such rifle, together with an explanation that the firearm was produced at the factory in Sulaymaniyah with a combination of parts that were produced in house in Sulaymaniyah and parts that were manufactured outside of Iraq.

Testimony from witnesses will prove that Roggio was purchasing sub-quality machines for the project that were incapable of manufacturing the type and number of weapons promised. One of Roggio's employees came to believe that Roggio would be incapable of manufacturing the mass quantity of M4-type rifles and Glock pistols he had contracted to make for the Kurds and discovered that Roggio was diverting funds from the project to buy expensive automobiles and other items. Alarmed that this employee might reveal this information to the Kurdish officials who did not yet realize that they were being defrauded, Roggio arranged for Kurdish soldiers to abduct, detain, and torture the employee.

11

For 39 days, the victim was detained at a Kurdish military compound. Kurdish soldiers who were part of the official power structure and who exercised dominion in the Kurdistan region of Iraq carried out Roggio's orders to savagely and repeatedly beat, tase, suffocate, and otherwise torture the victim. To intimidate the other Estonian employees and demonstrate to them his ability to use Kurdish military personnel, Roggio brought the other employees on occasion to the Kurdish military compound to observe the victim's torture. According to the victim and the other employee witnesses who were made to observe the torture, Roggio's purpose was to show them his power over them and make them fear what could happen to them if they were not loyal to Roggio.

Two weeks after the victim was released from the military compound where he was tortured, Roggio summoned to his apartment one of the employees whom Roggio forced to watch the torture. Fearing for her safety, the witness covertly recorded the encounter on her cell phone. At trial the witness will authenticate the recording, which is admissible under Federal Rule of Evidence 801(d)(2)(A).

The recording contains powerful evidence in which Roggio acknowledges committing the crimes with which he is now charged. He refers to having gun drills and gun-making parts, and then says he needs to hide what he is doing from U.S. authorities, implicitly acknowledging that he did not have approval to be exporting weapons parts from the United States. A moment later, he mentions the torture victim by name and explicitly admits to having tortured him. The following is a draft transcript of a portion of that recording:

Roggio:       *I've got to pay taxes.*

Witness:     *Yeah.*

Roggio:       *And I cannot hand receipts to the IRS for this shit. See, when – when I make a million dollars – say I make – like this year, $4 million came into my account, right?*

Witness:     *Yeah.*

Roggio:       *They know this. Then they – when I do my taxes, if I say I spent 4 million, well, then I owe no taxes right? They want to see the receipts of everything I bought. Now, the moment I turn those receipts over to them, that's evidence. Because, when you turn a receipt in to the IRS, you're turning it in to the U.S. federal government. And once they have those receipts, it's admissible for any type of crime. You understand?*

Witness:     *Yeah, I understand.*

Roggio:     So, by – by paying taxes as profits on all of it, it costs – it costs them more money, but it keeps my ass out of the fire. Because the moment: "OK, you turned in $4 million – what are you doing with gun drills, gun-making parts? This – this is all used for guns, and here's all the evidence that you gave us." Remember, busting me comes from the finances.

Witness:    Yeah, I know that.

Roggio:     Not from what I will say. They can – they can fucking arrest me and torture me 'til the day they die, I'll never talk. It's the finances. This is why [first name of victim] went for the finances.

Witness:    Are you sure that he went for the finances? That he wanted to somehow bust you?

Roggio:     No, he wanted – he wanted to blackmail me – for whatever, for whatever reason.

Witness:    Are you sure?

Roggio:     Yes.

Witness:    Because I know that the first thing you went in the compound with to see him – he – was $1 million and blah blah blah –

Roggio:     100,000.

Witness:    Yeah, but is it true? Is it true? He wanted to do that? Are you sure?

Roggio:     Enough to beat him. Enough to torture him.

Witness:    OK, let's not talk about that.

14

Later in the recorded conversation, Roggio said that he could not look the victim in the eye "because of what I did to him." Roggio also bragged that the victim "experienced the overwhelming ability of mine to crush somebody."

## GOVERNMENT'S *IN LIMINE* MOTION TO PRECLUDE EVIDENCE OR ARGUMENT ABOUT EXPORT CONTROL REFORM

In addition to several other serious felony offenses, the defendant is charged with illegally exporting three types of firearm parts: (1) M4 Bolt Gas Rings MIL; (2) M4 Firing Pin Retainers; and (3) rifling combo buttons. As the Government will prove at trial, at the time Roggio exported these items in or about March 2016, the M4 Bolt Gas Rings MIL and M4 Firing Pin Retainers were controlled for export by the U.S. Department of State on the United States Munitions List ("USML") (specifically, under USML Category I(h)), while the rifling combo buttons were controlled by the U.S. Department of Commerce on the Commerce Control List ("CCL") (specifically, under Export Control Classification Number ("ECCN") 2B018.e).

In or about March 2020 – in other words, four years after Roggio's illegal exports, and two years after he was indicted for those crimes – final rules issued by the Departments of Commerce and State went into effect, revising the control of certain types of firearms, guns, ammunition, and related articles. *See* 85 Fed. Reg. 3819 (Jan. 23, 2020); 85 Fed. Reg. 4136 (Jan. 23, 2020). Consequently, the M4 Bolt Gas Rings MIL and M4 Firing Pin Retainers were removed from the USML and added to the CCL. This action did not have the effect of removing controls on these items in any way; indeed, an authorization is still required to export these items to Iraq for, among other reasons, national security and regional stability concerns. *See* 15 C.F.R. part 774 (ECCN 0A501.x). The explanation for the change was articulated by the Department of Commerce, in relevant part:

> This final rule does not deregulate the transferred items. [The Bureau of Industry and Security (BIS)] will require authorization to export or reexport to any country a firearm or other weapon that is being moved from the USML to the CCL by this final rule . . . . Rather than decontrolling firearms and other items, in publishing this final rule, BIS, working with the Departments of Defense and State, is continuing to ensure that appropriate regulatory oversight will be exercised over exports, reexports, and transfers (in- country) of these items while reducing the procedural burdens and costs of

16

export compliance on the U.S. firearms industry and allowing the U.S. Government to make better use of its export control resources.

85 Fed. Reg 4136. *See also* 85 Fed. Reg. 3819 (State Department explaining that purposes for the changes included "to resolve jurisdictional confusion between the ITAR and EAR among the regulated community through revision to 'bright line' positive lists" and "to provide clarity to the regulated community thereby making it easier for exporters to comply with the regulations and enable them to compete more successfully in the global marketplace").

Such revisions of export control by the Government are irrelevant to any issue before the Jury. Roggio should not be allowed to present evidence of the revisions nor argue that such revisions have any bearing on his guilt or innocence. Nonetheless, it is possible that the defendant would attempt to elicit testimony from the Government's expert witnesses from State and Commerce, or otherwise argue, that these efforts at export control reform somehow imply that Roggio's export of the M4 Bolt Gas Rings MIL and M4 Firing Pin Retainers was a less serious crime because those items are no longer considered "defense

17

articles" by the U.S. Government. This argument is irrelevant to the question of Roggio's guilt, because a license was required at the time that he shipped the firearm parts, and also would be required today, so it would be a crime to export the parts at any point in time. Similarly, any attempt by Roggio to argue that the shift in control and licensing regimes (again, years after his crimes) indicates that this area of regulatory compliance is overly complicated and somehow supports a lack of willfulness on his part also is irrelevant and should likewise be prohibited.[4]

Any evidence, testimony, or discussion about the Government's export control reform efforts, or arguments related thereto (whether those described above or others not yet contemplated) are completely irrelevant and would only result in confusing the jury. Generally speaking, evidence that is irrelevant – *i.e.*, evidence that does not have

---

[4] These arguments also could inappropriately open the door to jury nullification, an independent basis on which the Court may exclude them. *Cf. United States v. DeMuro*, 677 F.3d 550, 565 (3d Cir. 2012) (upholding the exclusion of testimony relating to alternate remedies that could have supported a lack of willfulness defense because it could lead to confusion of and speculation by the jury).

a tendency to make a consequential fact more or less probable than it would be without the evidence – is inadmissible. Fed. R. Evid. 401, 402. However, even if evidence is relevant, a court may exclude it "if its probative value is substantially outweighed by a danger of," among other things, "confusing the issues" or "misleading the jury." Fed. R. Evid. 403. *See United States v. Casoni*, 950 F.2d 893, 919 (3d Cir. 1991) ("Rule 403 authorizes a district court in its broad discretion to exclude collateral matters that are likely to confuse the issues."); *United States v. Wright*, 534 F. Supp. 3d 384, 398 (M.D. Pa. 2021).

Here, as explained above, efforts to reform the way the U.S. Government controls firearm parts for export, undertaken several years after the exports in question, are irrelevant to the question of whether Roggio's exports were unlawful at the time. However, even if somehow relevant, any evidence, testimony, or argument regarding these reforms should be excluded due to the high likelihood of jury confusion.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court issue an order precluding the defendant from introducing evidence or argument about export control reform.

Dated: April 10, 2023                    Respectfully submitted,

                                         GERARD M. KARAM
                                         UNITED STATES ATTORNEY

                                         */s/ Todd K. Hinkley*
                                         Todd K. Hinkley
                                         Assistant U.S. Attorney
                                         Atty ID No. PA 68881
                                         235 N. Washington Ave.
                                         Scranton, PA 18503

                                         KENNETH A. POLITE, JR.
                                         Assistant Attorney General

                                         */s/Patrick Jasperse*
                                         Patrick Jasperse
                                         Trial Attorney
                                         Criminal Division
                                         U.S. Department of Justice
                                         Human Rights and Special
                                         Prosecutions Section

                                         MATTHEW G. OLSEN.
                                         Assistant Attorney General

                                         */s/Scott A. Claffee*
                                         Scott A. Claffee

Trial Attorney
National Security Division
U.S. Department of Justice
Counterintelligence and Export
Control Section

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :
                                  :     No.   3:18-CR-0097
            v.                    :
                                  :     (Judge Mariani)
ROSS ROGGIO, and                  :
ROGGIO CONSULTING Co, LLC,        :
      Defendants.                 :     (electronically filed)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That on April 10, 2023, he served a copy of the attached **GOVERNMENT'S BRIEF IN SUPPORT OF MOTION IN LIMINE** by electronic means to:

Gino Bartolai
bartolai@ptd.net

                    */s/ Todd K. Hinkley*
                    Todd K. Hinkley
                    Assistant United States Attorney

22