```
                  IN THE UNITED STATES DISTRICT COURT
               FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA    :
                            :
                            :
                            :
      vs                    :       3:CR-18-97
                            :
                            :
                            :
ROSS ROGGIO                 :
                            :


     BEFORE:        THE HONORABLE ROBERT D. MARIANI

     PLACE:         COURTROOM NO. 4

     PROCEEDINGS:   TRIAL EXCERPT - STEVEN CLAGETT

     DATE:          FRIDAY, MAY 12, 2023

APPEARANCES:

For the United States:

TODD K. HINKLEY, ESQ.
UNITED STATES ATTORNEY'S OFFICE
WILLIAM J. NEALON FEDERAL BUILDING
SUITE 311
SCRANTON, PA 18501-2830

SCOTT ANDREW CLAFFEE, ESQ.
DOJ-NSD
COUNTERINTELLIGENCE & EXPORT CONTROL SECTION
950 PENNSYLVANIA AVENUE NW
WASHINGTON, DC 20530

PATRICK JASPERSE, ESQ.
DOJ-CRM
1301 NEW YORK AVE., NW
WASHINGTON, DC 20530

For the Defendant:

GINO A. BARTOLAI, JR., ESQ.
238 WILLIAM STREET
PITTSTON, PA 18640
```

1           THE COURT:  Good morning, everyone.

2           MR. HINKLEY:  Good morning.

3           THE COURT:  I understand there's something you want
4    to discuss?

5           MR. HINKLEY:  If may.  As the Court is aware, this
6    case has been going in fairly rapidly and very well in regards
7    to timing.  The government is looking at our witness list and
8    as you know, we have folks coming from Estonia as well as Iraq
9    who won't be here this week.  So as I'm looking at the
10   witnesses we have remaining who are here and available to call,
11   I think what it amounts to is we have approximately a day and a
12   half of testimony but two days to fill.

13          So when we are thinking about it, we thought we'd
14   make a recommendation to the Court that we call witnesses who
15   we think will fill up the morning and maybe a little bit
16   through after lunch depending on how quickly those witnesses go
17   and then start fresh Monday, which would then -- would give the
18   jury an opportunity to have the afternoon off on a beautiful
19   spring day.

20          If the Court decides to do that, we still anticipate
21   that based on the paces of witnesses we have left it's likely
22   we will -- we will be resting -- the government's case will be
23   resting either Wednesday afternoon or Thursday midmorning, you
24   know, depending how quickly those last witnesses go.  So it
25   will be still be fairly quick.  We anticipate two to three

1  weeks, but, again, the testimony has been going in fairly
2  smoothly.  So we want to alert the Court of that fact.
3              THE COURT:  Thank you.  Mr. Bartolai, your thoughts?
4              MR. BARTOLAI:  No, no, I have no thoughts.  I mean,
5  it is a -- I wouldn't want to have the last witness at ten to
6  five today to cross-examine, but, you know, that's always a
7  problem, you know, but whatever.  I mean, we will deal with
8  what the day gives us, right.  As far as -- I have a -- I have
9  a witness or two that -- at least one witness we have been
10 discussing and perhaps that -- if it does happen maybe a video.
11 We talked about the possibility of a video conference call, and
12 so I'm just bringing that to the Court's attention.  I don't
13 know what more I can tell you at this point, Judge.
14             THE COURT:  All right.  Well, you think you have
15 enough to fill the day today and possibly you won't be reach
16 all of the witnesses who are presently available?
17             MR. HINKLEY:  So we would have -- we think a day and
18 a half worth of testimony, two days to fill.  So the guess the
19 Court's decision is whether we take the afternoon off today
20 giving the jury an opportunity to go home early or Monday we
21 will be short or if we do half day today then Monday we will be
22 a full day and go right into the week and hopefully be done, as
23 I said, Wednesday evening or Thursday morning.
24             THE COURT:  Let's proceed.  Let's see how far we get.
25 Perhaps around lunchtime I'll have Judy inquire of the jury how

1 they want to approach this.  I suspect without knowing they
2 would welcome an early quit on Friday.  Unless there's some
3 opposition from the jury, then that's how we will proceed.
4          MR. HINKLEY:  Thank you so much, Your Honor.
5          THE COURT:  Okay.  Bring them in, Judy.  You may call
6 your next witness.
7          MR. CLAFFEE:  The government calls Steven Clagett.
8          STEVEN CLAGETT, called as a witness, being duly
9 sworn, testified as follows:
10 DIRECT EXAMINATION
11 ON QUALIFICATIONS
12 BY MR. CLAFFEE:
13 Q.   Good morning, Mr. Clagett.  Would you please tell the jury
14 where you work currently?
15 A.   I am the director of the nuclear missile technology
16 division at the U.S. Department of Commerce Bureau of Industry
17 Security in Washington, D. C.
18 Q.   How long have you worked at the Commerce Department?
19 A.   I worked at the Commerce Department since 1989.
20 Q.   How long have you been in the role of director of the
21 nuclear and missile technology division?
22 A.   Since the year 2000.
23 Q.   What does the nuclear and missile technology division do?
24 A.   We oversee the export and policy related to the export of
25 items that are considered dual use for the nuclear suppliers

1  group, the missile technology control regime and now also
2  commercial firearms and ammunition.
3  Q.   What are your responsibilities as director?
4  A.   As director I basically oversee the licensing, you know,
5  and commodity classification use and licensing determinations.
6  That is when a person wants to export an item that is
7  controlled by the Department of Commerce, they'd come to us to
8  get the license and refer to other agencies, review the
9  transaction and then make a determination.  Also if people have
10 questions as to whether or not it was controlled or not, they
11 would come to us.  We make a technical rendering telling them
12 where if would fall on our list.  From that they can determine
13 to where a license would be required as well as a policy
14 related to these exports.
15 Q.   Did you have any other roles at commerce before you became
16 a director?
17 A.   Prior to director, I served as an engineer.  I did
18 actually the actual processes of licensing, making commodity
19 classifications, licensing determinations, again, representing
20 the United States at various international negotiations
21 regarding the export of these type items.
22 Q.   Have you worked anywhere other than the Department of
23 Commerce?
24 A.   Yes, I was an engineer with the Department of Navy at a
25 naval station Indian Head.

1  Q.   Were you a civilian?
2  A.   Yes, I was a civilian.
3  Q.   What is your educational background?
4  A.   I have a bachelor's of science in mechanical engineering
5  from West Virginia University and a master in engineering
6  administration from George Washington University.
7  Q.   I believe you touched on this earlier.  Are you generally
8  familiar with how the Commerce Department controls certain
9  items for export?
10 A.   Yes.
11 Q.   Are you familiar with something called the commerce
12 control list?
13 A.   Yes, I am.
14 Q.   Can we call that the C. C. L.?
15 A.   Yes, it's commonly referred to as a C. C. L.
16 Q.   What is the C. C. L.?
17 A.   The C. C. L. is a list of commodities and technologies
18 that are controlled by the Department of Commerce, and from
19 that you can determine where they fall on the list, and also
20 from that you can determine to what countries you would need to
21 apply for a license for.
22 Q.   How is the C. C. L. organized?
23 A.   The C. C. L. is organized in ten categories zero through
24 nine.  Within each category there are individual E. C. C. N.s,
25 export control classification numbers.  There are a five

1  character number.  From that you determine from what regime the
2  item comes, whether it's material, software, technology.  And
3  also for that E. C. C. N. you can look at the country chart and
4  determine to what country we need to get a license for.
5  Q.    You said E. C. C. N.s consist of five characters?
6  A.    Yes.
7  Q.    How are they generally organized?
8  A.    Generally you have the first character would be what
9  category it is, zero through nine.  You know, one is -- one is
10 materials, two is machinery, three is electronics.  Then
11 there's a letter A., B., C., D., E., A. being equipment, B.
12 being production equipment, C. being materials, D. software, E.
13 technology, and a three digit code.  Then there's some foreign
14 policy controls that have other numbers at the end.
15 Q.    One of the things you mentioned you oversee is -- I
16 believe you called it a licensing determination?
17 A.    Yes.
18 Q.    Can you explain more about the process of licensing?
19 A.    License determination is also somewhat like a commodity
20 classification.  A licensing determination is when a law
21 enforcement agency would come and say, we have an item, where
22 does it fall on your list and also they may say a country where
23 they needed a license at that time.  So basically it's a
24 technical rendering, you know, of seeing what the item is,
25 where it falls on the list.  If they give a country from that,

1 you would also determine as to whether or not a license is
2 required to export it to a particular country.
3 Q.   So you mentioned a license determination comes from law
4 enforcement.  What if you're not law enforcement and you want
5 to know if an item is controlled by commerce?
6 A.   It's called a commodity classification.  The Commerce
7 Department C. C. L. is written in a way that most people
8 familiar -- remotely familiar within the industry should be
9 able to determine where their item falls on the list.  If they
10 can't determine it, we also say you can go to the original
11 manufacturer who may be able to provide an E. C. C. N., or you
12 can apply for a commodity classification request.  They're
13 free.  There's a simple procedure to do it.  Basically you
14 would send in specifications or a brochure.  We look at the
15 item and then send you back an official sheet of paper which
16 says, this is the E. C. C. N., these are the reasons for
17 control.  And then again you can look at your country chart.
18 It's like a big matrix.  There's an X. in the box you can apply
19 for a license.  We provide those thousands a year.
20 Q.   So it's written in a way that people in the industry
21 should be able to tell, but if they have any questions they can
22 just ask commerce?
23 A.   Yes.
24 Q.   Have you ever done any licensing determinations yourself?
25 A.   I've performed -- I prepared thousands of them, and I have

1 reviewed and counter-signed, which is the official final
2 determination -- thousands of them.
3 Q.   Do you oversee people who perform licensing determinations
4 now?
5 A.   As a director I oversee the people who perform them.  As
6 an engineer I actually did them.  Basically an engineer who
7 works for me will do a license determination, I will review it
8 and sign it off as correct and final.
9 Q.   Have you testified before on how commerce controls items
10 for export in the process for issuing licenses?
11 A.   Yes.
12       MR. CLAFFEE:  Your Honor, the government offers
13 Steven Clagett as an expert on Commerce Department licensing
14 process and how commerce controls items for export in certain
15 countries.
16       MR. BARTOLAI:  He's accepted, Your Honor.
17       THE COURT:  The witness is accepted as an expert in
18 the field as described by counsel.
19       MR. CLAFFEE:  Thank you, Your Honor.
20 DIRECT EXAMINATION.
21 BY MR. CLAFFEE:
22 Q.   I would like to show you an exhibit that's already been
23 admitted as Government's Exhibit 7.10.  It will pop up on that
24 screen in a moment.
25 A.   Okay.

1  Q.   So directing your attention there to the middle of this
2  page, can you read the item that's listed on this packing list?
3  A.   Combo button 3585/3470, 6X.101 10 inch -- R.H. is probably
4  right hand -- .325 x 22, 17-4 P. H. Rod Futura Nano titanium
5  coated, 9 millimeter.  It's a description of a 9 millimeter
6  rifling button.
7  Q.   Are you familiar with a rifling button?
8  A.   Yes.  It's a tool which is either pulled or pushed through
9  a gun barrel to impose the rifling action.  It cuts the grooves
10 and slightly resizes the barrel in the process.
11 Q.   You mentioned that this item appears to be 9 millimeter in
12 size.  What types of guns could this type of rifling button --
13 A.   9 millimeter is a traditionally a traditional handgun,
14 semiautomatic handgun round, various submachine guns, some
15 semiautomatic carbines, not a very common size round.
16 Q.   But you can't tell by looking at this item what type of
17 firearm they'll end up rifling?
18 A.   No, not exactly, no.
19 Q.   Does it matter in terms of controls what type of firearm
20 they are going to --
21 A.   No, it would still be controlled.
22 Q.   Do you know if this item was contained on the C. C. L. in
23 2016?
24 A.   Yes.
25 Q.   How do you know?

1  A.    By looking at the C. C. L. at the time it would be E. C.
2  C. N. 2 B. 018.
3  Q.    What types of items does 2 B. 018 control?
4  A.    It tends to control items that are used in the production
5  of munitions and firearms.  It has, you know, rifling
6  equipment, turning -- armor drilling equipment.  It's items
7  that are for the production of arms and armory.
8  Q.    I'm sorry?
9  A.    There's numerous items listed in that E. C. C. N.
10 Q.    Does that category of items you just described match your
11 -- or include your understanding of the item listed in
12 Government's Exhibit 7.10?
13 A.    Yes, it would fall under E. C. C. N. 20 B. 018.
14 Q.    You mentioned that you look to a country chart to
15 determine whether items are controlled for a particular
16 country.  Are there different reasons for control to countries?
17 A.    Yeah, items could be controlled for a number of reasons.
18 This particular type item would be controlled for national
19 security, regional stability and United Nations Arms Embargo.
20 It's a U. N. reason.
21 Q.    What does that mean, U. N.?
22 A.    That had to do -- it was tied to an U. T. arms embargo.
23 So it was -- in this particular entry, so if the country was
24 subject to an arms embargo, that control would apply.
25 Q.    Have you formed an opinion as to whether the item in

1  Government's Exhibit 7.10 required a license to export to Iraq
2  in 2016?
3  A.    Yes, it would.  There would be an X. in the box for
4  national security, regional stability and for U.N.
5  Q.    Of the X. in the box on the --
6  A.    On the country chart, yes.
7  Q.    Under the Country of Iraq?
8  A.    On the Country of Iraq the X.s in the boxes means a
9  license is required.
10 Q.    The whole Country of Iraq?
11 A.    Yes.
12 Q.    Now, I would like to show you a document that has been
13 marked for identification as Government's Exhibit 18.3.  You
14 have a binder right there on the ledge.  If you want to just
15 flip to 18.3 and silently and look at it yourself and then let
16 me know when you're ready.
17 A.    Okay.
18 Q.    Do you recognize this exhibit?
19 A.    Yes.
20 Q.    Generally speaking what is it?
21 A.    This is a print-out of a licensing determination.  It's
22 what we do for -- usually a law enforcement request, and it's
23 what we -- it's what we produce and the print-out from it.
24 Q.    Is that as a result of the same process you talked about
25 earlier?

1  A.   Yes, we'd look at the specification of the item, look at
2  the C. C. L., look at the country.  From that we'd say where it
3  falls in the E. C. C. N., whether or not a license is required.
4  Sometimes we will put extra verbiage about licensing policy, et
5  cetera.
6            MR. CLAFFEE:  Your Honor, the government moves for
7  admission of Exhibit 18.3.
8            MR. BARTOLAI:  No objection.
9            THE COURT:  18.3 is admitted.
10 BY MR. CLAFFEE:
11 Q.   Let's actually start with second page and all the way up
12 at the top.  Did you personally certify this document?
13 A.   Yes.
14 Q.   Is it -- is that part of your job as director to certify
15 records like this?
16 A.   Yes.
17 Q.   Okay.  Going back to the first page about half way down
18 there's a section that begins with policy text.  Will you
19 please read the sentence that starts under policy text
20 beginning with based on?
21 A.   Based on information provided with this request, the
22 Bureau of Industry and Security has determined that the rifling
23 combo button 385.3470 6 X. 101 10 Inch R. H. .325 x 22 17-4PH
24 Futura Nano Titanium Nitrate Coated 9 millimeter is classified
25 under export control classification 2 B. 018.  Items classified

1  under E.C.C.N.  2 B. 018 are controlled on the commerce control
2  list, the C.C.L., 15 C.F.R. Part 774 Supplement No. 1 for
3  national security and regional stability and United Nations
4  embargo, reasons to Iraq.
5  Q.    Is that consistent with the opinion that you just gave the
6  jury a few moments ago?
7  A.    Yes.
8  Q.    And just read the next sentence from January 1.
9  A.    From January 1, 2016 to May 19th, 2016 a B. I. S. license
10 was required under part 742.4 and part 742.6 of the export
11 administration regulations E.A.R. 15 C.F.R. part 730 for the
12 export or re-export to Iraq of items classified under E. C. C.
13 N. 2 B. 018.
14 Q.    So this license determination is consistent with your
15 opinion that a license was required to send this particular
16 type of rifling combo button to Iraq in 2016?
17 A.    Yes.
18 Q.    Does the Commerce Department maintain records of all
19 licenses it has issued for exporting items to certain
20 countries?
21 A.    Yes.
22 Q.    So would commerce have a record of licenses for all items
23 controlled under 2 B. 018 sent to Iraq?
24 A.    Yes.
25 Q.    Explain why it's organized like that.  Why would you

1 maintain a record of all licensing --
2 A.   We control records -- we control records of all export
3 license applications no matter how they are adjudicated.  We
4 have them -- you can search by the names of the parties,
5 countries of destination or E. C. C. N.s, that being 2 B. 018,
6 and it's helpful in case there's ever a question about a
7 license.  It's also helpful for determining past licensing
8 practices and past licensing history.  So we keep a record of
9 all of it.
10 Q.   Have you personally checked to see whether any licenses
11 have ever been issued to send items under 2 B. 018 to Iraq?
12 A.   I searched and did not see any license applications for 2
13 B. 018.
14 Q.   Were there any?
15 A.   There were none.
16 Q.   Have you also checked to see if the defendant Ross Roggio
17 was ever issued a license?
18 A.   I found no record of him in the system.
19 Q.   To any country?
20 A.   To any country.
21 Q.   For any item?
22 A.   For any item.
23 Q.   What about Roggio Consulting, did you check that name?
24 A.   Yes.
25 Q.   What were the results of that search?

1  A.    The same.
2  Q.    So the defendant has never been issued any licenses by the
3  Commerce Department at all?
4  A.    No.
5  Q.    I would like to show you document marked for
6  identification as Government's Exhibit 18.2.  So it should be
7  in the binder there one tab earlier.  Do you recognize this?
8  A.    Yes.
9  Q.    What is it?
10 A.    It's a certified licensing history which is done by our
11 export management and compliance division who oversees in some
12 ways the database, and they have gone through and looked for
13 these individuals, these addresses, these companies and state
14 that no licensing history was found.
15 Q.    Do you know the person -- the director who prepared this
16 memorandum?
17 A.    Yes.
18 Q.    Are you familiar with how that director goes about
19 producing a memo like this?
20 A.    Yes.
21         MR. CLAFFEE:  Your Honor, the government moves to
22 admit Government's Exhibit 18.2.
23         MR. BARTOLAI:  No objection.
24         THE COURT:  Exhibit 18.2 is admitted.
25 BY MR. CLAFFEE:

17

1  Q.   So directing your attention to the text in bold at the
2  bottom of the page -- bottom half of the page, generally
3  speaking what does that say?
4  A.   It says that these individuals, these addresses, these
5  companies, the databases were searched and there's no licensing
6  history found for them.  They don't appear on any license
7  request or applications or anything.
8  Q.   So down there at the bottom following the asterisks, what
9  does that say?
10 A.   The Commerce Department export license management record
11 systems checks are completed back to October 2012, which are
12 the oldest records available electronically.
13 Q.   Above that?
14 A.   No license history found.
15 Q.   Is that consistent with your own checks that you just
16 described?
17 A.   Yes.
18          MR. CLAFFEE:  No further questions, Your Honor.
19          THE COURT:  Cross-examine.
20          MR. BARTOLAI:  May I have a moment?
21          THE COURT:  Of course.
22 CROSS EXAMINATION
23 BY MR. BARTOLAI:
24 Q.   Sir, good morning. Can we see Government's Exhibit 19.2 I
25 believe it is -- or 18.2 again?  The asterisks at the very

1  bottom no license history found, and there's an asterisk.  It
2  says -- I will read it.  Commerce Department export license
3  management record system checks are completed back to October
4  2012 which are the oldest records available electronically.
5  What do you do in a situation like that before 2012?
6  A.   There are -- could be some possible paper records or
7  something else, but traditionally that's what the default is.
8  Q.   So in other words, you have to go back to the paper method
9  at that point?
10 A.   Paper method or data which may not be generally searchable
11 on the normal system.
12 Q.   Was it checked back to before 2012?
13 A.   I do not know.
14 Q.   Pardon me?
15 A.   Sir, I would not know.  I just said the check goes to
16 2012.  Whether or not they searched before I'm not --
17          MR. BARTOLAI:  Nothing further.
18          THE COURT:  Anything further?
19          MR. CLAFFEE:  Nothing further.
20          THE COURT:  Thank you very much, sir.  You may step
21 down.
22          MR. CLAFFEE:  May we release the witness, Your Honor?
23          MR. BARTOLAI:  No objection.
24          THE COURT:  Witness is released.  Next witness.
25

                                                                    19

1                         REPORTER'S CERTIFICATE

2

3      I, Laura Boyanowski, RMR, CRR, Official Court Reporter for
4  the United States District Court for the Middle District of
5  Pennsylvania, appointed pursuant to the provisions of Title 28,
6  United States Code, Section 753, do hereby certify that the
7  foregoing is a true and correct transcript of the
8  within-mentioned proceedings had in the above-mentioned and
9  numbered cause on the date or dates hereinbefore set forth; and
10 I do further certify that the foregoing transcript has been
11 prepared by me or under my supervision.

12

13

14                            s/ Laura Boyanowski, RMR,CRR
                              Laura Boyanowski, RMR, CRR
15                            Official Court Reporter

16 REPORTED BY:

17     LAURA BOYANOWSKI, RMR, CRR
       Official Court Reporter
18     United States District Court
       Middle District of Pennsylvania
19     235 N. Washington Avenue
       Scranton, PA  18503
20

21     (The foregoing certificate of this transcript does not
   apply to any reproduction of the same by any means unless under
22 the direct control and/or supervision of the certifying
   reporter.)
23

24

25