1

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

 3   UNITED STATES OF AMERICA :
                            :
 4                          :
                            :
 5       vs                 :    3:CR-18-97
                            :
 6                          :
                            :
 7   ROSS ROGGIO           :
                            :
 8

        BEFORE:      THE HONORABLE ROBERT D. MARIANI
 9
        PLACE:       COURTROOM NO. 4
10
        PROCEEDINGS:  TRIAL EXCERPT - ALEX DOUVILLE
11
        DATE:        THURSDAY, MAY 11, 2023
12
     APPEARANCES:
13
     For the United States:
14
     TODD K. HINKLEY, ESQ.
15   UNITED STATES ATTORNEY'S OFFICE
     WILLIAM J. NEALON FEDERAL BUILDING
16   SUITE 311
     SCRANTON, PA 18501-2830
17
     SCOTT ANDREW CLAFFEE, ESQ.
18   DOJ-NSD
     COUNTERINTELLIGENCE & EXPORT CONTROL SECTION
19   950 PENNSYLVANIA AVENUE NW
     WASHINGTON, DC 20530
20
     PATRICK JASPERSE, ESQ.
21   DOJ-CRM
     1301 NEW YORK AVE., NW
22   WASHINGTON, DC 20530

23   For the Defendant:

24   GINO A. BARTOLAI, JR., ESQ.
     238 WILLIAM STREET
25   PITTSTON, PA 18640
```

2

1       THE COURT:  Ready to proceed?

2       MR. CLAFFEE:  We are, Your Honor.  The government

3  calls Alex Douville.

4       ALEX DOUVILLE, called as a witness, being duly sworn,

5  testified as follows:

6  DIRECT EXAMINATION

7  ON QUALIFICATIONS

8  BY MR. CLAFFEE:

9  Q.   Good afternoon, Mr. Douville.

10  A.   Good afternoon.

11  Q.   Make sure you speak into the microphone.

12  A.   Sure.

13  Q.   Please tell the jury where you currently work.

14  A.   I work at the Director of Defense Trade Controls in the

15  State Department, U.S. State Department.

16  Q.   How long have you worked at the state department?

17  A.   I've worked there for going on a little over 12 years.

18  Q.   What is your current title?

19  A.   I am a division chief for the space and missile and sensor

20  teams as well as the small arms of light weapons team.

21  Q.   How long have you been in the role of division chief?

22  A.   Full-time about two years, and I was acting for a couple

23  years before that, so four years total.

24  Q.   What are your responsibilities as division chief?

25  A.   It's my job to ensure that the cases that we receive for

1  exports for defense articles are adjudicated to ensure they are

2  consistent with U.S. national security and foreign policy, and

3  I run the day-to-day operations of my team.  I have two teams

4  about five to eight people each of who process the cases, and I

5  do the final adjudication of their cases.

6  Q.    What is a case?

7  A.    Oh, a case is whenever a -- I work with direct commercial

8  sales of exports of defense articles.  And whenever an

9  applicant or someone who is in the business of selling arms

10  overseas gets a purchase order, they need to submit a license

11  to export hardware and defense services or tech data.  So I

12  supervise, and we review those cases.

13  Q.    What does the small arms and training do?

14  A.    The small arms and light weapons team --

15  Q.    Sorry.

16  A.    That's fine.  The United States munitions list is divided

17  up into categories, 21 categories.  My team controls the small

18  arms and light weapons categories.  Those are categories one,

19  two and three.  We also do nine and 14.

20  Q.    How about the other division, space and missile --

21  A.    Yes, space and missile covers -- as you would believe, the

22  category four is for missiles, category 15 is space.

23  Q.    What did you do before you became a division chief?

24  A.    I was a licensing officer on the space and missile team.

25  Q.    What does a licensing officer do?

A.    A licensing officer gets assigned cases -- export license cases that they need to review.  I review them for regulatory and administrative review to make sure that they have submitted all the correct paperwork.  Then I make sure that the application is filled out correctly and selecting the right categories.

Then I staff the case out to reviewers to review the case for national security and foreign policy concerns.  And then when those staffing positions submit their final positions, then I review those positions and do a final adjudication of the case and either issue it as an approval, approval with conditions or a R. W. A., which is return without action or a denial.

Q.    So how many of these types of reviews you have done yourself?

A.    Thousands.

Q.    In your role as division chief, you supervise others that perform reviews?

A.    Yes.

Q.    How many reviews have you supervised in that capacity?

A.    Last year and the year previously, my small arms and light weapons team did about 10,000 cases each year.

Q.    What's your educational background?

A.    I have a master's degree in American history and a bachelor's in European history.

5

1  Q.    Are you familiar with generally with how the state

2  department controls certain items for export?

3  A.    Yes.

4  Q.    And if items are controlled for export, what are those

5  items called?

6  A.    Defense articles.

7  Q.    Can you describe the general organization of the export

8  regulations?

9  A.    Yeah, Congress passed the Arms Export Control Act, and

10  that is the law that delegated or that authorized the

11  presidents to control the export of and temporary import of

12  defense articles.  Now, the law -- that's the law, but the

13  regulations that -- the regulations that we use to implement

14  the law is called International Traffic and Arms Regulations,

15  the I.T.A.R.  Within the I.T.A.R. it's divided into nine

16  chapters.  One of those chapters is the United States munitions

17  list, a listing of all defense articles that what the U.S.

18  government considers a defense article to be controlled, and it

19  also talks about registration and how to submit licenses and

20  policies and procedures.

21  Q.    So what's a defense article?

22  A.    A defense article is a thing that is on the United States

23  munitions list that is especially designed for a military

24  purpose.

25  Q.    How is the United States munitions list categorized or

1  organized?

2  A.    It's divided up into 21 categories.  Each one is -- has a

3  separate commodities they are called -- so categories one would

4  be small arms, category two is larger weapons, like, above 50

5  caliber machine guns, category three is ammunition, four is

6  missiles and so on.

7  Q.    Does your day-to-day work involve referencing the United

8  States munitions list?

9  A.    Every day.

10  Q.    I believe you also talked a little bit about the licensing

11  process.  Are you familiar with the licensing process at D. D.

12  T. C.?

13  A.    Yes.

14  Q.    How did you come to be familiar with that process?

15  A.    By, like, going through training and processing and being

16  on -- and being a licensing analyst on a commodity team.

17  Q.    Have you testified before as an expert on defense articles

18  United States munitions list and the state department licensing

19  process for exports?

20  A.    Yes.

21        MR. CLAFFEE:  Your Honor, the government offers Alex

22  Douville as an expert on defense articles, the U.S.M.L., United

23  States Munitions List, and the state department licensing

24  process.

25        MR. BARTOLAI:  He's accepted.

7

1          THE COURT:  The witness is received as you have

2   offered him as an expert as you described him.

3          MR. CLAFFEE:  Thank you, Your Honor.

4   DIRECT EXAMINATION

5   BY MR. CLAFFEE:

6   Q.    Are you familiar with a firearm known as an M. 4 rifle or

7   M. 4 carbine?

8   A.    Yes.

9   Q.    Can you describe that weapon, please?

10  A.    An M. 4 fully automatic firearm is a military assault

11  rifle that is used by our armed forces.

12  Q.    Is an M. 4 rifle a defense article?

13  A.    Yes.

14  Q.    Was it listed on the United States Munitions List in 2016?

15  A.    Yes.

16  Q.    Under what category?

17  A.    Category 1 B, and 1 B. is automatic firearms up to and

18  including 50 caliber.

19  Q.    I would like to show you an exhibit that has been

20  previously been admitted.  It's Government's Exhibit 9.5.  Did

21  you read the column that says description and what item they

22  are listed under that?

23  A.    Yes, the first one is M. 4 bolt gas ring.  The second is

24  firing pin retainer, and the third is -- just says expedite

25  shipping.

8

1  Q.    So just focusing on the first two, are you familiar with

2  those two items?

3  A.    Yes.

4  Q.    What's an M. 4 bolt gas ring mil?

5  A.    A gas ring is a part and component of an M. 4 rifle.  It

6  helps regulate the flow of gas into the bolt carrier group.

7  Q.    What's a firing pin retainer?

8  A.    Firing pin retainer is a part and component of an M. 4

9  that basically helps retain or helps keep the firing pin within

10  the bolt carrier group as well.

11  Q.    So let's take these one by one starting with the gas

12  rings.  Do you know if M. 4 bolt gas rings were contained on

13  the United States Munitions List in 2016?

14  A.    Yes.

15  Q.    How do you know?

16  A.    Because they were found under category 1 H., which is

17  parts and components of weapons contained under 1 B., which is

18  a fully automatic.

19  Q.    How about firing pin retainers?  Were they controlled on

20  the United States Munitions List in 2016?

21  A.    Yes.

22  Q.    How do you know that?

23  A.    Because they are contained under category 1 H., which is

24  also the same as parts and components of articles under 1 B.

25  Q.    Why were these two items controlled on the United States

1  Munitions List?

2  A.    They are controlled because they are inherently specially

3  designed for a defense article.  That's why they are on the

4  United States Munitions List.

5  Q.    Have you formed an opinion as to whether the items in

6  Government's Exhibit 9.5, the gas rings and the firing pin

7  retainers, required a license to export to Iraq in 2016?

8  A.    Yes.

9  Q.    What's that opinion?

10  A.    That they would require a license to be exported from the

11  country.

12  Q.    If an item is on the United States Munitions List, what

13  does a person need to do in order to be able to export that

14  item to a foreign country?

15  A.    First of all, a person or a company that's in the business

16  of manufacturing and/or exporting defense articles need to be

17  registered with the state department, with our office,

18  department of -- director of defense trade controls.  They

19  register.  They will come in.  There's a fee structure with

20  that.  And once they are registered, then they are eligible to

21  be able to submit licenses to export defense articles.

22  Q.    Just because they are registered, are they automatically

23  entitled to a license?

24  A.    No.

25  Q.    What would they need to show for a license?

1  A.    Once they are registered, then they are able to submit

2  licenses through an online portal, D.E.C.C.S.  They will be

3  able to submit their licenses through there.  It comes to us so

4  we can review it.  Each license for export needs to have a

5  purchase order, needs to have an end use statement from a

6  foreign party, and it needs to contain all of the parties

7  involved with the transaction, freight orders, intermediaries,

8  sources, manufacturers, and the license itself needs to have

9  the country of ultimate destination.  It needs to have a

10 quantity, needs to have the commodity description, and it needs

11 to have a value.

12 Q.    Those requests for licenses through the D.E.C.C.S. system

13 come through your office?

14 A.    Yes.

15 Q.    In 2016 if you had received an application for a license

16 to ship M. 4 bolt gas rings or firing pin retainers to Iraq,

17 would you approve that request for license?

18 A.    Each case is reviewed on a case-by-case basis.  First it

19 would need to go through regulatory and administrative to

20 review to make sure they had all the paperwork.  If they didn't

21 have the paperwork, it would be sent back and they can

22 resubmit.  If we had -- if they had all the correct paperwork

23 and then we'd staff it out to the defense department and other

24 staffing points for -- to review it for national security and

25 foreign policy concerns.  For Iraq, Iraq is a 126.1 country

11

1  which is section 126.1 of the International Traffic and Arms

2  Regulations.  That chapter, 126.1, is a listing of countries

3  where we have restrictions for what can be exported to those

4  countries.

5  Q.    Is that also known as a policy of denial?

6  A.    It can be.

7  Q.    Can you explain what that means?

8  A.    Yeah, well, it's for -- there's different levels of

9  countries on the 126.1 list.  126 D. 1 are countries that we

10  have a policy of denial.  Those are for China, for Iran and

11  Belarus and countries like that.  D. 2 countries are other

12  countries which have -- are not as restricted but we have a --

13  generally a policy of denial unless they meet certain

14  carve-outs for each country.

15  Q.    Does the state department maintain records of all persons

16  or entities who have registered with D. D. T. C. to be able to

17  be able to export defense articles?

18  A.    Yes.

19  Q.    Does the state department maintain records of all licenses

20  it has issued for exporting defense articles?

21  A.    Yes.

22  Q.    Have you checked to see if the defendant Ross Roggio has

23  ever registered with D. D. T. C.?

24  A.    Yes.

25  Q.    Has he?

1  A.    No, he has not.

2  Q.    Did you also check a company by the name of Roggio

3  Consulting?

4  A.    Yes.

5  Q.    And what was the result of that check?

6  A.    No company by that name has been registered with us.

7  Q.    Have you also checked to see if the defendant Ross Roggio

8  has ever been issued an export license by D. D. T. C.?

9  A.    Yes.

10  Q.    What was the result of that check?

11  A.    We have no record of any export licenses for that

12  individual.

13  Q.    How about for Roggio Consulting?

14  A.    No.

15  Q.    So the defendant has never registered with the state

16  department or been issued any licenses by the state department?

17  A.    No.

18  Q.    I would like to show you what's been previously marked as

19  Government's Exhibit 19.3.  You have a binder three-ring binder

20  I will bring you.

21  A.    Yes.

22  Q.    Flip to the tab that says 19.3.  Look at that and read it

23  to yourself a little bit.  Look up when you're ready to

24  proceed.  Do you recognize this document?

25  A.    Yes.

1  Q.    Generally what is it?

2  A.    It's a licensing registration check we received that we

3  sent to Homeland Security.

4  Q.    And who is this memo from?

5  A.    It is from Anthony Dearth.

6  Q.    Do you know Anthony Dearth?

7  A.    Yes.

8  Q.    How are you familiar with Anthony Dearth?

9  A.    He used to be the -- well, the licensing director of D. D.

10 T. C. of licensing, and he was also a division chief.  And I

11 was under him when he was division chief.

12 Q.    Are you familiar with how Mr. Dearth would have created

13 one of these memorandum?

14 A.    Yes.

15 Q.    And are these memos maintained in the state department's

16 files as records of regularly conducted activity?

17        MR. CLAFFEE:  Your Honor, we move to admit

18 Government's Exhibit 19.3.

19        MR. BARTOLAI:  No objection.

20        THE COURT:  Government's Exhibit 19.3 is admitted.

21        MR. CLAFFEE:  May we publish?

22        THE COURT:  Yes.

23 BY MR. CLAFFEE:

24 Q.    I will direct to direct your attention to the second

25 paragraph of this memo.  What does this paragraph say

1  generally?  You don't need to read the whole thing.

2  A.    This paragraph basically says that we did a search in our

3  systems for a Ross William Roggio Consulting and Ross Gotham

4  Brogan.

5  Q.    The next page, the first full paragraph, what does that

6  generally say?

7  A.    That we also did a search for a Roggio Consulting

8  Corporation in our systems.

9  Q.    Is the license and registration history check in this

10  exhibit consistent with the checks you performed yourself?

11  A.    Yes.

12  Q.    You testified earlier that an M. 4 rifle was a defense

13  article in 2016.  Are you also familiar with what a defense

14  service is?

15  A.    Yes.

16  Q.    What is a defense service?

17  A.    A defense service is when a person or a company furnishes

18  assistance to a foreign party in the design, development,

19  production, manufacture, operation, use, integration of a

20  defense article.

21  Q.    In your opinion, would assisting or training a foreign

22  person in the manufacture of an M. 4 rifle be a defense

23  service?

24  A.    Yes.

25  Q.    What about assisting or training in the production of an

1  M. 4 rifle?

2  A.    Yes.

3  Q.    Or assisting or training in the assembly of an M. 4 rifle?

4  A.    Yes.

5  Q.    Assisting in the testing of an M. 4?

6  A.    Yes.

7  Q.    What, if anything, is required from D. D. T. C. before a

8  U.S. person can provide a defense service?

9  A.    It's similar to what -- the other licenses we receive.  We

10  need to receive a -- it's called a technical assistance

11  agreement.  It's a larger license which includes -- could

12  include hardware, and it's for larger programs where we need --

13  where there needs to be an exchange and a back and forth of

14  assistance and tech data and defense services in the making or

15  distributing or sale of a defense article.

16      It's different than a regular hardware license because

17  that's just a straight up company -- country A. is buying a gun

18  from somebody and they're just shipping it to them.  This one

19  is when they need to have a back and forth and we need to

20  provide assistance in order to do whatever they are trying to

21  do.

22  Q.    Okay.  Would your license check that you performed on the

23  defendant have turned up any of these technical assistance

24  agreements or written approvals from D. D. C. T. to provide

25  defense services?

1  A.    Yes.

2  Q.    Did any of those show up?

3  A.    No.

4  Q.    So the defendant did not have any registration, license or

5  approval from D. D. T. C. to provide any defense services

6  either?

7  A.    No.

8  Q.    I would like to show you what's been previously marked as

9  Government's Exhibit 19.5 if you want to just flip two more in

10 the binder.  Do you recognize this exhibit?

11 A.    Yes.

12 Q.    Generally what is it?

13 A.    It's a letter to Homeland Security talking about the

14 classification of certain articles and whether they fall on the

15 U.S. --

16 Q.    Who sent this letter?

17 A.    This is from a Rick Koelling.

18 Q.    I think you said he goes by Rick?

19 A.    Yes.

20 Q.    Do you know Rick Koelling?

21 A.    Yes, I do.

22 Q.    Who is he?

23 A.    He is the deputy director for the Office of Defense Trade

24 Controls and Policy.

25 Q.    Are you familiar with how Mr. Koelling would come to

1  create a letter like this?

2  A.    Yes.

3  Q.    And are letters like these made in the regular course of

4  business of the D. D. T. C.?

5  A.    Yes.

6  Q.    And are they maintained in D. D. T. C.'s files of

7  regularly conducted business activity?

8  A.    Yes, they are.

9           MR. CLAFFEE:  Your Honor, I move to admit

10  Government's Exhibit 19.5.

11           MR. BARTOLAI:  No objection.

12           THE COURT:  19.5 is admitted.  You can publish.

13  BY MR. CLAFFEE:

14  Q.    Thank you.  So I would like to direct your attention to

15  just the second page of this exhibit.  In the middle of the

16  first there's a first full paragraph.  Read the sentence that

17  starts for the period of.

18  A.    Okay.  For the period of January 1st, 2015 through March

19  20th, 2018, D. T. C. P. has determined that there is no doubt

20  the M. 4 fully automatic firearm and the furnishing of

21  assistance including training to a foreign person in the

22  manufacture, production, assembly, testing, operation or use of

23  an M. 4 firearm were and are described in U.S.M. L. category 1

24  B. and 1 I. respectively.

25  Q.    You can stop there.  Then looking at the second paragraph

1  starting with additionally, will you please read the first

2  sentence of that paragraph.

3  A.   Additionally for the period of January 1st, 2015 through

4  March 20th, 2018, D. T. C. P. has determined that there is no

5  doubt that the M. 4 bolt gas rings M. I. L. and M. 4 firing pin

6  retainers were described in U.S.M.L. category 1 H.

7  Q.   Are the conclusions contained in this letter consistent

8  with your independent expert opinion that you offered the jury

9  earlier?

10 A.   Yes.

11         MR. CLAFFEE:  No further questions, Your Honor.

12         THE COURT:  Cross-examine.

13         MR. BARTOLAI:  Yes, may I have a moment?

14         THE COURT:  Sure.

15         MR. BARTOLAI:  Good afternoon.

16         THE WITNESS:  Good afternoon.

17 CROSS EXAMINATION

18 BY MR. BARTOLAI:

19 Q.   Can I have Government's Exhibit 19.5, please?  I think --

20 the next page, please.  I'm pointing out for the period of

21 January 1st, 2015.  You read this to the jury, right?

22 A.   Yes.

23 Q.   You stopped I think it was around after it said

24 respectively about six lines down or five lines down?

25 A.   Yeah.

19

1   Q.   Read on.  What does that mean?

2   A.   What's it mean, or what does it say?

3   Q.   Consequently -- read that to the jury.

4   A.   Sure.  Consequently, a commodity jurisdiction

5   determination as described in I.T.A.R. 120.4 is not required.

6   Q.   What's not required?

7   A.   A commodity or jurisdiction determination.

8   Q.   What is that?

9   A.   That's when there is doubt as to if a manufacturer or an

10   he exporter has doubt as to something as on the U.S.M.L.,

11   United States Munitions List, and they can submit a commodity

12   jurisdiction request to our commodity jurisdiction team.

13   Q.   So, okay.  I understand.  If it's doubtful they can submit

14   that request.  Is that what that's about?

15   A.   Yeah.

16   Q.   If there's dual purposes, is that a reason to be doubtful

17   for an item, dual purposes?

18   A.   No.

19   Q.   No.  Like, for instance, the difference between a firing

20   pin retainer and cotter pin, is that just semantics?

21   A.   And a what?

22   Q.   Cotter pin.

23   A.   I don't know what a cotter pin is.

24   Q.   Okay.  All right.  How about can I have -- there's a photo

25   of some -- let me get that.

1        MR. BARTOLAI:  May I have a moment, Your Honor?

2        THE COURT:  Yes, of course.

3        MR. BARTOLAI:  Can I have 10.3, please?  So do you

4  know what these are when you look at Government's Exhibit 10.3?

5        THE WITNESS:  Yes.

6  BY MR. BARTOLAI:

7  Q.    What are they?

8  A.    Those look like firing pin retainers.

9  Q.    Do you know if they are mil spec from looking at them?

10  A.    They are on the United States Munitions List.

11  Q.    How about was there a difference between mil spec and

12  what's on the United States Munitions List?

13  A.    There could be, yes.

14  Q.    There could be, okay.  What does mil spec mean?

15  A.    Mil spec means it's something that was designed or it's --

16  what it means if something is designed and it's up to certain

17  specifications that the military requires.

18  Q.    In other words, it could look like this and it can be made

19  out of some sort of base metal that wouldn't cut it for

20  military purposes, right?

21  A.    I guess, yes.

22  Q.    Okay.  Good.  How about Government's Exhibit 10.2?  Can

23  you tell us what they are?

24  A.    Yeah, those are the gas bolt rings.

25  Q.    Do you know whether or not they are mil spec?

1  A.   No.

2  Q.   And I think -- and I know you -- can I have 19.3 for a

3  moment, please?  Government's Exhibit 19.3.  And I think this

4  is a multi-page document.  Would you go to the next page?  Stop

5  right there.  Thank you.  And we have -- you recall testifying

6  to that, correct?

7  A.   Yes.

8  Q.   It says history check -- a license and registration

9  history check for Roggio Consulting Company, right --

10 A.   Yes.

11 Q.   And also the next one would be Roggio Arsenal, right?

12 A.   Yes.

13 Q.   And the next paragraph, Kristy Lynn Roggio, correct?

14 A.   Yes.

15 Q.   That would be the next paragraph, second line.

16 A.   Yes.

17 Q.   And the next paragraph, Amanda Mecomber?

18 A.   Yes.

19 Q.   The very first one was Ross Roggio, correct?

20 A.   Yes.

21 Q.   And the government asked you -- or the case agents in this

22 case submitted those names and asked you to run the check on

23 those names?

24 A.   Yes.

25 Q.   Is that how that works?  All right.  You said -- you

1  talked a little bit about the munitions list.  What are defense

2  articles was the question, and I believe it was your answer,

3  things that are on the munitions list, right.  And I think you

4  -- you went a little bit farther.  Things that are specifically

5  designed for military purposes?

6  A.    Yes.

7  Q.    So an AR-15 versus an M. 4, is that a defense article?

8  A.    What kind of AR-15?

9  Q.    Colt AR-15, like, a Colt type -- I guess -- well, I have

10 to get specific I guess, right.  Like a Colt A. 4, AR-15?

11 A.    A fully automatic one, no.  A semiautomatic Colt firearm

12 or a Colt AR-15 is not.

13 Q.    Is not.  In other words, so it has to be fully automatic

14 to be on the munitions list?

15 A.    Currently, yeah.

16 Q.    Now, these parts you, know, these firing pin retainers,

17 they are interchangeable with AR-15s, right?

18 A.    They could be, yes.

19 Q.    As well as the gas ring containers, they can be

20 interchangeable with AR-15s?

21 A.    Yes, they could be.

22 Q.    It's the same platform, correct?

23 A.    Same platform?  It's different platforms, same part.

24 Q.    Thank you.

25         MR. BARTOLAI:  Nothing further.

23

1          THE COURT:  Redirect?

2          MR. CLAFFEE:  Briefly, Your Honor.

3    REDIRECT EXAMINATION

4    BY MR. CLAFFEE:

5    Q.   I believe in response to one of counsel's last questions

6    he asked you if a semiautomatic AR-15 was on the United States

7    Munitions List, and I believe you said currently not.  Is that

8    right?

9    A.   Yes.

10   Q.   What about in 2016?

11   A.   It was on the -- it was considered a defense article in

12   2015.

13   Q.   And 2016?

14   A.   2016 as well.

15          MR. CLAFFEE:  Thank you.  No further questions.

16          MR. BARTOLAI:  Your Honor, I'm sorry.  I had another

17   question that I forgot to ask, and I think it's --

18          MR. CLAFFEE:  Is it within the scope of direct?

19          MR. BARTOLAI:  It is.

20   RECROSS EXAMINATION

21   BY MR. BARTOLAI:

22   Q.   When you talk about things on the munitions list and the

23   regulations, would you agree with me that aside from a license,

24   other approval can be done on a case-by-case basis?

25   A.   Sometimes, yes.

1  Q.    For instance, non-lethal military equipment, correct?

2  A.    To who?

3  Q.    To Iraq or these countries on the D. 2 list.

4  A.    If it's -- are you saying they wouldn't require a license?

5  Q.    No, they can other approval though.

6  A.    I'm sorry.  I am confused by your --

7  Q.    In other words, if there's a policy against shipping items

8  to Iraq, there can be a license or other approval can be issued

9  on a case-by-case basis for that type of services and those

10 type of items, defense articles?

11 A.    For Iraq -- the carve-outs for exports to Iraq are for --

12 we'd only accept licenses for non-lethal stuff or stuff that

13 was approved by the national government of Iraq.

14 Q.    Or lethal military equipment required by the government of

15 Iraq or coalition forces, correct?

16 A.    Yes.

17 Q.    So that would be an exception?

18 A.    No.  You would still require a license, but we'd be able

19 to approve it if it was for those end use purposes.

20 Q.    For the government of Iraq or for the coalition forces?

21 A.    Yes.

22          MR. BARTOLAI:  Nothing further.  Thank you.

23          MR. CLAFFEE:  Quick clarifying question, Your Honor.

24 REDIRECT EXAMINATION

25 BY MR. CLAFFEE:

1  Q.   Even if one were to seek a license through this other

2  approval exceptions that counsel just referred to, would one

3  still have to be registered with D. D. T. C.?

4  A.   Yes.

5            MR. CLAFFEE:  That's it.

6  RECROSS EXAMINATION

7  BY MR. BARTOLAI:

8  Q.   Are there any circumstances where the other approval

9  wouldn't be in your indices of who has a license and who does

10 not?

11 A.   No.

12 Q.   No.  Very good.  Thank you.

13           THE COURT:  Thank you, sir.  You can step down.

14           MR. CLAFFEE:  May the witness be excused?

15           THE COURT:  Any objection to him being excused?

16           MR. BARTOLAI:  No objection.

17           THE COURT:  The witness is excused.  Call your next

18 witness.

19

20

21

22

23

24

25

26

1                    REPORTER'S CERTIFICATE

2

3        I, Laura Boyanowski, RMR, CRR, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Pennsylvania, appointed pursuant to the provisions of Title 28,

6    United States Code, Section 753, do hereby certify that the

7    foregoing is a true and correct transcript of the

8    within-mentioned proceedings had in the above-mentioned and

9    numbered cause on the date or dates hereinbefore set forth; and

10   I do further certify that the foregoing transcript has been

11   prepared by me or under my supervision.

12

13

14                         s/ Laura Boyanowski, RMR,CRR
                          Laura Boyanowski, RMR, CRR
15                        Official Court Reporter

16   REPORTED BY:

17       LAURA BOYANOWSKI, RMR, CRR
         Official Court Reporter
18       United States District Court
         Middle District of Pennsylvania
19       235 N. Washington Avenue
         Scranton, PA  18503
20

21       (The foregoing certificate of this transcript does not
     apply to any reproduction of the same by any means unless under
22   the direct control and/or supervision of the certifying
     reporter.)
23

24

25