**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | NO. 3:18-CR-0097 |
| **v.** | : | |
| | : | (MARIANI, J.) |
| **ROSS ROGGIO** | : | |
| Defendant | : | |

**<u>GOVERNMENT'S SENTENCING MEMORANDUM</u>**

The United States respectfully requests that the Court impose a
Guidelines sentence that ensures defendant Ross Roggio remains in
prison for the rest of his life. The Probation Department has calculated
Roggio's total offense level at 48, which for purposes of calculating the
Guidelines range is treated like offense level 43, which carries an
advisory Guidelines sentence of life in prison. While none of the crimes
for which Roggio was convicted carries a maximum penalty of more
than 20 years in prison, the 33 counts on which Roggio was convicted
carry a collective statutory maximum of 625 years in prison. By
ordering sentences on multiple counts to be served consecutively, the
Court can provide just punishment and protect the public by ensuring
that the 55-year-old defendant spends the rest of his life in prison.

I.    **Procedural History**

On March 20, 2018, a federal grand jury in Scranton returned an indictment that charged Roggio and his company with 37 counts related to his illegal export from the United States to Iraq of weapons parts, weapons tools, and defense services. Doc. 1. On February 15, 2022, a federal grand jury in Scranton returned a superseding indictment that added one count of conspiracy to commit torture and one count of torture. Doc. 122. On May 8, 2023, the Court granted the government's motions to dismiss six of the arms export-related counts and to sever Roggio's company from the trial. Docs. 294-295.

On May 19, 2023, after a two-week trial, the jury found Roggio guilty of all 33 remaining counts. Doc. 319. The table below summarizes those counts and their statutory maximum prison sentences:

| Count | Charge | Statute | Maximum Sentence in Years |
|---|---|---|---|
| 1 | Conspiracy to commit torture | 18 U.S.C. § 2340A(c) | 20 |
| 2 | Torture | 18 U.S.C. § 2340A(a) | 20 |
| 3 | Conspiracy to commit offenses against the United States | 18 U.S.C. § 371 | 5 |

| Count | Charge | Statute | Maximum Sentence in Years |
|---|---|---|---|
| 4 | Exporting defense articles w/out a State Dept. license or approval, in violation of Arms Export Control Act | 22 U.S.C. § 2778 | 20 |
| 5 | Exporting weapons parts tools w/out a Commerce Dept. license, in violation of International Emergency Economic Powers Act | 50 U.S.C. §§ 1702, 1705 | 20 |
| 6 | Exporting defense services w/out State Dept. approval, in violation of Arms Export Control Act | 22 U.S.C. § 2778 | 20 |
| 7 | Smuggling | 18 U.S.C. § 554 | 10 |
| 8 | Smuggling | 18 U.S.C. § 554 | 10 |
| 9 | Wire fraud | 18 U.S.C. § 1343 | 20 |
| 10 | Wire fraud | 18 U.S.C. § 1343 | 20 |
| 12 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 13 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 14 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 15 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 17 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 18 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 19 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 21 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 22 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 23 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 24 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |

| Count | Charge | Statute | Maximum Sentence in Years |
|---|---|---|---|
| 27 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 28 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 29 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 30 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 31 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 32 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 33 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 34 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 36 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 37 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 38 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
| 39 | Money laundering | 18 U.S.C. § 1956(a)(2)(A) | 20 |
|  | Total |  | 625 |

The Presentence Report ("PSR") prepared by the Probation Office calculates Roggio's combined adjusted offense level as 48. Doc. 350 at ¶61. The sentencing hearing is scheduled on April 15 at 10 a.m.

## II.   Sentencing Procedure

The Third Circuit has set forth a three-step process for district courts to follow to comply with the Supreme Court's ruling in *United States v. Booker*, 543 U.S. 220, 244 (2005):

1. Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

2. In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a

4

departure and how that departure affects the Guidelines calculation, and take into account our Circuit's *pre-Booker* case law, which continues to have advisory force.

3. Finally, they are to exercise their discretion by considering the relevant § 3553 factors in setting the sentence they impose regardless of whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (*citing United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006)). In calculating the guideline range, the court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556, 568-70 (3d Cir. 2007) (en banc).

At the third step of the sentencing process, the court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citation omitted).

5

## III.   Defendant's PSR Objections

### A.   The Correct Guideline Section

Contrary to what Roggio argues in his objections to the PSR[1], Doc. 351 at 1, the Probation Department correctly determined that U.S.S.G. § 2A4.1 – not § 2A.2. – is the correct guideline for calculating the offense level related to counts 1 and 2.

The first step in calculating a defendant's guideline range is determining the offense guideline section from Chapter Two that is applicable to the offense of conviction. U.S.S.G. § 1B1.1(a)(1); *see also United States v. Boney*, 769 F.3d 153, 160 (3d Cir. 2014). To do so, the Court must look to the Statutory Index found in Appendix A. U.S.S.G. § 1B1.2(a); *see also Boney*, 769 F.3d at 160. As noted in the Addendum to the PSR, Appendix A lists five possible guidelines for a torture conviction pursuant to 18 U.S.C. § 2340A: §2A1.1 (First Degree Murder); § 2A1.2 (Second Degree Murder); § 2A2.1 (Assault with Intent to Commit Murder; Attempted Murder); § 2A2.2 (Aggravated Assault);

---

[1] Roggio has not to date filed a sentencing memorandum, which under the Court's order was due on March 29, 2024. Doc. 349. Roggio's objections to the PSR are summarized in the PSR Addendum. Doc. 351.

and § 2A4.1 (Kidnapping, Abduction, Unlawful Restraint). Doc. 351 at 1. When, as here, there are multiple offense guidelines referenced in Appendix A for the offense of conviction, the Court must "determine which of the referenced guideline sections is *most appropriate* for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. § 1B1.2 Application Note 1 (emphasis added); *see also Boney*, 769 F.3d at 160. In doing so, the Court "may consider only offense of conviction conduct, not all relevant conduct." *United States v. Aquino*, 555 F.3d 124, 129 (3d Cir. 2009).

Roggio was convicted in count 1 of conspiracy to commit torture, which, charged Roggio with directing the Kurdish soldiers who conspired with him to abduct the victim at his residence and take the victim forcibly against his will to a nearby military compound, where the victim was held for 39 days, during which time Roggio and his co-conspirators intended to inflict severe physical and mental pain and suffering multiple times while the victim was in their custody and physical control at the military compound. Doc. 122 at ¶¶ 5, 7, 10.a, 10.b, 10.c, 12, and 13. Paragraph 12 and 13, for example, charged that

Roggio "arranged for armed Kurdish soldiers in uniform to abduct the victim at his residence in the Kurdish region of Iraq, place a bag over the victim's head, and take the victim against his will to a nearby Kurdish military compound, where the victim was detained "against his will" for 39 days. The paragraphs specifying the types of torture that Roggio and his cohorts inflicted all began: "While the victim was detained at the military compound." *Id.* at ¶¶ 14-17. Roggio was also convicted in count 2 of torture, which incorporated and mirrored the allegations in count 1. *Id.* at ¶¶18-19.

The abduction and detention of the victim enabled and facilitated the acts of torture supporting the application of the kidnapping guideline. Further, the guideline recognizes that kidnapping can "occur[] as part of or to facilitate the commission of another offense." U.S.S.G. § 2A4.1, Background. Unlike the aggravated assault guideline for which Roggio advocates, the kidnapping guideline takes into account the duration of the detention. U.S.S.G. § 2A4.1(b)(4). The kidnapping guideline encompasses more circumstances relevant to these charges, and the Probation Department correctly applied § 2A4.1.

In the only previous conviction under the torture statute, the

Eleventh Circuit Court of Appeals affirmed the district court's

application of the kidnapping guideline section. *United States v.*

*Belfast*, 611 F.3d 783, 824-25 (11th Cir. 2010). In that case, the

defendant also argued that the aggravated assault guideline, § 2A2.2,

should have been used to calculate his sentence. *Id.* at 801. In that case,

the defendant also tortured his victims over extended periods of time

after first having them seized and imprisoned. *Id.* at 825.

The Eleventh Circuit found that the district court had not erred in

determining that § 2A4.1 was the most appropriate guideline for the

offense conduct:

> Torture requires, as an element, that the defendant have
> custody or physical control over the victim. 18 U.S.C.
> § 2340(1).[2]  Kidnapping is one method of obtaining and

---

[2]  In situations in which the Guidelines' Statutory Index does not list
the offense of conviction, the most *analogous* guideline is to be used.
U.S.S.G. § 1B1.2 Application Note 1 (emphasis added). The Third
Circuit has said that identifying the most analogous guideline "is
generally a task of comparing the elements of the defendant's crime of
conviction to the elements of federal offenses already covered by a
specific guideline." *United States v. Jackson*, 862 F.3d 365, 372-76 (3d
Cir. 2017) (citations and quotation marks omitted). Like the jury in
*Belfast*, the Roggio jury was instructed that one of the elements of
torture was that the torture was carried out against another person
"who was within the defendant's custody or physical control." Doc. 265

maintaining custody or physical control over another…. This charged seizure and detention of his victims enabled and facilitated [defendant]'s acts of torture, thus the application of the kidnapping guideline, which itself recognizes that kidnapping can occur "during the commission of, or in connection with, another offense," was entirely proper. U.S.S.G. § 2A4.1(b)(7). Indeed, the kidnapping guideline is particularly appropriate in cases of torture, such as this case, where there are repeated, severe physical assaults, and the victims are imprisoned in inhumane conditions that exacerbate the physical pain caused by the abuse.

The kidnapping guideline takes into account the gravity of the victim's injuries, whether a dangerous weapon was used, the length of the unlawful detention, and whether the victim was sexually exploited or killed – all of which are circumstances relevant to determining the proper degree of punishment for [defendant]'s crimes, and none of which are considered under the other applicable guidelines for Torture Act convictions.

*Id.*

## B.   Serious Bodily Injury

In his objections to the PSR, Roggio claims that the evidence presented at trial did not prove "serious bodily injury." Doc. 351 at 2. The victim testified that he was struck and tased repeatedly in particularly sensitive areas of his body, such as his nose, throat and

---

at 32. Under the elements-based analysis, the result would be the same: § 2A4.1 is the correct guideline.

10

groin; the soldiers acting under Roggio's direction hit him so hard that he was knocked down repeatedly; the beatings with plastic pipes caused intense pain; and he was unable to breathe, thought he was going to die, and passed out while being suffocated with a plastic bag (multiple times) and, when Roggio wrapped his belt around the victim's neck and lifted the victim off the ground (once). PSR ¶ 22. The Probation Department's application of the 2-level enhancement pursuant to § 2A4.1(b)(2)(B) is justified by the evidence.

C.    Duration of the Victim's Detention

Roggio contends that § 2A4.1(b)(4)(A) should not apply because "the evidence at trial proved that the victim was detained lawfully by a foreign government and/or military." Doc. 351 at 2. With the exception of Roggio's testimony, all of the evidence at trial indicated that the victim was abducted and detained at Roggio's behest. The victim was never charged and never appeared in court in Iraq. An Iraqi judge provided expert testimony that what happened to the victim was not permitted by the laws of Iraq. The Probation Department's application of the 2-level enhancement pursuant to § 2A4.1(b)(4)(A) is justified by

the evidence.

### D.   <u>Organizer or Leader</u>

Roggio argues that § 3B1.1 should not apply because (1) he was not the leader or organizer of criminal activity, (2) the victim was lawfully detained by the government or military, and (3) the criminal activity did not involve five or more people because Roggio's co-conspirators were not U.S. nationals or present in the United States. Doc. 351 at 3. Regarding the first two arguments, Roggio simply continues to ignore the trial evidence and the verdict that he was responsible for ordering and leading the victim's torture. Regarding the third argument, Roggio confuses elements with jurisdiction. Being a U.S. citizen or being present in the United States is a jurisdictional requirement, but it is not one of the elements of torture. Doc. 265 at 31-32. The fact that Roggio's co-conspirators cannot be charged unless they set foot in the United States does not mean that they are not criminally responsible. Furthermore, as noted in the Addendum to the PSR, the criminal activity that Roggio organized and led not only involved five or more participants, but also was otherwise extensive. Doc. 351 at 3. The

Probation Department's application of the 4-level enhancement pursuant to § 3B1.1 is justified by the evidence.

### E.   Obstruction

Roggio argues that § 3C1.1, the obstruction enhancement, should not apply because (1) he was not sworn under oath to tell the truth when he lied to law enforcement during the investigation; and, (2) he should not be punished for asserting his Constitutional right to defend himself. Doc. 351 at 3-4.

Regarding the first argument, the obstruction enhancement does not apply only when a defendant obstructs justice under oath. The Third Circuit has affirmed application of the obstruction enhancement for materially false statements made to law enforcement. *See, e.g., United States v. LaCroix*, 69 Fed. Appx. 566, 569 (3d Cir. 2003); *United States v. Kim*, 27 F.3d 947, 958-61 (3d Cir. 1994).

Regarding the second argument, the Supreme Court has held "on a number of occasions that a defendant's right to testify does not include a right to commit perjury." *United States v. Dunnigan*, 507 U.S. 87, 96 (1993) (citations omitted). Roggio inexplicably states that the

"verdict does not lead to a conclusion that the Defendant lied under oath." In fact (1) Roggio testified that he acted under duress; and, (2) the jury received an instruction that it must find Roggio not guilty if it found that he was acting under duress. Doc. 267 at 18.   The jury found Roggio guilty. In assessing whether defendant's testimony is false, the sentencing court is bound to accept the facts "necessarily implicit in the verdict." *United States v. Boggi*, 74 F.3d 470, 479 (3d Cir. 1996) (citations omitted). *See also* Doc. 351 at 4.

As for Roggio's demand for "strict proof," while the jury already rejected his testimony in a verdict that required evidence beyond a reasonable doubt, the standard at sentencing is a preponderance of the evidence. The PSR succinctly summarizes some of the areas in which Roggio's trial testimony was contradicted by the rest of the evidence. PSR at ¶35.

## IV.   18 U.S.C. § 3553(a) Factors

### A.   The Nature and Circumstances of the Offense

While developing a weapons factory in the Kurdistan region of Iraq from 2014 to 2017, Roggio tortured one of his employees and

illegally exported weapons tools, weapons parts, and defense services
from the United States to Iraq. Having sat through the two-week trial,
the Court is well acquainted with the evidence that Roggio and Kurdish
soldiers tortured Siim Saar while Saar was detained at Roggio's behest
on a Kurdish military compound in the Kurdistan region of Iraq. The
Court is also well aware of the testimony and documents that showed
Roggio knew he needed U.S. government approval to export controlled
items to Iraq (PSR ¶¶ 11-12), but did so anyway without a license or
approval. The offense conduct is also concisely and accurately described
in paragraphs 9-31 of the Presentence Report.

###### B.   <u>The History and Characteristics of the Defendant</u>

Roggio is a serial fraudster who throughout his life has used
people and stolen their money. For years before his behavior escalated
to physical violence in Iraq, Roggio left behind him a trail of deceit,
failed businesses, and broken promises. He was discharged from the
Army after less than two years, under a separation code for misconduct.
PSR ¶¶ 92-94. In 2005 he was terminated from a job at Goodyear Tire
for excessive absences and attendance issues. PSR § 108. From 2008 to

2010, Roggio operated Roggio Arsenal, which had financial issues and collapsed in part because Roggio lied about his military record. PSR ¶¶ 10, 103-104. Roggio worked as a contractor in Haiti after an earthquake there in 2010; his employer, Raidon Tactics, says Roggio produced fraudulent contracts, piled up $20,000 in personal expenses on a company credit card, and sold for personal profit clothing that had been donated to help the earthquake victims. PSR §§ 101-102. In the instant offense from 2014 to 2017, Roggio even used his then-wife's and his parents' addresses to circumvent the restrictions on exporting controlled items to Iraq. PSR ¶¶ 11, 16.

The biggest fraud of Roggio's career led to the crimes in this case. Kurdish officials paid Roggio millions of dollars to set up a factory in which Roggio promised to mass-produce automatic weapons. Roggio's factory only produced a handful of functioning weapons because Roggio spent much of the money on himself. PSR ¶ 18. At trial the jury saw photographs of Roggio's exotic sports cars, huge house, multi-stall garage with lifts for his many vehicles, arsenal of expensive firearms, and other luxury items. Several of Roggio's former employees testified

that he flaunted photographs of the lavish items he had purchased with the project's funds. When Roggio feared that Saar might tell Kurdish officials that Roggio was defrauding them, Roggio decided to shut Saar up. Roggio arranged for Kurdish soldiers to go to Saar's apartment, abduct him at gunpoint, put a bag over his head, and bring him to a Kurdish military compound, where over a 39-day period Roggio led multiple sessions in which he interrogated and tortured Saar. At that time, Kurdish officials still trusted Roggio, were unaware of the fraud, and believed Roggio when he said Saar had been misbehaving and needed to be taught a lesson.

Later, when Roggio began feeling pressure from Kurdish officials to start showing results, he elected to export from the United States to Iraq components that were essential to mass-producing these weapons. He did so even though he knew these were controlled items and it was against the law to export these items without a license and approval.

The torture of Saar and the export of the controlled items were consistent with Roggio's history and characteristics. The defendant's defining characteristic is his willingness to sacrifice others to serve his

own interests. When Kurdish officials unfortunately gave Roggio a great deal of power in the Sulaymaniyah area of Kurdistan, Roggio abused that power by intimidating and terrorizing the employees he had hired from Estonia to work in Kurdistan. When Roggio feared his greed could backfire and jeopardize his safety, he put Saar's life at risk. How concerned was Roggio about the possibility of Saar exposing years of fraud? "Enough to beat him. Enough to torture him," according to Roggio. Doc. 325-1 at 6. Furthermore, when Roggio worried what would happen to him if he was unable to manufacture the weapons the Kurds had paid him millions of dollars to produce, he violated his nation's export laws.

### C.   The Seriousness of the Offense

Short of murder, torture is as serious an offense that a person can commit. The victim in this case survived, thankfully, but the suffering he endured at Roggio's directive during a 6-week period was severe. As the Court will recall from Saar's chilling testimony and the corroborating testimony of the Estonian colleagues whom Roggio brought to the military compound to witness some of the torture, at

Roggio's orders:

- Soldiers hit Saar with their fists in his stomach, chest, and in particularly painful places such as his ears, nose, and throat;

- Soldiers used rubber hoses to lash Saar's legs, back, stomach, and chest;

- While Saar was prone on the floor, soldiers wearing boots jumped violently on his chest;

- Soldiers tased Saar repeatedly, again targeting sensitive parts of his body such as his groin;

- Soldiers on multiple occasions placed a plastic bag over Saar's head, causing Saar to lose consciousness and fear he was going to die; and

- A soldier named Goran applied pressure to one of Saar's fingers with a cutting tool, as Saar believed the finger was going to be cut off.

PSR ¶¶ 22-27.

Multiple Estonian witnesses testified that Roggio was instrumental in Saar's torture. PSR § 25. Roggio admitted during his testimony that he led Saar's questioning and indicated to Kurdish soldiers when Saar seemed uncooperative, after which the soldiers would beat the detainee.

In addition to ordering the physical abuse, Roggio himself at times

participated. On at least one occasion, when Saar asked for a cup of tea because his throat hurt from the abuse, Roggio took off his belt, wrapped it around Saar's neck from behind, and yanked Saar off the ground, suspending him in the air to the point where Saar lost consciousness. When Saar regained consciousness, a Kurdish soldier named Goran was beating him with a stick. PSR § 27. As Roggio himself acknowledged, Saar "experienced the overwhelming ability of mine to crush somebody." Doc. 325-1 at 7. Roggio bragged about mistreating Saar so badly that Goran was inspired to say "I've never seen anyone do it like that…. I'm learning from you." *Id.*

In addition to this repeated physical abuse, Roggio also inflicted significant emotional trauma on Saar and his loved ones in Estonia by concocting a story to justify such a prolonged detention. Saar testified that he was coerced by Roggio into writing messages to his mother and girlfriend, falsely stating that he had been arrested for violating local drug possession laws. Roggio maintained control over these communications, even boasting on tape about psychologically "breaking" Saar by telling him (falsely) that his mother and girlfriend

no longer wanted to speak with him after learning of these supposed infractions.

Roggio's export violations were also serious. The purpose of the laws that restrict the sale of certain weapons parts, tools, and services is to try to prevent the United States' advanced weapons and technology from getting into the wrong hands. When Roggio began feeling pressure to deliver the weapons the Kurds were paying him millions of dollars to produce, he put himself ahead of his country and found ways to move controlled items from the United States to Iraq. Even if Roggio had not committed torture, his offense level for the arms export violations is 34, which carries a significant Guidelines sentence of twelve and one-half to fifteen and one-half years in prison. PSR §§ 51-57.

### D.   Respect for the Law and Just Punishment

Roggio thought he was above the law when he exported controlled items from the United States to Iraq. Roggio thought he was beyond the reach of U.S. law when he tortured an Estonian citizen in the Kurdistan region of Iraq.

Roggio also felt free to lie with impunity to U.S. law enforcement

and to this Court. When the FBI first began investigating the weapons'
parts and tools exports, Roggio falsely told agents that he had not
shipped any gun parts or gun tools to Iraq. PSR § 34. When Roggio was
interviewed by U.S. Customs and Border Protection officers upon his
return to the United States from Iraq, he gave them the same cover
story that he had taught his employees to use – falsely stating that he
had been in Iraq to construct residential housing. PSR § 34. When a
search warrant was executed at his residence in 2017, Roggio falsely
told FBI and Homeland Security Investigations agents that he had been
working for the CIA in Kurdistan. PSR § 34. At trial, Roggio lied under
oath to the jury and to this Court, telling the preposterous story –
contradicted by all of the other evidence – that Kurdish officials wanted
to harm Saar and that it was Roggio who saved him. PSR § 35. Even
within his own testimony, Roggio's falsehoods contradicted each other.
At times, he claimed that Saar had been detained for drug possession.
Later, he said that Saar had offended Kurdish officials during a
business meeting, before changing his testimony again to allege that
Saar had instead angered those officials while playing pool.

Although imposing an outright life sentence is not possible due to the statutory maximum sentences for the statutes that Roggio was convicted of violating, an effective life sentence is possible by ordering the sentences on each count to be served consecutively. Anything less would fail to promote respect for the law and provide just punishment for Roggio's offenses.

### E.   Deterrence

Section 3553(a)(2)(B)'s requirement that courts consider the need "to afford adequate deterrence to criminal conduct" refers to both specific and general deterrence. *See, e.g., United States v. Burns*, No. 22-1184, 2022 WL 17336210, at *3 (3d Cir. Nov. 30, 2022). A sentence that keeps Roggio in prison for the remainder of his life is needed to fulfill both objectives. Roggio has shown no remorse for his crimes. He appears unwilling or unable to grasp the gravity of what he has done. He has shown no empathy for his victims. For example, Saar testified that at one point while he was being tortured, Roggio told him to "stop crying like a girl."[3] When Roggio was asked about that during cross-

---

[3] The government does not have a trial transcript. Quotations are based on the undersigned's notes' and recollections.

examination, he smirked and said Saar was being "melodramatic." It is doubtful that anyone who was in the courtroom during trial has any confidence that, if released from prison, Roggio would thereafter lead a law-abiding life. A sentence that is effectively life in prison is necessary for specific deterrence.

A sentence that is effectively life in prison is also necessary to achieve general deterrence. Torture is a heinous crime. The torture Roggio inflicted on Saar was cruel and lengthy. Individuals who are contemplating committing such crimes, especially U.S. nationals who think they can get away with such brutality in a foreign country, need to know that if they are caught, prosecuted, and convicted, their punishment will be severe.

### F.   Protect the Public

A sentence that keeps Roggio in prison for the rest of his life is necessary to protect the public. The evidence at trial showed that Roggio is a violent, temperamental individual who has the ability to amass an arsenal of weapons and no compunction about hurting other people. Saar testified that, more than seven years later, he still

trembles whenever he talks about his detention and torture. Although Saar was the primary victim, Roggio also traumatized the other Estonian employees whom he forced to observe portions of the torture, even directing a Kurdish soldier to tase one of them to intimidate the whole group.

Roggio's abusive conduct toward his employees continued after Saar's departure from Kurdistan. When Kurdish authorities discovered the extent of Roggio's financial fraud, he suspected his Estonian employees of leaking information and became even more paranoid and menacing toward them. After calling a group of them to his house, he struck one of them in the face and threatened several others by brandishing a pistol.

Each Estonian witnesses showed courage in traveling to the United States and facing Roggio in court. Each witness indicated in one way or another that they remain frightened of Roggio. This fear is based in part on what they saw Roggio do to Saar, but it is also based on the whole of their experience in Kurdistan, where they were subject to Roggio's manipulation, demands for "loyalty," threats, and intimidation

– to the point where they did not believe they could leave Kurdistan without Roggio's permission.[4] Several of Roggio's former employees testified that they saw his efforts to maintain contact with them after they had returned to Estonia as implicit threats through which he was demonstrating to them that he could locate them wherever they chose to live. Though they maintained the appearance of friendliness with him after they had departed Kurdistan, they did so out of fear. Roggio had made clear what he would do if these individuals betrayed him: "I'd come for you…. I'd come get you myself." Doc. 325-1 at 9. Protecting the trial witnesses and the general public requires an effective life sentence.

### G.   Avoid Unwarranted Sentencing Disparities

Roggio is the second defendant to be convicted of torture since the statute was enacted in 1994. The first defendant to be convicted of torture was sentenced to 97 years in prison. *Belfast*, 611 F.3d at 801. An equivalent or lengthier sentence would be appropriate for Roggio.

---

[4] In addition to the testimony of witnesses at trial, an individual who did not testify at trial speaks to the threatening environment Roggio created in a victim impact statement that is attached to the PSR at pages 32-33.

26

V.   **Sentencing Recommendation**

A.   **Prison Sentence**

Roggio is guilty of a violent, brutal crime that endangered another person's life and of exporting sensitive weapons' parts, tools, and services without U.S. government approvals and licenses that he knew were required but he did not have. He took the witness stand at trial and lied. He has shown no regret for his crimes. He is at offense level 48, which carries a Guidelines sentence of life in prison. The Guidelines, the nature and circumstances of the offense, the history and characteristics of the defendant, and the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate specific and general deterrence, and protect the public all call for a sentence that keeps Roggio in prison for the rest of his life.

The government respectfully requests that the Court impose the following sentence, for an effective total of 115 years in prison:

- Conspiracy to commit torture and torture: 20 years in prison each for counts 1 and 2, to be served consecutively with each other and consecutively with the sentences for the other counts;

- Conspiracy to violate the Arms Export Control Act: 5 years in prison for count 3, to be served consecutively with the sentences

for the other counts;

- Violating the Arms Export Control Act: 20 years in prison for counts 4 and 6, to be served concurrently with each other but consecutively with the sentences for the other counts;

- Violating the International Emergency Economic Powers Act: 20 years in prison for count 5, to be served consecutively with the sentences for the other counts;

- Smuggling: 10 years in prison for counts 7 and 8, to be served concurrently with each other but consecutively with the sentences for the other counts;

- Wire fraud: 10 years in prison for counts 9 and 10, to be served concurrently with each other but consecutively with the sentences for the other counts;

- Money laundering: 10 years in prison for counts 12-15, 17-19, 21-24, 27-34, and 36-39, to be served concurrently with each other but consecutively with the sentences for the other counts.

## B.   Restitution

Pursuant to 18 U.S.C. §§ 3663A and 3664(f)(1)(A), the Court shall order full restitution without consideration of the defendant's economic circumstances. PSR ¶ 128. The Mandatory Victims Restitution Act (MVRA) requires that restitution be granted to victims of violent crimes as long as a victim or victims have been identified and have suffered physical injury or monetary loss. 18 U.S.C. § 3663A. The

MVRA defines "victim" as "a person directly or proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663(a)(2). According to the MVRA, in the case of an offense resulting in bodily injury to a victim the Court may order restitution be paid in an amount equal to the cost of necessary medical and related professional services … relating to physical, psychiatric, and psychological care, including non-medical care and treatment rendered in accordance with a method of healing recognized by the law of the place of treatment. 18 U.S.C. § 3663A (b)(2)(A).

Siim Saar has made a claim for restitution in the amount of $9,7567.22 for medical and therapy treatment, together with wages withheld by Roggio during the time Saar was being tortured. PSR ¶¶ 32, 128. Such restitution is contemplated by the MVRA and should be ordered by the Court.

As noted in the presentence investigation report, victim impact statements have been requested from Saar, together with Elina Kadaj, Syuzana Abayeva, Triin Kiviking, Martin Vilist, and Heret Viltrop. PSR ¶ 33. While Saar is the only victim thus far to request restitution, the government non-the-less is requesting the Court order restitution for future medical, psychiatric and psychological care for each victim. Saar submitted a letter from a clinical psychologist indicated that he would require approximately 25 therapy sessions to recover from the trauma inflicted by Roggio's torture. PSR ¶ 32. Saar is but one of the victims who were physically and psychologically traumatized by Roggio. Roggio had each of the Estonian victims observe Saar's torture. PSR ¶ 24. Martin Vilist was tased by one of the torturers at the direction of Roggio. PSR ¶ 24. Roggio's purpose was to intimidate the other Estonians and to show them what would happen to them if they were "disloyal." PSR ¶ 24. Ross Roggio threatened the other Estonians and all of them were traumatized by what they saw. PSR ¶ 24.

Given the physical and psychological trauma experienced by each of Roggio's victims, the government requests that in addition to the

restation requested by Saar, the Court order each of the other victims receive restitution in the amount of $3500 to cover future therapy and psychological services.

## C.   Forfeiture

The superseding indictment contained forfeiture allegations. Doc. 122 at 23-26. Immediately after the jury returned a guilty verdict on all of the remaining counts, the Court held forfeiture proceedings before the jury. Doc. 338. After hearing the evidence and the summation offered by counsel, the jury retired to consider the question of forfeiture. *Id.* at 3-17. Before the jury returned its forfeiture verdict, however, the parties reached an agreement regarding forfeiture that was placed in the record. *Id.* at 17-19. The parties agreed to put the stipulated agreement in writing and file it with the Court. *Id.* at 19. The government has drafted and provided proposed stipulation to the defense, but Roggio has not signed it nor returned it to the government for filing with the Court.

Nonetheless, as shown in the forfeiture transcript, the forfeiture of the items listed in the superseding indictment were agreed to by the

parties and presented to the Court. Roggio and his counsel both agreed

to the forfeiture. *Id.* at 19. The government requests that the Court

order forfeiture when imposing the sentence in this case.


Dated: April 4, 2024                    Respectfully submitted,

                                        GERARD M. KARAM
                                        UNITED STATES ATTORNEY

                                        */s/ Todd K. Hinkley*
                                        Todd K. Hinkley
                                        Assistant U.S. Attorney
                                        Atty ID No. PA 68881
                                        235 N. Washington Ave.
                                        Scranton, PA 18503

                                        NICOLE M. ARGENTIERI,
                                        PRINCIPAL DEPUTY
                                        ASSISTANT ATTORNEY
                                        GENERAL
                                        HEAD OF THE
                                        CRIMINAL DIVISION

                                        */s/Patrick Jasperse*
                                        Patrick Jasperse
                                        Trial Attorney
                                        Criminal Division
                                        U.S. Department of Justice
                                        Human Rights and Special
                                        Prosecutions Section

MATTHEW G. OLSEN.
ASSISTANT ATTORNEY
GENERAL

*/s/ Scott A. Claffee*
Scott A. Claffee
Trial Attorney
National Security Division
U.S. Department of Justice
Counterintelligence and Export
Control Section

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that he is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on April 4, 2024, he served a copy of the above document via ECF on William J. Watt, Esq., counsel for the defendant.

s/ <u>*Todd K. Hinkley*</u>
TODD K. HINKLEY
Assistant U.S. Attorney
